IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-875 (GMS) |
| | ) | |
| LUCENT TECHNOLOGIES, INC., | ) | REDACTED VERSION |
| | ) | |
| Defendant. | ) | |
| | ) | |
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-876 (GMS) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | REDACTED VERSION |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' MOTIONS *IN LIMINE*

YOUNG, CONAWAY, STARGATT &
   TAYLOR, LLP
John W. Shaw (#3362)
Monte T. Squire (#4764)
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, DE  19899
(302) 571-6600

*Attorneys for Lucent Technologies, Inc.*

Original Filing Date:  February 8, 2007

Redacted Filing Date:  February 16, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
Wilmington, DE  19899
(302) 658-9200

*Attorneys for Cisco Systems, Inc.*

Defendants Cisco Systems, Inc. and Lucent Technologies, Inc. respectfully submit the following motions:

## Joint Motions

Exhibit 1    Motion *In Limine* No. 1 Re:  Unsupported Damages Theories

Exhibit 2    Motion *In Limine* No. 2 Re:  Uncorroborated Evidence of Conception

Exhibit 3    Motion *In Limine* No. 3 Re:  Advice of Counsel

Exhibit 4    Motion *In Limine* No. 4 Re: *Telcordia v. Fore Systems* License and Settlement Agreements

## Cisco's Motion

Exhibit 5A    Cisco's Motion *In Limine* No. 5 Re:  Hyperbolic and Prejudicial Argument or Evidence

## Lucent's Motion

Exhibit 5B    Lucent's Motion *In Limine* No. 5 Re:  References to the Alcatel-Lucent Merger

Counsel for the Defendants certify that, pursuant to D. Del. LR 7.1.1, the subject of the foregoing motions has been discussed with counsel for the Plaintiff and that the parties have not been able to reach agreement thereon.  Counsel for the Defendants further certify that counsel for Plaintiff refused to confer about the subject of Plaintiff's motions *in limine*.

YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

*/s/ John W. Shaw*

_____

John W. Shaw (#3362)
Monte T. Squire (#4764)
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, DE  19899
(302) 571-6600
 *Attorneys for Lucent Technologies, Inc.*

Original Filing Date: February 8, 2007

Redacted Filing Date: February 16, 2007

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

*/s/ Leslie A. Polizoti*

_____

Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
Wilmington, DE  19899
(302) 658-9200
 *Attorneys for Cisco Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to Steven J. Balick, John G. Day, Tiffany Geyer Lydon, Israel S. Mayergoyz, David A. Nelson, Neilesh R. Patel, John W. Shaw, John M. Williamson, Jack B. Blumenfeld, Jessica L. Davis, Sonal N. Mehta, Leslie A. Polizoti, and Edward R. Reines.

I further certify that I caused copies of the foregoing document to be served on February 16, 2007 upon the following in the manner indicated:

**BY HAND**

John G. Day
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801


John W. Shaw
YOUNG CONAWAY STARGATT
  & TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, DE 19801

**BY FEDERAL EXPRESS on 2/16/07**

Don O. Burley
FINNEGAN, HENDERSON,
  FARABOW, GARRETT & DUNNER
901 New York Avenue
Washington, DC 20001

David A. Nelson
LATHAM & WATKINS
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606

**BY ELECTRONIC MAIL**

Steve Balick (sbalick@ashby-geddes.com)
Tiffany Geyer Lydon (tlydon@ashby-geddes.com)
John Day (jday@ashby-geddes.com)
John Williamson (john.williamson@finnegan.com)
York Faulkner (york.faulkner@finnegan.com)
Don Burley (don.burley@finnegan.com)
Israel Mayergoyz (sasha.mayergoyz@lw.com)
David Nelson (david.nelson@lw.com)
Neilesh Patel (neilesh.patel@lw.com)
John Shaw (jshaw@ycst.com)

*/s/ Leslie A. Polizoti(#4299)*
lpolizoti@mnat.com

# Exhibit 1

# Motion in Limine No. 1 and Exhibits

# Filed Under Seal

# Exhibit 2

**MOTION *IN LIMINE* NO. 2 RE: UNCORROBORATED EVIDENCE OF CONCEPTION**

Defendants move *in limine* to preclude Telcordia from arguing that the invention claimed in U.S. Patent No. Re. 36,633 ("the '633 patent") was conceived before November 4, 1991, and from introducing uncorroborated evidence of prior invention.

## I.     INTRODUCTION

After Telcordia refused to voluntarily reveal the earliest date of conception for the '633 patent, this Court ordered it to do so. D.I. 54 [Oct. 11, 2005 Tr.] at 41:4-14.[1]  In compliance with that Order, Telcordia identified November 4, 1991 as the date of invention that it believed it could corroborate.  This position was unqualified.  Indeed, subsequent to this Court's order, Telcordia represented in a supplemental interrogatory response that it would not assert a conception date earlier than November 4, 1991.  Exh. 2-A [Jan. 20, 2006 Sixth Supp. Resp. to Cisco] at 5-7.  Telcordia re-confirmed this position just weeks before the close of fact discovery, when its 30(b)(6) designee on conception testified that he had no information suggesting that the subject matter claimed in the '633 patent was conceived before November 4, 1991.  Exh. 2-B [May 18, 2006 Sincoskie Tr.] at 227:16-21.

Now, however, Telcordia is trying to claim an earlier conception date to avoid invalidation.  Information that Bellcore (Telcordia's predecessor) has had from the outset of this case shows that someone other than the named inventors conceived of the '633 invention prior to November 4, 1991.  Specifically, on August 26, 1991, Pierre Adam (who is not named as an inventor on the '633 patent and who never worked at Bellcore) sent a fax to Bellcore disclosing the key ideas claimed in the '633 patent.  By response letter dated September 4, 1991, named inventor Chi-Leung Lau confirmed that he was basing his SRTS work on the ideas conceived of

---

[1]   All D.I. numbers are from *Telcordia v. Lucent Technologies Inc.*, C.A. No. 04-875-GMS.

1

by Pierre Adam. This September 4, 1991 letter is the first corroborated material from the named inventors in the record, and it shows derivation – not invention.

Correctly recognizing that its case is in serious jeopardy unless it can somehow prove invention before Mr. Adam's August 26, 1991 fax, Telcordia submitted – long after the completion of fact discovery – a supplemental interrogatory response making clear that it would attempt to rely on an invention date before its claimed November 4, 1991 date (and before the August 26, 1991 Pierre Adam invention date). Exh. 2-C [Sept. 8, 2006 Supp. Resp. to Cisco].

Telcordia should not be permitted to do this for two reasons. First, Telcordia's belated attempt to claim an invention date before November 4, 1991 is in blatant disregard of this Court's order, is without substantial justification, and is not harmless. Second, Telcordia's "evidence" of a pre-August 1991 conception is not corroborated and is thus legally improper. Its presentation to the jury would invite error and is grossly prejudicial in view of the long-respected rule requiring corroboration of invention dates.

## II.    TELCORDIA'S ATTEMPT TO ESTABLISH A CONCEPTION DATE EARLIER THAN NOVEMBER 4, 1991 IS IMPROPER IN VIEW OF THIS COURT'S ORDER

Up until October 11, 2005, Telcordia waffled as to the conception date for the invention claimed in the '633 patent, stating only that it was "*at least* as early as November 4, 1991." However, on October 11, this Court attempted to end the uncertainty by definitively ordering Telcordia to provide a conception date. It did so, and chose November 4, 1991. Then, on September 8, 2006, almost 11 months later, and after fact and expert discovery closed, Telcordia served a supplemental interrogatory response claiming that Dr. Fleischer's uncorroborated testimony established a conception date ███████████████ and that the Lau memorandum with a 1991 date shows that the inventors were in possession of subject matter

2

corresponding to the invention on June 6, 1991. Exh. 2-C [Sept. 8, 2006 Supp. Resp. to Cisco]. The Court should hold Telcordia to its November 4, 1991 conception date.

Disturbingly, Telcordia continues to maintain, even after serving its supplemental interrogatory response, that ███████████████████████████████████████████ ████████████████████████████████████████████████████████ Exh. 2-D [Sept. 13, 2006 email from Don Dunner]. It does so through an illogical shell game. For example, with regard to the Lau memo, Telcordia maintains that, although it may not rely on that memo to show conception, it may rely on it to show that Mr. Adam's August 26, 1991 fax is not prior art. In fact, these two purposes are one in the same, and the Court should not permit Telcordia's attempt to camouflage the uncorroborated and dubious evidence of conception it plans to introduce. Telcordia has repeatedly represented to the Court that "[t]here is going to be no change in our conception date." Exh. 2-E [Sept. 18, 2006 Tr.] at 54:3-4. That date is November 4, 1991, and the Court should not permit Telcordia's attempted end-run around this Court's order.

## III.    TELCORDIA CANNOT RELY ON UNCORROBORATED INVENTOR EVIDENCE TO ESTABLISH A CONCEPTION DATE

The strength of this Court's order is sufficient to preclude Telcordia from introducing evidence of conception prior to November 4, 1991. However, this Court should also exclude Telcordia's evidence because it consists only of legally improper uncorroborated inventor claims.

Corroboration is required "where a party seeks to show conception through the oral testimony of an inventor. This requirement arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d

1572, 1577 (Fed. Cir. 1996) (internal citations omitted). "Even the most credible inventor testimony is a *fortiori* required to be corroborated by independent evidence, which may consist of documentary evidence as well as the testimony of non-inventors." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171-72 (Fed. Cir. 2006). In fact, "[i]t is well established that joint inventors cannot corroborate each others' testimony as to conception and reduction to practice." *Marketel Int'l, Inc. v. Priceline.com*, 138 F. Supp. 2d 1210, 1213 (N.D. Cal. 2001) (internal citations omitted). These principles apply also to uncorroborated documents originating from an inventor. *See Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) ("[R]egardless of the contents of the notebooks, unwitnessed laboratory notebooks on their own are insufficient to support [the inventor's] claim of co-inventorship.") (internal citations omitted). Simply put, an inventor's own unwitnessed account lacks the vital independence and impartiality needed to corroborate a conception date, regardless of whether it is on paper.

Nevertheless, Telcordia has suggested that it intends to rely heavily on such uncorroborated inventor materials. Specifically, Telcordia has stated that evidence establishing a conception date in the ███████████████ is the █████████████████████ ████████ Telcordia has alternatively stated that an uncorroborated memorandum, supposedly from June 6, 1991 and supposedly from the named inventor, Chi-Leung Lau, shows that he was ██████████████████████ of the disputed concepts. Exh. 2-C [Sept. 8, 2006 Supp. Resp. to Cisco] at 3.

Telcordia has identified no documents, no third party testimony, or any other independent physical exhibits – nothing – to corroborate Dr. Fleischer's testimony. Although Dr. Fleischer testified that he did his best to fulfill Bellcore requirements that patentable ideas be recorded in a signed witnessed lab notebook, no such laboratory notebooks were produced in this case. Exh.

2-F [May 11, 2006 Fleischer Tr.] at 194:12-195:5.   For this reason, Dr. Fleischer's uncorroborated testimony regarding conception before September 4, 1991 should be excluded. With regard to the Lau memorandum, Telcordia wrongly suggests that the following material provides corroboration: (1) expert witness testimony given more than 15 years after the Lau memorandum by individuals entirely unconnected to the alleged inventive acts; (2) Pierre Adam's August 26, 1991 fax (which makes no mention whatsoever of the Lau memo and, on the contrary, proves that Lau derived his ideas from France Telecom); (3) deposition testimony from two former France Telecom employees that includes no discussion of Lau's memo; (4) the deposition testimony of Bruce Kittams, who stated that he does not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of the Lau memo; and (5) the self-serving inventor testimony and unwitnessed documents.[2]

In short, Telcordia's supplemental interrogatory response points to no independent evidence tied to the alleged 1991 inventive acts that can corroborate either Fleischer's testimony or Lau's memorandum.   Telcordia appears to understand this, because it has stated that introduction of the Lau memo "is not a change in Telcordia's contention regarding the conception date of the claimed invention that it believes it can provide with *corroborated* evidence." Exh. 2-D [Sept. 13, 2006 email from Don Dunner] (emphasis added).

V.     CONCLUSION

For the foregoing reasons, Telcordia should be precluded from introducing any evidence suggesting a conception date for the '633 patent before November 4, 1991.

---

[2]  Even if these impermissible "corroboration" materials were considered, they demonstrate, on the contrary, that the Lau memorandum is *un*corroborated.   For example, co-inventor Fleischer admitted ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Exh. 2-G [May 12, 2006 Fleischer Tr.] at 409:14-410:7. Indeed, after reviewing the subject matter of the '633 patent for three days, Fleischer had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [May 12, 2006 Fleischer Tr.] at 420:22-421:12.



REDACTED

B

REDACTED

C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 04-876-GMS |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## TELCORDIA TECHNOLOGIES, INC.'S SUPPLEMENTAL RESPONSE TO CISCO'S INTERROGATORY NO. 8

Plaintiff Telcordia Technologies, Inc. ("Telcordia") provides this supplemental response

to Defendant Cisco Systems, Inc.'s Interrogatory No. 8, subject to and without waiving any of its

previously stated general and specific objections.

### INTERROGATORY NO. 8:

For each Claim-in-Suit, state the dates on which the claimed invention was conceived and
reduced to practice, and identify all evidence corroborating such conception and reduction
practice, including without limitation, any acts of diligence leading to such reduction to practice,
and including the identification of each person and all documents that can corroborate such
conception, reduction to practice and/or diligence.

### SUPPLEMENTAL RESPONSE:

Telcordia incorporates by reference each of the applicable general objections as though

fully set forth herein.  Telcordia objects to this interrogatory to the extent it seeks information

that is protected by the attorney-client privilege or the attorney work product immunity.

Pursuant to an agreement between the parties, the discovery requests of both Cisco and

Telcordia that are directed to the '306 patent and/or the '633 patent, or to the "Patents-In-Suit,"

shall be interpreted to cover not only the '306 patent and/or the '633 patent, but also the '763

patent.  Telcordia's supplementation of this interrogatory with information regarding the '763

patent incorporates and is subject to all of the General and Specific Objections already asserted as to this interrogatory.

Subject to and without waiving any of these general and specific objections and reserving its right to supplement its response as discovery proceeds, Telcordia responds to this interrogatory as follows:

### '306 Patent

Based upon information currently available to Telcordia and subject to updating, dynamic time division multiplexing (DTDM) concepts were conceived by one or more of the named inventors of the '306 patent at least as early as September 17, 1986. *See* BEL 16804-16821. The earliest corroborated conception of the subject matter claimed in the claims of the '306 patent is at least as early as November 19, 1986. *See* BEL 134457-134463. Other documents reflect the conceived subject matter of the claims of the '306 patent, including BEL 040206-040227; BEL 048208-408233; and "Dynamic TDM – A Packet Approach to Broadband Networking," IEEE Int'l Conf. on Comm. '87 (June 10, 1987).

The earliest reduction to practice of the subject matter of the claims of the '306 patent currently known to Telcordia was constructive and occurred on November 10, 1987, the filing date of the '306 patent. Telcordia is not relying on diligence between its conception of the subject matter of the claims of the '306 patent and the filing date of the '306 patent.

Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu, the named inventors of the '306 patent, and Kenneth Rubenstein, the patent attorney associated with the constructive reduction to practice, are individuals likely to have knowledge regarding dates of conception and reduction to practice of the claims of the '306 patent.

*'633 Patent*

Telcordia currently contends that the independently corroborated conception date of the subject matter claimed in the asserted claims of the '633 patent by the named inventors is Friday, November 1, 1991. *See* Lau and Fleisher, "Synchronous Residue-TS:  A Compromise For SFET/TS" (Nov. 4, 1991); Declaration of Kittams, TELC 0006122-25; Kittams deposition testimony; Lau deposition testimony; Fleischer deposition testimony.  Later documents reflecting conception of the subject matter claimed in the asserted claims of the '633 patent by the named inventors include "Synchronous Residue-Time Stamp:  A Combination of SFET/TS" (Dec. 1991); and Lau and Fleischer, "Synchronous Techniques for Timing Recovery in BISDN" (Feb. 27, 1992).  The earliest conception date of the subject matter claimed in the asserted claims of the '633 patent by the named inventors is the first quarter of 1991.  The evidence reflecting this earliest conception date is the deposition testimony of Dr. Fleischer.

In view of an expert opinion and expert testimony recently offered by Cisco, Lucent, and Alcatel in district court litigation concerning a private communication from France Telecom to Dr. Kittams dated August 26, 1991, Telcordia further contends that June 6, 1991, is the independently corroborated date on which the named inventors of the '633 patent were clearly in prior possession of subject matter which corresponds to the subject matter that defendants argue is supposedly disclosed in that private communication.  Documents and evidence reflecting prior possession of that subject matter by the named inventors include the deposition testimony of Dr. Jones, the validity expert for Cisco, Lucent, and Alcatel on the '633 patent in the district court litigation; the text of the private communication from France Telecom to Dr. Kittams dated August 26, 1991, TELC 0006512; Dr. Lau's June 6, 1991, memo, TELC 0373769-71; Dr. Fleischer's handwritten notes, TELC 3150179-82;  TELC0006716-TELC0006727; U.S. Patent

No. 4,961,188; the Expert Report of Dr. Clark, July 21, 2006; the deposition testimony of Mr. Adam; the deposition testimony of Mr. Houdoin; the deposition testimony of Dr. Kittams; the deposition testimony of Dr. Lau; and the deposition testimony of Dr. Fleischer.

Discovery and Telcordia's investigation is continuing, and if additional evidence is discovered that demonstrates earlier dates of corroborated conception or prior possession of relevant subject matter by the named inventors, such as any of the records identified by Dr. Fleischer during his deposition, Telcordia will supplement its interrogatory response as required by Fed. R. Civ. P. 26(e).

The reduction to practice of the subject matter claimed in the asserted claims of the '633 patent was constructive and occurred on October 30, 1992, i.e., the filing date of the patent application that issued as the '978 patent. Telcordia is not relying on diligence between the corroborated date of conception of the subject matter claimed in the asserted claims of the '633 patent and the filing date of the '978 patent.

Paul E. Fleischer and Chi-Leung Lau, the named inventors of the '633 patent, and Stephen M. Gurey, the patent attorney associated with the constructive reduction to practice, are individuals likely to have knowledge regarding dates of conception and reduction to practice of the asserted claims of the '633 patent.

### '763 Patent

Telcordia currently contends that the independently conception date of the subject matter for the '763 patent is September 30, 1986. *See* Lau, "Survivable Architectures and Implementations for a High Speed SONET Ring" (Sept. 30, 1986). Later documents reflecting conception of the subject matter claimed in the asserted claims of the '763 patent by the named

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
220 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Richard H. Smith
Don O. Burley
Houtan K. Esfahani
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

York M. Faulkner
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
11955 Freedom Drive
Reston, Virginia 20190-5675
(571) 203-2700

Dated:  September 8, 2006

173014.1

D

```
----- Original Message -----
From: "Williamson, John" [John.Williamson@finnegan.com]
Sent: 09/13/2006 09:33 PM
To: Edward Reines
Cc: <Steven.Cherny@lw.com>; <david.nelson@lw.com>; Jessica Davis; Sonal
Mehta; Dunner, Don" <Don.Dunner@finnegan.com>
Subject: RE: Telcordia v. Lucent, C.A. No. 04-875-GMS;  Telcordia v. Cisco,
C.A. No. 04-876-GMS
```

Ed,

Don is in London at a meeting of the American College of Trial Lawyers, but he has asked me to send the email below.

Ed:

I am writing in response to your request that we withdraw our supplemental interrogatory response on invention dates.  Your characterization of our supplement as an "attempt to change the invention date" is incorrect.  As a result, we will not withdraw our supplemental response.

At the outset, your interrogatory no. 8 asks for, and Telcordia's answer provides, "the dates on which *the claimed invention* was conceived and reduced to practice." The supplemental response states that "Telcordia currently contends that the independently corroborated conception date of the subject matter claimed in the asserted claims of the '633 patent by the named inventors is Friday, November 1, 1991." I have been advised that this date reflects the facts as explained by Dr. Kittams during his April 28, 2006, deposition.  While this date differs by three days from the November 4, 1991, date set forth in our earlier response, I did not appreciate until this evening that the two dates were different, and accordingly we will rely only on the original November 4, 1991, date set forth in the earlier interrogatory response.  As so changed, Telcordia's contentions on conception and reduction to practice of *the claimed invention* of the asserted '633 patent claims remain unchanged.

Telcordia's supplemental response further states that there is uncorroborated deposition testimony from Dr. Fleischer wherein he states, in response to your questions, that "the clear and definite concept of SRTS" was known to the inventors in the first quarter of 1991 (*see* May 11, 2006, Fleischer Dep. at 119-22).  That is not a change in Telcordia's contention regarding the conception date of the claimed invention that it believes it can prove with corroborated evidence .  It is merely an observation regarding existing deposition testimony elicited by Cisco after the October 11, 2005, hearing.

The supplemental interrogatory also explains that on June 6, 1991, the inventors were in possession of the subject matter allegedly provided to them in an August 26, 1991, France Telecom communication. This is not a new invention date because the June 6, 1991, date is not a date of conception of *the claimed invention* but only relates to features of the claimed invention .  In fact, it is questionable whether Telcordia is even required to disclose that information in response to Interrogatory No. 8.  However, in light of opinions and testimony offered by defendants' expert regarding the August 26, 1991, France

Telecom communication, Telcordia thought it prudent to provide its contention that the inventors were already in possession of the information defendants contend was disclosed in the August 26 communication. In other words, without changing any dates of invention of the claimed invention, Telcordia's supplemental answer merely provides its contention that the August 26, 1991, France Telecom communication cannot support an invalidity defense because the inventors were already in possession of that information. *See, e.g.* , *In re Stryker* , 435 F.2d 1340 (C.C.P.A 1971); *In re Stempel* , 241 F.2d 755 (C.C.P.A. 1957).

To be clear, Telcordia is not contending that it has corroborated evidence that *the claimed invention* was conceived on June 6, 1991. As such, there has been no violation of Judge Sleet's instructions during the October 11, 2005, hearing, and Telcordia fully intends to comply with its prior representation that it will not rely on a conception date of the claimed invention prior to November 4, 1991, in this proceeding.

Sincerely,

Don Dunner

---

**From:** edward.reines@weil.com [mailto:edward.reines@weil.com]
**Sent:** Tuesday, September 12, 2006 8:26 PM
**To:** Dunner, Don
**Cc:** Steven.Cherny@lw.com; david.nelson@lw.com; Williamson, John; jessica.davis@weil.com; Sonal Mehta
**Subject:** Telcordia v. Lucent, C.A. No. 04-875-GMS; Telcordia v. Cisco, C.A. No. 04-876-GMS

Don,

We are in receipt of Telcordia's "supplemental" interrogatory responses in the above-captioned matters in which Telcordia purports to change its claimed invention date. This is improper, as explained in our letter to the Court last Friday. Among other things, it violates the Court's Order at the October 11, 2005 hearing, as well as Telcordia's written commitment not to attempt to change the invention date.

