IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC., )
)
    Plaintiff/Counterclaim Defendant, )
)
v. )        C.A. No. 04-876-GMS
)
CISCO SYSTEMS, INC., )
)
    Defendant/Counterclaim Plaintiff. )
)

## DEFENDANT CISCO SYSTEMS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR A NEW TRIAL ON WILLFUL INFRINGEMENT PURSUANT TO RULE 59(a)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (I.D. #1014)
Leslie A. Polizoti (I.D. #4299)
1201 North Market Street
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

May 31, 2007

# TABLE OF CONTENTS

**Page**

I. NATURE AND STAGE OF THE PROCEEDING ....................................................... 1

II. SUMMARY OF THE ARGUMENT ......................................................................... 1

III. STATEMENT OF FACTS ....................................................................................... 3

IV. BECAUSE THE COURT'S WILLFULNESS INSTRUCTION WAS
ERRONEOUS  AND NOT HARMLESS, CISCO IS ENTITLED TO A NEW
TRIAL ...................................................................................................................... 3

    A. The Jury Instruction On Willful Infringement Erroneously Incorporated
Factors That Are Not Relevant To The Jury's Threshold Willfulness
Inquiry ............................................................................................................ 4

        1. Issues Unconnected To Defendant's Mental State Have No Place
In The Jury's Threshold Willfulness Deliberations.................................. 4

        2. Although Some *Read* Factors Pertain to Willfulness, Others Have
No Bearing On State of Mind And Were Never Intended For Jury
Consideration ....................................................................................... 6

        3. Because Four Of The Nine *Read* Factors Are Directed To
Egregiousness, The Factors Are Not Properly Balanced For Use In
Deciding Willfulness ............................................................................ 8

    B. The Court's Erroneous Willfulness Instruction Was Not Harmless And A
New Trial Should Be Granted ......................................................................... 9

        1. The Court's Instruction Erroneously Enabled The Jury To
Consider Unsubstantiated Allegations Of Litigation Misconduct
And Was Not Harmless ...................................................................... 10

        2. The Court's Instruction Erroneously Enabled The Jury To
Consider Cisco's Size And Was Not Harmless ..................................... 15

V. CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Gustafson, Inc. v. Intersystems Industrial Prods., Inc.,*
    897 F.2d 508 (Fed. Cir. 1990) ............................................................. 4

*Hill v. Reederei F. Laeisz G.M.B.H.,*
    435 F.3d 404 (3d Cir. 2006) ......................................................... 3, 9, 10

*Honda Motor Co. v. Oberg,*
    512 U.S. 415 (1994) ............................................................................ 7

*Jurgens v. CBK, Ltd.,*
    80 F.3d 1566 (Fed. Cir. 1996) ............................................................. 4

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,*
    383 F.3d 1337 (Fed. Cir. 2004) ........................................................ 5, 6

*Miller v. Cigna Corp.,*
    47 F.3d 586, 591 (3d Cir. 1995) ......................................................... 3

*Nat'l Presto Indus. v. West Bend Co.,*
    76 F.3d 1185 (Fed. Cir. 1996) ............................................................. 4

*Read Corp. v. Portec, Inc.,*
    970 F.2d 816 (Fed. Cir. 1992) .....................................................*passim*

*Rolls-Royce, Ltd. v. GTE Valeron Corp.,*
    800 F.2d 1101 (Fed. Cir. 1986) .......................................................... 4

*SRI Int'l v. Advanced Tech. Lab.,*
    127 F.3d 1462 (Fed. Cir. 1997) .......................................................... 8

*Transclean Corp. v. Bridgewood Servs.,*
    290 F.3d 1364 (Fed. Cir. 2002) .......................................................... 6

*Weinar v. Rollform, Inc.,*
    744 F.2d 797 (Fed. Cir. 1984) .......................................................... 10

**Statutes**

35 U.S.C. § 284 ...................................................................................... 4

## I.    NATURE AND STAGE OF THE PROCEEDING

Telcordia filed this patent infringement lawsuit against Cisco in July 2004, asserting U.S. Patent Nos. 4,893,306 ("the '306 patent"), RE 36,633 ("the '633 patent"), and 4,835,763 ("the '763 patent"). This Court held a jury trial on all issues from April 30 to May 10, 2007.[1] As Rule 51(c) requires, Cisco raised objections to the Court's jury instruction on willful infringement at the charge conference. *See* D.I. 359 at 2044:9-2056:1. The Court overruled those objections, the jury determined that Cisco infringed willfully, and the Court entered judgment of willful infringement on May 16, 2007. *See* D.I. 348.

