IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Plaintiff/Counterclaim Defendant, | ) | Civil Action No. 04-876-GMS |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## TELCORDIA TECHNOLOGIES, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO ENHANCE DAMAGES PURSUANT TO 35 U.S.C. § 284

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, D.C. 20001
(202) 408-4000

Dated: May 30, 2007
181119.1

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

I.    Nature and Stage of the Proceeding.................................................................1

II.   Summary of the Argument................................................................................2

III.  Statement of Facts and Argument....................................................................3

      A.    Cisco Knew of Telcordia's Patents and Deliberately Copied Telcordia's
           Technology ............................................................................................3

           1.    Cisco Lawyers and Engineers Were Aware of Telcordia's SRTS
                 Patent and Cisco Nevertheless Copied Telcordia's SRTS
                 Technology .................................................................................4

           2.    Cisco's Lawyers and Engineers Were Aware of Telcordia's UPSR
                 Patent and Cisco Nevertheless Copied Telcordia's UPSR
                 Technology .................................................................................7

      B.    Cisco Willfully Infringed Telcordia's Patent with a Highly Culpable State
           of Mind, and Cisco's Actions in this Case are Particularly Egregious ...................8

      C.    Cisco Did Not Form a Good Faith Belief that its Activity Was
           Noninfringing or that Telcordia's Patent Was Invalid...........................................12

      D.    Cisco's Size and Financial Condition Weigh in Favor of Enhancement..............13

           1.    An Enhanced Damages Award Would Not Bankrupt Cisco .....................13

      E.    The Punitive and Deterrent Effect of Enhanced Damages is Appropriate
           Given Cisco's Size and Actions.............................................................................14

      F.    Cisco's Behavior in This Litigation Supports Enhancement .................................16

      G.    Cisco has Infringed for Many Years and has Taken no Remedial Action.............17

IV.   Conclusion ......................................................................................................18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.,*
   265 F.3d 1294 (Fed. Cir. 2001) ............................................................................. 9

*Amstead Industries v. Buckeye Steel Castings, Co.,*
   24 F.3d 178 (Fed. Cir. 1994) ............................................................................... 9

*Goodwall Construction Co. v. Beers Construction Co.,*
   991 F.2d 751 (Fed. Cir. 1993) ............................................................................. 4

*IMX v. Lending Tree LLC,*
   469 F.Supp.2d 203 (D. Del. 2007) ...................................................................... 13

*Johns Hopkins Univ. v. Cellpro,*
   978 F.Supp. 184 (D. Del. 1997) .......................................................................... 14

*Jurgens v. CBK, Ltd.,*
   80 F.3d 1566 (Fed. Cir. 1996) ............................................................................. 16

*nCube Corp. v. SeaChange Intern., Inc.,*
   313 F.Supp.2d 361 (D. Del. 2004) ...................................................................... 13

*Read Corp. v. Portec, Inc.,*
   970 F.2d 816 (Fed. Cir. 1992) ..................................................................... passim

*SRI International, Inc. v. Advanced Technology Labs., Inc.,*
   127 F.3d 1462 (Fed. Cir. 1997) ........................................................................... 2

## STATUTES

35 U.S.C. § 284 ......................................................................................... passim

## I.    Nature and Stage of the Proceeding

This action for patent infringement was tried to a jury from April 27, 2007, through May 9, 2007.  On May 10, 2007, the jury returned a verdict in favor of Plaintiff Telcordia Technologies, Inc. ("Telcordia" formerly Bell Communications Research, Inc. or "Bellcore") and against defendant Cisco Systems, Inc. ("Cisco"), finding that Cisco willfully infringed two of Telcordia's patents and awarding Telcordia $6.5 million in damages.

In its original complaint filed on July 16, 2004, Telcordia asserted that Cisco willfully infringed Telcordia's U.S. Patent Nos. 4,893,306 ("the '306 patent") and Re. 36,633 ("the '633 patent").  D.I. 1.  In an amended complaint filed on June 14, 2005, Telcordia asserted that Cisco willfully infringed U.S. Patent No. 4,835,763 ("the '763 patent").[1]  D.I. 28.  On June 22, 2006, the Court issued an Order construing the claims of the '306, '763, and '633 patents.  D.I. 179. Based on this Order, Telcordia determined that it could not prove that any of Cisco's accused products infringe any of the asserted claims of the '306 patent.  Telcordia did not oppose the entry of summary judgment against it as to noninfringement of the '306 patent, leaving for trial the issue of infringement of the '633 and '763 patents, as well the issues of validity and enforceability of the '306, '633, and '763 patents.  Additionally, the parties agreed to submit all equitable issues to the jury for a final decision.  D.I. 318 at n.3.  On May 16, 2007, after the jury found for Telcordia on every remaining issue, the Court entered judgment "in favor of the plaintiff, TELCORDIA and against the defendant, CISCO in the amount of SIX MILLION FIVE

