# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | C.A. No. 04-876-GMS |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## TELCORDIA TECHNOLOGIES, INC.'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL ON WILLFUL INFRINGEMENT PURSUANT TO RULE 59(a)

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

Of Counsel:

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, D.C. 20001
(202) 408-4000

Dated: July 23, 2007

# TABLE OF CONTENTS

FEDERAL CASES ............................................................................................................ ii

FEDERAL RULES .......................................................................................................... iii

I.      Introduction .......................................................................................................... 1

II.     Standard for Granting a New Trial ........................................................................ 2

III.    Argument .............................................................................................................. 3

        A.      The Court's Instruction on the *Read* Factors Was Entirely Proper Under
                Governing Federal Circuit Law ............................................................... 3

        B.      Cisco's Invitation to "Correct" the Law Should Be Rejected ................... 8

                1.      A Defendant's Size Is an Appropriate Factor to Consider in the
                        Willfulness Determination ............................................................ 9

                2.      A Defendant's Behavior as a Party to the Litigation Is an
                        Appropriate Factor to Consider in the Willfulness Determination ........... 11

                3.      *Read* Factors 6, 7, 8, and 9 Are Appropriate Factors to Consider in
                        the Willfulness Determination ...................................................... 13

        C.      Any Purported "Error" Was Harmless in Light of Overwhelming Evidence
                of Willful Infringement .......................................................................... 14

                1.      Cisco's Mischaracterization of the Trial Record in an Effort to
                        Argue that the Court's "Error" Was Not Harmless Should Be
                        Disregarded ................................................................................. 15

                        a)      Cisco's Mischaracterizations Regarding Events Relating to
                                Its Size and Financial Condition ..................................... 15

                        b)      Cisco's Mischaracterizations Concerning Litigation
                                Misconduct .................................................................... 19

        D.      Cisco Did Not Comply with Rule 51(c) ................................................. 26

IV.     Conclusion .......................................................................................................... 28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Bearing Co., Inc. v. Litton Industries,*
    729 F.2d 943 (3rd Cir.) ................................................................................. 3

*Avocent Huntsville Corp. v. Clearcube Tech., Inc.,*
    Civ. A. CV-03-S-2875-NE, 2006 WL 2109503 (N.D. Ala. July 28, 2006) ............... 7

*Century Wrecker Corp. v. E.R. Buske Mfg. Co.,*
    913 F. Supp. 1256 (N.D. Iowa 1996).................................................................. 8

*Dunn v. Hovic,*
    1 F.3d 1371 (3d Cir. 1993) ............................................................................ 26

*Etna Prods. Co. v. Q Marketing Group, Ltd.,*
    No. 03 Civ. 3805(SAS), 2004 WL 1769794 (S.D.N.Y. Aug. 6, 2004) ..................... 7

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
    394 F.3d 1368 (Fed. Cir. 2005) ...................................................................... 9

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.,*
    897 F.2d 508 (Fed. Cir. 1990) ........................................................................ 5

*Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GmbH,*
    408 F.3d 1374 (Fed. Cir. 2005) .................................................................... 13

*IMX, Inc. v. Lendingtree, LLC,*
    No. Civ. 03-1067-SLR, 2006 WL 38918 (D. Del. Jan. 6, 2006)........................ 5, 6

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge, GmBH v. Dana Corp.,*
    383 F.3d 1337 (Fed. Cir. 2004) ............................................................. 5, 6, 7, 9

*Lifescan v. Home Diagnostics, Inc.,*
    103 F.Supp.2d 345 (D. Del. 2000).................................................................... 3

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed.Cir.1995) ............................................................................ 6

*Mars, Inc. v. Coin Acceptors, Inc.,*
    Civ. A. No. 90-49(JCL), 2005 WL 4821316 (D. N.J. Sept. 15, 2005)................... 7

*McKenna v. Pacific Rail Service,*
    817 F.Supp. 498 (D. N.J. 1993)...................................................................... 3

*Miller v. Cigna Corp.,*
    47 F.3d 586 (3d Cir. 1995) ........................................................................... 26

*Read Corp. v. Portec, Inc.,*
 970 F.2d 816 (Fed. Cir. 1992) ................................................................. 4, 5, 6, 7

*Roebuck v. Drexel University,*
 852 F.2d 715 (3rd Cir. 1988) ............................................................................. 3

*Rolls-Royce Ltd. v. GTE Valeron Corp.,*
 800 F.2d 1101 (Fed. Cir. 1986) ......................................................................... 5

*SRI Int'l v. Advanced Tech. Lab.,*
 127 F.3d 1462 (Fed. Cir. 1997) ......................................................................... 5

*Tenneco Auto. Operating Co. Inc. v. Visteon Corp.,*
 375 F.Supp.2d 360 (D. Del. 2005)................................................................... 6, 7

*TiVo, Inc. v. EchoStar Comm. Corp.,*
 No. Civ. A. 2:04CVI(DF), 2005 WL 4131649 (E.D. Tex. Sept. 26, 2005)............... 7

*Trading Techs. International, Inc. v. Espeed, Inc.,*
 431 F.Supp.2d 834 (N.D. Ill. 2006) ................................................................... 7

*Universal Computers v. Datamedia Corp.,*
 653 F.Supp. 518 (D.N.J.1987)............................................................................ 3

*Williamson v. Consolidated Rail Corp.,*
 926 F.2d 1344 (3d Cir. 1991) ............................................................................ 3

## FEDERAL RULES

Fed. R. Civ. P. 51(c) ......................................................................................... 26

## I.     Introduction

Without offering any precedent or meaningful support for its position, Cisco contends

that this Court fatally erred by instructing the jury that it may use the *Read* factors when

considering willful infringement.  Cisco claims it is entitled to a new trial on willfulness due to

the Court's error.  Cisco's argument is frivolous—established Federal Circuit law endorses use

of the *Read* factors when determining willfulness and, unsurprisingly, district courts nationwide

routinely apply the *Read* factors when evaluating willfulness.  Recognizing that all precedent

goes against it, Cisco cobbles together a self-serving argument based on vague generalizations

about the law of willfulness.  Although buried in a footnote in its brief, Cisco alludes to its true

agenda lurking behind its policy argument: an invitation for this Court to "correct" what Cisco

perceives to be a nationwide "misunderstanding in this area of the law."  Cisco fails to note that

it is asking this Court to be the first and only court (to Telcordia's knowledge) to find error based

on the widely adopted practice of using the *Read* factors when considering willfulness.

In reality, despite Cisco's over-dramatization of the issue, there most certainly is no

"severe need to correct a misunderstanding in this area of the law."  Rather, Cisco merely seeks a

change in the law to serve its own interest in this case.  Specifically, Cisco would have this Court

find error in the jury instructions and retry the case in spite of the Federal Circuit's express en

banc endorsement in *Knorr-Bremse* of the practice of using the *Read* factors when considering

willfulness.  The Court should reject Cisco's invitation out of hand—the resources of this Court

and the parties should not be strained with an entire new trial so that Cisco can attempt to

advance a wholly self-serving, unprecedented, and incorrect legal theory.

