IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-876 (GMS) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | **REDACTED-PUBLIC VERSION** |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |

### DEFENDANT CISCO SYSTEMS, INC.'S ANSWERING BRIEF IN OPPOSITION TO TELCORDIA TECHNOLOGIES, INC.'S MOTION TO ENHANCE DAMAGES PURSUANT TO 35 U.S.C. § 284

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 North Market Street
Post Office Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065

Originally Filed: July 23, 2007
Redacted Version Filed: July 30, 2007

# TABLE OF CONTENTS

**Page(s)**

I.     NATURE AND STAGE OF THE PROCEEDING................................................. 1

II.     SUMMARY OF THE ARGUMENT ............................................................... 1

III.     STATEMENT OF FACTS ............................................................................ 3

IV.     THE TOTALITY OF THE CIRCUMSTANCES WEIGHS AGAINST ENHANCEMENT ....................................................................................... 3

      A.     Cisco's Good-Faith Defense And Meritorious Challenge Preclude A Finding Of Enhancement ..................................................................... 4

      B.     The Other Read Factors Do Not Support Telcordia's Request For Enhancement .................................................................................... 14

           1.     Telcordia Cannot Seek Enhanced Damages For Cisco's Alleged "Copying" Of A Technology That Telcordia Furtively Included In An Industry Standard, Or For The Industry's Displeasure When Telcordia's Deceit Was Revealed ............................................... 14

                a.     Telcordia Encouraged The Adoption Of SRTS While Keeping Secret The Existence Of Its Patent................................ 15

                b.     Once The Industry Finally Learned Of Telcordia's Patent, It Was Frustrated By Telcordia's Continued Refusal To License It On RAND Terms .............................................. 16

           2.     The Evidence Demonstrates Neither A Motivation To Harm Nor An Attempt To Conceal .......................................................... 26

           3.     Cisco's Size and Financial Condition Do Not Support Enhancement In This Case.................................................. 28

           4.     Cisco Pursued Its Substantial Defense In Good-Faith, And Behaved Accordingly Throughout This Litigation ................. 31

           5.     The Duration Of Any Misconduct By Cisco Is Attributable To Telcordia, And In Any Event, Cisco Has Taken Immediate Remedial Measures Following The Verdict .........:....................... 33

V.     CONCLUSION................................................................................... 36

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,*
    265 F.3d 1294 (Fed. Cir. 2001)..................................................................9

*Cybor Corp. v. FAS Technologies, Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998)................................................................4

*Delta-X v. Baker Hughes Prod. Tools,*
    984 F.2d 410 (Fed. Cir. 1993)..................................................................4

*GNB Battery Techs, Inc. v. Exide Corp.,*
    886 F. Supp. 420 (D. Del. 1995).............................................................5

*Golight, Inc. v. Wal-Mart Stores, Inc.,*
    216 F. Supp. 2d 1175 (D. Colo. 2002)...................................................29

*Honeywell Int'l, Inc. v. Hamilton Sundstrand,*
    166 F. Supp. 2d 1008 (D. Del. 2001)...........................................4, 13, 29

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
    382 F.3d 1367 (Fed. Cir. 2004)...............................................................3

*King Instrument Corp. v. Otari Corp.,*
    814 F.2d 1560 (Fed. Cir. 1987)..............................................................35

*Laitram Corp. v. NEC Corp.,*
    115 F.3d 947 (Fed. Cir. 1997).................................................................4

*MercExchange, L.L.C. v. eBay, Inc.,*
    275 F. Supp. 2d 695 (E.D. Va. 2003) ....................................................28

*Modine Mfg. Co. v. Allen Group, Inc.*
    14 U.S.P.Q. 2d 1210 (N.D. Cal. 1989), aff'd, 917 F.2d 538 (Fed. Cir. 1990) .......4

*Modine Mfg. Co. v. Allen Group, Inc.,*
    917 F.2d 538 (Fed. Cir. 1990)..............................................................3, 4

*Odetics, Inc. v. Storage Tech. Corp.,*
    185 F.3d 1259 (Fed. Cir. 1999).........................................................3, 28

*Odetics, Inc. v. Storage Technology Corp.*
    14 F. Supp. 2d 800 (E.D. Va. 1998), aff'd, 185 F.3d 1259 (Fed. Cir. 1999) ...........4, 28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Oscar Mayer Foods Corp. v. ConAgra, Inc.,*
  869 F. Supp. 656 (W.D. Wis. 1994) ................................................................13, 29

*Paper Converting Mach. Co. v. Magna-Graphics Corp.,*
  745 F.2d 11 (Fed. Cir. 1984)........................................................................................4

*Read Corp. v. Portec, Inc.,*
  970 F.2d 816 (Fed. Cir. 1992)........................................................................... Passim

*Riles v. Shell Exploration & Production Co.,*
  298 F.3d 1302 (Fed. Cir. 2002)...................................................................................4

## I.    NATURE AND STAGE OF THE PROCEEDING

Telcordia filed this patent infringement lawsuit against Cisco in July 2004, asserting U.S. Patents Nos. 4,893,306 ("the '306 patent"), RE 36,633 ("the '633 patent"), and 4,835,763 ("the '763 patent"). Because Telcordia did not oppose summary judgment of non-infringement of the '306 patent, infringement of that patent was not tried to the jury; the Court entered an Order granting summary judgment of non-infringement on five grounds requested by Cisco. D.I. 341. The Court held a jury trial on all issues relating to the '633 and '763 patents from April 30 to May 10, 2007. The jury determined that Cisco willfully infringed the '633 and '763 patents, and the Court entered judgment on May 16, 2007. D.I. 346, 348. The parties have filed a number of post-trial motions. D.I. 362, 366, 369, 371, 373 and 375.

## II.    SUMMARY OF THE ARGUMENT

Although Telcordia obtained a jury finding of willful infringement, its victory was far from decisive. To the contrary, the jury's "plaintiff's ticket" verdict was resoundingly offset by its award of less than 10% of the damages Telcordia sought. Whatever the basis for the jury's finding of willfulness,[1] it is clear that they did not view Cisco's conduct to be egregious or to reflect the sort of culpability that typically supports an enhancement of damages.

That the jury's willfulness finding was not voiced with full-throated support would not be surprising to anyone who sat through the trial. Those present at the trial could not forget Mr. Adam, with his shock of white hair and French accent, explaining that he and his

---

[1]    As set forth in Cisco's motion for a new trial on willful infringement and supporting briefing, there is a substantial risk that the jury may have been led to its verdict by an improper jury instruction. D.I. 373, 374. Accordingly, Cisco has moved this Court to vacate the jury's finding of willful infringement and order a new trial on that issue. Obviously, insofar as those motions are granted, Telcordia's request for enhanced damages (and its concurrent request for attorneys' fees) would be moot.

colleagues at France Telecom took a significant political risk to break the SFET/Time Stamp standards logjam and propose SRTS, or Dr. Lau's ultimate admission that one of the key concepts of the SRTS invention had in fact come from France Telecom. Nor could anyone forget Professor Grover's poise and facility in explaining the Prisco & Hoss article, which had been so confusing to Telcordia's expert Dr. Prucnal and to Dr. Lau, or the game of "hot potato" Telcordia's inventors and attorneys played when it came to accepting responsibility for the withholding of critical prior art—including the France Telecom documents and Prisco & Hoss— from the Patent Office. Indeed, if there was one thing that became clear over the eight days of evidence and argument, it was this: the validity of Telcordia's patents and their applicability to Cisco's products were severely in doubt.[2]

The strength of Cisco's defense as presented at trial alone warrants a denial of Telcordia's motion for enhanced damages. Perhaps recognizing this, Telcordia chose to ignore Cisco's substantial defense—or at a minimum, the closeness of the case—entirely in its motion. So too did Telcordia ignore the admissions of its own employees that Cisco acted in "complete good faith" in its dealings with Telcordia. Instead, Telcordia has created a patchwork-quilt argument for enhancement: scraps of evidence are stitched together with rhetoric and recriminations to create the illusion of malice on Cisco's part. On further inspection, however, Telcordia's patchwork quilt shows the holes in Telcordia's case and the wear that comes with a decade-long pursuit of strained allegations.

Telcordia's motion for enhanced damages should be denied.

---

[2]     Because the trial record overwhelming supports the conclusion that Cisco is not liable for infringement of either the '633 or '763 patents, Cisco has filed a motion for judgment as a matter of law that is currently pending before the Court. D.I. 375, 376.

2

III.    **STATEMENT OF FACTS**

The pertinent facts are set forth in the Argument sections, as appropriate.

