# EXHIBIT 6



"Kakarla, Vamsi"
<vamsi.kakarla@finnegan.com>

05/02/2007 06:15 PM

To  <derek.walter@weil.com>, <Sonal.Mehta@weil.com>

cc  <edward.reines@weil.com>, <jessica.davis@weil.com>, <matt.powers@weil.com>

Subject  Fedorkow

The Fedorkow video is on its way to you.  The video contains the following testimony.

Telcordia initial designations:
7:7-8
25:15-26:6
27:6-27:8
27:14-20
74:04-75:6
75:17-76:15
222:7-222:10
222:13-17

Cisco counter-designations:
75:7-16
80:1-12
78:13-79:5

Telcordia reply designations:
80:13-18

Thanks, Vamsi

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

< END >

# EXHIBIT 7

## FULLY REDACTED

# EXHIBIT 8

To: fedorkow
Cc: goodhue, dwade, psantos, crowther, swallow, tappan, tdowney, gmuntz,
     slackey, mlague, jwiggins, tv, pianin, bthomas, rbradfor, colclase,
     tdonahue, kmcgratt, mvaysman, sjacobs, kjones, marcos, wayne, jtiao,
     lmccallu, mcanha, ju, aalles@cisco.com, alin@cisco.com
Subject: Re: Report from the February ATM Forum
In-Reply-To: Your message of "Sat, 11 Feb 1995 21:10:39 EST."
     <9502120210.AA02892@yggdrasil.LightStream.COM>
Date: Mon, 13 Feb 1995 11:28:12 -0500
From: George Swallow <swallow>

A few comments on Guy's report.

1. Please note that the George who thought that a statement from
Bellcore solved everything was George Dobrowski - not me. It was I
who replied to George D. statement at the Chair Breakfast that
Bellcore was 'being reasonable' with 'by that measure so was Attila
the Hun'.

2. Better CES technical work will occur at ANSI. Actually almost no
CES technical work occurs at ANSI (T1S1). The work done there is almost
totally controlled by Bellcore and AT&T. They bring in very complete
work - usually the researchers themselves don't show up - it gets
discussed and usually approved with only minor modifications. Once in
a while a serious issue is surfaced. These are taken back to AT&T and
Bellcore who almost always respond at the next meeting. Its my
perception that the reason that things go better is partially because
these companies really do have great people working on the problems -
but a lot of it is because they don't have to keep munging things
around to fit in everyone's pet feature.

3. I don't understand the switch from psuedocode to text. This is
*not* a requirement of the standards process. ANSI and ITU don't
typically include psuedocode in their specs, but they *usually*
include SDLs (can't recall what the letters stand for) which are very
much like flow charts and as equally precise as well written
psuedocode. IEEE has one bridging specification (I believe I was told
that its the spanning tree algorithm - if anyone knows for sure speak
up) where the psuedocode is *normative* and the text is for
information.

   So to blame the standards process for this sounds like smoke. (It
has pleanty of faults, but this isn't one.) The reality is probably
that some folks want things loose so that they can have some
implementation flexibility and still claim compliance. Will this lead
to good interoperation and stable behaviour? Doesn't bode well...

