## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-876-GMS |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | **REDACTED–PUBLIC VERSION** |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |

## CISCO'S ANSWERING BRIEF IN OPPOSITION TO TELCORDIA'S MOTION FOR ENTRY OF A PERMANENT INJUNCTION OR, IN THE ALTERNATIVE, FOR AN ORDER REQUIRING CISCO TO PAY A MARKET-RATE ROYALTY

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 North Market Street
Post Office Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065

Originally Filed: July 23, 2007
Redacted Version Filed: July 30, 2007

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS ............................................. 1

II.  SUMMARY OF THE ARGUMENT ............................................................... 2

III. STATEMENT OF FACTS ............................................................................ 3

IV.  THE JURY VERDICT COMPLETELY COMPENSATES TELCORDIA AND
     NO FURTHER REMEDY IS APPROPRIATE OR NECESSARY ..................... 3

     A.   The Jury Verdict Is Best Seen As Adopting The Paid-Up Damages Theory
          of Cisco's Expert................................................................................... 6

     B.   Telcordia's Argument That Cisco's Expert Presented Two Alternative
          Damages Opinions Should Not Be Credited And In Any Event Cannot
          Support Prospective Relief ................................................................... 8

          1.   Cisco's Expert Only Presented One Damages Theory To The Jury.......... 9

          2.   Telcordia's Argument Cannot Support Injunctive Relief Under
               *eBay*............................................................................................. 10

V.   TELCORDIA CANNOT MEET ANY OF THE EQUITABLE FACTORS
     REQUIRED BY THE SUPREME COURT'S *EBAY* DECISION ................... 11

     A.   Telcordia Has Not Suffered Irreparable Harm........................................ 11

          1.   There Is No Presumption Of Irreparable Harm ............................... 12

          2.   There Is No Evidence Of Irreparable Harm..................................... 13

               a.   Telcordia's Desire For More Negotiating "Leverage" Is
                    Not A Cognizable Basis To Find Irreparable Harm .................. 13

               b.   There Is No Evidence Of Market Harm...................................... 14

     B.   Money Damages Are Adequate Compensation....................................... 16

     C.   The Balance Of Hardship Weighs In Cisco's Favor Since Telcordia's
          Proposed Injunction Would Mostly Enjoin Non-infringing Activity ............... 18

          1.   The Proposed Injunction For The '633 Patent Would Mostly
               Enjoin Non-infringing Activities ........................................... 19

          2.   The Proposed Injunction For The '763 Patent Would Also Enjoin
               Non-infringing Activities...................................................... 21

     D.   The Public Interest Is Not Served By Granting Overbroad Injunctions .............. 22

VI.  TELCORDIA'S INVOLVEMENT WITH INDUSTRY STANDARDS BARS IT
     FROM OBTAINING INJUNCTIVE RELIEF ............................................. 23

     A.   Telcordia Cannot Obtain Injunctive Relief For The '633 Patent Because
          Of Its RAND Obligations ................................................................. 23

# TABLE OF CONTENTS
## (continued)

Page

    B.    Telcordia's Behavior Also Prevents It From Obtaining An Injunction For The '763 Patent .................................................................................................. 26

VII.    THE SCOPE OF THE INJUNCTION THAT TELCORDIA SEEKS IS OVERBROAD, AND ANY INJUNCTION SHOULD BE STAYED PENDING APPEAL .......................................................................................................... 27

    A.    The Scope Of The Order ............................................................................... 27

    B.    The Notice Requirement ............................................................................... 28

    C.    Timing Of The Proposed Injunction ............................................................ 28

VIII.    THERE IS NO FACTUAL OR LEGAL SUPPORT FOR TELCORDIA'S REQUEST FOR A COMPULSORY LICENSE BASED ON ITS LITIGATION-DRIVEN TERM SHEET .................................................................................. 30

    A.    Telcordia Is Not Entitled To An Ongoing Royalty Because The Jury Awarded Cisco A Paid-Up License .............................................................. 30

    B.    Any Compulsory Ongoing Royalty Should Be Based On The Royalty Awarded By The Jury .................................................................................. 30

IX.    CONCLUSION .......................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Additive Controls & Measurement Systems v. Flowdata, Inc.*
986 F.2d 476 (Fed. Cir. 1993)..............................................................................27

*Amoco Production Co. v. Village of Gambell, Alaska*
480 U.S. 531 (1987)..............................................................................................12

*Aptix Corp. v. Quickturn Design Systems, Inc.,*
269 F.3d 1369 (Fed. Cir. 2001).............................................................................22

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*
C.A. No. 04-7955, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006).......................15

*Brooktrout, Inc. v. Eicon Networks Corp.*
No. 03-59, 2007 WL 1730112 (E.D. Tex. June 14, 2007)...................................15

*Central Pennsylvania Teamsters Pension Fund v. McCormick Dray*
85 F.3d 1098 (3d Cir. 1996)..................................................................................23

*Commonwealth Scientific and Industrial Research Organization*
*v. Buffalo Technology Inc.*
No. 06-CV-324, 2007 WL 1739999 (E.D.Tex. June 15, 2007)...........................17

*ESS Tech. Inc. v PC-TEL, Inc.*
No. 3-99-20292, 1999 U.S. LEXIS 23227 (N.D.Cal. November 2, 1999).........25

*eBay Inc. v. MercExchange, L.L.C.*
126 S. Ct. 1837 (2006) .......................................................................... in passim

*Ericsson Inc. v. Samsung Electronics Co., Ltd,*
(Exhibit 11) No. 06-63 (E.D. Tex. April 20, 2007) ...........................................25

*Firestone Tire and Rubber Co. v. Pearson*
769 F.2d 1471 (10th Cir. 1985) .............................................................................5

*Foster v. American Machinery & Foundry Co.*
492 F.2d 1317 (2d Cir. 1977).................................................................................13

*Golden Blount v. Robert H. Peterson, Co.*
438 F.3d 1354 (Fed. Cir. 2006)............................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Heller Int'l. Corp. v. Sharp*
 974 F.2d 850 (7th Cir. 1992) ........................................................24, 26

*High Tech Med. Instrum., Inc. v. New Image Indus., Inc.*
 49 F.3d 1551 (Fed. Cir. 1995) ......................................................15, 16

*IMX, Inc. v. LendingTree, LLC*
 469 F. Supp. 2d 203 (D. Del. 2007) ........................................12, 14, 16

*KSM Fastening Systems v. H.A. Jones Co., Inc.*
 776 F.2d 1522 (Fed. Cir. 1985) .............................................................27

*King Instrument Corp. v. Otari, Corp.*
 814 F.2d 1560 (Fed. Cir. 1987) .............................................................21

*Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*
 846 F.2d 78, 1988 WL 24933 (Fed. Cir. 1988) ...........................4, 5, 8

*Paice LLC v. Toyota Motor Corp.*
 C.A. No. 04- 211, 2006 WL 2385139 (E.D. Tex. Aug. 16, 2006) ...............12, 14, 30

*Praxair, Inc. v. ATMI, Inc.,*
 479 F. Supp. 2d 440 (D. Del. 2007) ........................................13, 15, 18

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*
 324 U.S. 806 (1945) ..............................................................................22

*Quaker City Gear Works, Inc. v. Skil Corp.*
 747 F.2d 1446 (Fed. Cir. 1984) ...............................................................5

*Standard Havens Products, Inc. v. Gencor Industries, Inc.*
 897 F.2d 511 (Fed. Cir. 1990) ...............................................................28

*Stickle v. Heublein*
 716 F.2d 1550 (Fed. Cir. 1983) ........................................................4, 27

*Sundance, Inc. v. DeMonte Fabricating Ltd.*
 C.A. No. 02-73543, 2007 WL 37742 (E.D. Mich. Jan. 4, 2007) .................16, 17

*The Regents of the University of California v. Monsanto*
 C.A. No. 04-0634, 2005 WL 3454107 (N.D. Cal. December 16, 2005) ...............4, 8

iv

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*
  F.Supp.2d, No. 07-0246, 2007 WL 1752725, at *8 (D. Minn. June 18, 2007) .................12

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*
  750 F.2d 1552 (Fed. Cir. 1984).............................................................................2, 4, 8, 11

