# EXHIBIT 1

Sonal Mehta/SV/WGM/US

04/13/2007 04:56 PM

To John.Williamson@finnegan.com

cc Sasha.Mayergoyz@lw.com

Subject RE: Telcordia v. Cisco/Lucent Link

John,

We disagree with your position that the pretrial statement cannot be modified to address Mr. Gurey's passing. The argument that your hands are tied procedurally from making such an addition to the statement of undisputed facts because "there is no procedural mechanism for such a modification," is at odds with our concerted effort to build an increased spirit of cooperation.

Telcordia apparently intends to rely at trial on testimony relating to Mr. Gurey's role in the prosecution of the patents-in-suit. See, e.g., Telcordia's deposition designations for Messrs. Falk and Fleischer. The jury is entitled to know why Mr. Gurey is not at trial to present his testimony in response. Given your refusal to acknowledge his death through a neutral undisputed statement of fact, we will raise this issue with Judge Sleet.

Regards,
Sonal N. Mehta
Weil Gotshal & Manges
201 Redwood Shores Pkwy
Redwood Shores, CA 94065
t: (650) 802-3118
f: (650) 802-3100
sonal.mehta@weil.com

"Williamson, John" <John.Williamson@finnegan.com>

04/12/2007 08:52 PM

To <Sonal.Mehta@weil.com>

cc <Sasha.Mayergoyz@lw.com>

Subject RE: Telcordia v. Cisco/Lucent

Sonal,

Thank you for your email.  We regret to hear of Mr. Gurey's passing.

We see no reason to modify the statement of uncontested facts in the pretrial order.  For one, there is no procedural mechanism for such a modification.  Moreover, because the statement of uncontested facts as it stands does not make any mention of Mr. Gurey, there is no reason to modify the statement.

Regards,

John

---

**From:** Sonal.Mehta@weil.com [mailto:Sonal.Mehta@weil.com]
**Sent:** Tuesday, April 10, 2007 1:13 PM
**To:** Williamson, John
**Cc:** Sasha.Mayergoyz@lw.com
**Subject:** Telcordia v. Cisco/Lucent

John,

It has come to our attention that Steven Gurey passed away earlier this year.  Accordingly, Defendants propose that we modify the statement of uncontested facts to include the following: "Steven Gurey passed away in 2007."  Please confirm Telcordia will agree.

Regards,
Sonal N. Mehta
Weil Gotshal & Manges
201 Redwood Shores Pkwy
Redwood Shores, CA 94065
t: (650) 802-3118
f: (650) 802-3100
sonal.mehta@weil.com

< END >

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure

under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

< END >

# EXHIBIT 2

```
1              IN THE UNITED STATES DISTRICT COURT
               IN AND FOR THE DISTRICT OF DELAWARE
2
                          -  -  -
3    TELCORDIA TECHNOLOGIES INC.,    :   Civil Action
                                     :
4         Plaintiff/Counterclaim     :
          Defendant,                 :
5                                    :
                                     :
6      v.                            :
                                     :
7    LUCENT TECHNOLOGIES, INC.,      :
                                     :
8         Defendant/Counterclaim     :
          Plaintiff.                 :   No. 04-874-GMS
9                      -  -  -       :
     TELCORDIA TECHNOLOGIES, INC.,   :   Civil Action
10                                   :
          Plaintiff/Counterclaim     :
11        Defendant,                 :
                                     :
12     v.                            :
                                     :
13   LUCENT TECHNOLOGIES INC.,       :
                                     :
14        Defendant/Counterclaim     :
          Plaintiff.                 :   No. 04-875-GMS
15                     -  -  -
     TELCORDIA TECHNOLOGIES, INC.,   :   Civil Action
16                                   :
          Plaintiff/Counterclaim     :
17        Defendant,                 :
                                     :
18     v.                            :
                                     :
19   CISCO SYSTEMS, INC.,            :
                                     :
20        Defendant/Counterclaim     :
          Plaintiff.                 :   No. 04-876-GMS
21                     -  -  -
22              Wilmington, Delaware
             Thursday, January 5, 2006
23                 1:30 p.m.
24                     -  -  -
25   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
```

1        If you unseasonably disclose the

2   information you had an obligation to disclose under

3   26(e)(2), then you lose and you can't use that at

4   trial.  That is what should be implemented here.

5            THE COURT:  It says unless such failure is

6   harmless.

7            MR. REINES:  It is their burden to show

8   substantial justification and harmlessness.  We don't

9   think it is at all harmless.  We have a schedule.  We

10  are living by it.  The Court said very clearly, I set my

11  schedule.  Everyone is expected to live by it.

12           THE COURT:  There is no question about it.

13  The Court is very jealous of its process, counsel know

14  that, and very resentful, not in a personal way, but

15  when lawyers sort of try to take the process in hand on

16  your own.  We have to deal with that on a daily basis.

17  It takes up too much of our time.

18           So I am disappointed that resort to the

19  Court wasn't made by plaintiff in a more aggressive

20  manner.

21           I have to say, Mr. Burley, it does appear

22  that, as you have suggested earlier -- well, I am sure

23  you didn't say it exactly this way, maybe not at all --

24  you sort of went on and did what you wanted to do anyway

25  in spite of what the Court said you couldn't do and what

# EXHIBIT 3

1

```
 1   1
 2              IN THE UNITED STATES DISTRICT COURT
 3              IN AND FOR THE DISTRICT OF DELAWARE
 4                        - - -
 5   TELCORDIA TECHNOLOGIES INC.,   :   Civil Action
 6              Plaintiff,          :
 7        v.                        :
 8   LUCENT TECHNOLOGIES, INC.,     :
 9              Defendant.          :   No. 04-875 (GMS)
10                        - - -
11                 Wilmington, Delaware
11               Tuesday, October 11, 2005
12                     10:00 a.m.
12                   Teleconference
13                        - - -
14   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
15   APPEARANCES:
15
16        JOHN G. DAY, ESQ.
16        Ashby & Geddes
17             -and-
17        DON O. BURLEY, ESQ.,
18        RICHARD H. SMITH, ESQ., and
18        JOHN M. WILLIAMSON, ESQ.
19        Finnegan, Henderson, Farabow,
19        Garrett & Dunner, L.L.P.
20        (Washington, D.C.)
20
21             Counsel for Plaintiff
21
22        JOHN W. SHAW, ESQ.
22        Young Conaway Stargatt & Taylor, LLP
23             -and-
23        DAVID A. NELSON, ESQ.,
24        STEVEN C. CHERNY, ESQ.,
24        ISRAEL S. MAYERGOYZ, ESQ., and
25        DAVID C. McKONE, ESQ.
25        Latham & Watkins
25        (New York, New York)
```

2

```
 1             Counsel for Defendant
 2        THE COURT:  Good morning, counsel.  Let's start
 3   off with a roll call for plaintiff.
 4        MR. DAY:  Good morning, Your Honor.  For
 5   Telcordia this morning you have John Day from Ashby & Geddes
 6   as local counsel.  And with me on the phone from Finnegan
 7   Henderson, lead counsel for Telcordia are Don Burley,
 8   Richard Smith, and John Williamson.
 9        THE COURT:  Good morning, gentlemen.
10        (Counsel respond "Good morning.")
11        THE COURT:  For Lucent.
12        MR. SHAW:  Good morning, Your Honor.  John Shaw
13   at Young Conaway for Lucent.  With me are Steve Cherny, Dave
14   Nelson, Israel Mayergoyz and Dave McKone from Latham &
15   Watkins.
16        THE COURT:  Good morning.
17        Let's start off with Telcordia's issues.  Is it
18   possible to group these three items and discuss them all at
19   the same time?  Or should we take them individually?
20        MR. BURLEY:  Your Honor, I think it is logical
21   to talk about all three in the same context.  I think all
22   three raise the same basic issue.
23        THE COURT:  Okay.
24        MR. BURLEY:  As the letter indicates, Your
25   Honor, we are seeking information, discovery, relating to
```

3

```
 1   products that we have essentially defined by setting out
 2   certain technological criteria.
 3        At the outset, it's important to note that Cisco
 4   and Alcatel have both agreed to provide discovery in exactly
 5   this way.  And, in fact, we sent to Lucent's outside counsel
 6   the agreement that we had executed with Cisco, and asked
 7   them to agree to exactly the same thing, substituting Lucent
 8   every time that Cisco appeared in the agreement that we had
 9   entered into with Cisco.
10        What we have done here is defined the products
11   for which we seek discovery in very narrow technological
12   terms that certainly Lucent is able to understand and is
13   able to determine the universe of products that satisfy
14   these criteria without any problems.
15        Moreover, at this stage, Telcordia is not
16   seeking full discovery with respect to all of the products
17   that meet this criteria.  What we are doing is going
18   through sort of a stepped or staged process where we are
19   asking Lucent now to identify the products that meet the
20   criteria and provide a discrete set of what we have called
21   relevant functionality documents relating to the products
22   that meet the criteria.  We have then committed to promptly
23   identifying the universe of allegedly infringing products
24   for which Lucent must provide full discovery.
25        Your Honor, our position that discovery is
```

4

```
 1   required in this situation is directly supported by the
 2   Federal Rules and case law.  I think the problem here is
 3   that when we were communicating with Lucent counsel, we set
 4   out the criteria, which narrowed what we had originally
 5   included in our interrogatories.  We narrowed them to the
 6   technological criteria that are set out in the letter.
 7   Lucent then responded and said that it would consider
 8   providing discovery on the products that met the criteria,
 9   but only if we first stated that all products that met the
10   criteria infringed one of the three patents.
11        We were unable to make and can't make a
12   categorical statement like that.  We take our Rule 11
13   obligations seriously, and we weren't willing to say and
14   can't say as a definitive no exception situation that all
15   products that meet these criteria infringe the patents.
16        What we are able to say, though, and I believe
17   have made quite clear to Lucent, is that we believe it's
18   much more likely than not that any product that meets these
19   criteria infringes the patent, the relevant patent that is
20   connected to the particular criteria, and, in fact, we are
21   unaware of any products that meet the criteria that do not
22   infringe the patent.
23        Certainly, that information, we believe, would
24   be enough to bring a suit for infringement.  It's certainly
25   way beyond the kind of information that is needed in order
```

5

1  to obtain discovery.

2          The rule, the Federal Rules and the standards

3  established in Rule 26(b)(1) is not absolute certainty that

4  the information relates to infringement. It's that, in the

5  language of Rule 26(b)(1), the discovery is reasonably

6  calculated to lead to the discovery of admissible evidence.

7          Certainly, these criteria are sufficient to

8  indicate that if a product meets given what we have said

9  about the criteria, that that is reasonably calculated to

10  lead to the discovery of admissible evidence.

11          Further, Your Honor, the only alternative that

12  we can see here -- either a product that meets these

13  criteria is an infringing product or there is a distinct

14  possibility that Lucent might argue at some point that the

15  product, while it meets the criteria, doesn't infringe for

16  some particular reason, in which case we would expect Lucent

17  to argue that the product was a noninfringing alternative.

18  So in either case, we would be entitled to discovery

19  relating to the product.

20          In other words, it is not correct, as Lucent

21  implicitly assumes, that our ability to obtain discovery

22  related to a product is confined only to products that

23  definitively infringe.

24          Finally, Your Honor, as a practical matter,

25  Lucent is able, obviously, to answer these interrogatories,

6

1  provide the information that we have requested as the first

2  stage of this process with little disruption or difficulty.

3          The only alternative for us would be to buy

4  Lucent's universe of products and reverse-engineer them,

5  which would be both time-consuming, extremely expensive, and

6  also impossible to achieve the end result that we need to

7  achieve, because there are certainly discontinued products

8  that we couldn't obtain on the market.

9          For all these reasons, Your Honor, we believe

10  the discovery we sought is very limited and should be

11  ordered.

12          THE COURT: Thank you, Mr. Burley.

13          Lucent.

14          MR. NELSON: Your Honor, this is Dave Nelson

15  from Latham & Watkins.

16          Let me step back just a little bit and give you

17  some context for this.

18          We started out in this case, in the original

19  interrogatory responses, Telcordia gave us the definition of

20  the products in suit that literally did include every single

21  product that Lucent makes. We did not believe that that was

22  consistent with the scope of their claim and was a

23  ridiculous burden in terms of the discovery they were asking

24  us for. Prior to that time we had actually talked to them

25  and they had given us information concerning six products

7

1  that they believed were infringing the patent.

2          So what we did, rather than simply object and

3  say, this is unduly burdensome, we are not going to provide

4  discovery, we don't understand your definition, we actually

5  responded with our interrogatories and said, well, this

6  definition is overly broad but we have -- it is

7  unintelligible, but we do have the information you have

8  given us before, so we will produce information on those

9  products and we will respond to your discovery requests with

10  respect to those six products that you have identified.

11          At the same time they gave us interrogatory

12  responses because we had asked them to identify the products

13  they alleged to infringe. And only one of those six

14  products was actually on that particular list at the time.

15          So our natural response was, well, I guess you

16  are not accusing the other products of infringement anymore

17  and you don't want discovery on those products. Their

18  response was, no, we are accusing this one product, and we

19  want discovery on those other five products as well. And

20  they also then supplemented their interrogatory responses

21  and identified two more of the products from that original

22  six that they had accused of infringement plus one new

23  product. But three of the products that were originally

24  identified still were not identified as infringing products

25  when they supplemented the interrogatories.

8

1          So then we went into it and said, well, we are

2  already at the stage based upon the products you have

3  identified where we have produced at this stage over 1.3

4  million pages of documents, which is a substantial burden,

5  substantial cost. In fact, we have produced, Lucent has

6  produced more documents than all the other parties in this

7  litigation combined at this point in time.

8          So we asked them, with respect to this

9  definition, we need a more specific definition. We are not

10  telling you that you need to identify by product number

11  exactly which products infringe. But you need to provide us

12  a specific definition of what you believe the scope of your

13  claims to be, which is what the Federal Rules tie discovery

14  to.

15          Their response to that was to provide us with

16  another definition that still would include nearly all of

17  the products that Lucent makes, and at the same time say we

18  will not confirm that this is the scope of our claim. In

19  other words, we will not confirm that this is consistent

20  with our invention, but what we will confirm is that we

21  believe what we are asking for is much broader than the

22  invention.

23          So we are trying to reach a compromise with

24  them. We want them reasonably at this point in time to take

25  a position, if they will confirm for us that this is the

9

1  scope of their claim, what we have told them is we will go
2  ahead and produce those products as best as we can determine
3  that meet those criteria.
4          They have told us that they will not do that.
5          Now, with the definition that they provided at
6  this point in time, I understand that Telcordia is saying,
7  well, they can't obtain the information. But our website
8  contains the information at the level of detail that they
9  have asked for in terms of this. They could go through that
10 and determine which of these products that they believe that
11 they have claims on, and then we can go ahead and produce
12 documents, as we have done with all the other products.
13         The burden that we are talking about, to go
14 through, when we have already produced a million-three, and
15 there are more documents that are being produced at this
16 point in time, the expense, the burden to go through this,
17 when they will not confirm for us that the definition they
18 have set out for these accused products is consistent with
19 what they believe to be the scope of their invention, is an
20 unreasonable burden for our client to undertake, and for the
21 costs associated with that.
22         So we are not hiding behind anything. We have
23 responded with noninfringement contentions. We have
24 responded with our invalidity contentions, even though we
25 have not received from them any confirmation as to what they

10

1  believe to be the scope of their claims in this case. And
2  we will continue to provide discovery on anything that they
3  do identify to be within the scope of their claims.
4          But contrary to Telcordia's position on what the
5  scope of the Federal Rules is on discovery, what the federal
6  rule says is you get discovery on those things reasonably
7  calculated to lead to the discovery of admissible evidence
8  concerning your claims. In fact, the Federal Circuit stated
9  specifically that discovery is not for purposes of
10 determining whether or not you can make a claim. It is for
11 gathering information to help to prove or disprove the
12 claims that you believe you have without discovery.
13         So the statement that the Federal Rules allow
14 you to simply broadly cast a net that you, yourself, know is
15 much broader than the scope of your claim and that you get
16 discovery to determine whether or not you in fact have a
17 claim is incorrect. That is not the scope of the rules and
18 that is not the burden that we are talking about placing on
19 a party here. That is not consistent with the requirement
20 under the Federal Rules.
21         In fact, under Telcordia's construction of the
22 rules, what they would have to do is file a lawsuit, name
23 one product, and then make a general statement to say, I
24 would like to have information concerning any products that
25 you make that do X, Y and Z, refuse to confirm that that is

11

1  consistent with their belief as to the scope of the
2  invention, and they would be entitled to discovery on all
3  those products, get that information, determine where they
4  are going to place that burden on the defendants, determine
5  where they are going to walk the line, and then take a
6  position as to what they believe to be the scope of their
7  claim.
8          I submit that that is not what the Federal Rules
9  provide.
10         THE COURT: Okay. Thanks, Mr. Nelson.
11         Mr. Burley, your reaction. I am interested in
12 hearing from you as to why the compromise position that has
13 been offered by Lucent is insufficient for your purposes.
14         MR. BURLEY: I am not sure, Your Honor,
15 listening to what the compromise position is. Maybe this is
16 leading me to wonder whether this is a semantical argument
17 that we are having, listening to Lucent's counsel talk about
18 our supposed refusal to say that the scope of our discovery
19 is consistent with the scope of the invention.
20         What I said in my initial statement was that we
21 understood Lucent to be asking us to state affirmatively and
22 categorically that any product that met the technological
23 criteria that we set out infringed.
24         We have --
25         THE COURT: Mr. Nelson, I don't think that's

