IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,              )
                                           )
        Plaintiff/Counterclaim Defendant,  )
                                           )
                v.                         )          C.A. No. 04-876-GMS
                                           )
CISCO SYSTEMS, INC.,                       )
                                           )
        Defendant/Counterclaim Plaintiff.  )


**DEFENDANT CISCO SYSTEMS, INC.'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW**


                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                        Jack B. Blumenfeld (I.D. #1014)
                        Leslie A. Polizoti (I.D. #4299)
                        1201 North Market Street
                        Wilmington, DE  19899-1347
                        (302) 658-9200
                        jblumenfeld@mnat.com
                        lpolizoti@mnat.com

                        *Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

August 13, 2007

# TABLE OF CONTENTS

Page

I. THE COURT SHOULD GRANT JMOL OF NON-INFRINGEMENT OF THE '763 PATENT ...................................................................................................... 1

    A. No Reasonable Jury Could Have Found That The Pointer Processor Performs The Demultiplexing Required By The '763 Patent .............................. 2

        1. The Claimed Demultiplexer Is The Cross-Connect ................................... 2

        2. All Of The Evidence Shows That The Claimed Demultiplexing Is Not Complete Until After The Cross-Connect .......................................... 3

        3. The Pointer Processor Does Not Perform The Required Demultiplexing ................................................................................................ 4

    B. The Pointer Processor Does Not Insert Error Signals In Response To A High-Level Failure ............................................................................................... 5

II. THE COURT SHOULD GRANT JMOL OF '763 INDEFINITENESS ........................... 6

    A. Under Federal Circuit Precedent, Indefiniteness Is A Question Of Law ............... 6

    B. Telcordia Does Not Identify The Required "Circuitry At A Controller" ............. 7

    C. The '763 Patent Does Not "Clearly Link Or Associate" Any Structure With The Claimed "Monitoring Means" ................................................................ 8

III. THE COURT SHOULD GRANT JMOL THAT THE '633 PATENT IS INVALID .................................................................................................................... 9

    A. No Reasonable Jury Could Have Found The '633 Patent Non-Obvious ............ 10

        1. Telcordia's Criticism Of Cisco's "Shortcut" Presentation On Obviousness Is Legally And Factually Inapposite ................................... 11

        2. There Is No Meaningful Dispute That Gonzales Teaches A Shortened Time Stamp, Including A 4-Bit Time Stamp ......................... 11

        3. A Person Of Ordinary Skill Reading Gonzales Would Have Understood And Been Motivated To Transmit A Shortened Time Stamp Outside The Convergence Sublayer Overhead ............................. 12

    B. At A Minimum, The '633 Patent Is Invalid For Improper Inventorship ............. 14

        1. Whether Or Not The France Telecom Engineers "Claimed" Inventorship Is Irrelevant To The Inventorship Inquiry ......................... 14

        2. France Telecom Conceived Of Transmitting A Shortened Time Stamp Outside The Convergence Sublayer Overhead ............................. 16

        3. Telcordia's Evidence Of Inventorship Is Insubstantial ........................... 17

**TABLE OF CONTENTS**
**(continued)**

Page

IV.   THE COURT SHOULD GRANT JMOL THAT THE '306 PATENT IS
      INVALID ............................................................................................................ 18

      A.   Telcordia Has Not Pointed To Any Evidence That The "Garbage Bits"
           Limitation Is Not Taught In The FasNet and Budrikis References .................... 18

      B.   Telcordia's Belated Assertion That The Priority Limitation Of The
           Asserted Claims Is Not Taught In FasNet or Budrikis Is Unsupported .............. 19

V.    CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*AINS, Inc. v. U.S.*,
 365 F.3d 1333 (Fed. Cir., 2004)......................................................................7

*Abel v. Dubberly*,
 210 F.3d 1334 (11th Cir. 2000) ..................................................................2

*B. Braun Med. Inc. v. Abbot Labs.*,
 124 F.3d 1419 (Fed. Cir. 1997)......................................................................8

*BJ Servs. v. Halliburton Energy Servs., Inc.*,
 338 F.3d 1368 (Fed. Cir. 2003)......................................................................7

*Beckson Marine, Inc. v. NFM, Inc.*,
 292 F.3d 718 (Fed. Cir. 2002)......................................................................11

*Biomedino, LLC v. Waters Techs. Corp.*,
 490 F.3d 946 (Fed. Cir. 2007)......................................................................8

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
 412 F.3d 1291 (Fed. Cir. 2005)......................................................................8

*Exxon Corp. v. U.S.*,
 931 F.2d 874 (Fed. Cir. 1991)......................................................................1

*Exxon Research and Eng'g Co. v. U.S*,
 265 F.3d 1371 (Fed. Cir. 2001)..............................................................6-7

*Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*,
 819 F.2d 1100 (Fed. Cir. 1987)......................................................................11

*KSR Int'l Co. v. Teleflex Inc.*,
 127 S. Ct. 1727 (2007)......................................................................10

*Montemayor v. City of San Antonio*,
 276 F.3d 687 (5th Cir. 2001) ......................................................................1

*Naturopathic Labs. Int'l, Inc. v. Dermal Research Labs., Inc.*,
 415 F. Supp. 2d 1007 (W.D. Mo. 2006) ......................................................1

*Oak Tech., Inc. v. ITC*,
 248 F.3d 1316 (Fed. Cir. 2001)......................................................................4

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,*
    -- F.3d --, 2007 WL 1964863 (Fed. Cir. July 9, 2007) ......................................................13

*Spectrum Int'l v. Sterilite Corp.,*
    164 F.3d 1372 (Fed. Cir. 1998)...............................................................................................3

*Williams v. County of Westchester,*
    171 F.3d 98 (2d Cir. 1999)........................................................................................................1

*Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.,*
    206 F.3d 1408 (Fed. Cir. 2000)...............................................................................................1

**<u>Other Authority</u>**

9 Moore's Federal Practice § 50.06[5][b] (3d ed. 2007) ..............................................................2

iv

In its opening brief, Cisco established that there is no evidentiary basis in the record from which a reasonable jury could have found that: (1) Cisco's products infringe the '763 patent; (2) the '763 patent is not invalid as indefinite; (3) the '633 patent is not invalid as obvious, or alternatively, for improper inventorship; or (4) the '306 patent is not invalid. Because Telcordia has failed to identify any such basis, Cisco's motion for JMOL should be granted.