Because Telcordia has not withdrawn this supplement, we will raise this issue with the Court.

Sincerely,

Ed

Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel (650) 802-3022
Fax (650) 802-3100

< END >

---

**The information contained in this
email message is intended only for use of the individual or entity
named above. If the reader of this message is not the intended
recipient, or the employee or agent responsible to deliver it to
the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in
error, please immediately notify us by email (postmaster@weil.com),
and destroy the original message. Thank you**

This e-mail message is intended only for individuals) to whom it is addressed and may contain
information that is privileged, confidential, proprietary, or otherwise exempt from disclosure
under applicable law. If you believe you have received this message in error, please advise the
sender by return e-mail and delete it from your mailbox Thank you.

E

1

1                    IN THE UNITED STATES DISTRICT COURT
                     IN AND FOR THE DISTRICT OF DELAWARE
2
                             - - -
3      TELCORDIA TECHNOLOGIES INC.,        :    Civil Action
                                           :
4                  Plaintiff/Counterclaim  :
                   Defendant,              :
5                                          :
                                           :
6          v.                              :
                                           :
7      LUCENT TECHNOLOGIES, INC.,          :
                                           :
8                  Defendant/Counterclaim  :
                   Plaintiff.              :    No. 04-874-GMS
9                            - - -
       TELCORDIA TECHNOLOGIES, INC.,       :    Civil Action
10                                         :
                   Plaintiff/Counterclaim  :
11                 Defendant,              :
                                           :
12         v.                              :
                                           :
13     LUCENT TECHNOLOGIES INC.,           :
                                           :
14                 Defendant/Counterclaim  :
                   Plaintiff.              :    No. 04-875-GMS
15                           - - -
       TELCORDIA TECHNOLOGIES, INC.,       :    Civil Action
16                                         :
                   Plaintiff/Counterclaim  :
17                 Defendant,              :
                                           :
18         v.                              :
                                           :
19     CISCO SYSTEMS, INC.,                :
                                           :
20                 Defendant/Counterclaim  :
                   Plaintiff.              :    No. 04-876-GMS
21                           - - -

22                     Wilmington, Delaware
                    Monday, September 18, 2006
23                        10:00 a.m.
                    TELEPHONE CONFERENCE
24                           - - -
       BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
25

54

1    So there is no change in our interrog response,
2  particularly in view of the discussions we had or e-mails we
3  sent to counsel prior to this weekend. There is going to be
4  no change in our conception date. There will be no change
5  in our reduction to practice date. To the extent defendants
6  are now arguing that this August 26th letter is not a 102
7  reference but it discloses pieces of the invention, we are
8  allowed to show that the inventors in fact communicated
9  those pieces to France Telecom beforehand.
10    So we believe the discovery supplementation was
11  warranted in view of the circumstances. We are willing to
12  stand by the conception date. We are willing to stand by
13  the reduction to practice date. And we also, however,
14  believe we are entitled to bring out facts which clearly
15  were disclosed and in evidence. The deposition of Mr.
16  Kittams, the deposition of Mr. Lau, the deposition of Dr.
17  Fleischer, the deposition of the three people from France
18  Telecom all happened after the interrog response.
19    We only got their expert contentions on
20  invalidity recently, and the deposition of their '633
21  invalidity expert only happened on August 15. That is the
22  reason for the supplementation now and that is the reason we
23  are pointing out that under Section 103 and under the
24  Stryker case they don't have a case with respect to this
25  August 26 letter, just as the Patent Office found when it

55

1  allowed the claims over it.
2    MR. REINES: Your Honor, may I respond briefly?
3    THE COURT: Yes. I am trying to fathom where
4  the issue here is. Go ahead.
5    MR. REINES: The first thing is, the
6  supplemental interrog response is Exhibit 11 to our
7  submission, that is Cisco's and Lucent's submission of
8  September 11.
9    THE COURT: I don't have that in front of me.
10    MR. REINES: As the Court --
11    THE COURT: Counsel, counsel -- Mr. Reines, you
12  got to listen up. I don't have that in front of me. Unless
13  you can tell me -- I don't think I have that in any of the
14  attachments for today's summary judgment discussion. Do I?
15    MR. REINES: Yes. It is Exhibit 11 to the
16  September 11 letter.
17    THE COURT: Okay.
18    MR. REINES: I am sorry, sometimes the phones
19  cut out. I apologize for that.
20    THE COURT: Go ahead.
21    MR. REINES: So what is undisputed is that their
22  original conception date, if you turn to the '633 patent,
23  that is the subject matter here, is November 1, 1991. I
24  think it was originally November 4, 1991. That is a minor
25  issue.

56

1    If you look down three sentences or four
2  sentences, it states, the earliest conception date of the
3  subject matter claimed in the asserted claims of the '633
4  patent.
5    THE COURT: I see the sentence. Slow down for
6  Mr. Maurer's sake.
7    The earliest conception date..., let's go from
8  there.
9    MR. REINES: The earliest conception date of the
10  subject matter claimed in the asserted claims of the '633
11  patent by the named inventors is the first quarter of 1991.
12  That's different than November 1991. I don't know what Mr.
13  Anzalone's basis is for talking about Section 103 and Oddzon
14  and everything else. There is no reference to any of those
15  things in here.
16    MR. ANZALONE: That is in the next paragraph,
17  Evidence.
18    MR. REINES: What the reference is is an attempt
19  to -- in black and white, we are all looking at the
20  paragraph, what was originally a November 1991 conception
21  date. That is what Telcordia said it was presenting and
22  that's what it said it wasn't going to move from. Here,
23  they include a number of different changes. One of them is
24  the attempt to change the conception date to first quarter
25  of 1991.

57

1    THE COURT: Well, he says, to the extent that
2  that may contradict this writing, Mr. Anzalone has indicated
3  on the record here that that is not plaintiff's intention.
4    MR. ANZALONE: That's correct, Your Honor. We
5  have indicated and we did send an e-mail before this call,
6  we indicated we will stick with the November 4 conception
7  date. We did add this paragraph and we said right in there,
8  there is no reason to speculate as Mr. Reines did and assign
9  other motives that would be put in the response in view of
10  an expert opinion and expert testimony recently offered
11  (inaudible) Alcatel.
12    And that explains why we went into this because
13  we are now making a 103 contention. They changed their
14  contentions. And we are entitled to rely on Stryker, which
15  is controlling case law, and show pieces of the claim --
16    THE COURT: Counsel, what I need to do is this
17  on this one. I have actually a sentencing scheduled that
18  was supposed to start at 11. Are you able to continue and
19  possibly resolve this on your own?
20    UNIDENTIFIED SPEAKER: I believe so, Your Honor.
21    UNIDENTIFIED SPEAKER: We will put our best
22  effort to do so, Your Honor.
23    THE COURT: There is that motion to preclude
24  something. What is that all about?
25    MR. ANZALONE: Yes, Your Honor. We filed a

F

REDACTED

G

REDACTED

# Exhibit 3

**MOTION *IN LIMINE* NO. 3 RE: ADVICE OF COUNSEL**

Defendants move *in limine* to preclude Telcordia from introducing evidence of Defendants' decision not to disclose advice of counsel pertaining to the '763 or '633 patents, or to argue that Defendants did not properly seek legal counsel.

## I. TELCORDIA SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE RELATING TO CISCO'S RELIANCE ON PRIVILEGE FOR ADVICE OF COUNSEL

Pursuant to this Court's scheduling order, Cisco was required to disclose within 14 days after issuance of the claim construction order whether it intended to rely on advice of counsel as a defense to patent infringement. D.I. 20.[1] Cisco declined this election, choosing to invoke the attorney-client privilege instead. The Court's scheduling order then barred Telcordia from taking discovery on any advice of counsel that Cisco may have obtained. *Id.*

Consistent with its decision, Cisco asserted privilege in response to discovery requests seeking advice of counsel and served a privilege log with over 400 entries. Such documents include legal advice provided by Cisco's then in-house patent counsel, Robert Barr. In addition, it is a matter of record that, before this case even started, Cisco retained Baker & Botts to provide advice relating to Telcordia's infringement claims. Indeed, over a multi-year period prior to the initiation of this lawsuit, Telcordia negotiated with Baker & Botts about the patent infringement claims against Cisco at issue here.[2]

Telcordia has now made clear that it will attempt to use Cisco's decision to rely on

---

[1]    All D.I. numbers are from *Telcordia v. Cisco Systems, Inc.*, C.A. No. 04-876-GMS.

[2]    In its trial brief, Telcordia asserts that Cisco failed to "identify any legal advice – even on its privilege log – during discovery in this case." Telcordia Trial Br. at 10. As noted above, Telcordia's assertion is incorrect. Furthermore, to the extent that Telcordia alleges that Cisco failed to log any formal opinion letters, Cisco did in fact log all legal advice save post-suit communications which were excluded per the parties' agreement. Thus, any argument that Cisco failed to identify formal opinion letters is moot.

privilege for advice of counsel to ████████████████████████████████████████

████████████████████████████[3]  Telcordia Trial Br. at 10.  Asking the jury to infer willfulness

based on the absence of evidence of advice of counsel is contrary to the policy behind the

attorney-client privilege and prohibited by *Knorr-Bremse*.   More importantly, it is unfairly

prejudicial because it invites the jury to speculate blindly as to the content of any advice.

### A.    RECENT CASE LAW SEVERELY LIMITS THE WEIGHT ATTACHED TO A DEFENDANT'S DECISION NOT TO IDENTIFY ADVICE OF COUNSEL

The Federal Circuit has been clear that "no adverse inference that an opinion of counsel

was or would have been unfavorable flows from an alleged infringer's failure *to obtain or*

*produce* an exculpatory opinion of counsel." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH*

*v. Dana Corp.*, 383 F.3d 1337, 1341 (Fed. Cir. 2004).[4]  It is Telcordia's burden, as the patentee,

to present threshold evidence of culpable behavior on the part of the alleged infringer, and it

cannot do this "merely by proof that the accused is asserting the attorney-client privilege to

withhold an opinion of counsel." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354,

1368 (Fed. Cir. 2006); *see also Knorr*, 383 F.3d at 1344 ("[N]o adverse inference shall arise

from invocation of the attorney-client and/or work product privilege.").  Thus, according to the

Federal Circuit, a defendant's failure to rely on advice of counsel has no probative value.

As Judge Jordan has noted, in light of *Knorr-Bremse*, there is no reason why a patentee

should be permitted to introduce evidence at trial about an opinion of counsel that was not

disclosed:

> I have never yet heard anybody make a reasoned argument to me

---

[3]  Indeed, Telcordia has designated portions of deposition transcripts where Cisco's attorneys instructed Mr. Barr on the basis of privilege.  *See, e.g.*, Exh. 3-A [May 27, 2006 Barr Tr.] at 32-33, 35-38, 76, 78, 88.

[4]  Emphases supplied throughout.

2

> why it could be put before a jury after the *Knorr-Bremse* opinion
> that an opinion was received but not tendered. And in the absence
> of that, I'm inclined to think there probably isn't a reasoned
> argument. That the only reason for putting it in front of a jury
> would be so that they draw an adverse inference, which was what
> *Knorr-Bremse* says could not happen.

Exh. 3-B [*Pharmacia & Upjohn Co. v. Sicor Inc.*, C.A. No. 04-833 (D. Del.), Transcript of

October 11, 2005 Telephone Conference] at 38:8-16. For the exact same reasons, the Model

Patent Jury Instructions for the Northern District of California explicitly exclude from

consideration reliance on advice of counsel *unless* the accused is relying on advice of counsel as

a defense. Exh. 3-C [N.D. Cal. Model Patent Jury Instructions] at 22 n.7.

It is inappropriate for Telcordia to attempt to have the jury – even tacitly – draw a

negative inference of willfulness from Cisco's invocation of the privilege. Indeed, *Knorr-*

*Bremse* specifically condemns any adverse inference from "an alleged infringer's failure *to*

*obtain*" advice. *Id.* at 1341. Any suggestion that Cisco did not seek legal advice is further

improper because it would require Cisco to invoke the privilege in front of the jury, which itself

is unfairly prejudicial. *See United States v. Tomaiolo*, 249 F.2d 683, 690 (2d Cir. 1957).

## B.    INVITING THE JURY TO SPECULATE AS TO THE ADVICE OF COUNSEL IS UNFAIRLY PREJUDICIAL

It is a long-standing principle that evidence that invites the jury to speculate is generally

excluded as unfairly prejudicial under Federal Rule of Evidence 403. *See, e.g., McAvey v. Lee,*

260 F.3d 359, 374 (5th Cir. 2001).

In this case, the danger from jury speculation is particularly acute. In *McKesson Info.*

*Solutions, Inc. v. Bridge Med., Inc.*, 434 F. Supp. 2d 810 (E.D. Cal. 2006), the accused infringer

received advice of counsel as to infringement, but invoked the privilege regarding the contents of

that advice. *Id.* at 811. As is the case here, plaintiff attempted to introduce evidence of

defendant's position to show willful infringement. The defendant moved *in limine* to prevent the

introduction of such evidence. The court weighed the interests of the parties, "consider[ed] the

dictates of *Knorr-Bremse* and its emphasis on the sanctity of the privilege," and ultimately held:

> Were the court to permit such evidence, even with a cautionary
> instruction imposing *Knorr's* limitations (of no adverse inference),
> the jury would nevertheless be left to speculate why [defendant]
> would not reveal its counsel's opinion. It is inescapable that the
> jury would likely conclude that [defendant] received an
> unfavorable opinion, otherwise [defendant] would reveal it. This is
> precisely the negative inference *Knorr* prohibits.

*Id.* at 812. Telcordia is trying to do the same thing that the plaintiff in *McKesson* tried, and there

is the same risk that the jury will draw a prohibited inference based on speculation. Accordingly,

any and all evidence and argument pertaining to Cisco's alleged failure to seek advice of counsel

or decision to assert the privilege should be excluded.

## II.    TELCORDIA SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE THAT LUCENT DID NOT OBTAIN ADVICE OF COUNSEL

Telcordia does not allege that Lucent willfully infringed the '763 patent. Any reference

by Telcordia to the fact that Lucent does not rely upon advice of counsel regarding the '763

patent is therefore irrelevant and highly prejudicial.

Although Telcordia alleges that Lucent willfully infringed the '633 reissue patent and

bears the burden of proving this allegation by clear and convincing evidence, at this late stage of

submitting a Pretrial Order, Telcordia still cannot identify a date on which it contends Lucent

first had notice of the '633 patent prior to the commencement of this lawsuit. *See* Exh. 3-D [May

4, 2006 DePinho Tr.] at 199:4-200:3. Indeed, consistent with the testimony of Telcordia's own

Rule 30(b)(6) witness, Lucent did not have notice of the '633 patent until shortly before

Telcordia amended its complaint to assert that patent – almost a year after it filed the original

complaint asserting only the '306 patent.[5] By the time Telcordia amended its complaint, Lucent

---

[5]    Though Lucent was aware of the '633 patent after Telcordia originally asserted the patent

had retained litigation counsel to defend against the original complaint. It is both misleading and prejudicial for Telcordia to argue to the jury that Lucent did not have advice of counsel when Lucent was nearly a year into this litigation before having notice of the '633 patent.

Telcordia bears the burden of establishing a *prima facie* case of when Lucent had actual notice of the '633 patent. *See Imonex Servs. v. Munzprufer DietmarTrenner GmbH*, 408 F.3d 1374, 1377 (Fed. Cir. 2005). "'The patentee must present threshold evidence of culpable behavior' before the burden of production shifts to the accused to put on evidence that it acted with due care." *Golden Blount*, 438 F.3d at 1368. Accordingly, the Court should preclude Telcordia from making any reference that Lucent did not obtain advice of counsel when Telcordia cannot establish a *prima facie* case of notice of the '633 patent.

Under such circumstances any reference that Lucent did not obtain advice of counsel should be deemed inadmissible under Federal Rule of Evidence 403.

## III.    CONCLUSION

For the foregoing reasons, Defendants request that Telcordia be precluded from introducing evidence of Defendants' decisions not to disclose advice of counsel, to argue that Defendants did not properly seek legal counsel, or to introduce evidence that Defendants asserted the attorney-client privilege.

---

against Cisco, because Lucent was selling the accused products at that time but was not accused of infringement, Telcordia's conduct indicated that it would not assert the patent against Lucent.



REDACTED

B

REDACTED

C

Model Patent Jury Instructions
for the Northern District of California


September 20, 2004


Working Committee

Martin Fliesler – Chair
Professor Mark Lemley
David McIntyre
James Pooley
Matthew Powers
Honorable Ronald Whyte
James Yoon

*B.3. Infringement*

## 3.11 WILLFUL INFRINGEMENT

In this case, [patent holder] argues both that [alleged infringer] infringed and that [alleged infringer] infringed willfully. To prove willful infringement, [patent holder] must persuade you that it is "highly probable" that [alleged infringer] willfully infringed.

Specifically, [patent holder] must demonstrate that it is highly probable that:

>   A.     [Alleged infringer] had actual knowledge of the [     ] patent; and
>
>   B.     [Alleged infringer] had no reasonable basis for believing (1) that [alleged infringer]'s [product] [method] did not infringe the [     ] patent or (2) that the [     ] patent was invalid [or unenforceable].[6]

In deciding whether [alleged infringer] committed willful infringement, you must consider all of the facts, which include but are not limited to:

>   A.     Whether [alleged infringer] intentionally copied a product of [patent holder] covered by the [     ] patent;
>
>   B.     Whether [alleged infringer], when it learned of [patent holder]'s patent protection, investigated the scope of the patent and formed a good-faith belief that the patent was invalid [or unenforceable] or that it was not infringed;
>
>   C.     Whether [alleged infringer] had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;
>
>   D.     Whether [alleged infringer] made a good faith effort to avoid infringing the patent; and
>
>   E.     [Whether [alleged infringer] relied on a legal opinion that appeared to it to be well-supported and believable and that advised [alleged infringer] (1) that the [product] [method] did not infringe the [     ] patent or (2) that the [     ] patent was invalid [or unenforceable].][7]

---

[6] If unenforceability is an issue, the court will need to give further instruction to the jury explaining the requirements for the particular theory of unenforceability relied on by [alleged infringer].

[7] Factor E should be included only if the alleged infringer relies on a legal opinion as a defense to an allegation of willful infringement. "[I]t is inappropriate to draw an adverse inference that undisclosed legal advice for which attorney-client privilege is claimed was unfavorable . . . (and) it is (also) inappropriate to draw a similar adverse inference from failure to consult counsel." *Knorr-Bremse v. Dana Corporation*, 2004 WL 2049342 *5 (Fed.Cir. (Va.)).

Authorities

*35 U.S.C. § 284; Knorr-Bremse v. Dana Corporation*, 2004 WL 2049342 *5 (Fed.Cir. (Va.)); Crystal *Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,* 246 F.3d 1336, 1346 (Fed. Cir. 2001); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999); *Read Corp. v. Portec, Inc.,* 970 F.2d 816 (Fed. Cir. 1992); *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.,* 897 F.2d 508, 510 (Fed. Cir. 1990).

September 20, 2004

D

REDACTED

# Exhibit 4

**MOTION *IN LIMINE* NO. 4**
**RE: *TELCORDIA V. FORE SYSTEMS* LICENSE AND SETTLEMENT AGREEMENTS**

Defendants move *in limine* to exclude Telcordia from introducing into evidence, and/or relying upon at trial, the license and settlement agreements resulting from its litigation of *Bell Communications Research Inc. v. Fore Systems, Inc.*, 113 F. Supp. 2d 635 (D. Del. 2000) (hereinafter "the *Fore Systems* license and settlement agreements").

**I.     STATEMENT OF FACTS**

In 1998, Telcordia (then Bell Communications Research) sued Fore Systems, Inc. (which later merged with, and became, Marconi Corporation, PLC), alleging infringement of U.S. Patent No. 4,893,306 ("the '306 patent"), along with other patents not asserted in this litigation. When Marconi and Telcordia settled the litigation in 2004, the '306 patent was the only remaining asserted patent. The settlement agreement included a license to Marconi for the '306 patent as well as numerous other patents from Telcordia's various portfolios.

During the course of this litigation, Defendants repeatedly requested production of the *Fore Systems* license and settlement agreements. Exh. 4-A [Correspondence between Counsel]. Telcordia, however, refused to do so and instead claimed that the license and settlement agreements were not discoverable because such agreements included Marconi confidential information. *See* Exh. 4-B [May 4, 2006 DePinho Tr.] at 244:17-245:4; 248:7-249:2; Exh. 4-C [May 22, 2006 DePinho Tr.] at 229:24-233:2; Exh. 4-D [May 18, 2006 DePinho Tr.] at 541:3-18. Telcordia refused to produce these agreements or related evidence requested by Defendants in discovery and blocked questioning on the terms of these agreements in depositions.[1]

_____

[1]   Following Telcordia's refusal to produce the *Fore Systems* license and settlement agreements, Defendants obtained a copy of just the license agreement from Marconi's public filings with the Securities and Exchange Commission ("SEC") from the Edgar website. Defendants then attempted to depose Telcordia's Rule 30(b)(6) designee regarding the terms

Despite Telcordia's refusal to produce the *Fore Systems* license and settlement agreements and answer questions regarding such agreements, Telcordia's damages expert relied on these agreements in his expert report and identified such agreements as material considered in forming his opinions. *See* Exh. 4-E [Jun. 28, 2006 Expert Report of James Nawrocki] at 17.

II.   **GIVEN TELCORDIA'S FAILURE TO PRODUCE THE *FORE SYSTEMS* AGREEMENTS AND ALLOW DISCOVERY ON THOSE AGREEMENTS, TELCORDIA SHOULD NOT BE PERMITTED TO RELY ON THE AGREEMENTS AT TRIAL**

Federal Rule of Civil Procedure 26 requires that a party disclose and produce information that it will use to support its claims or defenses and/or its computation of damages. If the party does not disclose such information, the Court may prohibit that party from producing or relying on that evidence at trial pursuant to Federal Rule of Civil Procedure 37(c)(1). Telcordia steadfastly refused to provide Defendants with any discovery regarding the *Fore Systems* license and settlement agreements. Telcordia failed to produce such agreements and instructed its witnesses not to answer any questions concerning the agreements. *See* Exh. 4-D [May 18, 2006 DePinho Tr.] at 660:10-672:16; Exh. 4-C [May 22, 2006 DePinho Tr.] at 229:24-233:2. Given Telcordia's position during discovery, Defendants asked Telcordia to confirm it would not affirmatively rely upon the *Fore Systems* license and settlement agreements at trial. Telcordia responded by stating that "it reserves its right to rely upon agreements with FORE Systems and, presently, *it seems likely that such agreements would be part of our case.*" Exh. 4-F [Jan. 26, 2007 email from J. Williamson to E. Reines] (emphasis added).