## II.    SUMMARY OF THE ARGUMENT

The jury's finding of willful infringement should be vacated because it was premised on a jury instruction that was legally inaccurate and not harmless. Specifically, the court's instruction to the jury on willfulness improperly included nine factors from *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992), which relate to the extent to which the *judge* should enhance damages, if at all, after a finding of willful infringement. Because this set of factors was designed for the judge to use in evaluating the *extent* of intentional wrongdoing when deciding whether to enhance damages, they are not properly matched to the threshold jury question of whether infringement was willful in the first place. The instruction was thus legally improper.

The inappropriateness of the *Read* enhancement factors for a jury's willfulness inquiry is plainly apparent when their use is considered within the context of this case. For instance, the Court specifically instructed the jury to consider Cisco's size when deciding whether Cisco acted

---

[1]    Because Telcordia did not oppose summary judgment of non-infringement of the '306 patent, infringement of that patent was not tried to the jury. The Court has issued an Order granting summary judgment of non-infringement on five grounds requested by Cisco. D.I. 341.

with wrongful intent in allegedly infringing the '633 and '763 patents. As a matter of pure logic, Cisco's large size proves absolutely nothing about whether it acted with good or bad intent. However, by permitting the jury to infer bad intent from corporate size, the Court allowed the jury to base its verdict on the prejudices that many citizens harbor against large corporations.[2] Likewise, the Court instructed the jury to consider Cisco's "litigation conduct" in deciding whether Cisco acted with good or bad intent. Although a judge may consider an accused infringer's litigation conduct in determining the extent of enhancement, jurors are extremely ill-suited to accurately determine whether Cisco conducted itself as a proper litigant in this case. More importantly, Cisco's litigation conduct simply does not correlate with its intent when the alleged bad faith ensued long before litigation ensued.

Indeed, of the nine Read factors, another four are directed specifically to the egregiousness of defendant's willful infringement, demonstrating just how strongly the *Read* factors are oriented to pin-pointing the extent of defendant's alleged misconduct, and not making a threshold decision as to whether bad intent is present.

---

[2]    The Court itself recognized and understood precisely this prejudice, as the following exchange from the Pretrial Conference illustrates:

| | |
|---|---|
| The Court: | . . . Do you believe companies frequently try to infringe or violate patents? We get this all the time. What are we asking? |
| Mr. Powers: | There are individuals out there who are intensely suspicious of large companies, just believe that they are out there stealing and infringing and doing -- infringing is just a subset of what they consider to be bad conduct, particularly in the current milieu. And this gets at that mindset, which I believe would be an unfair mindset for a fair and impartial juror in this case. |
| The Court: | I agree with you. Okay. So, then, this is how it will stand. |

D.I. 361 [3/30/2007 Pretrial Conference Tr.] at 170:21-171:7.

By providing the jury with four factors directed to egregiousness, one factor regarding defendant's size, and one factor regarding litigation conduct, the instruction's overall message to the jury was that its task was not merely to decide whether willfulness was present, but to decide the extent of wrongdoing. The Court's erroneous instruction was thus not harmless, because it simply cannot be said that there is no way that the error affected the outcome of the case. And, the risk that the jury could have been led astray is sufficient reason for the Court to order a new trial on the issue of willfulness.

## III.    STATEMENT OF FACTS

The pertinent facts are set forth in the Argument sections, as appropriate.

## IV.    BECAUSE THE COURT'S WILLFULNESS INSTRUCTION WAS ERRONEOUS AND NOT HARMLESS, CISCO IS ENTITLED TO A NEW TRIAL

In deciding whether to grant a new trial in response to an allegedly erroneous jury instruction, Third Circuit courts must apply a two-part test. First, the Court must determine whether the instruction was legally erroneous. If so, the Court "must accordingly ask whether that error was harmless. An error will be deemed harmless only if it is highly probable that the error did not affect the outcome of the case." *Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 411 (3d Cir. 2006) (citations omitted). For the Court to grant a new trial, Cisco need only show that the erroneous "instructions were capable of confusing and thereby misleading the jury." *Miller v. Cigna Corp.*, 47 F.3d 586, 591 (3d Cir. 1995). As set forth below, both requirements are unquestionably met in this case, and the Court should thus grant a new trial on the issue of willfulness.

**A.      The Jury Instruction On Willful Infringement Erroneously Incorporated
Factors That Are Not Relevant To The Jury's Threshold Willfulness Inquiry**

The *Read* factors, considered as a whole, are entirely incompatible with a jury's

investigation into defendant's state of mind, which is the essence of the willfulness inquiry.

Indeed, two *Read* factors – defendant's size and defendant's litigation conduct – have no

connection whatsoever to defendant's state of mind, while four other *Read* factors *presuppose* ill

intent and are directed to the extent of wrongdoing.  Instructing the jury to decide willfulness on

the basis of this highly imbalanced set of factors is thus erroneous.