---

[1]Telcordia asserted these same patents in two parallel cases before this Court against defendants Alcatel USA, Inc. and Lucent Technologies, Inc. (C.A. Nos. 04-874-GMS and 04-875-GMS). Those defendants settled their cases without the need for a jury trial on April 30, 2007.  D.I. 223 in 04-874-GMS and D.I. 351 in 04-875-GMS.

HUNDRED THOUSAND DOLLARS ($6,500,000) for infringement of the U.S. Patent No.
4,835,763 and the U.S. Patent No. Re. 36,633." D.I. 348.

## II.    Summary of the Argument

As Telcordia noted in its trial brief, this lawsuit is the unfortunate culmination of
continuous and heated licensing negotiations between Cisco and Telcordia that lasted for over a
decade.  At any point during the decade-long negotiation, Cisco could have avoided this
litigation by simply taking a license at the modest rates offered by Telcordia—rates that in fact
were accepted by many others in the industry.  Instead, as the evidence at trial demonstrated,
Cisco chose to string Telcordia along, to ignore Telcordia's patents and license offers, to design
and market products that it knew practiced Telcordia's inventions, and to benefit significantly
from the unsanctioned use of Telcordia's patented technologies.

Presented with almost 40 communications between Cisco and Telcordia about licensing
the patents-in-suit during a 10-year saga of Cisco stonewalling, the jury in this case determined
that Cisco's actions, including ignoring Telcordia's license offers and simultaneously launching
products that use Telcordia's patented technologies, warranted a finding of willful infringement
against Cisco.  Given the jury's finding of willful infringement, Telcordia requests that the Court
treble the jury's damages award pursuant to the statutory authority in 35 U.S.C. § 284.

"When willful infringement or bad faith has been found, the remedy of enhancement of
damages not only serves its primary punitive/deterrent role, but in so doing it has the secondary
benefit of quantifying the equities as between patentee and infringer." *SRI International, Inc. v.
Advanced Technology Labs., Inc.*, 127 F.3d 1462, 1468 (Fed. Cir. 1997).  "The paramount
determination in deciding to grant enhancement and the amount thereof is the egregiousness of
the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*,
970 F.2d 816, 826 (Fed. Cir. 1992).

In considering enhancement based on all of the facts and circumstances, the Federal Circuit applies the established *Read* factors: (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the infringer's behavior as a party to the litigation, (4) the defendant's size and financial condition, (5) the closeness of the case, (6) the duration of the defendant's misconduct, (7) remedial action by the defendant, (8) the defendant's motivation for harm, and (9) whether defendant attempted to conceal its misconduct. *Id.* at 827. In this case, the *Read* factors weigh heavily in favor of enhancement.

## III.    Statement of Facts and Argument

### A.    Cisco Knew of Telcordia's Patents and Deliberately Copied Telcordia's Technology

As demonstrated during trial, Cisco unquestionably knew of Telcordia's original SRTS patent (U.S. Patent No. 5,260,978), Telcordia's reissue SRTS patent (U.S. Patent No. Re. 36,633), and Telcordia's UPSR patent (U.S. Patent No. 4,835,763) during the time Cisco was actively designing, making, launching, and supporting its products that use Telcordia's SRTS and UPSR technologies.[2] Moreover, Cisco admitted to copying and incorporating Telcordia's SRTS and UPSR technologies into its products by virtue of using chips and implementing technical standards or specifications that expressly employ SRTS or UPSR. Enhancement under

---

[2] Cisco's awareness of and refusal to license Telcordia's original SRTS patent is highly relevant to those same issues as they apply to Telcordia's reissue SRTS patent. For instance, because Telcordia's license offers for the original SRTS patent extended to any reissue patents, had Cisco negotiated a license with Telcordia in good faith under the original SRTS patent, it would have avoided this lawsuit and would have rather enjoyed a license under the reissue SRTS patent as well. Testimony of J. Giordano at Trial Tr. 288-89. Moreover, Cisco's treatment of Telcordia regarding the original SRTS patent is an integral part of a pattern of Cisco's callous disregard of Telcordia and Telcordia's legal rights.