Moreover, even if the Court "erred" by instructing the jury in accordance with established

Federal Circuit law—which, obviously, it did not—any supposed "error" was harmless.

Although it insists that the jury should have been sharply limited as to what types of factors it

1

could weigh when considering willfulness, Cisco must nevertheless concede that it is always proper for the jury to consider the totality of the circumstances when evaluating the question of willful infringement. In this case, Cisco's willful infringement was so clear under the totality of the circumstances that the result would have been the same under any appropriate jury instruction centered on the totality of the circumstances.

Almost as troubling as its demand that the Court and the parties endure another trial based only on Cisco's dubious legal position, in its brief Cisco distorts the record of this litigation and rehashes already decided issues. Cisco apparently advances its re-creation of the record in an effort to argue that the Court's "error" in instructing on the *Read* factors was not harmless. At bottom, however, even if Cisco's version of the record were accepted as accurate, the Court's instruction on the *Read* factors remains harmless as any jury considering the totality of the circumstances still would have found Cisco's infringement to be willful.

Finally, and most troubling of all, many of Cisco's new arguments on the propriety of instructing the jury on the *Read* factors were either never raised during trial or stand in direct conflict with the express representations that Cisco's counsel made to the Court during the charge conference. For example, Cisco's counsel told the Court that *Read* factor 6 (duration of defendant's misconduct) "should be considered" by the jury. In an about-face and without hesitation, Cisco now charges the Court with error for instructing on *Read* factor 6. Cisco's strategy—its highly misleading nature aside—clearly violates Rule 51(c) and warrants the denial of Cisco's newly raised positions.

## II.    Standard for Granting a New Trial

Cisco asks the Court to upset the jury's finding that Cisco willfully infringed Telcordia's patents and conduct a new trial on the issue of willfulness. In the Third Circuit,

> [t]he decision to grant or deny a new trial is committed to the
> sound discretion of the district court. . . . [A] new trial should only
> be granted where 'a miscarriage of justice would result if the
> verdict were to stand,' the verdict 'cries out to be overturned,' or
> where the verdict 'shocks our conscience.'

*Lifescan v. Home Diagnostics, Inc.*, 103 F.Supp.2d 345, 351 (D. Del. 2000), *quoting Williamson*

*v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991). Moreover, the "heavy burden"

to demonstrate grounds for a new trial lies with Cisco as the moving party:

> Under Rule 59(a) of the Federal Rules of Civil Procedure, a new
> trial may be granted where the moving party meets the heavy
> burden of showing that the verdict is clearly against the weight of
> the evidence or is necessary to correct an injustice. *Roebuck v.*
> *Drexel University,* 852 F.2d 715, 736 (3rd Cir. 1988); *American*
> *Bearing Co., Inc. v. Litton Industries,* 729 F.2d 943, 948 (3rd Cir.),
> *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984);
> *Universal Computers v. Datamedia Corp.,* 653 F.Supp. 518, 523
> (D.N.J.1987), *aff'd,* 838 F.2d 1208 (3rd Cir.1988).

*McKenna v. Pacific Rail Service*, 817 F.Supp. 498, 511 (D. N.J. 1993).

## III. Argument

### A. The Court's Instruction on the *Read* Factors Was Entirely Proper Under Governing Federal Circuit Law

Cisco offers only one argument in an effort to meet its "heavy burden" of establishing a

"miscarriage of justice" or a verdict that "cries out to be overturned" or "shocks the conscience":

that the Court committed legal error when instructing the jury on willfulness.

On the issue of willfulness, the Court instructed the jury, *inter alia*, as follows:

> The determination of willfulness is made in consideration of the
> totality of the circumstances and that may include contribution of
> several factors. These factors may include:
>
> First. Whether the infringer deliberately copied the ideas or design
> of another;
>
> Whether the infringer, when he knew of the other's patent
> protection, investigated the scope of the patent and formed a good-
> faith belief that it was invalid or that it was not infringed;

The infringer's behavior as a party to the litigation;

Defendant's size;

The closeness of the case;

Duration of the defendant's misconduct;

Remedial action by the defendant;

The defendant's motivation for harm; and finally

Whether the defendant attempted to conceal its misconduct.

Trial Tr. at 2123-24. With one minor modification—which the Court made to accommodate

Cisco (*see* Section III(D), *infra*)—these factors were taken verbatim from the Federal Circuit's

opinion in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992).

Cisco contends that the instruction on the *Read* factors amounts to legal error because the

*Read* factors "relate to the extent to which the *judge* should enhance damages, if at all, after a

finding of willful infringement," and not to "the threshold jury question of whether infringement

was willful." D.I. 374 at 1. Telcordia agrees that the *Read* factors were originally set forth in the

context of determining enhanced damages after a finding of willful infringement. *Read*, 970

F.2d at 826. But as this Court correctly noted during the charge conference, the *Read* factors

were "imported from an enhancement discussion into the willfulness analysis." Court

Comments at Trial Tr. 2048. Specifically, the Federal Circuit, in its en banc *Knorr-Bremse*

decision, expressly endorsed the use of the *Read* factors in the willfulness analysis (irrespective

of the fact that the factors originated in an enhancement case):

> Determination of willfulness is made on consideration of the
> totality of the circumstances, see *Gustafson, Inc. v. Intersystems*
> *Indus. Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990), and **may**
> **include contributions of several factors, as compiled, e.g., in**
> *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed.
> Cir. 1986) **and *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27**
> **(Fed. Cir. 1992).**

4

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge, GmBH v. Dana Corp.*, 383 F.3d 1337, 1343-44 (Fed. Cir. 2004)(en banc)(emphasis added).[1]  Indeed, the Federal Circuit has consistently emphasized the fundamental principle that the factors used for enhancement may also be used to determine willfulness: "[t]he principal considerations in enhancement of damages are the same as those of the willfulness determination . . ." *SRI Int'l v. Advanced Tech. Lab.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997).

Following the Federal Circuit's guidance in *Knorr-Bremse*, this Court, on numerous occasions, has recognized the propriety of using the *Read* factors when evaluating the threshold willfulness determination.  For example, in *IMX v. Lendingtree* this Court (Judge Robinson) explained that:

> Unchanged by *Knorr-Bremse* is the standard that a determination of willfulness is made as a result of consideration of the totality of the circumstances. *Id.* at 1342-43.  Several factors may be considered in the totality of the circumstances analysis used to evaluate willfulness, but no factor deserves per se treatment; each factor must be given the weight warranted by its strength in a particular case.[FN1]
>
> FN1.  The Federal Circuit has identified several factors that may be considered in determining whether infringement is willful: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the

---

[1] Cisco's repeated citations of Federal Circuit authority applying the *Read* factors in the enhancement context misses the mark entirely.  Telcordia does not dispute that the *Read* factors apply to enhancement (indeed, in its motion for enhanced damages, Telcordia argues that the *Read* factors warrant enhancement in this case).  The point that Cisco attempts to obscure with these citations is that under *Knorr-Bremse*, it is also entirely proper to consider the *Read* factors when evaluating the totality of the circumstances to determine willfulness in the first instance. As such, the ample case law applying the *Read* factors to enhancement does not help Cisco and does not take away from the fact that the factors are also applicable to the threshold willfulness determination.