IV.    **THE TOTALITY OF THE CIRCUMSTANCES WEIGHS AGAINST ENHANCEMENT**

In cases where the jury finds willful infringement, the trial court has discretion to enhance damages up to three times the amount found. 35 U.S.C. § 284. It is well-established, however, that a finding of willfulness "merely *authorizes*, but does not *mandate*, an award of increased damages," let alone treble damages. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1373 (Fed. Cir. 2004) (quoting *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) (emphasis in original)).[3] Rather, "[t]he paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992). The enhancement decision is therefore "firmly within the scope of the district court's reasoned discretion, informed by the totality of the circumstances." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999).

The Federal Circuit has identified a number of factors for district courts to consider in determining whether enhancement is merited: (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the infringer's behavior as a party to the litigation, (4) the defendant's size and financial condition, (5) the closeness of the case, (6) the duration of the

---

[3]    Emphasis supplied throughout, unless otherwise noted.

defendant's misconduct, (7) remedial action by the defendant, (8) the defendant's motivation for harm, and (9) whether the defendant attempted to conceal its misconduct. *Read*, 970 F.2d at 827.

As set forth below, the totality of the circumstances demonstrates that Cisco's conduct in this case was anything but egregious, and that enhanced damages are not warranted.

### A. Cisco's Good-Faith Defense And Meritorious Challenge Preclude A Finding Of Enhancement

"[A]n infringer may generally avoid enhanced damages with a meritorious good faith defense and a substantial challenge to infringement." *Delta-X v. Baker Hughes Prod. Tools*, 984 F.2d 410, 413 (Fed. Cir. 1993); *see also Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984). It is hard to imagine circumstances that would better exhibit a meritorious, good-faith defense or substantial challenge than those here.[4]

---

[4]  At a minimum, this was a close case. Courts have consistently recognized the significance of closeness to the enhancement inquiry, and time and time again have declined to enhance damages on that basis. *See, e.g., Honeywell*, 166 F. Supp. 2d at 1041; *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1461 (Fed. Cir. 1998) (affirming denial of enhanced damages because "although Cybor was found to infringe all twenty of the claims, this result does not mean that the case was not close"); *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1314 (Fed. Cir. 2002) (affirming denial of enhanced damages where, "[d]espite record evidence that Shell copied the '918 patent, the district court found that the issues of infringement, damages, and willfulness were close questions" and district court "noted that the case was hard-fought, and that the jury could have found for Shell on the infringement and willfulness issues"); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming district court's decision not to enhance damages because "[t]he district court held that, despite the jury finding of willfulness, which it assumed to be proper, enhanced damages were inappropriate because of the closeness of both the infringement and willfulness issues"); *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 800, 805 n.9 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999) ("It is worth noting that, even if [the defendant] were found not to have 'mount[ed] a good faith and substantial challenge to the existence of infringement,' this Court would still decline to award any enhanced damages, taking into consideration the nine factors enumerated in *Read*, especially the closeness of the case.") (citation omitted); *Modine Mfg. Co. v. Allen Group, Inc.*, 14 U.S.P.Q.2d 1210, 1217 (N.D. Cal. 1989), *aff'd*, 917 F.2d 538 (Fed. Cir. 1990) ("Because the issue of patentability was close and litigated in good faith, this Court exercises its complete discretion and DENIES plaintiff's motion for increased damages, despite the finding of willful infringement.")

In 1992, Telcordia commenced a decade-long course of licensing and business discussions with Cisco. Over the course of more than 10 years, Telcordia erratically identified numerous patents as the subject of a potential license agreement with Cisco. The '080 patent was first identified in 1992, but then disappeared from Telcordia's correspondence in mid-1990s, only to reappear again in correspondence in the late 1990s and early 2000s but ultimately did not make it into this lawsuit. The '306 patent, on which Telcordia did sue, was first identified in 1994 and was listed steadily in communications throughout the mid- and late-1990s. It then dropped from Telcordia' radar throughout the early 2000s, reappearing in communications immediately preceding the suit. However, even the '306 patent was ultimately dropped when Telcordia conceded non-infringement under the Court's *Markman* ruling.

Telcordia's pursuit of the patents that ultimately made it to trial was no more consistent. Having repeatedly suggested to Cisco that it should take a license to the '633 patent's predecessor, the '978 patent, Telcordia abandoned that patent in a reissue proceeding and now admits that Cisco never infringed it to begin with.[5] D.I. 352 [4/30/07 Trial Tr.] at 410:9-14 (testimony of Mr. Giordano that Telcordia stipulated that the '978 patent claims are not infringed

---

(citation omitted); *GNB Battery Techs, Inc. v. Exide Corp.*, 886 F. Supp. 420, 441 (D. Del. 1995) (denying motion for enhanced damages where validity issues were close).

[5] In view of Telcordia's unprompted concession that Cisco does not infringe the '978 patent (something Cisco has known all along), Telcordia's assertion that "Cisco's treatment of Telcordia regarding the original patent is an integral part of a pattern of Cisco's callous disregard of Telcordia and Telcordia's legal rights" is particularly shocking. D.I. 370, Opening Brief at 3. Quite to the contrary, it is *Telcordia* that has shown callous disregard for *Cisco's* legal rights, asserting the '978 patent claims against Cisco for a decade and litigating them for nearly two years, only to unceremoniously drop them from the case in its opening expert report. *See, e.g.*, Exhibit 1 [Clark Depo. Tr.] at 106:3-108:8 **REDACTED**

by Cisco).  Even after it asserted the '633 patent against Cisco in 2001, Telcordia could not figure out which claims Cisco infringed, providing a claim chart for claim 19, a claim it ultimately did not assert in the lawsuit.  PTX 1204 [Telcordia Claim Charts]; *see also* D.I. 352 [4/30/07 Trial Tr.] at 405:11-406:3, 479:22-480:9 (testimony of Mr. Giordano that, when Telcordia finally provided Cisco with the claim charts it had requested 8 years earlier, Telcordia's claim chart for the '633 patent was limited to claim 19, which Telcordia did not assert in the litigation).  The '763 patent fared no better:  it did not make it into Telcordia's letters to Cisco until 2001, and even then, Telcordia could not muster enough support to assert that patent when it filed its original Complaint in July 2004.  D.I. 1 [Complaint].  It was not for another 11 months that Telcordia even asserted the patent against Cisco.  D.I. 28 [Amended Complaint].

All told, the picture Telcordia's licensing correspondence painted more closely resembled a Jackson Pollock than a serious proposal for licensing discussions or a studied conclusion that Cisco was practicing Telcordia's patents:[6]

---

[6]    Indeed, Cisco's attorney Mr. Barr testified that Cisco did not believe that Telcordia had concluded that Cisco was infringing its patents because it entered into an OSMINE agreement in 1998 which involved the very products that were later accused of infringement.  D.I. 353 [5/1/07 Trial Tr.] at 547:10-15 ("[W]hat we concluded is that if there was infringement that Telcordia thought was actionable, they would have brought it up in the context of entering into this agreement, which apparently it [sic] involves these products that were later accused.").



Exhibit 2 [Cisco's Closing Presentation] at slide 18; *see also* D.I. 352 [4/30/07 Trial Tr.] at 384:7-13.

      Faced with a smorgasbord of vague, unsupported infringement allegations, Cisco did exactly what any responsible party would do: it attempted to assess the merits of Telcordia's claims. The first step in this assessment was to request from Telcordia the basis for its allegations. However, it was essentially undisputed at trial that Cisco's repeated requests for that information were met with nearly a decade of silence. *Compare* DTX 2383 [December 6, 1994 Cisco letter] (requesting the "basis for [Telcordia's] conclusion that Cisco's ATM products are likely to use these inventions") *with* D.I. 359 [5/8/07 Trial Tr.] at 1950:17-25 (testimony of Telcordia's attorney responsible for licensing that he does not remember giving Cisco a response); *see also, e.g.*, D.I. 352 [4/30/07 Trial Tr.] at 405:11-406:3 (testimony of Mr. Giordano that, between 1994 and 2002, Telcordia did not ever provide claim charts to Cisco and that it took from 1994 to 2003 "for Telcordia to have a meeting with Cisco"); D.I. 353 [5/1/07

Trial Tr.] at 561:22-562:4 ("Q.   What is your recollection, what is your personal recollection of the status of the Telcordia ATM patent portfolio licensing matter as of August 2003?  A.  That nine years after I asked for information about what they were alleging, if they were alleging anything, for the first time we had detailed information, nine years later, but that a business resolution was still possible.") (testimony of Mr. Barr).