------------------------------



CONFIDENTIAL

**PTX-416**

CSCO 0246-1983

00416-0001

ATM Forum Meeting Report
fedorkow, cisco/lightstream, feb 10/95

The first ATM Forum meeting of 1995 was held on the west coast in
San Francisco. This meeting started with the usual statistics,
explaining why these meetings just seem to get bigger and bigger:
  - 200 principal members
  - 350 auditing memebers
  - 122 user members
  - 600 attendees
Of overall note, Fred Sammartino, the person who has been the President
of the Forum for a few years now, announced his intention to step down.
The search for a new president and new members to run for the board of
directors is now underway...
  The meeting this time was a curious mix of frantic activity for some
groups and light schedules for others.
  LAN Emulation has declared itself done. The MIB is still under
construction, and I think they are considering 'phase two' work, but
they held few sessions. Signalling also is relatively quiet; there was
a joint session on traffic management, and some new work introduced for
"secure" signalling. The QoS group is declaring itself done, I think
having defined a few terms, but no numbers.
  The Frame UNI project claims to be done. The Testing group has material
on physical layer testing out for straw ballot, and is starting on AAL5
and signalling testing. B-ICI also is claiming done, having
said "#include SS7", I think.
  Some of the current round of work is not done. Traffic management is
late. Multiprotocol-over-ATM is just starting. The hot new topic this
meeting is "Residential Broadband", which may be a forum in which cable
companies and phone companies fight about how to bring broadband services
to small companies and homes. (By the year 2037 for my house, I'd expect.)

The remainder of this report is organized as follows:

1. Circuit Emulation
1.1 Finishing the Spec
1.2 New Work
2. Traffic Management Notes
2.1 Algorithm Stability
2.2 ITU Alignment
2.3 Conformance
2.4 RM Cell Priorities
2.5 Work Plan
3. Random Notes
3.1 622 Mbit PHY
3.2 25 Mbit PHY
3.3 Lawyers and Antitrust

CONFIDENTIAL

CSCO 0246-1984

00416-0002

1. Circuit Emulation

The Phase 1 Circuit Emulation spec should have been forwarded to the Technical committee this meeting.  Unfortunately, or maybe fortunately, depending on point of view, MCI's objection to Bellcore's terms on their SRTS patent held us up, probably by one meeting cycle.

1.1 Finishing the Spec

As part of the straw ballot process, we received about six contributions with comments on the CES spec.  The comments resulted in dozens of wording changes and clarifications, deletions of some extraneous text, plus a few extra explanatory paragraphs here and there.  I don't believe any of the changes are 'substantive' for hardware people.  Technical areas where discussion did take place include the MIB and call setup paramters for SVC operation.  Randy Mitchell and I edited in the changes at the meeting, so a new version of the document is currently ready.

Last meeting, I got a major lesson in how to structure a MIB.  This meeting, I got a practical lesson in organizing pressure tactics.

The major issue for CES was the Bellcore patent problem.  This was brought to the surface by MCI, through a contribution which said that they would vote against the CES specification, because it subjected vendors to unlimited liability due to the inclusion of SRTS, a technology on which Bellcore may hold a patent.  Bellcore had opened itself to this problem by issuing private letters to a selection of vendors offering terms for use of the patent.  The terms offered were said by those who received the letters to be "outrageous".  Once MCI introduced the idea, a number of other companies quickly saw that a carefully constructed boycott could be quite effective in bringing Bellcore to better terms.

I say carefully constructed, because there are conflicts of interest all over the place.  Antitrust restrictions strictly prohibit the Forum from "discussing prices", and a meeting between Bellcore and a bunch of vendors to negotiate terms would have been strictly illegal.  Consequently, no one could say "I'm voting against CES until Bellcore reduces their licensing fee to $10K."  What we could all say was that we were voting against it because our respective companies had "business concerns" regarding the spec, and that we "needed more time to resolve these concerns."

Events played out as follows:

On Monday, George Dubrowski, the ATM Forum Technical Committee Chairman, (and also a Bellcore employee -- note another conflict of interest), read and distributed a letter from Bellcore stating that Bellcore held the patent in question, and would license it to anyone who wanted.  George actually seemed to think that the problem was thereby solved.

CONFIDENTIAL

CSCO 0246-1985

00416-0003

On Tuesday evening, there was a vote to declare the Circuit Emulation Specification complete. Thanks to MCI's contribution, and some excellent organizing by Anthony, the vote went against the document by about 19 to 1, with everyone in the room knowing that we were voting against the Bellcore terms. Of course, no one could exactly say that, due to antitrust requirements. We later learned that the one vote in favor was a mistake -- the chairman held a proxy from the company's principal rep asking for a No vote!