*Voda v. Cordis Corp.*
  C.A. No. 03-1512, 2006 WL 2570614, at *5 (W.D. Okla. Sept. 5, 2006) ............12, 15, 30

*Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*
  C.A. No. 05-0094, 2006 U.S. Dist. LEXIS 36590 (N.D. Tex. June 6, 2006)....................18

*z4 Techs, Inc. v. Microsoft Corp.*
  434 F. Supp. 2d 437 (E.D. Tex. 2006) ..................................................................12, 14, 29

Defendant Cisco Systems, Inc. submits this brief in opposition to Telcordia's motion for entry of a permanent injunction or, in the alternative, for an order requiring Cisco to pay a market rate royalty. Cisco opposes Telcordia's motion on the following bases: 1) no further relief against Cisco is appropriate because the damages awarded by the jury already includes payment of a license fee for prospective uses of the claimed invention, and thus Cisco's future sales are licensed; 2) Telcordia has not shown that it is entitled to an injunction, because it does not meet any of the factors required by *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837, 1839 (2006); 3) the relief Telcordia seeks (both the injunction and the compulsory license) is overbroad and ignores the Court's Order (D.I. 343) which stated that damages are only possible for those Cisco cards that actually contain infringing functionality; 4) injunctive relief is inappropriate in view of Telcordia's involvement in the standards-setting process, and 5) any compulsory license should be based on the reasonable royalty analysis that the jury adopted in reaching its verdict.

## I.   NATURE AND STAGE OF THE PROCEEDINGS

This Court held a jury trial on the infringement and validity of U.S. Patent Nos. RE 36,633 ("the '633 patent") and 4,835,763 ("the '763 patent") from April 30 to May 10, 2007. The jury determined that Cisco infringed both patents and that the patents are not invalid, and the Court entered judgment of infringement on May 16, 2007. *See* D.I. 348. On May 31, 2007, Cisco filed motions for a new trial and JMOL on certain targeted issues. *See* D.I. 373-376. Based on the jury's verdict, Telcordia brought a motion pursuant to 35 U.S.C. § 283 seeking an injunction, or in the alternative a compulsory license. *See* D.I. 366-368. Cisco opposes Telcordia's motion.

## II.    SUMMARY OF THE ARGUMENT

Telcordia is not entitled to an injunction because the jury has already awarded Telcordia full relief for Cisco's adjudged use of its patents. It is clear from the size of the damages award, and the trial record, that the jury adopted the damages theory of Cisco's expert, Terry Musika, which was premised on the fact that the parties would have negotiated a fully paid-up license through the expiration of the patents-in-suit. The jury's verdict, therefore, is best understood to include full compensation to Telcordia – not only for any past use of its patents, but also for any *future* use of these patents. Accordingly, no injunction can issue. *See Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1565 (Fed. Cir. 1984) ("Where the damage award is based upon an assumed license for the life of the patent, there is no need to enjoin use, since the license fee authorizes use."). Thus, upon execution of judgment, Cisco will have a license to practice the patents-in-suit for the remainder of their terms. Because Cisco will be completely licensed, no additional relief for any prospective infringement is available to Telcordia, and its motion should be denied on this basis standing alone.

Setting aside this dispositive threshold issue, Telcordia has not demonstrated that it is entitled to injunctive relief for the '633 or the '763 patents under the four-factor test set forth in *eBay*. In particular, the overbroad injunction requested by Telcordia is inconsistent with the evidence presented at trial and the Court's April 24, 2007 Order, D.I. 343, in which the Court rejected Telcordia's attempt to seek damages on a broad range of non-infringing boxes. Telcordia also fails to show any irreparable harm that it will suffer if an injunction is not granted; rather, it improperly relies on a "presumption" of irreparable harm which has been uniformly and unequivocally rejected in the cases following *eBay*. Because Telcordia has never sought to do anything other than monetize its patents, it cannot complain that money damages are insufficient, especially given its recent attempts to sell the "vast majority" of its patent portfolio. Similarly,

2

Telcordia cannot prove that any of the other *eBay* factors weigh in its favor, since its proposed injunction attempts to shut down several billion dollars of non-infringing Cisco activity based on a few million dollars of Cisco sales found to infringe. In short, Telcordia's motion is an attempt to distort its legal rights far beyond their proper scope, and cannot be sustained as a proper use of the Court's equitable power.

Telcordia is further barred from injunctive relief because of its involvement in the standards-setting process. With respect to the '633 patent, Telcordia has an acknowledged obligation to license the patent on reasonable and nondiscriminatory terms to everyone in the industry. Accordingly, it cannot obtain an injunction against Cisco since it has waived that element of its exclusive right to practice the invention. With respect to the '763 patent, Telcordia has waived its right to an injunction by promulgating and encouraging compliance with its GR-1400 standard for ten years before suing Cisco for compliance with the very same standard.

Finally, should the Court determine that an ongoing compulsory license is appropriate, it cannot be based on a "term sheet" prepared by Telcordia's litigation counsel during the course of this litigation but must rather be based on the royalty percentages the jury applied at trial.

## III.    STATEMENT OF FACTS

The pertinent facts are set forth in the argument sections, as appropriate.

## IV.    THE JURY VERDICT COMPLETELY COMPENSATES TELCORDIA AND NO FURTHER REMEDY IS APPROPRIATE OR NECESSARY

An injunction is not appropriate in this case because the jury verdict is best understood as granting Cisco a fully paid-up license that compensates Telcordia through the expiration of the patents-in-suit. The law is well-established that a verdict that represents a paid-up lump sum bars the issuance of an injunction. Indeed, controlling Federal Circuit law

unambiguously states that, "Where the damage award is based upon an assumed license for the life of the patent, there is no need to enjoin use, since the license fee authorizes use." *Trans-World*,., 750 F.2d at 1565; *see also Stickle v. Heublein* 716 F.2d 1550, 1563 (Fed. Cir. 1983) ("Upon receiving full compensation for the making and using of existing infringing fryers, appellees are not thereafter entitled to enjoin use of such fryers.").[1] As explained below, the jury verdict is best viewed as adopting the theory of Cisco's damages expert, Terry Musika, who opined that the hypothetical negotiation would have resulted in a fully paid-up license for $5 million ($6.2 million unadjusted for present value). Accordingly, pursuant to *Trans-World*, an injunction is not appropriate here because Telcordia is *already* receiving full payment for any prospective use of its patents.

The fact that the verdict form did not specify the form of the license granted does not preclude the application of *Trans-World*. The Federal Circuit has recognized that district courts may look at the facts and theories presented at trial in order to determine the bases for the jury's award and whether the award consists of a fully paid-up license. *See, e.g., Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*, 846 F.2d 78, 1988 WL 24933 (Fed. Cir. 1988) (affirming the district court's temporary denial of a permanent injunction based in part on the *possibility* that the jury's damage award was a paid up license and thus fell under the reasoning of *Trans-World*).

This Court's authority to rely on the damages award in determining whether an injunction is appropriate stems from several sources. First, the Federal Circuit has made clear

---

[1] Although not in the injunction context, a district court recently examined these cases in detail in *The Regents of the University of California v. Monsanto*, C.A. No. 04-0634, 2005 WL 3454107 at *26-28 (N.D. Cal. Dec. 16, 2005). Although the opinion in *Monsanto* does not address the injunction issue, it discusses these cases extensively and concludes that a damages theory based on a paid-up licensing fee is appropriate.

4

that "[i]njunctions and damages must be tailored to the circumstances and correlatively determined." *Stickle*, 716 F.2d at 1563. Thus, as part of determining the appropriateness of an injunction, the Court must look to the jury's damages award, including the facts and arguments on which it was based.[2] It is logical to conclude that a damages award that approximates the opinion of one expert is based on the underlying rationale of that expert's theory. *See Firestone Tire and Rubber Co. v. Pearson*, 769 F.2d 1471, 1482 (10th Cir. 1985) (the questions submitted by the jury and the amount of the damages award "indicate that the jury agreed with [defendant's] interpretation of the contract"). Finally, if the Court is unable to determine the basis for the jury award, Rule 49(a) of the Federal Rules of Civil Procedure allows the Court to make its own findings of fact necessary to support a final judgment. *See Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1452 (Fed. Cir. 1984) ("When a special verdict is sought from a jury, the appropriate procedure is for the court to accept the findings of fact explicitly made or implicit in the jury's answers and, based thereon and on such additional findings as the court may find necessary to make."). However, regardless of whether the Court applies the jury verdict directly, or makes its own findings under Rule 49(a), the analysis it must perform is the same: it must look to the evidence, theories, and arguments made at trial to determine whether or not the damage award is a fully paid-up license.[3]

---

[2] *See* CJS TRIAL § 918 ("A verdict is to be construed so as to effectuate the true intent of the jury, which may be derived from the construction of the verdict in the context of the case as a whole, including its procedural posture, issues, evidence, admissions, pleadings and papers, arguments, jury instructions, and the forms of the verdict submitted.").