12

1  what you said, is it?
2          MR. NELSON: No, sir, that is not. We had asked
3  them to confirm that that is the scope of their invention.
4          MR. BURLEY: I am not sure what the phrase the
5  scope of the invention means. Maybe that is the semantical
6  problem.
7          THE COURT: Perhaps Mr. Nelson can give you his
8  definition.
9          MR. NELSON: The scope of the invention -- they
10 have litigated this patent before, Your Honor, all the way
11 through to the Federal Circuit. Certainly, they have an
12 idea, I assume they took a position in that case as to what
13 they believed to be the invention of the patent, in other
14 words, why it is they got that patent.
15         My concern when I asked them that question,
16 which is a pretty straightforward one, and I suspect they
17 are going to go to the jury and say, here is what we
18 invented, here is why we are different from the prior art,
19 and this is the scope of the invention in this case, my
20 concern, when I ask them that question, is "We are not going
21 to confirm that, but we want discovery on all these other
22 things," is that it completely shifts the burden and
23 requires me and my client to undertake the burden to say,
24 okay, here is everything I make. Now you determine, based
25 upon that, what is going to be the scope of your claim and

13

1  you determine what position you are going to take as to the
2  scope of the invention of your patent.
3      MR. BURLEY: Your Honor, we are not saying that.
4  It doesn't sound like maybe we are as far apart as Lucent's
5  counsel might be implying.
6      It sounded to us, when they were asking about
7  the scope of the invention, that they were asking
8  essentially for a claim construction. Claim construction
9  under Your Honor's order isn't to be provided by the parties
10 until sometime in December.
11     We certainly can say and have said that any
12 product that meets or satisfies the technological criteria
13 that we have set out comes within -- it infringes, but it
14 comes within the scope of the invention as defined by the
15 claims. If you are trying to find an easy one-sentence
16 answer to what the scope of the invention is, that is not
17 part of what happens in an infringement case. We don't
18 define the invention in a one-sentence sound bite. The
19 invention is defined by the claim terms.
20     THE COURT: Let me interrupt for a second. I
21 will tell you, the Court does agree with Mr. Nelson's
22 assessment of the Federal Rules insofar as he points out
23 that, by way of example, and perhaps an extreme example, you
24 file one claim and then you ask for the universe -- and
25 that's obviously a much overly simplified statement of what

14

1  he said -- but I think, if you, Mr. Burley, and you, Mr.
2  Nelson, can agree, that Mr. Nelson's -- I don't know, quite
3  frankly, as an aside, that you necessarily have a different
4  reading of the Federal Rules. You have perhaps stated your
5  understanding of the Federal Rules a little differently.
6  But it sounds to me like there is a basis for agreement
7  here. That is, I think you understand, Mr. Burley, that you
8  can't ask the question that Mr. Nelson says you can't ask
9  and expect discovery on everything.
10     MR. BURLEY: Your Honor, the next point I was
11 going to make is I fully agreed with Mr. Nelson. I can't
12 file suit, for example, as we did here and ask for
13 infringement on all Lucent switch products. I think I have
14 to define the products in some way, either by, you know,
15 something like the integrated circuit that it contains or
16 the technological function that it performs or in some way
17 where I can at least reasonably say that we believe it's at
18 least likely or possible that a product that satisfies or
19 performs a certain function or contains a certain integrated
20 circuit, for example, infringes.
21     Now, I don't think I have to say that
22 definitively without exception. Maybe that was what the
23 confusion was here.
24     In this case, Your Honor, as I said before, I
25 can say that certainly beyond the requirement of more likely

15

1  than not that any product that meets these criteria
2  infringes.
3      In fact, if we knew of other products, let's say
4  we dispensed with all the products that we have identified
5  before, and we found out in some way that a Lucent product
6  met one of these technological criteria, I think that would
7  be sufficient for us to file a complaint. So I think at
8  this stage the discovery that we are seeking is only related
9  to products for which we could file suit independently.
10     THE COURT: Mr. Nelson.
11     MR. NELSON: Your Honor, I think that the point
12 we are -- let's just take the '306. What they have asked us
13 for, their definition of products in suit, what they are
14 looking for discovery on is all Lucent products that map
15 packetized data infringe. My simple question is, if they
16 will confirm that any Lucent product that maps packetized
17 data and does not infringe comes within the scope of what
18 they believe to be their invention, then, yes, that's fine,
19 we will produce the documents that they are looking for on
20 those things. But that's what I don't hear. Obviously, it
21 is a very important question.
22     I am not trying to hide the ball here, because
23 there are many, many pieces of prior art that we have given
24 them in detailed fashion. There are systems that are
25 described in the background section of the patent themselves

16

1  that map packetized data and do not infringe. So if that is
2  the scope of their invention, then I want that confirmation,
3  because I strongly believe that these claims are invalid.
4  But I need to get it one way or the other.
5      MR. BURLEY: Let me answer that, if I may, Your
6  Honor, first by talking about the other two patents. It is
7  a little easier with respect to the '633 and '763 patents.
8      THE COURT: Let me interrupt one more time, Mr.
9  Burley. I think if we could speak about this conceptually,
10 keeping in mind what the rules, that is the rules of
11 discovery, are designed to accomplish, rather than speaking
12 about it in terms of specific patents and specific
13 technology, I think we can get through this rather quickly,
14 if we can achieve agreement on what is permitted and what is
15 not. No?
16     MR. BURLEY: I will address that, Your Honor. I
17 absolutely agree and am not that far away from where Mr.
18 Nelson is.
19     My understanding with respect to the '306 patent
20 is we believe it is more likely than not that any Lucent
21 product that maps packetized data into a sonic frame
22 infringes the '306 patent. As I understand it, and I will
23 ask Dick Smith to speak up if I say anything that is
24 technologically wrong, as I understand it, with the '306
25 patent, that is one of the reasons why we have asked for the

**17**

1 technical functionality documents. We want to be able to
2 either see something related to the circuitry or understand
3 the mapping protocols that are used. And we should be able,
4 understanding the mapping protocols or the circuitry, to be
5 able to determine more definitively, certainly with the
6 ability to allege infringement, once we see that
7 information.
8          MR. SMITH: Correct.
9          MR. BURLEY: That was Mr. Smith saying I didn't
10 misspeak, Your Honor.
11          THE COURT: Mr. Nelson.
12          MR. NELSON: Your Honor, if there are some
13 mapping protocols that are relevant for them to determine
14 whether this comes within their claims or does not come
15 within their claims, then all I am asking for, and I have in
16 interrogatory responses, interrogatories, and I have in the
17 context of trying to define these accused products, tell me
18 what that is. They obviously know what that is. That is
19 fine. If that is relevant to determining whether or not it
20 comes within their invention, then I am entitled to know
21 that at this stage.
22          If they want to supplement down the road, I
23 would question whether or not it's valid to supplement when
24 you are the inventor on the patent and have litigated it
25 before, what you believe to be the scope of your invention,

**18**

1 but if they want to supplement, we can deal with Rule 26(e)
2 and the requirements down the road. But if they have that
3 information and these mapping protocols that they are
4 talking about are relevant to that determination, then they
5 need to tell me that.
6          MR. BURLEY: My understanding, Your Honor -- I
7 am sorry if I interrupted Mr. Nelson.
8          Were you finished?
9          MR. NELSON: Yes, sir.
10          MR. BURLEY: I was just handed our letter of
11 July 13th to counsel, which defines packetized data as data
12 formatted according to certain protocols. So I believe that
13 we have already listed that. If there are any questions
14 relating to this, Your Honor, I think that this is something
15 that we can certainly iron out with Lucent if they don't
16 understand us. But we set seven protocols in the definition
17 of packetized data in our letter of July 13 to counsel.
18          THE COURT: Mr. Nelson, are you aware of that
19 letter?
20          MR. NELSON: I am aware that what those
21 protocols are is packetizing protocols. Actually, one of
22 them is not even a packetizing protocol. But still, the
23 other shoe hasn't dropped yet in that this letter and
24 followup communications with this letter, they still will
25 not confirm for me that if something uses these protocols to

**19**

1 packetize data and then maps those into sonic frames, that
2 that comes within their claim as to their invention.
3          Obviously, I disagree as to the definition of
4 that scope. All I want is that confirmation. If I get that
5 confirmation, I agree with you, I have no fight with respect
6 to providing the initial set of discovery that they are
7 after.
8          THE COURT: Mr. Burley, do you have difficulty
9 with that request?
10          MR. BURLEY: Yes, Your Honor. We have no
11 trouble with that question. We said more likely than not
12 that is the case. We are not saying that if we looked at
13 something eventually that there might not be some aspect of
14 the circuitry or something that caused us to reach a
15 different conclusion. But we believe -- we do not know of
16 any product that would meet those criteria or satisfy those
17 protocols that does not infringe. I can't say it more
18 definitively than that because it's impossible, given --
19 unless you are actually examining the circuitry, it is
20 physically impossible to say without exception that there is
21 infringement.
22          We realize that, of course, you know, at any
23 trial of this case we would have to establish that there was
24 in fact infringement. But at this stage, knowing what we
25 know is certainly enough to allege infringement in a case

**20**

1 and satisfy Rule 11, we believe it's much more likely than
2 not that, in fact, when these criteria are satisfied there
3 is infringement of the patent.
4          THE COURT: I think you gentlemen are in violent
5 agreement, perhaps. It sounds to me like you are using
6 different language, some more, some less, to say the same
7 thing.
8          Mr. Nelson, do you disagree?
9          MR. NELSON: The only thing that I disagree with
10 a little bit, Your Honor, is they keep phrasing this in
11 terms of infringement. I am asking them as to the scope of
12 their claim. I mean, when you sit down and you are the
13 patentowner, when you write the claim, you don't have the
14 products that are going to come in the future and the
15 schematics and the circuit diagrams to determine whether or
16 not this is something that would come within the scope of
17 your claims. That is the only confirmation I am asking for.
18          It's their patent, their inventors. They have
19 litigated it before. Just confirm with me. I don't need
20 the more likely than not a product infringes. What is it --
21 is it something that uses one of these seven protocols that
22 they have listed here in this letter to map packetized data
23 into sonic frames? Is that coextensive with what they
24 believe to be the scope of their claims? If they will
25 confirm that, then you are right, we are in absolute

21

1  agreement.

2          THE COURT: Mr. Burley, are you able to do that?

3          MR. BURLEY: I am --

4          THE COURT: Yes or no, Mr. Burley. Are you able

5  to do that? I think you are looking down the road and

6  perhaps, maybe -- I don't mean to read tea leaves here -- it

7  sounds to me you are concerned about being locked into a

8  position you don't want to be locked into. Understood.

9          MR. BURLEY: It's less that, Your Honor, than it

10  is a feeling that he is asking us to construe the claims

11  according to -- this is for the '306 patent -- according to

12  certain protocols.

13          THE COURT: Is that what you are asking, Mr.

14  Nelson? Whether your asking it or not, is that what you are

15  later going to come back and argue?

16          MR. NELSON: I am asking for exactly the

17  confirmation you asked for.

18          THE COURT: I don't see it as problematic, Mr.

19  Burley. I am struggling, right now, with why you are

20  struggling.

21          MR. BURLEY: If you will give me just a second,

22  Your Honor.

23          THE COURT: Sure.

24          MR. BURLEY: Your Honor, as I understand it, the

25  protocols establish certain criteria, but they don't set out

22

1  all of the details by which those criteria are implemented.

2          THE COURT: Okay.

3          MR. BURLEY: So to say that, maybe it's just

4  there can be different ways to accomplish the same end. But

5  without establishing -- without knowing a hundred percent

6  how a detail required by a protocol is implemented, I can't

7  say definitively how a product that satisfies a particular

8  protocol works. It is only how it works that determines

9  whether or not it infringes the '306 patent.

10          What we can say is that we know the product that

11  satisfies certain protocols. The ones we are aware of work

12  in ways that would infringe the patent. So unless there is

13  information we are unaware of, we can confirm that.

14          THE COURT: All right. Mr. Nelson, that sounds

15  to me that Mr. Burley has, without using the exact

16  terminology that you are requesting, has agreed. No?

17          MR. NELSON: If he is providing a confirmation

18  that something that maps packetized data uses these

19  protocols into sonic frames comes within something that they

20  believe to be the scope of what they claim is their

21  invention, then you are right.

22          THE COURT: Without the detail of how it works.

23          MR. NELSON: Not the detail of how it works. If

24  they are willing to make that confirmation, then that is

25  correct. You know, of course, this is, as you stated very

23

1  pointedly, Your Honor, yes, I want them to take a position

2  here. It's not only necessary for purposes of trying to

3  limit the burden on discovery or at least go back and

4  justify to my client why they are being asked to go and get

5  millions of more pages of documents, which is not going to

6  be a well-received conversation, as you might imagine, but

7  then, in addition, I have my invalidity contentions. I have

8  given them a number of things.

9          The target may move. But at least I want to be

10  able to argue at some point, Your Honor, that the target has

11  moved as opposed to, no, no, that was never the target, you

12  are mistaken.

13          THE COURT: Mr. Burley, do we have an agreement

14  here?

15          MR. BURLEY: It sounds to me like we have got an

16  agreement, Your Honor. I have said what I have said. I

17  think I have confirmed, with the caveat that, if there is

18  information of which I am not aware...

19          THE COURT: I defy anyone to read this

20  transcript and tell me what we have agreed on. But I am

21  going to take it on a lot of faith that counsel are going to

22  be able to work through what I think you have agreed to. We

23  are going to leave it at that. I don't think we can massage

24  this much more at this point, because, quite frankly, I am

25  trying to conceptualize the words that I would utter that

24

1  would sound like a coherent order of some sort. I will

2  leave it there.

3          MR. BURLEY: Your Honor, if I may suggest, the

4  order that we would request Your Honor to enter would be

5  just to go through this staged process that we have

6  requested to which Cisco and Alcatel agreed, that they

7  identify the product, provide very limited documents related

8  to the functionality, then we will get right back to them

9  and make sure there isn't information of which we are

10  unaware that would cause us to think a product did not

11  infringe. We will confirm what the universe of infringing

12  products is and they will provide full discovery on that.

13          THE COURT: Mr. Nelson, can you respond to that,

14  please.

15          MR. NELSON: The problem that I have with the

16  restatement of that, Your Honor, is we have gone back away

17  from the confirmation I was asking for, which is confirm for

18  me that this falls within the scope of your claims, i.e.,

19  the scope of your invention, to, well --

20          THE COURT: I think Mr. Burley is willing to do

21  that.

22          Or are you not, Mr. Burley?

23          MR. BURLEY: If we want to make this a one-stage

24  process, I am perfectly willing to confirm that we believe

25  that any product that meets these criteria infringes. If

25

1  that's what Lucent counsel, Mr. Nelson, would prefer, I will
2  do it that way.
3        THE COURT: Mr. Nelson.
4        MR. NELSON: I think that's just the corollary
5  of the same thing. If they are going to confirm that, that
6  that's a confirmation within the scope of their invention --
7        THE COURT: I think, without exactly buying into
8  your language, they have agreed to your proposal.
9        MR. NELSON: Right.
10        THE COURT: Let's see if you can get through it.
11        MR. NELSON: Understood.
12        One point on the Cisco and Alcatel we heard
13  about, Your Honor. Just for your information, my
14  understanding is when Cisco went through this process and
15  identified things, that it was somewhere upwards of six or
16  seven hundred products that were identified. So I am not
17  really sure we should be using that process as the model
18  process.
19        THE COURT: Is that true, Mr. Burley?
20        MR. BURLEY: Your Honor, I don't know. I am
21  looking at John Williamson, and John says he does not know.
22  Cisco, I presume, has many more products. Our understanding
23  is that Lucent's production had had only about 500 products.
24  But certainly, however many Cisco identified just was
25  something that they felt was a reasonable thing to agree to.

26

1  We are not having the problems with Cisco that we are having
2  with Lucent.
3        THE COURT: Okay. Let's see how you make out if
4  you need to come back, because the devil is in the details,
5  and you will just have to come back.
6        MR. BURLEY: Your Honor, on that point. And
7  this is not -- we would not like to come back to Your Honor.
8  Our concern is we are imposing on Your Honor in doing this.
9  We are wondering whether it might make sense to consider
10  appointing a special master that we could go back to so that
11  we could avoid having to impose on you.
12        THE COURT: Is this something that both parties
13  have talked about?
14        MR. CHERNY: Your Honor, we haven't spoken or
15  even heard the suggestion of a special master before. Given
16  where we are in the case and how long it has been going on,
17  this is the first and only discovery dispute that we have
18  had to bring to the Court. I am not sure it's time yet.
19  Certainly it is something we can discuss with the other side
20  regarding whether both sides can agree whether it is
21  necessary and if so to come back to the Court and say, you
22  know, we think there is enough discovery disputes here that
23  we need to have a discovery master.
24        THE COURT: Mr. Burley, your reaction?
25        MR. BURLEY: Your Honor, I don't oppose the idea

27

1  of talking with Mr. Cherny and counsel a little more. I can
2  foresee other arguments coming out. I was reluctant to say
3  anything, though, about Mr. Nelson -- for example, about Mr.
4  Nelson'S comments about 1.3 million documents have been
5  produced in discovery, because I can see a battle coming up
6  on who is going to pay for this. We determined over the
7  weekend that, according to our best estimate, about a
8  million pages of those what Mr. Nelson says are 1.3 million
9  are sourcecodes that have been provided in totally unusable
10  form. As I understand, they are pictures of sourcecode, not
11  readable by anything.
12        The parties had discussed how sourcecode would
13  be provided. It was specifically contemplated that
14  sourcecode would be provided on CDs and electronically, in
15  electronically searchable format.
16        THE COURT: That is a matter not ripe for today.
17        MR. BURLEY: I recognize that, Your Honor. It
18  is just one of the things that is behind my request. I have
19  no problem talking to Mr. Cherny.
20        THE COURT: At this point, Mr. Burley, your
21  request is premature. Mr. Cherny correctly points out, as
22  far as I recollect, that this is the first time I have met
23  with counsel in a discovery dispute on this matter. I think
24  that's accurate.
25        UNIDENTIFIED SPEAKER: That is correct.