## I.   THE COURT SHOULD GRANT JMOL OF NON-INFRINGEMENT OF THE '763 PATENT

In its opening brief, Cisco established that no reasonable jury could have found that Cisco's products insert error signals following demultiplexing. Telcordia's principal argument in response is that Cisco cannot be entitled to JMOL because the Court previously denied Cisco's motion for summary judgment on this issue.

The law does not support Telcordia's assertion. A trial court is not constrained by its prior rulings unless and until they are adopted by an appellate court. *See Exxon Corp. v. U.S.*, 931 F.2d 874, 877 (Fed. Cir. 1991) (the law of the case doctrine "does *not* constrain the trial court with respect to issues not actually considered by an appellate court").[1] As such, courts routinely deny motions for summary judgment in favor of giving the case to a jury to decide and then granting JMOL if its verdict is not supported by the trial record. *See, e.g., Naturopathic Labs. Int'l, Inc. v. Dermal Research Labs., Inc.*, 415 F. Supp. 2d 1007, 1008-13 (W.D. Mo. 2006) (granting JMOL of non-infringement after denying summary judgment where opinions offered by plaintiffs' experts at trial were "not supported by sufficient facts to validate it in the eyes of the law"), *aff'd*, 224 Fed. Appx. 977 (Fed. Cir. 2007).[2] Even where both motions are

---

[1]     Emphasis supplied and citations omitted throughout, unless otherwise noted.

[2]     *See also Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1410 (Fed. Cir. 2000) (affirming JMOL after summary judgment denial); *Montemayor v. City of San Antonio*, 276 F.3d 687 (5th Cir. 2001); *Williams v. County of Westchester*, 171 F.3d 98 (2d Cir. 1999).

based on "identical evidence," there are "[s]ound practical reasons" why a court may deny a motion for summary judgment and later grant JMOL. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000); *see also* 9 Moore's Federal Practice § 50.06[5][b] (3d ed. 2007).

The basic rule that denial of summary judgment does not preclude JMOL is particularly appropriate where, as here, the evidence presented at trial is different than the evidence presented during the summary judgment phase. *Compare* D.I. 341 at 14 (considering Dr. Prucnal's opinion that the pointer processor demultiplexes the high-level signal in denying summary judgment) *with* D.I. 354 at 1138:15-1139:4 (trial testimony of Dr. Prucnal admitting that the signal going into *and coming out of* the pointer processor is a high-level multiplexed signal).

The grant of JMOL is appropriate here because no reasonable jury could have found infringement of the '763 patent based on Telcordia's theory that the pointer processor performs the required demultiplexing and inserts error signals following that demultiplexing. Section A addresses three independent bases for JMOL based on evidence that the pointer processor does not perform the claimed demultiplexing. Second B addresses a fourth independent ground for JMOL based on evidence that the pointer processor does not insert the required error signals.

### A.    No Reasonable Jury Could Have Found That The Pointer Processor Performs The Demultiplexing Required By The '763 Patent

#### 1.    The Claimed Demultiplexer Is The Cross-Connect

Cisco established in its opening brief that the pointer processor cannot perform the required demultiplexing because the claimed *act* of demultiplexing must be performed by the demultiplexer *object* recited in the claims, which Dr. Prucnal admitted is the cross-connect. Telcordia completely ignores this legal (and logical) requirement, arguing instead that there is "ample support" in the trial record that the pointer processor is actually the claimed demultiplexer *object*. D.I. 389 at 5. None of the numerous references to Dr. Prucnal's testimony

2

cited by Telcordia—or any testimony in the record—support this assertion. *Id.* at 4-7. Rather, each of Telcordia's citations is merely a reference to Dr. Prucnal's opinion that the pointer processor performs the *act* of demultiplexing. Importantly, the only testimony offered by Dr. Prucnal at trial as to what constitutes the demultiplexer *object* recited in the claims is the cross-connect. D.I. 354 at 1123:14-24; *id.* at 1126:24-1127:13.[3]

Because Telcordia does not challenge that the demultiplexer *object* recited in the claims must perform the claimed *act* of demultiplexing, and the only evidence in the record as to what constitutes the claimed demultiplexer *object* is the cross-connect, the cross-connect must also perform the claimed *act* of demultiplexing.[4] JMOL of non-infringement is appropriate because all of the evidence shows that Cisco's products insert error signals before, not following, the cross-connect. D.I. 354 at 1129:22-1130:9; *id.* at 1125:7-22.

## 2. The Claimed Demultiplexing Is Not Complete Until After The Cross-Connect

Even if it were supported by the record, Dr. Prucnal's opinion that the pointer processor also performs some portion of the claimed demultiplexing is not sufficient to avoid JMOL because the claims require error signals to be inserted after the high-level signal is demultiplexed, not during demultiplexing. Telcordia does not and cannot disown Dr. Prucnal's admission at trial that the required demultiplexing is not complete until *after* the error signals are inserted. Thus, the only dispute here is a legal question as to the scope of the claims.

---

[3]     Telcordia asserts without explanation that Dr. Prucnal's admissions should be ignored as "out-of-context" and "cropped" deposition testimony. But not once at trial did Dr. Prucnal testify that that the pointer processor, and not the cross-connect, constitutes the claimed demultiplexer.