---

of the *Fore Systems* license and settlement agreements. Telcordia, however, obstructed Defendants' efforts to obtain such discovery by objecting to such questioning and instructing its witness not to answer any questions regarding the *Fore Systems* license and settlement agreements *on the anomalous ground that the publicly-available document contained Marconi confidential information*. *See* Exh. 4-D [May 18, 2006 DePinho Tr.] at 660:10-672:16; Exh. 4-C [May 22, 2006 DePinho Tr.] at 229:24-233:2.

2

Rule 37(c)(1) addresses this precise situation: "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . or information not so disclosed." Having refused to provide any discovery on the *Fore Systems* license and settlement agreements, Rule 37, as well as fundamental fairness, precludes Telcordia and its expert from introducing any evidence of and/or relying upon the *Fore Systems* license and settlement agreements.

## III.     FEDERAL RULE OF EVIDENCE 408 ALSO PRECLUDES TELCORDIA FROM RELYING UPON THE *FORE SYSTEMS* LICENSE AND SETTLEMENT AGREEMENTS

Even if Telcordia had produced the *Fore Systems* license and settlement agreements, such agreements would not be admissible under Federal Rule of Evidence 408. Rule 408 excludes from evidence a license agreement that "(1) was reached under the threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation." Exh. 4-G [*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, No. 02-148 (GMS), 2003 WL 22387038, at *2 (D. Del. October 7, 2003)]; *see also Studiengesellschaft Kohle, M.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988). In *PharmaStem*, this Court analyzed various precedent regarding use of settlement agreements at trial for purposes of determining a reasonable royalty, and concluded that "[g]iven its discretion to determine the methodology for calculating a reasonable royalty, the court finds that it is better practice to exclude [settlement] licenses in view of the policy considerations behind Rule 408." Exh. 4-G [*PharmaStem*, No. 02-148 (GMS), 2003 WL 22387038] at *3.

The *Fore Systems* license and settlement agreements are a direct result of the settlement of the *Bell Communications Research Inc. v. Fore Systems, Inc.*, 113 F. Supp. 2d 635 (D. Del.

3

2000) litigation.  As such, Telcordia cannot introduce any evidence of or rely upon the *Fore Systems* license and settlement agreements.[2]

## IV.  FEDERAL RULES OF EVIDENCE 401-403 ALSO PRECLUDE TELCORDIA FROM RELYING UPON THE FORE SYSTEMS LICENSE AND SETTLEMENT AGREEMENTS

Telcordia's Rule 30(b)(6) witness testified that the settlement with Marconi ██████ ████████████████████████████████ Exh. 4-D [May 18, 2006 DePinho Tr.] at 541:1-2.  That settlement was driven by Telcordia's infringement claims concerning the '306 patent, while the unasserted '633 and '763 patents (the only patents for which Telcordia still has an infringement theory in this litigation) were essentially thrown in together with a long list of other patents.  As Telcordia's Rule 30(b)(6) witness explained: ██████████████████████████████████ ████████████████████████████████████████████████████ *See id.* at 542:16-18.  The marginal relevance, if any, of the *Fore Systems* license and settlement agreements is further underscored by the fact that the agreements provided a license for over 75 patents.  Exh. 4-D [May 18, 2006 DePinho Tr.] at 665:13-666:20.

Telcordia agrees that issues of infringement and damages regarding the '306 patent will not be tried to the jury in this case.  Because the *Fore Systems* license and settlement agreements have little, if anything, to do with the patents remaining in suit, they will have little probative value regarding damages for the alleged infringement of those patents.  The *Fore Systems* license and settlement agreement could only mislead and confuse the jury regarding the value of the

---

[2]  Further, simply because Telcordia's expert relied on the *Fore Systems* license and settlement agreements does not require that such agreements be admitted into evidence.  Rather, courts are not obliged "to allow otherwise inadmissible settlement agreements into evidence simply because one party's expert relies on them in reaching a reasonable royalty." Exh. 4-G [*PharmaStem*, 2003 WL 22387038] at *3.

'633 and '763 patents, especially when the record evidence will include license agreements specific to these two patents, which are probative of the disputed issues.

Put simply, Telcordia will use this *Fore Systems* license and settlement agreement to artificially inflate its damages calculation. Accordingly, the *Fore Systems* license and settlement agreements should not be allowed into evidence because their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

## V.     CONCLUSION

For the foregoing reasons, Defendants request that Telcordia be precluded from introducing any evidence of, and/or relying upon, the *Fore Systems* license and settlement agreements.

5



REDACTED

B

REDACTED

C

REDACTED

D

REDACTED

E

REDACTED

F



"Williamson, John"
<John.Williamson@finnegan.c
om>

01/26/2007 03:56 PM

To   <edward.reines@weil.com>

cc   <steven.cherny@lw.com>

Subject   Telcordia v. Cisco / Lucent

Ed,

I write in response to your January 24 email to Don Dunner.  You have asked that we "respond to each point with []our position."  In your email you said that your positions "should not be perceived as final."  We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement.  That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely.  If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so. The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006. That would be the entire scope of their testimony.

The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6)  Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards.  You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Additionally, we have been unable to address this issue fully with all of the necessary members of our team.  We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products.  Please let us know your position."

Again, we are unsure exactly how to interpret your statement.  Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief.  Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco employees.  Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9)  Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties

for foreign sales.  Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10)  Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger.  Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

G

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
PharmaStem Therapeutics, Inc. v. Viacell
Inc.D.Del.,2003.Only the Westlaw citation is cur-
rently available.
　　United States District Court,D. Delaware.
　PHARMASTEM THERAPEUTICS, INC., Plaintiff,
　　　　　　　　　　v.
VIACELL INC., Cryo-Cell International, Inc., Cor-
cell, Inc., Stemcyte, Inc., Cbr Systems, Inc. f/k/a
Cord Blood Registry, Inc., Birthcells Technology,
Inc., Nustem Technologies, Inc., and Bio-Cell, Inc.,
　　　　　　　Defendants.
　　　　　No. C.A. 02-148 GMS.

　　　　　　Oct. 7, 2003.

Philip A. Rovner, Potter Anderson & Corroon, LLP,
Wilmington, DE, for Plaintiff.
Jeffrey L. Moyer, David Allan Felice, Richards,
Layton & Finger, Robert F. Stewart, Jr., Dilworth,
Paxson LLP, Richard D. Kirk, Morris, James,
Hitchens & Williams, Wilmington, DE, for Defend-
ants.

　　　　*MEMORANDUM AND ORDER*
SLEET, J.

　　　　　I. INTRODUCTION

**\*1** On August 5, 2003, PharmaStem Therapeutics,
Inc. ("PharmaStem") filed a motion *in limine* to ex-
clude from evidence all discovery relating to settle-
ment negotiations regarding patent licensing agree-
ments. On August 12, 2003, Viacell Inc., Cryo-Cell
International, Inc., Corcell, Inc., Stemcyte, Inc., CBR
Systems, Inc. f/k/a Cord Blood Registry, Inc., Birth-
cells Technology, Inc., Nustem Technologies, Inc.,
and Bio-Cell, Inc. (collectively "Viacell") filed an an-
swer requesting that PharmaStem's motion be denied.
Alternatively, Viacell moved to exclude from evid-
ence the license agreements between PharmaStem
and third parties, Anthrogenesis Corporation
("Anthrogenesis") and Stembanc, Inc. ("Stembanc"),
and to preclude PharmaStem's expert, Russell Parr,
from relying on those licenses as a factor in determin-

ing a reasonable royalty rate. On August 15, 2003,
PharmaStem filed a reply. The court conducted a pre-
trial conference on September 8, 2003 in which it
heard oral argument from the parties on PharmaS-
tem's motion. Upon consideration of the arguments
raised at the pretrial conference and in the parties'
briefs, the court will grant PharmaStem's motion *in
limine* to exclude from evidence all discovery relating
to settlement negotiations regarding the Anthrogenes-
is and Stembanc licenses and with any of the defend-
ants in this case. The court will also grant Viacell's
cross-motion *in limine* to exclude from evidence the
Anthrogenesis and Stembanc license agreements
themselves and to preclude Mr. Parr from relying on
those licenses as a factor in determining a reasonable
royalty rate. The court bases its ruling on the follow-
ing reasons.

　　　　　II. DISCUSSION

After the commencement of the present litigation,
PharmaStem licensed the patents-in-suit to two, non-
defendant companies, Anthrogenesis and Stembanc.
PharmaStem entered into licensing agreements with
Anthrogenesis and Stembanc in the context of set-
tling a claim of infringement against each of those
companies. PharmaStem also has held settlement ne-
gotiations with several of the defendants. In all in-
stances, PharmaStem and the various parties entered
into a negotiation agreement containing the following
clause:
All offers, promises, conduct and statements, whether
oral or written made in the course of negotiations re-
lating to the Patents by either of the parties, their at-
torneys, agents or representatives are "Confidential
Statements." Confidential Statements may not be dis-
closed by the receiving party without the consent of
the disclosing party. Confidential Statements are sub-
ject to Rule 408 of the Federal Rules of Evidence
may not be used by the receiving party in litigation
for any purpose including, without limitation, im-
peachment. However, evidence that is otherwise ad-
missible or discoverable shall not be rendered inad-
missible or non-discoverable as a result of its present-
ation or use in connection with this Agreement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

PharmaStem claims that evidence related to the negotiations underlying the Anthrogenesis and Stembanc license agreements is inadmissible under Rule 408 of the Federal Rules of Evidence. PharmaStem maintains, however, that the Anthrogenesis and Stembanc license agreements themselves are admissible to establish the appropriate reasonable royalty calculation. Accordingly, PharmaStem's damages expert, Russell Parr, relied on the license agreements in reaching his opinion that PharmaStem is entitled to a high royalty rate for the patents-in-suit.

**2** Conversely, Viacell takes an "all-or-nothing" position, arguing that if the underlying negotiations are inadmissible because of Rule 408, then the license agreements themselves are also inadmissible for the same reason. If Mr. Parr is nonetheless permitted to rely on the Anthrogenesis and Stembanc licenses, Viacell argues that it then should be permitted to introduce the underlying negotiations to show that the final agreements were not the product of a freely negotiated, bargained-for exchange. Indeed, Viacell's damages expert, David E. Yurkerwich, relied on evidence of the underlying negotiations to reach his conclusion that the reasonable royalty rate should be much lower than the one Mr. Parr calculated. The court agrees that PharmaStem is not permitted to have it both ways.

"[T]he methodology for determining a 'reasonable royalty' is consigned to the district court's discretion and is reviewed only for abuse of that discretion." Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc., 898 F.Supp. 1334, 1336 (N.D.Iowa 1995) (citing Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 869 (Fed.Cir.1993); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed.Cir.1991); Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1576 (Fed.Cir.1988)). It is well established that a patent holder's license agreements with third parties are permissible considerations in a reasonable royalty calculation. See, e.g., Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970). However, notwithstanding their relevance to a reasonable royalty calculation, the court may exclude license agreements between a patent holder and third parties under Rule 408 of the Federal Rules of Evidence.

Rule 408 states in pertinent part:
Evidence of (1) furnishing or offering or promising to furnish, (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromising negotiations is likewise not admissible.

Fed.R.Evid. 408. Specifically, a license agreement may be excluded from evidence under Rule 408 where it (1) was reached under a threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation infringement. See Century Wrecker, 898 F.Supp. at 1340 (citing Studiengesellschaft Kohle, M.b.H. v. Dart Indus., Inc., 862 F.2d 1564, 1572 (Fed.Cir.1988) (synthesizing the teachings of Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1164 n. 11 (6th Cir.1978), Rude v. Westcott, 130 U.S. 152, 164, 9 S.Ct. 463, 32 L.Ed. 888 (1889), Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed.Cir.1983), and Deere & Co. v. Int'l Harvester Co., 710 F.2d 1551, 1557 (Fed.Cir.1983), respectively)). The court must look carefully at the context in which the license agreement was reached to determine whether it meets any of these requirements. See Dart Indus., 862 F.2d at 1572; Century Wrecker, 898 F.Supp. at 1340.

**3** The license agreements between PharmaStem and third parties Anthrogenesis and Stembanc arose in a context where litigation was threatened or at least probable. PharmaStem in fact states, "With respect to Anthrogenesis and Stembanc, discovery obtained unambiguously refers to the amounts contemplated to settle PharmaStem's claim of infringement against them." (PharmaStem Therapeutics, Inc's Motion In Limine to Exclude All Discovery Relating to Settlement Agreement Negotiations Regarding Patent License Agreements, at 3). Additionally, PharmaStem's negotiation agreements with Anthrogenesis and Stembanc specifically reference Rule 408, indicating that the parties involved must consider the licenses to have arisen out of settlement negotiations over the

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

validity or amount of an infringement claim. A "dispute" under Rule 408 includes "both litigation and less formal states of a dispute." In view of the term's broad construction, it is clear that the Anthrogenesis and Stembanc license agreements arose from a dispute within the meaning of Rule 408.

Both PharmaStem and Viacell cite *Century Wrecker* in support of their respective positions. In *Century Wrecker,* the court admitted evidence of license agreements between the plaintiff and third parties, which arose out of the threat of litigation. Although the court noted that the agreements were inadmissible under Rule 408, it nonetheless allowed the defendants to introduce the agreements into evidence because the plaintiff's expert had relied on them in his reasonable royalty calculations. The court reasoned that the defendants were entitled to use the settlement agreements to challenge the basis of the plaintiff's expert's conclusions.

*Century Wrecker,* however, is not binding precedent on this court. Moreover, *Century Wrecker* held only that the actual settlement agreements were admissible to challenge the basis of the expert's opinion. The case, therefore, does not dictate Viacell's position that evidence of negotiations *underlying* the license agreements must be admitted to challenge Mr. Parr's report. Nor does *Century Wrecker* mandate PharmaStem's conclusion that the Anthrogenesis and Stembanc licenses are automatically admissible because Mr. Parr used them to calculate a reasonable royalty.

The court is not required to allow otherwise inadmissible settlement agreements into evidence simply because one party's expert relies on them in reaching a reasonable royalty. This is particularly true where other options, such as excluding the licenses altogether, are available to the court. The purpose of Rule 408 is "to encourage full and frank disclosure between parties in order to promote settlements, rather than protracted litigation." *See* Fed.R.Evid. 408 (citing *Olin Corp. v. Ins. Co. of N. Am.,* 603 F.Supp. 445, 449 (S.D.N.Y.1985)). Given its discretion to determine the methodology for calculating a reasonable royalty, the court finds that it is the better practice to exclude the Anthrogenesis and Stembanc licenses in view of the policy considerations behind

Rule 408. *See Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1364 (10th Cir.1987) ("[W]hen the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers.").

**\*4** Finally, although Viacell does not appear to seek the introduction of such evidence, to the extent PharmaStem requests the exclusion of settlement negotiations between itself and any of the defendants in this case, that evidence is plainly inadmissible under Rule 408. *See* Fed.R.Evid. 408 ("Evidence of conduct or statements made in compromising negotiations is likewise not admissible.").

### III. CONCLUSION

Because the agreements arose in a context where litigation was threatened or at least probable, the court will exclude all evidence relating to negotiations of the Anthrogenesis and Stembanc licenses, including the license agreements themselves.

Therefore, IT IS HEREBY ORDERED that:
1. PharmaStem Therapeutics, Inc.'s motion *in limine* to exclude from evidence all discovery relating to settlement negotiations regarding the Anthrogenesis and Stembanc licenses and with any of the defendants in this case is GRANTED.
2. Viacell's cross-motion *in limine* to exclude from evidence the Anthrogenesis and Stembanc license agreements and to preclude Russell Parr from relying on those licenses as a factor in determining a reasonable royalty rate is GRANTED.
3. The parties' experts may not rely on the Anthrogenesis and Stembanc licenses or any documents or other evidence pertaining to negotiations of the those licenses to calculate a reasonable royalty rate or to challenge the opposing party's calculation of a reasonable royalty rate.

D.Del.,2003.
PharmaStem Therapeutics, Inc. v. Viacell Inc.
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 3333202 (Trial Motion, Memorandum and Affidavit) Pharmastem Therapeutics, Inc.'s Mo-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 22387038 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

tion to Dismiss Defendant CBR's First, Second, Third, Fourth, Fifth and Sixth Counterclaims (Sep. 14, 2004) Original Image of this Document (PDF)
• 2003 WL 23310808 (Verdict and Settlement Summary) (Oct. 29, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 5

# Exhibit A

## MOTION *IN LIMINE* NO. 5A [FOR CISCO ONLY]
## RE: HYPERBOLIC AND PREJUDICIAL ARGUMENT OR EVIDENCE

Defendant Cisco moves *in limine* to exclude Telcordia from discussing Cisco's total worth, revenue, profitability, or market cap or characterizing Cisco's alleged conduct before the ATM Forum with inflammatory language such as "illegal boycott."

## I.     INTRODUCTION

At trial, Telcordia intends to introduce hyperbolic argument and/or evidence concerning Cisco that is irrelevant and unfairly prejudicial because it risks inflaming the jury and has little probative value. First, Telcordia has stated that it may introduce evidence of Cisco's overall revenues or net worth. This appears to be an attempt to suggest that Cisco can and should pay a large judgment. Cisco's overall sales and profitability include the enormous contributions of *non*-accused products which are entirely *unrelated* to this case. Further, any probative value of such evidence is clearly outweighed by the danger of unfair prejudice that would be created by presenting such evidence to a jury. Second, Telcordia has characterized Cisco's activities at the ATM Forum in 1995 as an "illegal boycott." Such derogatory language is unfounded and unfairly prejudicial and should be excluded at trial.

## II.    TELCORDIA SHOULD BE PRECLUDED FROM PRESENTING HYPERBOLIC ARGUMENT OR EVIDENCE CONCERNING CISCO'S TOTAL WORTH, REVENUE, PROFITABILITY, OR MARKET CAP

During pretrial negotiations with Cisco, Telcordia has stated that it may introduce hyperbolic argument and evidence of Cisco's overall sales and profitability to the jury. Exh. 5A-A [Jan. 26, 2007 email from J. Williamson] ("Telcordia reserves its right to reference Cisco's size and finances" without qualification or limitation.).

Cisco's overall financial performance necessarily includes the revenues of products *not* accused of infringement here. Basic principles of patent law (and common sense) dictate that

Telcordia is not entitled to damages on noninfringing products.  *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 799 (Fed. Cir. 1988) (affirming a district court's award of damages for infringing sales).  Indeed, this district has precluded evidence about revenue that is not connected to the accused infringing products in granting previous *in limine* motions.  *See, e.g.*, Exh. 5A-B [*Inline Connection Corp., v. AOL Time Warner Inc.*, Nos. 02-272, 02-477, 2007 WL 108382, at *6 (D. Del. Jan. 16, 2007)].

Courts also have excluded evidence of overall profitability under Federal Rule of Evidence 403 because of the risk of juror confusion and unfair prejudice.  In *Fournier v. Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003), the court properly excluded evidence of overall profits for non-accused product lines under Rule 403.  The court also held that the size of the sales goals for even the accused products, including references to "revenue growth in the billions of dollars, are likely to significantly prejudice the jury *despite* the Defendant's burden of establishing what portion of the overall gross revenues are actually attributable to factors other than the alleged infringement."  *Id.* at 330.

The facts at hand are even more stark than those in *Fournier*.  Here, there is no connection between Cisco's overall sales and profitability and the damages Telcordia claims.  Telcordia's damages theory is based on ▮▮▮▮▮▮ of sales over five years, whereas Cisco's total revenues exceed ▮▮▮▮▮▮ a year, consisting overwhelmingly of revenues generated from non-accused products.

In short, evidence of Cisco's overall sales and profitability is irrelevant to Telcordia's damages theory and creates a dangerous risk of misleading the jury otherwise.  Accordingly, the Court should preclude Telcordia from presenting argument and evidence about Cisco's total worth, revenue, profitability, or market cap.

2

**III.  TELCORDIA SHOULD BE PRECLUDED FROM PRESENTING HYPERBOLIC ARGUMENT OR EVIDENCE CONCERNING CISCO'S ALLEGED BOYCOTT CAMPAIGN**

Telcordia should also be precluded under Federal Rule of Evidence 403 from characterizing Cisco's activities at the ATM Forum as an "illegal boycott."[1]  In its trial brief, Telcordia alleges that Cisco held "a self-styled illegal boycott" in the ATM Forum in 1995:



Telcordia Trial Br. at 2 (emphasis added).  There is no support in the record for Telcordia's characterization of Cisco's conduct.

There is ample precedent holding that parties should be precluded from describing conduct in derogatory terms before a jury.  For example, in *Schwab v. Philip Morris USA*, the court held that "conclusory and derogatory words such as 'monopoly,' 'oligopoly,' 'collusion,' and the like shall be omitted [as] [t]hese are terms likely to be viewed by the jury as pejorative." 449 F. Supp. 2d 992, 1221 (E.D.N.Y. 2006) (excluding derogatory words pursuant to Fed. R. Evid. 403).  This was true even though an alleged "collusion" was "a central part of the plaintiffs' case." *Id.* at 1221.  Where – as here – Telcordia's case concerns patent infringement and validity, and not boycotts, it is particularly important that highly charged and confusing phrases like "illegal boycott" be kept from the jury.  To permit such inflammatory accusations

---

[1]  To attempt to avoid the need for this motion, Cisco met and conferred regarding Telcordia's use of the phrase "illegal boycott."  Telcordia stated that its support for this allegation was in documents, but refused to identify the supposedly supporting documents, citing "trial strategy."  Exh. 5A-C [Jan. 30, 2007 email from E. Reines].  Cisco is not aware of any documents that would support such an extreme allegation, even if an illegal boycott was an element of a claim in this case, which it is not.

3

would create the risk of a satellite dispute concerning the unplead allegation that Cisco is guilty of an "illegal boycott."

## V.    CONCLUSION

For the foregoing reasons, Cisco requests that Telcordia be precluded from presenting hyperbolic argument or evidence by (1) discussing Cisco's total worth, revenue, profitability, or market cap, or (2) characterizing Cisco's alleged conduct before the ATM Forum with inflammatory language.



Ed,

I write in response to your January 24 email to Don Dunner.  You have asked that we "respond to each point with []our position."  In your email you said that your positions "should not be perceived as final."  We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement.  That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely.  If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so. The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006. That would be the entire scope of their testimony.

The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6)  Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards.  You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Additionally, we have been unable to address this issue fully with all of the necessary members of our team.  We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products.  Please let us know your position."

Again, we are unsure exactly how to interpret your statement.  Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief.  Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco employees.  Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9)  Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties

for foreign sales.  Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

<u>Point 10</u>

You wrote:

"(10)  Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger.  Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John


This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

B

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

H
Briefs and Other Related Documents
Inline Connection Corp. v. AOL Time Warner
Inc.D.Del.,2007.Only the Westlaw citation is
currently available.
United States District Court,D. Delaware.
INLINE CONNECTION CORPORATION,
Broadband Technology Innovations, LLC, and Pie
Squared, LLC, Plaintiffs,
v.
AOL TIME WARNER INCORPORATED, et al.,
Defendants.
INLINE CONNECTION CORPORATION,
Broadband Technology Innovations, LLC, and Pie
Squared, LLC, Plaintiffs,
v.
EARTHLINK, INC., Defendant.
**No. C.A. 02-272-MPT, C.A. 02-477-MPT.**

Jan. 16, 2007.