**1.      Issues Unconnected To Defendant's Mental State Have No Place
In The Jury's Threshold Willfulness Deliberations**

The Federal Circuit has repeatedly confirmed that the determination of whether to

increase damages under 35 U.S.C. § 284 requires a "two step process."  *See, e.g., Jurgens v.*

*CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996).  In the first step, "the fact-finder must determine

whether an infringer is guilty of conduct upon which increased damages may be based."  *Id.*  If

the jury makes a threshold finding of willfulness, "*the court* then determines, exercising its sound

discretion, whether, and to what extent, to increase the damages award given the totality of the

circumstances."  *Id.* (emphasis added).

The first step requires *the jury* to make a determination regarding the "intent, state of

mind, and culpability" of the defendant based on the totality of the circumstances.  *Nat'l Presto*

*Indus. v. West Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996); *see also Read Corp.*, 970 F.2d at

828 ("Willfulness is a determination as to state of mind."); *Gustafson, Inc. v. Intersystems*

*Industrial Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990) ("Whether an act is 'willful' is by

definition a question of the actor's intent."); *Rolls-Royce, Ltd. v. GTE Valeron Corp.*, 800 F.2d

1101, 1110 (Fed. Cir. 1986) (noting that willfulness is "an intent-implicating question" that is

within the province of the fact finder).  Based on this authority, it is clear that the jury should

4

focus only on factors having some relation to state of mind when deciding willfulness. Indeed, the Federal Circuit's seminal decision on willfulness stresses consideration of whether a reasonably prudent business person would have "sound reason to believe" that plaintiff's patent was either not infringed or invalid. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed. Cir. 2004). This consideration places the focus squarely on what the defendant was thinking at the time it was first faced with the possibility of patent infringement liability.

Along these lines, every set of post-*Knorr* model patent jury instructions of which Cisco is aware zeroes in on the defendant's state of mind. For instance, the model jury instructions produced by the Federal Circuit Bar Association ("FCBA") enumerate six factors for the jury to consider in determining willfulness, and four of them expressly mention defendant's mental state. Specifically, the FCBA's model instruction asks the jury to consider (1) whether defendant "*intentionally* copied," (2) whether defendant had a "good-faith *belief*" that plaintiff's patent was invalid, (3) whether defendant "reasonably *believed*" its defenses would be successful if litigated, and (4) whether defendant relied on a "*believable*" opinion of counsel." *See* Exh. 1 [FCBA Model Patent Jury Instructions] § 3.8 (emphasis added). The remaining two factors included in the FCBA model instruction, whether defendant made a "good faith effort" to avoid infringement and whether defendant attempted to "cover up" its infringement, bear at least some relationship to defendant's state of mind. *Id.*

The model patent jury instructions for the Northern District of California are in complete accord with the FCBA's instructions, including direct references to defendant's state of mind in four of the five factors the jury consider in deciding willfulness. *See* Exh. 2 [Model Patent Jury Instructions for the Northern District of California] § 3.11; *see also* Exh. 3 [American

5

Intellectual Property Law Association Model Patent Jury Instructions] § 13 (directing the jury to consider whether defendant had a "reasonable basis for believing" that it did not infringe or that plaintiff's patent was invalid, and excluding defendant's size and litigation conduct as relevant factors).  Thus, both courts and commentators concur that the thrust of the willfulness inquiry is defendant's mental state, and the jury should not be asked to contemplate unrelated factors when deciding willfulness.

> ### 2.    Although Some *Read* Factors Pertain to Willfulness, Others Have No Bearing On State of Mind And Were Never Intended For Jury Consideration

In *Knorr*, the Federal Circuit noted that the willfulness inquiry "may include" several factors as compiled, for example, in *Read Corp v. Portec.  See Knorr*, 383 F.3d at 1342-43. However, it is abundantly clear that the Federal Circuit in *Knorr* did not endorse the jury's wholesale use of all nine *Read* factors to aid in deciding willfulness.[3]  Indeed, *Read* itself explicitly states that the factors enumerated therein are for use by the "trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages . . . ."  *Read Corp.*, 970 F.2d at 828.  Ten years later, in *Transclean Corp. v. Bridgewood Servs.*, 290 F.3d 1364, 1377 (Fed. Cir. 2002), the Federal Circuit reaffirmed this point, observing that the *Read* factors are "other factors relevant to the second step" of determining whether damages should be enhanced.  To the extent subsequent jurisprudence permits the jury to consider some *Read* factors in deciding willfulness, the Federal Circuit's unambiguous guidance that willfulness is a question of intent nevertheless instructs that

---

[3]    Cisco acknowledges that some post-*Knorr* district court decisions have endorsed the use of all nine *Read* factors in the threshold willfulness inquiry.  This merely demonstrates the severe need to correct a misunderstanding in this area of the law.

two *Read* factors – defendant's conduct during litigation and defendant's size and financial condition – remain exceptionally inappropriate for inclusion in the jury's willfulness calculus.