35 U.S.C. § 284 is particularly appropriate against the evidence of Cisco's awareness of Telcordia's SRTS and UPSR patents, and its express copying of Telcordia's SRTS and UPSR technologies. *Goodwall Construction Co. v. Beers Construction Co.*, 991 F.2d 751, 758 (Fed. Cir. 1993)(affirming enhancement under 35 U.S.C. § 284 where record supported inference that defendant copied plaintiff's patented process); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992) (Factor 1—"whether the infringer deliberately copied the ideas or design of another. . . .").

    1.    **Cisco Lawyers and Engineers Were Aware of Telcordia's SRTS Patent and Cisco Nevertheless Copied Telcordia's SRTS Technology**

At the outset, Mr. Giordano, Telcordia's Vice President and Acting General Counsel, testified as to Telcordia's earnest effort to license Cisco and the fruitless 10-year history of negotiations and communications between Telcordia and Cisco regarding the licensing of the patents-in-suit. Testimony of J. Giordano at Trial Tr. at 297-360. As part of his testimony, Mr. Giordano detailed how and when Telcordia (1) presented its SRTS and UPSR patents to Cisco, (2) explained—through claim charts and general correspondence—exactly which Cisco products infringe Telcordia's SRTS and UPSR patents, and (3) sought to avoid litigation through a license or other business solution. *Id.*

For its part during trial, Cisco did not and could not deny its acute awareness of Telcordia's patents. Indeed, Cisco lawyer Robert Barr—the Cisco lawyer responsible for negotiating with Telcordia—virtually admitted that although he knew full well of Telcordia's patents and its infringement claims, he simply did not care. For example, Mr. Barr testified (through deposition read at trial):

- that despite Telcordia's many letters and communications, Cisco "continued to announce products using ATM without believing that Telcordia was going to try to stop us," Testimony of R. Barr at Trial Tr. 556;

- that he was "not going to answer out-of-context crap" when asked about a slide presentation given to Cisco in 2002 regarding licensing of Telcordia's patents, Testimony of R. Barr at Trial Tr. at 561-62; and

- that he thought Telcordia's letter explaining that Telcordia intended to enforce its patents was "a mistake," Testimony of R. Barr at Trial Tr. 553-54.

Notably, Cisco offered no witness during trial to explain or contradict Mr. Barr's indignant positions.[3] As such, the trial record demonstrates that Cisco knew about Telcordia's patents, ignored Telcordia's license offers, and continued to launch new infringing products in the face of Telcordia's legal rights. *See, e.g.*, Testimony of R. Barr at Trial Tr. 540-70; Testimony of G. Fujii at Trial Tr. 1219-20; Testimony of J. Giordano at Trial Tr. 297-360; PTX 472; DTX 2566; DTX 2448; JTX 6000.

Moreover, not only were Cisco's lawyers acutely aware of Telcordia's patents, but Cisco's engineers were also independently aware of Telcordia's patented technology due to the objective technical merits of the technology. For example, Cisco engineers were aware of Telcordia's patented SRTS technology because the technology is incorporated into key industry standards issued by the International Telecommunications Union, the American National Standards Institute, and the ATM Forum. Testimony of S. Walters at Trial Tr. at 1180-1187; DTX 2164; DTX 2397; PTX 234; PTX 728; PTX 1195; PTX 1196; PTX 1216; PTX 1231; PTX 1232. Cisco participated in the standardization efforts, designed its products to comply with the standards, and marketed its products as compliant with the standards. Testimony of G.

---

[3] Indeed, only one (non-expert) witness from Cisco testified before the jury on Cisco's behalf—Mark Carroll, a current Cisco senior director who was an engineering director for some of the products in suit during the infringing period. Despite his key engineering position during the relevant time period, Mr. Carroll explained that he "wasn't related" to Cisco's licensing discussions with Telcordia and "didn't know the details associated" with the licensing discussions. Testimony of M. Carroll at Trial Tr. 1412. In fact, Cisco failed to produce any witness at trial who knew anything about the decade-long license negotiations with Telcordia.

Fedorkow at Trial Tr. 1161-63; Testimony of M. Carroll at Trial Tr. 1414-16; Testimony of J. Nawrocki at Trial Tr. 1308-09; PTX 355; PTX 356; PTX 1242; PTX 1370; PTX 1375; PTX 1376, PTX 1404.

Quite simply, Cisco directly copied the standards that included Telcordia's SRTS technology. In the words of Cisco engineer and Senior Director Mark Carroll: "we had a standard that we were going to implement and we implemented it." Testimony of M. Carroll at Trial Tr. 1414.