defendant's size and financial condition; (5) closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action taken by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. ***Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).**

*IMX, Inc. v. Lendingtree, LLC*, No. Civ. 03-1067-SLR, 2006 WL 38918 (D. Del. Jan. 6, 2006)

(emphasis added). Similarly, in *Tenneco Auto. Operating Co. v. Visteon Corp* this Court (Judge

Robinson) provided a discussion of the factors that may be used when evaluating willful

infringement, again directly acknowledging the importation of the *Read* factors from the

enhancement context to the willfulness context:

> A determination of willful infringement is based on the totality of the circumstances. *Knorr-Bremse Systeme Fuer Nutzfahrzeuge v. Dana Corp.,* 383 F.3d 1337, 1342 (Fed.Cir.2004). The Federal Circuit has identified several factors that may be considered in determining whether infringement is willful: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action taken by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827 (Fed.Cir.1992), *abrogated on other grounds by Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975 (Fed.Cir.1995).[FN4]
>
> **FN4. Although *Read Corp.* presented these factors as part of its analysis on enhancing damages, the Federal Circuit subsequently adopted these factors for determining willfulness. *Knorr-Bremse,* 383 F.3d at 1343.**

*Tenneco Auto. Operating Co. v. Visteon Corp.*, 375 F.Supp.2d 360, (D. Del. 2005)(emphasis

added).

Unsurprisingly, in accordance with the Federal Circuit's en banc *Knorr-Bremse* opinion, many other district courts acknowledge the propriety of using the *Read* factors when evaluating the threshold question of willfulness:

- *Avocent Huntsville Corp. v. Clearcube Tech., Inc.*, Civ. A. CV-03-S-2875-NE, 2006 WL 2109503 (N.D. Ala. July 28, 2006) (recognizing and applying all *Read* factors when addressing threshold question of willfulness);

- *Trading Techs. International, Inc. v. Espeed, Inc.*, 431 F.Supp.2d 834, 841 (N.D. Ill. 2006) (recognizing applicability of all *Read* factors to the threshold question of willfulness in the context of a motion to bifurcate willfulness from liability— "Because willfulness is assessed according to a totality of the circumstances, the Federal Circuit has identified a number of factors to consider in making a willfulness determination. *Knorr-Bremse*, 383 F.3d at 1243; *Read Corp.*, 970 F.2d at 827-28; *Tenneco Auto. Operating Co. Inc. v. Visteon Corp.*, 375 F.Supp.2d 360, 365 (D. Del. 2005).");

- *TiVo, Inc. v. EchoStar Comm. Corp.*, No. Civ. A. 2:04CVI(DF), 2005 WL 4131649 at *4 (E.D. Tex. Sept. 26, 2005) ("The Federal Circuit has identified a non-exclusive list of factors to assist the trier of fact in determining whether a putative infringer has engaged in willful infringement . . . *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-28 (Fed. Cir. 1992).");

- *Mars, Inc. v. Coin Acceptors, Inc.*, Civ. A. No. 90-49(JCL), 2005 WL 4821316 (D. N.J. Sept. 15, 2005) (recognizing and applying *Read* factors, including litigation misconduct, when determining threshold question of willful infringement);

- *Knorr-Bremse System Fuer Nutzfahrzeuge GmBH v. Dana Corp.*, 372 F.Supp.2d 833, 844-45 (E.D. Va. 2005) ([A]lthough there are no 'hard and fast per se rules' with respect to a finding of willful infringement, various factors have been recognized as relevant and thus appropriately considered in the willfulness analysis. Such factors include, but are not limited to, the following: [all *Read* factors cited].");

- *Etna Prods. Co. v. Q Marketing Group, Ltd.*, No. 03 Civ. 3805(SAS), 2004 WL 1769794, *10 (S.D.N.Y. Aug. 6, 2004)(enumerating all *Read* factors and recognizing applicability of all *Read* factors to the threshold willfulness question);

- *Century Wrecker Corp. v. E.R. Buske Mfg. Co.*, 913 F. Supp. 1256, 1272 (N.D. Iowa 1996) (enumerating all *Read* factors and recognizing applicability of all *Read* factors to threshold willfulness inquiry).

In sum, overwhelming Federal Circuit precedent and prior case law from this court, as well as many other district courts, validate the Court's instruction that the jury *may* consider contribution of the *Read* factors "in consideration of the totality of the circumstances." There are no cases to the contrary. The Court simply did not commit any legal error when instructing the jury on willfulness and Cisco is simply not entitled to a new trial on such grounds.

### B.    Cisco's Invitation to "Correct" the Law Should Be Rejected

Against the clear precedent, Cisco is left, as it acknowledges in its brief, with only the strained argument that this Court should "correct" what Cisco self-servingly perceives as a "misunderstanding in this area of the law." In reality, however, there is no "misunderstanding in this area of the law" and Cisco's argument resolves to nothing more than an invitation for this Court to retry the case in order to entertain Cisco's wish to change the law to suit its needs in this case. This invitation should be declined. Even leaving aside the fact that Cisco's position requires a departure from established Federal Circuit precedent, Cisco's position also fails on the merits. In other words, unsurprisingly, the Federal Circuit precedent is correct, whereas Cisco's position that certain *Read* factors should not be considered by the jury when evaluating the totality of the circumstances is incorrect.

Specifically, Cisco contends that the Court erred when instructing on *Read* factors 3 (the infringer's behavior as a party to the litigation), 4 (defendant's size), 6 (duration of defendant's misconduct), 7 (remedial action by defendant), 8 (defendant's motivation for harm), and 9 (whether defendant attempted to conceal its misconduct). The crux of Cisco's argument— "commentators concur that the thrust of the willfulness inquiry is defendant's mental state, and the jury should not be asked to contemplate unrelated factors when deciding willfulness" D.I. at 6—incorrectly presupposes that *Read* factors 3, 4, 6, 7, 8, and 9 can have no bearing upon the defendant's mental state. Cisco ignores the fact that the determination of the defendant's mental

state for purposes of willfulness is made under the totality of the circumstances. *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1379 (Fed. Cir. 2005)("The willfulness inquiry requires 'consideration of the totality of the circumstances.'") *citing Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004)(en banc). The totality of the circumstances analysis—again consistent with governing Federal Circuit precedent and countless district court opinions—logically includes consideration of the defendant's general behavior, context, and circumstances (i.e., the types of considerations set forth in all of the *Read* factors including *Read* factors 3, 4, 6, 7, 8, and 9) when evaluating the defendant's mental state.