Unable to get a straight answer from Telcordia, Cisco did what it could on its own to assess the merits of Telcordia ever-shifting allegations.  Wholly apart from the legal advice Cisco obtained,[7] Cisco uncovered serious flaws in Telcordia's claims.  For example, in his notes concerning the April 1995 ATM Forum meeting, Mr. Guy Fedorkow—a Cisco engineer much maligned by Telcordia at trial and in its post-trial briefing—had already identified the exact inventorship issue that was the centerpiece of the trial (and Cisco's motion for JMOL):

> Patent News
>
> Some more news and rumors on patent topics from the April Forum meeting
>
> Many rumors circulated regarding the SRTS patent. Other companies have discovered that *it can probably be circumvented* although there's still window where Bellcore could refile to attempt to fix their oversight. Another angle that surfaced is that some claim that *SRTS was developed when France Telecom and Bellcore merged two competing techniques called SFET and RTS for submission to the ITU Bellcore then filed in the US without admitting France Telecom as co-inventor.* I don't know how to verify this rumor.

---

[7]   Although Cisco does not rely on the *substance* of its advice of counsel as part of its defense to willful infringement or the request for enhancement, the *existence* of that advice is highly probative of Cisco's good faith.  *See* D.I. 335 [Order on Motions *In Limine*] at footnote 2 ("To resolve the issue, the court ordered Cisco to produce for in camera review a sampling of documents that it would rely on as opinions of counsel. Cisco filed those documents on April 16, 2007. After having reviewed the documents, the court concludes that they constitute opinions of counsel received by Cisco in this litigation.").

PTX 408 [Report from April 1995 ATM Forum Meeting]. Indeed, this email also evidences

Cisco's knowledge in April 1995 that the industry believed that compliance with the SRTS

standards did not fall within the scope of the '978 patent absent a reissue—we now know that

Telcordia itself ultimately came to the same conclusion. *Id.*; *see also, e.g.*, Exhibit 3 [April 3,

1995 email from G. Fedorkow] [DTX 2518 (not admitted)[8]]

## REDACTED

Similarly, by the time Telcordia presented some basis for its infringement

allegations at a 2003 meeting between the parties, Cisco had already identified an invalidating

flaw in the '763 patent. Specifically, a November 21, 2003 letter confirmed the parties'

discussion at that meeting during which Cisco's counsel identified what it viewed to be a

fundamental Section 112 definiteness problem with the "monitoring means" limitation:

> *We discussed the claim requirement of monitoring means.* We
> understand that you will be identifying where in figure 2 of the
> patent the "monitoring means" is disclosed. On this issue we also
> discussed the applicability of the Federal Circuits decision in
> *Medical Instrumentation and Diagnostics Corp v. Elekta* to the
> monitoring means claim requirement in this patent. We
> understood Mr. Kovalick's response to this issue to be that he did
> not believe it was necessary to describe the structure corresponding
> to the monitoring means if that structure was well known in the art.
> The Federal Circuit appears to have considered and rejected that
> very argument in the *Medical Instrumentation* case. For example,
> the court explained, "The correct inquiry is to look at the
> disclosure of the patent and determine in one of skill in the art

---

[8]     As Telcordia notes in its opening brief, the Court may consider evidence not before the
jury for purposes of assessing the totality of the circumstances in the enhancement
inquiry. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1311
(Fed. Cir. 2001).

would have understood that disclosure to encompass software for digital-to-digital conversion and been able to implement such a program not simply whether one of skill in the art would have been able to write such program." *Id.* at 13. ***Please explain why you believe the monitoring means claim element in this patent meets the definiteness requirement of 35 U.S.C 112 in light of the Federal Circuit's decision in Medical Instrumentation.***

PTX 1206 [November 21, 2003 Letter from Cisco's counsel] at 3-4.[9] Again, this invalidity

defense was ultimately tried to the jury, and is now the subject of a pending motion for JMOL.

In the face of evidence that Cisco had not only identified significant flaws in

Telcordia's allegations as to the '978, '633 and '763 patents shortly after learning of those

patents, but ended up actually trying those very same defenses, Telcordia's suggestion that

Cisco's "late-in-the-game invalidity position(s)" were an attempt to stonewall Telcordia is,

frankly, incredible. Indeed, not even Telcordia's own witnesses believed Cisco to be stalling or

stonewalling—they testified repeatedly that Cisco exhibited nothing but good faith in its dealings

with Telcordia. *See, e.g.,* D.I. 352 [4/30/07 Trial Tr.] at 416:3-6 (testimony of Mr. Giordano that

he has "no basis to say otherwise" than that Cisco was in "complete good faith" during the three-

year period in 1998 to 2001 when parties were under a Memorandum of Understanding to try to

enter into a business deal); D.I. 359 [5/8/07 Trial Tr.] at 1963:7-1964:12 (testimony of Telcordia

Group Senior Vice President W.D. Sincoskie that, during his discussions with Cisco in 2003,

Cisco was "fair" and was not leading Telcordia on or otherwise being deceptive). In contrast, it

is abundantly clear that *Telcordia* never took Cisco's significant (and meritorious) questions as

to the basis for Telcordia's claims seriously,[10] instead hoping that Cisco would take a license or

---

[9] In that same letter, Cisco also identified several concerns and questions relating to Telcordia's allegation as to the '633 patent. *Id.* at p. 3.

[10] This pattern makes Telcordia's repeated assertions (at trial and again here) that Cisco was arrogant and cavalier particularly inappropriate. *See, e.g.,* D.I. 370, Opening Brief at 4-5.

enter into a business deal just to make Telcordia go away.  Indeed, Telcordia's desire to "ride the

next telecom wave" with Cisco was the one point on which it was forthcoming.

Further confirming the merit of Cisco's substantial defense is the evidence it

uncovered in discovery in this case and presented at trial.  Indeed, contrary to Telcordia's

allegations that Cisco threw the kitchen sink at Telcordia's patents, Cisco's trial presentation

revealed that Telcordia's infringement allegations were riddled with problems.  Beyond the

overwhelming evidence cited in support of Cisco's motion for judgment as a matter of law, D.I.

376, the following are but a few examples of the substantial challenges Cisco presented to

Telcordia's infringement allegations:

- '633 Non-Infringement:

    o Cisco presented extensive evidence that the standard on which
      Telcordia's infringement allegation is based requires that the residual
      time stamp be transmitted *in* the convergence sublayer overhead.
      DTX 2164 [ITU I.363.1 Standard]; Exhibit 2 [Cisco's Closing
      Presentation] at slides 157-164.

    o Telcordia's expert Dr. Clark admitted that the Convergence Sublayer
      Indication (CSI) bit that transmits the residual time stamp is generated
      in the convergence sublayer, and ultimately, that the convergence
      sublayer provides the SRTS method itself.  D.I. 357 [5/2/07 Trial Tr.]
      at 928:23-929:10.

- '978 Inequitable Conduct:

    o In addressing the materiality of Telcordia's failure to disclose any of
      the six France Telecom communications to the Patent Office, Cisco's
      expert, Professor Acampora, testified that the patent examiner would
      have been very interested to learn that SRTS resulted from a
      collaboration between France Telecom and Bellcore.  D.I. 356 [5/7/07

---

Recognizing this, Telcordia resorts to *ad hominem* attacks against Cisco and Mr. Barr.
Contrary to Telcordia's assertions, the fact that Mr. Barr was frustrated by Telcordia's
pattern of schizophrenic patent assertions and unfair deposition questioning on that
subject does not reflect arrogance.  Nor does Mr. Barr's decision not to travel across the
country and relive that frustration months after undergoing major heart surgery.

11

Trial Tr.] at 1568:9-18. Telcordia's expert, Dr. Clark, did not provide any rebuttal.

○ Dr. Lau admitted that "[the] concept of putting a time stamp in the SAR layer, meaning outside the convergen[ce] sublayer overhead" was France Telecom's contribution, but tried to justify his failure to provide that information to the Patent Office by explaining that he did not "even think that is relevant in terms of the key technology in SRTS." D.I. 357 [5/2/07 Trial Tr.] at 805:16-806:3. However, Dr. Lau admitted that transmitting the residual time stamp outside the convergence sublayer overhead was "one key aspect of SRTS." *Id.* at 804:17-20.

- '633 Inequitable Conduct:

  ○ In addressing the materiality of Telcordia's failure to disclose the September 4, 1991 and October 16, 1991 communications, Professor Acampora testified that the omitted correspondence was "very germane." D.I. 356 [5/7/07 Trial Tr.] at 1568:23-1569:11. Dr. Clark did not provide any rebuttal.

  ○ Dr. Lau testified that he did not know why the September 4 and October 16 communications were not provided to the Patent Office because he "turned in whatever [he had]." D.I. 353 [5/1/07 Trial Tr.] at 692:1-6. But, Dr. Lau's lawyer, Mr. Hammond, pointed his finger right back at Dr. Lau, testifying that he did not believe he had gotten the September 4 correspondence from Dr. Lau (or anyone else). D.I. 359 [5/8/07 Trial Tr.] at 1970:21-1971:1.