The lopsided vote apparently got Bellcore's attention. They somehow hadn't exactly got around to even attending the Tuesday meeting where they were being vilified. But, Wednesday, they started circulating an informal assurance that this was all a big goof-up, and that Bellcore had no intention of charging high fees for SRTS. By the time Wednesday evening's meeting came around, they sent Mark Garrett, one of their regular technical Forum attendees, to read another statement that sounded much more conciliatory.

The gist of the message was that "Bellcore is committed to fair and reasonable licensing in line with industry norms." In addition, he provided a name for each interested Forum member to contact to learn the new licensing story, one Dr Vassilis Keramides (a person who is likely to learn a practical lesson on congestion in circuit switched networks, ie, his phone's gonna ring a lot).

Of course, we have no idea yet what the real story back in New Jersey might be. So, I'm sure cisco lawyers will be calling Dr Keramides to work on actual terms.

Assuming that the rumors of better Bellcore behavior are true, the CES spec should go to final ballot next meeting with no further changes.


1.2 New Work

The second part of the Circuit Emulation agenda was a review of new work proposals. There were half a dozen different contributions.

- virtual n-isdn trunks -- This rather odd proposal was offered by Northern Telecom from England, and proposed a rather complex sounding way of enhancing the existing CES baseline to allow for the use of ATM networks as backbones to trunk together Narrow-Band ISDN switches.

- voice over atm -- Several companies, led by IBM France proposed a plan to add explicit voice support to the CES next version of the spec. This would include the following work:
   - selection of voice compression and silence detection algorithms
   - definition of QoS requirements
   - speech/data discrimination
   - fax mod/demod
   - signalling, ie, AB bits and all that
Support for this kind of work is said to come from northern telecom,

cray communications, comsat, and maybe mitel.  AT&T is strongly opposed to taking up this work at the Forum; Behram Barucha offered the opinion that it would be done with competence at ANSI, but that the Forum will only do a hack job on a rather complex topic.  I think there's a good chance that he's right...

  - ds3, and maybe e3 – Kevin Stodola of Tellabs proposed adding DS3 and E3 to the work list.
  - J2 - Northern Telecom proposed adding the 6 Mbit J2 spec to CES.  I was a bit surprised to see this from the British subsidiary of a Canadian company, but why not.  I had a little side conversation with the NEC Forum rep, Hirose Suzuki, suggesting that Japanese input to a standard for J2 might be a good idea...

  - T1/E1 interworking -- Tellabs also proposed a work item expliticly addressing DS1/E1 interworking.  The hard part here is figuring out what to do with the signalling bits.

  There was a vote to gauge interest in these various topics, since it's clear that a group that averages 10 to 20 participants can't cover all of them.  Interest came out as follows:
    Virtual Trunk Groups      4
    Voice over ATM      10
    DS3 Emulation                  6
    T1/E1 Interworking  8
    J2 Emulation             4

  It's not clear where this goes next.  The current chairman (Randy Mitchell) and the editor (me) have both stated our intentions to resign these positions upon completion of the CES Release One doc.  There are potential candidates to lead a second phase, but no one explicitly signed up yet.  To be resolved at the next meeting...


2. Traffic Management Notes
  When I was not chasing MIB details or editing out deleted text, I sat in on Traffic Management along with Arthur Lin from Cisco, plus about a hundred other people.

2.1 Algorithm Stability
  The big issue this time was algorithmic stability (that is, stability of the document itself.  Stability of the equipment that might attempt to implement the spec is another issue!)  Bugs in the basic traffic management algorithm continue to surface, so many people,  particularly those who don't have a feeling for the complexity of traffic management, complain that "those guys can't make up their minds."  It does seem that there is more than a little possibility of 'feature-creep', as people invent various weird ways to try to  improve the behavior in corner cases.  As always, one person's corner case is

another's principal concern, so closure is hard to achieve.