[3] The Court must also look to the underlying basis for the damage award to determine the proper *scope* of any injunctive relief. As explained below in sections V(C) and VII(A), Telcordia's proposed injunctive relief goes far beyond what the evidence presented at trial will support.

### A.    The Jury Verdict Is Best Seen As Adopting The Paid-Up Damages Theory of Cisco's Expert

It is clear from the amount awarded and the theories presented at trial that the damage award is best understood as a fully paid-up license. It is indisputable that the jury rejected Telcordia's running royalty theory of damages when it awarded $6.5 million dollars (as opposed to the $75 million dollars that Telcordia sought). Therefore, the most reasonable way to understand the jury verdict is to recognize that the jury did not adopt the damages theory of Telcordia, but instead adopted the damages theory of Cisco's expert, Mr. Musika, who opined that $5 million ($6.2 million unadjusted for present value at the time of the hypothetical negotiation) was the amount of money adequate to compensate Telcordia for the asserted infringement.

There is also no dispute that Mr. Musika's presentation to the jury included payment for *both* past and future infringement of the patents-in-suit. He told the jury that: "[M]y damage period goes further than Mr. Nawrocki's, since I am doing a paid-up, [Cisco has] to pay all the way through when the patent expires." D.I. 359 at 1907:25-1908:3. It is clear from the record that the premise of Mr. Musika's damages calculation was that Cisco and Telcordia would have agreed to a fully paid-up lump sum license during the hypothetical negotiation.

Mr. Musika explained at trial that the overwhelming majority of patent license agreements entered into by Cisco were fully paid-up lump sum patent licenses. Accordingly, Mr. Musika concluded that "Cisco would, as they have done repeatedly, have looked to engage in a paid-up royalty, purchasing it, not engaging in a running royalty" at the time of the hypothetical negotiation. *Id.* at 1906:1-6. Mr. Musika also relied on the fact that Telcordia would have agreed to a fully paid-up license based on Cisco's strong preference to do so. Consistent with Mr. Musika's opinion, Mr. Giordano testified at trial that Telcordia was willing

6

to negotiate with licensees who desired a paid-up license and "come to an appropriate agreement that met both parties' needs." D.I. 352 at 315:6-25.[4,5] This is demonstrated by Telcordia's only contemporaneous license for the '763 patent (which formed the bulk of the damages at trial), which is a paid-up lump sum license for $150,000 through the expiration of the '763 patent. D.I. 355 at 1330:7:1331:21.

Based on Cisco's strong preference and Telcordia's demonstrated willingness to enter into a fully paid-up lump sum license, Mr. Musika concluded that a paid-up license was the appropriate form of a reasonable royalty, and calculated damages through the expiration of the patents, not just through trial. Thus, the damages number Mr. Musika presented to the jury for the '763 patent was calculated by applying his royalty rate to Cisco's actual accused sales for the period from September 2001 through January 2007, and his projection of Cisco's sales for the period from January 2007 through the expiration of the '763 patent in February 2008. This resulted in a total of $5.7 million, which was adjusted to its present value at the time of the hypothetical negotiation. For the '633 patent, Mr. Musika applied his methodology to Cisco's actual accused sales for the period from September 2001 through January 2007 and his

---

[4] In addition to having previously agreed to paid-up licenses, Telcordia *offered*, in the midst of trial, to license the '633 and '306 patents on a paid-up basis to a third party.

## REDACTED

[5] Telcordia's 30(b)(6) witness, Rick DePinho also testified at deposition that in some instances, Telcordia would also prefer to enter into paid-up licensing arrangements. *See* Exhibit 2 [DePinho Deposition dated May 22, 2006] at 243:2-17; 244:7-22

projection of Cisco's sales for the period from January 2007 through the expiration of the '633 patent in 2012. This resulted in a total of $550,000, which was also adjusted to its present value. Mr. Musika then calculated the total damages for both patents at $6.2 million, which when adjusted for present value considerations resulted in a reasonable royalty of $5 million.[6] *See* D.I. 359 at 1907:19-1909:13.

As explained above, in view of the size of the damage award and the trial record as a whole, the jury verdict is best seen as adopting Mr. Musika's paid-up licensing theory. Thus, pursuant to *Trans-World*, an injunction cannot issue because the damage award is a paid-up licensing fee and Telcordia is therefore already receiving full payment for any future damages. *Trans-World*, 750 F.2d at 1565. Accordingly, Telcordia's motion should be denied on this basis standing alone.

## B.    Telcordia's Argument That Cisco's Expert Presented Two Alternative Damages Opinions Should Not Be Credited And In Any Event Cannot Support Prospective Relief

Telcordia does not dispute[7] the fact that the jury adopted Mr. Musika's damages theory. Nor does Telcordia dispute the legal or factual bases for Mr. Musika's opinion.[8] Rather,

---

[6] As explained in Cisco's concurrently-filed Answering Brief In Opposition To Telcordia Technologies, Inc.'s Motion For (1) An Award Of Prejudgment Interest And (2) An Accounting Of Defendant Cisco Systems, Inc.'s Infringing Sales Sine January 31, 2007, the most reasonable way to understand the jury award is to recognize that the jury did not adjust Mr. Musika's figures to their present value at the time of the hypothetical negotiations because Telcordia will not receive the damages award in 2001, but instead in 2007.

[7] Although Telcordia did not address this topic in its opening injunction brief, it did explain its position in the parallel proceeding pending before the International Trade Commission. *See* Exhibit 3 [Telcordia ITC Summary Determination Reply Brief dated July 6, 2007] at 20-22.

[8] There can be no dispute that Mr. Musika's damages theory has a proper legal basis. *See, e.g., Trans-World*, 750 F.2d at 1565; *Lear*, 1988 WL 24933 at *2; *The Regents of the University of California*, 2005 WL 3454107 at *26-28 (rejecting argument that a paid-up lump sum reasonable royalty damages theory was inappropriate).

Telcordia argues that Mr. Musika presented *two* damages theories to the jury and it is "impossible to tell whether the jury award represents a lump-sum, paid-up license (as Cisco argues), or instead reflects the jury's acceptance of Mr. Nawrocki's and Telcordia's running royalty analysis applied to Mr. Musika's royalty base and rate." *See* Exhibit 3 [Telcordia ITC Summary Determination Reply Brief dated July 6, 2007] at 21. However, a review of the record shows that Mr. Musika only presented one damages theory to the jury, and Telcordia's argument to the contrary misrepresents what actually transpired at trial. Furthermore, if it were "impossible to tell" what the jury decided – as Telcordia contends – that uncertainty alone would provide an alternate basis for denying Telcordia's motion since it would also be "impossible" for Telcordia to meet its burden of proving irreparable harm.

### 1.    Cisco's Expert Only Presented One Damages Theory To The Jury

Contrary to Telcordia's argument, Mr. Musika presented only one damages theory to the jury: that a $5 million paid-up license (which it is reasonable conclude the jury inflated to compensate for the time value of money) was adequate to compensate Telcordia for any infringement of the '763 and '633 patents. This testimony lasted for over an hour and takes up over 40 pages of the trial transcript. *See* D.I. 359 at 1868-1910. After presenting his full opinion to the jury, including the evidence he relied upon and the methodology he used, Mr. Musika also provided a brief high-level explanation to the jury as to why there was a $65 million dollar difference between the number he calculated and the number Mr. Nawrocki calculated for the '763 patent. In particular, Mr. Musika demonstrated the effect of three incorrect premises of Mr. Nawrocki's opinion. *Id.* at 1910-1914.