28

1        THE COURT: So then, given my current practice,
2  you have two more strikes. Then we will ship you off to a
3  discovery panel.
4        MR. BURLEY: Okay, Your Honor.
5        THE COURT: All right. Let's go onto the issues
6  raised by Lucent. No. 1.
7        MR. CHERNY: That would be me, Your Honor.
8        The first two issues really relate to our laches
9  defense and in some ways can be combined. I will start with
10  No. 1.
11        These patents, all the patents in suit are very
12  old patents, and not surprisingly, we have brought laches
13  and estoppel defenses based on the fact that it has been,
14  since the beginning of Lucent, you know, that we have been
15  doing the acts that they accuse of infringement, and that's
16  ten years ago.
17        One of the things we need to prove up for laches
18  is obviously that they knew or should have known what we
19  were doing that they accuse of infringement. We have the
20  odd situation here where Telcordia acts as a testing body
21  for the R-Box, Baby Bells, and has done so for ten, 15
22  years. It used to be called Bellcore. They test our
23  products. They have tested our products since the inception
24  of Lucent. They also sell their own products that they
25  claim are intercompatible with the products that they accuse

29

1  of infringement.

2          So there is a lot of information at Telcordia

3  regarding our products, how they work, and they have had it

4  for years. What we have asked for was, give us the

5  documents that show what you knew, when you knew it, who

6  knew it there, regarding things like testing, certification,

7  intercompatibility. For example, if you say something is

8  intercompatible with our products, you must know how our

9  products work.

10         They have responded by saying, look, you gave us

11 this information pursuant to a contract where we agreed to

12 only use it for certain purposes. And to me, that seems to

13 be a substantive response to our laches argument. If they

14 want to make an argument that somehow they have

15 compartmentalized knowledge of Telcordia and therefore that

16 excuses the ten years that they delayed in bringing this

17 suit, that's fine, they can make that at trial. But at this

18 point, all we want is to find out the factual information.

19 We want the documents that we gave them over the years that

20 show, you know, what they knew about our products that they

21 now accuse infringe.

22         It is a very strange situation where a testing

23 body, a body that goes out there and has essentially put

24 their stamp of approval for ten years, said, go out, you can

25 buy these products, to various companies like Verizon and

30

1  such, and then after ten years of stamping the approval and

2  saying these products are fine, they function correctly, all

3  our products are compatible with them, they come back and

4  say those products we have been telling you to buy for ten

5  years, they infringe our patent that issued five years ago.

6          I don't mind if they want to try to make some

7  argument that somehow they have compartmentalized

8  information we have given them over the years. But it seems

9  to me I have the right to at least discover, you know, what

10 they knew, who knew it, what they used it for within

11 Telcordia, whether it's for compatibility, testing or

12 whatever, and to give me a witness that I can ask questions

13 of, to say, okay, who knew this at Telcordia? What did they

14 know? When did they know it? When did they know that we

15 did the functionalities that Mr. Burley is talking about

16 infringe?

17         That's all we want, is the discovery. We don't

18 want to get into a fight about, a substantive fight about

19 laches versus non-laches. We want the discovery that will

20 help us show the bases for our laches defense.

21         THE COURT: Are you getting a response from

22 plaintiff that at the very least you know what they knew

23 because you provided the information in the first place?

24         MR. CHERNY: They are saying you have the

25 documents. My answer is, I understand we have the documents

31

1  and that we gave them to you. But once they went into the

2  black hole of Telcordia -- I don't know how they saw them,

3  what they used them for, when they used them.

4          THE COURT: Got you.

5          Who is going to respond for Telcordia?

6          MR. BURLEY: Your Honor, I think here we have

7  got basically an agreement in the works that just needs to

8  have the details ironed out. As Mr. Cherny indicates, the

9  knowledge that Telcordia has about the products is through a

10 program that is called Ozmine (phonetic), where Telcordia

11 tests the products and certifies them for purchase by the

12 regional Bell companies, the R-Box.

13         The problem is that we are contractually

14 precluded from using any of the information that is obtained

15 through the Ozmine program for any purpose other than that

16 testing and certification.

17         So the trial team at Finnegan Henderson and the

18 people at Telcordia, as I understand it, that work on

19 litigation, know nothing about Ozmine and the products --

20 excuse me, the materials that were submitted by Lucent to

21 Telcordia for this certification purpose.

22         And Lucent then proposed to Telcordia and I

23 think very --

24         THE COURT: Counsel, I am going to cut you off,

25 because you started your comments by saying you thought you

32

1  had an agreement. That is fine, because I have got other

2  things I need to move on to.

3          Is there an agreement or not?

4          MR. BURLEY: I am sorry, Your Honor. I should

5  have gotten to that part faster. Lucent's proposal was that

6  they would waive the contractual restrictions on Telcordia.

7  But they were only agreeing to waive it for the limited

8  purpose of identifying infringing products. We need a

9  broader waiver just to make sure we can use whatever

10 information we can for whatever purposes associated with

11 this litigation. But we think we can figure out exactly

12 what the waiver ought to be. So this shouldn't be something

13 that we have to bring to Your Honor.

14         MR. CHERNY: Your Honor, I don't want to waste

15 your time talking about this. But what we are doing is

16 mixing apples and oranges here. What Mr. Burley is alluding

17 to is when we were having the fight that Mr. Nelson was

18 discussing before about them identifying accused products,

19 we said, you have all the stuff in house. We understand

20 your contention that you can't look it over, you haven't

21 looked at it. If you want, go look at the stuff you have in

22 house, and we are not going to complain if you want to do

23 that to identify accused products.

24         That's wholly different from somehow

25 conditioning, giving me the documents they have in hand, and

---

33

1 a witness to tell me what they knew, and my having to waive
2 some contractual provision. I shouldn't have to waive a
3 contractual provision to just get them to produce the
4 documents they have in house and to get discovery on who
5 knew what.
6       At that point, we can argue about how the
7 documents are going to be used substantively at trial,
8 whether waivers need to be put in place. All I want is the
9 discovery. I don't want to have to say, in order to get you
10 to produce the documents regarding the certification process
11 and produce a witness to tell me who knew what and who knew
12 what about our products within Telcordia, that somehow I
13 have to waive a contractual provision. All I want is the
14 documents in the discovery.
15       MR. BURLEY: Your Honor, I am not sure how we
16 even talk to or prepare a witness. It seems to me without
17 at least some waiver of our contractual provision, I can't
18 talk to the people at Telcordia to find out what they have
19 got and produce this stuff to Mr. Cherny. It seems I am
20 violating the contract.
21       MR. CHERNY: If I can cut through it, we have no
22 problem with outside counsel talking to the witnesses or
23 helping to produce the documents. I don't know why we have
24 to then waive all of the rights regarding -- that
25 potentially may attach to use of these documents for any

---

34

1 purpose. If that's what Mr. Burley needs, is to be able to
2 talk to the witness, to prepare him and also to collect the
3 documents to give it to us, we don't have any problem with
4 outside counsel doing that.
5       THE COURT: Is that sufficient for your needs,
6 Mr. Burley? Sounds like it should be.
7       MR. BURLEY: Your Honor, that sounds like that's
8 at least the beginning of a workable compromise. I am not
9 sure if we will need anything additional beyond that.
10       THE COURT: I would just suggest you not
11 over-lawyer this on both sides.
12       MR. BURLEY: I agree, Your Honor. I am trying
13 not to create an issue where one doesn't exist.
14       MR. CHERNY: Totally agree.
15       THE COURT: No. 3.
16       MR. CHERNY: Actually, one thing on Point 2,
17 before we get to No. 3. I was combining 1 and 2.
18       Not surprisingly, we have an interrogatory
19 asking them when they first became aware of our allegedly
20 infringing activities. Not surprisingly.
21       They have given us the very surprising answer
22 that they became aware on or after the day they filed suit.
23       It's pretty surprising when a plaintiff says
24 that they became aware of the allegedly infringing
25 activities on or after the day they filed suit.

---

35

1       THE COURT: That's a little difficult --
2       MR. CHERNY: I am not sure how they could have
3 done it after they filed suit.
4       THE COURT: Rule 11 looms large there.
5       Could I get a response from plaintiff?
6       MR. BURLEY: Yes, Your Honor.
7       Our position with respect to when we became
8 first aware of Lucent's allegedly infringing activities is
9 that is not really a question seeking factual information.
10 It is at best a mixed question of fact and law that required
11 us to determine when we had established infringement. We
12 had established, in compliance with Rule 11, that we believe
13 that Lucent infringed --
14       THE COURT: Mr. Burley, I don't have time for
15 these games. Clearly, the response is not adequate and
16 needs to be re-thought. If literally what is represented
17 and implied in this paragraph is what you said, you can't
18 have meant it. So I am not prepared or willing to listen to
19 a lot of legalese on why you responded the way you
20 responded.
21       What I am ordering you to do is to supplement
22 this response. Okay?
23       MR. BURLEY: Yes, Your Honor.
24       MR. CHERNY: Thank you, Your Honor. No. 3,
25 Dave, do you want to deal with that?

---

36

1       MR. NELSON: Your Honor, this one is actually
2 the discussion that we had on the first issue, very similar
3 here with respect to claim construction.
4       THE COURT: There is a process that is outlined
5 in the scheduling order, I believe, for dealing with this.
6 Why is this showing up as a discovery dispute?
7       MR. NELSON: The only reason it is showing up as
8 a discovery dispute, Your Honor, is, as I said, I feel like
9 with respect to invalidity purposes in particular we are
10 dealing with a moving target. This was an effort to at
11 least at some point in time as we are going through and
12 providing our noninfringement responses, as we are going
13 through and providing our invalidity responses, to have some
14 target so that it's not simply, oh, the target is moved, but
15 there never was any target there at all, you were mistaken.
16       That's the only purpose for this, Your Honor.
17 We don't need to say much more about that.
18       What I had understood the process to be outlined
19 in the discovery schedule had to do with specifically the
20 Markman briefing itself, not whether or not there could be
21 discovery --
22       THE COURT: It is more than Markman briefing.
23 The process is designed to get counsel as early as you can
24 to sit down and in earnest discuss your positions on claim
25 construction. So it is not just designed to tee up the

37

1  briefing for Markman. There is a meet-and-confer that is
2  contemplated, designed to narrow the field of dispute that
3  leads to the preparation and exchange of positions in the
4  form of claim charts that eventually finds its way, those
5  arguments from the charts, into the briefs. So at least, if
6  not literally, the spirit of the thing, it is my thinking,
7  this is informed by the thinking of many, many patent
8  litigants who have come before this particular Court, that
9  this is a way to begin to crystallize the dispute, or
10  disputes.
11          So who is going to handle this for the other
12  side?
13          MR. BURLEY: Your Honor, we have obviously no
14  problem talking with Lucent's counsel informally about claim
15  constructions and lots of different mechanisms to advance
16  the ball. The claim constructions have to be provided,
17  though, under Your Honor's scheduling order by a certain
18  date. And interrogatories shouldn't trump Your Honor's
19  scheduling order.
20          THE COURT: No, they shouldn't. But counsel for
21  Lucent does make the fair and valid point that there are
22  discovery needs and things that need to be done in order to
23  inform that process, that claim construction process. It's
24  not unreasonable, it seems to me, for inquiries to be made
25  of the other party as to what your contentions are with

38

1  regard to the construction of certain claims. Yes? No?
2  Maybe? Go ahead.
3          MR. BURLEY: Your Honor, we have given them
4  claim charts, applying the limitations of the claims for the
5  '306 patent, for example, to seven products. So there is no
6  question how we apply the claims to the products. We just
7  haven't gotten to the point where we have, as contemplated
8  by Your Honor's scheduling order, gotten into the nuances of
9  disputed claim terms and provided our actual positions with
10  respect to those claim terms.
11          Lucent's request here is a very definitive one,
12  asking for information from us on specific claim terms.
13  This jumps the gun and essentially moots Your Honor's, both
14  of what Your Honor has done in requiring that lists of
15  disputed claim terms be exchanged by November 17 and our
16  proposed constructions of those terms by December 8.
17          You know, the fact that we have been through
18  this once before with four systems doesn't mean that we have
19  developed positions -- doesn't mean in the first place that
20  we had the same claim terms that were in dispute in both
21  cases.
22          THE COURT: Understood.
23          MR. BURLEY: The discovery in this case is going
24  to inform as to what claim terms we actually dispute and how
25  we construe those claims.

39

1          THE COURT: Okay. Mr. Nelson?
2          MR. NELSON: Your Honor, we have asked them
3  specific claim terms to help with the discovery we are going
4  through right now. It was not intended to jump the gun on
5  your order. That's why we provided them with specific terms
6  we were interested in. It seems to me -- there is a reason
7  why we chose those terms. We believe that with respect to
8  the invalidity issues, at least in the art we have
9  identified thus far and the noninfringement issues, these
10  are potentially pivotal issues. That is the reason for it.
11  That has nothing to do with trying to jump the gun on your
12  order and the process.
13          THE COURT: Well, I think if counsel can sit
14  down and talk about the reasons that you are asking for
15  things and the reasons that the other side is responding in
16  a certain way, then perhaps you will be able to work through
17  it. But right now I am going to let the process work itself
18  out and we will see where you go with regard to No. 3.
19          No. 4.
20          MR. CHERNY: Your Honor, for two of the patents
21  in suit, actually, for all the patents in suit, we have
22  asked for invention dates. Not surprisingly, as you know,
23  with prior art, there are two dates that are important, the
24  filing date, that one is readily apparent to everybody, and
25  for 102(a), (e) and (g) it's the invention date.

40

1          We asked for all the patents what the invention
2  dates were. For two of them, they said the invention date
3  is the filing date. That is perfectly allowable, to have
4  the filing date as the invention date. All we want is for
5  them to speak now or forever hold their piece. This is not
6  something they need discovery on. It is their own invention
7  dates. When we called up and said, is your position that
8  your invention date is this, they said, well, you know, it
9  is our position now but it may change. And I said, well, I
10  don't understand. It is nothing you need to supplement.
11  Supplementation is where you find something out later.
12  These are your patents, one of which has been in suit
13  against Cisco for a year and a half that you had for 15
14  years. All we want to know is the invention date so when we
15  are looking for prior art that we have a specific target.
16          When I spoke to Mr. Rainey about a week ago
17  about this and said, you know, can we work this out, he
18  said, well, my position is that first you have got to come
19  up with art and I will come up with an earlier invention
20  date if I want -- if I think I need to. Then my view was,
21  why do we have to play hop-scotch? Why do I have to come up
22  with a piece of art that is three months before their filing
23  date only to have them say, our invention date is now at
24  least three months and one day before the filing date?
25          A lot of courts, you know, as a matter of course

41

1    nowadays, just make the plaintiff give you the invention

2    date right off the bat.

3            THE COURT:  That's right.

4            MR. CHERNY:  So I don't understand why I have to

5    fight to get the invention date or why I have to get into a

6    process where we go out, we have prior art, we cite it --

7            THE COURT:  Mr. Cherny, you shouldn't have to.

8    Let's hear from the other side.

9            MR. BURLEY:  Your Honor, this is a question of

10    who goes first.

11            THE COURT:  That's exactly right.  You are going

12    to go first.

13            MR. BURLEY:  I read that into your comments to

14    Mr. Cherny.  I was reluctant to say anything.

15            THE COURT:  Let's go to No. 5.

16            MR. McKONE:  We have asked Telcordia to give the

17    factual and legal basis behind its contention that it has

18    been damaged.  Telcordia contends that it is entitled to a

19    reasonable royalty but it will not state what that royalty

20    is on the patent.

21            We have reason to believe that they have enough

22    knowledge to give an answer at this time.  For example, on

23    their SRTS patent, they have represented to standards

24    organizations that the patent is available for licensing on

25    a nondiscriminatory basis at a reasonable royalty.

42

1            If you look at their website, the website

2    indicates that they have dedicated a senior licensing

3    manager devoted just to licensing the SRTS patent.

4    Telcordia's website also states that the enforcing and

5    licensing of the SRTS patent is worth more today than any

6    other IT held by Telcordia.

7            Moreover, they have licensed this patent to

8    several different companies.

9            In fact, back in 1997 Telcordia sent Lucent a

10    letter offering licensing terms for its entire ATM

11    patents --

12            THE COURT:  I think I have your point, counsel.

13    Do you want to sum up there?

14            MR. McKONE:  Yes.  That is basically it.  We

15    think we are entitled to what their position is today on the

16    reasonable royalty for the patents in suit.

17            THE COURT:  Who is going to handle this?

18            MR. BURLEY:  Your Honor, this is still me.

19            The simple answer to that question is that the

20    reasonable royalty factors that are provided in

21    Georgia-Pacific deal with a lot of specific information that

22    is part of this discovery process.  While it is true that

23    there are certain royalties that we make the patents

24    available to the public on that nondiscriminatory basis,

25    those patents are being made available to people who are not

43

1    current infringers, obviously, on that basis.  That doesn't

2    establish the reasonable royalty that would be the result of

3    a hypothetical negotiation between Lucent and Telcordia, and

4    has nothing to do with any of the factors that are listed in

5    the Georgia-Pacific case.

6            Those include things, for example, like the rate

7    paid by Lucent for use of other patents comparable --

8            THE COURT:  So the answer to the question is you

9    are not prepared to provide your assessment as to what you

10    will be prepared to contend before the jury is a reasonable

11    royalty today, at this point.

12            MR. BURLEY:  That's right, Your Honor.

13            THE COURT:  That is not unreasonable.  And I am

14    not going to require that you do it at this point.