[4]     Telcordia cannot rely on an unclaimed additional demultiplexer to satisfy the demultiplexing requirement because inclusion of an additional demultiplexer would be at odds with the claim language, which requires a demultiplexer and demultiplexing. *See, e.g., Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1377-81 (Fed. Cir. 1998).

The contested legal issue is simple: does the Court's claim construction requiring error signals to be inserted "*following* demultiplexing" mean that the error signals must be inserted after the demultiplexing is complete (Cisco's position), or is it enough to show error insertion in the midst of demultiplexing (Telcordia's position)? There is no reason to deviate here from the Federal Circuit's holding in *Oak Tech., Inc. v. ITC* that when a claim requires step B to come after step A, step A must be complete before step B occurs. 248 F.3d 1316, 1328-29 (Fed. Cir. 2001). JMOL is appropriate because it is undisputed that the error signal insertion (step A) relied on by Telcordia occurs before the cross-connect, D.I. 354 at 1129:20-1130:9, and demultiplexing (step B) is not complete until after the cross-connect, D.I. 354 at 1128:15-21 ("The final stage of the demultiplexing and its completion, as you said, is done at the cross-connect.").

### 3. The Pointer Processor Does Not Perform The Claimed Demultiplexing

Based on the evidentiary record at trial, no reasonable jury could have found that the pointer processor performs any of the demultiplexing required by the patent. Although Dr. Prucnal testified that the pointer processor performs some initial demultiplexing, there is no meaningful support for a finding that it performs the demultiplexing required by the patent.

First, Dr. Prucnal conceded on cross-examination that demultiplexing requires dropping one or more channels. D.I. 354 at 1139:5-10. Telcordia agrees that Cisco's pointer processor does not do this. Telcordia responds that Dr. Prucnal really meant that demultiplexing could mean dropping one or more channels but could also mean something else. D.I. 389 at 11-12. This interpretation is unsupported. When Dr. Prucnal agreed that demultiplexing requires outputting "different streams, right, or something dropped," he was acknowledging that outputting "different streams" means "something [is] dropped" from the high-level multiplexed signal, not saying that it could mean something else. D.I. 354 at 1139:5-10. This is confirmed

4

by Dr. Prucnal's admission at trial that he equated demultiplexing communications with dropping communications in his expert report. *Id.* at 1122:2-1123:2 (testimony of Dr. Prucnal that cross-connect is used to "demultiplex (drop) communications").

Second, Telcordia does not dispute that Dr. Prucnal conceded that a demultiplexer must at the very least have a combined multiplexed stream at its input and different separated channels at its output. D.I. 389 at 11-12 (discussing Dr. Prucnal's testimony at D.I. 354 at 1139:5-10); *see also* D.I. 354 at 1138:15-1139:4. Nor does Telcordia dispute Dr. Prucnal's admission, as confirmed by his own trial demonstrative, that, in contrast to a demultiplexer, the signal at both the input *and* the output of the pointer processor is a high-level multiplexed signal.

## B.    The Pointer Processor Does Not Insert Error Signals In Response To A High-Level Failure

As Cisco explained in its opening brief, even if one were to assume that a reasonable jury could have found that the pointer processor performs the required demultiplexing, there is a fourth independent basis for JMOL: no reasonable jury could have found that the pointer processor inserts the error signals required by the claims.

Telcordia does not dispute that the required error signals are not just any error signals, but rather must be inserted *in response to a high-level failure*. D.I. 389 at 14. Nor does Telcordia dispute that both experts testified that the AIS-L error signals inserted by the framer—which are undisputedly inserted *before* the pointer processor—are inserted in response to a high-level failure. Telcordia argues instead that "substantial evidence supports the jury's determination" that the AIS-P error signals on which its expert relied are *also* inserted in response to a high-level failure. However, the testimony on which Telcordia relies does not support its assertion.

That testimony merely refers to the fact that an AIS-L signal and an AIS-P signal are not always the same thing. Cisco does not contend that these two types of signals are the same in all

circumstances,[5] but rather that in the only scenario covered by the asserted claims—*i.e.*, when there is a high-level failure—all that happens at the pointer processor is that the all-ones AIS-L error signal inserted at the framer in response to the high-level failure continues to propagate through the system, including through the pointer processor. As Cisco explained in its opening brief, this is the only interpretation of what happens at the pointer processor that is consistent with the trial record, including Dr. Prucnal's testimony. Telcordia does not dispute that Dr. Prucnal admitted that the all-ones AIS-P error signals he relied on are merely the result of the all-ones AIS-L error signals inserted upstream. D.I. 354 at 1133:3-10; 1134:2-1135:1.

It is evident from the excerpts of Dr. Prucnal's testimony relied on by Telcordia that in the case of a high-level failure, the error signals inserted by the pointer processor are a mere continuation of the AIS-L error signal inserted before the pointer processor. The only error signals inserted in response to a high-level failure, as the claims undisputedly require, are the AIS-L error signals which both experts agree are inserted *before*, not after, both the pointer processor and the cross-connect.

## II.     THE COURT SHOULD GRANT JMOL OF '763 INDEFINITENESS[6]

### A.     Under Federal Circuit Precedent, Indefiniteness Is A Question Of Law

As an initial matter, Telcordia's argument that indefiniteness is a question of fact subject to substantial evidence review is incorrect. Binding Federal Circuit precedent rejects the notion that questions of indefiniteness are questions for the fact-finder. In *Exxon Research and Eng'g*

---

[5]     As Dr. Prucnal testified, when only some of the channels (also referred to as paths) are defective (in contrast to the situation claimed in the patent in which the high-level signal or line including all of the channels is defective), the framer will not insert an AIS-L error signal ("alarm indication signal line"). Rather, the pointer processor will insert AIS-P error signals ("alarm indication signal path") on the channels that are defective. D.I. 354 at 1136:9-15.

[6]     This issue has not been addressed three times before, as Telcordia states. Rather, full resolution of this issue has been delayed until now for procedural reasons.