**Background:** Patentee brought infringement action
against Internet service providers (ISPs), alleging
infringement of family of patents concerning
simultaneous transmission of high frequency
information signals and lower frequency voice band
signals over conventional telephone wiring.
Defendants brought motions for partial summary
judgment and in limine.

**Holdings:** The District Court, Thynge, United
States Magistrate Judge, held that:

(1) expert's testimony regarding licensing royalty
base, which incorporated total number of
competitors' customers, including those who did not
infringe upon patent, was reliable;

(2) testimony of expert regarding competitor's bring
your own access (BYOA) related commissions,
profits, and revenues was not probative or relevant
as to reasonable royalty from which to calculate
damages; and

(3) fact issue existed as to reasonable royal
corresponding applicable customer royalty bas

Motion in limine granted in part. Motion for
summary judgment denied.

**[1] Evidence 157 ⟳546**

157 Evidence
     157XII Opinion Evidence
          157XII(C) Competency of Experts
               157k546 k. Determination of Ques
Competency. Most Cited Cases
The determination of whether to exclude
evidence is committed to the court's discretion.

**[2] Evidence 157 ⟳555.2**

157 Evidence
     157XII Opinion Evidence
          157XII(D) Examination of Experts
               157k555 Basis of Opinion
                    157k555.2    k.    Necessity
Sufficiency. Most Cited Cases
A trial judge has considerable leeway in d
how to determine whether expert testimo
reliable.

**[3] Evidence 157 ⟳146**

157 Evidence
     157IV Admissibility in General
          157IV(D) Materiality
               157k146 k. Tendency to Misl
Confuse. Most Cited Cases

**Evidence 157 ⟳546**

157 Evidence
     157XII Opinion Evidence
          157XII(C) Competency of Experts
               157k546 k. Determination of Ques

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Competency. Most Cited Cases
When making the decision to exclude expert
evidence, a court must balance the need for the
challenged evidence against the risk that it will
confuse the jury and delay trial; to exclude evidence
is within purview of the court, but determinations to
exclude evidence before the challenging party has
an opportunity to develop the record are unfair and
improper. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2    k.    Necessity    and
Sufficiency. Most Cited Cases
When the parties' experts rely on conflicting sets of
facts, it is not the role of the trial court to evaluate
the correctness of facts underlying an expert's
testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞2465.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2465 Matters Affecting Right to
Judgment
                    170Ak2465.1 k. In General. Most
Cited Cases
Summary judgment is not appropriately based on
argument that parties' experts use different theories,
data and reach different conclusions. Fed.Rules
Civ.Proc.Rule 56, 28 U.S.C.A.

**[6] Evidence 157 ☞570**

157 Evidence
    157XII Opinion Evidence
        157XII(F) Effect of Opinion Evidence
            157k569 Testimony of Experts
                157k570 k. In General. Most Cited
Cases
A court may not determine the credibility of expert
witnesses nor substitute its choice for that of the
jury between conflicting elements of the evidence.

**[7] Federal Civil Procedure 170A ☞2461**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2461 k. In General. Most
Cases

**Federal Courts 170B ☞847**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Exte
            170BVIII(K)5 Questions of Fact, V
and Findings
                170Bk847 k. Verdicts in General
Cited Cases
To the extent that there are conflicts in the ev
with respect to damages, neither the trial cour
motion for summary judgment, nor the ap
court, may substitute its findings for those
jury.

To the extent that there are conflicts in the ev
with respect to damages, neither the trial cour
motion for summary judgment, nor the ap
court, may substitute its findings for those
jury.

**[8] Patents 291 ☞318(1)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k318 Profits
                291k318(1) k. In General. Most
Cases

**Patents 291 ☞319(1)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k319 Damages
                291k319(1) k. In General. Most
Cases
A patentee may seek to recover actual dam
the form of lost profits, or, in the event th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

profits cannot be ascertained, on the basis of a reasonable royalty; patentee is entitled, at a minimum, to a reasonable royalty for infringement of its patent.

**[9] Patents 291 ⚙═►314(5)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k314 Hearing
                291k314(5) k. Questions of Law or Fact. Most Cited Cases
The amount of damages, or harm sustained by a patentee, is a question of fact, decided by a jury when trial is to a jury.

**[10] Evidence 157 ⚙═►555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and Sufficiency. Most Cited Cases

**Patents 291 ⚙═►312(2)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k312 Evidence
                291k312(2) k. Admissibility. Most Cited Cases
Expert's testimony regarding licensing royalty base, which incorporated total number of competitors' customers, including those who did not infringe upon patent, was reliable, since expert possessed requisite knowledge, skill, experience, and training and his opinion incorporated methodologies used by experts in his field; although competitors wanted to limit damages claim to subset of their asymmetric digital subscriber line (ADSL) customers connected through remote terminal (RT) lines, expert's testimony could include customers provisioned through non-infringing central office (CO) digital subscriber line access multiplexers (DSLAMS). Fed.Rules. Evid.Rule 702, 28 U.S.C.A.; Fed.Rules Evid.Rule 403, 28 U.S.C.A.

Expert's testimony regarding licensing royalty which incorporated total number of comp customers, including those who did not i upon patent, was reliable, since expert po requisite knowledge, skill, experience, and t and his opinion incorporated methodologies u experts in his field; although competitors wa limit damages claim to subset of their asyn digital subscriber line (ADSL) customers cor through remote terminal (RT) lines, c testimony could include customers prov through non-infringing central office (CO) subscriber line access multiplexers (DSL Fed.Rules. Evid.Rule 702, 28 U.S.C.A.; Fed Evid.Rule 403, 28 U.S.C.A.

**[11] Evidence 157 ⚙═►555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity Sufficiency. Most Cited Cases
Court could not evaluate and determine underlying expert's testimony which rela material contested facts that directly rela weight and credibility. Fed.Rules Evid.Rule 7 U.S.C.A.

**[12] Patents 291 ⚙═►312(2)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k312 Evidence
                291k312(2) k. Admissibility.
Cited Cases
Testimony of expert regarding competitor's your own access (BYOA) related commi profits, and revenues was not probative or r as to reasonable royalty from which to ca damages, in patent infringement action, revenues or profits from BYOA services wo element of expert's reasonable computations; although expert's c calculations were grounded on sufficient fac testimony would have shown completene expert's analysis of all relevant factors used f

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

calculation, they were not critical to expert's analysis. Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[13] Evidence 157 ⟲⟲99**

157 Evidence
    157IV Admissibility in General
        157IV(A) Facts in Issue and Relevant to Issues
            157k99 k. Relevancy in General. Most Cited Cases
When determining whether an item of evidence is relevant, a court evaluates whether the evidence tends to prove the matter sought to be proved. Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[14] Patents 291 ⟲⟲323.2(3)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k323 Final Judgment or Decree
                291k323.2 Summary Judgment
                    291k323.2(3) k. Particular Cases. Most Cited Cases
Genuine issue of material fact existed as to reasonable royalty and corresponding applicable customer royalty base, precluding summary judgment in patent infringement action. 35 U.S.C.A. § 284; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**Patents 291 ⟲⟲328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
5,844,596, 6,236,718, 6,243,446, 6,542,585. Cited.

Julia Heaney, Thomas C. Grimm, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiffs.
Chad Michael Shandler, Kelly E. Farnan, Richards, Layton & Finger, Gary William Lipkin, Duane Morris LLP, Wilmington, DE, for Defendants.
Broadband Technology Innovations LLC, pro se.

Pie Squared LLC, pro se.

**MEMORANDUM ORDER**
THYNGE, Magistrate J.

## I. INTRODUCTION

*1 This is a patent infringement case. Communication Corporation ("Inline") America Online Inc. ("AOL") on April 12, and EarthLink, Inc. ("EarthLink") on June 4 alleging infringement of U.S. Patent Nos. 5,8 ("the '596 patent"), 6,243,446 ("the '446 pa and 6,236,718 ("the '718 patent").[FN1]

On August 31, 2006, AOL and EarthL defendants") jointly filed motions for summary judgment and *in limine* to pt damages for customers provisioned t non-infringing central office ("CO") DSLAI On September 20, 2006, Inline respond arguing that its expert's methodology on dam supported by substantial evidence and the any disagreement regarding appr methodologies is not properly determine summary judgment.[FN3] On October 27, AOL and EarthLink jointly filed a motion *in* to exclude the testimony of Inline's expert, Ja Malackowski,[FN4] arguing that his testimony supported by reliable evidence and is ba: unsupported conclusions regarding hypo negotiations with Inline. Moreover, defendan that Malackowski be precluded from c testimony regarding AOL's "Bring Your Access'" ("BYOA") service on the basis that t no evidence that sales of these services m legal requirements of a convoyed sale an revenues from such sales are irrelevan November 17, 2006, Inline responded by a that its damage calculations are ground sufficient facts and that BYOA service comm are probative under the *Georgia-Pacifi* factors.

In its opinion of December 5, 2006, the determined that the defendants' motions for summary judgment and *in limine* on the pre of damages for non-infringing CO lines, an motion *in limine* to exclude Malackowski's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

testimony were intrinsically related and should be decided together. For the reasons discussed herein, defendants' motions are granted in part and denied in part.

## II. POSITIONS OF THE PARTIES

### A. Motion *in limine* to Limit the Expert Testimony of James E. Malackowski.

AOL and EarthLink argue that Malackowski's analysis lacks the reliability required by the Federal Rules of Evidence and deviates from the standards in *Daubert* [FN6] and therefore is inadmissible evidence. Defendants contend that Malackowski improperly relied upon an unfounded conclusion that AOL and EarthLink would have agreed to pay a royalty on all ADSL customers because they would not have obtained remote terminal ("RT") deployment information. Defendants also argue that Malackowski's analysis is not "tied" to any reliable evidence or data. In this regard, they assert that Malackowski did not account for the possibility that some customers provisioned through a RT do not infringe the patents-in-suit because not all claim limitations are satisfied. Moreover, they state that neither Malackowski nor Dr. Charles Jackson (Inline's infringement expert) offer any evidence regarding the specific number of AOL or EarthLink users who infringe the patents in question.

**\*2** Defendants also move to preclude Malackowski's opinion regarding AOL's BYOA service [FN7] on the basis that there is no evidence that BYOA service infringes the patents-in-suit; BYOA sales have no relationship to a reasonable royalty rate calculation, and as such, expert evidence would mislead the jury. They contend that Inline's conclusion that BYOA revenues influence a reasonable royalty calculation is flawed as a matter of law because BYOA service is not sold in connection with an infringing product. Defendants contend that the value of these transactions were not accounted for in Malackowski's computation of a reasonable royalty rate, and should therefore be omitted as not probative.

Inline contends that Malackowski's methodo supported by the evidence and accurately upon the hypothesis that AOL and EarthLink not or could not have obtained RT deplo information during the hypothetical negotiations. It argues that Malackowski p analyzed damages by determining the cost that defendants enjoyed through the use inventions. Inline also contends that AOL's service is intrinsically related to ADSL According to Inline, "if sales of an inf product are used to increase sales non-infringing product, the non-infringing sa considered convoyed or derivative sales Since AOL receives commissions from a thir for each ADSL subscription by an AOL cu Inline contends that Malackowski p considered AOL's revenues under *Georgia-* Factor No. 6.[FN9] Inline further asserts Malackowski's opinion regarding AOL's services is not misleading, but demonstrat overall reasonableness of his damages analys

### B. Motion to Preclude Damages for Custom Provisioned through Non-Infringing CO DSL

AOL and EarthLink assert that the metho utilized by Malackowski is flawed as a ma law. AOL and EarthLink contend that expert impermissibly includes as part of his calculation those customers provisioned t non-infringing CO DSLAMS and that Inline entitled to compensation which incor non-infringing use. AOL and EarthLink requ Inline be prohibited from presenting a da model which applies a royalty to all ADSL including non-infringing CO lines.

In support of their position, AOL and Ea state that: (1) this court determined CO-provisioned ADSL lines do not infring matter of law; (2) Inline should not be perm circumvent this court's prior ruling; (3) expert relies on the absence of inform specifically, telephone company records, to that a royalty base includes all ADSL lines; Inline's expert ignores the actual and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

estimated RT deployment data. AOL and EarthLink argue that Inline's damage methodology is not based on a "reasonable royalty" formula and point to evidence which they say establishes that approximately two-thirds of ADSL customers are provisioned through non-infringing COs.

**\*3** Inline counters that the court should deny AOL and EarthLink's motion because the evidence supports the Cost Approach method employed by Malackowski. Inline argues that a methodology which employs a broader royalty base is not prohibited merely because it includes non-infringing sales.[FN11] In support of that argument, Inline points out AOL and EarthLink did not know whether customers would be provisioned through CO or RT lines, and as a result, they would have used truck roll installations for all subscribers to avoid infringement. Therefore, according to Inline, a reasonable royalty rate should reflect the cost of the truck rolls which defendants avoided by infringement.

Finally, Inline emphasizes that differences in methodologies for assessing damages, the credibility of each expert and the weight given to the evidence is within the province of the jury, which cannot be resolved on summary judgment.

### III. LEGAL STANDARD

A. Evidentiary Standards for Expert Testimony

AOL and EarthLink move to limit Inline's evidence regarding the licensing royalty base on which damages are calculated. Specifically, they want Malackowski's opinion confined to the subset of EarthLink or AOL customers who allegedly infringe the patents-in-dispute. Defendants argue that Malackowski's testimony lacks the reliability required by Federal Rules of Evidence ("FRE") 702.

Rule 702 provides in relevant part:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training or education, may thereto in the form of an opinion or otherwise the testimony is based upon sufficient facts (2) the testimony is the product of principles and methods, and (3) the witne applied the principles and methods reliably facts of the case.

In *Daubert,* the Supreme Court found that Ru "confides to the judge some gatek responsibility in deciding questions o admissibility of proffered expert testimony. This gatekeeper function of excluding un testimony has also been applied to patent liti [FN13] *Daubert* provides a "non-exclusive che [FN14] for trial courts to use in their assessn whether expert testimony met the rel requirements. FRE *Advisory Committee Note* are instructive as well. The 2000 Amen emphasize that no single factor is nece dispositive of the reliability of an testimony. Rather, the amendments iden number of factors relevant to non-scientific testimony on the issue of reliability.

[1] The determination of whether to exclude evidence is committed to the court's discretio The Third Circuit has noted, however, that: While evidentiary rulings are generally subje particularly high level of deference because t court has a superior vantage point to asse evidence ..., evaluating the reliability of sc methodologies and data does not generally i assessing the truthfulness of the expert wi and thus is often not significantly more diffi a cold record. Moreover, here there are facto counsel in favor of a hard look at (more st review of) the district court's exercise of disc For example, because the reliability stand Rules 702 and 703 is somewhat amorphous, t a significant risk that district judges will threshold too high and will in fact force plain prove their case twice. Reducing this particularly important because the Federal R Evidence display a preference for admissibilit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

**\*4** The Third Circuit found that " 'the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence," ' [FN18] and identified several factors for the court to consider in deciding whether to exclude testimony:
(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.[FN19]

The Third Circuit also noted that " 'the importance of the excluded testimony' should be considered." [FN20]

[2][3] Nonetheless, the trial judge has considerable leeway in deciding how to determine whether expert testimony is reliable. The Third Circuit found in *In re Paoli R.R.* that profferers of expert testimony do not have to "demonstrate ... by a preponderance of the evidence that the assessments of their experts are *correct,* they [need] only ... demonstrate by a preponderance of evidence that their opinions are reliable," [FN21] *Daubert* recognized that "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [FN22] *Daubert* emphasized that the trial court must "focus" solely on principles and methodology, and not on the conclusions they generate.[FN23] A trial judge, however, is to scrutinize whether such methods have been properly applied to the facts of the case. [FN24] In making the decision to exclude evidence, the court must balance the need for the challenged evidence against the risk that it will confuse the jury and delay trial.[FN25] To exclude evidence is within purview of the court, but "determinations to exclude evidence before the challenging party has an opportunity to develop the record are unfair and improper." [FN26]

[4] Finally, the Federal Circuit's decision in *Micro Chemical Inc. v. Lextron, Inc.*[FN27] sheds light on

the role of the trial court under FRE 702. "W here, the parties' experts rely on conflicting facts, it is not the role of the trial court to e the correctness of facts underlying an c testimony." [FN28]

**B. Summary Judgment**

[5][6][7][8][9] AOL and EarthLink move for summary judgment to limit Inline's damages to a subset of their ADSL customers cor through RT lines. Summary judgment is pr the "pleadings, depositions, answer interrogatories, and admissions on file, to with affidavits, if any, show that there is no g issue as to any material fact and that the r party is entitled to judgment as a matter of law This standard has also been applied to cases.[FN30] The party seeking summary juc bears the initial burden of establishing the la genuinely disputed material fact by demon: that there is an "absence of evidence to supp nonmoving party's case." [FN31] The court is t the nonmoving party the benefit of all jus inferences and must resolve disputed issues in favor of the nonmovant.[FN32] Su judgment is not appropriately based on ar; that parties' experts use different theories, d; reach different conclusions. "The court m determine the credibility of the witness substitute its choice for that of the jury b conflicting elements of the evidence." [FN33] extent that there are conflicts in the evidenc respect to damages, "neither the trial court the appellate court, may substitute its findir those of the jury." [FN34] A patentee may s recover actual damages in the form of lost or, in the event that lost profits cann ascertained, on the basis of a reasonable royalt The patentee is entitled, at a minimum, reasonable royalty for infringement of its pate: The amount of damages, or harm su by a patentee, is a question of fact, "decide jury when trial is to a jury." [FN37]

**IV. ANALYSIS**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

### A. Motion *in limine* to Preclude Malackowski's Opinion which Includes Customers Provisioned through COs

**\*5** **[10]** AOL and EarthLink argue that Malackowski's opinion is based on speculation, and not on evidence or reliable data, because the reasonable royalty resulting from the hypothetical licensing negotiations would not apply to *all* of defendants' ADSL customers, but only to those serviced through RTs. Defendants contend that the specific number of potentially infringing customers should have been used and the analytical gap between Malackowski's data and his conclusions is too significant to be reliable. Defendants conclude that his opinion is merely speculation, because it relies entirely on assumptions without foundation.

Malackowski's conclusions are not unfounded, as defendants suggest, simply because his calculations incorporate the total number of defendants' customers, including those who do not infringe. Malackowski's report meets the requirements of FRE 702 and the case law. Defendants cannot, and have not argued that he lacks the requisite knowledge, skill, experience and training. His opinion incorporates methodologies used by experts in his field. He employs three distinct methods to evaluate a reasonable royalty rate: the Market Approach, the Income Approach, and Cost Approach.[FN38] Each approach is commonly used by experts to value intangible assets. FRE 703 allows experts to use evidence that would not commonly be admissible in court, as long as, it is reasonably applied or relied upon by experts in the field for their conclusions. Malackowski's report concludes that the Cost Approach gives the "best indication of a royalty in this case" and that \$35 per customer is a reasonable starting point.[FN39] AOL and EarthLink do not dispute that Malackowski employs generally accepted methods and principles; rather, they contend that he improperly concludes that they would have agreed to a royalty base of all ADSL customers, including non-infringing COs.

**[11]** Both sides have argued to exhaustion whether either could have determined the number of customers that were provisioned through the CO

and RT lines at the time of the hypo: negotiations. Whether or not either side coul‹ or should have made that determinati‹ irrelevant to the issues under consideration parties' arguments demonstrate that n contested facts exist which directly relate to and credibility. Under *Daubert* and FRE 70 not the court's role to evaluate and determin underlying an expert's testimony.

**[12]** AOL and EarthLink move to pi Malackowski's testimony regarding BYOA commissions, profits and revenues [FN40] ‹ basis that BYOA services do not fall un‹ definition of convoyed goods and as such, h probative value. "The expression 'convoye‹ should preferably be limited to sales simultaneously with a basic item." [FN41] Co: sales occur when the sale of one thing is li‹ cause the sale of another. [FN42] Although co: sales may be used in determining a rea: royalty rate where the hypothetical licensee have anticipated increased convoyed sales result of sales of the allegedly infringing p [FN43] defendants argue that BYOA service d‹ meet this definition and should not have included in Malackowski's analysis.

**\*6** BYOA revenues are not probative or r‹ and therefore fail to meet the criteria for adr under FRE 401 and 702. Malackowski admit: deposition that BYOA revenues are irrelevan calculations of a reasonable royalty.
Q. Okay.... At the end of the day, if-if yo this-if you took a pair of scissors and cut tl section of your report that talked about profits in Factor 6, that wouldn't have any imp any of your opinions in this case, would it?
A. I don't think it would change anything.
Q. Nothing?
A. I don't think so.[FN44]

Malackowski later commented that BYO r‹ were "simply listed" in his opinion because tl "a fact in the record." [FN45]

Clearly, Malackowski did not consider revenues as relevant to his calculation reasonable royalty. Although he concludes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

opinion, without any explanation of how or why BYOA offerings are convoyed sales, the revenues derived from that service are not an element of his reasonable royalty computations. Inline agrees that Malackowski does not use those revenues as part of his calculation of a reasonable royalty. It argues however, that AOL's BYOA revenues should be included to show the completeness of his analysis of all the *Georgia-Pacific* factors, including convoyed sales.[FN46]

FRE 401 defines relevant evidence as:
evidence having any tendency to make the existence of any fact that is *of consequence* to the determination of the action more or less probable than it would be without the evidence. (emphasis added).

[13] In determining whether an item of evidence is relevant, the court evaluates whether the evidence " tends to prove the matter sought to be proved."[FN47] The matter under consideration is the reasonable royalty from which to calculate damages. Malackowski concedes that his entire discussion regarding BYOA under *Georgia-Pacific* factor No. 6 literally could be "cut out" of his opinion and it would have no effect on his reasonable royalty analysis. The primary reason that he includes the discussion is because "[i]t's a fact in the record." Because a matter is a fact in the record does not make it a relevant fact. For a fact to be relevant it must be of consequence to the issue under determination. FRE 402 provides that " evidence which is not relevant is not admissible."

Although Inline argues that excluding evidence is an extreme sanction, particularly "before the challenging party has the opportunity to develop the record," this argument assumes that the evidence is relevant and ultimately critical to an expert's conclusions.[FN48] Malackowski concedes that the revenues and/or profits from BYOA services are not critical.

Therefore, the court determines that Malackowski not be allowed to affirmatively testify regarding the revenues and profitability of AOL's BYOA service offerings. This opinion does not address what Inline

may be allowed to present on rebuttal to ev presented by defendants regarding BYOA offerings.