The *Read* court's treatment of these factors elucidates this point. With respect to defendant's conduct during litigation, the *Read* court noted that "bad faith behavior as a party to the litigation is a factor to be weighed in assessing the level of a defendant's culpability *where an infringement is found willful*." *Read Corp.*, 970 F.2d at 831 (emphasis added). Thus, the Federal Circuit was clear from the outset that consideration of defendant's conduct is appropriate only after a finding of willfulness. This approach is eminently sensible, as lay juries, present only during trial, are not privy to the greater part of the conduct that courts may choose to consider in assessing defendant's behavior throughout litigation. Perhaps more important, lay juries simply do not possess the qualifications and background knowledge necessary to make a meaningful evaluation of defendant's litigation conduct.

Similarly, although the Federal Circuit noted in *Read* that courts could consider a defendant's size and financial condition when deciding whether to enhance damages, the *Read* court actually declined to include any analysis of this factor in its opinion. Far from a suggestion that the *fact-finder* should consider defendant's size when deciding willfulness, this demonstrates nothing more than the subsidiary nature of defendant's size as a factor in deciding whether to enhance damages. Indeed, it is extraordinarily prejudicial to instruct the jury that a defendant is more likely to infringe willfully merely because it happens to be large or successful.[4] More

---

[4]    In discussing an Oregon law that eliminated judicial review of a jury's punitive damages award, the Supreme Court stated "[j]ury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994). Thus, the Supreme Court has recognized the particular prejudice large companies face when dealing with juries.

importantly, such an instruction invites the jury to begin balancing the equities among the parties. This is fundamentally improper because it is decidedly not the jury's role.

### 3. Because Four Of The Nine *Read* Factors Are Directed To Egregiousness, The Factors Are Not Properly Balanced For Use In Deciding Willfulness

Though relevant to defendant's state of mind, the following *Read* factors are directed towards the egregiousness of defendant's conduct: (1) whether defendant took remedial action, (2) defendant's motivation for harm, (3) whether defendant attempted to conceal its misconduct, and (4) duration of defendant's misconduct. Although egregiousness is one component in the willfulness inquiry, its true significance is its role as a factor to aid the judge in deciding whether to enhance damages after a finding of willfulness. As the Federal Circuit observed, "[t]he principal considerations in enhancement of damages are the same as those of the willfulness determination, but in greater nuance as may affect the degree of enhancement. Thus egregiousness of the infringer's conduct may receive greater emphasis, as may any mitigating factors." *SRI Int'l v. Advanced Tech. Lab.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997); *see also Read Corp.*, 970 F.2d at 826 (stating that egregiousness is the "paramount determination in deciding to grant enhancement").

Notably, all four of the above-listed egregiousness factors were presented to the jury in language that *presupposes* misconduct on the part of the defendant. For example, in asking the jury to consider whether Cisco "attempted to conceal its misconduct," the Court's instruction presumes that there was misconduct worthy of concealment. The Court's instruction included no qualification indicating that the jury should disregard this factor absent a finding of misconduct. Thus, of the nine factors submitted to the jury to aid it in deciding willfulness, two (defendant's size and defendant's litigation conduct) were totally inappropriate for the jury, and four were more appropriate for use by the judge in deciding whether to enhance damages *after* a finding of

misconduct.  That six of the nine factors given to the jury are not principally used in deciding

willfulness further demonstrates the lopsidedness of the instruction.  Cisco submits that a more

balanced instruction would have excluded defendant's size and defendant's conduct during

litigation, and included only a single, generalized factor relating to egregiousness presented in

language that does not presuppose misconduct.

**B.      The Court's Erroneous Willfulness Instruction Was Not Harmless And A
         New Trial Should Be Granted**

      In deciding whether an erroneous jury instruction warrants a new trial, Third Circuit

courts "must accordingly ask whether that error was harmless.  An error will be deemed harmless

only if it is highly probable that the error did not affect the outcome of the case."  *Hill v.*

*Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 411 (3d Cir. 2006) (citations omitted).  Here, the