The evidence presented at trial also demonstrates not only that Cisco implemented SRTS in its products, but also that it did so with full knowledge of Telcordia's SRTS patent and in a way that was certain to infringe Telcordia's SRTS patent. Specifically, as demonstrated at trial, the product literature in Cisco's own files associated with the chips of one of Cisco's primary component suppliers expressly warns that the chip "contains SRTS logic that Bellcore holds the patent on." Testimony of B. Holden at Trial Tr. 819-20; PTX 1366. Cisco engineers not only used the chip and the product literature, but also directly contacted the maker of the chip to gain insights about exactly how to implement Telcordia's patented SRTS technique. Testimony of M. Carroll at Trial Tr. 1416-18, PTX 1753. As Mr. Carroll further confirmed, Cisco's implementation of standards that include Telcordia's patented technology logically resulted in Cisco products that incorporated Telcordia's SRTS and UPSR technologies:

> Q:    You don't deny that Cisco's product have SRTS and UPSR features?
>
> A:    Cisco products are capable of being configured with SRTS, the MGX, MPSM, and the CESM, actually, I can't name all of them. There are a few others.
>
> Q:    The same is true for UPSR, the ONS products, Cisco knew when it received the letter from Telcordia that its ONS products had UPSR features?

A:      I wouldn't know if Cisco knew at the time whether they received it, when they received it, because I wasn't privy to any of those discussions.  But the original question is if the optical products are capable of doing that?  Yes, they are, only some of them, depending on how you configure it.

Testimony of M. Carroll at Trial Tr. at 1413.

### 2.      Cisco's Lawyers and Engineers Were Aware of Telcordia's UPSR Patent and Cisco Nevertheless Copied Telcordia's UPSR Technology

Although Mr. Carroll pled personal ignorance of Telcordia's UPSR patent, the evidence at trial demonstrated that Cisco was well aware of the patent as Telcordia had, *inter alia*, expressly identified the patent to Cisco in September of 2001 (Testimony of J. Giordano at Trial Tr. 333-36; PTX 456), and had provided Cisco with a claim chart showing how the patent related to Cisco's products that practice GR-1400 in 2003 (Testimony of J. Giordano at Trial Tr. 352-55; PTX 1204).  Again, just as in the case of SRTS, in addition to Cisco's lawyers' awareness of the UPSR patent through notice letters and license negotiations with Telcordia, Cisco's engineers independently recognized the importance of Telcordia's UPSR technology due to its technical merits.  For example, Cisco engineer Brian Rushka confirmed that Cisco copied Telcordia's generic requirements for unidirectional path switched rings (UPSR), GR-1400, in order to enjoy the many technical benefits inherent in Telcordia's UPSR technology:

Question:  Does Cisco believe that the architecture for path protection switching is its idea?

Answer:  A specific -- a specific instance or aspect of that I cannot -- Cisco did not define -- excuse me, Cisco did not define a workable, usable or desirable or saleable set of switching criteria for path protection switching.   The definition of the criteria was obtained from GR-1400 because that was a preexisting description of what people expect, want, need, and are willing to purchase.  So I can say with certainty that that was not an invention or discovery by myself or my coworkers.

Testimony of B. Rushka at Trial Tr. 1027.

Clearly Cisco was aware of Telcordia's UPSR patent, was aware of its relationship to GR-1400, and was aware of the fact that its products incorporated Telcordia's patented UPSR technology. Indeed Mr. Rushka confirmed that, just like Telcordia's SRTS technology, Cisco expressly copied Telcordia's UPSR technology by simply adopting the technical criteria set forth in the relevant technical specification—Telcordia's GR-1400 in the case of UPSR—in Cisco's products. Moreover, just as Telcordia maintained throughout negotiations with Cisco, the jury determined that Cisco implemented Telcordia's UPSR specification (GR-1400) in a manner that clearly infringed Telcordia's UPSR patent.

Cisco's motive for copying Telcordia's patented SRTS and UPSR technologies is no mystery. The record establishes that Cisco's key customers specifically demanded SRTS and UPSR technologies. Testimony of B. Rushka at Trial Tr. 1027; Testimony of G. Fedorkow at Trial Tr. 1160-62; PTX 472; PTX 1242; PTX 1404; PTX 1440; PTX 1444. As such, Cisco unsurprisingly achieved and continues to achieve great commercial success—literally billions of dollars in sales—from its ATM and ONS products that are expressly marketed as compliant with the applicable standards or requirements (*e.g.*, ATM Forum, GR-1400) and are able to practice Telcordia's SRTS and UPSR technology. Testimony of J. Nawrocki at Trial Tr. 1254, 1257-58, 1262-67; PTX 478.