### 1.    A Defendant's Size Is an Appropriate Factor to Consider in the Willfulness Determination

As to the Court's instruction on *Read* factor 4 (defendant's size and financial condition),[2] Cisco argues that "it is extraordinarily prejudicial to instruct the jury that a defendant is more likely to infringe willfully merely because it happens to be large or successful." D.I. 374 at 7. But the Court never issued any such instruction and Cisco's mischaracterization of the actual

---

[2] The Court actually modified its instruction as to *Read* factor 4 to eliminate "financial condition" in order to accommodate Cisco's concern about the jury focusing on Cisco's overall financial condition. Nevertheless, Cisco repeatedly offers the argument that instructing on financial condition is inappropriate:

- ". . . two *Read* factors—defendant's conduct during litigation and defendant's size and **financial condition**—remain exceptionally inappropriate for inclusion . . ." D.I. 374 at 7.
- "Telcordia's . . . references to Cisco's size and **financial condition** (set forth in detail below) were so pervasive that they undoubtedly crept into the jury's willfulness deliberations." D.I. 374 at 9.
- "Cisco's size and **financial condition** was central to Telcordia's case." D.I. 374 at 15.

These arguments are highly misleading—again the Court did not include any mention of "financial condition" in the actual instruction that was issued to the jury.

instruction that was given to the jury is highly misleading.[3]  Rather, as Telcordia sets forth verbatim above, in accordance with established Federal Circuit law, the Court instructed that the jury *may* consider the defendant's size as *one factor* when evaluating the *totality of the circumstances*.

An infringer's size—considered in the context of the totality of the circumstances— clearly bears, at the very least circumstantially, upon an infringer's state of mind.  For example, a small company with nothing to lose and no resources available to investigate a charge of infringement or to redesign its products may be more inclined to knowingly risk infringement. Alternatively, in other contexts, a small company with only one product might be significantly concerned about a charge of infringement against its only product that it might be more inclined to carefully investigate the charge before going forward with its business.  In other words, depending upon the context and circumstances, a company's small size might weigh in favor of finding willfulness or alternatively against a finding of willfulness (again, as only one of many factors to consider in the totality of the circumstances).  The same is true of a large company. For example, some large companies might be conservative-minded and/or more capable of investing resources in evaluating charges of infringement and resolving such charges to their satisfaction before proceeding with additional accused infringing conduct.  Alternatively, again depending on all of the circumstances, other large companies might be inclined to ignore charges of infringement on the assumption that their strength in the market or business acumen will ultimately allow them to negotiate their way out of any infringement problems.

---

[3] Curiously, in its motion seeking a new trial on the basis of an improper jury instruction, Cisco never recounts the actual instruction that the Court gave the jury.  Instead, Cisco repeatedly mischaracterizes the Court's actual instruction.

In sum, the size of a company is a contextual factor that bears upon that company's state of mind when the company is confronted with knowledge of a patent or a charge of infringement. Cisco's suggestion that a defendant's size has "no connection whatsoever to a defendant's state of mind" is simply wrong. D.I. 374 at 4. Rather, the size of a company (small vs. medium vs. large), considered against the totality of the circumstances, can be an indication of motivation which in turn could weigh in favor of a finding of either willfulness or no willfulness depending on the context and circumstances of the case.

### 2.    A Defendant's Behavior as a Party to the Litigation Is an Appropriate Factor to Consider in the Willfulness Determination

Similarly, *Read* factor 3 (the infringer's behavior as a party to the litigation) also may shed light on the infringer's state of mind. Again, just as in the case of *Read* factor 4, in its brief Cisco takes liberties with the Court's actual jury instruction as to *Read* factor 3. Specifically, Cisco argues that this is a case where "a party exploits every opportunity to suggest litigation misconduct by its opponent and the jury is erroneously instructed to consider that misconduct." D.I. 374 at 15. But the Court never instructed the jury to consider "litigation misconduct" as part of the willfulness inquiry. Rather, quite simply, the Court instructed the jury that it may consider "the infringer's behavior as a party to the litigation" as one factor when evaluating the totality of the circumstances—no reference to "litigation misconduct" was made in the jury instructions at all.

The Court's neutral instruction that the jury may consider Cisco's "behavior as a party to the litigation" served to do nothing more than remind the jury that it may evaluate the credibility and conduct of the party and its witnesses during trial.[4] Again, the jury is properly charged with

_____

[4] Of course, when considering *Read* factor 3 in the enhancement context, the court might consider aspects of a party's behavior at every stage of the litigation (e.g., discovery, *Markman*,

(continued on next page)

the task of evaluating the totality of the circumstances, and a party's behavior during litigation certainly sheds light upon the party's state of mind for the willfulness calculus. For instance, when confronted with facts and questions relevant to willfulness (e.g., notice letters establishing the defendant's knowledge of the patent, questions about product design in the relevant time period, questions about the party's meetings and considerations prior to new product launches in the relevant time frame, etc.) a defense witness might appear responsive, composed, and concerned. Alternatively the witness might appear evasive, dismissive, and arrogant. The defendant's behavior as a party to the litigation (e.g., how the defendant's witnesses respond to questioning under oath, whether the defendant's witnesses appear to be concealing or obstructing the truth, whether the defendant's witnesses engage in arrogant outbursts during Court proceedings, etc.)—particularly when confronted with facts relevant to the willfulness inquiry— most definitely sheds light upon the defendant's state of mind. Here, there was ample evidence that Cisco's general counsel did not care to be bothered determining whether or not there was merit to Telcordia's infringement allegations. Cisco's disdain for Telcordia's allegations and presentations of Cisco's infringement, and a failure to analyze or investigate those allegations, are proper factors to consider in determining whether Cisco's infringement was wilfull. There is simply no reason to preclude a jury from considering a matter as probative as "behavior" when evaluating the totality of the circumstances for willfulness.

---

(continued from previous page)
proceedings, summary judgment proceedings, etc.). Obviously, the jury was not privy to the pretrial proceedings. As such, having been instructed to consider "behavior as a party to the litigation," the jury naturally would consider only the aspects of a party's behavior to which it was privy—namely behavior during the trial.

3.    *Read* Factors 6, 7, 8, and 9 Are Appropriate Factors to Consider in the
Willfulness Determination

Cisco argues that the Court erred in instructing the jury on *Read* factors 6 (duration of

defendant's misconduct), 7 (remedial action by defendant), 8 (defendant's motivation for harm),

and 9 (whether defendant attempted to conceal its misconduct) because those factors, according

to Cisco, are related only to what Cisco calls the "egregiousness" of the defendant's conduct.

Cisco advances this argument while admitting in the same brief that "egregiousness is one

component in the willfulness inquiry." D.I. 374 at 8.  Unable to escape clear Federal Circuit

precedent recognizing the applicability of *Read* factors 6, 7, 8, and 9 to the willfulness inquiry,

Cisco nonetheless argues that the Court committed legal error because it listed each factor

separately whereas it should have, according to Cisco, issued "a more balanced instruction [that]

would have . . . included only a single, generalized factor relating to egregiousness." D.I. 374 at

9.

The egregiousness of the defendant's conduct is not, as Cisco suggests, a subsidiary issue

that must necessarily be marginalized—at the risk of committing a supposed legal error—into a

single factor when instructing the jury.  Rather the Federal Circuit emphasizes that egregiousness

actually stands as the centerpiece in the willfulness analysis: "Willfulness requires a showing

that the totality of the circumstances evince the egregious conduct that constitutes willful

infringement." *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d

1374, 1377 (Fed. Cir. 2005).  As Cisco admits in its own brief, each of *Read* factors 6, 7, 8, and 9

is relevant to the egregiousness of the defendant's conduct.  Each of those factors also relates to

the defendant's state of mind and is entirely appropriate to consider when evaluating the totality

of the circumstances.  The Court did not commit any legal error by instructing on *Read* factors 6,

7, 8, and 9 or by listing the factors separately instead of collapsing them into a single factor as Cisco demands.