  ○ In attempting to explain his failure to disclose the missing correspondence to the Patent Office, Mr. Hammond testified that the relevance of the correspondence was "too confusing," that SRTS was a "fairly technical subject matter," and ultimately, that he did not recall studying the issue. *See generally* D.I. 359 [5/8/07 Trial Tr.] at 1966:18-1969:9. In other words, Mr. Hammond had no explanation at all.

- '763 Prior Art Invalidity and Inequitable Conduct

  ○ Dr. Lau admitted that he was aware of the Prisco & Hoss prior art reference before he filed his patent application, and that he cited it as an example of the very same "hybrid ring" that he claimed to have invented in the '763 patent. D.I. 357 [5/2/07 Trial Tr.] at 719:12-19, 721:18-25, 740:14-18. In fact, Dr. Lau admitted that Prisco & Hoss, along with other references discussed in his 1986 Technical Memorandum, was "the most relevant information" about his claimed

invention yet was never disclosed to the Patent Office. *Id.* at 763:15-20; 764:8-20.

o   Cisco demonstrated a pattern of conduct in which Dr. Lau hid Prisco & Hoss from the Patent Office and the public once he had filed his application for the '763 patent. *Compare* DTX 2065 [draft IEEE article] (citing Prisco & Hoss) *with* DTX 2045 [published IEEE article] (published version of same article, deleting Prisco & Hoss and replacing it with an article published after Dr. Lau filed his patent application).

o   Dr. Grover, who had over 20 years of experience in the field of survivable architectures, demonstrated at trial that Prisco & Hoss discloses all of the elements of the asserted claims. D.I. 359 [5/8/07 Trial Tr.] at 1800:3-1812:2. Telcordia's expert Dr. Prucnal, who has no particular expertise in survivable architectures, testified that he found Prisco & Hoss to be "confusing." D.I. 354 [5/3/07 Trial Tr.] at 1143:23-25, 1144:7-10.

o   Dr. Grover also demonstrated that the Hashizume prior art reference discloses all of the elements of the asserted claims. D.I. 359 [5/8/07 Trial Tr.] at 1812:3-1816:1. Dr. Grover explained that Hashizume disclosed a UPSR ring approximately six years before the application for the '763 patent was filed. *Id.* at 1814:16-24 ("I was very immediately impressed when I did see it because I realized on first reading that as early as 1982, essentially, the UPSR ring, this fellow had the conception of it. . . . I kind of thought Prisco and Hoss was the earliest before. But, no, even in '82 someone had realized the same situation or problem and [came] up with the same solution.").

The strength of these defenses and Cisco's vigorous pursuit of them is itself probative of Cisco's good faith. *See Oscar Mayer Foods Corp. v. ConAgra, Inc.*, 869 F. Supp. 656, 667 (W.D. Wis. 1994). The fact that the jury ultimately found for Telcordia does not negate Cisco's good faith or the merit of Cisco's substantial challenges. *Honeywell Int'l, Inc. v. Hamilton Sundstrand*, 166 F. Supp. 2d 1008, 1040-41 (D. Del. 2001) (Sleet, J.) ("[T]he court finds that Sundstrand defenses although ultimately unsuccessful, were not frivolous and were litigated in good faith. Moreover, Sundstrand mounted a substantial challenge to Honeywell's infringement contentions."). Telcordia's request for enhanced damages should be denied on this basis alone.

13

**B.    The Other *Read* Factors Do Not Support Telcordia's Request For Enhancement**

Having failed to address in any meaningful way the merits of Cisco's good-faith

defense and substantial challenge, Telcordia instead resorts to piecing together incomplete

snippets and creative interpretations of evidence to construct an argument in favor of

enhancement.  As set forth below, however, Telcordia's interpretation of the facts is strained, to

say the least.

      **1.    Telcordia Cannot Seek Enhanced Damages For Cisco's Alleged "Copying" Of A Technology That Telcordia Furtively Included In An Industry Standard, Or For The Industry's Displeasure When Telcordia's Deceit Was Revealed**

The first half of Telcordia's argument in support of enhancement is a striking

revival of theories and evidence that Telcordia promised to deliver in its Opening Statement but

quickly abandoned at trial.  This attempted revival of its "copying" and "illegal boycott"

allegations fares no better than the original effort.

Telcordia's only evidence of Cisco's alleged "copying" is that Cisco's engineers

designed products to comply with industry standards incorporating the accused SRTS and UPSR

functionalities.[11]  D.I. 370, Opening Brief at 5-8.  The suggestion that this "copying" warrants an

---

[11]    At trial and again in its opening brief, Telcordia suggests that Cisco copied the technology of a chip manufacturer, PMC-Sierra, notwithstanding a notice on the chip vendor's product documentation that the chip "contains SRTS logic that Bellcore holds the patent on."  D.I. 370, Opening Brief at 6.  That Telcordia persists in this argument is amazing.

At the outset, the evidence at trial made clear that Cisco was not "copying" a PMC-Sierra chip, but instead that Cisco was working to ensure that its product would interoperate with PMC-Sierra's product.  D.I. 355 [5/4/07 Trial Tr.] at 1417:11-21 ("Q.  Mr. Jain's supervisor said, look, I made this contact with PMC-Sierra and you can talk with him to make sure that Mr. Jain's SLFP implementation *interworked* with the AAL1gator chip.  Isn't that right? A. Yes.  I am not sure what his supervisor said to him. But it wouldn't be that uncommon to check in with another implementation to see if there is *interoperability issues.* It's beneficial for both companies to do that and to say, how did you do this?  Are

14

enhancement of damages completely disregards the law and facts of this case.

a.   **Telcordia Encouraged The Adoption Of SRTS While Keeping
     Secret The Existence Of Its Patent**

As discussed in detail in Cisco's motion for judgment as a matter of law, D.I. 376,

France Telecom began working towards a potential compromise to break the standards logjam

that had been reached in the early 1990s. D.I. 355 [5/4/07 Trial Tr.] at 1447:21-1448:1. By the

end of 1991, France Telecom and Bellcore had reached a compromise and presented the SRTS

compromise to the standards community, and the compromise was quickly adopted. DTX 2119

[CCITT Study Group XVIII entitled "Report of the Meeting of SWP XVIII/8-3 (Services, IVS

and AAL types 1 and 2)" (December 1991)] ("D.1745 proposed *consolidated method of both*

*SFET and TS as the result of cooperative work carried out by USA and France.*").[12]

In October 1992, Bellcore filed a patent application on the SRTS compromise.

DTX 2004 ['633 patent]. The Patent Office issued the '978 patent in November 1993. *Id.* Yet,

---

we going to interoperate when we are done with our implementation? That would be
fairly common to do.").

In any event, the patent to which the PMC-Sierra documentation refers is *not the '633
patent, but the predecessor '978 patent which Telcordia admits Cisco did not infringe.*
PTX 1366 (PMC-Sierra datasheet dated January 1999, months before the '633 patent
issued); *see also* D.I. 357 [5/2/07 Trial Tr.] at 918:19-919:5 (testimony of Dr. Clark).

---

[12]   In February of 1992, Bellcore stated in an internal patent submission that it might pursue
       a patent on the SRTS compromise. DTX 2684 [Patent Submission – Lab 213]. That
       Submission acknowledged the SRTS method as a technique "based on two previously
       proposed methods Synchronous Frequency Encoding Technique (SFET) and Time Stamp
       (TS)" and that "combines, modifies, and improves on both SFET and TS." *Id.* Because
       the SRTS compromise was "submitted to CCITT SG XVIII and was accepted in Dec.
       1991 as an international standard for timing recovery for constant bit rate services," the
       internal Bellcore document recognizes that any patent on SRTS was "likely to be patent
       that we will wish to *'give away'* in order to assure good international standard for timing
       recovery." *Id.*

at no point during the process did Bellcore tell France Telecom—or the industry more broadly—

that it intended to seek patent protection for SRTS.  To the contrary, Bellcore's representative to

the standards community stated that Bellcore affirmatively decided not to disclose the SRTS

patent to the standards community:

Q:    You will agree that when you had a meeting with Bellcore's management about the SRTS patent application, a decision was made to try to keep it quiet -- as quiet as it could be?

A:    I would agree that they did not want the issue discussed freely within Bellcore, and they *certainly wanted no one to make any statement in the standards form forum or in public,* yes.

. . .

Q:    Why did you believe, in 1993, that if word of the SRTS patent application reached the standards community, that that would complicate your effort to get SRTS standardized?

A:    You mean T1?

Q:    Let's just start with T -- let's start with T1.