One reason for the apparent instability in the spec is that the focus has shifted from writing an algorithm in pseudo-code, to describing the behavior of sources, destinations and switches in english text. This change is an essential part of the standards process, as it turns the focus to the minimal rules that must be obeyed by each component, rather than specifying exactly one acceptable algorithm (as the p-code does).

The problem is, of course, that it's hard to get the English text to be precise, and doing so requires careful examination of many ambiguous cases. The end result of all of the discussion were many changes to the text. A side effect of the discussion on wording was some inspiration for a new, apparently simpler p-code as well.

There's considerable fear that the changes will have subtle effects on behavior. As a result, a motion was passed that, before the Traffic document can be released to straw vote, at least one meeting must pass in which no "semantic", ie, algorithmic, changes are made. People hope that will be true next meeting (ie, April), allowing the possibility of straw vote no sooner than June.

The bad news is that, even if the algorithm stays put, there are still rather difficult issues to be solved. A 'to do' list that runs to two pages was issued at the end of the meeting, along with a request for contributions to close items.

Here are some of the other issues discussed:

2.2 ITU Alignment

As noted at the last meeting, the ITU and ANSI have suddenly decided that they are interested in traffic management, perhaps at the urging of companies that may not be getting everything they want in the Forum.

One place that's coming out is fighting over fields in the Resource Management cell. If you don't like what the Forum is doing, you can keep a foot in the door by getting your favorite feature into the RM cell...

There's considerable desire to have the ITU and the Forum share a common format, so a lot of energy went into trying to get them to line up. The Forum will send its suggestion to ANSI for their next meeting. Maybe this can be settled by the next meeting, but I wasn't close enough to gauge the chances.

I was also perplexed that the focus was on a common cell format, without much talk of common algorithms. That might be a "one step at a time" policy on the part of the Forum, or it might be that no one thinks that ANSI or the ITU can get around to specifying an algorithm on any time scale that matters.

2.3 Conformance

Policing of ABR traffic continues to be an unsolved problem. A policer that operates directly at the ultimate ABR source would be easy, but one that can operate several switches away from the source, is

CONFIDENTIAL

CSCO 0246-1988

**00416-0006**

still a research topic.  AT&T suggested a technique that would place more than a few restrictions on "CPE networks".  Siemens from Europe lead another futile charge against the EFCI bit on the grounds that it makes policing even harder.

People are very nervous about the policing problem.  Providers fear that they won't be able to offer the service if they can't police it.  Vendors fear that a rule that defines the behavior of a policer will in fact become the de-facto specification for end system behavior.

Expect lots more argument on this topic.

### 2.4 RM Cell Priorities

This is not a big deal, but people have started to note the complexity of dealing with these RM cells.  In a switch, you have to process them quickly, but you don't have to keep them exactly in order with the data stream, so all kinds of complex queueing arrangements are possible to prevent the need to process an RM cell in exactly 700 nsec at OC-12.

In an end station, forward and backwards RM cells must contend in priority with ABR, VBR and CBR traffic.  Techniques to avoid piles of extra queues were discussed.  While this is a bit complex, I don't think it's extreme.

### 2.5 Work Plan

As noted, there's some hope that the doc can get to straw ballot by the June meeting.  It's not going to be a big surprise if this slips again.

### 3. Random Notes

Here are a few more things that happened:

### 3.1 622 Mbit

At the last meeting, there were two competing physical layer specs for oc-12 LAN links, one based on Compact Disk lasers, and another on an LED transmitter.  The LED version appears to have won, clearing the way for a (procedurally) simple completion of a 622 Mbit/sec local area physical interface.  Steve Lang of PMC apparently will edit this document.

### 3.2 25 Mbit PHY

The Token Ring based 25 Mbit physical layer won out over the Sonet OC-1/2 25 Mbit proposal.  I don't know if this makes any difference; after a considerable fight over a 51 Mbit standard, no one seems to be using it.