Telcordia's argument that this brief presentation was an "alternative theory" that the jury could have adopted to support its conclusions (*see* Exhibit 3 at 20-22) distorts the trial record and Mr. Musika's testimony. Mr. Musika was not presenting an alternative damages

9

theory; rather, he was helping the jury to understand the *differences* between the two experts. *See e.g.*, D.I. 359 at 1911:22-24 ("So to help you understand the *difference* between Mr. Nawrocki and myself, that's 28 million of it is just the sales that he includes for that earlier period.") (emphasis added throughout, unless otherwise noted); *id.* at 1913:25-1914:4 ("So to help you understand the *difference* between Mr. Nawrocki and myself, that's 28 million of it is just the sales that he includes for that earlier period, the $21 million for the foreign sales, and the 15.75 million dollars for the *difference* in rate."). Telcordia's supplementary argument that the number Mr. Musika calculated for the '763 patent after discounting Mr. Nawrocki's incorrect assumptions is closer to the damages awarded by the jury than Mr. Musika's actual damages theory is likewise incorrect because it fails to take into account Mr. Musika's unadjusted number of $6.2 million for both the '633 and '763 patents, which also takes prejudgment interest into account.

Simply put, the jury verdict cannot be viewed in a vacuum:  it must be viewed in the context of the arguments and evidence actually presented at trial.  It is clear that Mr. Musika did not provide the jury with *two* damages theories – rather, he provided the jury with *one* damages theory and an explanation of the differences between that damages theory and the theory offered by Telcordia's expert Mr. Nawrocki.

### 2.  Telcordia's Argument Cannot Support Injunctive Relief Under *eBay*

If Telcordia were correct that it is impossible to tell whether the jury awarded a fully paid-up license or a running royalty license, then an injunction would not be equitable.  It is Telcordia, not Cisco, that must "satisfy a four-factor test before a court may grant [injunctive] relief." *eBay*, 126 S. Ct. at 1839.  If it were truly "impossible" to determine what damages approach was most likely accepted by the jury as Telcordia contends, then Telcordia cannot meet its burden to prove irreparable harm or the inadequacy of legal remedies (two of the four factors

in *eBay*) because Telcordia would be unable to establish that the jury verdict provides anything less than a complete recovery.  In other words, because Telcordia bears the burden of proof on these issues it cannot rely on confusion – real or imaginary – as a basis for obtaining the injunctive relief or compulsory license that it requests.

## V.    TELCORDIA CANNOT MEET ANY OF THE EQUITABLE FACTORS REQUIRED BY THE SUPREME COURT'S *EBAY* DECISION

As explained above, "If the damage award is based upon an assumed license for the life of the patent, there is no need to enjoin use, since the license fee authorizes use." *Trans-World*, 750 F.2d at 1565.  Thus, if the Court finds that the jury verdict represents a paid-up license, there is no need to analyze this case under the *eBay* framework.  Nevertheless, it is clear that even under the *eBay* test Telcordia cannot obtain the injunctive relief it seeks because it has not met its burden of proving that each of the following four factors weighs in its favor: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay*, 126 S.Ct. at 1839.

For the reasons set forth below, Telcordia cannot show that it meets *any* of the four factors necessary to obtain an injunction let alone all of them.

### A.    Telcordia Has Not Suffered Irreparable Harm

Apart from its legally baseless assertion that "the Court can, and should, presume irreparable harm from the jury's verdict," Telcordia offers no specific evidence supporting its contention that it has suffered irreparable harm.[9]  As Judge Robinson recently recognized,

---

[9] Telcordia has expressed concern that it will be unable to "advise potential licensees that infringement of its patents can result in a permanent injunction" if this motion is denied. *See* D.I.

"infringing one's right to exclude, alone, is insufficient to warrant injunctive relief." *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 225 (D. Del. 2007).

### 1.     There Is No Presumption Of Irreparable Harm

The law is clear that there is no presumption of irreparable harm. Rather, as the Supreme Court held in *eBay*, "a plaintiff seeking a permanent injunction . . . must demonstrate [ ] that it has suffered an irreparable injury," and injunctions must only be issued "in accordance with the traditional principles of equity." 126 S. Ct. at 1840-41. It is well-recognized that presuming that there has been irreparable harm – as Telcordia has advised the Court to do – would be "contrary to traditional equitable principles." *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 544 (1987).

Since *eBay*, district courts have uniformly and unequivocally rejected a presumption of irreparable harm as contrary to the Supreme Court's holding. *See, e.g., z4 Techs, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006) ("[Plaintiff's] suggestion, that the right to exclude creates a presumption of irreparable harm, is *not in line with the Supreme Court's holding*, which mandates that Courts balance the traditional principles of equity."); *Paice LLC v. Toyota Motor Corp.*, C.A. No. 04-211, 2006 WL 2385139, at *4 (E.D. Tex. Aug. 16, 2006) ("The *eBay* decision demonstrates that no presumption of irreparable harm should automatically follow from a finding of infringement."); *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, -- F. Supp. 2d --, No. 07-0246, 2007 WL 1752725, at *8 (D. Minn. June 18, 2007) (same). In fact, in *Voda v. Cordis Corp.*, the court found that the patent owner's argument that it was entitled to a presumption of irreparable harm ran "*afoul* of the [Supreme Court's] reasoning

---

367, Opening Brief at 3. Putting aside the relevance of Telcordia's concern, it will be adequately addressed if this motion is denied in view of the paid-up nature of the jury verdict.

in *eBay*." C.A. No. 03-1512, 2006 WL 2570614, at *5 (W.D. Okla. Sept. 5, 2006); *vacated and remanded on other grounds*, 476 F.3d 887 (Fed. Cir. 2007).

### 2.    There Is No Evidence Of Irreparable Harm

In order to meet its burden, Telcordia must prove irreparable harm with specific evidence. *See, e.g., Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440, 444 (D. Del. 2007). Telcordia has not, and indeed cannot, offer any specific evidence supporting this factor.

### a.    Telcordia's Desire For More Negotiating "Leverage" Is Not A Cognizable Basis To Find Irreparable Harm

Telcordia's argument as to why it has suffered irreparable harm is its assertion that its "ability to enforce its patents in the future" will be "significantly hampered" without the "additional leverage" of an injunction. D.I. 367, Opening Brief at 2-5; *see also id.* at 5 ("There is no question that an injunction entered against Cisco will provide Telcordia additional leverage in licensing its technology, leverage to which it is legally entitled because the jury found that Cisco's products infringe the patents-in-suit and which is not available simply through the jury's award of past damages.") Under this logic, virtually every patent owner would be entitled to an injunction, because the threat of an injunction will almost always provide additional leverage when negotiating a patent license. This, of course, is directly contrary to the Supreme Court's mandate in *eBay* that an injunction is not automatic in a patent case but rather must "rest[ ] with the equitable discretion of the district court." 126 S. Ct. at 184. In fact, Justice Kennedy recognized in his concurring opinion in *eBay* that "an injunction may not serve the public interest" where "the threat of an injunction is employed simply for *undue leverage* in negotiations." *Id.* at 1842 (Kennedy, J., concurring).

It is well established that an injunction "is not intended to be wielded by a patentee to enhance his negotiating stance." *Foster v. American Machinery & Foundry Co.*, 492

F.2d 1317, 1324 (2d Cir. 1977). Telcordia's argument that it will suffer irreparable harm without

the additional leverage of an injunction has already been rejected, including by Judge Robinson.

In *IMX*, the court found "no indication in the record that defendant's infringement affected

plaintiff's ability to license" its patent. 469 F. Supp. 2d at 225. Similarly, in *Paice*, the court

found that the plaintiff did not demonstrate "why other potential licensees would be less likely to

take a license if this case ends with monetary damages instead of equitable relief." 2006 WL

2385139, at *5.