15            MR. McKONE:  Okay, Your Honor.

16            THE COURT:  Counsel, thank you.

17            (Teleconference concluded at 11:25 a.m.)

18                    - - -

19    Reporter:  Kevin Maurer

20

21

22

23

24

25

'306 [7] - 15:12, 16:19, 16:22, 16:24, 21:11, 22:9, 38:5
'633 [1] - 16:7
'763 [1] - 16:7

**0**

04-875 [1] - 1:9

**1**

1 [4] - 1:1, 28:6, 28:10, 34:17
1.3 [3] - 8:3, 27:4, 27:8
102(a [1] - 39:25
10:00 [1] - 1:11
11 [5] - 1:11, 4:12, 20:1, 35:4, 35:12
11:25 [1] - 43:17
13 [1] - 18:17
13th [1] - 18:11
15 [2] - 28:21, 40:13
17 [1] - 38:15
1997 [1] - 42:9

**2**

2 [2] - 34:16, 34:17
2005 [1] - 1:11
26(b)(1 [2] - 5:3, 5:5
26(e [1] - 18:1

**3**

3 [4] - 34:15, 34:17, 35:24, 39:18

**4**

4 [1] - 39:19

**5**

5 [1] - 41:15
500 [1] - 25:23

**8**

8 [1] - 38:16

**A**

ability [2] - 5:21, 17:6
able [13] - 3:12, 3:13, 4:16, 5:25, 17:1, 17:3, 17:5, 21:2, 21:4,

23:10, 23:22, 34:1, 39:16
absolute [2] - 5:3, 20:25
absolutely [1] - 16:17
accomplish [2] - 16:11, 22:4
according [4] - 18:12, 21:11, 27:7
accurate [1] - 27:24
accuse [4] - 28:15, 28:19, 28:25, 29:21
accused [5] - 7:22, 9:18, 17:17, 32:18, 32:23
accusing [2] - 7:16, 7:18
achieve [3] - 6:6, 6:7, 16:14
Action [1] - 1:5
activities [3] - 34:20, 34:25, 35:8
acts [2] - 28:15, 28:20
actual [1] - 38:9
addition [1] - 23:7
additional [1] - 34:9
address [1] - 16:16
adequate [1] - 35:15
admissible [3] - 5:6, 5:10, 10:7
advance [1] - 37:15
affirmatively [1] - 11:21
ago [3] - 28:16, 30:5, 40:16
agree [9] - 3:7, 13:21, 14:2, 16:17, 19:5, 25:25, 26:20, 34:12, 34:14
agreed [8] - 3:4, 14:11, 22:16, 23:20, 23:22, 24:6, 25:8, 29:11
agreeing [1] - 32:7
agreement [11] - 3:6, 3:8, 14:6, 16:14, 20:5, 21:1, 23:13, 23:16, 31:7, 32:1, 32:3
ahead [3] - 9:2, 9:11, 38:2
Alcatel [3] - 3:4, 24:6, 25:12
allege [2] - 17:6, 19:25
alleged [1] - 7:13
allegedly [4] - 3:23, 34:19, 34:24, 35:8
allow [1] - 10:13

allowable [1] - 40:3
alluding [1] - 32:16
alternative [3] - 5:11, 5:17, 6:3
answer [8] - 5:25, 13:16, 16:5, 30:25, 34:21, 41:22, 42:19, 43:8
apart [1] - 13:4
apparent [1] - 39:24
Appearances [1] - 1:14
appeared [1] - 3:8
apples [1] - 32:16
apply [1] - 38:6
applying [1] - 38:4
appointing [1] - 26:10
approval [2] - 29:24, 30:1
argue [5] - 5:14, 5:17, 21:15, 23:10, 33:6
argument [4] - 11:16, 29:13, 29:14, 30:7
arguments [2] - 27:2, 37:5
art [8] - 12:18, 15:23, 39:8, 39:23, 40:15, 40:19, 40:22, 41:6
Ashby [2] - 1:16, 2:5
aside [1] - 14:3
aspect [1] - 19:13
assessment [2] - 13:22, 43:9
associated [2] - 9:21, 32:10
assume [1] - 12:12
assumes [1] - 5:21
Atm [1] - 42:10
attach [1] - 33:25
available [3] - 41:24, 42:24, 42:25
avoid [1] - 26:11
aware [8] - 18:18, 18:20, 22:11, 23:18, 34:19, 34:22, 34:24, 35:8

**B**

Baby [1] - 28:21
background [1] - 15:25
ball [2] - 15:22, 37:16
based [8] - 8:2, 12:24, 28:13
bases [1] - 30:20
basic [1] - 22:4

basis [5] - 14:6, 41:17, 41:25, 42:24, 43:1
bat [1] - 41:2
battle [1] - 27:5
became [4] - 34:19, 34:22, 34:24, 35:7
begin [1] - 37:9
beginning [2] - 28:14, 34:8
behind [3] - 9:22, 27:18, 41:17
belief [1] - 11:1
Bell [1] - 31:12
Bellcore [1] - 28:22
Bells [1] - 28:21
best [3] - 9:2, 27:7, 35:10
between [1] - 43:3
beyond [3] - 4:25, 14:25, 34:9
bit [2] - 6:16, 20:10
bite [1] - 13:18
black [1] - 31:2
body [3] - 28:20, 29:23
box [2] - 28:21, 31:12
briefing [3] - 36:20, 36:22, 37:1
briefs [1] - 37:5
bring [3] - 4:24, 26:18, 32:13
bringing [1] - 29:16
broad [1] - 7:6
broader [3] - 8:21, 10:15, 32:9
broadly [1] - 10:14
brought [1] - 28:12
burden [3] - 6:23, 8:4, 9:13, 9:16, 9:20, 10:18, 11:4, 12:22, 12:23, 23:3
burdensome [1] - 7:3
Burley [62] - 1:17, 2:7, 2:20, 2:24, 6:12, 11:11, 11:14, 12:4, 13:3, 14:1, 14:7, 14:10, 16:5, 16:9, 16:16, 17:9, 18:6, 18:10, 19:8, 19:10, 21:2, 21:3, 21:4, 21:9, 21:19, 21:21, 21:24, 22:3, 22:15, 23:13, 23:15, 24:3, 24:20, 24:22, 24:23, 25:19, 25:20, 26:6, 26:24, 26:25, 27:17, 27:20, 28:4, 30:15, 31:6,

32:4, 32:16, 33:15, 34:1, 34:6, 34:7, 34:12, 35:6, 35:14, 35:23, 37:13, 38:3, 38:23, 41:9, 41:13, 42:18, 43:12
buy [5] - 6:3, 29:25, 30:4
buying [1] - 25:7

**C**

calculated [3] - 5:6, 5:9, 10:7
case [15] - 4:2, 5:16, 5:18, 6:18, 10:1, 12:12, 12:19, 13:17, 14:24, 19:12, 19:23, 19:25, 26:16, 38:23, 43:5
cases [1] - 38:21
cast [1] - 10:14
categorical [1] - 4:12
categorically [1] - 11:22
caused [1] - 19:14
caveat [1] - 23:17
Cds [1] - 27:14
certain [12] - 3:2, 14:19, 18:12, 21:12, 21:25, 22:11, 29:12, 37:17, 38:1, 39:16, 42:23
Certainly [4] - 4:23, 5:7, 12:11, 26:19
certainly [9] - 3:12, 4:24, 6:7, 13:11, 14:25, 17:5, 18:15, 19:25, 25:24
certainty [1] - 5:3
certification [4] - 29:6, 31:16, 31:21, 33:10
certifies [1] - 31:11
change [1] - 40:9
charts [3] - 37:4, 37:5, 38:4
Cherny [20] - 1:23, 2:13, 26:14, 27:1, 27:19, 27:21, 28:7, 30:24, 31:8, 32:14, 33:19, 33:21, 34:14, 34:16, 35:2, 35:24, 39:20, 41:4, 41:7, 41:14
chose [1] - 39:7
Circuit [2] - 10:8, 12:11
circuit [3] - 14:15, 14:20, 20:15

circuitry [4] - 17:2, 17:4, 19:14, 19:19
Cisco [11] - 3:3, 3:6, 3:8, 3:9, 24:6, 25:12, 25:14, 25:22, 25:24, 26:1, 40:13
cite [1] - 41:6
Civil [1] - 1:5
Claim [1] - 13:8
claim [30] - 6:22, 8:18, 9:1, 10:10, 10:15, 10:17, 11:7, 12:25, 13:8, 13:19, 13:24, 19:2, 20:12, 20:13, 22:20, 28:25, 36:3, 36:24, 37:4, 37:14, 37:16, 37:23, 38:4, 38:9, 38:10, 38:12, 38:15, 38:20, 38:24, 39:3
claims [18] - 8:13, 9:11, 10:1, 10:3, 10:8, 10:12, 13:15, 16:3, 17:14, 17:15, 20:17, 20:24, 21:10, 24:18, 38:1, 38:4, 38:6, 38:25
clear [1] - 4:17
Clearly [1] - 35:15
client [3] - 9:20, 12:23, 23:4
coextensive [1] - 20:23
coherent [1] - 24:1
collect [1] - 34:2
combined [2] - 8:7, 28:9
combining [1] - 34:17
coming [1] - 27:2, 27:5
comments [3] - 27:4, 31:25, 41:13
committed [1] - 3:22
communicating [1] - 4:3
communications [1] - 18:24
companies [3] - 29:25, 31:12, 42:8
comparable [1] - 43:7
compartmentalized [2] - 29:15, 30:7
compatibility [1] - 30:11
compatible [1] - 30:3
complain [1] - 32:22
complaint [1] - 15:7
completely [1] -

12:22
compliance [1] - 35:12
compromise [4] - 8:23, 11:12, 11:15, 34:8
Conaway [2] - 1:22, 2:13
conceptualize [1] - 23:25
conceptually [1] - 16:9
concern [3] - 12:15, 12:20, 26:8
concerned [1] - 21:7
concerning [3] - 6:25, 10:8, 10:24
concluded [1] - 43:17
conclusion [1] - 19:15
conditioning [1] - 32:25
confer [1] - 37:1
confined [1] - 5:22
confirm [17] - 8:18, 8:19, 8:20, 8:25, 9:17, 10:25, 12:3, 12:21, 15:16, 18:25, 20:19, 20:25, 22:13, 24:11, 24:17, 24:24, 25:5
confirmation [10] - 9:25, 16:2, 19:4, 19:5, 20:17, 21:17, 22:17, 22:24, 24:17, 25:6
confirmed [1] - 23:17
confusion [1] - 14:23
connected [1] - 4:20
consider [2] - 4:7, 26:9
consistent [6] - 6:22, 8:19, 9:18, 10:19, 11:1, 11:19
construction [7] - 10:21, 13:8, 36:3, 36:25, 37:23, 38:1
constructions [3] - 37:15, 37:16, 38:16
construe [2] - 21:10, 38:25
consuming [1] - 6:5
contains [3] - 9:8, 14:15, 14:19
contemplated [3] - 27:13, 37:2, 38:7
contend [1] - 43:10
contends [1] - 41:18
contention [2] - 32:20, 41:17

contentions [4] - 9:23, 9:24, 23:7, 37:25
context [2] - 2:21, 6:17, 17:17
continue [1] - 10:2
contract [2] - 29:11, 33:20
contractual [5] - 32:6, 33:2, 33:3, 33:13, 33:17
contractually [1] - 31:13
contrary [1] - 10:4
conversation [1] - 23:6
corollary [1] - 25:4
correct [3] - 5:20, 22:25, 27:25
Correct [1] - 17:8
correctly [2] - 27:21, 30:2
cost [1] - 8:5
costs [1] - 9:21
Counsel [5] - 1:20, 2:1, 2:10, 31:24, 43:16
counsel [20] - 2:2, 2:6, 2:7, 3:5, 4:3, 11:17, 13:5, 18:11, 18:17, 23:21, 25:1, 27:1, 27:23, 33:22, 34:4, 36:23, 37:14, 37:20, 39:13, 42:12
course [3] - 19:22, 22:25, 40:25
Court [68] - 1:2, 2:2, 2:9, 2:11, 2:16, 2:23, 6:12, 11:10, 11:25, 12:7, 13:20, 13:21, 15:10, 16:8, 17:11, 18:18, 19:8, 20:4, 21:2, 21:4, 21:13, 21:18, 21:23, 22:2, 22:14, 22:22, 23:13, 23:19, 24:13, 24:20, 25:3, 25:7, 25:10, 25:19, 26:3, 26:12, 26:18, 26:21, 26:24, 27:16, 27:20, 28:1, 28:5, 30:21, 31:4, 31:24, 34:5, 34:10, 34:15, 35:1, 35:4, 35:14, 36:4, 36:22, 37:8, 37:20, 38:22, 39:1, 39:13, 41:3, 41:7, 41:11, 41:15, 42:12, 42:17, 43:8, 43:13, 43:16
courts [1] - 40:25

create [1] - 34:13
criteria [27] - 3:2, 3:14, 3:17, 3:20, 3:22, 4:4, 4:6, 4:8, 4:10, 4:15, 4:19, 4:20, 4:21, 5:7, 5:9, 5:13, 5:15, 9:3, 11:23, 13:12, 15:1, 15:6, 19:16, 20:2, 21:25, 22:1, 24:25
crystallize [1] - 37:9
current [2] - 28:1, 43:1
cut [2] - 31:24, 33:21

**D**

damaged [1] - 41:18
data [10] - 15:15, 15:17, 16:1, 16:21, 18:11, 18:17, 19:1, 20:22, 22:18
date [15] - 37:18, 39:24, 39:25, 40:2, 40:3, 40:4, 40:8, 40:14, 40:20, 40:23, 40:24, 41:2, 41:5
dates [4] - 39:22, 39:23, 40:2, 40:7
Dave [4] - 2:13, 2:14, 6:14, 35:25
David [2] - 1:23, 1:24
Dc [1] - 1:19
deal [3] - 18:1, 35:25, 42:21
dealing [2] - 36:5, 36:10
December [2] - 13:10, 38:16
dedicated [1] - 42:2
Defendant [2] - 1:9, 2:1
defendants [1] - 11:4
defense [2] - 28:9, 30:20
defenses [1] - 28:13
define [3] - 13:18, 14:14, 17:17
defined [4] - 3:1, 3:10, 13:14, 13:19
defines [1] - 18:11
definition [13] - 6:19, 7:4, 7:6, 8:9, 8:12, 8:16, 9:5, 9:17, 12:8, 15:13, 18:16, 19:3
definitive [2] - 4:14, 38:11
definitively [5] - 5:23, 14:22, 17:5, 19:18, 22:7

defy [1] - 23:19
Delaware [2] - 1:3, 1:10
delayed [1] - 29:16
described [1] - 15:25
designed [4] - 16:11, 36:23, 36:25, 37:2
detail [4] - 9:8, 22:6, 22:22, 22:23
detailed [1] - 15:24
details [3] - 22:1, 26:4, 31:8
determination [1] - 18:4
determine [12] - 3:13, 9:2, 9:10, 10:16, 11:3, 11:4, 12:24, 13:1, 17:5, 17:13, 20:15, 35:11
determined [1] - 27:6
determines [1] - 22:8
determining [2] - 10:10, 17:19
developed [1] - 38:19
devil [1] - 26:4
devoted [1] - 42:3
diagrams [1] - 20:15
Dick [1] - 16:23
different [8] - 12:18, 14:3, 19:15, 20:6, 22:4, 32:24, 37:15, 42:8
differently [1] - 14:5
difficult [1] - 35:1
difficulty [2] - 6:2, 19:8
directly [1] - 4:1
disagree [3] - 19:3, 20:8, 20:9
discontinued [1] - 6:7
discover [1] - 30:9
discovery [57] - 2:25, 3:4, 3:11, 3:16, 3:24, 3:25, 4:8, 5:1, 5:5, 5:6, 5:10, 5:18, 5:21, 6:10, 6:23, 7:4, 7:9, 7:17, 7:19, 8:13, 10:2, 10:5, 10:6, 10:7, 10:9, 10:12, 10:16, 11:2, 11:18, 12:21, 14:9, 15:8, 15:14, 16:11, 19:6, 23:3, 24:12, 26:17, 26:22, 26:23, 27:5, 27:23, 28:3, 30:17, 30:19, 33:4, 33:9, 33:14, 36:6, 36:8, 36:19, 36:21,

37:22, 38:23, 39:3, 40:6, 42:22
**discrete** [1] - 3:20
**discuss** [3] - 2:18, 26:19, 36:24
**discussed** [1] - 27:12
**discussing** [1] - 32:18
**discussion** [1] - 36:2
**dispensed** [1] - 15:4
**disprove** [1] - 10:11
**dispute** [8] - 26:17, 27:23, 36:6, 36:8, 37:2, 37:9, 38:20, 38:24
**disputed** [2] - 38:9, 38:15
**disputes** [2] - 26:22, 37:10
**disruption** [1] - 6:2
**distinct** [1] - 5:13
**District** [2] - 1:2, 1:3
**documents** [22] - 3:21, 8:4, 8:6, 9:12, 9:15, 15:19, 17:1, 23:5, 24:7, 27:4, 29:5, 29:19, 30:25, 32:25, 33:4, 33:7, 33:10, 33:14, 33:23, 33:25, 34:3
**Don** [2] - 1:17, 2:7
**done** [6] - 3:10, 9:12, 28:21, 35:3, 37:22, 38:14
**down** [6] - 17:22, 18:2, 20:12, 21:5, 36:24, 39:14
**dropped** [1] - 18:23
**Dunner** [1] - 1:19

## E

**early** [1] - 36:23
**earnest** [1] - 36:24
**easier** [1] - 16:7
**easy** [1] - 13:15
**effort** [1] - 36:10
**either** [4] - 5:12, 5:18, 14:14, 17:2
**electronically** [2] - 27:14, 27:15
**end** [2] - 6:6, 22:4
**enforcing** [1] - 42:4
**engineer** [1] - 6:4
**enter** [1] - 24:4
**entered** [1] - 3:9
**entire** [1] - 42:10
**entitled** [5] - 5:18, 11:2, 17:20, 41:18,