*Co. v. U.S.*, the patentee argued that summary judgment of indefiniteness was improper because of the existence of alleged factual questions related to the understandings of persons skilled in the art. 265 F.3d 1371, 1376 (Fed. Cir. 2001). After reciting the "multitude of recent authorities stating that indefiniteness is a question of law," the Federal Circuit stated: "We adhere to the principle that 'determination of claim *indefiniteness is a legal conclusion* that is drawn from the court's performance of its duty as the construer of patent claims.'" *Id*. Thus, as a matter of binding precedent, indefiniteness is a legal conclusion, which does not receive deferential substantial evidence review by this Court.[7]

## B.    Telcordia Does Not Identify The Required "Circuitry At A Controller"

Though the Court's claim construction requires "circuitry at a controller," Telcordia does not even attempt to show the presence of such circuitry in the '763 specification. In fact, Telcordia's brief focuses not on the "circuitry at a controller" at all, but rather, on the *controller itself*. "Circuitry at a controller" is not the same thing as a "controller." The Court's claim construction itself recognizes this distinction, holding the corresponding structure for "insertion means" to be "*the controller 118*, 147, 148 and all equivalents thereof," while requiring "*circuitry at a controller*" for the disputed "monitoring means" term. D.I. 179 at 2-3. The difference is clear: "circuitry at a controller" means something other than the "controller 118, 147, 148" of the patent. As a result, the "black box" controller cannot substitute for the required circuitry corresponding to the claimed "monitoring means."

Acknowledging this lack of circuitry, Telcordia's expert Dr. Prucnal admitted that the

---

[7]    Telcordia cites *BJ Servs. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368 (Fed. Cir. 2003), for the proposition that substantial evidence review is appropriate. To the extent that *BJ Servs.* is inconsistent with *Exxon*, it could not overrule that earlier decision. *See, e.g.*, *AINS, Inc. v. U.S.*, 365 F.3d 1333, 1341 (Fed. Cir. 2004) ("[P]rior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc.").

'763 patent only contains a "description of what [the monitoring function] does," and "not the circuitry itself." D.I. 354 at 1148:13-16. Notwithstanding this admission, Telcordia relies on Dr. Prucnal's testimony that "one of ordinary skill in the art[] would know how to interpret [the specification] and actually build a circuit." *Id.* at 1147:10-16. Telcordia's reliance on this testimony is misplaced. Just weeks ago, the Federal Circuit reaffirmed the principle that "'the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification.'" *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007) (quoting *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005)). Because the only "structures identified" by Dr. Prucnal—"controllers 117 and 118"—cannot be the required "circuitry at a controller," all that remains is the "total absence of structure" that the Federal Circuit has repeatedly proscribed.

### C.    The '763 Patent Does Not "Clearly Link Or Associate" Any Structure With The Claimed "Monitoring Means"

Even assuming Telcordia were correct in its assertions that "controller 117 and 118" can be the "circuitry at a controller" required by the Court's Claim Construction Order, the '763 patent would still be invalid. The Federal Circuit has held that structure is corresponding only if the "specification . . . *clearly links or associates* that structure to the function recited in the claim." *B. Braun Med. Inc. v. Abbot Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The only disclosure Telcordia relies on to link the controller to the monitoring function is: "Each node continuously *monitors and evaluates the integrity of the multiplexed subrate signals arriving at the node. . . .* When node 1 recognizes major line fault 122 in ring 100, *controller 118 inserts an error signal* onto the six subrate channels." D.I. 389 at 22 (citing PTX 7 at 3:4-13).

This passage does not—contrary Telcordia's argument—show that the controller is linked to the *monitoring* function. Rather, it shows that the controller is linked to the *inserting*

function, which is the subject of an entirely distinct means-plus-function claim limitation.[8]  Thus, even assuming that Telcordia were correct that the "controller 118" is eligible to be "circuitry at the controller," the plain text of the patent shows that "controller 118" does not supply the missing structure because it is not clearly linked to the monitoring means.

## III.   THE COURT SHOULD GRANT JMOL THAT THE '633 PATENT IS INVALID

At trial, Cisco demonstrated that the '633 patent is invalid as matter of law because of France Telecom's substantial contributions to the SRTS technique.  In its answering brief, Telcordia largely side-steps the incontrovertible record of France Telecom's contributions and their legal significance.  To rebut Cisco's inventorship showing, Telcordia dwells on the France Telecom engineers' disinterest in claiming ownership of the patent.  In the face of Cisco's showing that the '633 patent is obvious based on Gonzales, Telcordia focuses only on whether that article meets the *anticipation* legal standard.

It is not surprising that Telcordia's response is short on substance.  At trial, Telcordia elected not to present any expert testimony on '633 invalidity, leaving its '633 patent expert Dr. Clark to sit in the courtroom and watch as Telcordia limited its rebuttal case to the '763 patent. Similarly, Telcordia's factual presentation on the '633 patent was limited to the self-serving and uncorroborated, but flatly-inconsistent, testimony of Drs. Fleischer and Lau on the inventorship issue.  Now, facing a motion for JMOL after having failed to rebut Cisco's defenses, Telcordia has no choice but to resort to the argument of its *lawyers* to respond where Telcordia's *witnesses* either could or would not.  Telcordia's attorney argument is inadequate to defeat JMOL.

---

[8]      The court construed the "insertion means" to have the function of "inserting an error signal on designated ones of the subrate communications in response to said monitoring means detecting a lack of integrity on the multiplexed subrate communications on the first ring or the second ring, or both the first ring and the second ring." D.I. 179 at 3.