*7 Based on the foregoing, AOL and Eart motion *in limine* to exclude Malackowski's regarding customers provisioned t non-infringing CO lines is denied. AO EarthLink's motion *in limine* to Malackowski's testimony as to AOL's services (D.I.513) is granted to the extent herein.

### B. Motion to Preclude Damages for Non-Infri CO DSLAMS

[14] As stated previously herein, su judgment is available where there is no g issue of material fact. AOL and EarthLink a limit Inline's damages because 35 U.S.C. § 28 requires that damages be adequate to comp for the infringement. Defendants argue tha CO-provisioned ADSL lines do not infrin patents-in-suit, it therefore follows that da may only compensate a patentee for sa infringing products. Without further expla defendants also surmise that none o *Georgia-Pacific* factors or cases where court allowed recovery of damages on non-inf goods have any application to this situation.[FN]

The court finds that, at this stage, to restrict damages analysis as proposed by defenda inappropriate. The experts have differing o theories and, not surprisingly, have r different conclusions regarding damages question of a reasonable royalty an corresponding applicable customer royalty b facts in dispute for the jury to decide. I argument, defendants ignore that calcula reasonable royalty is not merely a function number of infringing systems, other el contribute to and influence the analysis *Georgia-Pacific* factors, which defe disregard in a footnote as "inapplicable," contingencies that influence a reasonable determination. Defendants' misplaced foc Inline's alleged lack of diligence to obtain a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

F

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

underlying data, and arguments about the correctness of Inline's expert calculations show that summary judgment is inappropriate. The court does not determine the credibility of expert witnesses or substitute its judgment for that of the jury. The determination of a reasonable royalty is an issue of fact to be decided by the trier of that fact.

Defendants have not established the lack of a genuine issue of material fact and therefore, defendants' summary judgment motion to exclude damages other than for RT provisioned ADSL lines (D.I.441) is denied.

FN1. Inline's U.S. Patent No. 6,542,585 (" the '585 patent") was subsequently added to this litigation. The '718 patent is not at issue in this litigation.

FN2. D.I. 441 (Defendant's America Online, Inc.'s and EarthLink, Inc .'s Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned through Non-Infringing Central Office DSLAMS. The court previously granted defendants' motion on failure to mark in *Inline Connection Corp. v. AOL Time Warner Inc.,* No. CIV. A. 02-272-MPT, CIV. A. 02-477-MPT, 2006 WL 3495979 (D.Del. Dec.5, 2006).

FN3. D.I. 476 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned through Non-Infringing Central Office DSLAMS).

FN4. D.I. 513, 514 (Defendants' Motion *In Limine* to Exclude or Preclude the Expert Testimony of James E. Malackowski and Opening Brief in support thereof). Defendants also incorporate their Joint Motion for Partial Summary Judgment into this motion *in limine.* See D.I. 441, 444, and 493.

FN5. *Georgia-Pacific Corp. v. Plywood Corp.,* 318 F.Supp. (S.D.N.Y.1970).

FN6. *Daubert v. Merrell Dow Pharm* 509 U.S. 579, 113 S.Ct. 2786 L.Ed.2d 469 (1993).

FN7. D.I. 514 at 8. BYOA or "Brin; Own Access" is a service whereby and on-line services, such as e-m; provided. The BYOA subscrib responsible for acquiring high internet service, whether it is ADSL or satellite. In his expert Malackowski assumed that EarthLi not realize profits from BYOA so thus, he only commented on revenue AOL's BYOA sales in his opinion 477, Ex. F at 52 (April 17, 2006, Report of James E. Malackowski).

FN8. D.I. 555 at 13.

FN9. *Georgia-Pacific* provides a 15 framework for determining a reas royalty from a hypothetical neg between the patent holder an infringer. *Georgia-Pacific* factor No. the effect of selling the patented sp in promoting sales of other products license; the existing value of the in to the licensor as a generator of sales non-patented items; and the extent c derivative or convoyed sales."

FN10. D.I. 555 at 4. According to since Malackowski's analysis of commissions under Factor No. 6 c increase or decrease the royalty ra probative value of his opinion out any prejudice to AOL and his conc are, therefore, reasonable.

FN11. D.I. 476. Malackowski use; methods in calculating a reas royalty-the Market Approach, Approach, and Cost Approach. argues that Malackowski conclude

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

F

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

the Cost Approach was the most logical of the three because AOL and EarthLink would not have had profit projections at the time of the hypothetical negotiation.

FN12. *Daubert,* 509 U.S. at 600.

FN13. See *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

FN14. *Daubert,* 509 U.S. at 593.

FN15. "The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." FRE 702, *Advisory Committee Notes,* 2000 Amendments.

FN16. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994).

FN17. *Id.* at 749-50.

FN18. *Id.* at 791-92 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir.1977)).

FN19. *Id.*

FN20. *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir.1997) (quoting *Meyers,* 559 F.2d at 904).

FN21. *In re Paoli R.R.,* 35 F.3d at 744.

FN22. *Daubert,* 509 U.S. at 596.

FN23. *Id.* at 580.

FN24. *See Id.*

FN25. *See In re Paoli R.R.,* 35 F.3d at

FN26. *In re Paoli R.R. Yard PCB* 916 F.2d 829, 859 (3d Cir.1990).

FN27. 317 F.3d 1387 (Fed.Cir.2003).

FN28. *Id.* at 1392.

FN29. Fed. R. Civ. Pro. 56(c).

FN30. *See Johnston v. IVAC Corp* F.2d 574, 576-77 (Fed.Cir.1989).

FN31. *Celotex Corp. v. Catrett,* 47 317, 325, 106 S.Ct. 2548, 91 L.Ed.2 (1986).

FN32. *Eastman Kodak Co. v. Technical Servs., Inc.,* 504 U.S. 45 112 S.Ct. 2072, 119 L.Ed.2d 265 (199

FN33. *Arthrocare Corp. v. Sm Nephew, Inc.,* 310 F.Supp.2d 638 (D.Del.2004).

FN34. *Festo Corp. v. Shoketsu K Kogyo Kabushiki Co., Ltd.,* 72 F.3 867 (Fed.Cir.1996).

FN35. *See Fromson v. Western Lith & Supply Co.,* 853 F.2d 1568, (Fed.Cir.1988).

FN36. *See Rite-Hite Corp. v. Kelle Inc.,* 56 F.3d 1538, 144 (Fed.Cir.199 banc); *Panduit Corp. v. Stahlin Fibre Works,* 575 F.2d 1152, 116 Cir.1978) (holding that if damages a measured by lost profits, then the owner is entitled to a reasonable under 35 U.S.C. § 284).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

FN37. *Festo,* 72 F.3d at 866.

FN38. D.I. 477, Ex. F at 39-48. The Market Approach values assets based on comparable transactions between unrelated parties. Malackowski considered the licensing history of Inline, AOL and EarthLink; however, he notes that the defendants refused to provide any patent license agreements for the previous 5 years. The Income Approach estimates an asset's price based on the value of the benefits derived from the use of that asset. The 25% Rule of Thumb and the Analytical Approach are two variations of the Income Approach. The 25% Rule of Thumb suggests that a licensee might regard 1/4 of its expected profits from products incorporating a piece of intellectual property as a starting point in negotiating a license for that property. Malackowski explained that he could not locate information regarding AOL or EarthLink's financial projections dating from the time of the hypothetical negotiation; therefore, he used the actual operating profits of AOL and EarthLink from 1999 as a proxy, though these numbers produced 9.6% profit margin for AOL and between 0 and 3.5% profit margin for EarthLink. Lastly, the Cost Approach is based on the economic principles of substitution and price equilibrium. This approach considers out-of-pocket expenses in addition to risks and other adverse economic impacts associated with alternative technology. A portion of the cost-savings is shared between the licensee and licensor. Malackowski explained that he took the cost of defendants' next best alternative to performing self-installation-the performance of truck roll installation. As a result, Malackowski determined that $35 per customer would be a reasonable starting point for a royalty.

FN39. D.I. 477, Ex. F at 48.

FN40. BYOA commissions an[d] resulting revenues and profits collectively referred to as "bounti[es] both defendants and Inline in respective motions.

FN41. *Carborundum Co. v. Molten Equip. Innovations, Inc.,* 72 F.3d 87 n. 8 (Fed.Cir.1995).

FN42. *See Proctor and Gamble Paragon Trade Brands, Inc.,* 989 [F. Supp.] 547, 610 (D.Del.1997).

FN43. *See Carborundum Co.,* 72 F.3d

FN44. D.I. 566, Ex. X at [p.] (Malackowski deposition transcrip[t] 13, 2006).

FN45. *Id.*

FN46. Although the parties expou[nd] whether BYOA service is a convoy[ed] the court need not address the issue [be cause] of Malackowski's concession that re[venues] from BYOA service were not inclu[ded in] his reasonable royalty calculation.

FN47. FRE 401 *Advisory Committee* 1972 Proposed Rules.

FN48. Inline's argument found at p[age] of its answering brief (D.I.555) that helped customers procure inf[ormation] self-install ADSL from other pro[viders] and received the bounties for doing part of its program to also sell customers subscriptions to AOL's [other] offerings," goes to the issue of co[nvoyed] sales. Malackowski, ho[wever] acknowledges that any such pu[rported] convoyed sales did not effect his u[ltimate] opinion on the reasonable royalty.

FN49. D.I. 444 at 15.

D.Del.,2007.

Inline Connection Corp. v. AOL Time Warner

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 108382 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Briefs and Other Related Documents (Back to top)

• 2005 WL 2385481 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Aol's Motion for Reconsideration of the Court's April 13, 2005 Order (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2385624 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Aol's Motion for Reconsideration of the Court'S April 13, 2005 Order (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2385479 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Defendants' Motion for Reconsideration and/or Clarification of the Court's April 13, 2005 Order (Jul. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 2385480 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Defendants' Motion for Reconsideration and/or Clarification of the Court's April 13, 2005 Order (Jul. 28, 2005) Original Image of this Document (PDF)
• 1:02cv00477 (Docket) (Jun. 4, 2002)
• 1:02cv00272 (Docket) (Apr. 12, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

Edward Reines/SV/WGM/US                To  "John M. Williamson" <john.williamson@finnegan.com>
01/30/2007 03:25 PM                    cc  "Steven C. Cherny" <Steven.Cherny@lw.com>
                                       bcc
                                  Subject  Re: Telcordia v. Cisco / Lucent


John,

I am in receipt of your email below refusing to identify the documents that
you think support Telcordia's allegation of an illegal boycott in this patent
case.  Consequently we will have to find out about your basis for this
allegation through your response to our limine motion rather than the meet and
confer process.  That seems silly to me.  However, I will assume that you
believe this curious approach to the limine process is  based on confidential
trial strategy and will not push the issue further now.

Best,

Ed


--------

    ----- Original Message -----
    **From:** "Williamson, John" [John.Williamson@finnegan.com]
    **Sent:** 01/30/2007 05:48 PM
    **To:** Edward Reines
    **Cc:** <steven.cherny@lw.com>
    **Subject:** RE: Telcordia v. Cisco / Lucent


    Ed,

    Your ongoing requests for specific information about Telcordia's trial strategy are not appropriate.

    Regards,

    John


--------

        **From:** edward.reines@weil.com [mailto:edward.reines@weil.com]
        **Sent:** Monday, January 29, 2007 1:36 AM
        **To:** Williamson, John
        **Cc:** steven.cherny@lw.com
        **Subject:** Re: Telcordia v. Cisco / Lucent


        John:

        On the "illegal boycott" limine issue, if you have any particular documents that support the use of
        this kind of inflammatory language, please identify them specifically so we can consider them
        before we file a limine to preclude the use of that or similar language.

Best,

Ed

"Williamson, John" <John.Williamson@finnegan.com>

01/26/2007 03:56 PM

To <edward.reines@weil.com>
cc <steven.cherny@lw.com>
Subject Telcordia v. Cisco / Lucent

Ed,

I write in response to your January 24 email to Don Dunner.  You have asked that we "respond to each point with []our position."  In your email you said that your positions "should not be perceived as final."  We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement.  That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely.  If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so. The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006. That would be the entire scope of their testimony. The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6) Reliance on sales of platforms beyond accused modules – Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards. You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. Additionally, we have been unable to address this issue fully with all of the necessary members of our team. We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products. Please let us know your position."

Again, we are unsure exactly how to interpret your statement. Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.' Telcordia used this phrase in its trial brief. Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco

employees.  Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9)  Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties for foreign sales.  Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10)  Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger.  Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

< END >

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

# Exhibit B

**MOTION *IN LIMINE* NO. 5B [FOR LUCENT ONLY]**
**RE: REFERENCES TO THE ALCATEL-LUCENT MERGER**

Defendant Lucent moves *in limine* to exclude Telcordia from referring to the recent merger between Lucent and Alcatel S.A.

## I.     STATEMENT OF FACTS

Telcordia filed the present action against Lucent on July 16, 2004.  *See* D.I. 1 [Telcordia's Complaint and Demand for Jury Trial Against Lucent].  Telcordia simultaneously filed a similar action against Alcatel S.A., and Alcatel USA, Inc.  *See* Alcatel D.I.[1] 1 [Telcordia's Complaint and Demand for Jury Trial Against Alcatel].  Alcatel S.A. was subsequently dismissed from that lawsuit.  *See* Alcatel D.I. 218 [Order Granting Alcatel's Motion to Stay Proceedings].  The products accused of infringement in this case against Lucent were entirely different from the products accused of infringement in the Alcatel action.

On May 15, 2006, Telcordia filed actions before the International Trade Commission against, among others, Lucent and Alcatel.  *See* Exh. 5B-A [Telcordia's Complaint in the ITC].  On July 10, 2006, Alcatel filed a motion to stay proceedings in the case pending against it in Delaware pursuant to its right under 28 U.S.C. § 1659.  *See* Alcatel D.I. 214 [Alcatel's Motion to Stay Proceedings].  On July 18, Alcatel's Motion to Stay was granted.  *See* Alcatel D.I. 218 [Order Granting Alcatel's Motion to Stay Proceedings].  Lucent, on the other hand, determined that it would proceed with the action pending in Delaware and did not request a stay.  *See* D.I. 200 [July 10, 2006 letter from J. Shaw to The Hon. G.M. Sleet].

---

[1]    The term "Alcatel D.I.," as used herein, refers to documents entered in the docket for *Telcordia v. Alcatel USA, Inc.*, C.A. No. 04-874-GMS that, prior to a stay of proceedings, was also pending in the United States District Court for the District of Delaware.  All other "D.I." numbers refer to documents entered into the docket for *Telcordia v. Lucent Technologies Inc.*, C.A. No. 04-875-GMS.

In November 2006, Lucent and Alcatel S.A. completed a merger and are now one company called Alcatel-Lucent. *See* Exh. 5B-B [Nov. 30, 2006 Press Release, Alcatel-Lucent Website]. However, both Lucent Technologies Inc. and Alcatel USA, Inc. still separately exist as subsidiaries to the merged parent, Alcatel-Lucent. No products that were the subject of Telcordia's action against Alcatel USA are involved in the present litigation.

## II.    ANY REFERENCE TO THE ALCATEL-LUCENT MERGER SHOULD BE EXCLUDED FROM TRIAL

Evidence of the Alcatel-Lucent merger should be excluded from trial because it is not relevant to any disputed issues. Under Federal Rule of Evidence 402, "evidence which is not relevant is not admissible" at trial. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Exh. 5B-C [*Software AG v. Bea Sys., Inc.*, No. 03-739 (GMS), 2005 WL 859266, *1 (D. Del. April 8, 2005)]; Fed. R. Evid. 401.

In the present case, no Alcatel product has ever been in dispute, and Telcordia's separate action against Alcatel has been stayed pursuant to Alcatel's statutory right. Accordingly, there is nothing about the Alcatel-Lucent merger that makes the determination of any disputed fact in this case "any more or less probable." Fed. R. Evid. 401. Given that the Alcatel-Lucent merger has no bearing on any disputed issues in this case, Lucent requested that Telcordia confirm that it will not make any reference to such merger at trial. Telcordia, however, refused to do so and stated that it "reserves its right to reference the Alcatel-Lucent merger." Exh. 5B-D [Jan. 26, 2007 email from J. Williamson]. Although Telcordia reserves this "right" it never explains the basis for its reservation or what possible relevance the fact of the merger would have to any issue in this case.

2

Federal Rule of Evidence 403 allows the court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As described above, any evidence or reference to the Alcatel-Lucent merger has no probative value. Reference to the merger would be both misleading and confusing to a jury, especially given that Alcatel has been separately sued by Telcordia and chose to stay that litigation as permitted by statute.

## III. CONCLUSION

For the foregoing reasons, Lucent requests that Telcordia be precluded from making any reference to the Alcatel-Lucent merger.

A



901 New York Avenue, NW ■ Washington, DC 20001-4413 ■ 202.408.4000 ■ Fax 202.408.4400
www.finnegan.com

**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER**LLP

SMITH R. BRITTINGHAM IV
202.408.4158
smith.brittingham@finnegan.com

CBI  *06-3/6*

May 15, 2006

**VIA HAND DELIVERY**

The Honorable Marilyn Abbott
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

DOCKET NUMBER
*2485*
Office of the
Secretary
Int'l Trade Commission

2006 MAY 15 AM 9: 44

Re:     *Certain Equipment For Telecommunications Or
Data Communications Networks, Including
Routers, Switches, And Hubs, And Components
Thereof*

Dear Secretary Abbott:

Enclosed for filing on behalf of Complainant Telcordia Technologies, Inc. ("Telcordia" or "Complainant") are the following documents in support of Telcordia's request that the Commission commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended. A separate request for confidential treatment of confidential Exhibits 18-19 and confidential Appendix G, is included with this filing.

Accordingly, Telcordia submits the following documents for filing:

1.     An original and twelve (12) copies of the verified Complaint and an original and six (6) copies of the accompanying exhibits, with the Confidential Exhibits segregated from the other material submitted (original and (1) copy unbound, without tabs (Rules 201.6(c), 210.4(f)(3)(i), and 210.8(a));

2.     Four (4) additional copies of both the Complaint and accompanying non-confidential exhibits for service upon each proposed respondent. (Rules 210.4 (f)(3)(i), 210.8(a), and 210.11(a));

3.     Four (4) additional copies of the Confidential Exhibits;

4.     Certified copies of United States Letters Patent Nos. 4,893,306 ("the '306 patent"), Re. 36,633 ("the '633 patent"), and 4,835,763 ("the '763 patent") (collectively the "Asserted Patents"), included as

Washington, DC ■ Atlanta, GA ■ Cambridge, MA ■ Palo Alto, CA ■ Reston, VA ■ Brussels ■ Taipei ■ Tokyo

The Honorable Marilyn Abbott
May 15, 2006
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

Exhibits 1-3 in the original Complaint, and copies thereof included as Exhibits 1-3 in all copies of the Complaint;

5. Certified copies of the assignments involving the Asserted Patents included as Exhibits 4-6 in the original Complaint, and copies thereof included as Exhibits 4-6 in all copies of the Complaint;

6. Certified copies and three (3) copies thereof of the prosecution histories of each of the Asserted Patents included as Appendices A, C, and E (Rule 210.12(c)(2));

7. Four (4) copies of each reference document mentioned in the prosecution histories of the applications leading to the issuance of the Asserted Patents included as Appendices B, D, and F;

8. Three copies of each license under the asserted patents included as Confidential Appendix G;

9. One (1) additional copy of the Complaint and the accompanying non-confidential exhibits for service upon the French embassy in Washington, D.C. (Rule 210.8(a) and 210.11(a)(1)); and

10. A letter and certification pursuant to Commission Rules 201.6(b) and 210.5(d) requesting confidential treatment of Confidential Exhibits 18-19 and Confidential Appendix G.

Thank you for your attention to this matter.

Respectfully submitted,

*Smith R. Brittingham IV/can*

Smith R. Brittingham IV

Enclosures



901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER**LLP

**SMITH R. BRITTINGHAM IV**
202.408.4158
smith.brittingham@finnegan.com

May 15, 2006

**VIA HAND DELIVERY**

The Honorable Marilyn Abbott
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:     *Certain Equipment For Telecommunications Or
Data Communications Networks, Including
Routers, Switches, And Hubs, And Components
Thereof*

Dear Secretary Abbott:

This firm represents Complainant Telcordia Technologies, Inc. ("Telcordia" or "Complainant"), who is concurrently filing a complaint pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

In accordance with Commission Rules 201.6, 210.5, 19 C.F.R. §§ 201.6 and 210.5, Telcordia requests confidential treatment of the business information contained in Confidential Exhibits 18-19 and Confidential Appendix G.

The information for which confidential treatment is sought is proprietary commercial information not otherwise publicly available. Specifically, these Exhibits contain proprietary commercial information concerning Telcordia's licensing of the Asserted Patents, and investments in the domestic industry.

The information described above qualifies as confidential business information pursuant to Rule 210.6(a) because:

1.      it is not available to the public;

2.      unauthorized disclosure of such information could cause substantial harm to the competitive position of Telcordia; and

3.      the disclosure of which could impair the Commission's ability to obtain information necessary to perform its statutory function.

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

The Honorable Marilyn Abbott
May 15, 2006
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

Please contact me if you have any questions about this request, or if this request is not granted in full.

We appreciate your assistance in this matter.