Court's willfulness instruction was not harmless.  Indeed, the extraordinary imbalance in the

willfulness instruction towards egregiousness – along with the inclusion of two factors having no

bearing on state of mind – presents an unusually compelling instance of an erroneous jury

instruction, cutting strongly against a finding that the instruction was not harmless.  More

importantly, Telcordia's manufactured allegations of litigation misconduct and constant

references to Cisco's size and financial condition (set forth in detail below) were so pervasive

that they undoubtedly crept into the jury's willfulness deliberations, inducing the jury to decide

egregiousness rather than make a threshold willfulness determination.  Having led the jury into

prematurely deciding the *extent* of Cisco's alleged misconduct, which is a task reserved for the

judge, the Court's instruction was not harmless – indeed positively harmful – and a new trial is

warranted.[5]

---

[5]    Because the threshold showing for a new trial is a procedural question, Third Circuit law
applies and the Court should grant a new trial in response to an erroneous jury instruction

1.    **The Court's Instruction Erroneously Enabled The Jury To Consider Unsubstantiated Allegations Of Litigation Misconduct And Was Not Harmless**

Because litigation conduct has no bearing on a defendant's state of mind, it is simply not "harmless" to sanction the jury's consideration of this issue when deciding willfulness. As a matter of pure logic, then, it is especially harmful for the Court to give its imprimatur to the jury's consideration of unsubstantiated allegations of litigation wrongdoing when deciding willfulness.

However, in light of Telcordia's persistent presentation of such issues at trial, that is precisely what happened in this case. Indeed, just minutes into its Opening Statement, Telcordia dressed as misconduct the frustrated testimony of a Cisco deponent, having been repeatedly asked to consider a few pages of a lengthy document divorced from context, that "I'm not going to answer this out-of-context crap." Expanding on its misinterpretation of the testimony, Telcordia made the sweeping generalization that the witness, and by extension Cisco, was so uncooperative that it "blew [Telcordia] away all through the proceeding."[6] In addition to playing

---

only if the error is not harmless, i.e., only if it is highly probable that the error did not affect the outcome of the case. *See Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 411 (3d Cir. 2006). However, it is noteworthy that the Federal Circuit's standard of review is not appreciably different, requiring a new trial "[i]f such error was not 'harmless', i.e., if it could have prejudicially affected the verdict . . . for in that event, th[e] court cannot say what verdict a jury would reach when properly instructed or when a proper procedure is followed." *Weinar v. Rollform, Inc.*, 744 F.2d 797, 808 (Fed. Cir. 1984). In any event, regardless of how the standard is articulated, it is clearly met in this case as demonstrated below.

[6]    In summarizing the deponent's testimony, Telcordia remarked as follows:

> In fact, his testimony is summed up by, if you would go to Slide 22 for the moment. He was deposed. You will hear him at this deposition:
>
> Q.    Do you regard this presentation as an assertion of infringement?

video of the deposition during its case in chief, Telcordia reiterated the testimony of the

frustrated Cisco deponent during its Closing Argument, placing even further emphasis on the

statement "I'm not going to answer this out-of-context crap."[7]  Because the testimony related

only to the deponent's frustration at being badgered to answer questions about information taken

out of context, Telcordia's characterization of the testimony as misconduct, and the Court's

instruction to consider this in deciding willfulness, were undeniably harmful and "capable of

misleading" the jury.  Indeed, the deponent's remark, which was not even an answer to a

question, should have been excluded entirely under Federal Rule of Evidence 403 because of its

prejudicial, misleading nature.  As such, Telcordia—which vigorously opposed Cisco's objection

---

> A.    That was the presentation that Telcordia made to Cisco. No.  I regarded it as an attempt to use the patent allegations to leverage into a business relationship.
>
> Q.    But in reviewing Pages 2, 3 and 4 –
>
> A.    On a 20-page document – I'm not going to answer this out-of-context crap.
>
> That was basically his view.  He blew us away all through this proceeding.

D.I. 352 at 215:6-19 (quoting the deposition of testimony of Cisco's former general
counsel, Robert Barr).

[7]    In its Closing Argument, Telcordia summarized the deposition testimony as follows:

> One of the things that you saw, you saw a videotape of Mr. Robert Barr, who was vice president in charge of intellectual property for Cisco.  And his deposition, if you will remember the details, is filled with brush off comments and some of them are on the screen.  I put just a few on the screen.  One of them, the contacts by Telcordia, he thought was a mistake.  He continued announcing products using ATM without believing that Telcordia was going to try to stop Cisco.  He believed that notwithstanding repeated warning after warning after warning, he thought we weren't going to try and stop them.  *And he ended his comments with a quote that you have seen before:  I'm not going to answer this out of context crap.*

D.I. 358 at 2164:15-2165:6 (emphasis added).

to the admission of the remark, and pushed for the jury to consider litigation conduct when deciding willfulness—undeniably understood that the misconstrued testimony was not harmless.