Given the definitive, un-rebutted evidence of Cisco's clear awareness and copying of both SRTS and UPSR, *Read* factor number 1, "whether the infringer deliberately copied the ideas or design of another," weighs heavily in favor of enhancing damages in this case.

## B. Cisco Willfully Infringed Telcordia's Patent with a Highly Culpable State of Mind, and Cisco's Actions in this Case are Particularly Egregious

Cisco's culpable conduct concerning Telcordia's patents in this case goes beyond its stonewalling across 10 years of negotiations, beyond its deliberate copying of Telcordia's

technology, and beyond its marketplace success from unsanctioned use of Telcordia's technology. Indeed, in addition to these willful acts, when presented with Telcordia's patented SRTS technology at the ATM Forum, Cisco helped to organize a group vote against Telcordia's technology that was improperly designed either to exclude SRTS from the ATM Forum's specification altogether or artificially depress the licensing rates that Telcordia would be able to seek in the market.[4]

Specifically, a contemporaneous February 1995 email from Guy Fedorkow—the Cisco employee who was acting as co-chair of the relevant ATM Forum committee, who was listed in Cisco's interrogatory answers as the person with knowledge about Cisco's equitable defenses relating to activity at the ATM Forum, and who was promised but not delivered at trial by Cisco's counsel[5]—evidences Cisco's clearly improper actions against Bellcore at the ATM Forum:

---

[4] Due to the prejudicial nature of the language that Cisco's own employees used to characterize Cisco's conduct and actions before the ATM Forum, the Court directed the parties to compromise as to which facts concerning Cisco's actions at the ATM Forum could be presented to the jury. Ruling and argument at Trial Tr. 91-112. Under the Court's guidance, a trial exhibit was redacted (PTX 416 redacted to form PTX 1808) and the jury was not exposed to certain language and arguments. In this motion, out of an abundance of caution, Telcordia limits its arguments and discussion about Cisco's behavior at the ATM Forum to the facts that were before the jury. That said, Telcordia notes that the Court may, under appropriate circumstances, consider evidence beyond the trial record when considering the question of enhancement under 35 U.S.C. § 284. *Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1311 (Fed. Cir. 2001) *quoting Amstead Indus. v. Buckeye Steel Castings, Co.*, 24 F.3d 178, 184 (Fed. Cir. 1994)("the trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation between winner and loser").

[5] Specifically, on the first day of trial when arguing that the Court should exclude aspects of Mr. Fedorkow's email, Cisco's trial counsel Mr. Powers argued that "[w]ithout the ███████ language, they can use it to describe what happened at the forum. Mr. Fedorkow is going to be here. They can talk to him about it." Argument at Trial Tr. at 100. Mr. Fedorkow, however, did not appear at trial.

The major issue for CES was the Bellcore [now Telcordia] patent problem. This was brought to the surface by MCI, through a contribution which said that they would vote against the CES specification, because it subjected vendors to unlimited liability due to the inclusion of SRTS, a technology on which Bellcore may hold a patent. Bellcore had opened itself to this problem by issuing private letters to a selection of vendors offering terms for use of the patent. The terms offered were said by those who received the letters to be "outrageous". Once MCI introduced the idea, a **number of other companies quickly saw that a carefully constructed** ▮▮▮▮ **could be quite effective in bringing Bellcore to better terms.**

I say carefully constructed, because there are conflicts of interest all over the place. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Consequently, no one could say "I'm voting against CES until Bellcore reduces their licensing fee to $10K."** What we could all say was that we were voting against it because of our respective "business concerns" regarding the spec, and that we "needed more time to resolve these concerns."

. . .

On Tuesday evening, there was a vote to declare the Circuit Emulation Specification complete. **Thanks to MCI's contribution, and some excellent organizing by Anthony** [aalles@cisco.com -- Anthony Alles -- was a Cisco employee who participated in the ATM Forum and who was copied on this internal Cisco email], **the vote went against the document by about 19 to 1, with everyone in the room knowing that we were voting against the Bellcore terms. Of course, no one could exactly say that** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

PTX 1808 (redactions in original, emphasis added). Mr. Fedorkow's email demonstrates (1) that Cisco directly participated—through at least "excellent organizing" by a Cisco employee—in arranging a group vote against SRTS, (2) that the true purpose of this group vote was to force Bellcore to reduce its licensing terms, (3) that the true motive of the group had to remain shrouded in secrecy and hidden behind the façade of general "business concerns," and (4) that Cisco recognized conflict of interest problems underlying its scheme.