Cisco also argues that *Read* factors 6, 7, 8, and 9 were improperly presented to the jury because the factors presuppose "misconduct."[5]  But the factors were presented in the willfulness instruction, and jury was clearly and properly instructed multiple times that it may consider willfulness only in the event that it first found that the defendant infringed a valid, enforceable patent claim.  Trial Tr. 2112, 2123; D.I. 348 at 7.[6]  As such, the jury already found misconduct (i.e., infringement of a valid, enforceable patent claim) before even considering the question of willfulness.  There can be no error in issuing a willfulness instruction with language that presupposes misconduct where the jury is instructed that it must affirmatively find misconduct before even reaching the question of willfulness.

### C.    Any Purported "Error" Was Harmless in Light of Overwhelming Evidence of Willful Infringement

Even if the Court's instruction on willfulness amounted to legal error—which it did not—the "error" was most certainly harmless against the overwhelming evidence of willful infringement in this case.  Specifically, the jury was presented with a decade-long licensing negotiation demonstrating that (1) Cisco's lawyers, business people, and engineers all knew about Telcordia's SRTS and UPSR patents, (2) Cisco knew that its products practiced the SRTS and UPSR standards, (3) to its great financial benefit, and to the detriment of Telcordia and its

---

[5] As noted below (*see* Section III(D), *infra*), Cisco never raised this argument during the charge conference and as such the argument should also be disregarded on procedural grounds under Rule 51(c).

[6] To this effect, Cisco's argument that the Court "included no qualification indicating that the jury should disregard this factor absent a finding of misconduct" is simply incorrect.  D.I. 374 at 8.

rightful SRTS and UPSR licensees, Cisco actually marketed and promoted its products as capable of practicing SRTS and UPSR, (4) Cisco never took a license to Telcordia's patents despite many opportunities, (5) Cisco continued to design and launch new infringing products in the face of Telcordia's patent rights, and (6) Cisco never developed a good faith belief of non-infringement, unenforceability, or invalidity. *See, e.g.,* D.I. 370 (Brief in Support of Telcordia's Motion for Enhanced Damages). Against this clear and overwhelming evidence, the Court's alleged "error" would not affect the outcome of the case because a finding of willfulness would issue under any jury instruction centered on the totality of the circumstances.

### 1.     Cisco's Mischaracterization of the Trial Record in an Effort to Argue that the Court's "Error" Was Not Harmless Should Be Disregarded

Cisco advances several arguments for the proposition that the Court's alleged "error" was not harmless. In so doing, Cisco skews the trial record, asserts new evidentiary objections never before raised, and rehashes already decided issues. Cisco's hyperbole should be disregarded.

#### a)     Cisco's Mischaracterizations Regarding Events Relating to Its Size and Financial Condition

In its brief Cisco suggests that Telcordia somehow improperly focused on Cisco's size and financial condition during trial. As set forth in detail below, Cisco's suggestion is misleading and entirely unfounded. Most tellingly, Cisco did not interpose even one objection during trial—because there was no need to do so—on the grounds that Telcordia improperly or inappropriately referenced Cisco's size or financial condition. Indeed, it was Cisco's counsel who first injected Cisco's size into the case in Cisco's opening statement and during cross-examination of the first witness before the jury—calling Cisco "the Big Kahuna" in telecommunications. Trial Tr. 426. As such, Cisco's new argument that Telcordia's references to Cisco's size and financial condition, in combination with the Court's alleged "erroneous" jury instruction, somehow yielded a "miscarriage of justice," a verdict that "shocks the conscience,"

or a verdict that "cries out to be overturned," is simply belied by Cisco's lack of objection on such grounds even once during trial.

As to Cisco's financial condition—in accordance with the Court's *in limine* ruling—Telcordia did not once refer to Cisco's overall financial condition during trial. Rather, Telcordia sharply limited its discussion of Cisco's finances to Cisco's sales of its accused products alone. As a result, Telcordia never told the jury, for example, that Cisco in fact made $28.5 billion in sales and $5.6 billion in revenues in 2006 alone. Instead, in accordance with the Court's *in limine* ruling, Telcordia limited its discussion to Cisco's $3.5 billion of non-RBOC sales of accused products during the infringing period.[7] Notably, Cisco was able to leverage this limited snapshot of its finances to its advantage before the jury. Specifically, because the parties were precluded from discussing Cisco's overall financial condition (which included billions of dollars of profits), Cisco was able to actually suggest to the jury that it was in fact losing money and that paying a royalty to Telcordia would cause it to go "further in the hole." Trial Tr. 1903. Cisco artfully presented this limited snapshot of its financial picture to the jury in an effective strategy to limit its damages in this case. Now, amazingly, Cisco argues that it is somehow prejudiced by the jury's exposure to this limited financial picture—the very same financial picture that Cisco presented to the jury and heavily relied upon during trial.

---

[7] Cisco goes so far as to attack Telcordia for using "superlatives" when discussing Cisco's sales. D.I. 374 at 16. Again, Cisco never raised this curious objection during trial, and the record will show that Cisco also prolifically uses "superlatives" when advocating its positions. As an example, in its attack on the Court's willfulness instruction (again, an argument which Telcordia believes is frivolous when viewed against controlling precedent), Cisco exclaims that the instruction was "exceptionally inappropriate" (p.7), "extraordinarily prejudicial," (p. 7) "totally inappropriate," (p. 8) and "an unusually compelling instance of an erroneous jury instruction" (p. 9).

Moreover—illustrating the sheer frivolity of Cisco's position—the Court actually removed reference to "financial condition" from the jury instruction on willfulness in order to accommodate any concerns Cisco may have had about the jury's focus on that factor. Trial Tr. 2055. Ignoring the Court's accommodation, Cisco now contends that "Cisco's size and financial condition are, for all practical purposes, one and the same." D.I. 374 at 16. The illogical argument that size and financial condition are "one and the same"—offered in order to circumvent the fact that the Court actually accommodated Cisco by removing "financial condition" from the instruction—was never raised by Cisco during trial. Indeed, Cisco exploited the difference between the concepts of size and financial condition during trial—suggesting that it was losing money (financial condition) despite its large volume of sales (size). Trial Tr. 1902-03. In sum, as to Cisco's financial condition, Cisco's positions during trial are entirely irreconcilable with Cisco's after-the-fact position that the jury somehow improperly focused on Cisco's financial condition.

As to Cisco's size, from the outset of the case Cisco highlighted its large size and successful business as the centerpiece of its trial strategy. For instance, as early as the opening statement Cisco bragged:

> . . . it's the archetypical U.S. success story. It grew from two employees to over 50,000 today. It is literally the engine of the Internet. Cisco is the most successful, and I think Telcordia would agree, the most successful company on the planet making the Internet work . . . but that success puts a target on your back.