A:    Basically, I think it would *raise credibility issues for Bellcore* with other voting members of T1 who could block SRTS becoming the U.S. position, who could have blocked it.

Q:    And what were the credibility issues that you saw?

A:    Basically, that; that *we had never represented any interest in SRTS or any other of the BISD/ATM standards efforts in terms of intellectual property, to my knowledge.* That's to my knowledge.  But I'd never seen any indication.

Q:    And why did you think that the other members of T1 would react negatively to the idea that Bellcore had intellectual property rights that it was seeking on -- in relation to standards?

A:    *Because I think they would have expected Bellcore to be up front.*

D.I. 359 [5/8/07 Trial Tr.] at 1938:19-1940:19.

> **b.    Once The Industry Finally Learned Of Telcordia's Patent, It Was Frustrated By Telcordia's Continued Refusal To License It On RAND Terms**

It was not until years later that the industry found out about Telcordia's patent.

*See, e.g.,* D.I. 356 [5/7/07 Trial Tr.] at 1503:14-22 (testimony of J.Y. Cochennec). A couple of

years after adoption of SRTS by the official standards bodies, Cisco and many other

telecommunications companies were involved in a industry organization known as the ATM

Forum, which aimed to promote interoperability in the industry by establishing technical

specifications (a.k.a. interworking agreements) that detailed implementations of normative

standards adopted by ANSI and the ITU. By February 1995, the ATM Forum was scheduled to

vote to approve the ATM Forum Circuit Emulation Service specification, an interworking

agreement that would promote compatibility of various products employing circuit emulation in

compliance with the ANSI T1.630 and ITU I.363.1 standards.

   Just days before the February 1995 meeting of the ATM Forum, Bellcore

formally notified the Forum that the '978 patent "may apply to the ATM Adaptation Layer Type

1 (AAL1) ANSI standard which is used in the ATM Forum Circuit Emulation Service

specification." DTX 2385 [February 3, 1995 Letter from L. Suchyta of Bellcore to ATM

Forum]; *see also, e.g.,* DTX 2386 [February 17, 1995 Letter from L. Suchyta to ANSI]; PTX

1232 [February 17, 1995 Letter from L. Suchyta to ITU].

   Bellcore's last-minute disclosure of its patent rights on SRTS caused an

unfavorable response in the Forum. This is not surprising. By this time, the industry had already

adopted SRTS in the formal standards setting organizations, and had invested in developing the

ATM Forum Circuit Emulation Services specification and even products that complied with

those standards. *See, e.g.,* DTX 2160 [ANSI Standard T1.630] (standard including SRTS,

adopted August 30, 1993, which was two months *after* Bellcore received notice from the PTO

that its patent had been allowed but two years *before* Bellcore told ANSI about the patent); *see*

*also, e.g.,* PTX 1242 [Statement Against Motion to Forward CES Specification To Vote]

(rejecting the suggestion that the ATM Forum Circuit Emulation Services specification be revised to remove SRTS because "[t]his is problematic from standards point of view. SRTS is already specified in ANSI and ITU specifications and may be fielded in some vendors['] equipment. A competing technique would cause confusion in the market place.").

Perhaps most frustrated by Telcordia's eleventh-hour disclosure was MCI. MCI issued a statement in which it recommended that the working group vote "no" on the Circuit Emulation Services specification because Bellcore had not disclosed its patent as required by the ATM bylaws, and because the terms on which it offered to license the patent were not consistent with industry practice and not in line with the "reasonable and nondiscriminatory terms" or "RAND" required for standards-essential patents *See, e.g.*, Exhibit 4 [January 26, 1995 mail from R. Mitchell of Mitre] [DTX 2498 (not admitted)].

Accordingly, MCI wanted the industry not to adopt the ATM Forum Circuit Emulation Services specification—and lock itself into the SRTS technology further—until it were able to secure actual RAND terms from Telcordia. Although Guy Fedorkow,[13] Cisco's representative to the ATM Forum—and co-author of the ATM Forum Circuit Emulation

---

[13]    In its opening brief, Telcordia calls out the fact that Mr. Fedorkow did not testify at trial, clearly intending to imply that Cisco was trying to hide something from the jury. D.I. 370, Opening Brief at 9. Quite to the contrary, Mr. Fedorkow was prepared to testify at trial and tell the full story surrounding Telcordia's standards misconduct. However, as Telcordia presented its case-in-chief, it became clear that it was abandoning its standards story (e.g., the "[illegal] boycott"), perhaps sensing how flat this theme was falling and recognizing how little evidentiary support it had. *Compare* Exhibit 5 [April 28, 2005 email from V. Kakarla and attachment] (designating nearly 30 excerpts from Mr. Fedorkow's transcript, totaling 588 lines) *with* Exhibit 6 [May 2, 2007 email from V. Kakarla] (identifying 8 designations from Mr. Fedorkow's transcript, totaling 87 lines). As commonly happens, the case narrows through trial, and as should be *encouraged*, Cisco revised its presentation in response. Among the revisions was the decision not to present Mr. Fedorkow and several other Cisco witnesses who were to appear but whose testimony was no longer necessary.

Services specification—expressed sympathy for MCI's position, he expressly told others in the ATM Forum working group that he recommended they each consult with their companies to determine how they should vote:


# REDACTED


Exhibit 7 [January 31, 1995 email from G. Fedorkow] [DTX 2499 (not admitted)].

At the February 1995 Forum meeting, the frustrated industry—led by MCI—sought assurances that Bellcore would license the patent at RAND terms before it would include SRTS within the Circuit Emulation Services specification. This is the meeting at which Cisco allegedly engaged in an "illegal boycott." The sole support for Telcordia's theory are *excerpts* from Mr. Fedorkow's report from this meeting—PTX 416, and as redacted, PTX 1818—*selected by Telcordia.* D.I. 370, Opening Brief at 9-10. However, Telcordia's conspiracy theories are belied by review of the complete report:

> The major issue for CES was the ***Bellcore patent problem. This was brought to the surface by MCI,*** through contribution which said that they would vote against the CES specification because it ***subjected vendors to unlimited liability*** due to the inclusion of SRTS, a technology on which Bellcore may hold patent. ***Bellcore had opened itself to this problem by issuing private letters to selection of vendors offering terms for use of the patent. The terms offered were said by those who received the letters to be "outrageous."*** Once MCI introduced the idea, number of other companies quickly saw that carefully constructed boycott could be quite effective in bringing Bellcore to better terms.
>
> I say carefully constructed, because there are conflicts of interest all over the place. ***Antitrust restrictions*** strictly prohibit the Forum

*from "discussing" prices and meeting <u>between Bellcore and a</u> <u>bunch of vendors</u> to negotiate terms would have been strictly illegal.* Consequently, no one could say "I'm voting against CES until Bellcore reduces their licensing fee to 10K." What we could all say was that we were voting against it because our respective companies had "business concerns" regarding the spec and that we "needed more time to resolve these concerns."

Events played out as follows:

On Monday, George Dubrowski the ATM Forum Technical Committee Chairman, (and also Bellcore employee -- note another conflict of interest), *read and distributed letter from Bellcore stating that Bellcore held the patent in question, and would license it to anyone who wanted. George actually seemed to think that the problem was thereby solved.*

On Tuesday evening, there was vote to declare the Circuit emulation Specification complete. Thanks to MCI's contribution and some excellent organizing by Anthony, the vote went against the document by about 19 to 1, with everyone in the room knowing that we were voting against the Bellcore terms. Of course no one could exactly say that due to antitrust requirements. We later learned that the one vote in favor was mistake -- the chairman held a proxy from the company's principal rep asking for No vote!

The lopsided vote apparently got Bellcore's attention. They somehow hadn't exactly got around to even attending the Tuesday meeting where they were being vilified. *But, Wednesday, they started circulating an informal assurance that this was all a big <u>goof-up</u> and that Bellcore had no intention of charging high fees for SRTS.* By the time Wednesday evenings meeting came around they sent *Mark Garrett, one of their regular technical Forum attendees to read another statement that sounded much more conciliatory.*

The gist of the message was that "Bellcore is committed to fair and reasonable licensing in line with industry norms." In addition, he provided name for each interested Forum member to contact to learn the new licensing story, one Dr Vassilis Keramides (a person who is likely to learn practical lesson on congestion in circuit switched networks, ie, his phone's gonna ring a lot).

Of course we have no idea yet what the real story back in New Jersey might be. *So, I'm sure [C]isco lawyers will be calling Dr Keramides to work on actual terms.*

20

> *Assuming that the rumors of better Bellcore behavior are true,*
> *the CES spec should go to final ballot next meeting with no*
> *further changes.*

Exhibit 8 [G. Fedorkow Report from February 1995 ATM Forum Meeting] [PTX 416 (not

admitted)] at 416-0003 to 416-0004.