### 3.3 Lawyers and Antitrust

In an indication of how much the Forum worries about antitrust law, there was a well-attended (like about 150 people) meeting at which two of the lawyers who provide legal cousel for the Forum presented a summary of antitrust law as it applies to industry groups like the Forum.

While there's no suggestion that the Forum is illegal — apparently groups like the ATM Forum are covered by the National Cooperative Research Act — it's obvious that there is ample opportunity for people

CONFIDENTIAL                                    CSCO 0246-1989

**00416-0007**

to make mistakes and cross a line that is never far away.
   Obviously, we can't compare pricing for things we buy or products we plan to sell.  But more subtle anti-competitive behavior (such as specifying the use of a component that can only be made by one vendor, or an algorithm that is un-fairly controlled by one owner (did I hear some one mention SRTS here?) is much harder to regulate.

   So, with that advice, I will close this memo by denying the rumor that George and I may have agreed to sell additional copies of our reports for no less than $0.35 each to qualified buyers....

CONFIDENTIAL

CSCO 0246-1990

00416-0008

# EXHIBIT 9

## FULLY REDACTED

# EXHIBIT 10

## FULLY REDACTED

# EXHIBIT 11

## FULLY REDACTED

# EXHIBIT 12

## FULLY REDACTED

# EXHIBIT 13

## FULLY REDACTED

# EXHIBIT 14

## FULLY REDACTED

# EXHIBIT 15

## FULLY REDACTED

# EXHIBIT 16

## FULLY REDACTED

# EXHIBIT 17

## FULLY REDACTED

# EXHIBIT 18

## FULLY REDACTED

# EXHIBIT 19

From: "Brittingham, Smith" [smith.brittingham@finnegan.com]
Sent: 05/10/2007 06:54 PM
To:
<Gregory.Moldafsky@usitc.gov>;<Benjamin.Levi@usitc.gov>;<david.hickerson@weil.
com>;<joanne.guerrera@weil.com>;<david.southard@weil.com>;<matthew.powers@weil
.com>;<edward.reines@weil.com>;<jessica.davis@weil.com>;<sonal.mehta@weil.com>
;<steven.cherny@lw.com>;<david.nelson@lw.com>;<max.grant@lw.com>;<sean.pak@lw.
com>;<alcatel_itc@kenyon.com>;<mladra@wsgr.com>;<jotteson@wsgr.com>;<mreed@wsg
r.com>;"Anzalone, Steven" <steven.anzalone@finnegan.com>;"Williamson, John"
<John.Williamson@finnegan.com>;"Dunner, Don" <Don.Dunner@finnegan.com>
Subject: RE: Inv. 337-TA-574 - Conference Call

Mr. Moldafsky:

I wanted to update you on the status of the district court trial.  The jury
returned a verdict in Telcordia's favor on all issues Thursday afternoon.  The
'633 patent, the remaining patent in the ITC investigation, was found to be
valid, enforceable, and willfully infringed.  The previously asserted '763
patent was also found to be valid, enforceable, and willfully infringed, and
the previously asserted '306 patent was found to be valid and enforceable
(although you will recall from the motion to terminate that Telcordia conceded
it could not prove infringement under the district court's claim
construction).  The jury also decided against Cisco on its equitable defenses.

I know that our trial team will be traveling home tomorrow, and I suspect that
Cisco's counsel will also be occupied.  I will try to set up a conference call
early next week.  If the Judge would prefer a particular time, please let me
know.

In addition, Telcordia will be filing a motion tomorrow to extend the time to
file summary determination motions relating to the district court judgment and
its res judicata or collateral estoppel effect.  It is our understanding that
the deadline for filing summary determination motions is fast approaching.

Regards,

Smith Brittingham

# EXHIBIT 20

Edward Reines /SV/WGM/US    To    Gregory.Moldafsky@usitc.gov
05/10/2007 11:12 PM
                          cc    alcatel_itc@kenyon.com, Benjamin.Levi@usitc.gov,
                                Gregory.Moldafsky@usitc.gov, jotteson@wsgr.com,
                                max.grant@lw.com, mreed@wsgr.com,

                    Subject    Re: 337-TA-574: update regarding Cisco motion to compel re
                                privilege claims

Mr. Moldafsky:

This email responds to Mr. Brittingham's email submission earlier today concerning the district court
proceedings.