Moreover, Telcordia's repeated assertions that its "lifeblood" is its ability to

license and enforce its intellectual property are misleading. *See, e.g.*, D.I. 367, Opening Brief at

2, 5. Telcordia earns roughly

REDACTED

*See* Exhibit 4 [Giordano Deposition dated July 19, 2007] at 696:23-697:8;

699:2-9. In contrast, absent a major litigation settlement, Telcordia earns no more than

million dollars a year from royalty-based *patent* licensing for *all* of its patents (not just the

patents-in-suit). *See id.* at 704:24-706:3. In any event, even if licensing were an important part

of Telcordia's business in the past, the acting general counsel for Telcordia, Joseph Giordano,

admitted at a March 2006 deposition that Telcordia was trying

REDACTED Exhibit

5 [ITC Giordano Deposition dated March 16, 2007] at 494:17-21; 517:25-518:6.[10]

**b.    There Is No Evidence Of Market Harm**

Since *eBay*, district courts have largely been unwilling to grant injunctions unless

the patent owner (or a closely-related company) is practicing the claimed invention and

---

[10] Telcordia has also recently

REDACTED

14

demonstrates a market harm such as loss of profits, market share, brand name recognition, and/or goodwill relating to product sales. *See, e.g., z4 Techs*, 434 F. Supp. at 440 ("[L]ost profits, the loss of brand name recognition or the loss of market share . . . are the type of injuries that are often incalculable and irreparable."); *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, C.A. No. 04-7955, 2006 WL 3446144, at *4 (N.D. Ill. Nov. 29, 2006) ("Loss of market share is a key consideration in determining whether a plaintiff has suffered irreparable harm."); *see also High Tech Med. Instrum., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) ("Although a patentee's failure to practice an invention does not necessarily defeat the patentee's claim of irreparable harm, the lack of commercial activity by the patentee is a *significant factor* in the calculus."); *Brooktrout, Inc. v. Eicon Networks Corp.*, No. 03-59, 2007 WL 1730112, at *1 (E.D. Tex. June 14, 2007) (finding that parties were competitors for the infringing technology "weigh[ed] heavily" in finding irreparable harm). Even where the patent owner practices the claimed invention in direct competition with the party whose sales it is seeking to enjoin, the patent owner must demonstrate "precisely what market share, revenues, and customers" the patent owner contends it has lost. *Praxair*, 479 F. Supp. 2d at 444.

As an admitted non-practicing patent owner, Telcordia cannot show any of the market harm factors courts have relied on to find irreparable harm. Nor has it offered sufficient proof of any harm. Moreover, there is no factual or legal support for Telcordia's attempt to rely on the market activities of licensees, including former non-practicing licensees and speculative unidentified future licensees. *See* D.I. 367, Opening Brief at 3. Indeed, Telcordia does not identify a single licensee that would be harmed by awarding a compulsory license rather than an injunction. Even if Telcordia were able to offer specific evidence of market harm suffered by a specific licensee as a result of Cisco's activities, market harm by a non-party licensee would not

suffice to entitle Telcordia to an injunction. *See, e.g., Voda*, 2006 WL 2570614, at *5 (finding alleged market harm to a non-party "irrelevant because . . . the person seeking a permanent injunction must demonstrate harm from infringement of those rights that is personal"). This is especially true given the imminent expiration of the '763 patent on February 4, 2008, which Telcordia asserts "covers most of the infringing products."[11] *See* D.I. 367, Opening Brief at 4.

### B. Money Damages Are Adequate Compensation

Money damages are adequate here because Telcordia has never tried to do *anything* other than license its patents for money. Mr. Giordano testified at trial that, "As far as I have been part of Telcordia, I have never seen an instance where we haven't been willing to license somebody similarly situated in the industry at any time." D.I. 352 at 277-78. A willingness to license weighs strongly in favor of a finding that money damages are adequate. *High Tech Med.*, 49 F.3d at 1557 ("[T]he evidence shows that HTMI offered a license to New Image, so it is clear that HTMI is willing to forgo its patent rights for compensation. That evidence suggests that any injury suffered by HTMI would be compensable in damages assessed as part of the final judgment in the case.").[12]

---

[11]    There is no legal support for Telcordia's assertion that the imminent expiration of the '763 patent weighs in favor of granting an injunction. *See* D.I. 367, Opening Brief at 4. Rather, as discussed below in Section V(C), the imminent expiration clearly tips the balance of hardships in Cisco's favor, especially considering Telcordia's almost six-year delay in asserting the '763 patent against Cisco. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, C.A. No. 02-73543, 2007 WL 37742 at *2 (E.D. Mich. Jan. 4, 2007) (considering patent owner's "delay in filing suit and seeking injunctive relief" in finding no irreparable harm).

[12] There is no legal support for Telcordia's assertion that a "reputation for enforcing one's patents" supports a finding of irreparable harm. D.I. 367, Opening Brief at 5. To support its assertion, Telcordia misapplies this Court's finding in *Fisher-Price, Inc. v. Safety 1st, Inc.* This Court did not grant an injunction based on the patent owner's reputation for enforcing its patents through a licensing program, as Telcordia asserts, but rather based on the *loss in market share* of the patent owner's products resulting from its marketplace reputation for enforcing patents associated with such products. 279 F. Supp. 2d 526, 528 (D. Del. 2003). Also notable is that the Court's decision in *Fisher-Price* predates the Supreme Court's decision in *eBay*, and therefore

16

In *IMX*, Judge Robinson found that the patent owner's licensing activities suggested that its injury "would be compensable in damages" because "licensing is incompatible with the emphasis on the right to exclude." 469 F. Supp. 2d 225 n.24 (relying on *High Tech Med.*). This is especially true here given Telcordia's repeated attempts to license the '633 and '763 patents *to Cisco* prior to filing this lawsuit. *See, e.g., Sundance, Inc. v. DeMonte Fabricating Ltd.*, C.A. No. 02-73543, 2007 WL 37742 at *2 (E.D. Mich. Jan. 4, 2007) (finding money damages to be an adequate remedy where plaintiff offered to license the patent-in-suit to the defendant prior to the lawsuit); *Paice*, 2006 WL 2385139, at *5 (finding the plaintiff's licensing offers to the defendants "further demonstrates the adequacy of monetary relief from Plaintiff's point of view").

The district court for the Eastern District of Texas's analysis in *Commonwealth Scientific and Industrial Research Organisation ("CSIRO") v. Buffalo Technology Inc.* is not applicable here because Telcordia does not even attempt to argue that it has suffered lost research opportunities because of Cisco's failure to license its '633 and '763 patents.[13] No. 06-CV-324, 2007 WL 1739999, at *4-6, (E.D. Tex. June 15, 2007). In *CSIRO*, the court did not award an injunction to provide the patent owner with "additional leverage" over potential future licensees as Telcordia claims it is entitled to here, but rather because the court found that the patent owner had demonstrated lost research opportunities resulting from the infringement. Not only has Telcordia not offered any evidence -- or even argued -- that it lost any research

---

relied, in part, on the old "general rule that an injunction will issue when infringement has been adjudged." 279 F. Supp. 2d at 528.

[13]    In contrast to Telcordia, the court in *CSIRO* described the patent owner as the Australian version of the U.S. National Science Foundation and National Institute of Health with a "broad charter to advance health, prosperity, and welfare . . . to benefit Australia and people everywhere." *Id.* at *1.

opportunities as a result of this litigation, but the Eastern District of Texas's finding that lost research opportunities could not be compensated with money damages is also contrary to Judge Robinson's decision in *Praxair. See* 479 F. Supp. 2d at 444 n.6 ("Praxair does not explain why money damages could not suffice to compensate for any lost 'opportunities' to conduct research due to budget constraints.").

Even where the patent owner practices the claimed invention and is seeking to enjoin a direct competitor, courts have found that the patent owner must prove that money damages are inadequate with specific evidence. In *Praxair*, for example, Judge Robinson denied the patent owner's motion for an injunction because the patent owner had failed to meet its burden of identifying "specific reasons" why it could not be compensated for the infringement with money damages. 479 F. Supp. 2d at 444. In particular, the court found that the patent owner had not explained "why it may have 'difficulties calculating damages going forward,' nor how money damages could not adequately compensate for 'lost market share' or any 'lost research opportunities.'" *Id.*

In short, money damages in the form of a reasonable royalty are adequate to compensate Telcordia because money damages provide the same and only relief Telcordia has sought, and continues to seek, outside the courthouse, including from Cisco. *See, e.g., Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, C.A. No. 05-0094, 2006 U.S. Dist. LEXIS 36590, at *13 (N.D. Tex. June 6, 2006) ("Wireless can recover through damages what it seeks from its licensing efforts – royalties from a non-exclusive license").