42:15
**Esq** [9] - 1:15, 1:17, 1:17, 1:18, 1:21, 1:23, 1:23, 1:24, 1:24
**essentially** [4] - 3:1, 13:8, 29:23, 38:13
**establish** [3] - 19:23, 21:25, 43:2
**established** [3] - 5:3, 35:11, 35:12
**establishing** [1] - 22:5
**estimate** [1] - 27:7
**estoppel** [1] - 28:13
**eventually** [2] - 19:13, 37:4
**evidence** [3] - 5:6, 5:10, 10:7
**exact** [1] - 22:15
**exactly** [7] - 3:4, 3:7, 8:11, 21:16, 25:7, 32:11, 41:11
**examining** [1] - 19:19
**example** [9] - 13:23, 14:12, 14:20, 27:3, 29:7, 38:5, 41:22, 43:6
**exception** [3] - 4:14, 14:22, 19:20
**exchange** [1] - 37:3
**exchanged** [1] - 38:15
**excuse** [1] - 31:20
**excuses** [1] - 29:16
**executed** [1] - 3:6
**exist** [1] - 34:13
**expect** [2] - 5:16, 14:9
**expense** [1] - 9:16
**expensive** [1] - 6:5
**extreme** [1] - 13:23
**extremely** [1] - 6:5

## F

**fact** [13] - 3:5, 4:20, 8:5, 10:8, 10:16, 10:21, 15:3, 19:24, 20:2, 28:13, 35:10, 38:17, 42:9
**factors** [2] - 42:20, 43:4
**factual** [3] - 29:18, 35:9, 41:17
**fair** [1] - 37:21
**faith** [1] - 23:21
**falls** [1] - 24:18
**far** [4] - 13:4, 16:17, 32:22, 39:9

**Farabow** [1] - 1:18
**fashion** [1] - 15:24
**faster** [1] - 32:5
**Federal** [12] - 4:2, 5:2, 8:13, 10:5, 10:8, 10:13, 10:20, 11:8, 12:11, 13:22, 14:4, 14:5
**federal** [1] - 10:5
**felt** [1] - 25:25
**field** [1] - 37:2
**fight** [5] - 19:5, 30:18, 32:17, 41:5
**figure** [1] - 32:11
**file** [5] - 10:22, 13:24, 14:12, 15:7, 15:9
**filed** [1] - 34:22, 34:25, 35:3
**filing** [5] - 39:24, 40:3, 40:4, 40:22, 40:24
**Finally** [1] - 5:24
**fine** [5] - 15:18, 17:19, 29:17, 30:2, 32:1
**finished** [1] - 18:8
**Finnegan** [3] - 1:18, 2:6, 31:17
**first** [14] - 4:9, 6:1, 16:6, 26:17, 27:22, 28:8, 30:23, 34:19, 35:8, 36:2, 38:19, 40:18, 41:10, 41:12
**five** [2] - 7:19, 30:5
**followup** [1] - 18:24
**foresee** [1] - 27:2
**forever** [1] - 40:5
**form** [2] - 27:10, 37:4
**format** [1] - 27:15
**formatted** [1] - 18:12
**four** [1] - 38:18
**frame** [1] - 16:21
**frames** [3] - 19:1, 20:23, 22:19
**frankly** [2] - 14:3, 23:24
**full** [3] - 3:16, 3:24, 24:12
**fully** [1] - 14:11
**function** [3] - 14:16, 14:19, 30:2
**functionalities** [1] - 30:15
**functionality** [3] - 3:21, 17:1, 24:8
**future** [1] - 20:14

## G

**games** [1] - 35:15

**Garrett** [1] - 1:19
**gathering** [1] - 10:11
**Geddes** [2] - 1:16, 2:5
**general** [1] - 10:23
**gentlemen** [2] - 2:9, 20:4
**Georgia** [2] - 42:21, 43:5
**Georgia-pacific** [2] - 42:21, 43:5
**Given** [1] - 26:15
**given** [10] - 5:8, 6:25, 7:8, 15:23, 19:18, 23:8, 28:1, 30:8, 34:21, 38:3
**Gms** [1] - 1:9
**Gregory** [1] - 1:13
**group** [1] - 2:18
**guess** [1] - 7:15
**gun** [3] - 38:13, 39:4, 39:11

## H

**half** [1] - 40:13
**hand** [1] - 32:25
**handed** [1] - 18:10
**handle** [2] - 37:11, 42:17
**hear** [2] - 15:20, 41:8
**heard** [2] - 25:12, 26:15
**hearing** [1] - 11:12
**held** [1] - 42:6
**help** [3] - 10:11, 30:20, 39:3
**helping** [1] - 33:23
**Henderson** [3] - 1:18, 2:7, 31:17
**hide** [1] - 15:22
**hiding** [1] - 9:22
**hold** [1] - 40:5
**hole** [1] - 31:2
**Honor** [64] - 2:4, 2:12, 2:20, 2:25, 3:25, 5:11, 5:24, 6:9, 6:14, 11:14, 12:10, 13:3, 14:10, 14:24, 15:11, 16:6, 16:16, 17:10, 17:12, 18:6, 18:14, 19:10, 20:10, 21:9, 21:22, 21:24, 23:1, 23:10, 23:16, 24:3, 24:4, 24:16, 25:13, 25:20, 26:6, 26:7, 26:14, 26:15, 26:7, 27:17, 28:4, 28:7, 31:6, 32:4, 32:13, 32:14, 33:15, 34:7,

34:12, 35:6, 35:23, 35:24, 36:1, 36:8, 36:16, 37:13, 38:3, 38:14, 39:2, 39:20, 41:9, 42:18, 43:12, 43:15
**Honor's** [5] - 13:9, 37:17, 37:18, 38:8, 38:13
**Honorable** [1] - 1:13
**hop** [1] - 40:21
**hop-scotch** [1] - 40:21
**house** [3] - 32:19, 32:22, 33:4
**hundred** [2] - 22:5, 25:16
**hypothetical** [1] - 43:3

## I

**idea** [2] - 12:12, 26:25
**identified** [10] - 7:10, 7:21, 7:24, 8:3, 15:4, 25:15, 25:16, 25:24, 39:9
**identify** [6] - 3:19, 7:12, 8:10, 10:3, 24:7, 32:23
**identifying** [3] - 3:23, 32:8, 32:18
**imagine** [1] - 23:6
**implemented** [2] - 22:1, 22:6
**implicitly** [1] - 5:21
**implied** [1] - 35:17
**implying** [1] - 13:5
**important** [3] - 3:3, 15:21, 39:23
**impose** [1] - 26:11
**imposing** [1] - 26:8
**impossible** [3] - 6:6, 19:18, 19:20
**Inc** [2] - 1:5, 1:8
**inception** [1] - 28:23
**include** [3] - 6:20, 8:16, 43:6
**included** [1] - 4:5
**incorrect** [1] - 10:17
**independently** [1] - 15:9
**indicate** [1] - 5:8
**indicates** [3] - 2:24, 31:8, 42:2
**individually** [1] - 2:19
**inform** [2] - 37:23, 38:24

informally [1] - 37:14
information [29] - 2:25, 4:23, 4:25, 5:4, 6:1, 6:25, 7:7, 7:8, 9:7, 9:8, 10:11, 10:24, 11:3, 17:7, 18:3, 22:13, 23:18, 24:9, 25:13, 29:2, 29:11, 29:18, 30:8, 30:23, 31:14, 32:10, 35:9, 38:12, 42:21
informed [1] - 37:7
infringe [15] - 4:15, 4:22, 5:15, 5:23, 7:13, 8:11, 15:15, 15:17, 16:1, 19:17, 22:12, 24:11, 29:21, 30:5, 30:16
infringed [3] - 4:10, 11:23, 35:13
infringement [16] - 4:24, 5:4, 7:16, 7:22, 13:17, 14:13, 17:6, 19:21, 19:24, 19:25, 20:3, 20:11, 28:15, 28:19, 29:1, 35:11
infringers [1] - 43:1
infringes [8] - 4:19, 13:13, 14:20, 15:2, 16:22, 20:20, 22:9, 24:25
infringing [9] - 3:23, 5:13, 7:1, 7:24, 24:11, 32:8, 34:20, 34:24, 35:8
initial [2] - 11:20, 19:6
inquiries [1] - 37:24
insofar [1] - 13:22
insufficient [1] - 11:13
integrated [2] - 14:15, 14:19
intended [1] - 39:4
intercompatibility [1] - 29:7
intercompatible [2] - 28:25, 29:8
interested [2] - 11:11, 39:6
interrogatories [6] - 4:5, 5:25, 7:5, 7:25, 17:16, 37:18
interrogatory [5] - 6:19, 7:11, 7:20, 17:16, 34:18
interrupt [2] - 13:20, 16:8
interrupted [1] - 18:7
invalid [1] - 16:3

invalidity [5] - 9:24, 23:7, 36:9, 36:13, 39:8
invented [1] - 12:18
invention [36] - 8:20, 8:22, 9:19, 11:2, 11:19, 12:3, 12:5, 12:9, 12:13, 12:19, 13:2, 13:7, 13:14, 13:16, 13:18, 13:19, 15:18, 16:2, 17:20, 17:25, 19:2, 22:21, 24:19, 25:6, 39:22, 39:25, 40:1, 40:2, 40:4, 40:6, 40:8, 40:14, 40:19, 40:23, 41:1, 41:5
inventor [1] - 17:24
inventors [1] - 20:18
iron [1] - 18:15
ironed [1] - 31:8
Israel [2] - 1:24, 2:14
issue [3] - 2:22, 34:13, 36:2
issued [1] - 30:5
issues [6] - 2:17, 28:5, 28:8, 39:8, 39:9, 39:10
items [1] - 2:18
itself [2] - 36:20, 39:17

## J

John [8] - 1:15, 1:18, 1:21, 2:5, 2:8, 2:12, 25:21
July [2] - 18:11, 18:17
jump [2] - 39:4, 39:11
jumps [1] - 38:13
jury [2] - 12:17, 43:10
justify [1] - 23:4

## K

keep [1] - 20:10
keeping [1] - 16:10
Kevin [1] - 43:19
kind [1] - 4:25
knowing [2] - 19:24, 22:5
knowledge [3] - 29:15, 31:9, 41:22
known [1] - 28:18

## L

laches [7] - 28:8,

28:12, 28:17, 29:13, 30:19, 30:20
language [3] - 5:5, 20:6, 25:8
large [1] - 35:4
Latham [3] - 1:25, 2:14, 6:15
law [2] - 4:2, 35:10
lawsuit [1] - 10:22
lawyer [1] - 34:11
lead [4] - 2:7, 5:6, 5:10, 10:7
leading [1] - 11:16
leads [1] - 37:3
least [12] - 14:17, 14:18, 23:3, 23:9, 30:9, 30:22, 33:17, 34:8, 36:11, 37:5, 39:8, 40:24
leave [2] - 23:23, 24:2
leaves [1] - 21:6
legal [1] - 41:17
legalese [1] - 35:19
less [2] - 20:6, 21:9
letter [9] - 2:24, 4:6, 18:10, 18:17, 18:19, 18:23, 18:24, 20:22, 42:10
level [1] - 9:8
licensed [1] - 42:7
licensing [5] - 41:24, 42:2, 42:3, 42:5, 42:10
likely [7] - 4:18, 14:18, 14:25, 16:20, 19:11, 20:1, 20:20
limit [1] - 23:3
limitations [1] - 38:4
limited [3] - 6:10, 24:7, 32:7
line [1] - 11:5
list [1] - 7:14
listed [3] - 18:13, 20:22, 43:4
listen [1] - 35:18
listening [2] - 11:15, 11:17
lists [1] - 38:14
literally [3] - 6:20, 35:16, 37:6
litigants [1] - 37:8
litigated [3] - 12:10, 17:24, 20:19
litigation [3] - 8:7, 31:19, 32:11
LIp [1] - 1:19, 1:22
local [1] - 2:6
locked [2] - 21:7, 21:8

logical [2] - 2:20
look [4] - 29:10, 32:20, 32:21, 42:1
looked [2] - 19:12, 32:21
looking [5] - 15:14, 15:19, 21:5, 25:21, 40:15
looms [1] - 35:4
Lucent [38] - 1:8, 2:11, 2:13, 3:7, 3:12, 3:19, 3:24, 4:3, 4:7, 4:17, 5:14, 5:16, 5:20, 5:25, 6:13, 6:21, 8:5, 8:17, 11:13, 11:21, 14:13, 15:5, 15:14, 15:16, 16:20, 18:15, 25:1, 26:2, 28:6, 28:14, 28:24, 31:20, 31:22, 35:13, 37:21, 42:9, 43:3, 43:7
Lucents [3] - 3:5, 6:4, 11:17, 13:4, 25:23, 32:5, 35:8, 37:14, 38:11

## M

manager [1] - 42:3
map [3] - 15:14, 16:1, 20:22
mapping [4] - 17:3, 17:4, 17:13, 18:3
maps [4] - 15:16, 16:21, 19:1, 22:18
market [1] - 6:8
Markman [3] - 36:20, 36:22, 37:1
massage [1] - 23:23
master [2] - 26:10, 26:15, 26:23
materials [1] - 31:20
matter [4] - 5:24, 27:16, 27:23, 40:25
Maurer [1] - 43:19
Mayergoyz [2] - 1:24, 2:14
Mckone [5] - 1:24, 2:14, 41:16, 42:14, 43:15
mean [4] - 20:12, 21:6, 38:18, 38:19
means [1] - 12:5
meant [1] - 35:18
mechanisms [1] - 37:15
meet [8] - 3:17, 3:19, 3:22, 4:15, 4:21, 9:3, 19:16, 37:1
meet-and-confer [1]

- 37:1
meets [7] - 4:18, 5:8, 5:12, 5:15, 13:12, 15:1, 24:25
met [5] - 4:8, 4:9, 11:22, 15:6, 27:22
might [5] - 5:14, 13:5, 19:13, 23:6, 26:9
million [5] - 8:4, 9:14, 27:4, 27:8
million-three [1] - 9:14
millions [1] - 23:5
mind [2] - 16:10, 30:6
misspeak [1] - 17:10
mistaken [2] - 23:12, 36:15
mixed [1] - 35:10
mixing [1] - 32:16
model [1] - 25:17
months [2] - 40:22, 40:24
moots [1] - 38:13
Moreover [2] - 3:15, 42:7
morning [7] - 2:2, 2:4, 2:5, 2:9, 2:10, 2:12, 2:16
move [2] - 23:9, 32:2
moved [2] - 23:11, 36:14
moving [1] - 36:10
must [2] - 3:24, 29:8

## N

name [1] - 10:22
narrow [2] - 3:11, 37:2
narrowed [2] - 4:4, 4:5
natural [1] - 7:15
nearly [1] - 8:16
necessarily [1] - 14:3
necessary [2] - 23:2, 26:21
need [19] - 6:6, 8:9, 8:10, 8:11, 16:4, 18:5, 20:19, 26:4, 26:23, 28:17, 32:2, 32:8, 33:8, 34:9, 36:17, 37:22, 40:6, 40:10, 40:20
needed [1] - 4:25
needs [5] - 31:7, 34:1, 34:5, 35:16, 37:22

negotiation [1] - 43:3

Nelson [42] - 1:23, 2:14, 6:14, 11:10, 11:25, 12:2, 12:7, 12:9, 14:2, 14:8, 14:11, 15:10, 15:11, 16:18, 17:11, 17:12, 18:7, 18:9, 18:18, 18:20, 20:8, 20:9, 21:14, 21:16, 22:14, 22:17, 22:23, 24:13, 24:15, 25:1, 25:3, 25:4, 25:9, 25:11, 27:3, 27:8, 32:17, 36:1, 36:7, 39:1, 39:2