### A.    No Reasonable Jury Could Have Found The '633 Patent Non-Obvious

Throughout the trial, Telcordia's primary argument for why the '633 patent is not obvious in view of Gonzales is that Gonzales does not meet the anticipation standard. *See, e.g.,* D.I. 358 at 2179:15-17; D.I. 359 at 1999:2-9; D.I. 356 at 1690:12-1693:8. Even now, facing a motion for JMOL setting forth precisely why the '633 patent is obvious in view of the prior art, Telcordia's primary response is to continue to tilt at the anticipation windmill. D.I. 389 at 23.

Telcordia's steadfast focus on anticipation betrays a larger defect in its position: its failure to address—or even cite to—obviousness law. As explained in Cisco's opening brief, the essence of obviousness is not the formalistic checkmark approach urged by Telcordia, but a focus on how persons of ordinary skill would view the prior art—with a particular emphasis on the *problem* they faced—to ensure that the invention is "real innovation" and not an advance that would occur "in the ordinary course." *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1740-41 (2007).

The record simply does not support any conclusion other than that SRTS was, at best, an advance made in the ordinary course and *not* real innovation. Telcordia does not dispute that persons of ordinary skill in the art as of mid-1991 faced a simple, known problem—how to shorten the time stamp to conserve convergence sublayer overhead—flowing directly from the respective criticisms of the TS and SFET approaches. Nor does Telcordia dispute that SRTS was the solution to this problem. Indeed, according to Telcordia, this solution is the very essence of the claimed invention. D.I. 357 at 924:6-15. All that is left for Telcordia to dispute is whether persons of ordinary skill would have arrived at a modified time stamp approach as a solution to the problem. D.I. 375 at 19-22. Telcordia has done little to dispute even this.

1.    **Telcordia's Criticism Of Cisco's "Shortcut" Presentation On Obviousness Is Legally And Factually Inapposite**

In its answering brief, Telcordia repeatedly criticizes Cisco's obviousness presentation as a "shortcut" approach. D.I. 389 at 25-27. Telcordia's specific criticism is that Cisco's obviousness presentation at trial and on JMOL was focused on whether the two key aspects of the invention—acknowledged and agreed upon by *both* experts—were obvious. *Id.*

Telcordia's argument is flatly inconsistent with both the law and the facts. The obviousness inquiry does not require the rigid checkmark approach that Telcordia urges: "obviousness ***does not require the prior art to reach expressly each limitation exactly.***" *Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 727 (Fed. Cir. 2002). In fact, the inquiry is "not whether each element existed in the prior art, but whether the prior art made obvious the invention as a whole for which patentability is claimed." *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987). Here, the claimed *invention as a whole* is precisely where Cisco focused its obviousness presentation. Both parties agree that the claimed invention is the alteration of the traditional time stamp technique to transmit (1) a shortened time stamp (2) in overhead other than the convergence sublayer overhead. By focusing on the two aspects of the SRTS invention that arguably make it novel over the prior art, Cisco's focus is exactly where the obviousness inquiry should be.

2.    **There Is No Meaningful Dispute That Gonzales Teaches A Shortened Time Stamp, Including A 4-Bit Time Stamp**

On the merits, Telcordia's primary argument is that Cisco did not present evidence that the Gonzales references teaches or renders obvious the counting and transmission of residual time stamps "modulo 16," and that substantial evidence thus supports the jury verdict of non-obviousness. D.I. 389 at 24-25. Oddly, Telcordia presented no technical expert to even attempt to support this argument.

In fact, Telcordia all but ignores the unrebutted evidence that a person of ordinary skill in the art would have understood the Gonzales reference to teach the counting and transmission of *shortened* (i.e., fewer than 16 bit) time stamps, *see* D.I. 375 at 22-25, instead relying on attorney argument, D.I. 389 at 25 n.6. Not only is Telcordia's attorney argument immaterial, it is wrong. The plain text of the Gonzales article describes an embodiment where timing information is sent in *fewer* than 16 bits, *i.e.*, a shortened time stamp. *See* DTX 2046 at 9.4.5. Cisco presented both expert and fact testimony that this disclosure would be understood by skilled artisans to teach a shortened time stamp. Indeed, even Mr. Houdoin expressly rejected the argument that Telcordia (or, more accurately, its lawyers) attribute to him in their answering brief, explaining that Gonzales "*says that only two bits are needed.*" D.I. 356 at 1488:13-1489:4; *id.* at 1559:8-1560:1. Unsupported by actual *evidence* or expert testimony, Telcordia's argument that Gonzales does not teach a shortened time stamp fails.

Once that argument is stripped away, it becomes clear that Telcordia's complaint is in fact much narrower. The essence of Telcordia's complaint is that Gonzales does not expressly teach a *4-bit* time stamp (*i.e.*, a time stamp that is counted modulo 16). This is irrelevant. As the '633 patent itself explains, the invention, if there was one, was in substantially reducing the number of bits, not in some magic attributed to the number 4. DTX 2004 at 3:40-4:38. Indeed, the record confirms that the exact length of that shortened time stamp, be it 2 bits or 4, is simply an implementation detail. D.I. 353 at 636:21-638:2 (testimony of Dr. Fleischer that the number of bits is a non-inventive implementation detail); D.I. 356 at 1493:23-1495:3, 1488:13-1489:4.

### 3. A Person Of Ordinary Skill Reading Gonzales Would Have Understood And Been Motivated To Transmit A Shortened Time Stamp Outside The Convergence Sublayer Overhead

Telcordia's final argument is that Dr. Acampora's explanation of why a person of ordinary skill in the art would have been motivated to transmit a shortened time stamp outside

the convergence sublayer overhead—the other key aspect of the invention—"actually weighs

against" a finding of obviousness. But Telcordia relies solely on attorney argument, unsupported

by any evidence or testimony, to assert this alleged discrepancy in Dr. Acampora's testimony.