Respectfully submitted,

*Smith R. Brittingham IV /EAN*

Smith R. Brittingham IV

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

**In the Matter of**

**CERTAIN EQUIPMENT FOR
TELECOMMUNICATIONS OR DATA
COMMUNICATIONS NETWORKS,
INCLUDING ROUTERS, SWITCHES,
AND HUBS, AND COMPONENTS
THEREOF**

Investigation No. 337-TA-_____

COMPLAINT OF TELCORDIA TECHNOLOGIES, INC.
UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

**COMPLAINANT**

Telcordia Technologies, Inc.
One Telcordia Drive
Piscataway, NJ 08854
(732) 699-2000

**COUNSEL FOR COMPLAINANT**

Smith R. Brittingham IV
Donald R. Dunner
Steven M. Anzalone
Houtan K. Esfahani
James T. Wilson
John Williamson
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

**PROPOSED RESPONDENTS**

Cisco Systems, Inc.
170 West Tasman Drive
San Jose, CA 95134
(408) 526-4000

Lucent Technologies, Inc.
600 Mountain Avenue
Murray Hill, NJ 07974
(908) 582-3000

Alcatel S.A.
rue La Boétie
75008, Paris, France
33-1-3077-3077

Alcatel USA, Inc.
3400 W. Plano Parkway
Plano, TX 75075
(972) 519-3000

# TABLE OF CONTENTS

I.     Introduction ................................................................................................... 1

II.    Complainant .................................................................................................. 2

III.   Proposed Respondents .................................................................................. 3

IV.    The Technology and Products in Issue ......................................................... 4

V.     The Patents-In-Suit and Non-Technical Descriptions Of The Inventions ........... 5

   A.   The '306 Patent ........................................................................................ 5
     1.   Identification of the Patent and Ownership by Telcordia .................. 5
     2.   Non-Technical Description of the Patent ......................................... 5
     3.   Foreign Counterparts to the Patent .................................................. 7
     4.   Licenses ........................................................................................... 7

   B.   The '633 Patent ........................................................................................ 7
     1.   Identification of the Patent and Ownership by Telcordia .................. 7
     2.   Non-Technical Description of the Patent ......................................... 8
     3.   Foreign Counterparts to the Patent .................................................. 9
     4.   Licenses ........................................................................................... 9

   C.   The '763 Patent ........................................................................................ 9
     1.   Identification of the Patent and Ownership by Telcordia .................. 9
     2.   Non-Technical Description of the Patent ......................................... 10
     3.   Foreign Counterparts to the Patent .................................................. 11
     4.   Licenses ........................................................................................... 11

VI.    Unlawful And Unfair Acts Of Respondents—Patent Infringement ............... 12

   A.   Cisco ........................................................................................................ 13
     1.   The '306 Patent ............................................................................... 13
     2.   The '633 Patent ............................................................................... 15
     3.   The '763 Patent ............................................................................... 16

   B.   Lucent ...................................................................................................... 16
     1.   The '306 Patent ............................................................................... 16
     2.   The '633 Patent ............................................................................... 18
     3.   The '763 Patent ............................................................................... 18

   C.   Alcatel ..................................................................................................... 19
     1.   The '306 Patent ............................................................................... 19
     2.   The '633 Patent ............................................................................... 19

   D.   Direct, Contributory, and Induced Infringement ...................................... 20

VII.   Specific Instances Of Unfair Importation And Sale ...................................... 21

A.  Cisco ................................................................................................................ 22

B.  Lucent .............................................................................................................. 23

C.  Alcatel ............................................................................................................. 24

VIII.  Harmonized Tariff Schedule Item Number .................................................... 24

IX.  The Domestic Industry ........................................................................................ 25

X.  Related Litigation ................................................................................................ 26

XI.  Relief Requested ................................................................................................ 27

## TABLE OF EXHIBITS AND APPENDICES

**Public Exhibit**     **Document**

Exhibit 1     Certified copy of United States Letters Patent No. 4,893,306

Exhibit 2     Certified copy of United States Letters Patent No. Re. 36,633

Exhibit 3     Certified copy of United States Letters Patent No. 4,835,763

Exhibit 4     Certified copy of the recorded assignments of United States Letters Patent No. 4,893,306

Exhibit 5     Certified copy of the recorded assignments of United States Letters Patent No. Re. 36,633

Exhibit 6     Certified copy of the recorded assignments of United States Letters Patent No. 4,835,763

Exhibit 7     Claim Chart Comparing Cisco Products (such as the Catalyst 8510) to Claim 3 of U.S. Patent No. 4,893,306

Exhibit 8     Claim Chart Comparing Cisco Products (such as the Lightspeed 1010) to Claim 33 of U.S. Patent No. Re. 36,633

Exhibit 9     Claim Chart Comparing Cisco Products (such as the ONS 15327) to Claim 7 of U.S. Patent No. 4,835,763

Exhibit 10     Claim Chart Comparing Lucent Products (such as the CBX-500) to Claim 1 of U.S. Patent No. 4,893,306

Exhibit 11     Claim Chart Comparing Lucent Products (such as the CBX-500) to Claim 1 of U.S. Patent No. Re. 36,633

Exhibit 12     Claim Chart Comparing Lucent Products (such as the DMX Access Multiplexer (AM)) to Claim 7 of U.S. Patent No. 4,835,763

Exhibit 13     Claim Chart Comparing Alcatel Products (such as the OmniSwitch ) to Claim 1 of U.S. Patent No. 4,893,306

Exhibit 14     Claim Chart Comparing Alcatel Products (such as the Omniswitch) to Claim 1 of U.S. Patent No. Re. 36,633

Exhibit 15     A series of photographs of the Cisco Catalyst 8510 product

| | |
|---|---|
| Exhibit 16 | A series of photographs of the Lucent CBX-500 product |
| Exhibit 17 | A series of photographs of the Alcatel Omniswitch product |
| **Confidential Exhibit** | **Document** |
| Confidential Exhibit 18 | A list of all entities licensed under the Asserted Patent |
| Confidential Exhibit 19 | Description of Telcordia's Domestic Industry |
| **Appendix** | **Document** |
| Appendix A | Four copies of the prosecution history of United States Letters Patent No. 4,893,306 |
| Appendix B | Four copies of each reference mentioned in the prosecution history of United States Letters Patent No. 4,893,306 |
| Appendix C | Four copies of the prosecution history of United States Letters Patent No. Re. 36,633 |
| Appendix D | Four copies of each reference mentioned in the prosecution history of United States Letters Patent No. Re. 36,633 |
| Appendix E | Four copies of the prosecution history of United States Letters Patent No. 4,835,763 |
| Appendix F | Four copies of each reference mentioned in the prosecution history of United States Letters Patent No. 4,835,763 |
| **Confidential Appendices** | **Document** |
| Confidential Appendix G | Three copies of licenses under the Asserted Patents |

## I.    INTRODUCTION

1.    This Complaint is filed by Telcordia Technologies, Inc. ("Telcordia"), pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based on the unlawful importation into the United States, the sale for importation and the sale within the United States after importation, by manufacturers, importers, or consignees of certain equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof that infringe any of United States Letters Patent Nos. 4,893,306 ("the '306 patent"), Re. 36,633 ("the '633 patent"), and 4,835,763 ("the '763 patent") sometimes collectively referred to as "the Asserted Patents."

2.    The proposed respondents are Cisco Systems, Inc., Lucent Technologies, Inc., Alcatel, S.A., and Alcatel USA, Inc.

3.    Certified copies of the Asserted Patents are attached as **Exhibits 1 through 3,** respectively.  Telcordia owns all right, title, and interest in each of the Asserted Patents. Certified copies of the recorded assignments of each of the patents are attached as **Exhibits 4 through 6.**

4.    An industry as required by 19 U.S.C. § 1337(a)(2) and (3) exists in the United States relating to the technology protected by the Asserted Patents.

5.    Telcordia seeks, as relief, an exclusion order barring from entry into the United States infringing equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for Cisco, Lucent, or Alcatel equipment.  Telcordia also seeks, as relief, cease and desist orders prohibiting the importation, sale, offer for sale, advertising, testing, or the soliciting of the sale of equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof, encompassed by the Asserted Patents.

1

## II.    COMPLAINANT

6.  Complainant Telcordia is a corporation organized under the laws of the Delaware, with its principal place of business located at One Telcordia Drive, Piscataway, New Jersey 08854.

7.  Telcordia is a provider of communications software, engineering, and consulting services throughout the United States.

8.  Telcordia's roots in the telecommunications industry begin with Alexander Graham Bell.  Telcordia was formerly known as Bell Communications Research, Inc. (sometimes referred to as "Bellcore").  Bellcore was formed in 1984 as part of the breakup of AT&T to assist the newly created Regional Bell Operating Companies with technical support and research aimed at insuring the safety and integrity of the U.S. telecommunications network.

9.  Over the years, Telcordia has obtained more than 800 U.S. patents and has developed a rich history as an agent of change in the telecommunications industry. Telcordia's research led to a number of important communications formats and standards, such as the Multipurpose Internet Mail Extensions (MIME), Asymmetric Digital Subscriber Line (ADSL), Virtual Local Area Network (VLAN), Asynchronous Transfer Mode (ATM), Frame Relay, Synchronous Optical NETwork (SONET), Advanced Intelligent Network (AIN), Integrated Services Digital Network (ISDN), as well as other industry breakthroughs.

10. Today Telcordia is a leading provider of the software and services needed to manage multi-vendor, multi-technology, and multi-service networking infrastructures.

11. Telcordia continues to be at the forefront of telecommunications and data communications research, employing a number of research and licensing personnel in the United States.

2

### III.  PROPOSED RESPONDENTS

12.  On information and belief, proposed respondent Cisco Systems, Inc. ("Cisco") is a corporation organized under the laws of California with its principal place of business located at 170 West Tasman Drive, San Jose, California 95134. Cisco designs and sells hardware, software, and services relating to Internet networks, including routers, switches and hubs used in regulating and directing the transmission of data over various types of Internet networks.

13.  On information and belief, proposed respondent Lucent Technologies, Inc. ("Lucent") is a corporation organized under the laws of Delaware with its principal place of business located at 600 Mountain Avenue, Murray Hill, New Jersey 07974. Lucent designs and sells hardware, software, and services relating to various types of communications networks, including networks operating over the Internet.

14.  On information and belief, proposed respondent Alcatel S.A. is a corporation organized under the laws of France with its principal place of business located at 54, rue La Boétie, 75008, Paris, France. Alcatel S.A. provides a wide range of communications solutions in the form of hardware and software to telecommunication carriers, Internet service providers and enterprises for delivery of voice, data and video applications. In 2000, Alcatel S.A. acquired a Canadian company known as "Canadian Newbridge," and began providing the ATM products previously being sold by Canadian Newbridge.

15.  On information and belief, proposed respondent Alcatel USA, Inc. ("Alcatel USA") is a corporation organized under the laws of Delaware with its principal place of business located at 3400 W. Plano Parkway, Plano, Texas 75075, and is a subsidiary of Alcatel S.A. Alcatel USA assists Alcatel in selling products and services to United States customers. At times, Alcatel S.A. and Alcatel USA are referred to collectively as "Alcatel."

3

## IV.     THE TECHNOLOGY AND PRODUCTS IN ISSUE

16.   The products in issue in this Complaint are certain types of equipment for telecommunications or data communications networks, including (but not limited to) devices commonly referred to as routers, switches, and hubs.  Also at issue are components of that equipment, particularly printed circuit boards and semiconductor chips that go onto those boards.

17. Communications networks rely on creating a path for data travel from one node to another, often over lines that are shared by many different types of devices attempting to communicate with many other devices.  As a result, success depends on devices and systems that can direct a variety of data types to the correct destination.

18. Since information is placed on shared lines, it must be identifiable so that it can later be extracted from the stream of information traveling over the shared line.  Thus, such a network requires devices that will read the incoming information, determine where particular pieces of information should go, and direct each piece to the next series of lines available to send that particular information on its way.  Today's communications networks use devices known generally as routers, switches, and hubs, to perform the functions of identifying information and directing it to its proper address or further distributing it.

19. Initially, the most substantial nationwide communications network involved telephone signals, ie. voice transmission.  With the advent of the internet and the widespread use of fiber optic cable, communications networks now can carry different types of information.  For example, fiber optic cables now carry data as well as voice transmissions, and the various types of data now traveling over those networks can be formatted in different ways.

20. In addition, modern devices, such as computers, are now capable of accepting different types of signals—data, voice files, faxes, etc.  This in turn requires networks capable of

4

handling and routing different formatted information, as well as routers, switches and hubs that can support such capabilities.

## V.     THE PATENTS-IN-SUIT AND NON-TECHNICAL DESCRIPTIONS OF THE INVENTIONS

### A.     The '306 Patent

#### 1.     Identification of the Patent and Ownership by Telcordia

21.    United States Letters Patent No. 4,893,306, entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," issued on January 9, 1990, to inventors Hung-Hsiang J. Chao, San H. Lee, and Liang T. Wu.  The '306 patent expires on November 10, 2007, and is based on Patent Application Serial No. 118,977 filed on November 10, 1987.

22.    The '306 patent has four independent claims and three dependent claims. Independent claims 1 and 3 and dependent claim 4 are being asserted in this investigation.

23.    Telcordia owns by assignment the entire right, title, and interest in and to the '306 patent. *See* **Exhibit 4.**

24.    This Complaint is accompanied by four copies of the certified prosecution history of the '306 patent, and four copies of each reference mentioned in the prosecution history. *See* **Appendices A and B.**

#### 2.     Non-Technical Description of the Patent

25.    The '306 invention allows different data sources, even those providing data at different bit rates (for example, voice, video, and computer data), to share the same communication link using a technique the patent calls "Dynamic Time Division Multiplexing" (DTDM).  In conventional "Time Division Multiplexing" (TDM), signals from different sources are transmitted over the same link by transmitting signals from each of the sources only during a fixed time period (slot) and in a fixed rotation.  In contrast, DTDM permits data from different

5

sources to be transmitted during any available time period, i.e., the multiplexing of signals is flexible or "dynamic." Further, because DTDM does not require each source to wait before its data can be transmitted over the shared link (as can happen in TDM), each stream of source data can be transmitted at its own particular "bit rate."

26. DTDM takes advantage of "high bandwidth" communication links, i.e., transmission media that can transfer large volumes of data at a high rate. Before source data (in the form of a series of ones and zeroes, or "bits") is transmitted, the bits are first arranged in the form of "packets," which consist of discrete blocks of data, each having a "header" at the front indicating where the data is being sent. As soon as a packet from any source has been formed and is ready to be sent, that packet can be written into an even larger package of data, referred to as a "frame," for transmission over a communication link. The frames, which are continually being created, are divided into separate "overhead" and "payload" fields, which are arranged so that packets of source data can be placed in the payload fields.

27. A simplified illustration of the "dynamic" multiplexing of data from three different sources on the same communication link, as taught by the '306 patent, is set forth below.



Shared Fiber Optic Line

28. The '306 patent's DTDM technique thus accommodates different sources of data, even ones that transmit data at different bit rates. This means that variable bit-rate sources (such as packet-generating computer devices that can transmit large but intermittent "bursts" of data) as well as constant bit-rate sources (such as traditional telephones that transmit a smaller but continuous volume of data) can transmit data over the same communication link. In this way,

the '306 invention eliminates the need to construct separate telecommunications infrastructures to deal with different kinds of data sources.

### 3.     Foreign Counterparts to the Patent

29.   There are no foreign patents or foreign patent applications corresponding to the '306 patent.

### 4.     Licenses

30.   A list of entities licensed under the Asserted Patents is attached as **Confidential Exhibit 18.**  Pursuant to Commission Rule 210.12(c)(1) three copies of the licenses are included in **Confidential Appendix G.**

## B.     The '633 Patent

### 1.     Identification of the Patent and Ownership by Telcordia

31.   United States Letters Patent No. Re. 36,633, entitled "Synchronous Residual Time Stamp for Timing Recovery in a Broadband Network," was reissued on March 28, 2000, to inventors Paul E. Fleischer and Chi-Leung Lau.  The '633 patent is based on Patent Application Serial No. 09/639,887, filed on November 8, 1995.  The '633 patent is a reissue of U.S. Patent 5,260,978, issued November 9, 1993 and now surrendered, which was based on Patent Application Serial No. 07/969,592, filed on October 30, 1992.  The '633 patent expires on October 30, 2012.

32.   The '633 patent has 15 independent claims and 17 dependent claims.  Independent claims 1, 3, 5, 8, 11, and 33 are asserted in this investigation.

33.   Telcordia owns by assignment the entire right, title, and interest in and to the '633 patent. *See* **Exhibit 5.**

7

34. This Complaint is accompanied by four copies of the certified prosecution history of the '633 patent, and four copies of each reference mentioned in the prosecution history. *See* Appendices **C and D.**

## 2.    Non-Technical Description of the Patent

35. The '633 invention ensures that the source and destination clocks used in transporting data over a packet network are synchronized, using a technique referred to in the industry as the Synchronous Residual Time Stamp ("SRTS") method of clock recovery. Without "clock recovery," small timing differences caused by the packet transmission process will eventually result in a loss of information. This problem can be illustrated by imagining a telephone call as a series of telegrams provided to a messenger at a rate of one every five seconds. If the messenger delivers the telegrams at a slower rate than they were received, the telegrams will at some point overflow the "in basket," and the phone call will become unintelligible as telegrams get lost or jumbled.

36. One solution to this problem is for the messenger to apply a "time stamp" to each telegram as it is received, which would allow the messenger to deliver the telegrams at the same rate they were received. As explained above in connection with the '306 patent, source data can be transmitted on a communication link with the bits arranged in the form of packets and frames, which can be divided into separate fields. In such a network, time stamp information can be included in, for example, the "overhead" field of the packets or frames being transported.

37. Unfortunately, traditional clock recovery techniques using a "time stamp" required transport of a relatively large number of data bits, thus taking up "bandwidth" in the communication links (and "space" in the frames and packets) that could otherwise be used to transmit data, voice, or video information. Instead of relying on this traditional approach, the '633 patent discloses a technique that transports timing information on a network more

8

efficiently, i.e., using less bandwidth and space. The invention discloses a "Residual" Time Stamp technique that significantly reduces the number of bits required to provide a time reference but still provides enough timing information to enable synchronization of the source and destination clocks. In a simplified analogy, instead of sending a message with a time stamp having information regarding the year, month, day, hour, minute, and second, the '633 invention provides a time stamp consisting only of the information regarding the second. Due to the inventors' ingenuity, however, this is still enough information to allow the clocks to be synchronized.

### 3.    Foreign Counterparts to the Patent

38.    There are no foreign patents or foreign patent applications corresponding to the '633 patent.

### 4.    Licenses

39.    A list of entities licensed under the Asserted Patents is attached as **Confidential Exhibit 18**. Pursuant to Commission Rule 210.12(c)(1) three copies of the licenses are included in **Confidential Appendix G**.

## C.    The '763 Patent

### 1.    Identification of the Patent and Ownership by Telcordia

40.    United States Letters Patent No. 4,835,763, entitled "Survivable Ring Network," issued on May 30, 1989, to Chi-Leung Lau. The '763 patent expires on February 4, 2008, and is based on Patent Application Serial No. 152,238, filed on February 4, 1988.

41.    The '763 patent has four independent claims and four dependent claims. Independent claims 1 and 7 and dependent claims 2 and 8 are asserted in this investigation.

42.    Telcordia owns by assignment the entire right, title, and interest in and to the '763 patent. *See* **Exhibit 6**.

43.  This Complaint is accompanied by four certified copies of the prosecution history of the '763 patent, and four copies of each reference mentioned in the prosecution history. *See* **Appendices E and F.**

> ## 2.     Non-Technical Description of the Patent

44.  The '763 patent provides a novel way for communications networks to survive accidents that might occur to portions of the network, such as utility workers digging into the ground and cutting a cable, potentially disrupting phone service, email, and other communications to buildings in the area.

45. In the typical prior art communications network, a "node" on the network can send messages to other nodes, but only in one direction.  As a result, the most common approach used in the prior art to avoid service disruptions caused by accidents is (as shown in the figure below) to have both a main path (Ring 1) and a standby path (Ring 2) that is used when the main path fails:



46. When a problem occurs, the prior art systems transfer communications to the standby ring or initiate a "looping back" of communication received on one ring to the other ring.  The techniques for transferring communications and "looping back," however, are complicated.

10

47. The '763 patent improves on the prior art by providing a simple way to survive accidents and other service failures. Like the old arrangements, the invention of the '763 patent arranges the network in a ring configuration and uses redundant communications paths. But unlike the prior art, the invention of the '763 patent does not seek to maintain the ring characteristics by transferring communications to a standby path following a fault. Indeed, the patented arrangement does not function as a ring following a break in the main path. Instead, the '763 patent teaches parallel, active paths and provides protection switching for lower level, or "subrate" communications, within the rings when faults occur.

48. Ring communications consist of message-carrying subrate channels that are combined together, or "multiplexed," to form a main signal. When a fault is detected, the patented arrangement inserts error signals into the faulty subrate channels within the main signal. The error signals allow the signals from the good subrate channels on the other ring to be substituted at the destination node for the signals from the faulty subrate channels. Using this arrangement, the nodes do not need to know in advance which "ring" or main signal to use, significantly reducing the complexity of the arrangement.

### 3.    Foreign Counterparts to the Patent

49.   There are no foreign patents or foreign patent applications corresponding to the '763 patent.

### 4.    Licenses

50.   A list of entities licensed under the Asserted Patents is attached as **Confidential Exhibit 18.** Pursuant to Commission Rule 210.12(c)(1) three copies of the licenses are included in **Confidential Appendix G.**

11

## VI.  UNLAWFUL AND UNFAIR ACTS OF RESPONDENTS—PATENT INFRINGEMENT

51. The accused products are devices and systems that work with telecommunications or data communications networks, including routers, switches, and hubs. Although the accused products have specific product numbers, the specific items sold to an individual customer may be uniquely configured for that customer. Indeed, many of the accused products are said to be "scalable," meaning they can be expanded to meet the customer's specific needs.

52. As sold to the customer, the accused products usually consist of a metal chassis or rack with a backplane communicating to slots for insertion of boards, the boards inserted into the chassis, and related items. The size of the chassis depends on the application for which the product is intended. Products for smaller applications may be roughly the size of a home stereo system component, while products for larger applications may be the size of a refrigerator or even larger. The chassis holds one or more modules or printed circuit boards, which in turn contain various integrated circuits as well as hardware for connecting the products to the telecommunications or data network. On information and belief, the final products may be assembled in the United States or abroad, but for those products assembled in the United States, most of the modules, printed circuit boards, and integrated circuits that make up final products are imported.

53. The specific products of Cisco, Lucent, and Alcatel that Telcordia currently believes have infringed or are infringing the asserted patent claims are set forth below. The list is based on Telcordia's current understanding, and it may be expanded or contracted as further information is obtained. By identifying specific products below, Telcordia is not intending to limit the scope of the investigation to the specific products listed, but rather intends to accused any products that infringe any of the asserted patent claims.

12

54. Among the components that may be imported and that, therefore, are at issue in this investigation, are boards that go into the accused routers, switches, and hubs, as well as particular semiconductor chips that are specially adapted for use in the accused devices. For example, on information and belief, many of the accused products use PMC-Sierra "framing" chips, such as the "S/UNI" family of chips, in a manner that infringes the '306 patent. ("S/UNI" is a PMC-Sierra registered trademark that stands for "Saturn User Network Interface".) Framing chips perform the function of arranging the data to be transmitted by the router or switch into frames as called for in, for example, the '306 patent. Without those chips, the larger equipment could not function, and the chips are designed and sold specifically to perform that function.

55. Many of the accused products also use other PMC-Sierra chips that implement, among other functions, the use of SRTS in a manner that infringes the '633 patent. Without those chips, the larger equipment could not perform that function, and the chips are designed and sold specifically to perform that function.

A.    **Cisco**

1.    **The '306 Patent**

56. On information and belief, Cisco products having components with framing chips that map packetized data into SONET frames infringe one or more of claims 1, 3 and 4 of the '306 patent. At least some of the accused Cisco products use PMC-Sierra framing chips.