The above represents just one example of Telcordia's many efforts to import contrived instances of litigation misconduct into the jury's willfulness deliberations, and, enabled by the Court's erroneous instruction, convert the willfulness deliberations into *de facto* enhancement deliberations focused on egregiousness  As another example, Telcordia insinuated in its Opening Statement that Cisco was raising frivolous, inappropriate defenses, remarking that Cisco was "basically 'throwing everything but the kitchen sink.'" D.I. 352 at 221:24-222:1.  During its Closing Argument, Telcordia returned to this theme, stating again, that Cisco's case amounted to "throwing the kitchen sink" at Telcordia. *See* D.I. 358 at 2174:10-16.

Telcordia coupled this innuendo with unmistakably clear statements regarding Cisco's behavior over an extended period, leaving no doubt that one of Telcordia's key themes was Cisco's allegedly improper behavior.  Specifically, Telcordia stated that Cisco "did not act like a proper citizen," that Cisco's conduct was "not the kind of conduct that is acceptable," and that "it's more of the same type of conduct that we've seen over the past ten years." *See id.* at 2194:7-10; *id.* at 2166:24-2167:7.  This continued hammering away at a broad theme of litigation misconduct simply cannot be discarded as "harmless," especially when considered in light of the Court's willfulness instruction, slanted towards egregiousness and openly endorsing the consideration of litigation conduct in assessing willfulness.

Throughout trial, Telcordia also alleged over and over that Cisco engaged in deliberate discovery misconduct with respect to the production of foreign sales information.  For instance, Telcordia's damages expert, James Nawrocki, testified as follows:

12

> I would prefer if we had the same electronic database for U.S. as well as international. I could have made a consistent calculation. But they apparently excluded the international sales from their production.

D.I. 355 at 1276:16-20. The following exchange subsequently took place during the examination of Mr. Nawrocki:

> Q.    Were you here yesterday when we read Mr. Fujii's testimony about how those international sales were *deliberately excluded* from that?
>
> A.    Right. I think he said they were filtered. He filtered out -- he had the information but he filtered out the international sales. Unfortunately, we needed for our calculation here to make the calculation of international sales as well.

*Id.* at 1277:8-15 (emphasis added). The Court recognized early on the sheer harmfulness of this line of questioning, noting that the jury "could draw the inference that something improper was done," and issuing a limiting instruction. *Id.* at 1278:11-12. However, even after the Court's instruction, Telcordia persisted in pursuing arguments designed to suggest that Cisco concealed foreign sales information. For instance, during its Closing Argument, Telcordia asserted that "the U.S. sales data had filtered out of the foreign sales data. There was no foreign sales data in [Cisco's production]." D.I. 358 at 2191:7-11. Further, during the cross examination of Cisco's damages expert, Telcordia asked point-blank: "[y]ou were also instructed by Cisco not to include any analysis of foreign sales in your report, is that correct?" D.I. 359 at 1919:3-6. Given the Court's early recognition of the danger from this line of questioning, there can be no doubt that Telcordia intentionally sought to exploit that danger by repeatedly emphasizing Cisco's alleged discovery misconduct. Against that backdrop, the Court's instruction *directing* the jury to consider these allegations of misconduct when deciding willfulness presented clear harm.

As yet another example, during its rebuttal Closing Argument, Telcordia leveled, for the first time, a particularly deceptive allegation of litigation misconduct regarding Cisco's

presentation of witnesses by video.  Here, as is often the case given the limited subpoena power

of federal district courts, Cisco was forced to present the testimony of certain key witnesses by

video, including Cisco's former general counsel and three France Telecom employees who

worked on network clock recovery in the early 90s.  Telcordia characterized the presentation of

this testimony by video as an indication that Cisco was hiding something, and possibly even

being untruthful.  Specifically, with regard to the testimony of Cisco's former general counsel,

Telcordia remarked as follows:

> We brought a lot of witnesses to Court live.  We brought Dr. Lau.  We
> brought Dr. Fleischer.  We brought Dr. Chao.  We brought Mr. Walters.
> You saw a lot of videos of the Cisco witnesses.  You didn't see Mr. Barr.
> Where is Mr. Barr?

D.I. 358 at 2259:4-9.  At no point did Telcordia inform the jury that both Cisco and the Court

were powerless to compel the presence of Cisco's former general counsel at trial, a fact that

Telcordia was well aware of.  Neither did Telcordia inform the jury that Cisco's former general

counsel had recently undergone heart surgery and was highly reluctant to be cross-examined at

trial, a fact also known to Telcordia.  *See* Exh. 4 [Feb. 21, 2007 Declaration of E. Reines from

ITC Investigation] ¶ 4.  Given these circumstances, and the eleventh-hour timing of Telcordia's

presentation of this issue to the jury, the extreme prejudice to Cisco is apparent.