10

The essence of Mr. Fedorkow's email shows that Cisco recognized the impropriety of its actions and that Cisco was therefore uneasy about a group vote focused (albeit secretly) on Bellcore's licensing terms. Cisco's unease is unsurprising against the ATM Forum's express written policy—as explained by former ATM Forum Chairman Dr. Steve Walters during trial—that members were not permitted to discuss financial matters. Testimony of S. Walters at Trial Tr. 1213-15; PTX 1487.

Beyond its backroom organizing at the ATM Forum, Cisco also issued unwarranted public statements against Bellcore at the ATM Forum. For instance, at an ATM Forum meeting in April of 1995—two months after Cisco organized the vote against Bellcore—Cisco publicly (and incorrectly) chided Bellcore for allegedly not following ATM Forum rules:

> ATM Forum bylaws require that ANSI Patent Policy be followed for specifications that may include intellectual property of others. This policy requires that patent holders disclose patents that may apply to the specification under consideration, and must agree to license the relevant patent with terms that are fair and non-discriminatory. In the case of a patent that may cover the Synchronous Residual Time Stamp clock recovery algorithm, Cisco believes that these requirements have not been met.

PTX-1242. Cisco's public attack on Bellcore was unwarranted and inappropriate because Bellcore had in fact already provided the exact licensing assurance that was required by the ATM Forum policies. Testimony of J. Giordano at Trial Tr. 304-320; Testimony of S. Walters at Trial Tr. 1170-72, 1178-79, 1181-84; Testimony of G. Fedorkow at Trial Tr. 1163-64; PTX 1519. Indeed, the assurance that Bellcore gave the ATM Forum regarding licensing was identical in all material respects to the assurance that Cisco provided to the ATM Forum when Cisco disclosed one of its patents to the Forum. *Compare* PTX 1519 with PTX 1531 at p. 7.

Given Cisco's aggressive and unwarranted actions against Bellcore at the ATM Forum, *Read* factor 8, the "defendant's motivation for harm," and *Read* Factor 9, "whether the defendant

attempted to conceal its misconduct," both weigh heavily in favor of enhancing damages in this case.

**C.    Cisco Did Not Form a Good Faith Belief that its Activity Was Noninfringing or that Telcordia's Patent Was Invalid**

Cisco's actions at the ATM Forum (i.e., organizing a vote and creating a controversy about the licensing rates that Bellcore was offering for SRTS), and its actions toward Telcordia in general, are not the actions of a company that had formed a good faith belief that its activity was noninfringing or that Telcordia's patents were invalid or unenforceable.

Indeed, had Cisco harbored a good faith belief of invalidity, unenforceability, or noninfringement, Cisco would have had every opportunity to convey this belief to Telcordia during the decade-long license negotiations with Telcordia.  But in the course of almost 40 communications across nine years of negotiations, Cisco never once stated to Telcordia that it believed that Telcordia's patents were invalid, unenforceable, or not infringed.  Testimony of J. Giordano at Trial Tr. 358-59.  Only in the tenth year of negotiations, after Cisco had been infringing Telcordia's patents and negotiating with Telcordia for many years, did Cisco first raise the obscure suggestion that a subset of the claims of one of the two patents in suit may be invalid.  Testimony of J. Giordano at Trial Tr. 487-88; DTX 2471.  Telcordia naturally viewed Cisco's late-in-the-game invalidity position as yet another tactic to further stall and stonewall negotiations beyond 10 years.  Testimony of J. Giordano at Trial Tr. 357-58, 532-33.  Telcordia was forced to put an end to Cisco's stonewalling by filing this action.  *Id.*

During the decade of negotiations leading up to this suit, the evidence strongly supports the view that Cisco had not formed a good faith belief of invalidity, unenforceability, or noninfringement.  Instead, Cisco apparently formed a belief that Telcordia did not have the nerve, or perhaps the resources, to stand up to it.  Cisco's belief is best summarized by its

12

counsel, Mr. Barr: "we continued to announce products using ATM without believing that Telcordia was going to try to stop us." Testimony of R. Barr at Trial Tr. at 556. Against the evidence that Cisco never held a good faith belief of noninfringement, invalidity, or unenforceability, *Read* factor 2 weighs heavily in favor of enhancement in this case.