Trial Tr. 237-38. Similarly, in its cross-examination of the very first trial witness, Cisco's counsel badgered Telcordia's corporate representative with repeated questions that insinuated Cisco's dominance in the industry:

> Cisco was the big kahuna at this time in telecoms, wasn't it? It was the most successful player in that space, wasn't it?

17

Trial Tr. 426. From the outset, Cisco's trial strategy was clear—to present itself as a big, successful corporation with a "target on its back," and to contrast that with its crude characterization of Telcordia as "those dinnertime telemarketers who are always calling you with something you don't want and don't need at the time you don't need it." Trial Tr. 239. Telcordia can hardly be faulted for responding to Cisco's characterizations by presenting the other side of the same coin: that from Telcordia's perspective, Cisco was a large, successful company that had no qualms about ignoring Telcordia's valid patent rights and stringing Telcordia along for years.

Indeed, Telcordia's response was centered not on attorney argument, but on the statements and demeanor of Cisco's own witnesses. For example, Cisco's general counsel's testimony—delivered as he rolled his eyes, sighed, and threw exhibits across the table—that Cisco "continued to announce products using ATM without believing that Telcordia was going to try to stop us," Testimony of R. Barr at Trial Tr. 556; and Cisco's senior director's evasive demeanor and testimony in response to the simple question: "instead of re-engineering the products to remove UPSR and SRTS features, Cisco chose to risk infringement?" *See* Testimony of M. Carroll at Trial Tr. 1414-15.

Having considered all of the witnesses' testimony and demeanor, the jury simply rejected the theme that Cisco was a large successful company with a target on its back whereas Telcordia was nothing more than an annoying dinnertime telemarketer. Rather, the jury accepted Telcordia's correct theme—that Cisco was a large company ("the Big Kahuna" in its own words) that felt it could get away with ignoring Telcordia's valid patent rights and stringing Telcordia along year after year.

Now with a jury verdict against it, and despite making its size and success a fundamental part of its case and strategy during trial, Cisco faults (1) Telcordia for responding to Cisco's arguments centered on its size and success and (2) the Court for instructing the jury that it *may* consider Cisco's size as *one factor* in the *totality of the circumstances*. But Telcordia's response to Cisco's presentation of its size was entirely appropriate (again, Cisco never objected) and the Court's instruction on size was entirely appropriate under governing Federal Circuit precedent.

### b)     Cisco's Mischaracterizations Concerning Litigation Misconduct

Cisco is truly grasping for straws in drumming up a litany of its own litigation misconduct in an effort to claim that the jury improperly considered Cisco's litigation misconduct when evaluating willfulness. Cisco's characterization of the record in this regard is highly suspect.

First, Cisco claims that it was improper for Telcordia to present the jury with Mr. Barr's (Cisco's General Counsel and the primary negotiator with Telcordia during the relevant time frame) outburst while under oath at a deposition, that "I'm not going to answer this out-of-context crap" after being presented with a deposition exhibit entitled "Cisco-Telcordia Licensing Discussions, December 2002." Trial Tr. 561. Cisco entirely mischaracterizes the circumstances of Mr. Barr's remark, claiming that Telcordia "badgered [Mr. Barr] to answers questions about information taken out of context." D.I. 376 at 11. To the contrary, Telcordia did not badger Mr. Barr at all (indeed, the jury was shown all relevant aspects of the video of Mr. Barr's deposition, including all of Cisco's counter-designated testimony, and was fully capable of evaluating whether the witness had been improperly "badgered"). And even a cursory review of the document at the heart of the questioning—PTX 460—reveals that the information is not "out of context" whatsoever but rather is a highly relevant, detailed record of the licensing negotiations

concerning the patents-in-suit in the 2002 time frame. Mr. Barr's crass and dismissive reaction when confronted with a highly relevant document in this case is consistent with and indicative of his behavior toward Telcordia generally: he simply blew Telcordia off. There was nothing improper about Telcordia's presentation of Mr. Barr's highly relevant deposition testimony.

Next, Cisco claims that Telcordia improperly characterized Cisco's defense strategy as "throwing everything but the kitchen sink" at Telcordia. D.I. 374 at 12. But there is nothing improper about noting the nature and extend of an adversary's legal claims. Indeed, Cisco characterized Telcordia's claims far more harshly, incorrectly asserting that Telcordia's case is "not about technology. It's just about money," Trial Tr. 237, and that "this is not a case where someone has a credible, real claim. Instead, they are just trying to get money from us, just like those dinnertime telemarketers," Trial Tr. 238. As far as "throwing everything but the kitchen sink" is concerned, Cisco actually leveled virtually the exact same analogy against Telcordia during closing arguments: "It's them [Telcordia] throwing patents up against the wall any way they can. . . they were throwing every patent against the wall they could. If that one doesn't work, we will try this one." Trial Tr. 2202. There is simply nothing improper about the jury hearing these competing contentions and deciding which party's contentions are credible and which are not.

Next, Cisco faults Telcordia for presenting the jury with the reason that Telcordia's damages expert analyzed summary data of Cisco's foreign sales in contrast with the analysis of detailed sales records of Cisco's domestic sales. Specifically, Telcordia read the following deposition testimony from Cisco's 30(b)(6) witness:

> Q:    Can you tell me about the information in the text files?
> Where did the information come from"
>
> A:    The information in the text files came from the database --
> a sales database within Cisco.

Q:    What was the name of that?

A:    The name of the database from which we pulled the data is named the GARP database.

. . .

Q:    Do you know the criteria that was used to extract the data using GARP and provide the data to us in these text files?

A:    Can you elaborate on criteria?

Q:    Well, for example, was the search limited to Cisco business entity USA?

A:    The initial query was not as -- but with the text files, we filtered out unnecessary data.

Q:    And what types of data were filtered out?

A:    The data that was filtered out specifically was information related to entities outside of the United States.

. . .

Q:    Right before the break we were talking about the sales order being rolled up into the numbers that appear on Exhibit Fujii 008, and I have another question about that. The sales database that was produced to us was filtered and that only the sales associated with Cisco business unit USA were produced to us. Was that same filter used in generating Fujii Exhibit 008?

A:    No. This would be the entire revenues for these product families.

Trial Tr. 1223. Cisco contends that it was inappropriate for Telcordia to note that (1) Cisco

produced a sales database, according to Cisco's 30(b)(6) witness, in which foreign sales were

deliberately "filtered" out of the data, and (2) that Cisco produced an overall summary database

that included foreign sales. But Telcordia introduced the Fujii testimony and observed the

distinction between the U.S. and foreign sales data in direct anticipation of cross-examination of

its damages expert. Indeed, Cisco did ultimately vigorously cross-examine Telcordia's damages

21

expert precisely on the data and methodologies used in the foreign sales analysis.  Trial Tr. 1357-
60.