Far from a "boycott" in violation of antitrust regulations or otherwise, it is clear

that the industry, led by MCI, sought merely to *delay* the vote on the specification until it could

obtain a commitment from Bellcore that it would license the patent on RAND terms.  Because

the ATM Forum is an industry organization and not a formal standards body, the industry could

not discuss licensing terms *with Bellcore* at Forum meetings for fear of price-fixing allegations.

Thus, their only choice was to delay adoption of the specification by one meeting to allow time

for the industry, including Cisco, to independently approach Bellcore for the RAND licensing

terms it was required to provide.[14]

Perhaps the best evidence of what actually happened at the February 1995 ATM

Forum meeting are the *contemporaneous* writings of *Bellcore* employees.  Mark Garrett, who

attended that meeting on behalf of Bellcore and read the "conciliatory" statement promising to

offer the patent on RAND terms, also wrote detailed notes from that meeting.  Exhibit 9 [M.

Garrett Notes from February 1995 ATM Forum Meeting] [DTX 2596 (not admitted)].  These

notes do not discuss, let alone suggest, any concerns about the Cisco's behavior.  Nor do they

hint at a "boycott," or any illegal or even negative activities by the industry.  To the contrary, Mr.

Garrett reported that                                    **REDACTED**

---

[14]     Of course, had Telcordia timely disclosed its patent to the ITU, ANSI and ATM Forum,
and promptly provided RAND terms to the industry, none of this would be an issue.

*Id.* at 1. Mr. Garrett goes on to note that a

## REDACTED

Beyond these general statements, Mr. Garrett specifically outlined his communications with representatives from the various vendors, including Mr. Alles of Cisco and Mr. Fedorkow (then at Lightstream)—the alleged ringleaders of the "boycott." *See* D.I. 370, Opening Brief at 10. Mr. Garrett recalls the discussion thusly:

## REDACTED

*Id.* at 3; *cf. id.* at 4

## REDACTED

It is noteworthy that, in the contemporaneous account of the ATM Forum meeting, Mr. Garrett does not suggest any wrongdoing by Messrs. Alles or Fedorkow, or Cisco, at all. To the contrary, he notes *Cisco's* frustration with Telcordia's lack of response on the licensing front—the very frustration that Mr. Barr discussed in his deposition.

Equally telling is the internal Telcordia correspondence immediately following the February 1995 ATM Forum meeting. In an email chain entitled "SRTS Patent licensing debacle at ATM Forum," Telcordia employees commented on the

## REDACTED

Ultimately, these individuals thought that a likely end result of the

## REDACTED

Following the February debacle, Cisco and the industry approached Telcordia to obtain details on RAND licensing terms for the SRTS patent. Once again, they had trouble getting a response from Telcordia. *See, e.g.*, Exhibit 11 [March 6, 1995 email from G. Fedorkow to K. Stodola at Tellabs] [DTX 2506 (not admitted)]

## REDACTED

; *see also, e.g.*, Exhibit 12 [March 15, 1995 email from G. Fedorkow to Dean S. at IBM] [DTX 2510 (not admitted)]

## REDACTED

Unfortunately, even when Telcordia finally provided licensing terms, they were far from the RAND terms that had been promised. Exhibit 13 [March 29, 1995 mail from G. Fedorkow] [DTX 2515 (not admitted)]

## REDACTED

23

# REDACTED

*e.g.*, Exhibit 14 [March 29, 1995 mail from G. Fedorkow] [DTX 2516 (not admitted)].  It is

common sense that such terms are not RAND.  If they were, companies could have their

technologies included in industry standards by promising RAND terms for a short period, only to

"renegotiate" those terms to whatever they want once the industry has included that technology

in the standard.  Standards organizations require RAND licensing precisely to prevent this.  *See,*

*e.g.*, DTX 2164 [ANSI Patent Policy].

　　　　　At this point, the April 1995 ATM Forum meeting was mere days away.

Although Mr. Fedorkow was eager to finalize the Circuit Emulation Services specification that

he had authored, the industry could not go forward with the specification because it still did not

have RAND licensing terms from Telcordia.  At this meeting, Cisco made a public statement and

motion encouraging Forum members to vote not to forward the CES specification to final ballot

until the industry got those terms.  The statement, which appears only in truncated form in

Telcordia's opening brief, specifies Cisco's dissatisfaction with Bellcore's proposal that the

industry further lock it self into SRTS by adopted the specification in exchange for licensing

terms that were ***totally open-ended and indefinite***:

> Statement Against the Motion to Forward the CES Spec
> [G.] [F]edorkow [C]isco [S]ystems [A]pr 13/95
>
> Cisco Systems will vote No to the motion to forward the Circuit
> Emulation Specification to final ballot.
>
> ATM Forum bylaws require that ANSI Patent Policy be followed for
> specifications that may include intellectual property of others.  This
> policy requires that patent holders disclose patents that may apply to
> the specification under consideration, and must agree to license the
> relevant patent with terms that are fair and non-discriminatory.
> In the case of patent that may cover the Synchronous Residual Time

Stamp clock recovery algorithm Cisco believes that these requirements have not been met. *Proposed terms for licensing the patent have been released by the patent holder, but the proposed terms do not specify formula for calculating the cost of the license, stating only that recurring annual fee shall be negotiated in the second and subsequent years in which the patent is licensed.*

While it may be difficult to achieve precise definition of "fair and non-discriminatory", *Cisco believes that license with unbounded and indefinite financial liability does not fall into this category.*

*Cisco will vote Yes to the CES Spec* upon satisfactory resolution of this issue.

PTX 1242 [April 1995 Cisco Statement and Motion]. Far from being an "unwarranted and inappropriate" public attack on Bellcore, this statement reflected Cisco's, and the industry's, frustration with Bellcore's history of playing fast and loose with standards policies and industry practice.

As a result of industry frustration with Telcordia's licensing proposal, the motion to pass the Circuit Emulation Services specification on to the plenary for a final vote at the April 1995 meeting was again denied. A few months later, after Telcordia promised the industry that it would in fact license the SRTS patent on RAND terms, the specification was adopted without incident. Cisco was among the companies that voted to adopt it.[15] Exhibit 15 [G. Fedorkow Report from June 1995 ATM Forum Meeting] at CSCO 0360-0067.

*     *     *

As the above history demonstrates, Telcordia intentionally (mis)led the industry into adopting SRTS, and only *after the industry had adopted and invested in SRTS* did

---

[15]     Amazingly, Telcordia still did not learn its lesson, waiting *seven months* after filing its reissue application before alerting the standards bodies that it had done so. *Compare* DTX 2004 (reissue application filed November 8, 1995) *with* DTX 2397 and PTX 1196 (June 3, 1996 letters to ATM Forum and ANSI disclosing reissue application).

25

Telcordia disclose its patents. For Telcordia to complain that Cisco's compliance with these industry standards constitutes "copying" and supports nearly $20 million in enhanced damages is preposterous.[16] Equally absurd is Telcordia's unrelenting accusation that Cisco—and the industry—were violating antitrust laws when they tried to halt Telcordia's railroading of the standardization process so that they could secure reasonable and non-discriminatory licensing terms.

### 2. The Evidence Demonstrates Neither A Motivation To Harm Nor An Attempt To Conceal

Aside from its reference to Cisco's supposed illegal boycott, Telcordia offers no evidence that Cisco was motivated to harm Telcordia or attempted to conceal anything. Nor could it. As noted above, the conduct on which Telcordia bases its infringement allegations was by its very nature intended to be public and for the benefit of consumers and the industry: Cisco's only alleged fault here was complying with industry standards (formal, in the case of the SRTS standards, and Telcordia-sponsored in the case of GR-1400). Cisco complied with these standards for the same reason everyone in an industry complies with industry standards: to promote interoperability and provide flexibility to consumers. Accordingly, Cisco's compliance with these standards was hardly secret. As part of its product literature (which appears on its website), Cisco regularly identified the different industry standards with which a product was

---

[16]    So too is Telcordia's suggestion that Cisco "copied" the UPSR technology. Once again, Telcordia's allegation is based entirely on Cisco's compliance with an industry standard, this time one promulgated by *Telcordia itself*. Not only did Cisco purchase and comply with the Telcordia standard GR-1400 (which fails to mention the '763 patent), but it paid Telcordia to certify its products through the OSMINE process. To suggest that Cisco was "copying" this technology is flat-out wrong. Moreover, Telcordia's expert admitted at trial that Cisco's compliance with GR-1400 was not sufficient to show that Cisco's products performed UPSR. D.I. 354 [5/3/07 Trial Tr] at 1104:22 -1105:22 ("[B]y conforming to the GR-1400 wouldn't necessarily mean that something infringed.") (testimony of Dr. Prucnal).

compliant. Thus, with respect to the conduct at issue in this case, Cisco's behavior was open, public and in furtherance of industry standards which *Telcordia* promulgated.