To add balance to Mr. Brittingham's characterization of the trial, we wanted to report that the jury awarded
less than 1/10 of the damages sought by Telcordia.  Specifically, Telcordia sought more than
$75,000,000 for its two patents and received only $6,500,000 total.  Indeed, the unchallenged testimony at
trial was that of the fourteen Cisco network cards that contain the accused SRTS technology for the '633
Patent (the only patent remaining in this investigation), thirteen have been discontinued and the last one
will be discontinued in a matter of months.  Put simply, Cisco is phasing out due to lack of demand the
last card that enables its products to use the accused SRTS technology.  Accordingly, the accused
technology will be entirely discontinued very soon and Telcordia did not deny that at trial.

Although Telcordia abandoned the two other patents originally in this investigation in view of the fact that
there was no reasonable possibility it would obtain meaningful relief, time will tell what it plans to do with
its last remaining patent.  Judging by Mr. Brittingham's email, Telcordia appears interested in continuing
ahead notwithstanding the discontinuation of the accused technology.  Of course, Cisco will evaluate its
options in this regard.

Respectfully Submitted,

Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel (650) 802-3022
Fax (650) 802-3100

# EXHIBIT 21

# Bloomberg.com



## Cisco Owes Telcordia $6.5 Million Damages, Jury Says (Update2)

By Phil Milford

May 10 (Bloomberg) -- Cisco Systems Inc., the world's biggest maker of computer networking equipment, must pay Telcordia Technologies Inc. $6.5 million in damages for infringing two patents, a federal jury decided.

Telcordia took Cisco to court in 2004 over the patents, one for an invention to synchronize phone data and eliminate sound dropouts, the other for re-routing voice, video and other data if telephone wires are accidentally cut, according to testimony.

After a seven-day trial in Wilmington, Delaware, the jury of five men and three women deliberated about seven hours before reaching a verdict today, also deciding that the patents, awarded since 1989, are valid and enforceable.

``Right was justified,'' Donald Dunner, closely held Telcordia's lawyer, said after the verdict. He told jurors earlier that ``Cisco did not act like a proper citizen.''

Cisco lawyer Matthew Powers wouldn't comment after the verdict. He told the jury during closing arguments that Telcordia, the former research division of the Bell telephone companies, wanted to be paid ``for no good reason.''

``The trial is just a first step in an ongoing process to resolve this matter,'' Cisco spokesman John Noh said in a statement. He said Cisco will ask the court to rule in its favor, and will appeal, if necessary.

Telcordia, based in Piscataway, New Jersey, asked the jury for $75 million in damages.

Triple Damages Possible

The jury ruled that Cisco's infringement of both patents was intentional, which may allow U.S. District Judge Gregory M. Sleet to triple the damages award to almost $20 million.

The Lucent Technologies unit of Paris-based Alcatel-Lucent, the world's largest supplier of telecommunications equipment, also was a defendant in the case and said it settled with Telcordia under confidential terms on the eve of trial.

Telcordia, based in Piscataway, New Jersey, faces another trial in the same court, probably within the next two years. In a case filed in February, Cisco accused Telcordia of infringing two of its software patents.

Shares of San Jose, California-based Cisco fell 22 cents to $26.29 in Nasdaq Stock Market composite trading. They have risen 26 percent in the past year.

Alcatel-Lucent, with $15.4 billion in sales last year, fell 1 cent to 9.72 euros in trading today in Paris.

The case is Telcordia Technologies Inc. v. Cisco Systems Inc., 04CV876. U.S. District Court, District of Delaware (Wilmington).

To contact the reporter on this story: Phil Milford in Wilmington, Delaware, at **pmilford@bloomberg.net** .