### C. The Balance Of Hardship Weighs In Cisco's Favor Since Telcordia's Proposed Injunction Would Mostly Enjoin Non-Infringing Activity

As shown below, Telcordia's proposed request seeks to enjoin an incredibly broad range of non-infringing Cisco conduct. In *Praxair*, Judge Robinson recognized that the proof

required to satisfy the *eBay* factors relates directly to the scope of the injunction requested. 479 F. Supp. 2d at 443. Here, the injunction requested by Telcordia would impose a serious and unfair burden on Cisco by enjoining conduct of far greater scope and magnitude than justified by any interest in protecting Telcordia's patent rights or the jury's verdict. Consequently the balance of hardships weighs sharply against this injunction.[14]

### 1. The Proposed Injunction For The '633 Patent Would Mostly Enjoin Non-Infringing Activities

Telcordia's proposed injunction is an attempt to revive the overbroad infringement theory that the Court rejected in its April 24, 2007 Order. D.I. 343. Telcordia's rejected theory for the '633 patent included several *billion* dollars of Cisco sales of non-infringing boxes and cards in its damages base.[15] *See* Exhibit 7 [Schedule 3 to Nawrocki Report dated June 28, 2006]. As explained in the Court's Order, Telcordia sought damages on over 200,000 Cisco boxes, even though Cisco had only sold 3000 accused SRTS cards over the relevant time period. D.I. 343 at 3. Telcordia argued that these indisputably non-infringing boxes were included in the damages base because they were electrically and mechanically

---

[14] Telcordia's attempt to show that the balance of hardships weighs in its favor is contradictory. In one breath, Telcordia argues that "the systems that infringe Telcordia's patents have fallen from favor and are not currently much in use," and in the next, it argues that it will be harmed because Cisco will be "taking Telcordia's intellectual property without paying for it." *See* D.I. 367, Opening Brief at 6 (citations omitted). Only one of these can be true, and here, the record confirms that it is the former.
Moreover, Telcordia's argument ignores what will happen if its motion is denied. Because the damage award is a paid-up license, Telcordia will be fully compensated upon execution of final judgment. If a compulsory license is nevertheless granted, Cisco will provide further compensation to Telcordia. Either way, Telcordia will be compensated for its rights and cannot be heard to complain.

[15] Telcordia attempts to minimize the potential injunction burden to Cisco because of an alleged "gambl[e] on whether or not Telcordia would enforce its rights and the outcome of this litigation." *See* D.I. 367, Opening Brief at 7. However, it was Telcordia who gambled that the '306, '633, and '763 patents were worth hundreds of millions or perhaps billions of dollars, only to learn that they were worth at most a tiny fraction of that amount.

compatible with the few *million* dollars of independently manufactured and invoiced cards capable of performing the accused SRTS functionality.[16] *Id.* at 3-4; *see also* Exhibit 8 [Schedule 3C to Nawrocki Report dated April 20, 2007]. Thus, even though 197,000 (i.e. approximately 98 percent) of Telcordia's desired royalty base was incapable of direct infringement, Telcordia nevertheless included these boxes in its damages base. *Id.* The Court rejected Telcordia's argument, finding that the boxes were "incapable themselves of performing the function that infringes the '633 patent." *See* D.I. 343 at 5. Relying on *Golden Blount v. Robert H. Peterson, Co.*, 438 F.3d 1354 (Fed. Cir. 2006), the Court agreed with Cisco and barred Telcordia from pursuing this damages theory. *See* D.I. 343 at 5 ("[T]he court concludes that Telcordia can recover damages only for SRTS-capable cards sold by the defendants, and not for the total number of boxes the defendants sold.").

Notwithstanding this Court's Order, Telcordia nevertheless seeks a broad injunction against all Cisco boxes, even where an SRTS-capable card is not installed. *See* Exhibit 9 [Giordano Deposition dated July 20, 2007] at 752:24-753:10. Telcordia's proposed injunction approaches this issue as if the Court's Order had never issued – it seeks to bar essentially all Cisco activities relating to eight entire product lines, each of which consists of hundreds (if not thousands) of non-infringing elements (chasses, boards, power supplies,

---

[16] This is another situation where it is necessary to look to the evidence and arguments presented to the jury to understand the significance of the damage award. It is clear from the size of the damages award that the jury agreed with Mr. Musika that the proper damages base for the '633 patent was Cisco's accused SRTS cards. Both parties' experts agreed that less than 10 percent of the damages in this case fell under the '633 patent. *See* D.I. 359 at 1907:19-1909:13. In particular, Mr. Nawrocki opined that if damages were based on both the box and the card level, Telcordia was entitled to $4.7 million. Exhibit 8 [Schedule 3C to Nawrocki Report dated April 20, 2007] Because $4.7 million dollars is far more than 10 percent of the jury award of $6.5 million dollars, it is clear that the card level view of damages carried the day and that damages were not based at the box level.

software, etc.).[17]  *See* D.I. 367, Opening Brief at Exhibit 1 (proposed order).  In view of the

indisputably non-infringing character of the vast majority of these products and the fact that the

Court excluded them from Telcordia's damages theory, it is clear that the balance of hardships

weighs heavily against granting this injunction.

### 2. The Proposed Injunction For The '763 Patent Would Also Enjoin Non-Infringing Activities

Telcordia's proposed injunction with respect to the '763 patent also imposes

serious burdens that go well beyond the scope of Telcordia's patent rights.  At trial, Telcordia's

expert conceded that Cisco's products must be configured in a very specific way in order to fall

within the scope of Telcordia's infringement allegations.  *See* D.I. 354 at 1104:22-1105:22

("[B]y conforming to the GR-1400 wouldn't necessarily mean that something infringed.").

Cisco's expert explained that Cisco's customers must arrange Cisco's products in a counter-

rotating ring configuration and choose to path protect each connection in the ring to satisfy

Telcordia's infringement contentions.  D.I. 359 at 1795:15-1796:8.  There is no dispute that

Cisco's products do not infringe the '763 patent when they are not configured in this way,

including when they are configured in a so-called BLSR ring.  *See* D.I. 354 at 1116:5-6 ("[T]his

is referring to bidirectional line switch rings, BLSR, which would not infringe on the '763.").[18]

---

[17] Telcordia's proposed injunction would also prohibit "providing maintenance or customer support" on the products found to infringe.  Even Telcordia (who believes Cisco does not have a paid-up license) must accept the fact that the verdict will, at a minimum, result in a license to Cisco for prior sales under the patents-in-suit, allowing Cisco to continue customer service and repair operations.  *See King Instrument Corp. v. Otari, Corp.*, 814 F.2d 1560 (Fed. Cir. 1987).

[18] *See also* D.I. 354 at 1108:8-1109:9; DTX-2675 (document that this testimony describes).  This exhibit and testimony shows a potential configuration that has main traffic going over the shortest route (the route through nodes B and G).  It also has a protection path through nodes B, A, and I.  Dr. Prucnal's testimony shows that this is not a counter-rotational ring configuration because the protection path goes through nodes B, A, and I regardless of whether traffic is going from node C to J or node J to C.  Similarly, the preferred route always goes through nodes B and

Thus Telcordia's proposed injunction for the '763 patent also seeks to preclude a broad range of non-infringing conduct. Telcordia, however does not address this issue or attempt to justify its overbroad proposal based on any harm that it might suffer if an injunction does not issue. Given the many non-infringing ways in which Cisco's products can be used that Telcordia's proposed injunction would prevent, it is clear that this factor cannot weigh in Telcordia's favor either.

**D.     The Public Interest Is Not Served By Granting Overbroad Injunctions**

The overbreadth of Telcordia's proposed injunction also takes it well beyond any public interest. "[A] patent is an exception to the general rule against monopolies and to the right to access to a free and open market." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 816 (1945). "The far-reaching social and economic consequences of a patent . . . give the public a paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope." *Id.* (as quoted by Chief Judge Mayer in dissent in *Aptix Corp. v. Quickturn Design Systems, Inc.,* 269 F.3d 1369, 1381 (Fed. Cir. 2001)).