Nelson's [3] - 13:21, 14:2, 27:4

net [1] - 10:14

never [2] - 23:11, 36:15

new [1] - 7:22

New [2] - 1:25

next [1] - 14:10

non [1] - 30:19

non-laches [1] - 30:19

nondiscriminatory [2] - 41:25, 42:24

noninfringement [3] - 9:23, 36:12, 39:9

noninfringing [1] - 5:17

note [1] - 3:3

nothing [4] - 31:19, 39:11, 40:10, 43:4

November [1] - 38:15

nowadays [1] - 41:1

nuances [1] - 38:8

number [2] - 8:10, 23:8

**O**

object [1] - 7:2

obligations [1] - 4:13

obtain [4] - 5:1, 5:21, 6:8, 9:7

obtained [1] - 31:14

Obviously [2] - 15:20, 19:3

obviously [6] - 5:25, 13:25, 17:18, 28:18, 37:13, 43:1

October [1] - 1:11

odd [1] - 28:20

offered [1] - 11:13

offering [1] - 42:10

old [1] - 28:12

once [1] - 17:6, 31:1,

38:18

One [2] - 25:12, 28:17

one [24] - 4:10, 7:13, 7:18, 7:22, 10:23, 12:16, 13:15, 13:18, 13:24, 15:6, 16:4, 16:8, 16:25, 18:21, 20:21, 24:23, 27:18, 34:13, 34:16, 36:1, 38:11, 39:24, 40:12, 40:24

one-sentence [2] - 13:15, 13:18

one-stage [1] - 24:23

ones [1] - 22:11

oppose [1] - 26:25

opposed [1] - 23:11

oranges [1] - 32:16

order [12] - 4:25, 13:9, 24:1, 24:4, 33:9, 36:5, 37:17, 37:19, 37:22, 38:8, 39:5, 39:12

ordered [1] - 6:11

ordering [1] - 35:21

organizations [1] - 41:24

original [2] - 6:18, 7:21

originally [2] - 4:4, 7:23

ought [1] - 32:12

outlined [2] - 36:4, 36:18

outset [1] - 3:3

outside [3] - 3:5, 33:22, 34:4

over-lawyer [1] - 34:11

overly [2] - 7:6, 13:25

own [2] - 28:24, 40:6

Ozmine [3] - 31:10, 31:15, 31:19

**P**

pacific [2] - 42:21, 43:5

packetize [1] - 19:1

packetized [8] - 15:15, 15:16, 16:1, 16:21, 18:11, 18:17, 20:22, 22:18

packetizing [2] - 18:21, 18:22

pages [2] - 8:4, 23:5, 27:8

paid [1] - 43:7

panel [1] - 28:3

paragraph [1] - 35:17

part [3] - 13:17, 32:5, 42:22

particular [6] - 4:20, 5:16, 7:14, 22:7, 36:9, 37:8

parties [4] - 8:6, 13:9, 26:12, 27:12

party [2] - 10:19, 37:25

patent [27] - 4:19, 4:22, 7:1, 12:10, 12:13, 12:14, 13:2, 15:25, 16:19, 16:22, 16:25, 17:24, 20:3, 20:18, 21:11, 22:9, 22:12, 30:5, 37:7, 38:5, 41:20, 41:23, 41:24, 42:3, 42:5, 42:7

patentowner [1] - 20:13

patents [17] - 4:10, 4:15, 16:6, 16:7, 16:12, 28:11, 28:12, 39:20, 39:21, 40:1, 40:12, 42:11, 42:16, 42:23, 42:25, 43:7

pay [1] - 27:6

people [3] - 31:18, 33:18, 42:25

percent [1] - 22:5

perfectly [2] - 24:24, 40:3

performs [2] - 14:16, 14:19

Perhaps [1] - 12:7

perhaps [5] - 13:23, 14:4, 20:5, 21:6, 39:16

permitted [1] - 16:14

phone [1] - 2:6

phonetic [1] - 31:10

phrase [1] - 12:4

phrasing [1] - 20:10

physically [1] - 19:20

pictures [1] - 27:10

piece [2] - 40:5, 40:22

pieces [1] - 15:23

pivotal [1] - 39:10

place [4] - 11:4, 30:23, 33:8, 38:19

placing [1] - 10:18

plaintiff [5] - 2:3, 30:22, 34:23, 35:5, 41:1

Plaintiff [2] - 1:6,

1:20

play [1] - 40:21

plus [1] - 7:22

point [20] - 5:14, 8:7, 8:24, 9:6, 9:16, 14:10, 15:11, 23:10, 23:24, 25:12, 26:6, 27:20, 29:18, 33:6, 36:11, 37:21, 38:7, 42:12, 43:11, 43:14

Point [1] - 34:16

pointedly [1] - 23:1

points [2] - 13:22, 27:21

position [16] - 3:25, 6:17, 8:25, 10:4, 11:6, 11:12, 11:15, 12:12, 13:1, 21:8, 23:1, 35:7, 40:7, 40:9, 40:18, 42:15

positions [4] - 36:24, 37:3, 38:9, 38:19

possibility [1] - 5:14

possible [2] - 2:18, 14:18

potentially [2] - 33:25, 39:10

practical [1] - 5:24

practice [1] - 28:1

precluded [1] - 31:14

prefer [1] - 25:1

premature [1] - 27:21

preparation [1] - 37:3

prepare [2] - 33:16, 34:2

prepared [3] - 35:18, 43:9, 43:10

presume [1] - 25:22

pretty [2] - 12:16, 34:23

problem [6] - 4:2, 12:6, 24:15, 27:19, 31:13, 33:22, 34:3, 37:14

problematic [1] - 21:18

problems [2] - 3:14, 26:1

process [17] - 3:18, 6:2, 24:5, 24:24, 25:14, 25:17, 25:18, 33:10, 36:4, 36:18, 36:23, 37:23, 39:12, 39:17, 41:6, 42:22

produce [2] - 7:8, 9:2, 9:11, 15:19, 33:3, 33:10, 33:11, 33:19, 33:23

produced [6] - 8:3, 8:5, 8:6, 9:14, 9:15, 27:5

product [27] - 4:18, 5:8, 5:12, 5:13, 5:15, 5:17, 5:19, 5:22, 6:21, 7:18, 7:23, 8:10, 10:23, 11:22, 13:12, 14:18, 15:1, 15:5, 15:16, 16:21, 19:16, 20:20, 22:7, 22:10, 24:7, 24:10, 24:25

production [1] - 25:23

products [69] - 3:1, 3:10, 3:13, 3:16, 3:19, 3:21, 3:23, 4:8, 4:9, 4:15, 4:21, 5:22, 6:4, 6:7, 6:20, 6:25, 7:9, 7:10, 7:12, 7:14, 7:16, 7:17, 7:19, 7:21, 7:23, 7:24, 8:2, 8:11, 8:17, 9:2, 9:10, 9:12, 9:18, 10:24, 11:3, 14:13, 14:14, 15:3, 15:4, 15:9, 15:13, 15:14, 17:17, 20:14, 24:12, 25:16, 25:22, 25:23, 28:23, 28:24, 28:25, 29:3, 29:8, 29:9, 29:20, 29:25, 30:2, 30:3, 30:4, 31:9, 31:11, 31:19, 32:8, 32:18, 32:23, 33:12, 38:5, 38:6

program [2] - 31:10, 31:15

promptly [1] - 3:22

proposal [2] - 25:8, 32:5

proposed [2] - 31:22, 38:16

protocol [3] - 18:22, 22:6, 22:8

protocols [15] - 17:3, 17:4, 17:13, 18:3, 18:12, 18:16, 18:21, 18:25, 19:17, 20:21, 21:12, 21:25, 22:11, 22:19

prove [2] - 10:11, 28:17

provide [12] - 3:4, 3:20, 3:24, 6:1, 7:3, 8:11, 8:15, 10:2, 11:9, 24:7, 24:12, 43:9

provided [10] - 9:5, 13:9, 27:9, 27:13, 27:14, 30:23, 37:16, 38:9, 39:5, 42:20

providing [5] - 4:8, 19:6, 22:17, 36:12, 36:13
provision [4] - 33:2, 33:3, 33:13, 33:17
public [1] - 42:24
purchase [1] - 31:11
purpose [5] - 31:15, 31:21, 32:8, 34:1, 36:16
purposes [6] - 10:9, 11:13, 23:2, 29:12, 32:10, 36:9
pursuant [1] - 29:11
put [2] - 29:23, 33:8

**Q**

questions [2] - 18:13, 30:12
quickly [1] - 16:13
quite [3] - 4:17, 14:2, 23:24

**R**

Rbox [2] - 28:21, 31:12
Rainey [1] - 40:16
raise [1] - 2:22
raised [1] - 28:6
rate [1] - 43:12
rather [3] - 7:2, 16:11, 16:13
re [1] - 35:16
re-thought [1] - 35:16
reach [2] - 8:23, 19:14
reaction [2] - 11:11, 26:24
read [3] - 21:6, 23:19, 41:13
readable [1] - 27:11
readily [1] - 39:24
reading [1] - 14:4
realize [1] - 19:22
really [3] - 25:17, 28:8, 35:9
reason [5] - 5:16, 36:7, 39:6, 39:10, 41:21
reasonable [7] - 25:25, 41:19, 41:25, 42:16, 42:20, 43:2, 43:10
reasonably [5] - 5:5, 5:9, 8:24, 10:6, 14:17
reasons [4] - 6:9, 16:25, 39:14, 39:15

received [2] - 9:25, 23:6
recognize [1] - 27:17
recollect [1] - 27:22
refusal [1] - 11:18
refuse [1] - 10:25
regard [2] - 38:1, 39:18
regarding [5] - 26:20, 29:3, 29:6, 33:10, 33:24
regional [1] - 31:12
relate [1] - 28:8
related [5] - 5:22, 15:8, 17:2, 24:7
relates [1] - 5:4
relating [4] - 2:25, 3:21, 5:19, 18:14
relevant [5] - 3:21, 4:19, 17:13, 17:19, 18:4
reluctant [2] - 27:2, 41:14
Reporter [1] - 43:19
represented [2] - 35:16, 41:23
request [5] - 19:9, 24:4, 27:18, 27:21, 38:11
requested [2] - 6:1, 24:6
requesting [1] - 22:16
requests [1] - 7:9
require [1] - 43:14
required [3] - 4:1, 22:6, 35:10
requirement [2] - 10:19, 14:25
requirements [1] - 18:2
requires [1] - 12:23
requiring [3] - 38:14
respect [11] - 3:16, 7:10, 8:8, 16:7, 16:19, 19:5, 35:7, 36:3, 36:9, 38:10, 39:7
respond [4] - 2:10, 7:9, 24:13, 31:5
responded [7] - 4:7, 7:5, 9:23, 9:24, 29:10, 35:19, 35:20
responding [1] - 39:15
response [8] - 7:15, 7:18, 8:15, 29:13, 30:21, 35:5, 35:15, 35:22
responses [6] - 6:19, 7:12, 7:20, 17:16,

36:12, 36:13
restatement [1] - 24:16
restrictions [1] - 32:6
result [2] - 6:6, 43:2
reverse [1] - 6:4
reverse-engineer [1] - 6:4
Richard [2] - 1:17, 2:8
ridiculous [1] - 6:23
rights [1] - 33:24
ripe [1] - 27:16
road [3] - 17:22, 18:2, 21:5
roll [1] - 2:3
royalties [1] - 42:23
royalty [7] - 41:19, 41:25, 42:16, 42:20, 43:2, 43:11
rule [2] - 5:2, 10:6
Rule [7] - 4:12, 5:3, 5:5, 18:1, 20:1, 35:4, 35:12
rules [4] - 10:17, 10:22, 16:10
Rules [10] - 4:2, 5:2, 8:13, 10:5, 10:13, 10:20, 11:8, 13:22, 14:4, 14:5

**S**

satisfied [1] - 20:2
satisfies [4] - 13:12, 14:18, 22:7, 22:11
satisfy [3] - 3:13, 19:16, 20:1
saw [1] - 31:2
schedule [1] - 36:19
scheduling [4] - 36:5, 37:17, 37:19, 38:8
schematics [1] - 20:15
scope [34] - 6:22, 8:12, 8:18, 9:1, 9:19, 10:1, 10:3, 10:5, 10:15, 10:17, 11:1, 11:6, 11:18, 11:19, 12:3, 12:5, 12:9, 12:19, 12:25, 13:2, 13:7, 13:14, 13:16, 15:17, 16:2, 17:25, 19:4, 20:11, 20:16, 20:24, 22:20, 24:18, 24:19, 25:6
scotch [1] - 40:21
searchable [1] - 27:15

second [2] - 13:20, 21:21
section [1] - 15:25
see [8] - 5:12, 17:2, 17:6, 21:18, 25:10, 26:3, 27:5, 39:18
seek [1] - 3:11
seeking [4] - 2:25, 3:16, 15:8, 35:9
sell [1] - 28:24
semantical [2] - 11:16, 12:5
senior [1] - 42:2
sense [1] - 26:9
sent [2] - 3:5, 42:9
sentence [2] - 13:15, 13:18
seriously [1] - 4:13
set [9] - 3:20, 4:3, 4:6, 9:18, 11:23, 13:13, 18:16, 19:6, 21:25
setting [1] - 3:1
seven [4] - 18:16, 20:21, 25:16, 38:5
several [2] - 42:8
Shaw [3] - 1:21, 2:12
shifts [1] - 12:22
ship [1] - 28:2
shoe [1] - 18:23
show [3] - 29:5, 29:20, 30:20
showing [2] - 36:6, 36:7
side [4] - 26:19, 37:12, 39:15, 41:8
sides [2] - 26:20, 34:11
similar [1] - 36:2
simple [2] - 15:15, 42:19
simplified [1] - 13:25
simply [3] - 7:2, 10:14, 36:14
single [1] - 6:20
sit [3] - 20:12, 36:24, 39:13
situation [4] - 4:1, 4:14, 28:20, 29:22
six [5] - 6:25, 7:10, 7:13, 7:22, 25:15
Sleet [1] - 1:13
Smith [5] - 1:17, 2:8, 16:23, 17:8, 17:9
sometime [1] - 13:10
somewhere [1] - 25:15
sonic [4] - 16:21, 19:1, 20:23, 22:19
sorry [2] - 18:7, 32:4

sort [2] - 3:18, 24:1
sought [1] - 6:10
sound [3] - 13:4, 13:18, 24:1
sounded [1] - 13:6
Sounds [1] - 34:6
sounds [4] - 14:6, 20:5, 21:7, 22:14, 23:15, 34:7
sourcecode [3] - 27:10, 27:12, 27:14
sourcecodes [1] - 27:9
Speaker [1] - 27:25
speaking [1] - 16:11
special [2] - 26:10, 26:15
specific [3] - 8:9, 8:12, 16:12, 38:12, 39:3, 39:5, 40:15, 42:21
specifically [3] - 10:9, 27:13, 36:19
spirit [1] - 37:6
spoken [1] - 26:14
Srts [3] - 41:23, 42:3, 42:5
stage [8] - 3:15, 6:2, 8:2, 8:3, 15:8, 17:21, 19:24, 24:23
staged [3] - 3:18, 24:5
stamp [1] - 29:24
stamping [1] - 30:1
standards [2] - 5:2, 41:23
Stargatt [1] - 1:22
start [3] - 2:2, 2:17, 28:9
started [2] - 6:18, 31:25
state [2] - 11:21, 41:19
statement [5] - 4:12, 10:13, 10:23, 11:20, 13:25
states [1] - 42:4
States [1] - 1:2
step [1] - 6:16
stepped [1] - 3:18
Steve [1] - 2:13
Steven [1] - 1:23
still [5] - 7:24, 8:16, 18:22, 18:24, 42:18
straightforward [1] - 12:16
strange [1] - 29:22
strikes [1] - 28:2
strongly [1] - 16:3
struggling [2] -

21:19, 21:20
stuff [3] - 32:19, 32:21, 33:19
submit [1] - 11:8
submitted [1] - 31:20
substantial [2] - 8:4, 8:5
substantive [2] - 29:13, 30:18
substantively [1] - 33:7
substituting [1] - 3:7
sufficient [3] - 5:7, 15:7, 34:5
suggest [2] - 24:3, 34:10
suggestion [1] - 26:15
suit [14] - 4:24, 6:20, 14:12, 15:9, 15:13, 28:11, 29:17, 34:22, 34:25, 35:3, 39:21, 40:12, 42:16
sum [1] - 42:13
supplement [5] - 17:22, 17:23, 18:1, 35:21, 40:10
Supplementation [1] - 40:11
supplemented [2] - 7:20, 7:25
supported [1] - 4:1
supposed [1] - 11:18
surprising [2] - 34:21, 34:23
surprisingly [1] - 28:12, 34:18, 34:20, 39:22
suspect [1] - 12:16
switch [1] - 14:13
systems [2] - 15:24, 38:18

T

target [8] - 23:9, 23:10, 23:11, 36:10, 36:14, 36:15, 40:15
Taylor [1] - 1:22
tea [1] - 21:6
team [1] - 31:17
technical [1] - 17:1
technological [7] - 3:2, 3:11, 4:6, 11:22, 13:12, 14:16, 15:6
technologically [1] - 16:24
Technologies [2] - 1:5, 1:8
technology [1] -

16:13
tee [1] - 36:25
Telcordia [26] - 1:5, 2:5, 2:7, 3:15, 6:19, 9:6, 28:20, 29:2, 29:15, 30:11, 30:13, 31:2, 31:5, 31:9, 31:10, 31:18, 31:21, 31:22, 32:6, 33:12, 33:18, 41:16, 41:18, 42:6, 42:9, 43:3
Telcordias [4] - 2:17, 10:4, 10:21, 42:4
Teleconference [2] - 1:12, 43:17
ten [6] - 28:16, 28:21, 29:16, 29:24, 30:1, 30:4
terminology [1] - 22:16
terms [17] - 3:12, 6:23, 9:9, 13:19, 16:12, 20:11, 38:9, 38:10, 38:12, 38:15, 38:16, 38:20, 38:24, 39:3, 39:5, 39:7, 42:10
test [1] - 28:22
tested [1] - 28:23
testing [5] - 28:20, 29:6, 29:22, 30:11, 31:16
tests [1] - 31:11
themselves [1] - 15:25
therefore [1] - 29:15
thinking [2] - 37:6, 37:7
three [8] - 2:18, 2:21, 2:22, 4:10, 7:23, 9:14, 40:22, 40:24
tie [1] - 8:13
time-consuming [1] - 6:5
today [4] - 27:16, 42:5, 42:15, 43:11
took [1] - 12:12
Totally [1] - 34:14
totally [1] - 27:9
transcript [1] - 23:20
trial [4] - 19:23, 29:17, 31:17, 33:7
trouble [1] - 19:11
true [2] - 25:19, 42:22
trump [1] - 37:18
try [1] - 30:6
trying [8] - 8:23, 13:15, 15:22, 17:17, 23:2, 23:25, 34:12,

39:11
Tuesday [1] - 1:11
two [7] - 7:21, 16:6, 28:2, 28:8, 39:20, 39:23, 40:2

U

unable [1] - 4:11
unaware [1] - 4:21, 22:13, 24:10
under [4] - 10:20, 10:21, 13:9, 37:17
understood [2] - 11:21, 36:18
Understood [3] - 21:8, 25:11, 38:22
undertake [2] - 9:20, 12:23
unduly [1] - 7:3
Unidentified [1] - 27:25
unintelligible [1] - 7:7
United [1] - 1:2
universe [5] - 3:13, 3:23, 6:4, 13:24, 24:11
unless [2] - 19:19, 22:12
unreasonable [3] - 9:20, 37:24, 43:13
unusable [1] - 27:9
up [11] - 16:23, 27:5, 28:17, 36:6, 36:7, 36:25, 40:7, 40:19, 40:21, 42:13
upwards [1] - 25:15
Usdcj [1] - 1:13
uses [3] - 18:25, 20:21, 22:18
utter [1] - 23:25