Here again, Telcordia's reliance on *post hoc* attorney argument is insufficient to defeat JMOL.[9]

More importantly, however, Telcordia's argument ***completely ignores*** the '633 patent's

own acknowledgement of rigidity of the convergence sublayer as a drawback. DTX 2004 at

3:32-34. Although Telcordia would prefer to ignore the '633 patent's own recognition of the

problem facing those of ordinary skill in the art—and by extension, the motivation for solving

that problem—the law does not permit Telcordia to do so. *See, e.g., PharmaStem Therapeutics,*

*Inc. v. ViaCell, Inc.*, -- F.3d --, 2007 WL 1964863, *17 (Fed. Cir. July 9, 2007) ("Admissions in

the specification regarding the prior art are binding on the patentee for purposes of a later inquiry

into obviousness."). To the contrary, the express statement in the '633 patent specification—

coupled with the unrebutted testimony of Dr. Acampora as to the knowledge and motivations of

persons of ordinary skill in the art—compel the conclusion of obviousness.[10]

---

[9]    In any event, Telcordia's argument makes no sense. To be sure, one would not "simply shuffle timing information out of its designated layer and place it in a different layer." D.I. 389 at 27. Indeed, Dr. Acampora himself explained that once the job of transmitting a shortened time stamp is assigned to one layer of overhead, "that layer is stuck with it," "the buck stops there." D.I. 356 at 1550:1-4. Telcordia's argument fails to recognize that this is precisely ***why*** one of ordinary skill would move the shortened time stamp out of the rigid convergence sublayer— where overhead space is valuable—and into other overhead. *Id.* at 1550:5-12, 1560:7-21.

[10]    Telcordia presents evidence of secondary considerations that it contends weighs against obviousness. D.I. 389 at 28-29. However, Telcordia's evidence is far from persuasive:

o   The vast majority of licenses for the '633 patent—including those to NEC, Siemens and Newbridge—have either been terminated or allowed to expire, and the total licensing royalties for the '633 patent have totaled less than $3 million. *See* D.I. 353 at 496:13-512:25.

o   That the industry adopted SRTS as a standard does not reflect industry acceptance, but rather acquiescence to SRTS as a compromise. D.I. 375 at 16-19, 27 n.11.

o   Telcordia's citation to improvement patents on the SRTS technique and publication in a

**B.     At A Minimum, The '633 Patent Is Invalid For Improper Inventorship**

Telcordia's position that the claimed inventions of the '633 patent would not have been

obvious to persons of ordinary skill in the art at the time is fundamentally inconsistent with its

position that the France Telecom engineers were properly excluded as inventors because their

contributions were not inventive.  To the extent the SRTS compromise was not obvious, the

record establishes conclusively that '633 patent is invalid because the supposedly-inventive

aspects Telcordia attributes to the '633 patent came from France Telecom.  In response,

Telcordia again resorts to attorney argument, having relegated its technical expert to the

sidelines.  Not only are Telcordia's arguments inconsistent with the admissions of Telcordia's

own witnesses that France Telecom contributed the key aspects of the claimed invention, but

they fly in the face of law and logic.  On this record, the grant of JMOL is warranted.

**1.     Whether Or Not The France Telecom Engineers "Claimed"
Inventorship Is Irrelevant To The Inventorship Inquiry**

At trial, Telcordia offered only the uncorroborated, self-serving and inconsistent

testimony of its inventors to support its claims of inventorship.   It is thus unsurprising that

Telcordia's primary argument in support of its inventorship position here is not based on actual

evidence but on the illogical and legally-unsound premise that the France Telecom engineers

cannot be inventors because they have not formally *claimed* to be inventors.

---

peer-reviewed journal do not reflect professional recognition of SRTS, but rather that the
technique had been included in industry standards.  D.I. 356 at 1695:1-1700:10.

o   As to unexpected results, Dr. Lau's incredulity about SRTS was contradicted by Dr.
Fleischer, who claimed he was able to convince Dr. Lau "very quickly" that SRTS
worked.  D.I. 353 at 578:8-22; *see also id.* at 577:21-578:15.

o   Telcordia's evidence of "copying" reflects nothing more than compliance with industry
standards Telcordia promulgated while hiding its patent.  *See* D.I. 391 at 14-26.

In contrast, Cisco's evidence of the secondary considerations weighing in favor of obviousness
was essentially unanswered by Telcordia.  *Compare* D.I. 375 at 27-28 *with* D.I. 389 at 28-29.

Telcordia has cited no authority—nor could it—that an individual must formally claim to be an inventor to have made an inventive contribution that should be recognized. This makes sense. There are numerous reasons that an inventor may not legally claim inventorship, including that he or she does not know about the patent, is not interested in sharing in patent rights on the invention, does not believe there is a patentable invention, or simply does not understand the legal requirements enough to know that he or she should claim inventorship.

Here, even assuming *arguendo* Telcordia's premise that France Telecom did not "claim" inventorship, the record confirms that these are *precisely* the reasons why. As Mr. Adam explained, France Telecom only learned of Bellcore's patent on SRTS a "very, very long time" after their collaboration and even then, only from others in the industry. *See, e.g.,* D.I. 355 at 1457:15-1459:10. When the France Telecom engineers did learn of the patent, they were frustrated and upset. As Mr. Adam noted, their collaboration with Bellcore was to achieve an acceptable industry standard and, in so doing, "to forget any patent issue." *Id.* Indeed, France Telecom never even thought to patent SRTS because "it made no sense, no sense at all" to patent a technology that was the subject of an industry standard and had been the result of collaboration between two participants in the standards process. *Id.* at 1467:1-19; *see also id.* at 1474:1-19. It was perhaps Mr. Cochennec who put it best: "Well, its [sic] never been the intention of France Telecom to get a patent on the SRTS, simply because it was a common study between the two firms, Bellcore and France Telecom. That's the reason why." D.I. 356 at 1509:5-15. That the France Telecom engineers did not formally "claim" inventorship in these circumstances does not diminish their contribution.[11]