57. The Cisco products believed to infringe claims 1, 3, and/or 4 of the '306 patent include at least:

- Cisco's Optical Networking Products including at least the ONS 15190, 15194, 15327, 15300 series (including 15301/ISR3301, 15303/ISR3303, 15304,15310, 15310-CL, 15310-MA, and 15327 units), 15454 MSPP, 15454 MSTP, and 15600 MSPP;

13

- Cisco's Switching Products, including at least the Catalyst 5000 series (including at least the 5000 and 5002 units), Catalyst 5500 series (including at least the 5500, 5505, and 5509 units), Catalyst 6000 series (including at least the 6006 and 6009 units), Catalyst 6500 series (including at least the 6503, 6509, 6509-NEB, 6509-NEB-A, and 6513 units), Catalyst 8500 series (including at least the 8510 MSR, 8510 CSR, and 8540 MSR units), Lightstream 1010, Lightstream 2020, MGX 8200 series (including at least the MGX 8220, 8230, 8240, 8250, and 8260 units), MGX 8800 series (including at least the MGX 8830, 8830/B, 8850, 8850/B and 8880 units), MGX 8900 series (including at least the MGX 8900 and 8950 units), IGX 8400 series (including at least the IGX 8410, IGX 8420, IGX 8430, and IGX 8450), BPX 8600 series (including at least the BPX 8620, BPX 8650, and BPX 8680);

- Cisco's Router Products including at least the 2691, 3600 series (including at least the 3620, 3631, 3640, 3660, 3661, and 3662 units), 3700 series (including at least the 3725 and 3745 units), 3800 series (including at least the 3725 and 3745 units), Cisco 6000 series (including at least the 6015, 6130, 6160, 6260, 6701, 6705, and 6732 units), Cisco 7000 series (including at least the 7000 and 7010 units), 7100 series (including at least the 7120 and 7140 units and the Cisco uBR7100 Universal Broadband Router Series, including the uBR7111, 7111E, 7114, and 7114E units), 7200 series (including at least the 7202, 7204, 7204 VXR, 7206, and 7206 VXR units and the Cisco uBR7200 Universal Broadband Router Series, including the uBR7223, uBR7246, and uBR7246VXR units), 7300 series (including at least the 7301 and 7304 units), 7400 series (including at least the 7401 ASR unit), 7500 series (including at least the 7505, 7507, 7513, and 7576 units), 7600 series (including at least the 7603, 7604, 7606, 7609,

14

and 7613), 10000 series (including at least the 10005, 10008, and 10720 units and the Cisco uBR10012 Universal Broadband Router), 12000 series (including at least the 12004, 12006, 12008, 12010, 12012, 12016, 12404, XR12404, 12406, XR12406, 12410, XR12410, 12416, XR12416, 12810, and 12816 units), and CRS-1, 6400 Broadband Concentrator, and 8110 Broadband Termination Unit.

58. A chart that applies representative claim 3 of the '306 patent to one of the products within the class of Cisco products using ATM SONET Framing Chips, specifically the Catalyst 8510, is attached as **Exhibit 7.**

**2.    The '633 Patent**

59. On information and belief, Cisco's products capable of using the Synchronous Residual Time Stamp ("SRTS") clock recovery technique complying with the ATM Forum Standard, ITU-T Standard I.363.1 issued by the International Telecommunications Union, and/or ANSI T1.630 issued by the American National Standards Institute, infringe one or more of claims 1, 3, 5, 8, 11, and 33 of the '633 patent.

60. The Cisco products believed to infringe claims 1, 3, 5, 8, 11, and 33 of the '633 patent are products with ATM-enabled ports, including at least Cisco's Lightstream 1010 Switch, 3600 series (including at least the 3620, 3631, 3640, 3660, 3661, and 3662 units), uBR7200 series routers (including at least the uBR7223, uBR7246, and uBR7246VXR units), 7200 series routers (including at least the 7202, 7204, 7204VXR, 7206, and 7206VXR units), 7500 series routers (including at least the 7505, 7507, 7513, and 7576 units), MGX 8200 Series Edge Concentrator (including at least the 8220, 8230, 8240, 8250, and 8260 units), IGX 8400 series switches (including at least the 8410, 8420, 8430, and 8450 units), Catalyst 5500 series and 8500 series switches (including at least the 8510MSR, 8510CSR, and 8540MSR units), MGX

15

8830, 8850 and 8880 series switches, 8110 Broadband Termination Unit, IP Transfer Point, and ATM Port Adapter and Interface Modules.

61. A chart that applies representative claim 33 of the '633 patent to the Cisco products that uses the SRTS standard clock recovery technique, such as the Lightspeed 1010 Switch, is attached as **Exhibit 8.**

### 3. The '763 Patent

62. On information and belief, Cisco's products that provide path protection switching, including Unidirectional Path Switched Ring ("UPSR") switching, infringe one or more of claims 1, 2, 7, and 8 of the '763 patent.

63. The Cisco products believed to infringe claims 1, 2, 7, and/or 8 of the '763 patent include at least the ONS 15301/ISR3301, ONS 15303/ISR1303, ONS 15304, ONS 15305, ONS 15310, ONS 15310-CL, ONS 15310-MA, ONS 15327, ONS 15350, ONS 15454, ONS15454 MSPP, ONS 15454 MSTP, ONS 15455, ONS 15530, ONS 15540 ESP, ONS 15540 ESPx, ONS 15600 MSPP, 6705 Access Device, and 6732 Access Device..

64. A chart that applies representative claim 7 of the '763 patent to one of the Cisco products that uses UPSR, specifically the ONS 15327, is attached as **Exhibit 9.**

### B. Lucent

### 1. The '306 Patent

65. On information and belief, Lucent products having components with framing chips that map packetized data into SONET frames infringe one or more of claims 1, 3 and 4 of the '306 patent. At least some of the accused Lucent products use PMC-Sierra framing chips.

66. The Lucent products believed to infringe claims 1, 3, and/or 4 of the '306 patent include at least:

16

- Lucent products or processes using PMC-Sierra S/UNI framing chips for mapping packets (ATM cells) into SONET frames, including Lucent's CBX-500 Multiservice WAN switch equipped with ATM enabled ports;

- Lucent's CBX-500 switch using physical layer devices other than the PMC-Sierra S/UNI ATM framing chips;

- the DMX Access Multiplexer, the GX-550 Multiservice WAN Switch, CBX-3500 Multiservice Edge Switch, DMXtend Access Multiplexer, DMXplore Access Multiplexer, DMXpress Access Multiplexer, DDM 2000, and LambdaUnite Multiservice Switch;

- the Flexent Serving GPRS Support Node (SGSN), Lucent Gateway GPRS Support Node (GGSN), and AnyMedia Access System;

- the AXC 2000, APX 1000, APX 8000, MAX TNT Universal Gateway, APX 8100;

- the Stinger series of products (including Stinger FS+, Stinger RT, Stinger LS, Stinger DSL, and Stinger MRT);

- the 5E-XC Switch and Lucent Compact Switch;

- the PacketStar PSAX 20, 1000, 1250, 2300, and 4500 platforms, and the PacketStar AC 60;

- and the B-STDX 8000/9000 and TMX0880 products.

67. A chart that applies representative claim 3 of the '306 patent to one of the products within the class of Lucent products using ATM SONET Framing Chips, specifically the CBX-500 with an S/UNI framing chip, is attached as **Exhibit 10**.

17

### 2.     The '633 Patent

68. On information and belief, Lucent's products capable of using the Synchronous Residual Time Stamp ("SRTS") clock recovery technique complying with the ATM Forum Standard, ITU-T Standard I.363.1 issued by the International Telecommunications Union, and/or ANSI T1.630 issued by the American National Standards Institute, infringe one or more of claims 1, 3, 5, 8, 11, and 33 of the '633 patent.

69. The Lucent products believed to infringe claims 1, 3, 5, 8, 11, and 33 of the '633 patent include at least the CBX 3500 MS Edge Switch, CBX 500 MS WAN Switch, GX 550 MS Wan Switch, the PacketStar PSAX 1000, 1250, 2300, and 4500, the PacketStar AC60, PacketStar PSAX 20, and AXC 2000 Switch.

70. A chart that applies representative claim 33 of the '633 patent to one of the Lucent products that uses the SRTS standard clock recovery technique, specifically the CBX-500 with a PMC-Sierra S/UNI framing chip, is attached as **Exhibit 11**.

### 3.     The '763 Patent

71. On information and belief, Lucent's products that provide path protection switching, including UPSR ("Unidirectional Path Switched Ring") switching, infringe one or more of claims 1, 2, 7, and 8 of the '763 patent.

72. The Lucent products believed to infringe claims 1, 2, 7, and/or 8 of the '763 patent include at least the DMX Access Multiplexer (AM), DMXtend Access Multiplexer, DMXplore Access Multiplexer, DMXpress Access Multiplexer, DDM 2000, LambdaUnite Multiservice Switch, WaveStar TDM 10G, and Wave Star TDM 2.5G products.

73. A chart that applies representative claim 7 of the '763 patent to one of the Lucent products that uses UPSR, specifically the DMX Access Multiplexer (AM), is attached at **Exhibit 12**.

18

C. **Alcatel**

1. **The '306 Patent**

74. On information and belief, Alcatel products having components with framing chips that map packetized data into SONET frames infringe one or more of claims 1, 3 and 4 of the '306 patent. At least some of the accused Alcatel products use PMC-Sierra framing chips.

75. The Alcatel products believed to infringe claims 1, 3, and/or 4 of the '306 patent include at least:

- Alcatel's Omniswitch products using PMC-Sierra S/UNI framing chips in ATM Access Modules or other physical layer devices for mapping packets (ATM cells) into SONET frames;

- Alcatel's OmniAcess, 7670 RSP, 7670 ESE, 7x50 (including at least the 7450 and 7750), 7470 MSP, 7270 MSC, 3600 Mainstreet, and 3600+ Mainstreet products that map either or both ATM and non-ATM forms of packetized data into SONET frames.

76. A chart that applies representative claim 3 of the '306 patent to one of the products within the class of Alcatel products using ATM SONET Framing Chips, specifically the Omniswitch, is attached as **Exhibit 13**.

2. **The '633 Patent**

77. On information and belief, Alcatel's products capable of using the Synchronous Residual Time Stamp ("SRTS") clock recovery technique complying with the ATM Forum Standard, ITU-T Standard I.363.1 issued by the International Telecommunications Union, and/or ANSI T1.630 issued by the American National Standards Institute, infringe one or more of claims 1, 3, 5, 8, 11, and 33 of the '633 patent.

19

78. The Alcatel products believed to infringe claims 1, 3, 5, 8, 11, and 33 of the '633 patent include at least the Omniswitch, OmniAccess, 7670 RSP, 7670 ESE, 7470 MSP, 7270 MSC, 3600 Mainstreet, 3600+ Mainstreet, and SpeedTouch 690 products.

79. A chart that applies representative claim 33 of the '633 patent to one of the Alcatel products that uses the SRTS standard clock recovery technique, specifically the Omniswitch, is attached as **Exhibit 14**.

**D.      Direct, Contributory, and Induced Infringement**

80. To the extent any of the asserted claims require products sold by the respondents to be installed in a network or operated in order to satisfy all claim elements, on information and belief the accused products infringe both directly and indirectly.

81. On information and belief, each of the respondents tests or operates the accused products in the United States by using them in a network and performing the claimed methods, thereby directly infringing any claim requiring such operation.

82. Cisco, Lucent, and Alcatel have had notice of the three asserted patents since, at a minimum, the filing of lawsuits in the U.S. District Court for Delaware in July 2004, as described below in Section X.

83. Each of the accused products listed above are specifically designed to be combined with telecommunications or data communications networks and to comply with various standards in a manner that results in the apparatuses and methods of the asserted claims.

84. The accused products have no substantial non-infringing use other than to be combined with telecommunications or data communications networks and to comply with various standards in a manner that results in the apparatuses and methods of the asserted claims.

85. Respondents induce infringement of the asserted claims by designing the accused products or boards to be incorporated into the accused products specifically for use in

20

telecommunications or data communications networks and to comply with various standards in a manner that results in the apparatuses and methods of the asserted claims, by publishing materials describing the use of the accused products in infringing manners, and by offering support and technical assistance to their customers that encourages use of the accused products in telecommunications or data communications networks in ways that infringed the asserted claims.

## VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

86. The accused equipment is not widely available to the general public.  Instead, it is typically sold directly to customers developing or operating a telecommunications or data communications network, and is often modified to meet a customer's specific requirements. Some of the accused equipment is extremely large and costs several thousand dollars or more. The accused equipment is not sold at retail establishments and does not always have standard packaging or markings with geographic origins of the equipment or its components.  Once installed in telecommunications or data communications networks, the equipment is typically kept in secure locations away from public scrutiny.

87. Cisco, Lucent, Alcatel, and PMC-Sierra have not stated publicly where the specific accused equipment or chips are manufactured, and such information is not widely available to the general public.  As a result, Telcordia is unable to provide publicly available information that details the importation of the accused products.[1]

88. On information and belief, Cisco, Lucent, and Alcatel import, sell for importation, and/or sell within the United States after importation, the accused equipment, or at a minimum

---

[1] Telcordia has obtained information during discovery in the pending district court cases regarding these issues, but cannot currently disclose that information in light of the protective orders governing those litigations.

those three companies (or their contract manufacturers acting on their behalf) import components used in the accused products or they sell those imported components after importation as part of the larger accused equipment. Specifically, it is believed that Cisco, Lucent, and Alcatel use imported boards or modules containing, among other things, PMC-Sierra chips made overseas, to assemble and sell final products in the United States.

89. Due to the size and costs of the accused products, Telcordia has not submitted physical exemplars together with the Complaint. As described below, Telcordia has included as exhibits digital pictures of the accused infringing devices it has been able to obtain.

A.    Cisco

90. On information and belief, Cisco manufacturers and assembles various infringing routers, switches, hubs and other telecommunications equipment, and sells that equipment in the United States. It is believed that Cisco contracts with several well-known companies who provide printed circuit boards to the electronics industry, that those companies make the boards that go into Cisco's accused products, and that many (if not all) of those boards are made outside the United States. For example, in their most recent annual reports, Jabil Electronics, Celestica, Inc., and Solectron Corporation all list Cisco as one of their largest customers for electronic manufacturing services. *See generally* http://www.jabil.com, http://www.celestica.com, and http://www.solectron.com. Each of those suppliers has significant overseas operations.

91. In addition, each Cisco board contains a number of integrated circuits. On information and belief, nearly all integrated circuits are made, at least in part, outside the United States.

92. A Telcordia employee obtained a Cisco Catalyst 8510 from a distributor in the United States. **Exhibit 15** is a series of photographs of that product. The metal chassis indicates that it

22

was made in the United States, but at several of the circuit boards contained within the chassis indicates that they were made in Malaysia, and many of the chips bear legends indicating they were manufactured outside the U.S. The Catalyst 8510 boards include several PMC-Sierra chips, including a PMC-Sierra S/UNI 155-Lite framer chip, which is believed to be manufactured outside the United States.

### B.     Lucent

93. On information and belief, Lucent manufacturers and assembles various infringing routers, switches, hubs and other telecommunications equipment, and sells that equipment in the United States. It is believed that Lucent contracts with several well-known companies who provide printed circuit boards to the electronics industry, that those companies make the boards that go into Lucent's accused products, and that many of those boards are made outside the United States. For example, in their most recent annual reports, Celestria, Inc., and Solectron Corporation all list Lucent as one of their largest customers for electronic manufacturing services. *See generally* http://www.celestria.com, and http://www.solectron.com. Each of those suppliers has significant overseas operations.

94. In addition, each Lucent board contains a number of integrated circuits. On information and belief, nearly all integrated circuits are made, at least in part, outside the United States.

95. A Telcordia employee obtained a Lucent CBX-500 from a distributor in the United States. **Exhibit 16** is a series of photographs of that product. The metal chassis indicates that it was assembled in the U.S. of U.S. and non-U.S. components. Many of the chips on those boards bear legends indicating that they were manufactured outside the U.S. At least one board contains a PMC-Sierra S/UNI 155 Dual framer chip, which is believed to be manufactured outside the United States.

23

### C.    Alcatel

96.   On information and belief, Alcatel manufacturers and assembles various infringing routers, switches, hubs and other telecommunications equipment, and sells that equipment in the United States.  Like Cisco and Lucent, it is believed that Alcatel contracts with several well-known companies who provide printed circuit boards to the electronics industry, that those companies make the boards that go into Alcatel's accused products, and that many of those boards are made outside the United States.  .

97. In addition, each Alcatel board contains a number of integrated circuits.  On information and belief, nearly all integrated circuits are made, at least in part, outside the United States.

98.   A Telcordia employee obtained an Alcatel Omniswitch product from a distributor in the United States.  **Exhibit 17** is a series of photographs of that product.  The metal chassis indicates that it was assembled in the U.S. of U.S. and non-U.S. components.  Many of the chips on those boards bear legends indicating that they were manufactured outside the U.S.

## VIII.  HARMONIZED TARIFF SCHEDULE ITEM NUMBER

99. Since Telcordia is not a seller or importer of the accused products and is unaware of precisely which products or components are being imported, it is unsure what HTSUS numbers are used to cover the imports associated with the accused products.  At a minimum, semiconductor chips used as components in the accused products may be imported under any of the following classifications:  8541.50.00 (other semiconductor devices), various categories within section 8542 (electronic integrated circuits and microassemblies; parts thereof).  Routers, switches or hubs (including components such as modules or boards) may be imported under any of the following classifications:  various categories within section 8517.30 (telephonic or telegraphic switching apparatus), 8517.90.34 (electrical apparatus for line telephony or line

24

telegraphy ..., parts, printed circuit assemblies), 8534.00.00 (printed circuits), 8543.89.60

(articles designed for connection to telegraphic or telephonic apparatus or instruments or to

telegraphic or telephonic networks), or 8543.90.68 (electrical machines and apparatus ...,

printed circuit assemblies, other).

## IX.    THE DOMESTIC INDUSTRY

100.    Complainants have established a domestic industry under 19 U.S.C. §

1337(a)(3)(c).

101.    A domestic industry as defined by 19 U.S.C. § 1337(a)(3)(c) exists with respect to

Telcordia's activities in the United States that exploit the Asserted Patents by reason of

Complainants' substantial investment in licensing of the Asserted Patents.

102.    Telcordia employs several domestic employees whose primary responsibilities are

to further Telcordia's licensing activities related to the exploitation of Telecordia's

communications technology patent holdings, including the Asserted Patents.  Other employees,

such as clerical personnel and contract specialists, assist the licensing effort in addition to

supporting other corporate departments..

103.    The activities of these employees devoted to the Telcordia licensing program

include: the identification of companies that make, use, or sell products that may be covered by

any of the claims of any of the Telcordia patents; the contact of potential licensees, preparation

of correspondence with those potential licensees identifying products and patent claims in issue,

and the conduct of licensing negotiations; participation in the enforcement of the patents when

licensing negotiations fail; market and industry research; and participation in industry groups

and standards bodies that promote the use of the technology covered by Telcordia's patents.

104.    The licensing employees are employed in Telcordia's domestic facilities in

Piscataway, New Jersey.

25

105.    As noted above, **Confidential Exhibit 18** is a list of entities that are licensed under the Asserted Patents.  In addition to those licenses, Telcordia's licensing personnel, or attorneys acting under their supervision, have contacted multiple other companies to offer potential licensing opportunities under the Telcordia patents, including the Asserted Patents.

106.    Telcordia has made substantial investments in the operating costs devoted to the licensing program at its domestic facility, including paying the salaries for personnel responsible for licensing activities.  Telcordia has also made substantial investment in third party service providers related to the exploitation of the Asserted Patents.  *See* **Confidential Exhibit 19.**

## X.    RELATED LITIGATION

107.    The '306 patent was the subject of litigation between Telcordia (then known as Bell Communications Research, Inc.) and Marconi Communications, Inc. (then known as Fore Systems, Inc. in the U.S. District Court for the District of Delaware.  *See Bell Communications Research, Inc. v. Fore Systems, Inc.*, C.A. No. 98-586-JJF (D. Del.), amended as *Telcordia Technologies, Inc. v. Fore Systems, Inc.*, No. 98-586-JJF (D. Del.).  An appeal of Judge Farnan's summary judgment ruling of September 21, 2000 was appealed to the Court of Appeals for the Federal Circuit, reversed, and remanded.  *Bell Communications Research, Inc. v. Fore Systems, Inc.*, 62 Fed. Appx. 951 (Fed. Cir. 2003) (unpublished).  While on remand, the parties settled, with Fore Systems taking a license under the '306 patent in addition to other Telcordia patents, including the Asserted Patents.

108.    All three Asserted Patents are the subject of litigation between Telcordia and Cisco that was filed on July 16, 2004 and is currently pending in the U.S. District Court for the District of Delaware.  *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, C.A. No. 04-876-GMS (D. Del.).  The case is currently in discovery, and a Markman hearing was held on May 5, 2006.  Trial is currently scheduled for May 2007.

109.    All three Asserted Patents are the subject of litigation between Telcordia and Lucent that was filed on July 16, 2004 and is currently pending in the U.S. District Court for the District of Delaware. *See Telcordia Technologies, Inc. v. Lucent Technologies, Inc.*, C.A. No. 04-875-GMS (D. Del.). The case is currently in discovery, and a Markman hearing was held on May 5, 2006. Trial is currently scheduled for May 2007.

110.    All three Asserted Patents are the subject of litigation between Telcordia and Alcatel that was filed on July 16, 2004 and is currently pending in the U.S. District Court for the District of Delaware. *See Telcordia Technologies, Inc. v. Alcatel S.A.*, C.A. No. 04-87-GMS (D. Del.). Alcatel filed a counterclaim asserted that Telcordia infringed an Alcatel patent. The case is currently in discovery, and a Markman hearing was held on May 5, 2006. Trial is currently scheduled for May 2007.

## XI.    RELIEF REQUESTED

111.    WHEREFORE, by reason of the foregoing, Complainant Telcordia requests that the United States International Trade Commission:

(a)  Institute an immediate investigation, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337(a)(1)(B)(i) and (b)(1), with respect to violations of Section 337 based upon the importation, sale for importation, and sale after importation, into the United States of certain equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for incorporation into Cisco, Lucent, and Alcatel equipment, that infringe each of United States Letters Patent Nos. 4,893,306, 4,835,763, and Re. 36,633.

(b)  Schedule and conduct a hearing on said unlawful acts and, following said hearing;

(c)  Issue a permanent limited exclusion order, pursuant to 19 U.S.C. § 1337(d)(2)

27

barring from entry into the United States imported Cisco, Lucent, and Alcatel equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for Cisco, Lucent, and Alcatel equipment, that infringe one or more claims of any of United States Letters Patent Nos. 4,893,306, 4,835,763, and Re. 36,633;

(d)  Issue permanent cease and desist orders, pursuant to 19 U.S.C. § 1337(f), directing those respondents in the United States to cease and desist from importing, marketing, advertising, demonstrating, testing, or warehousing inventory for distribution, sale or use of equipment for telecommunications or data communications networks, including routers, switches, and hubs, and components thereof intended for Cisco, Lucent, and Alcatel equipment, that infringe one or more claims of any of United States Letters Patent Nos. 4,893,306, 4,835,763, and Re. 36,633; and

(e)  Grant such other and further relief as the Commission deems just and proper based on the facts determined by the investigation and the authority of the Commission.