With regard to the French witnesses, Telcordia went even further, planting in juror's

minds the notion that defense lawyers procured testimony by improperly informing France

Telecom that it would be in its best interest for the witnesses to testify.[8]  Telcordia also attempted

---

[8]    In its Closing Argument, Telcordia made the following remark regarding the deposition
testimony of the France Telecom employees:

And you should remember the witnesses that you saw in open court and decide
yourselves, do you believe them or don't you believe them?  And then look at the
videotapes. One of those videotapes basically noted a letter from lawyers in

to suggest to the jury that defense lawyers influenced the witnesses to provide dishonest testimony by paying their expenses and by instructing them on how to testify at a pre-deposition meeting.[9]  Indeed, Telcordia concluded its Closing Argument by remarking that "the fact that their deposition was taken in 2006 or 2007 and suddenly they remember all kinds of details and what they contributed certainly is not reflective of the truth."  D.I. 358 at 2267:13-16.  Such a statement is plainly aimed at leaving the jury with the false impression that Cisco manipulated the French witnesses to offer false testimony.

In a case where a party exploits every opportunity to suggest litigation misconduct by its opponent and the jury is erroneously instructed to consider that misconduct, it simply cannot be said that the error was harmless, i.e., that it is highly probable the error ***did not*** affect the outcome of the case.  To the contrary, it is highly probable that the error ***did*** affect the outcome of the case, just as Telcordia intended.

### 2.     The Court's Instruction Erroneously Enabled The Jury To Consider Cisco's Size And Was Not Harmless

Similar to Telcordia's allegations of litigation misconduct, Cisco's size and financial condition was central to Telcordia's case.  Given Telcordia's vigorous arguments that the Court instruct the jury to consider this issue when deciding willfulness, it is simply not credible to

---

connection with the, not the Houdoin deposition, but -- and not the Adam deposition, but the second one, and basically said that it was in France Telecom's interest to actually put its inventors up.

D.I. 358 at 2266:23-2267:5.

[9]     A portion of testimony from a France Telecom employee that was designated by Telcordia and played at trial included questioning directed at whether "lawyers for defendants hoped that [the witness] would claim that France Telecom made a contribution to SRTS," whether the witness understood "what the lawyers for defendants are trying to do," and whether the witness was "being paid to appear at this deposition." *See* D.I. 356 at 1505:16-1506:18 (deposition testimony of Jean-Yves Cochennec).

suggest that it is highly probable the Court's error in instructing the jury to consider Cisco's size *did not* affect the outcome of the case.[10]    Indeed, Telcordia intended for it to affect the outcome.

Telcordia mentioned Cisco's $3.5 billion worth of sales related to the accused products at least twenty times during the course of trial.  From the very outset of the trial—in its Opening Statement—Telcordia made absolutely certain the jury understood the exact magnitude of Cisco's sales, remarking that "Cisco has sold over three billion, not million, but billion dollars worth of equipment which we contend is covered by the '763 patent."  D.I. 352 at 206:20-23. And throughout the trial, Telcordia often used superlative terms to describe Cisco's sales.  For instance, during its Closing Argument, Telcordia remarked that Cisco's "commercial success is unparalleled, three and a half billion dollars worth of sales," D.I. 358 at 2180:15-16, and that the "sales under the '763 patent . . . are almost astronomical, $3.5 billion," *id.* at 2170:1-6.  Indeed, during the entirety of the direct examination of Telcordia's damages expert, James Nawrocki, Telcordia displayed a large poster board roughly four feet from the jury that prominently presented the fact that Cisco's sales of accused products amounted to $3.5 billion.  *See* Exh. 5 [May 4, 2007 Nawrocki Demonstratives] at 1.

Similarly, Telcordia often chose to refer to Cisco as "the big kahuna," incorporating the term into its witness' testimony.[11]  As an example, the following exchange took place during

---

[10]    Although the Court did revise Telcordia's proposed jury instruction to remove the reference to Cisco's "financial condition," the remaining directive that the jury consider Cisco's "size" had essentially the same effect.  Indeed, in the context of a trial where Telcordia repeatedly emphasized Cisco's revenues and status as an industry leader, Cisco's size and financial condition are, for all practical purposes, one and the same.

[11]    Cisco acknowledges that it also used the term "big kahuna" in its cross-examination of Mr. Giordano to make the narrow point that its success in the telecommunications industry caused Telcordia to view Cisco as an attractive business partner.  *See* D.I. 352 at 425:20-426:16 (using phrase only in connection with PTX-460, depicting an ocean wave, including text stating that Cisco and Telcordia could "jointly ride the next telecom wave .