### D.    Cisco's Size and Financial Condition Weigh in Favor of Enhancement

#### 1.    An Enhanced Damages Award Would Not Materially Impact Cisco's Financial Condition

During trial Cisco characterized itself, for good reason, as "The Big Kahuna." Counsel for Cisco at Trial Tr. 426. Defendant Cisco Systems, Inc. is one of the largest companies in the United States, ranking 77th in the latest Fortune 500 poll. Ex. A. According to its 2006 annual report, Cisco made $28.5 billion in sales and $5.6 billion in revenues in 2006 alone. Ex. B. Moreover, for the time period during which Cisco infringed Telcordia's patents and had actual notice of Telcordia's patents (September 2001 to present), Cisco made well over $110 billion in sales. Ex. B at 2. On average, that equates to over $60 million in sales per day, every day of the year, for over five years.

The total value of the enhanced damages award sought by Telcordia—$6.5 million trebled up to $19.5 million—would amount to less than one third of the value of Cisco's average sales for any one day during the more than 2000 days that Cisco willfully infringed Telcordia's patents with actual notice of the patents. By any measure, an enhanced damages award would not materially impact Cisco's financial condition. Indeed, courts have enhanced damages after evaluating the size and financial condition of willful infringers that pale in comparison to Cisco, reasoning that the enhancement awards would not adversely impact the willful infringers in a material manner. *See, e.g.*, *IMX v. Lending Tree LLC*, 469 F. Supp. 2d 203, 222 (D. Del. 2007) (enhancing damages where defendant generated $190 million in revenues in one year—in

comparison Cisco would generate $190 million in revenues in just over 3 days); *nCube Corp. v. SeaChange Intern., Inc.*, 313 F. Supp. 2d 361, 390 (D. Del. 2004) (enhancing damages where defendant had assets valued at over $150 million and generated $31.1 million in sales over two quarters—in comparison Cisco would generate $31.1 million in just over a half-day); *Johns Hopkins Univ. v. Cellpro*, 978 F. Supp. 184, 195-96 (D. Del. 1997) (enhancing damages where defendant had $60 million available in cash and marketable securities—in comparison, Cisco would generate $60 million in one day).

**E.    The Punitive and Deterrent Effect of Enhanced Damages is Appropriate Given Cisco's Size and Actions**

Courts consider the size and financial condition (*Read* factor 4) of the willful infringer not only to confirm that an enhanced award will not bankrupt the infringer, but also to gauge the appropriate measure of punitive damages against the willful infringer.  When considering enhancement, courts recognize that "[p]unishing a larger company in a stronger financial condition may call for higher damages, where a lower number may be equally effective in punishing a smaller company." *Johns Hopkins Univ. v. Cellpro*, 978 F. Supp. 184, 195 (D. Del. 1997), *aff'd,* 152 F.3d 1342 (Fed. Cir. 1998).  In this case, given Cisco's size and financial condition, the jury's damages award of $6.5 million will serve little deterrent or punitive purpose absent enhancement.  In fact, despite the finding that it willfully infringed Telcordia's patents, Cisco apparently views the outcome of the case as a victory because of the modest damages award.

Indeed, less than 24 hours after the jury rendered its verdict, Counsel for Cisco wrote to the office of the Administrative Law Judge in the parallel action before the International Trade Commission boasting about the modest size of the jury verdict:

> we wanted to report that the jury awarded less than 1/10 of the damages sought by Telcordia.  Specifically, Telcordia sought more

> than $75,000,000 for its two patents and **received <u>only</u> $6,500,000 total.**

Ex. C (emphasis added).  Similarly, a press release issued by Cisco's financial consultant, Invotex Group, appearing in numerous financial news reports including Market Watch and Yahoo! Finance explains the damages figures propounded by each party—$5.5 million and $75 million respectively—and trumpets the jury's finding of $6.5 million in damages.  Ex. D. Simply put, because it effectively limited its liability, Cisco publicly views the outcome of the case as a victory notwithstanding the jury's finding that Cisco willfully infringed two of Telcordia's patents.  In other words, Cisco continues, undeterred, with its cavalier attitude towards Telcordia's patent rights largely because its size allows it to absorb the jury's damages award with little to no consequence.  In such a case, the punitive and deterrent element of an enhanced damages award is particularly appropriate.

Moreover, Cisco has achieved its behemoth size and dominant market share in part by selling billions of dollars worth of products that practice Telcordia's patented technologies in direct competition with Telcordia's lawful licensees.  Indeed, during trial Cisco highlighted the fact that Telcordia's licensees struggled to achieve meaningful sales volumes of their products that practice Telcordia's patented technologies.  Testimony of J. Giordano at Trial Tr. 509-512, 534-537; Testimony of J. Nawrocki at 1290-91; DTX 2569.  In contrast, Cisco's sales of infringing products that practice Telcordia's patented technologies were shown to reach well into the billions of dollars.  Testimony of  J. Nawrocki at Trial Tr. 1253-54; Testimony of G. Fujii at Trial Tr. 1222-23; PTX 478.