Telcordia should not be faulted for presenting the jury with the complete picture of the
underlying data and the basis for its expert's analysis of foreign sales in anticipation of an
inevitable cross-examination on the matter.  Contrary to the allegations in Cisco's brief,
Telcordia never said that Cisco's decisions to (1) filter the sale-by-sale data on foreign sales out
of its production and (2) instead produce the data on foreign sales in a summary report kept in
the ordinary course of business at Cisco were "improper"—Telcordia only noted these realities
so that the jury would understand why there was a difference between Telcordia's damages
expert's analysis of U.S. sales (produced to Telcordia in a sale-by-sale database) versus foreign
sales (produced to Telcordia in a summary fashion).  Telcordia's point, quite simply, was that
Cisco, having chosen to produce its foreign sales information in a specific nature and form,
should not turn around and fault Telcordia's expert for evaluating the data in the nature and form
in which it was produced.

Moreover, Cisco did not object to the reading of Mr. Fujii's deposition at trial (which
established the facts regarding Cisco's production of foreign sales data) and, just like all other
deposition testimony introduced at trial, the reading included all of Cisco's counter-designated
testimony for balance.  Finally, given the modest size of the jury's damages award, Cisco could
not have been greatly prejudiced by Telcordia's approach to the presentation of the facts and
analysis regarding Cisco's sales.

Next Cisco faults Telcordia for presenting the jury with the context under which the
France Telecom witnesses testified in this case.  Specifically, as to the France Telecom
testimony, Cisco accuses Telcordia of "planting in juror's minds the notion that defense lawyers

procured testimony by improperly informing France Telecom that it would be in its best interest

for the witness to testify." D.I. 374 at 14. But Cisco's accusations center upon sworn deposition

testimony that was introduced at trial without any objection from Cisco. Specifically, during

Cisco's case-in-chief, the following passage from Theirry Houdoin's deposition was presented to

the jury:

> Question: do you see on page KK 60, down at the bottom, an
> email from Stuart Sinder to Mr. Jamet that says in part, quote, 'It
> will be very helpful to Alcatel, and could turn out to be in France
> Telecom's interest to discover the extent to which its own
> engineers may have contributed to the invention that Telcordia has
> long claimed for its own and for which Telcordia's engineers have
> taken all the credit,' close quote. Do you see that?

> Answer: Oh, okay. I can read it. Okay.

Trial Tr. 1508. Again, this testimony was presented in Cisco's case-in-chief without objection

from Cisco. Contrary to Cisco's allegations, the testimony was not introduced to "plant in the

juror's minds the notion that defense lawyers procured testimony improperly," but rather the

testimony was introduced for the entirely proper purpose of establishing potential witness bias.

Indeed, against the France Telecom witnesses' testimony that they had no interest in the matter

(Trial Tr. 1467-68) there is nothing improper about Telcordia's reference to a document

suggesting that France Telecom did in fact have an interest in the matter.

Finally, Cisco claims that Telcordia leveled "a particularly deceptive allegation of

litigation misconduct regarding Cisco's presentation of witnesses by video." D.I. 374 at 13-14.

But Telcordia's acknowledgement that Cisco presented key aspects of its case through video,

rather than through live testimony, is not an allegation of "litigation misconduct." To the

contrary, it is a response to Cisco's persistent theme that its witnesses were credible, whereas

Telcordia's witnesses were not credible. For example, in its opening and closing statements,

Cisco emphasized:

- "The last issue that can help you judge credibility is the testimony of the witness **on the stand**."  Cisco opening statement, Trial Tr. 239.

- "You are going to have to decide the credibility of those people **sitting on the stand**."  Cisco opening statement, Trial Tr. 240.

- "You will hear them say **on the stand** . . . It will be for you to decide the credibility of that in light of the evidence."  Cisco opening statement, Trial Tr. 254-55.

- "His [Dr. Lau's] credibility is what you are going to have to assess **on the stand** . . ."  Cisco opening statement, Trial Tr. 262.

- "One of the biggest issues you are going to have to decide in this case is credibility.  And you heard His Honor's instructions about how to assess that.  The biggest ways in that instruction were how consistent is that witness, not only between deposition and testimony, but **between direct examination and cross-examination**."  Cisco closing statement, Trial Tr. 2208-09.

- "It is for you to judge the credibility of that type of testimony."  Cisco closing statement, Trial Tr. 2217, 2227, 2229.

- "Best mode.  This is the area probably where credibility, which has been an issue throughout the case, is at its best or worst, depending on your perspective.  It's the issue. . . . He [Dr. Chao] **comes into court and says**, okay, I've got a new best mode."  Trial Tr. 2251.

In sum, Cisco's strategy and mantra was clear: focus on credibility of the witnesses—in court, on the stand, in response to direct and cross-examination—and attack Telcordia's witnesses' credibility.  Given that the jury was able to assess credibility of live witnesses much more effectively than it could of witnesses presented by deposition, and against Cisco's relentless credibility attack, it is hardly improper for Telcordia to note that Cisco, for its part, chose to present many of the key aspects of its case through heavily edited deposition video clips rather than through live testimony before the jury.  Most notably, despite the deep factual history of negotiations between Cisco and Telcordia over the patents-in-suit (dozens of letters, meetings,

and communications spanning over 10 years), Cisco failed to produce even one live fact witness

who knew anything about the situation.[8]

Similarly, Cisco did not bring its key engineers to trial, for example Mr. Fedorkow and

Mr. Rushka, to tell the jury about Cisco's product development or its factual responses to

Telcordia's infringement positions (Cisco failed to bring Mr. Fedorkow despite promising him

during pretrial proceedings—"Mr. Fedorkow is going to be here.  They can talk to him about it."

Trial Tr. 100.)

Indeed, Cisco presented only one live fact witness in support of its case (versus live

testimony from Mr. Giordano, Dr. Fleischer, Dr. Lau, Dr. Chao, and Dr. Walters—all fact

witnesses—on behalf of Telcordia).  Given Cisco's aggressive *ad hominem* credibility attacks

---

[8]As to the negotiations with Telcordia, Cisco made the actions of its former general counsel, Robert Barr, into a centerpiece of its case. *See, e.g.*, Cisco closing statement ("if you really want to talk about this issue [licensing of the patents-in-suit], send your correspondence to me, Robert Barr, because I'm in charge of it.  Robert Barr.")  Trial Tr. 2199.  But Cisco then faults Telcordia for noting that Mr. Barr did not appear live at trial.  D.I. 374 at 13-14.  Specifically, Cisco claims that Telcordia acted improperly because Telcordia supposedly knew (1) that Cisco was unable to convince its former general counsel to testify at trial, and (2) that Mr. Barr had a health condition that caused him to be "highly reluctant" to be cross-examined at trial.  Telcordia knew neither.  Telcordia only knew that as of February 21, 2007, Mr. Barr would not voluntarily represent Cisco at a Rule 30(b)(6) deposition in the parallel ITC investigation, and that Mr. Barr had, at some point prior to February 21, 2007 (over 2 months before trial was scheduled to start) undergone an angioplasty procedure and was "highly reluctant to sit for deposition."  D.I. 374 at Ex. 5.  Telcordia knew nothing beyond that and Telcordia remained surprised that Cisco would focus its case so heavily on Mr. Barr's actions without presenting him to the jury.