More broadly, there is no evidence that Cisco harbored any animosity or ill-will towards Telcordia, or was otherwise motivated to harm Telcordia. There is no dispute that Cisco and Telcordia are not competitors and, to the contrary, that Cisco and Telcordia have done :

of business *together* over the years through Telcordia's OSMINE program. D.I. 289 [Telcordia's Motion In Limine No. 3] (Telcordia motion *in limine* noting that "[t]he parties do not dispute that Telcordia does not make or sell equipment in competition with Cisco" and requesting that Cisco's **REDACTED** payments to Telcordia for "testing and related services" be precluded *in limine*); Exhibit 16 [May 22, 2006 Gilstein Depo Tr.] at 31:11-17 (testimony of Telcordia corporate designee that · **REDACTED**

Indeed, even Telcordia's witnesses have repeatedly admitted that Cisco has never exhibited anything but good faith in its dealings with Telcordia. *See, e.g.*, D.I. 352 [4/30/07 Trial Tr.] at 415:10-416:6 (testimony of Mr. Giordano that he has "no basis to say otherwise" than that Cisco was in "complete good faith" during the three-year period in 1998 to 2001 when parties were under a Memorandum of Understanding to try to enter into a business deal); PTX 453 (Cisco and Bellcore Memorandum of Understanding); D.I. 359 [5/8/07 Trial Tr.] at 1963:7-1964:12 (testimony of Telcordia Group Senior Vice President W.D. Sincoskie that, during his discussions with Cisco in 2003, Cisco was "fair" and was not leading Telcordia on or otherwise being deceptive).

Far from weighing "heavily" in favor of enhancement, *Read* factors 8 and 9 militate *against* the enhancement of damages.

### 3. Cisco's Size and Financial Condition Do Not Support Enhancement In This Case

A major element of Telcordia's enhancement argument is an emphasis on Cisco's size and financial condition. While there is no dispute that Cisco is a large and successful company, the relevance of that status to the Court's enhancement inquiry is questionable at best.

Although the Federal Circuit identified size and financial condition as one factor to be considered in the enhancement inquiry, it also stressed that the true question is not how deep the defendant's pockets are, but how culpable its actions were. *See Read*, 970 F.2d at 826 ("The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances."). Because ability-to-pay has nothing to do with culpability, some courts have expressly characterized the defendant's size and financial condition as a "'minor factor[] in the calculus." *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 800, 804 (E.D. Va. 1998), *aff'd in relevant part*, 185 F.3d 1259 (Fed. Cir. 1999); *see also MercExchange, L.L.C. v. eBay, Inc.*, 275 F. Supp. 2d 695, 720 (E.D. Va. 2003), *aff'd in relevant part*, 401 F.3d 1323 (Fed. Cir. 2005), *vacated on other grounds*, 126 S. Ct. 1837 (2006) (noting that the Court would give the size and wealth of eBay only "minor consideration when weighing the totality of the circumstances.").

Notwithstanding Telcordia's repeated references to Cisco's place on the Fortune 500 list and corporate revenues,[17] Cisco's status as a successful company is a particularly poor

---

[17]     For its own, Telcordia is no mom 'n pop operation. Between 1997 and early 2005, Telcordia was a subsidiary of Science Applications International Corporation ("SAIC"), a large research and engineering firm. For every fiscal year between 1999 and 2005, Mr. Nawrocki, Telcordia's damages expert, placed Telcordia's net operating *profit* at over Exhibit 17 [Schedule 6 to Nawrocki Report]. In 2005, Telcordia was acquired for over a billion dollars, by multibillion dollar private equity firms, Providence

REDACTED

barometer of whether enhancement is appropriate. As a result, courts have routinely declined to enhance damages against corporations as large as or larger than Cisco. *See, e.g., Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 166 F. Supp. 2d 1008, 1041 (D. Del. 2001) (denying request for enhanced damages even though Honeywell was ranked 71st on the Fortune 500 list in 2001); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 1175 (D. Colo. 2002) (declining to award enhanced damages even though Wal-Mart was ranked 1st on the Fortune 500 list in 2002); *Oscar Meyer Foods Corp. v. ConAgra, Inc.*, 869 F. Supp. 656, 667 (W.D. Wis. 1994) (denying request for enhanced damages based on the strength of ConAgra's invalidity defense, notwithstanding its rank as 16th on the Fortune 500 list in 1994).

At most, Cisco's size and financial condition could be relevant to the *amount* of enhanced damages, not the threshold question of *whether* damages should be enhanced. But Telcordia's suggestion that enhancement is proper to punish Cisco and deter it from future misconduct is not supported by the record. The most Telcordia was able to muster to justify its demand for nearly $20 million in trebled damages is an incomplete quotation from an email sent by Cisco's counsel and a press release by Cisco's damages expert. D.I. 370, Opening Brief at 14-15. While these examples would hardly justify enhancement in even the worst case, a review of the unadulterated record reveals that these examples are no support at all for Telcordia's enhancement request.

First, Telcordia's opening brief block quotes from an email from Cisco's counsel to the Administrative Law Judge's Attorney Advisor in the parallel ITC Investigation, which Telcordia asserts proves that Cisco views the outcome of the case as a victory. Telcordia's brief

---

Equity Partners and Warburg Pincus. And, even now, Telcordia's annual revenues are approximately REDACTED Exhibit 18 [7/19/07 Giordano Depo Tr.] at 696:23-697:8.

neglects to mention that the email was sent directly in response to an email from Telcordia's counsel, sent *three hours* after the verdict was read, in which Telcordia touted its victory on "all issues" and advised the Administrative Law Judge that Telcordia would soon be filing a motion for a summary determination giving the verdict preclusive effect in the ITC proceeding. Exhibit 19 [5/10/07 email from S. Brittingham]. Far from "boasting about the modest size of the jury verdict," Cisco's email was *expressly* provided to give the Administrative Law Judge a complete account of the jury's verdict: *"To add balance to Mr. Brittingham's characterization of the trial, we wanted to report that the jury awarded less than 1/10 of the damages sought by Telcordia.* Specifically, Telcordia sought more than $75,000,000 for its two patents and received only $6,500,000 total." Exhibit 20 [5/10/07 email from E. Reines]. Second, Telcordia points to the actions of Cisco's damages expert, Mr. Musika, as somehow reflective of Cisco's undeterred state of mind. The flaws in this reasoning are obvious: Mr. Musika's view of the outcome and his business reasons for publicizing that view have absolutely nothing to do with Cisco's view of the verdict.[18]

     Equally flimsy is Telcordia's assertion that Cisco must be "penalized" for its alleged use of the '633 and '763 patents for many years. Telcordia's claim that Cisco has made billions of dollars by "illegally" using Telcordia's patented technology is misleading to say the least. As the evidence presented at trial confirms, the accused products play only a tiny role in Cisco's overall revenues and profits, and the accused functionality a fraction of even that. D.I. 355 [5/4/07 Trial Tr.] at 1395:24-1396:21, 1399:25-1400:10 (testimony of Cisco's witness, Mark

---

[18] Indeed, Cisco did not issue a press release or otherwise boast about the verdict. To the contrary, Cisco provided a very simple comment to the press noting that "the trial is just a first step in an ongoing process to resolve this matter," and that Cisco would "ask the court to rule in its favor" and "appeal, if necessary." Exhibit 21 [Bloomberg article entitled *Cisco Owes Telcordia $6.5 Million Damages, Jury Says*].

Carroll, that accused products are "niche" products and represent dying technologies); DTX

2756 [NatKit SRTS Configuration Search] and 2758 [NatKit Global Summary] (showing that, of

553,306 boxes included in the NatKit database, only 2 boxes were configured to use SRTS, and

both by the same customer).  Against this backdrop, Telcordia's constant references to the

"billions" Cisco made from "enjoyment" of its patents can be seen as nothing more than a

cynical attempt to leverage Cisco's success as a leader in innovation for Telcordia's own

financial gain.

Simply put, evidence of this type does not support the dramatic step of enhanced

damages, particularly when this was not a case in which Cisco cavalierly or arrogantly infringed

Telcordia's patents.  Nor has Telcordia pointed to any evidence that Cisco's behavior warrants

the punitive and preventative relief Telcordia seeks.  Indeed, the weakness of the evidence

Telcordia does cite to justify the "punitive" and "deterrent"[19] relief it seeks suggests that it is

*Telcordia* that is projecting its own interpretation of the jury's "modest" award onto Cisco.