*Last Updated: May 10, 2007 18:09 EDT*



©2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

# EXHIBIT 22

**1/5/2006 Hearing**

```
1              IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE
2
                        -  -  -
3    TELCORDIA TECHNOLOGIES INC.,    :   Civil Action
                                     :
4           Plaintiff/Counterclaim   :
            Defendant,               :
5                                    :
                                     :
6       v.                           :
                                     :
7    LUCENT TECHNOLOGIES, INC.,      :
                                     :
8           Defendant/Counterclaim   :
            Plaintiff.              :   No. 04-874-GMS
9                       -  -  -
     TELCORDIA TECHNOLOGIES, INC.,   :   Civil Action
10                                   :
            Plaintiff/Counterclaim   :
11          Defendant,               :
                                     :
12      v.                           :
                                     :
13   LUCENT TECHNOLOGIES INC.,       :
                                     :
14          Defendant/Counterclaim   :
            Plaintiff.              :   No. 04-875-GMS
15                      -  -  -
     TELCORDIA TECHNOLOGIES, INC.,   :   Civil Action
16                                   :
            Plaintiff/Counterclaim   :
17          Defendant,               :
                                     :
18      v.                           :
                                     :
19   CISCO SYSTEMS, INC.,            :
                                     :
20          Defendant/Counterclaim   :
            Plaintiff.              :   No. 04-876-GMS
21                      -  -  -
22                   Wilmington, Delaware
                 Thursday, January 5, 2006
23                      1:30 p.m.
24                      -  -  -
25   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
```

**1/5/2006 Hearing**

1          If you unseasonally disclose the

2    information you had an obligation to disclose under

3    26(e)(2), then you lose and you can't use that at

4    trial.  That is what should be implemented here.

5          THE COURT:  It says unless such failure is

6    harmless.

7          MR. REINES:  It is their burden to show

8    substantial justification and harmlessness.  We don't

9    think it is at all harmless.  We have a schedule.  We

10    are living by it.  The Court said very clearly, I set my

11    schedule.  Everyone is expected to live by it.

12          THE COURT:  There is no question about it.

13    The Court is very jealous of its process, counsel know

14    that, and very resentful, not in a personal way, but

15    when lawyers sort of try to take the process in hand on

16    your own.  We have to deal with that on a daily basis.

17    It takes up too much of our time.

18          So I am disappointed that resort to the

19    Court wasn't made by plaintiff in a more aggressive

20    manner.

21          I have to say, Mr. Burley, it does appear

22    that, as you have suggested earlier -- well, I am sure

23    you didn't say it exactly this way, maybe not at all --

24    you sort of went on and did what you wanted to do anyway

25    in spite of what the Court said you couldn't do and what

1    the Court wasn't going for tolerate.

2                What I am talking about is what we discussed

3    at the April 14 conference.  That is, it was going to be

4    60 days and not seven months that you were going to be

5    allotted to identify the claims that you wanted to

6    assert in the case.

7                Let's talk about harmlessness.  That's sort

8    of where the rubber meets the road here, after all of

9    this discussion, because that's what the rule says,

10   unless failure is harmless, such failure is harmless.

11               MR. BURLEY:  Let me say, before addressing

12   that directly, Your Honor, that you are talking about

13   the failure of the plaintiff to disclose information

14   that should have been disclosed.  I think it's a little

15   different here.  What you are saying is that even if we

16   didn't have the information, we should have come to Your

17   Honor to seek Your Honor's assistance in getting the

18   information so that we would be able to make the

19   decision at an earlier time.  I take Your Honor's point.

20               THE COURT:  Let me say, to further

21   underscore, it is why I have not gone to a motions

22   practice format in terms of discovery disputes.  It is

23   exactly the reason that I continue to take my time to

24   entertain, and to permit my staff to be burdened, quite

25   frankly, with telephone calls.

# EXHIBIT 23

## FULLY REDACTED

# EXHIBIT 24

## FULLY REDACTED