For the reasons explained above in section V(C) regarding balance of hardships, Telcordia's proposed injunction goes far beyond the legitimate scope of its patent rights because it would enjoin a wide range of non-infringing Cisco conduct. An injunction would work a particularly egregious harm to the public interest where, as here, the U.S. public has paid billions of dollars for these products and relies on them to run their businesses. As a result, the proposed injunction would impose a substantial burden on the public's interest in "a free and open market," a burden which is unjustified in view of the narrow scope of Telcordia's patent rights. Telcordia itself acknowledges the limited scope of its patents when it relies on the trial testimony

---

G, regardless of the direction of traffic. In the counter-rotational ring configuration required by the patent, traffic from C to J would be routed in a different direction than traffic from J to C.

of Cisco's witnesses who stated that "the infringing features are *unnecessary options*." *See* D.I. 367, Opening Brief at 7.

Accordingly, shutting down a dozen Cisco product lines made up almost entirely of non-infringing boxes and cards harms the public because it takes these non-infringing devices out of the marketplace, thus limiting consumer choice and potentially raising prices on non-infringing goods. Telcordia's request for an injunction is a naked play to extract an advantageous settlement, which would lead to the same result – limited availability and/or higher prices on non-infringing goods. This burden on consumers and on non-infringing goods is clearly against the public interest, and thus this factor – like the other three *eBay* factors – weighs in Cisco's favor, not Telcordia's.

## VI.    TELCORDIA'S INVOLVEMENT WITH INDUSTRY STANDARDS BARS IT FROM OBTAINING INJUNCTIVE RELIEF

For the reasons stated below, Telcordia has waived its right to injunctive relief under the patent-in-suit.

### A.    Telcordia Cannot Obtain Injunctive Relief For The '633 Patent Because Of Its RAND Obligations

Telcordia voluntarily and intentionally relinquished its right to exclude others from practicing the '633 patent when it expressly declared that it would grant to everyone a license under the '633 patent on reasonable and nondiscriminatory terms ("RAND"). Telcordia's undisputed RAND obligation is yet another reason – independent of the paid-up license and *eBay* bases described above – that Telcordia's motion for an injunction under the '633 patent must be denied.

Waiver is simply "the intentional relinquishment of a known right." *Central Pennsylvania Teamsters Pension Fund v. McCormick Dray*, 85 F.3d 1098 (3d Cir. 1996). Waiver can be either express or implied and neither requires reliance by the party asserting or

23

claiming the waiver. *See, e.g.*, Richard A. Lord, *Williston on Contracts* § 39:28 at 624 (4th ed. 1990) (stating that waiver implied from a party's conduct is "dependent solely on what the party charged with waiver intends to do, and there is no need to show reliance by the party asserting or claiming the waiver."). "An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention." *Heller Int'l. Corp. v. Sharp*, 974 F.2d 850, 862 (7th Cir. 1992) (citations omitted).

Here, Telcordia voluntarily and intentionally relinquished its right to exclude others from practicing the '633 patent when it expressly declared that it would grant to everyone a license under the '633 patent on reasonable and nondiscriminatory terms. Telcordia's declarations were unequivocal: "Bellcore is willing to make nonexclusive licenses available under reasonable and non-discriminatory terms and conditions."[19] PTX 1231 [2/17/95 Bellcore letter to ANSI regarding '978 patent]; PTX-1232 [2/17/95 Bellcore letter to ITU regarding '978 patent]; *see also* D.I. 352 at 316:9-317:24. This language is nothing less than an express waiver of Telcordia's right to exclude because once a patentee commits to licensing its patent on certain terms, it has given up its right to exclude.[20]

---

[19] Much of the ongoing dispute involving the '633 patent relates to Telcordia's persistent failure to make a license available to Cisco on RAND terms. For example, until the Court's April 24, 2007 *in limine* ruling (D.I. 347), Telcordia sought damages based on entire Cisco product lines rather than the narrow subset of products that were actually alleged to infringe. As explained herein, Telcordia's current motion perpetuates this fallacy by once again pursuing relief based on entire Cisco product lines without regard to the presence or absence of infringing features.

[20] Further underscoring the conclusion that the right to exclude is waived in these circumstances is that once a patent-holder makes a commitment to grant licenses, as Telcordia repeatedly did, a willing licensee may be able to compel specific performance of the patent-holder to grant a license on reasonable and nondiscriminatory terms. *See, e.g, ESS Tech. Inc. v PC-TEL, Inc.*, No. 3-99-20292, 1999 U.S. LEXIS 23227 (N.D.Cal. November 2, 1999) (denying motion to dismiss a claim for specific performance of an agreement between a patent holder and the ITU to license the patent holder's standards-essential patents under reasonable and nondiscriminatory terms);

That the language in Telcordia's letters to the standards bodies constitutes a waiver of Telcordia's right to exclude is not surprising, because one of the very reasons for requiring parties with standards-essential patents to commit to granting licenses under specified terms is to prevent the patent holder from holding an entire industry hostage with its standards-essential patent by refusing to license the patent. Getting a patent included in an ANSI, ITU or ATM Forum standard (and most other standards) is a *quid pro quo*. In exchange for adoption of a standard requiring the use of someone's patent, the patentee promises to make that patent available for licensing on reasonable and non-discriminatory terms. This promise by the patent holder is critical because were it otherwise a patentee would have not only a government sanctioned monopoly on the standardized technology, but also a captive industry at its mercy for merely complying with the standard. Such a result would be directly at odds with the purposes of standards themselves, including, *inter alia*, the creation of widespread and essentially unrestricted adoption of interoperable technology.

Thus, even though the parties dispute what would constitute reasonable and nondiscriminatory terms, it is evident that the RAND obligation prevents Telcordia from excluding anyone from practicing the '633 patent.

### B. Telcordia's Behavior Also Prevents It From Obtaining An Injunction For The '763 Patent

For similar reasons, Telcordia's involvement in Telcordia Generic Requirement 1400 ("GR-1400") is inconsistent with an injunction. Generic Requirements are standards set by Telcordia that must be followed by Cisco and others equipment makers because major carriers such as AT&T and Verizon (*i.e.*, the Regional Bell Operating Companies ("RBOCs")) require it.

---

*Ericsson Inc. v. Samsung Electronics Co., Ltd*, No. 06-63 (E.D. Tex. April 20, 2007) (allowing contract claim relating to RAND obligation to proceed to trial) (Exhibit 11).

See D.I. 352 at 205:10-21. By developing and encouraging the use of GR-1400 (the practice of which it argued at trial results in infringement of the '763 patent) Telcordia has essentially waived its exclusive right to make, use, or sell products embodying the '763 patent.

It is undisputed that Telcordia developed and published GR-1400 in 1994. Subsequently, (in the late 1990s) Cisco and others started to build GR-1400 compliant equipment. Cisco relied on Telcordia to certify its equipment for compliance with a number of standards, including GR-1400, and paid Telcordia a substantial amount of money for its services. However, Telcordia did not provide any notice to Cisco of the '763 patent until September 2001. See PTX-456 [9/7/01 Letter from J. Giordano to D. Scheinman].

As noted, Telcordia's infringement theory and licensing strategy for the '763 patent are based on GR-1400, the very same standard which it promulgated to the industry. By doing so, Telcordia encouraged the development of the very same GR-1400-compliant Cisco equipment that it now seeks to enjoin. In short, by not simply condoning, but actively encouraging Cisco and others to develop GR-1400 compliant equipment, Telcordia cannot now be heard to urge an injunction against the same equipment, because it is evident that Telcordia has engaged in "a course of conduct as to sufficiently evidence an intention to waive a right." *See Heller*, 974 F.2d at 862.

## VII. THE SCOPE OF THE INJUNCTION THAT TELCORDIA SEEKS IS OVERBROAD, AND ANY INJUNCTION SHOULD BE STAYED PENDING APPEAL

Not only is Telcordia not entitled to injunctive relief, but the proposed relief it seeks is grossly overbroad and overreaching, and is clearly an attempt to gain "leverage" over Cisco (and potential future licensees), rather than a legitimate attempt to preserve any patent rights.