V

valid [2] - 17:23, 37:21
various [1] - 29:25
Verizon [1] - 29:25
versus [1] - 30:19
view [1] - 40:20
violating [1] - 33:20
violent [1] - 20:4

W

waive [6] - 32:6, 32:7, 33:1, 33:2, 33:13, 33:24
waiver [3] - 32:9,

32:12, 33:17
waivers [1] - 33:8
walk [1] - 11:5
Washington [1] - 1:19
waste [1] - 32:14
Watkins [3] - 1:25, 2:15, 6:15
ways [3] - 22:4, 22:12, 28:9
website [4] - 9:7, 42:1, 42:4
week [1] - 40:16
weekend [1] - 27:7
well-received [1] - 23:6
wholly [1] - 32:24
Williamson [3] - 1:18, 2:8, 25:21
willing [5] - 4:13, 22:24, 24:20, 24:24, 35:18
Wilmington [1] - 1:10
witness [5] - 30:12, 33:1, 33:11, 33:16, 34:2
witnesses [1] - 33:22
wonder [1] - 11:16
wondering [1] - 26:9
words [4] - 5:20, 8:19, 12:14, 23:25
workable [1] - 34:8
works [5] - 22:8, 22:22, 22:23, 31:7
worth [1] - 42:5
write [1] - 20:13

Y

year [1] - 40:13
years [11] - 28:16, 28:22, 29:4, 29:16, 29:19, 29:24, 30:1, 30:5, 30:8, 40:14
York [2] - 1:25
Young [2] - 1:22, 2:13
yourself [1] - 10:14

# EXHIBIT 4



**Jessica L Davis/SV/WGM/US**

10/27/2005 08:52 PM

To    john.williamson@finnegan.com
cc    JBlumenfeld@MNAT.com
bcc   Katherine Solda/SV/WGM/US
Subject   Telcordia v. Cisco

John:

As a result of the recent teleconference with the Court in the Telcordia v. Lucent case, we expect Telcordia will promptly supplement its responses to Cisco's interrogatories and its document production consistent with the Court's rulings. In particular, we expect that Telcordia will supplements its discovery as follow:

1.      Telcordia will produce all documents and things relating to Telcordia's analyses of Cisco's accused products as part of Telcordia's OSMINE testing and certification process and Telcordia's sale of its products as compatible with Cisco's accused products, including documents showing what Telcordia knew about Cisco's accused products, the individuals with this knowledge, and when Telcordia became aware of this information. We will agree that outside counsel for Telcordia can collect these documents from Telcordia employees for the sole purpose of producing them in the Telcordia v. Cisco litigation without violating any contractual obligations to Cisco.

2.      Telcordia will supplement its response to Cisco's Interrogatory No. 8 to provide Telcordia's earliest claimed conception and reduction to practice dates. As the Court held, Telcordia's response that the claimed inventions were conceived and reduced to practice "at least as early as" the filing dates of the patents in suit is not appropriate. Telcordia must promptly identify the earliest conception and reduction to practice dates it intends to rely on at trial. As you know, the Court rejected Telcordia's strategy of waiting to see what prior art the defendants identify before providing definite dates.

3.      Telcordia will supplement its response to Cisco's Interrogatory No. 7 to provide the dates by which Telcordia claims it became aware of Cisco's alleged infringement of each of the asserted patents. Telcordia's response to this interrogatory discusses pre-suit communications with Cisco, but does not identify the dates by which Telcordia is claiming it became aware of Cisco's alleged infringement as the Court ordered Telcordia to do in the Lucent case.

Please let us know by when we can expect this information.

Thanks,
Jessica

Jessica L. Davis
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone:  (650) 802-3909
Facsimile:    (650) 802-3100
Only admitted to practice in NY

< END >

# EXHIBIT 5



901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

JOHN M. WILLIAMSON
202.408.4282
john.williamson@finnegan.com

November 2, 2005

Jessica L. Davis, Esq.
Weil, Gotshal & Manges LLP                     *via email*
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Telcordia Technologies, Inc. v. Cisco Systems, Inc.

Dear Jessica:

Thank you for your October 27, 2005, email regarding the October 11, 2005, hearing in the Telcordia v. Lucent case ("the Lucent hearing"). Telcordia certainly intends to abide by the Court's direction set forth during the Lucent hearing. The compromises reached between Telcordia and Lucent during the Lucent hearing, however, are specific to that case, and do not necessarily translate to the Cisco case.

For example, your email states that you expect Telcordia to produce OSMINE and interoperability documents to Cisco. Unlike Lucent, however, Cisco has not issued any production requests directed towards this category of documents. Prior to the hearing, in fact, Lucent had propounded no fewer than twenty document requests directed to these topics, and Telcordia had objected to Lucent's requests on a number of grounds, including that contractual provisions restricted Telcordia's use of OSMINE and interoperability documents. Telcordia additionally informed Lucent that statutory provisions also restricted Telcordia's use of those documents. *See, e.g.,* 47 U.S.C. § 273(d)(2). Thus, Telcordia agreed to produce OSMINE and interoperability documents to Lucent only in light of specific representations that Lucent made to address Telcordia's objections.

In our view, it is likely that statutory and contractual provisions also apply here to preclude Telcordia from producing OSMINE and interoperability documents to Cisco. As I'm sure you understand, therefore, before we can even consider producing these documents to Cisco, we will need a formal discovery request that calls for the documents, and we will also need to reach an agreement that protects Telcordia from suffering any consequences as the result of its document production.

Your email also states that you expect Telcordia to supplement its response to Cisco's Interrogatory No. 7 to provide the date(s) Telcordia "became aware of Cisco's alleged infringement" for each asserted patent in light of the Lucent hearing. Again, however, the situations involving Lucent and Cisco are not the same. The Telcordia interrogatory answer at issue during the Lucent hearing included no facts and provided only the dates on which

Jessica L. Davis, Esq.
November 2, 2005
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

Telcordia's outside counsel completed diligence investigations. Accordingly, the issue before the Court (as framed by Lucent) was whether Telcordia could "limit its response to the date upon which its outside counsel completed its diligence." *See* October 7, 2005, Joint Agenda Letter. On the other hand, Telcordia's response to Cisco's Interrogatory No. 7 is not so limited, but already provides all the facts of which Telcordia is aware that bear on the issue of Telcordia's "awareness" of Cisco's infringement. Under these circumstances, therefore, we question whether supplementation is necessary. Nevertheless, we will revisit our answer to Cisco's Interrogatory No. 7 and ensure that it is complete.

Finally, your demand that Telcordia "promptly supplement" its discovery is surprising given Cisco's refusal to supplement its own interrogatory answers (other than Telcordia Interrogatory No. 1). Without identifying all of the specific ongoing deficiencies in Cisco's interrogatory responses, several of Cisco's failures are worthy of particular note. For instance, claiming that it does not understand the phrase "consideration by Cisco of the Relevant Patents," Cisco continues to refuse to answer Telcordia Interrogatory No. 3, which simply seeks the identification of persons responsible for Cisco's consideration of Telcordia's patents-in-suit. Similarly, with no meaningful excuse at all, Cisco has not yet provided its invalidity contentions in response to Telcordia Interrogatory Nos. 5 and 9. Moreover, Cisco's response to Telcordia Interrogatory No. 11 regarding estoppel, implied license, unclean hands, laches, and intervening rights does little more that reiterate the bare allegations in Cisco's answer. Finally, Cisco has not yet even supplemented its discovery responses to account for the new patent added through Telcordia's Amended Complaint, despite the fact that Cisco agreed, over four months ago, that all discovery of record would encompass the new patent. *See* June 14 emails between Y. Faulkner and E. Reines.

In sum, I propose that the parties agree to (1) mutually supplement interrogatory responses on November 11, 2005, and (2) conduct a teleconference regarding remaining deficiencies on November 16, 2005. For its part, Telcordia will supplement its responses to Cisco Interrogatory Nos. 7 and 8, and Telcordia will expect Cisco to supplement at least its responses to Telcordia Interrogatory Nos. 3, 5, 9, and 11 (and update its responses globally to account for the new patent).

Please let me know by close of business on November 4, 2005, whether Cisco will agree to this procedure and the proposed dates.

Very Truly Yours,

John M. Williamson

# EXHIBIT 6

## FULLY REDACTED

# EXHIBIT 7

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE
201 REDWOOD SHORES PARKWAY
REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000
FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(650) 802-3118
sonal.mehta@weil.com

August 16, 2005

**VIA E-MAIL**

John Williamson, Esq.
Finnegan Henderson Farabow
   Garrett & Dunner LLP
901 New York Avenue NW
Washington, DC 20001-4413

Re:    *Telcordia v. Cisco*
       C.A. No. 04-876-GMS

Dear John:

     I write in response to your letters of August 11 and June 15, 2005 concerning Cisco's responses and objections to Telcordia's interrogatories and document requests. I address the issues raised in your letters in turn.

*Interrogatory No. 1*

     First, with regard to the definition of "Products in Suit," we have received your letter of July 13, 2005 proposing a revised definition of "Products in Suit." Though we do not agree that your definition of Products in Suit is coterminous with the scope of the patents-in-suit, Cisco is willing, in the spirit of cooperation and efficient discovery, to supplement its response to Interrogatory No. 1 as follows: (1) with regard to the '306 patent, Cisco will identify those Cisco products that enable customers to transmit data over SONET; (2) with respect to the '633 patent, Cisco will provide discovery as to Cisco products that Cisco has promoted as compliant with the ATM Forum Standard, the I.363.1 standard, or the ANSI T1.630 standard; and (3) for the '763 patent, Cisco will provide discovery as to Cisco products that Cisco has promoted as compliant with GR-1400.

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 2

Once Cisco has supplemented its response to Interrogatory No. 1, Cisco will provide discovery sufficient to show the relevant functionality of the products identified therein to the extent such information is in its possession. That said, as the plaintiff in this action, Telcordia still has the burden of identifying the products it accuses of infringement in this action. Once Telcordia has reviewed the discovery provided by Cisco and made the threshold determination whether or not it is accusing these products of infringement in this case, Cisco will provide additional discovery in accordance with its previously-articulated responses and objections to Telcordia's discovery requests. For Cisco to produce all documents or provide exhaustive discovery on all products identified in response to Interrogatory No. 1 without that threshold determination from Telcordia would be unduly burdensome and oppressive, particularly because Cisco expects the list of products identified in response to Interrogatory No. 1 to be lengthy.

*Interrogatory No. 2*

In its written response to Interrogatory No. 2, Cisco has agreed to provide discovery to Telcordia sufficient to show the relevant sales and revenues for accused products after Telcordia has identified those products. For the reasons stated above, it would be incredibly burdensome for Cisco to provide sales and revenue figures for all products identified in response to Interrogatory No. 1 when, due presumably to a lack of information, Telcordia has not even made the threshold determination of whether it is accusing these products of infringement. As you know, the collection of sales and revenue figures is not a simple process, particularly in a company as large as Cisco. It is one thing for Telcordia to seek sales and revenue figures for products actually accused of infringement—information Cisco has already agreed to produce—and quite another for Telcordia to seek sales and revenue figures for broad range of products that it cannot yet accuse of infringement. The burden associated with the latter is tremendous, and is unwarranted.

*Interrogatory No. 3*

Telcordia's Interrogatory No. 3 asks Cisco to "Identify each person familiar with or responsible for any consideration by Cisco of the Relevant Patents" and instructs that "the response should include, but not be limited to, an identification of current or former officers, employees, agents, and consultants retained by or for Cisco familiar with or responsible for any consideration by Cisco of the Relevant Patents." Cisco has objected to this interrogatory as, *inter alia*, premature to the extent it seeks discovery on Cisco's willfulness allegations and as vague and ambiguous. More specifically, Cisco does not understand what is meant by "any consideration by Cisco of the Relevant Patents." To the extent Telcordia intends this phrase to cover opinions of counsel, Telcordia's request is premature. During the initial case management conference, the Court made clear that discovery as to opinions of counsel is stayed until

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 3

Cisco elects whether or not to rely on any such opinion of counsel. Under the Court's Scheduling Order, it is clear that Telcordia is not entitled to discovery concerning the existence or substance of any opinions of counsel until that election has been made. To the extent this interrogatory seeks discovery related to opinions of counsel, Cisco will provide discovery as to opinions of counsel if and when appropriate. To the extent this interrogatory seeks something different, Cisco does not understand what information is sought.

*Interrogatory No. 4*

Telcordia's Interrogatory No. 4 seeks discovery of the date on which Cisco first became aware of the existence of the patents-in-suit, the person(s) who first became aware of the patents-in-suit and the circumstances surrounding Cisco's discovery of the patents-in-suit. Subject to its objections, Cisco provided Telcordia with a response to this interrogatory based on its knowledge of the facts and circumstances of the case at this early stage. Naturally, Cisco's investigation is ongoing. As discovery and the case progress, Cisco will supplement its responses to Telcordia's interrogatories consistent with its obligations under the Rules.

*Interrogatory Nos. 5 and 9*

With regard to Interrogatory No. 5 and 9 seeking discovery on Cisco's invalidity contentions in this action, Cisco maintains its responses and objections as previously articulated. Telcordia's demand for detailed contentions at this juncture is premature. Telcordia has not provided a final identification of the claims of the patents-in-suit it intends to assert against Cisco. Cisco has provided responses based on its knowledge of the facts and circumstances of the case at this early stage. As discovery and the case progress, Cisco will supplement its responses to Telcordia's interrogatories consistent with its obligations under the Rules.

*Interrogatory No. 7*

With respect to Interrogatory No. 7 seeking discovery of Cisco's non-infringement contentions in this action, Cisco maintains its objections as previously articulated. Here again, Telcordia's demand for detailed contentions at this juncture is premature. Telcordia has not provided a final identification of the claims of the patents-in-suit it intends to assert against Cisco. Telcordia has not provided a final identification of the products it intends to accuse of infringement. Indeed, notwithstanding Telcordia's interrogatory responses, Telcordia has not provided Cisco with any meaningful discovery of how it is construing or applying any of the claim terms in the patents-in-suit to Cisco's products. Without meaningful discovery of Telcordia's infringement allegations, Cisco cannot provide an identification of its non-infringement allegations. As discovery and

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 4

the case progress, Cisco will supplement its responses to Telcordia's interrogatories consistent with its obligations under the Rules.

*Interrogatory No. 8*

With regard to Interrogatory No. 8, Cisco maintains its responses and objections as previously articulated. Interrogatory No. 8 seeks identification of "all opinions and analyses known by Cisco" that relate to non-infringement, including opinions or analyses of counsel, and documents and information related thereto. As we understand it, Telcordia's position is that Telcordia is entitled to discovery as to the existence of any opinions of counsel at this stage, if not to the substance of any such opinion. We disagree. In any incarnation, Telcordia's request that Cisco provide discovery as to opinions of counsel is premature. During the initial case management conference, the Court made clear that discovery as to opinions of counsel is stayed until Cisco elects whether or not to rely on any such opinion of counsel. Under the Court's Scheduling Order, it is clear that Telcordia is not entitled to discovery concerning the existence or substance of any opinions of counsel until that election has been made. Pursuant to that ruling, Cisco has already agreed to provide discovery as to opinions of counsel if and when appropriate.

*Interrogatory No. 10*

Telcordia's Interrogatory No. 10 seeks identification "of all networks in which Products-in-Suit have been installed or used since January 9, 1990," and seeks information falling into no fewer than 8 categories (corresponding to subparts (a) to (h)) for each of the identified networks. Cisco has objected to Interrogatory No. 10 as, *inter alia*, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. As it stands, this interrogatory theoretically seeks identification of all networks on which Cisco's customers and other end users of which Cisco is not even aware have installed or used the accused products, both in the United States and abroad, over the last 15 years. Moreover, this interrogatory seeks information in the possession of third parties rather than Cisco.

*Interrogatory No. 12*

Telcordia's Interrogatory No. 12 seeks identification of "each product made, used, sold, offered for sale, imported, exported, leased, licensed, or distributed by Cisco between 1990 and the present that included a SONET physical layer interface," and seeks information falling into no fewer than 5 categories (corresponding to subparts (a) to (e)) for each of the identified products. Cisco stands by its objections to this interrogatory as previously articulated. That said, Cisco has agreed, in the context of Interrogatory No. 1 to identify those Cisco products that enable customers to transmit

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 5

data over SONET, and to provide discovery sufficient to show the relevant functionality of such products. We believe this response will provide Telcordia with the information sought in Interrogatory No. 12 to the extent such information is in Cisco's possession. If, upon review of Cisco's supplemental response to Interrogatory No. 1 and Cisco's document production, you disagree, please explain what additional information you seek and Cisco will consider your request.

*       *       *

Your letter of August 11 also references your letter of June 15, 2005 in which you raise certain questions about Cisco's responses and objections to Telcordia's document requests.