---

[11]    Although Telcordia seeks to discredit the testimony of Messrs. Adam, Cochennec and Houdoin, there is simply no basis to do so. Neither France Telecom nor the French engineers stand to benefit from their testimony in this case. *See, e.g.,* D.I. 355 at 1467:20-1468:1, 1473:22-

2.    **France Telecom Conceived Of Transmitting A Shortened Time Stamp Outside The Convergence Sublayer Overhead**

As noted in Cisco's opening brief, Telcordia is in a Catch-22 when it comes to the validity of the '633 patent. To avoid a conclusion of obviousness, Telcordia insists that the idea of transmitting a shortened time stamp outside of the convergence sublayer overhead would not have been obvious to a person of ordinary skill in the art. D.I. 389 at 26-27. But Telcordia is also faced with the concession by Dr. Lau that the idea of transmitting the time stamp outside the convergence sublayer overhead—which is, according to Dr. Clark, one of the two key aspects of the SRTS invention—came from France Telecom. D.I. 357 at 805:16-19. In an effort to reconcile these competing positions, Telcordia argues that France Telecom did not contribute the idea of transmitting the "specific *residual* time stamp" in the convergence sublayer overhead. Not only does Telcordia's argument improperly conflate the two key aspects of the invention, it simply cannot be harmonized with the record in this case.

Cisco's opening brief explained in detail the evidence that France Telecom conceived of transmitting a shortened time stamp. D.I. 375 at 31-32. Telcordia's only response is to argue that the August 26, 1991 facsimile does not disclose a shortened time stamp because "the very first mention of a *residual* time stamp" does not appear in the August 26 facsimile, but in a later facsimile from Bellcore.[12] D.I. 389 at 31. Telcordia cannot point to any evidence to support this theory, relying entirely on attorney argument. But even its attorney argument is superficial. Obviously, the mere fact that the August 26, 1991 facsimile does not use the *word* "residual" does not mean that it does not teach the *concept* of a residual time stamp.

---

1474:19. Nor did Cisco or its co-defendants influence the testimony of the France Telecom engineers. D.I. 356 at 1505:16-24.

[12]    Telcordia also suggests that the August 26, 1991 facsimile does not reflect an inventive contribution because it "consists of five sentences on half a page of paper," as though the length of a document trumps its content. *See* D.I. 389 at 30.

Likewise, Telcordia has failed to provide any meaningful response to the evidence presented by Cisco that France Telecom conceived of transmitting the shortened time stamp in question outside of the convergence sublayer. D.I. 375 at 30-31. Instead, Telcordia argues that the "use of the SAR layer to transmit timing information was not a novel suggestion but rather had long been part of Bellcore's prior SFET technique for timing recovery." D.I. 389 at 32. Telcordia's choice of words is telling. Rather than assert that Bellcore conceived of transmitting a *time stamp* outside the convergence sublayer overhead, Telcordia asserts only that it conceived of transmitting generic *timing information* in the SAR header. But no one disputes that the transmission of generic timing information outside the convergence sublayer overhead is not the claimed invention. Indeed, it is Telcordia above all that stresses that the claimed invention is requires the transmission of a *shortened time stamp* outside the convergence sublayer overhead. Thus, Telcordia's citations to its prior possession of the SFET technique are, simply, irrelevant.[13]

### 3.   Telcordia's Evidence Of Inventorship Is Insubstantial

The problems with Telcordia's evidence of inventorship—including the vague, conflicting and entirely uncorroborated testimony of its inventors and the complete lack of any documentary support—were set forth in Cisco's opening brief. It is worth noting, however, that Telcordia's most recent citation to "substantial evidence" of its inventorship suffers from the same flaws. Merely by way of example:

- o Telcordia's citation to the self-serving and uncorroborated testimony of Dr. Fleischer that he invented SRTS exclusively with Dr. Lau is contradicted by Dr. Lau himself, not to mention the France Telecom engineers and the written record. *E.g.,* D.I. 357 at 770-776; D.I. 355 at 1447-67; D.I. 356 at 1491-92, 1509; DTX 2367, 2368, 2119.

- o Mr. Kittam's testimony that SRTS was developed by Bellcore is belied by his

---

[13]     To be sure, the prior art SFET method provides for the transmission of timing information in the SAR header. Far from supporting Telcordia, however, this confirms that, in view of the Time Stamp and SFET techniques, transmission of a shortened time stamp outside the convergence sublayer overhead would have been obvious to one of ordinary skill in the art.

concession that he did not really understand SRTS in any detail, did not have any opinion on whether and what Dr. Fleischer contributed to SRTS, and had no idea how Drs. Lau and Fleischer worked on SRTS. D.I. 359 at 1932:7-11, 1932:17-1933:4.

o   Telcordia's citation to the November 4, 1991 ANSI contribution as evidence of Drs. Lau and Fleischer's inventorship is puzzling because the record confirms that the contribution reflected a common proposal and was submitted on behalf of France Telecom. D.I. 356 at 1506:25-1508:4; D.I. 359 at 1938:7-18.

In contrast to the overwhelming evidence of France Telecom's contribution, this evidence simply is not "substantial."

## IV.   THE COURT SHOULD GRANT JMOL THAT THE '306 PATENT IS INVALID

Just as with the '633 patent, Telcordia was silent on Cisco's '306 prior art invalidity defenses at trial. After electing not to present on '306 invalidity in its case-in-chief (other than Dr. Chao's recanting of his admission that he violated the best mode requirement), Telcordia chose not to present any rebuttal at all. As a result, Telcordia is once again left to resort to attorney argument to avoid JMOL.[14]

### A.   Telcordia Has Not Pointed To Any Evidence That The "Garbage Bits" Limitation Is Not Taught In The FasNet and Budrikis References

At trial, the only limitation that Telcordia argued was missing from the FasNet and Budrikis references was the "empty payload field" limitation, construed by the Court to require a "payload field that is empty of source data, but including bit signals of some kind, i.e. garbage bits." D.I. 179 at 6. As explained in Cisco's opening brief, Cisco presented evidence establishing that the FasNet and Budrikis references include this limitation. D.I. 375 at 38-40.