Respectfully Submitted,

Smith R. Brittingham IV
Donald R. Dunner
Steven M. Anzalone
Houtan K. Esfahani
James T. Wilson
John Williamson

FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400
Counsel for Complainant Telcordia
Technologies, Inc.

28

## VERIFICATION OF COMPLAINT

I, Joe Giordano, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.  I am a Vice-President and Deputy General Counsel of Complainant Telcordia Technologies, Inc. and am duly authorized to sign this Complaint on behalf of Complainant;

2.  I have read the foregoing Complaint;

3.  To the best of my knowledge, information, and belief, based on reasonable inquiry, the foregoing Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

4.  The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

5.  The foregoing Complaint is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Executed on _May 9_, 2006.

29

B



# Alcatel and Lucent complete merger creating world's leading communication solutions provider

Unparalleled communication solutions leader with global reach, and a local presence in 130 countries

A leader in wireline, wireless and converged broadband networking, IP technologies, applications and services

Ideally positioned to help service providers, governments and enterprises, transform their networks

Pro-forma annual revenues of Euro 18.6 billion* and Euro 2.7 billion* in R&D investments with approximately 23,000 engineers

Expected to generate pre-tax annual cost synergies of approximately Euro 1.4 billion within three years

**Paris and Murray Hill, N.J., November 30, 2006** – Alcatel (Paris: CGEP.PA and NYSE: ALA) and Lucent Technologies (NYSE: LU) today announced the completion of their merger transaction and that they will begin operations as the world's leading communication solutions provider on December 1st, 2006. The new company Alcatel-Lucent, with one of the largest global R&D capabilities in communications and the broadest wireless, wireline and services portfolio, is incorporated in France, with executive offices located in Paris. The company will be traded on Euronext Paris and the New York Stock Exchange (NYSE) from December 1st, 2006 under a new common ticker (Euronext Paris and NYSE: ALU). As a result of the merger, each outstanding share of Lucent common stock has been converted into the right to receive 0.1952 of an Alcatel ADS. In connection with the merger, Alcatel has issued approximately 878 million shares, which is equivalent to the total number of ADS to be issued to the holders of Lucent common stock. Following the completion of the merger, approximately 2.31 billion ordinary shares of Alcatel-Lucent are outstanding.

Serge Tchuruk, appointed today as Chairman of the Board of Alcatel-Lucent, said: "Alcatel-Lucent will be for our customers a partner with the scale and scope to design, build and manage increasingly complex networks that deliver advanced converged services and communications experience to the end-user. That is what Alcatel-Lucent will deliver with an unparalleled focus on execution, innovation and service for our customers: the company will have the most experienced global services team in the telecommunications industry, as well as one of the largest research, technology and innovation organizations in the industry. In fact, our combined company is ideally positioned to help our customers transform their networks so they can offer new kinds of personalized, blended applications and services."

Patricia Russo, appointed today as Chief Executive Officer of Alcatel-Lucent, added: "Through this merger, we are bringing together two top-ranking companies to form an undisputed leader in the industry, a company poised to enrich people's lives by transforming the way the world communicates. Alcatel-Lucent is a strong and enduring ally that service providers, governments and enterprises can count on to help them unlock new market and revenue opportunities. This combination represents a strategic fit of vision, geography, solutions and people, leveraging the best of both companies to deliver meaningful communications solutions that are personalized, simple to adopt and available globally. Both Alcatel and Lucent embraced a common culture of innovation and excellence that will help ensure the success of our merger."

**A global communications solutions provider**
With a comprehensive and diversified portfolio of complementary products, Alcatel-Lucent is well-positioned to address the fastest growing areas of network transformation. The company is a leader in IPTV, broadband access, carrier IP, IMS and next-generation networks, and 3G spread spectrum (UMTS and CDMA). With more than 18,000 employees working in services worldwide, the company has the largest and most experienced global services team in the industry. In enterprise communications solutions, Alcatel-Lucent is No. 1 in Europe and has more than 250,000 enterprise and government customers worldwide.

**A global reach with local presence**
With a worldwide presence in 130 countries, 79,000 employees (after completion of the Thales transaction) and balanced revenues across all regions, Alcatel-Lucent has strong customer relationships with the 100 largest telecommunications operators in the world. The company will have four geographic regions: Asia-Pacific, Europe and North, Europe and South and North America, to answer the needs of service providers, enterprises and end-users in the most advanced telecommunication markets, as well as in high-growth economies.

There will be five Business Groups: the Wireline Business Group, the Wireless Business Group and the Convergence Business Group (addressing the needs of the carrier market), the Enterprise Business Group and the Service Business Group. Each Business Group will have a decentralized regional organization that will provide strong local support to customers.

In addition there will be several corporate functions that support the company including worldwide integrated supply chain and procurement, finance, information technology, marketing, human resources, legal and communications.

"While our respective corporate structures have changed, one constant remains: our commitment to be a first class corporate citizen and to act in a socially responsible way in interactions with all our stakeholders," said Patricia Russo.

**Unrivaled breadth and depth of research and innovation expertise**
Approximately 23,000 of the 79,000 total number of employees at Alcatel-Lucent are in R&D, including global Bell Labs which will remain headquartered in New Jersey, USA. With Euro 2.7 billion invested in R&D in calendar year 2005 by Alcatel and Lucent and 25,000 active patents, Alcatel-Lucent stands as an innovation powerhouse, featuring one of the largest global R&D capabilities in communications ready to partner and collaborate with customers on breakthrough technology. Alcatel-Lucent also leads standards initiatives with some 600 experts participating in 130 standardization bodies.

**Creating Shareholder Value**
Significant cost synergies are expected to be achieved within three years of closing and will come from several areas, including consolidating support functions, optimizing the supply chain and procurement structure, leveraging R&D and services across a larger base, and reducing the combined worldwide workforce by approximately 9,000 employees. The merger is expected to result in approximately Euro 1.4 billion in pre-tax annual cost synergies. A substantial majority of the restructuring activity is expected to be completed within 24 months after closing. The transaction is expected to be accretive to earnings per share in the first year post closing with synergies, excluding restructuring charges and amortization of intangible assets.

**Corporate governance**
The 14 Members of the Board of Directors are: Daniel Bernard, W. Frank Blount, Jozef Cornu, Linnet Deily, Robert Denham, Edward Hagenlocker, Jean-Pierre Halbron, Karl Krapek, Daniel Lebègue, Patricia Russo, Henry Schacht and Serge Tchuruk, and two additional jointly agreed directors appointed by the Alcatel-Lucent Board: Sylvia Jay and Jean-Cyril Spinetta, who were not members of either Alcatel Board of Directors or Lucent Board of Directors prior to the merger. There will be two Board observers representing the employee shareholders of the company's Employee Investment Fund: Jean-Pierre Desbois and Thierry de Loppinot.

**Press conference**
The press conference will be available via a live audio webcast on Friday, December 1, 2006 at

1.00PM at: http://www1.alcatel-lucent.com/conferences/day1/

**About Alcatel-Lucent**
Alcatel-Lucent (Euronext Paris and NYSE: ALU) provides solutions that enable service providers, enterprises and governments worldwide, to deliver voice, data and video communication services to end-users. As a leader in fixed, mobile and converged broadband networking, IP technologies, applications, and services, Alcatel-Lucent offers the end-to-end solutions that enable compelling communications services for people at home, at work and on the move. With 79,000 employees and operations in more than 130 countries, Alcatel-Lucent is a local partner with global reach. The company has the most experienced global services team in the industry, and one of the largest research, technology and innovation organizations in the telecommunications industry. Alcatel-Lucent achieved proforma combined revenues of Euro 18.6 billion in 2005, and is incorporated in France, with executive offices located in Paris.

**Alcatel Press Contacts**

| | | |
|---|---|---|
| Régine Coqueran | Tel :+ 33 (0)1 40 76 49 24 | regine.coqueran@alcatel.com |
| Mark Burnworth | Tel :+ 33 (0)1 40 76 50 84 | mark.burnworth@alcatel.com |

**Alcatel Investor Relations**

| | | |
|---|---|---|
| Pascal Bantegnie | Tel: +33 (0)1 40 76 52 20 | pascal.bantegnie@alcatel.com |
| Maria Alcon | Tel: +33 (0)1 40 76 15 17 | maria.alcon@alcatel.com |
| Charlotte Laurent-Ottomane | Tel: +1 703 668 7016 | charlotte.laurent-ottomane@alcatel.com |

**Lucent Press Contacts**

| | | |
|---|---|---|
| Joan Campion | +1 908-582-5832 (office) | joancampion@lucent.com |
| | + 1201-761-9384 (mobile) | |
| MaryLou Ambrus | + 1 908-582-8501 (office) | mambrus@lucent.com |
| | + 1 908-239-6654 (mobile) | |

**Lucent Investor Relations**

| | | |
|---|---|---|
| John DeBono | + 1908-582-7793 (office) | debono@lucent.com |
| Dina Fede | + 1 908-582-0366 (office) | fede@lucent.com |

SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

*Except for historical information, all other information in this press release consists of forward-looking statements within the meaning of the US Private Securities Litigation Reform Act of 1995, as amended. These forward looking statements include statements regarding the future financial and operating results of Alcatel-Lucent as well as the benefits and synergies of the completed merger transaction and other statements about Alcatel-Lucent managements' future expectations, beliefs, goals, plans or prospects that are based on current expectations, estimates, forecasts and*

projections about Alcatel-Lucent, as well as Alcatel-Lucent's future performance and the industries in which Alcatel-Lucent operates, in addition to managements' assumptions. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements which are not statements of historical facts. These forward-looking statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to assess. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements. These risks and uncertainties are based upon a number of important factors including, among others: difficulties and delays in achieving synergies and cost savings; fluctuations in the telecommunications market; the pricing, cost and other risks inherent in long-term sales agreements; exposure to the credit risk of customers; reliance on a limited number of contract manufacturers to supply products we sell; the social, political and economic risks of our global operations; the costs and risks associated with pension and postretirement benefit obligations; the complexity of products sold; changes to existing regulations or technical standards; existing and future litigation; difficulties and costs in protecting intellectual property rights and exposure to infringement claims by others; and compliance with environmental, health and safety laws. For a more complete list and description of such risks and uncertainties, refer to Alcatel-Lucent's Form 20-F for the year ended December 31, 2005, as amended, as well as other filings by Alcatel-Lucent and Lucent Technologies Inc. with the US Securities and Exchange Commission including Lucent's Proxy Statement dated August 7, 2006. Except as required under the US federal securities laws and the rules and regulations of the US Securities and Exchange Commission, Alcatel-Lucent disclaims any intention or obligation to update any forward-looking statements.

Copyright © 2006 Alcatel-Lucent. All rights reserved.

C

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 859266 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Software AG v. Bea Systems, Inc.D.Del.,2005.Only
the Westlaw citation is currently available.
United States District Court,D. Delaware.
SOFTWARE AG and Software AG Inc., Plaintiffs,
v.
BEA SYSTEMS, INC., Defendant.
**No. Civ.A.03-739 GMS.**

April 8, 2005.

Mary B. Graham, Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, for Plaintiffs.
John G. Day, Steven J. Balick, Ashby & Geddes,
Wilmington, DE, for Defendant.

*MEMORANDUM*
SLEET, J.

**I. INTRODUCTION**

**\*1** On April 4, 2005, the court held a pre-trial
conference with the above-captioned parties to
discuss, among other things, the motions *in limine*
filed by each side. With the exception of motion *in
limine* number eight filed by plaintiffs Software AG
and Software AG, Inc. (collectively "SAG"), the
court ruled on each motion during the conference. As
to the outstanding motion, the court reserved
judgment. After further deliberation, the court has
decided to grant SAG's motion, and therefore, to
preclude defendant BEA Systems, Inc. ("BEA")
from introducing evidence at trial of the involvement
of Sheldon Meyer in BEA's pre-litigation
correspondence with SAG, to the extent that he is
identified as a patent attorney.

**II. DISCUSSION**

This is an action for patent infringement brought by
SAG against BEA, in which SAG has also accused
BEA of willful infringement. As part of its defense
against SAG's willfulness claim, BEA seeks to do the
following:
BEA intends, however, to call its General Counsel
Robert Donohue to testify to the facts showing that
BEA acted in good faith and with due care, and thus
did not willfully infringe. Among other things, Mr.
Donohue is expected to testify to the conduct and
content of BEA's discussions with SAG, including
the oral and written evidence that BEA presented to
SAG (and which it will present to the jury at trial)

that the '619 patent was neither infringed nor valid.
Mr. Donohue will also testify that BEA's outside
patent prosecution counsel Sheldon Meyer, of
Fliesler, Dubb, Meyer & Lovejoy, was extensively
involved in these prefiling interactions with SAG.
Mr. Meyer was present with Mr. Donohue and other
BEA personnel in conference calls with SAG, and
took part in the discussions. Mr. Meyer also authored
or is the recipient of much of the pre-litigation
correspondence between the parties concerning
SAG's allegations. BEA will not adduce evidence of
any privileged "opinion" that Mr. Meyer might have
formed, including whether or not he was asked to
form such an opinion. Nor will any testimony as to
the contents of the discussions with SAG reveal
privileged communications relating to an opinion.

(D.I. 188 at 2.) BEA further states, "[t]he facts
establishing the conduct and content of BEA's
discussions with SAG, *including that Mr. Meyer was
a significant participant,* are highly probative of
BEA's intent and lack of willfulness." (Id. at 3
(emphasis added).) BEA does not intend to have
Meyer himself testify.

SAG argues that testimony regarding the pre-
litigation involvement of Meyer will be unfairly
prejudicial in violation of Fed.R.Evid. 403 because it
is "designed to suggest to the jury that BEA acted
responsibly by consulting Mr. Meyer or that Mr.
Meyer provided a favorable opinion to BEA." (D.I.
204 Ex. 8 at 2.) This type of testimony, SAG argues,
was held to be impermissible in *Advanced
Cardiovascular Sys., Inc. v. Medtronic, Inc.,* 265 F.3d
1294 (Fed.Cir.2001).

The court agrees with SAG. Relevant evidence is
defined as "evidence having any tendency to make
the existence of any fact that is of consequence to the
determination of the action more probable or less
probable than it would be without the evidence."
Fed.R.Evid. 401. In the context of willful
infringement, the "fact that is of consequence" is
BEA's intent. *See Medtronic,* 265 F.3d at 1309.
However, the mere fact that a patent attorney was a
significant participant in the pre-litigation
correspondence does not make the existence of intent
"more probable or less probable than it would be
without the evidence." At most, Meyer's involvement
is probative of the fact that BEA engaged in a serious
effort to defeat SAG's allegations. Thus, the court
holds that Meyer's involvement is irrelevant to BEA's
defense to willful infringement insofar as he is
identified to the jury as a patent attorney.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 859266 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

**\*2** Of course, to some degree, irrelevant evidence always has a way of finding itself before the jury. The extent of effort the court will undertake to exclude irrelevant evidence is a matter of judicial economy. In other words, it is not necessarily worth the court's time to exclude irrelevant evidence unless it is prejudicial, time consuming, etc. In *Medtronic,* the defendant sought to defend against an allegation that it willfully infringed one of the patents in the case by introducing evidence of its "consultation with legal counsel in its effort to design around" two *other* patents at issue in the case, while simultaneously asserting "privilege with respect to its legal consultations on the [allegedly willfully infringed patent]." 265 F.3d at 1309-10. The Federal Circuit held the evidence to be irrelevant due to its "lack of probative value." *Id.* at 1309. The court further explained that it "agreed with the district court that admitting evidence of [the defendant's] legal activities regarding the [two other patents] would have been potentially prejudicial to [the plaintiff]." *Id.* "Admitting the evidence in question," the court said, "would potentially have allowed [the defendant], in addition to asserting privilege, to establish an inference that it acted in a legally reasonable manner with respect to the [allegedly willfully infringed patent]. This would have prejudiced [the plaintiff]." *Id.* at 1310. Thus, the district court in *Medtronic* did not abuse its discretion by excluding this irrelevant and prejudicial evidence.

Furthermore, the Federal Circuit's decision in *Medtronic* was made three years before its decision in *Knorr-Bremse v. Dana Corp.,* in which the court held that "no adverse inference shall arise from invocation of the attorney-client and/or work product privilege." 383 F.3d 1337, 1344 (Fed.Cir.2004). In fact, the court in *Medtronic* specifically cited the rule prior to *Knorr-Bremse* (i.e., permitting an adverse inference from a party's decision to assert privilege), but nevertheless concluded that it is prejudicial to permit a defendant to introduce evidence of irrelevant legal consultations, while asserting privilege as to the truly probative communications, in an effort to show a lack of intent. 265 F.3d at 1309.

In the present case, BEA seeks to do something very similar to that which is prohibited by *Medtronic.* In particular, BEA would like to introduce evidence that its pre-litigation correspondence with SAG was handled in part by a patent attorney, while simultaneously asserting privilege as to his private communications with BEA, in an effort to show a lack of intent. In its brief, BEA denies that it will adduce evidence of any opinion that Meyer might

have formed, or whether Meyer was asked to form such an opinion. (D.I. 188 at 2.) And yet, almost in the very next breath, BEA asserts that Meyer's significant participation in the pre-litigation correspondence with SAG is "highly probative" on the issue of willful infringement. (Id. at 3.) This is an untenable position because Meyer's involvement can only be highly probative if it somehow reflects BEA's intent. But as discussed above, Meyer's involvement is legally irrelevant to BEA's intent. Therefore, the true value to BEA of this evidence is that it will permit BEA to give the jury a subtle "wink wink," in the hope that the jury will draw the improper inference that the patent attorney's involvement demonstrates BEA's lack of intent. Given the obvious prejudice to SAG, the court will not permit BEA to introduce the fact that Meyer was involved in the pre-litigation correspondence with SAG, to the extent he is identified as a patent attorney.

### III. CONCLUSION

**\*3** For the foregoing reasons, SAG's motion *in limine* number eight will be granted.

D.Del.,2005.
Software AG v. Bea Systems, Inc.
Not Reported in F.Supp.2d, 2005 WL 859266 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00739 (Docket) (Jul. 22, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D



"Williamson, John"
<John.Williamson@finnegan.
com>

01/26/2007 03:56 PM

To  <edward.reines@weil.com>

cc  <steven.cherny@lw.com>

Subject  Telcordia v. Cisco / Lucent


Ed,

I write in response to your January 24 email to Don Dunner. You have asked that we "respond to each point with []our position." In your email you said that your positions "should not be perceived as final." We echo that point as to our responses below.

Point 1

You wrote:

"(1) Fore settlement -- The parties agreed that the defendants should file a motion if they want because Telcordia plans to rely on this material."

We are unsure exactly how to interpret your statement. That said, Telcordia reserves its right to rely upon agreements with FORE Systems and, presently, it seems likely that such agreements would be part of our case.

Point 2

You wrote:

"(2) Uncorroborated '633 conception date -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on pre-September 1991 events on the inventorship issue."

Again, we are unsure exactly how to interpret your statement, and we disagree with your characterization of the issue entirely. If what you are referring to is the answer that Telcordia provided in response to Cisco interrogatory no. 8, we intend to rely upon that answer.

Point 3

You wrote:

"(3) Willfulness opinion -- The parties agreed that defendants should file a motion if they want because Telcordia plans to rely on the absence of a disclosed opinion of counsel."

Again, we are unsure exactly how to interpret your statement and disagree with your characterizations. Telcordia reserves the right to address the fact that the defendants did not identify any opinion of counsel during discovery, on their privilege logs or otherwise.

Point 4

You wrote:

"(4) Exclude undeposed witnesses for which timely depositions are not offered -- Telcordia does not want to take a position on the issue until defendants serve their witness list. Defendants plan to file a limine motion."

Again, we are unsure exactly how to interpret your statement. You are correct to note that it is premature to ask Telcordia to agree to offer and conduct additional depositions of potential trial witnesses before Telcordia has seen the defendants' proposed witness list (i.e., before Telcordia has any understanding of the number and identity of potential additional deponents).

If you are asking for an agreement to continue deposition discovery between now and the trial, we do not believe that the parties would be able to so agree. Discovery has long been closed and reopening depositions at this stage would violate the Court's scheduling order. Moreover, the Court's pretrial order requires each party to state that it has completed discovery, and indicates that absent good cause shown no further discovery will be permitted. As such, if we were to propose the continuation of deposition discovery at this stage it seems that leave of Court would be required. In sum, while we certainly are not foreclosing the possibility of agreement on this issue, we note that there are logistical hurdles, and that it is premature to consider the issue before Telcordia has had a chance to evaluate the defendants' witness list.

Point 5

You wrote:

"(5) Exclude FTI witnesses -- Telcordia reserves the right to call the FTI witnesses and does not know yet if it will do so.  The parties agreed that the defendants should file a motion if they want."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  The proposed FTI witnesses would be offered only to authenticate summaries under Fed. R. Evid. 1006.  That would be the entire scope of their testimony.  The testimony would be tailored to allow for the expeditious and smooth presentation of voluminous sales data.

Point 6

You wrote:

"(6)  Reliance on sales of platforms beyond accused modules -- Defendants are interested in precluding Telcordia from arguing that "boxes" are infringing and properly in the royalty base beyond the number of SRTS capable cards.  You will look into this and get back to us with your position."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations.  Additionally, we have been unable to address this issue fully with all of the necessary members of our team.  We will get back to you as soon as possible.

Point 7

You wrote:

"(7) References to Cisco's size / finances beyond products at issue -- Cisco is interested in precluding Telcordia from referencing Cisco's size or finances, except as it relates to the accused products.  Please let us know your position."

Again, we are unsure exactly how to interpret your statement.  Telcordia reserves its right to reference Cisco's size and finances.

Point 8

You wrote:

"(8) Alleged 'illegal boycott' by Cisco in the SRTS standardization process -- Cisco is interested in precluding Telcordia from arguing that it was involved in an 'illegal boycott.'  Telcordia used this phrase in its trial brief.  Please confirm you will not reference any alleged illegal conduct or boycott or similar language at trial."

Again, we are unsure exactly how to interpret your statement and we disagree with your characterizations. Specifically, we don't know what you mean by "or similar language." Telcordia's identification of a "self styled illegal boycott" is based upon contemporaneous emails drafted by and circulated among Cisco employees. Telcordia reserves all rights to use that evidence.

Point 9

You wrote:

"(9) Foreign sales -- Cisco is interested in precluding Telcordia from seeking royalties for foreign sales. Please let us know your position."

Cisco has no basis to preclude Telcordia from seeking royalties from foreign sales, and the matter would be properly before (and decided by) a jury.

Point 10

You wrote:

"(10) Alcatel-Lucent merger -- Lucent is interested in precluding Telcordia from referencing the Lucent-Alcatel merger. Please let us know your position."

Telcordia reserves its right to reference the Alcatel-Lucent merger.

Regards,

John

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.