Telcordia's direct examination of Joseph Giordano, Telcordia's corporate vice president and deputy general counsel, when asked about the sales of other companies relative to Cisco:

> Q.   Now, do you know, the companies on PTX-5000, how do they compare to the big kahuna in terms of product sales that are relevant to the patents in suit?
>
> Q.   Did you hear me mention yesterday in my opening that the product sales for the '763 patent were over three billion dollars for Cisco?
>
> A.   Yes, I did.
>
> Q.   Are the product sales of any licensee in PTX-5000 even remotely close to three-plus billion dollars?
>
> Q.   Do you know whether the product sales forming the subject matter of these agreements is anything even close to three billion dollars?
>
> A.   It was my understanding, based upon -- announced by our licensing folks, that in terms of the technology, product sales of technology, that none of these folks had sales of products even close to an order of magnitude to what Cisco had.

D.I. 353 at 535:19-536:16 (attorney colloquy removed); *see also id.* at 537:20-25 (testimony of Joseph Giordano that one would expect revenue from the "big kahuna" to be larger than for a small company); D.I. 355 at 1298:19-1299:2 (Telcordia's damages expert opines that Cisco "had grown from 1984 and grown to a rather large, I think it was called the big kahuna").

---

. . ."). Cisco's use of the term "big kahuna" in cross-examining Mr. Giordano on Telcordia's perception of Cisco as an industry leader must be contrasted with Telcordia's prejudicial, exploitative use of the phrase. Attempting to capitalize on what it perceived to be an "open door" to the use of "big kahuna," Telcordia uttered the phrase *seven* times during trial, and, as discussed in detail below, injected it directly into testimony regarding Cisco's size and revenue. It was Telcordia's extended misuse of the phrase that imparted prejudicial character to otherwise relevant facts. When the Court erroneously encouraged the jury to consider Cisco's size when deciding willfulness, Telcordia's prejudicial spin on the topic flooded into the jury's willfulness deliberations. *This is the true source of the harm to Cisco.* The fact that Cisco uttered the phrase "big kahuna" once does not call for the damage to be ignored, lessen its impact, or make it acceptable.

Telcordia also repeatedly informed the jury that Cisco grew in size through various multi-billion dollar acquisitions, and then injected this fact into its case whenever possible:

- Telcordia's damages expert, James Nawrocki, noted that Cisco acquired Lightstream for $120 million, StrataCom for $4 billion, and Cerent for $6.9 billion, and then testified that Cisco was "trying to become as big as they can" through these acquisitions. *See id.* at 1316:5-24.

- Mr. Nawrocki opined that Cisco acquired Cerent for $6.9 billion, and that $70 million was only one percent of this purchase price and hence a reasonable price to pay for a license. *See id.* at 1318:13-22.

- Mr. Nawrocki noted that Cisco acquired Cerent for $6.9 billion and Monterey for $7.4 billion in stock, so that Cisco could enter the optical transport market, which analysts had valued at over $10 billion dollars. *See id.* at 1312:18-1313:2.

- Mr. Nawrocki notes that Cisco underwent $40 billion in acquisitions to grow "quite a ways from the small company they once were." *See id.* at 1298:19-1299:2.

- Telcordia noted in its Closing Argument that Cisco acquired Cerent for $7.4 billion intending to enter a $10 billion optical transport market, and would thus be "willing to pay very substantial royalties in order to get a license agreement." D.I. 358 at 2192:6-20.

In light of the foregoing, it is clear that Telcordia left an indelible impression among jurors regarding Cisco's size and financial condition. As such, the Court's directive that the jury import this issue into its willfulness deliberations was anything but harmless. Any suggestion that it was highly probably it *did not* affect the outcome of the case—as Telcordia fervently intended—is simply not viable.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Cisco requests that the Court grant a new trial on the issue of willfulness.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (I.D. #1014)
Leslie A. Polizoti (I.D. #4299)
1201 North Market Street
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

May 31, 2007
845715

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to Steven J. Balick and John G. Day.

I further certify that I caused copies of the foregoing document to be served on May 31, 2007 upon the following in the manner indicated:

**BY HAND**

John G. Day
ASHBY & GEDDES
500 Delaware Avenue, 8th Fl.
Wilmington, DE 19801

**BY FEDERAL EXPRESS
(on June 1, 2007)**

Don O. Burley
FINNEGAN, HENDERSON,
 FARABOW, GARRETT & DUNNER
901 New York Avenue
Washington, DC 20001

**BY ELECTRONIC MAIL**

John Day (jday@ashby-geddes.com)
John Williamson (john.williamson@finnegan.com)
York Faulkner (york.faulkner@finnegan.com)
Don Burley (don.burley@finnegan.com)

*/s/ Jack B. Blumenfeld*
_____

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com