Again, Cisco gained its position of obvious dominance in the market by competing with companies who had lawfully licensed Telcordia's widely recognized technology and who were rightfully paying Telcordia for the use Telcordia's technology.  DTX 2569.  Cisco should be

penalized not only for its unfair treatment of Telcordia, but also for its unfair advantage against Telcordia's lawful licensees in the market.[6]

But the jury's modest damages award simply puts Cisco in the same position it would have been in had Cisco taken a license at discounted terms years ago. The damages award does not account for Cisco's enjoyment of many years of illegal royalty-free sales in the marketplace—in direct competition with Telcordia licensees who were playing by the rules. Cisco should not, after enjoying years of marketplace advantage against Telcordia's legal licensees, be permitted to simply retroactively step into the shoes of a licensee without penalty. In sum, Cisco's size, financial condition, attitude, and market presence all weigh in favor of enhancing the damages award.

### F.     Cisco's Behavior in This Litigation Supports Enhancement

Bad faith litigation tactics and conduct should be weighed in assessing the amount of enhancement under 35 U.S.C. § 284. *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570-71 (Fed. Cir. 1996); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992)(factor 3). Cisco's litigation misconduct is discussed in detail in Telcordia's Brief in Support of its Motion for Attorneys' Fees and Non-Taxable Expenses and Telcordia incorporates those arguments by reference.

---

[6] During the pretrial conference, counsel for Cisco characterized Telcoridia's licensees and potential licensees as "poor small companies" and claimed that these companies are "too defenseless to fight and can't take on the costs of a litigation." March 30, 2007, Hearing Tr. at 183-84. In reality, Telcordia's licensees are sophisticated technology companies and despite their smaller share of the market, they chose—unlike Cisco—to respect the intellectual property rights of others. Unfortunately, Telcordia's small licensees were left to compete in the market with a dominant competitor who chose to give itself an added advantage by refusing to pay for the right to use Telcordia's patented technology.

**G.    Cisco has Infringed for Many Years and has Taken no Remedial Action**

The trial record establishes that Cisco has infringed Telcordia's patents for many years.

Testimony of J. Nawrocki at Trial Tr. 1262-67, 1272, 1299-1300; Testimony of G. Fujii at Trial

Tr. 1220-21; PTX 472; DTX 2566.  Moreover, Cisco took no remedial action to avoid

infringement.  For example, Cisco Senior Director Mr. Carroll explained Cisco's lack of

remedial action in the face of Telcordia's infringement contentions:

> Q:    Instead of re-engineering the products to remove UPSR and SRTS features, Cisco chose to risk infringement?
>
> A:    I don't know what Cisco's decision was at the time.  Again, I wasn't part of those negotiations or discussions at the time.
>
> Q:    Well, the business decision was not to remove UPSR and SRTS from Cisco's products.  Isn't that correct?
>
> A:    At that time, my role was to develop a particular standard that existed.  And actually, I was even removed from the engineers in that they were doing the development at the time.  So I didn't actually make the decision on what we would do or not do.  It was more we had a standard that we were going to implement and we implemented it.
>
> Q:    But Cisco, to your knowledge, never removed SRTS and UPSR from its products?
>
> A:    As far as my knowledge, where we developed them, for instance on the MPSM, we left the SRTS in the product.  It's capable of being configured so you can use SRTS today, if you are in that mode.
>
> Q:    That is an interesting point.  It is not only that you didn't remove SRTS and UPSR from existing products, you actually developed new products and made the decision to include SRTS features in them?
>
> A:    In which product would that be?
>
> Q:    The MPSM?
>
> A:    The MPSM was developed, as I mentioned, to simply incorporate the products that were existing, like the CSM and to add other protocols for the transport as well.

Testimony of M. Carroll at Trial Tr. 1414-15.

In short, Cisco continued to infringe for many years and simply took no remedial action upon learning about Telcordia's patents. Nor did Cisco take any remedial action during the litigation or after the verdict and judgment. As such, *Read* factors 6 and 7 weigh in favor of enhancing damages.

## IV.    Conclusion

Against the jury's finding that Cisco willfully infringed Telcordia's patents, and in considering all of the facts and circumstances, Telcordia respectfully requests that the Court exercise its discretion to treble the jury's damages award pursuant to 35 U.S.C. § 284.

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, D.C.  20001
(202) 408-4000

Dated: May 30, 2007