Moreover, Mr. Barr aside, Telcordia's point to the jury stands:  Where was any Cisco witness who knew anything about the dozens of letters, communications, and meetings about the patents-in-suit that extended over a 10 year period?  In addition to Mr. Barr, many others at Cisco—including John Chambers, John Morgridge, Charles Giancarlo, Dan Scheineman (all of whom are currently listed as Cisco executives, *see* Ex. A), as well as Cisco's outside counsel Bart Showalter—directly knew about and participated in the decade-long negotiations with Telcordia (*see, e.g.*, PTX 448, 450, 452, 453, 454, 456, 458, 451, 462, 463, 464, 466, 1182, 1183, 1200, 1201, 1205, 1206).  Cisco could have—but chose not to—presented live testimony to the jury about Cisco's side of the negotiations from anyone in this group, or even any employee at all who was knowledgeable about Cisco's corporate records.

leveled against Telcordia's live witnesses, it is hardly improper for Telcordia to respond by
pointing out that Cisco did not even present live fact witnesses on key factual issues for which
the jury could have judged credibility. That is not "litigation misconduct" on Cisco's behalf, but
rather is only a misguided strategy choice.

In summary, Telcordia did nothing improper by (1) noting Cisco's witnesses' aggressive
and dismissive testimony about licensing negotiations with Telcordia, (2) characterizing Cisco's
defenses as "throwing the kitchen sink," (3) noting the difference between the underlying data
for U.S. and foreign sales, (4) presenting evidence regarding the nature and circumstances
surrounding the testimony of the France Telecom witnesses, or (5) noting that Cisco made a
decision to present its case through deposition videos rather than live testimony.

### D.    Cisco Did Not Comply with Rule 51(c)

Cisco's motion also suffers from basic procedural deficiencies in addition to its
substantive deficiencies. Specifically, many of the arguments that Cisco raises for the first time
in the post-trial phase of the case should be rejected outright because Cisco failed to comply with
Rule 51(c) of the Federal Rule of Civil Procedure. Rule 51(c) requires that:

> (1) A party who objects to an instruction or the failure to give an
> instruction must do so on the record, stating distinctly the matter
> objected to and the grounds of the objection.

Fed. R. Civ. P. 51(c). "[T]he purpose of Rule 51 is served when objections to the jury charge
give the trial judge an opportunity to correct the erroneous charge." *Miller v. Cigna Corp.*, 47
F.3d 586, 591 n.5 (3d Cir. 1995) *citing Dunn v. Hovic*, 1 F.3d 1371, 1379 (3d Cir. 1993). For
most of Cisco's new arguments, Cisco never gave the Court the to opportunity to correct
allegedly erroneous charges as required by Rule 51 and Third Circuit law.

Specifically, during the charge conference, Cisco raised only two objections to the use of
the *Read* factors: (1) that the *Read* factors as a whole are inappropriate because the *Read* case

concerned enhancement rather than willfulness, and, alternatively (2) that the Court should not

instruct on *Read* factors 3 (behavior during litigation), 4 (size and financial condition), 7

(remedial action by the defendant), 8 (motivation for harm), and 9 (concealment) because those

factors go to the egregiousness of the defendant's conduct.

Beyond that, with only one exception, Cisco did not distinctly identify both the matter

objected to and the grounds of its objections as required by Rule 51.[9]  As such, pursuant to Rule

51(c) Cisco should not be permitted to expand its objections or advance wholly new arguments

and objections during the post-trial phase of the case.  For example:

- Most notably, during the charge conference, when the Court asked counsel for Cisco
  which of the *Read* factors the Court should give the jury versus which ones it should not,
  counsel for Cisco, in going through the *Read* factors factor-by-factor, expressly stated
  that the jury should consider *Read* factor 6 (duration of defendant's misconduct):
  "[d]uration of defendant's misconduct I think probably should be considered."  Cisco
  counsel comments at Trial Tr. 2048.  Now that the jury has found against it, however,
  Cisco opportunistically argues that the Court actually erred in giving the jury *Read* factor
  6 because that factor, according to Cisco, relates only to egregiousness, not willfulness.
  D.I. 374 at 8.  Needless to say, Cisco's pre-verdict and post-verdict positions are
  irreconcilable—Cisco's post-hoc about-face on *Read* factor 6 is the exact conduct that
  Rule 51(c) is designed to preclude.  Indeed, in this instance Cisco not only failed to object
  to an instruction on *Read* factor 6 (as Rule 51(c) would have required), but Cisco actually
  affirmatively advanced an instruction on that factor.  Cisco's new position on *Read* factor
  6 should be rejected on the merits and under Rule 51(c).

- Cisco argues that the Court should have included a curative instruction or "qualification"
  explaining that the jury should disregard certain *Read* factors absent a finding of
  misconduct.  D.I. 374 at 8.  As a matter of fact, the Court did instruct the jury on multiple
  occasions that it was to address willfulness only if it first found infringement of a valid,

---

[9] Indeed, in the one instance for which Cisco actually articulated the specific matter objected to
and the grounds for its objections—Cisco's extensive argument and discussion regarding *Read*
factor 4 (size and financial condition)—the Court struck a considered and appropriate balance,
after evaluating the parties' respective presentations of the facts and issues in the case, by
modifying the factor to include size but exclude financial condition.  Trial Tr. 2055.  Aside from
this one instance, Cisco simply complained about the *Read* factors generally and summarily tried
to pick and choose which factors should be excluded, offering little or no grounds for its
positions at all.  Trial Tr. 2047-48.

enforceable claim (i.e., only after it first found misconduct). Trial Tr. 2112, 2123; D.I. 374 at 7. Because the Court's qualification as to if and when the jury should even consider willfulness was correct, during trial Cisco never sought any further curative instruction or "qualification" and Cisco never objected on the grounds that the Court's instruction did not include a further "qualification." As such, Cisco's new position on a "qualification" instruction should be rejected on the merits and under Rule 51(c).

- As noted, in an effort to marginalize the Court's modification of *Read* factor 4 (i.e., eliminating "defendant's financial condition" and leaving only "defendant's size"), Cisco now argues that "Cisco's size and financial condition are, for all practical purposes, one and the same." Having failed to ever suggest that size and financial condition are "one and the same" during trial, and having failed to object to "size" on the ground that it is the same as "financial condition," Cisco's argument should be rejected on the merits and under Rule 51(c).

- Cisco argues that the Court should have collapsed the four "egregiousness" factors—*Read* factors 6, 7, 8, and 9—into "one generalized factor relating to egregiousness." This objection, argument, and proposed option simply was not presented to the Court during the charge conference and as such should be rejected on the merits and under Rule 51(c).

In sum, with the exception of the two narrow objections Cisco interposed at the charge conference—(1) that the *Read* factors as a whole are inappropriate because the *Read* case concerned enhancement rather than willfulness and, alternatively, (2) that the Court should not instruct on *Read* factors 3, 4, 7, 8, and 9 because those factors go to the egregiousness of the defendant's conduct (both of which fail on the merits)—Cisco's expanded arguments and positions should be disregarded under Rule 51(c).

## IV.    Conclusion

For the reasons stated herein, Telcordia respectfully requests that the Court deny Cisco's motion for a new trial.

ASHBY & GEDDES

*/s/ Steven J. Balick*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
 (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, D.C.  20001
(202) 408-4000

Dated: July 23, 2007
182522.1