### 4.    Cisco Pursued Its Substantial Defense In Good-Faith, And Behaved Accordingly Throughout This Litigation

Cisco's good-faith and meritorious litigation conduct is discussed in detail in

Cisco's concurrently-filed Answering Brief Opposing Plaintiff Telcordia Technologies, Inc.'s

Motion For Attorneys' Fees And Expenses Pursuant To 35 U.S.C. § 285 And/Or The Court's

Inherent Equitable Authority, and will not be repeated here.[20]  Suffice it to say, Cisco believes

---

[19]    Of course, Telcordia stands to benefit to the tune of $20 million from the punitive and deterrent effect of the enhancement award it seeks.

[20]    Cisco incorporates by reference the arguments and evidence set forth in its Answering Brief in Opposition to Plaintiff Telcordia Technologies, Inc.'s Motion For Attorneys' Fees And Expenses Pursuant To 35 U.S.C. § 285 And/Or The Court's Inherent Equitable Authority.

that review of that brief, and the litigation record as a whole, will confirm that Cisco's litigation conduct manifested nothing but reasonableness, restraint, and a respect for this Court and the process at every turn.  Indeed, even in seeking [REDACTED] in attorney fees and nearly $20 million in trebled damages, Telcordia was able to muster only a handful of complaints, *none of which it raised to the Court prior to moving for attorneys' fees*, as evidence of Cisco's litigation "misconduct."

In contrast, Telcordia's repeated missteps reflected not only extremely aggressive litigation tactics but a consistent and willful disregard for this Court's rulings and procedures and the judicial process. *See, e.g.*, D.I. 341 [Summary Judgment Order] at footnote 5 (noting amazement at Telcordia's continued argument on the expert report issue after the Court's order that it cease making that argument); D.I. 356 [5/7/07 Trial Tr.] at 1677:8-12 ("And let me add that this has been a consistent theme throughout Telcordia's prosecution of its claims before this Court, since the *Markman* ruling, to resist the fact that the Court has ruled the way it ruled.  I ruled the way I ruled, end of discussion.  Take a different approach."); *see also, e.g.*,  D.I. 280 [November 15, 2006 Order] (noting Telcordia's failure to comply with Court's scheduling order and practice concerning discovery motions); Exhibit 22 [January 5, 2006 Hearing Tr.] at 64:21-65:1 ("I have to say, Mr. Burley, it does appear that, as you have suggested earlier -- well, I am sure you didn't say it exactly this way, maybe not at all -- you sort of went on and did what you wanted to do anyway in spite of what the Court said you couldn't do and what the Court wasn't going for tolerate.").

Against this backdrop, Telcordia's suggestion that this *Read* factor supports its request for enhancement is particularly audacious.

32

### 5. The Duration Of Any Misconduct By Cisco Is Attributable To Telcordia, And In Any Event, Cisco Has Taken Immediate Remedial Measures Following The Verdict

Turning to *Read* factors 6 and 7, Telcordia argues that "Cisco has infringed for many years and has taken no remedial action." D.I. 370, Opening Brief at 18. Here again, Telcordia's argument reflects a gross misapprehension of the evidence.

The '633 patent issued on March 28, 2000, and Cisco could not, by definition, have infringed that patent prior to that date. Similarly, Telcordia concedes that Cisco did not begin selling any products accused of infringing the '763 patent until late 1999. Any infringement of the '763 patent by Cisco could not begin until then. Critically, Cisco did not receive actual or constructive notice of either patent until September 7, 2001,[21] and any willful infringement could only begin then. Thus, any conceivable misconduct by Cisco had a duration of only a few years. Even standing in isolation, that duration is not particularly compelling evidence to support the trebling of damages. However, when placed in the context of the parties' licensing discussions—which were discussed at length at trial and above in Section IV.A—it is clear that the duration of any such "misconduct" was largely attributable to Telcordia.

---

[21] Telcordia admits that Cisco did not have actual notice of the '633 or '763 patents until September 7, 2001, and its evidence of marking—its attempt to show constructive notice—fell short at trial. *See, e.g.,* D.I. 352 [4/30/07 Trial Tr.] at 380:2-4 (testimony of Mr. Giordano that Telcordia's licenses to the Regional Bell Operating Companies (RBOCs), which cover the patents-in-suit, do not include a marking requirement); *id.* at 382:3-7 (testimony of Mr. Giordano that Telcordia did not investigate compliance with the marking requirement by those licensees whose agreements did include such a requirement); *id.* at 382:24-383:2 (testimony of Mr. Giordano that he did not know whether products made by any of Telcordia's licensees were ever marked); D.I. 359 [5/8/07 Trial Tr.] at 1953:5-10, 1951:1-9 (testimony of Alcatel witness that neither Alcatel nor Newbridge, which it acquired, marked products under a license from Telcordia).

33

Moreover, Cisco does not deny that it did not cease all activities that could conceivably have fallen within the scope of the many patents Telcordia identified during this 10+ years of negotiation. But Cisco cannot be expected to have done so—not when it was faced with this history of haphazard communications from Telcordia and could not get a straight answer out of Telcordia about which products it alleged to infringe its patents and how.

Significantly, since the verdict, Cisco has taken immediate steps to cease the activities which were found to infringe by the jury. Of the 14 cards accused of infringing the '633 patent, Cisco has long since discontinued all but one: the MPSM-8-T1E1. *See* D.I. 355 [5/4/07 Trial Tr.] at 1396:6-8 ("And I believe we only have one card now that does any kind of circuit emulation and that would be ending its life pretty soon as well."). Immediately after the verdict was rendered,

**REDACTED**

34

Similarly, Cisco has taken significant steps to address the conduct that was found

by the jury to infringe the '763 patent.  Over the last two months, Cisco has devoted extensive

resources to

# REDACTED

And, while these efforts are underway,

Cisco has added the following disclaimer to its website, as well as to all customer documentation

relating to the products accused of infringement on a rolling basis:

> The terms "Unidirectional Path Switched Ring" and "UPSR" may
> appear in Cisco literature.  These terms do not refer to using Cisco
> ONS 15xxx products in a unidirectional path switched ring
> configuration.  Rather, these terms, as well as "Path Protected
> Mesh Network" and "PPMN," refer generally to Cisco's path
> protection feature, which may be used in any topological network
> configuration. Cisco does not recommend using its path protection
> feature in any particular topological network configuration.

---

[22]     As it did at trial, Telcordia is sure to make hay of the fact that Cisco has ongoing
customer support responsibilities for its discontinued products.  However, those past sales
are licensed by virtue of the judgment in this case, and Cisco is therefore permitted to
provide customer support to allow its customers to continue to use products that have
been licensed.  *See King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560, 1564 (Fed. Cir.
1987).

35

*Id.* at ¶ 9. These steps—which are ongoing—will effectively remedy any infringement between now and the February expiration of the '763 patent.

## V.     CONCLUSION

For the foregoing reasons, Cisco respectfully requests that the Court deny Telcordia's motion for enhanced damages pursuant to 35 U.S.C. § 284.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Leslie A. Polizoti (#4299)*
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 North Market Street
Post Office Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, California  94065

July 23, 2007
979043

36

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2007 I electronically filed the foregoing

with the Clerk of the Court using CM/ECF, which will send notification of such filing to Steven

J. Balick and John G. Day.

I further certify that I caused copies of the foregoing document to be

served on July 23, 2007 upon the following in the manner indicated:

**BY HAND**

John G. Day
ASHBY & GEDDES
500 Delaware Avenue, 8th Fl.
Wilmington, DE 19801

**BY FEDERAL EXPRESS**
**(on July 24, 2007)**

Don O. Burley
FINNEGAN, HENDERSON,
 FARABOW, GARRETT & DUNNER
901 New York Avenue
Washington, DC 20001

**BY ELECTRONIC MAIL**

John Day (jday@ashby-geddes.com)
Steven J. Balick (sbalick@ashby-geddes.com)
John Williamson (john.williamson@finnegan.com)
York Faulkner (york.faulkner@finnegan.com)
Don Burley (don.burley@finnegan.com)

/s/ Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
lpolizoti@mnat.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2007 I electronically filed the foregoing with the

Clerk of the Court using CM/ECF, which will send notification of such filing to Steven J. Balick

and John G. Day.

I further certify that I caused copies of the foregoing document to be served on

July 30, 2007 upon the following in the manner indicated:

**BY ELECTRONIC MAIL**

John Day (jday@ashby-geddes.com)
Steven J. Balick (sbalick@ashby-geddes.com)
John Williamson (john.williamson@finnegan.com)
York Faulkner (york.faulkner@finnegan.com)
Don Burley (don.burley@finnegan.com)

*/s/ Leslie A. Polizoti*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
lpolizoti@mnat.com