26

**A.     The Scope Of The Order**

Despite the clear overbreadth of its proposed order, Telcordia has told the Court that the injunction is "narrowly crafted to enjoin only products litigated and products not colorably different therefrom." *See* D.I. 367, Opening Brief at 8. Cisco agrees with Telcordia that, in principle, injunctions should be "narrowly crafted" to cover as little non-infringing activity as possible. *See, e.g., Additive Controls & Measurement Systems v. Flowdata, Inc.*, 986 F.2d 476, 479 (Fed. Cir. 1993); *KSM Fastening Systems v. H.A. Jones Co., Inc*, 776 F.2d 1522 (Fed. Cir. 1985). Despite Telcordia's lip service to this principle, however, the injunction Telcordia seeks clearly fails this test because it would cover a wide range of non-infringing activity. For the reasons explained above in section V(C), Telcordia's injunction fails to acknowledge that the Court has rejected its preferred damages theory that included the wide range of Cisco boxes that are not capable of performing SRTS functionality. This is improper, because as noted above, "Injunctions and damages must be tailored to the circumstances and correlatively determined." *Stickle*, 716 F.2d at 1563. Furthermore, Telcordia's proposed injunction for the '763 patent does not account for the admitted wide variety of non-infringing uses of Cisco's products. Accordingly, Telcordia's proposed injunction must be rejected.

**B.     The Notice Requirement**

Cisco has over 50,000 employees in the United States, and thousands of other business partners and attorneys. Most of these persons do not have responsibility for or interact with the products accused of infringement in this lawsuit. Yet Telcordia's proposed injunction would require Cisco to provide a copy of any injunction order to all of these people in less than three weeks time. Prompt and full compliance with any injunction which the Court issues could be accomplished much more efficiently and in a less burdensome way by placing notices on Cisco's external and internal websites, providing notice to the relevant manufacturers, and by

27

making any enjoined products unavailable through Cisco's sales channels. Furthermore, Cisco could include a notice with its products that the unlicensed use of the accused SRTS and UPSR functionalities falls under the scope of Telcordia's patent and is prohibited. This would alleviate the needless administrative burden of distributing the proposed Order to tens of thousands of persons and businesses in a compressed period of time.

### C.    Timing Of The Proposed Injunction

Any injunction should be stayed pending the outcome of an appeal. The following criteria apply to the stay of an injunction under Rule 62(c): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511 (Fed. Cir. 1990). Courts apply these criteria by assessing the possibility of success on the merits and the irreparable harm caused by an improvidently granted injunction on a sliding scale to determine whether a stay is proper. *Id.*

Application of these factors to the issues presented in this litigation shows that a stay pending resolution on appeal of any injunctive relief would clearly be appropriate. As outlined in full in Cisco's brief supporting its motion for judgment as a matter of law (D.I. 376), Cisco has presented strong and unrebutted evidence that the '633 patent is invalid (either on obviousness or inventorship grounds), and that the '763 patent is not infringed and is invalid for indefiniteness.

The other factors similarly weigh in favor of a stay. As explained above, Telcordia's proposed injunction is overbroad, and covers a wide range of non-infringing devices and activities. Granting the proposed injunction would thus place a substantial burden on Cisco.

On the other hand, as demonstrated above in section V(B), Telcordia's interest in this lawsuit is purely monetary because money damage are adequate to compensate Telcordia. There is no dispute that Cisco is capable of posting an adequate bond that will compensate Telcordia if it ultimately prevails on appeal. Thus, the true burden on Telcordia if an injunction is stayed is minimal.

Finally, the public interest is minimally impacted by this case. The imminent expiration of the '763 patent is purely of Telcordia's own making. Telcordia did not even assert the '763 patent in this lawsuit until 2005 – less than three years before the expiration date and almost six years after Cisco started to sell the accused products. Indeed, except for the joinder of Telcordia's '763 claims with the preexisting lawsuit on the '633 and '306 patents, the court's procedural schedule would likely have delayed trial until well past the patent's expiration date. The public does not have a strong interest in protecting those who sit on their rights for years while encouraging others (such as Cisco) to adopt technology they believe to be patented.

## VIII. THERE IS NO FACTUAL OR LEGAL SUPPORT FOR TELCORDIA'S REQUEST FOR A COMPULSORY LICENSE BASED ON ITS LITIGATION-DRIVEN TERM SHEET

### A. Telcordia Is Not Entitled To An Ongoing Royalty Because The Jury Awarded Cisco A Paid-Up License

As explained above in section IV, an ongoing royalty is not appropriate in this case because the jury adopted Cisco's damages theory, which awarded Telcordia a lump sum payment for any infringement through the expiration of the patents-in-suit. Because the jury awarded Cisco a license that is paid-up through patent expiration, Telcordia is not entitled to any ongoing royalty payments.

**B.    Any Compulsory Ongoing Royalty Should Be Based On The Royalty Awarded By The Jury**

If a compulsory ongoing royalty is appropriate, it should be based on the royalty percentage the jury applied at trial. Significantly, Telcordia cites no authority supporting its request that the Court ignore the royalty determined by the jury at trial in setting a compulsory license. Rather, the law is clear that the terms of an ongoing compulsory license are based on the rate established though trial. *See, e.g., z4 Techs*, 434 F. Supp. at 442 ("Calculating the appropriate royalty rate for any future infringement . . . can be made based on the same reasonable royalty calculation used by the jury at trial."); *Paice*, 2006 U.S. Dist. Lexis 61600, at *7-8, 20 (awarding a compulsory royalty of $25 per vehicle where "the jury's verdict award[ed] reasonable royalty damages of only $25 per vehicle"). In *Voda*, the court rejected the patent owner's request to create a separate action for post-verdict money damages, finding that "there would be no issues for decision except simple mathematical calculations based on defendant's sales." 2006 WL 2570614, at *6.

The same is true here. While the parties dispute whether the jury's award represents a license that is paid-up through expiration or a running royalty applied to past sales, the parties *agree* that the jury applied Cisco's expert's royalty rate of 0.5 percent for the '763 patent and 1 percent for the '633 patent. *See* Exhibit 3 [Telcordia's ITC Reply Brief in Support of its Motion for Summary Determination] at 21; D.I. 359 at 1907-1909. The parties also agree that the jury used Cisco's expert's royalty base to determine its damages award. Exhibit 3 [Telcordia's ITC Reply Brief in Support of its Motion for Summary Determination] at 21; D.I. 359 at 1907-1909. As a result, any compulsory license should be calculated by applying a 0.5 percent royalty rate to Cisco's post-verdict U.S. sales of its ONS products accused of infringing

30

the '763 patent and a 1 percent royalty rate to Cisco's post-verdict U.S. sales of its boards (or

cards) capable of performing the SRTS functionality accused of infringing the '633 patent.[21]

There is no legal support for Telcordia's request for a so-called "market rate"

royalty. D.I. 367, Opening Brief at 11. Nor is there any factual support for Telcordia's

assertions that the "market rate" for the '763 patent is a        REDACTED        and the "market rate"

for the '633 patent is a    REDACTED    during the life of the '763 patent (i.e., the wrong

patent). These rates are even higher than the rates on which Telcordia's expert based his

opinion. Exhibit 8 [Schedules 3-3A to Nawrocki Report dated April 20, 2007]. It is clear from

Mr. Giordano's declaration that these "market rate" royalties are based on a Telcordia "Term

Sheet"        REDACTED

action. See D.I. 368 [Giordano Declaration] at ¶ 4 and Exhibit 1; Exhibit 10 [Telcordia ITC

Interrogatory Responses] at 2.

IX.    CONCLUSION

For the foregoing reasons, Cisco requests that the Court deny Telcordia's motion.

---

[21] Cisco's damages expert, Mr. Musika, based his opinion on Cisco's U.S. sales of its ONS products accused of infringing the '763 patent and on Cisco's U.S. sales of its boards capable of performing the SRTS functionality accused of infringing the '633 patent. D.I. 359 at 1907-1909.

[22] See Exhibit 10 [Telcordia Supplemental Response to Cisco ITC Interrogatory No. 35]

31

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Leslie A. Polizoti (#4299)*
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 North Market Street
Post Office Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, California  94065

July 23, 2007
980774

32

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to Steven J. Balick and John G. Day.

I further certify that I caused copies of the foregoing document to be served on July 30, 2007 upon the following in the manner indicated:

**BY ELECTRONIC MAIL**

John Day (jday@ashby-geddes.com)
Steven J. Balick (sbalick@ashby-geddes.com)
John Williamson (john.williamson@finnegan.com)
York Faulkner (york.faulkner@finnegan.com)
Don Burley (don.burley@finnegan.com)

*/s/ Leslie A. Polizoti*
_____
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
lpolizoti@mnat.com