*Request for Production Nos. 15, 26-31, 33-35, 37-39, 41, 53-55, 62, 64, 67-68, 78 and 83-87*

In your letter, you suggest that Cisco has improperly limited discovery to "relevant functionality of the products Cisco understands to be accused of infringement." We do not agree. The products accused of infringement in this case are complex and multifunctional. Indeed, each of the products you have accused of infringement thus far has broad-ranging functionality completely unrelated to any issues in this case. For each accused product, only a small portion, if any, is relevant to your infringement allegations or otherwise likely to lead to admissible evidence. Rather than tailor your discovery requests to this relevant functionality, you seek broad-ranging discovery as to entire accused platforms. As such, your requests are overbroad and unduly burdensome in the extreme. For example, your Request No. 41 seeks "All documents and things relating to any actual or potential joint development for any Cisco product." There is no theory under which Telcordia would be entitled to all documents and things related to joint development for *any* Cisco product. Such information is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Similarly, your Request No. 62 seeks "All documents and things that refer or relate to any potential or actual contract, license or agreement involving Cisco and Telcordia." Here again, your request is extremely overbroad in that it seeks discovery of potential contracts or agreements completely unrelated to the technologies at issue in this case.

In sum, there is simply no basis for your request that we provide broad-ranging discovery not related to the relevant technologies or accused functionalities in this case. To the extent you disagree and feel that you are entitled to discovery beyond that which we have already agreed to provide to Telcordia, please explain the relevance of that discovery and why you are entitled to it.

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 6

*Request for Production Nos. 17 to 25*

For the reasons discussed above in the context of Interrogatory No. 8, your Request for Production Nos. 17 to 25 are premature, and thus objectionable, to the extent they seek information concerning opinions of counsel. In the event Cisco chooses to rely on an opinion of counsel, Cisco will provide discovery related to such an opinion, consistent with its obligations under the Rules.

*Request for Production Nos. 33 to 36*

With regard to Request Nos. 33 to 36, you have requested that Cisco clarify that its response is not limited solely to testing, but also to documents related to evaluation, diagnosis or troubleshooting of products as requested. Subject to and without waiving its objections, Cisco will agree to produce non-privileged documents relating to the testing, *evaluation, diagnosis or troubleshooting* of the relevant functionality of the products it understands to be accused of infringement in this litigation.

*Request for Production Nos. 29 to 32*

You have requested that Cisco clarify that its response is not limited solely to design, but also to documents related to manufacture, configuration, structure, specifications, use or operation of products as requested. Subject to and without waiving its objections, Cisco will agree to produce non-privileged documents relating to the testing, *manufacture, configuration, structure, specifications, use or operation* of the relevant functionality of the products it understands to be accused of infringement in this litigation.

*Request for Production No. 57*

Request No. 57 seeks documents and things that "refer or relate to research or development relating to any invention, method, product or device described or shown in any of the Relevant Patents." Cisco has objected to this request as, *inter alia*, vague and ambiguous. Specifically, it is not clear to us what "research and development relating to any invention, method, product or device described or shown in any of the Relevant Patents" means. Does this mean documents or things in Cisco's possession, custody or control, referring or relating to Telcordia's (or Bellcore's) research and development relating to the Relevant Patents? Or does this request seek documents or things referring or relating to Cisco's research and development relating to the Relevant Patents? If the former, Cisco will agree to produce responsive documents if any exist. To the extent your request is aimed at the latter, the request is vague and only likely to provoke dispute.

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 7

*Request for Production Nos. 58 to 61*

Request Nos. 58 to 61 seek working units for each version of Cisco products meeting certain broad criteria. Cisco has agreed to "make a sample of each commercially-available accused product available for purchase after Telcordia identifies the specific Cisco products it is accusing of infringement in this litigation." In your letter, you state that "Cisco is obligated to preserve and produce all products responsive to these requests regardless of whether the product is a 'commercially-available accused product.'" We disagree. To the extent Cisco has possession, custody or control of products that are not commercially available, these products are not relevant to this litigation. Cisco has already agreed to make available for purchase working units of products accused of infringement in this case, to the extent Cisco still has possession, custody or control of such working units. To the extent you view this commitment as somehow insufficient, please explain specifically the basis for your position that Telcordia is entitled to something more. In any event, please contact us to arrange for the purchase of working units of the products accused of infringement to the extent you wish to do so.

*Request for Production No. 63*

Request No. 63 seeks all documents or things that refer or relate to or comprising any record and/or index of documents that have been destroyed by Cisco. Cisco has objected to this request as, *inter alia*, overly broad and unduly burdensome, and vague and ambiguous. Cisco maintains these objections. On its face, this request seeks all documents *relating* to or *referring* to *any* document *ever* destroyed by Cisco. There is no theory under which such information is discoverable, let alone relevant. If Telcordia can appropriately narrow this request to seek information that is discoverable, Cisco will consider producing responsive documents subject to its objections.

*Request for Production No. 69*

Request No. 69 seeks all documents or things relating to any visit by any Telcordia employee or ex-employees to Cisco's facilities. Cisco has objected to this request as, *inter alia*, overly broad and unduly burdensome, and vague and ambiguous. Cisco maintains these objections. Telcordia's request is extremely overbroad. On its face, this request seeks all documents relating to *any* visit by *any* Telcordia employee or ex-employee, of which there are presumably thousands, *ever* to *any* of Cisco's hundreds of offices worldwide. For obvious reasons, it would be incredibly—indeed prohibitively--burdensome for Cisco to collect this information. Indeed, to the extent such documents are in Cisco's possession, custody or control at all, it would require an enormous investigation, at tremendous expense, to locate such documents. Such a burden is unjustified: there is no theory under which such information is discoverable, let alone

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 8

relevant. If Telcordia can appropriately narrow this request to seek information that is discoverable, Cisco will consider producing responsive documents subject to its objections.

*Request for Production No. 85*

Request No. 85 seeks all documents referring or relating to "licensing practices of any participants in worldwide market for data network technology." Cisco has objected to this request as, *inter alia*, overly broad, unduly burdensome, vague and ambiguous, and not relevant or reasonably-calculated to lead to discovery of admissible evidence. On its face, this request could be construed to cover all documents concerning licenses issued by or to other companies that sell networking technology. If so, the request is severely overbroad and burdensome. Please either clarify the scope of the request or appropriately narrow this request to seek information that is discoverable. Cisco will then consider producing responsive documents subject to its objections.

*Request for Production Nos. 86 and 88*

Request No. 86 seeks all "valuations/royalty rate analyses that refer or relate to Cisco's intellectual property concerning data network technology, including valuations and royalty rate analyses for trademarks, patents, know-how, or trade secrets." Request No. 88 seeks all "valuations prepared by or for Cisco that refer or relate to its technologies or the business segments utilizing such technologies." Cisco has objected to these requests as, *inter alia*, overly broad, unduly burdensome, vague and ambiguous, and not relevant or reasonably-calculated to lead to discovery of admissible evidence. On their face, these requests call for all "valuations/royalty rate analyses" concerning *any* Cisco technology. As such, Telcordia's requests are utterly divorced from its infringement allegations in this case. Please either clarify the scope of these requests or appropriately narrow the requests to seek information that is discoverable. Cisco will then consider producing responsive documents subject to its objections.

*Request for Production Nos. 91 and 95*

Request Nos. 91 and 95 seek documents sufficient to summarize Cisco's cost of capital, capital structure, costs of short/long term debt, internal rates of return or hurdle rates, and documents referring or relating to any authorization of or request for the spending of capital in connection with the manufacture, sale, or distribution of any Product-in-Suit. Cisco has objected to these requests as, *inter alia*, not limited in time, not relevant or reasonably calculated to lead to discovery of admissible evidence, overly broad, unduly burdensome, and vague and ambiguous. As an initial matter, we do not understand the relevance of this information to this to the issues in this case. Moreover, even to the extent the requested information were somehow relevant or discoverable,

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
August 16, 2005
Page 9

these requests are overbroad in that they are not limited in time or limited to the products actually accused of infringement in this suit. As discussed in detail above, it would be incredibly burdensome for Cisco to provide such information for all products identified in response to Interrogatory No. 1 when Telcordia has not even made the threshold determination of whether it is accusing these products of infringement. Please explain the relevance of the documents sought by these requests and appropriately narrow the requests to seek information that is discoverable. Cisco will then consider producing responsive documents subject to its objections.

*        *        *

We believe the above discussion addresses the issues raised in your August 11 and June 15 letters. To the extent Telcordia continues to have concerns as to any of the above, we look forward to discussing those concerns in the ongoing meet and confer process and hope that the parties will be able to resolve these disputes in a mutually-agreeable manner.

Very truly yours,

Sonal N. Mehta

EXHIBIT 8

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(650) 802-3118
sonal.mehta@weil.com

December 23, 2005

**VIA E-MAIL**

Geoffrey C. Mason, Esq.
Finnegan Henderson Farabow
   Garrett & Dunner LLP
901 New York Avenue NW
Washington, DC 20001-4413

Re:    *Telcordia v. Cisco*, C.A. No. 04-876-GMS

Dear Geoff,

I write in response to your letter of December 21 concerning production of documents relating to approximately 70 "modules" Telcordia has identified in an attachment to your letter.

Your letter demands that Cisco produce by December 30: (a) "complete technical information (including board schematics, engineering specifications, hardware functional specifications, testing procedures and results, email traffic concerning design, development and testing of the accused products)"; (b) "complete marketing information (including customer relationship management (CRM) database information, presentations, brochures, emails to customers or potential customers, pricing, discounts, rebates and incentives)"; (c)    "complete production information (including correspondence with component suppliers, production engineering documents , and email traffic with suppliers)"; (d) "complete maintenance and support information (including bugs, features, and returns, and email traffic relating to support and maintenance activities, such as visits to customer sites)"; (e) "complete information regarding the management of the previously mentioned activities (including review meetings, strategic discussions, competitive analyses, shareholder conferences, board of directors meetings, merger and acquisition activities, and email traffic relating to all management activities)";

WEIL, GOTSHAL & MANGES LLP

Geoff Mason, Esq.
December 23, 2005
Page 2

and (f) "complete accounting information, such as sales, profits and inventory numbers" for each of the 70 modules you identified.

   Telcordia's demands are both unreasonable and inconsistent with the parties' discovery agreements in this case.

   At the outset, your list of 70 "modules" improperly conflates two distinct sets of products: (1) those products that were seasonably identified by Telcordia and for which Cisco has agreed to provide discovery; and (2) those products that were unseasonably identified by Telcordia and that are the subject of the January 5 hearing before Judge Sleet. I will address these two categories of products separately.

   Turning first to the products that were seasonably identified by Telcordia, your demand that Cisco produce documents falling into categories (a) to (f) above by December 30 is at odds with the parties' agreement as to the staging of discovery in this case. Though you only recently became involved in this case, we assume you have been apprised of the parties' meet and confer discussions by your colleagues. Specifically, the parties engaged in a written meet and confer throughout July and August 2005, which culminated in an August 26, 2005 teleconference attended by your colleagues Don Dunner, Rich Rainey and York Faulkner. At this conference, your colleagues agreed to Cisco's proposal concerning the staging of document production. Your colleagues agreed that Cisco would produce by October 31, 2005 documents sufficient for Telcordia to make a threshold infringement determination. After Telcordia made that threshold determination, Cisco agreed to produce additional documents relating to the accused products, subject to our responses and objections to your first set of document requests. Cisco will, of course, abide by its agreement to produce additional documents for the products seasonably accused of infringement.

   Your demand that we complete this production by December 30 is unreasonable--Cisco is actively collecting and reviewing additional responsive documents for the seasonably-accused products. We expect to produce additional documents on December 30, including documents specifically requested by Telcordia in John Williamson's December 7 letter. We expect our rolling production to continue after the Holidays.

   Turning next to the products unseasonably identified by Telcordia, Telcordia's demand for documents is improper. As we have explained in meet and confer, Telcordia's eleventh-hour identification of products--the day after the parties exchanged proposed claim constructions--is unseasonable and not substantially justified. To the extent the Court rules that these products were seasonably identified, Cisco will produce documents relating to these products as appropriate.

WEIL, GOTSHAL & MANGES LLP

Geoff Mason, Esq.
December 23, 2005
Page 3

       Please feel free to contact me if you would like to discuss this further.  As always, Cisco stands ready to meet and confer with the goal of resolving any disputes.

                     Very truly yours,

                     Sonal N. Mehta

# EXHIBIT 9

## FULLY REDACTED

# EXHIBIT 10

## FULLY REDACTED

EXHIBIT 11

Sonal Mehta/SV/WGM/US
01/18/2006 07:49 PM

To  geoff.mason@finnegan.com

cc

Subject  Telcordia v. Cisco


Dear Geoff,

I write in response to your January 17, 2006 letter to Ed Reines concerning Cisco's production of chip "schematics."

As explained in my letter of January 12 and repeatedly since then, to avoid dispute, Cisco agreed to go back and conduct another search for the specific chip-related documents requested in John Williamson's December 7 letter. Cisco did precisely that, and as a result, produced additional documents on December 30. Your suggestion that our production of December 30 was simply a belated production of documents that "should have been produced long ago" is incorrect: Cisco's December 30 document production resulted from a specific search for documents identified by Telcordia for the first time on December 7.

In any event, turning to the chip schematics you now contend are missing, we have searched for documents relating to the specific chips outlined in your December 7 letter and have already produced responsive documents found in our search. That said, to avoid dispute, Cisco remains willing to go back and look for specific documents that Telcordia claims it needs if Telcordia will describe specifically what documents it is looking for. Your request for "chip-level schematics" is not sufficient: Cisco has already produced documents that we believe fall within that description, including lengthy functional specifications that include pinouts, block diagrams, and detailed explanations of chip functionality. *See, e.g.,* CSCO1811093-2024, CSCO1812056-2305, CSCO1820001-0268.

Cisco stands ready to meet and confer with Telcordia concerning the specific "schematics" that Telcordia

is seeking.  We are available Friday, January 20 before 10 am PT or after 1:30 pm PT.  Please let us know if there is a time that works for you.

Regards,
Sonal N. Mehta
Weil Gotshal & Manges
201 Redwood Shores Pkwy
Redwood Shores, CA 94065
t: (650) 802-3118
f: (650) 802-3100
sonal.mehta@weil.com

< END >

< END >

# EXHIBIT 12

## FULLY REDACTED

EXHIBIT 13

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(650) 802-3118
sonal.mehta@weil.com

January 25, 2006

**VIA E-MAIL**

John Williamson, Esq.
Finnegan Henderson Farabow
   Garrett & Dunner LLP
901 New York Avenue NW
Washington, DC 20001-4413

Re:    *Telcordia v. Cisco*, C.A. No. 04-876-GMS

Dear John:

Thank you for your letter of January 20 in which you explain Telcordia's view of what constitutes a chip schematic.

At the outset, we believe we have already conducted a reasonable search for documents falling within this description for the chips identified in your December 7, 2005 letter. As explained in my January 18 email to Geoff Mason and on our January 19 teleconference, we have searched broadly for documents related to the chips listed in your December 7 letter, and produced on December 29, 2005 the responsive documents located in our search. To the extent our production does not contain the chip schematics you are looking for, it is because we have not located such documents. Please bear in mind that some of the chips for which you seek information were designed years ago by companies other than Cisco, and that the design documentation may be scarce, if it existed at all.

In any event, to avoid dispute, we have agreed to go back and search again for responsive documents, this time with your specific description of a schematic in hand. We will also perform the same search for schematics for the chips identified for the first time in your January 20 letter. If we locate any such documents, we will review and produce them as promptly as possible. Given the number of chips for which you seek

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
January 25, 2006
Page 2

schematics, we expect our search to take at least a couple of weeks. We will update you on the status of our search on February 7.

Very truly yours,

Sonal N. Mehta

EXHIBIT 14

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(650) 802-3118
sonal.mehta@weil.com

February 7, 2006

**VIA E-MAIL**

John Williamson, Esq.
Finnegan Henderson Farabow
   Garrett & Dunner LLP
901 New York Avenue NW
Washington, DC 20001-4413

Re:    *Telcordia v. Cisco*, C.A. No. 04-876-GMS

Dear John:

I write to follow-up on my letter of January 25, 2006 concerning the production of chip schematics.

As I explained in my January 25 letter, we believe we had already conducted a reasonable search for documents falling within this description for the chips identified in your December 7, 2005 letter. In any event, to avoid dispute, we agreed to go back and search again for responsive documents, this time with your specific description of a schematic in hand. We also agreed to perform the same search for schematics for the chips identified for the first time in your January 20, 2006 letter. I agreed to update you on the status of our search by February 7.

We have completed our search and have not located any schematics for the chips identified in your letter of January 20, 2006. We have gone so far as to contact engineers associated with each of the chips listed in your letter and confirmed that such schematics were never created.[1]

---

[1]    In any event, in a good faith effort to put this issue to rest, we expect to produce additional verilog files for some of the ASICs identified in your January 20 letter, even though you have not requested them.

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
February 7, 2006
Page 2

     In view of the above, Cisco has been more than patient in entertaining Telcordia's requests for the chip "schematics" you have requested, and has more than satisfied its obligations to search for such documents. We view this issue to be resolved.

Very truly yours,

Sonal N. Mehta

# EXHIBIT 15

## FULLY REDACTED

# EXHIBIT 16

## FULLY REDACTED

# EXHIBIT 17

## FULLY REDACTED

# EXHIBIT 18

## FULLY REDACTED

# EXHIBIT 19

## FULLY REDACTED

# EXHIBIT 20

## FULLY REDACTED

# EXHIBIT 21

## FULLY REDACTED

# EXHIBIT 22

## FULLY REDACTED

# EXHIBIT 23

## FULLY REDACTED

# EXHIBIT 24

## FULLY REDACTED

# EXHIBIT 25

## FULLY REDACTED

# Exhibit 26

## Fully Redacted

# EXHIBIT 27

## FULLY REDACTED

# EXHIBIT 28

## FULLY REDACTED

# EXHIBIT 29

## FULLY REDACTED

# EXHIBIT 30

## FULLY REDACTED

# EXHIBIT 31

## FULLY REDACTED

# EXHIBIT 32

## FULLY REDACTED

# EXHIBIT 33

## FULLY REDACTED

# EXHIBIT 34

## FULLY REDACTED