Telcordia's only response is to argue that the FasNet and Budrikis references do not teach this limitation because they "intentionally place" all zeroes in empty payload fields with the

---

[14]    In Section V.B of its answering brief, Telcordia urges denial of Cisco's request for a new trial on invalidity and unenforceability of the '306 patent, should the court's claim constructions be altered on appeal or remand. D.I. 389 at 40. Cisco does not dispute that the Court need not rule on this issue now (and believes it unlikely the Court will ever have to address this issue), but has sought to preserve its request for a new trial out of an abundance of caution.

objective of having them overwritten by data packets somewhere down the line.[15]  D.I. 389 at

36-37.  Far from presenting substantial *evidence* in support of its position, Telcordia relies

exclusively on conclusory attorney argument cobbled together with a handful of incomplete and

out-of-context snippets of Dr. Acampora's testimony.  In contrast, the evidence that is in the

record—the evidence on which this Court must decide the pending motion for JMOL—confirms

that the FasNet and Budrikis references teach the garbage bits limitation required by the claims.

Specifically, Cisco presented unrebutted and unequivocal expert testimony that the placement of

all 0s or 1s in empty payload fields in FasNet and Budrikis was *not* the intentional placement of

bits with the objective of having them processed elsewhere to accomplish some objective, but

simply *"an indication of the emptiness."*  D.I. 356 at 1616:21-1617:16.  As a result, Cisco's

expert was able to categorically reject the suggestion by Telcordia's counsel that the FasNet and

Budrikis references teach the intentional placement of 0s and 1s in empty payload fields with the

objective of having them processed somewhere else.  *Id.* at 1716:4-21; *see also id.* at 1720:9-19.

### B.    Telcordia's Belated Assertion That The Priority Limitation Of The Asserted Claims Is Not Taught In FasNet or Budrikis Is Unsupported

Telcordia does not dispute that its only argument at trial in response to Cisco's prior art

invalidity defense was that the "garbage bits" limitation of '306 asserted claims is not taught in

the FasNet and Budrikis references.  D.I. 389 at 35 n.12.  Now, however, Telcordia's lawyers

have crafted another theory in an attempt to preserve the validity of the '306 patent:  that the

FasNet and Budrikis references do not teach inserting packets into any available empty payload

field.  *Id.* at 38-39.  This belated argument fares no better than the first one.

---

[15]     Telcordia suggests that Dr. Acampora provided "unclear and contradictory" testimony about how he applied the garbage bits limitation in rendering his opinion. D.I. 389 at 35-37. To the contrary, Dr. Acampora's explained precisely how one of ordinary skill in the art would apply the garbage bits limitation. D.I. 356 at 1716:12-14. Telcordia has not offered any expert testimony or other evidence rebutting Dr. Acampora's testimony.

The heart of Telcordia's theory is that the word "any" in the claims "demand[s] that data be written into any available empty payload field, *i.e.*, any payload field can be filled with a data packet from the source of highest priority with a packet ready to transmit." *Id.* at 38. Because the FasNet and Budrikis references disclose schemes in which certain sources are not permitted to transmit data packets in certain cycles, Telcordia contends that the limitation is not met. *Id.*

This theory is based entirely on an interpretation of the Court's claim construction proffered by Telcordia's lawyers in these post-trial proceedings: the limitation "demand[s] that data be written into any available empty payload field, *i.e.,* any payload field can be filled with a data packet from the source of highest priority with a packet ready to transmit." Nowhere in the Court's claim construction is there a requirement that any payload field can *always* be filled with a data packet of the highest priority (as opposed to data being written into any payload field of the highest priority at that particular time). Nor has Telcordia presented any evidence or testimony that this is how one of ordinary skill in the art would apply the Court's construction. In contrast, Cisco presented extensive testimony from Professor Acampora as to how this limitation would be applied by a person of ordinary skill in the art, D.I. 356 at 1618:19-1619:6, and with this understanding in mind, how this limitation is met by FasNet and Budrikis. *Id.* at 1619:7-1620:5, 1627:13-1630:1.[16]

## V.  CONCLUSION

For the reasons set forth in Cisco's opening brief and herein, Cisco requests that the Court enter judgment as a matter of law in its favor.

---

[16]    Telcordia does not dispute that any one of Turner, Takeuchi, Luderer and Baran may be combined with FasNet and Budrikis to render obvious the addition of any corresponding structure that is deemed not met by those references standing alone. D.I. 389 at 40. Telcordia's only argument is that the "garbage bits" and "any available empty payload filed" limitations are not supplied by these references. As noted above, these limitations are disclosed in FasNet and Budrikis and need not be supplied by Turner, Takeuchi, Luderer and Baran in any event.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 North Market Street
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
lpolizoti@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

Matthew D. Powers
Edward R. Reines
Jessica L. Davis
Sonal N. Mehta
Thomas B. King
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

August 13, 2007
1210379

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to Steven J. Balick and John G. Day.

I further certify that I caused copies of the foregoing document to be served on August 13, 2007 upon the following in the manner indicated:

**BY HAND**

John G. Day
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

**BY FEDERAL EXPRESS
(on August 14, 2007)**

Don O. Burley
FINNEGAN, HENDERSON,
  FARABOW, GARRETT & DUNNER
901 New York Avenue
Washington, DC 20001

**BY ELECTRONIC MAIL**

John Day (jday@ashby-geddes.com)
Steven J. Balick (sbalick@ashby-geddes.com)
John Williamson (john.williamson@finnegan.com)
York Faulkner (york.faulkner@finnegan.com)
Don Burley (don.burley@finnegan.com)

*/s/ Jack B. Blumenfeld*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com