## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,              )
                                           )
    Plaintiff/Counterclaim Defendant,  )
                                           )
v.                                         )     Civil Action No. 04-876-GMS
                                           )
CISCO SYSTEMS, INC.,                       )     **REDACTED**
                                           )     **PUBLIC VERSION**
    Defendant/Counterclaim Plaintiff.  )
                                           )
                                           )
                                           )
                                           )
                                           )

## REPLY MEMORANDUM IN SUPPORT OF
## TELCORDIA TECHNOLOGIES, INC.'S MOTION FOR ENTRY OF
## A PERMANENT INJUNCTION, OR, IN THE ALTERNATIVE, FOR AN
## ORDER REQUIRING CISCO TO PAY A MARKET-RATE ROYALTY

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff/Counterclaim Defendant
Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20005
(202) 408-4000

Dated: August 13, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

I.      INTRODUCTION ........................................................................................................... 1

II.     ENTRY OF AN INJUNCTION IS A JUST REMEDY FOR CISCO'S
        ONGOING INFRINGEMENT ......................................................................................... 2

        A.    The Jury Did Not Award Damages For The Life Of Both Patents ..................... 2

        B.    Telcordia Has Shown That It will Suffer Irreparable Harm And That
              Money Damages Are Inadequate ....................................................................... 7

        C.    The Balance Of Hardships And Public Interest Weigh In Favor Of
              Granting An Injunction ...................................................................................... 13

III.    TELCORDIA HAS NOT RELINQUISHED OR WAIVED ITS RIGHT TO
        EXCLUDE OTHERS FROM PRACTICING THE '633 AND '763
        PATENTS ........................................................................................................................ 15

IV.     THE NOTICE PROVISION IN THE PROPOSED INJUNCTION IS
        STANDARD AND CISCO FAILS TO JUSTIFY A STAY ............................................ 16

V.      TELCORDIA SHOULD BE AWARDED A MARKET-RATE ROYALTY IF
        THE COURT DENIES INJUNCTIVE RELIEF ............................................................. 17

VI.     CONCLUSION ................................................................................................................ 19

# TABLE OF AUTHORITIES

## CASES

*Additive Controls & Measurement Sys., Inc. v. Floridation, Inc.*, 986 F.2d 476
(Fed. Cir. 1993) ........................................................................................................... 15

*Advanced Medical Optics, Inc. v. Alcon Labs, Inc.*, No. Civ. A. 03-1095,
2005 WL 3454283 (D. Del. Dec, 16, 2005) ........................................................... 5

*Black & Decker v. Robert Bosch Tool Corp.*, No. 04C7955, 2006 WL 3446144
(N.D. Ill., Nov. 29, 2006) .......................................................................................... 15

*Broadcom Corp. v. Qualcomm Inc.*, No. 05-3350, 2006 WL 2528545
(D.N.J. Aug. 31, 2006) ............................................................................................... 15

*Commonwealth Scientific and Ind. Research Org. v. Buffalo Tech., Inc.*, 06-CV-324,
2007 WL 1739999 (E.D. Tex. June 15, 2007) ............................................ 1, 9, 12, 16

*eBay v. MercExchange*, 126 S. Ct. 1837 (2006) .............................................. 7, 8, 9

*Ess Tech. Inc. v. PC-Tel, Inc.*, No. 3-97-20292, 1999 U.S. LEXIS 23227
(N.D. Cal. November 2, 1999) .................................................................................. 16

*Finisar Corp. v. DirecTVGroup, Inc.*, 1:05 CV-264 (E.D. Tex. July 7, 2006) ............................ 17

*Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471 (10th Cir. 1985) ............................ 7

*Fuji Photo Film, Co. v. U.S. Int'l Trade Comm'n*, 474 F.3d 1281 (Fed. Cir. 2007) ............... 5, 18

*In re TMI Litigation*, 193 F.3d 613 (3rd Cir. 1999) ....................................................... 5

*Johns Hopkins Univ. v. Datascope Corp.*, Nos. WDQ-05-0759 & WDQ-06-2711, slip op.
(D. Md. Aug. 10, 2007) ........................................................................................ 7, 13

*Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*, 846 F.2d 78,
1988 WL 24933 (Fed. Cir. 1988) ........................................................................... 6, 7

*Loughman v. Consol. Pennsylvania Coal Co.*, 6 F.3d 88 (3rd Cir. 1993) ................................ 6

*Lucent Technologies, Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181
(D. Del. 2000) ........................................................................................................ 15

*Maxwell v. Baker*, 86 F.3d 1098 (Fed. Cir. 1996) ..................................................... 18

*MercExchange, L.L.C. v. eBay, Inc.*, No. 2:01cv736, 2007 U.S. Dist. LEXIS 54642
(E.D. Va. July 27, 2007) ...................................................................................... 10, 11

*On Demand Machine Corp. v. Ingram Ind., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006) ...................... 17

ii

*Paice v. Toyota Motor Corp.*, No. 2:04-CV-11-DF, 2006 U.S. Dist. Lexis 61600
(E.D. Tex. Aug. 16, 2006) ..................................................................................... 17

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* 575 F.2d 1152 (6th Cir. 1978)....................... 18

*Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446 (Fed. Cir. 1984) ................................ 7

*Stickle v. Heublein*, 716 F.2d 1550 (Fed. Cir. 1983) ................................................................. 6, 18

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc*, 750 F.2d 1552 (Fed. Cir. 1984)........... 5, 6, 18

*United States v. Allen*, 302 F.3d 1260 (11th Cir. 2002)................................................................. 6

*United States v. Hamaker*, 455 F.3d 1316 (11th Cir. 2006) .......................................................... 6

*United States v. Oozco-Prada*, 732 F.2d 1076 (2d Cir. 1984)...................................................... 6

*United States v. Watts*, 519 U.S. 148 (1997) ............................................................................... 6

*Voda v. Cordis*, No. CIV-03-1512-L, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006)................ 17

*z4 Technologies, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437 (E.D. Tex. 2006) ................. 7, 18

**RULES**

Fed. R. Civ. P. 49(b) ..................................................................................................... 5

iii

## I.    INTRODUCTION

Cisco's opposition to entry of an injunction, or in the alternative, a compulsory license (D.I. 392 Filed Under Seal) ("Opp.") is premised on its wholly unsupported speculation that the jury's damage award of $6.5 million was for a paid-up license and an unfounded theory that an injunction may not issue because the '633 patent covers a standard and the '763 patent covers a Telcordia General Requirement.

Theorizing about the jury's views invades the sacred province of the jury and there is ample evidence in the record from Cisco's and Telcordia experts that the jury's finding is consistent with an award of past damages, as is the general rule in patent infringement cases, and not a paid-up amount for the life of the patents-in-suit.

Cisco's novel theory that the Court may not issue an injunction where the patent covers a standard is without legal support and is contradicted by contrary authority.  *See, e.g., Commonwealth Scientific and Ind. Research Org. v. Buffalo Tech.*, No. 06-CV-324, 2007 WL 1739999 (E.D. Tex. June 15, 2007) (granting an injunction to owner of a patent for wireless local area network (WLAN) forming a portion of the relevant IEEE standard) (Ex. A).

Cisco's Opposition fails to contradict Telcordia's compelling evidence of harm that is not compensable by money damages.  Instead, Cisco asks the Court to ignore it.  Cisco's erroneous complaint that Telcordia's proposed injunction sweeps in non-infringing products does not withstand scrutiny.  If the Court denies an injunction, even Cisco concedes that Telcordia's alternative request for an ongoing royalty is well within the Court's discretion.  Like its approach to Telcordia's licensing offers, Cisco simply posits it should not have to take a license on the same terms and conditions offered to others.

1

## II.    ENTRY OF AN INJUNCTION IS A JUST REMEDY FOR CISCO'S ONGOING INFRINGEMENT

### A.    The Jury Did Not Award Damages For The Life Of Both Patents

In support of its opposition to Telcordia's motion for an injunction, Cisco asserts that the jury's $6.5 million damage award necessarily represents a lump-sum royalty because its damage expert, Terry Musika, testified that the parties would (in his opinion) have agreed on a paid-up license through the remaining term of the '633 and '763 patents at the time of the hypothetical negotiation. (Opp. at 2-10.)  On that basis, Mr. Musika calculated Telcordia's lost royalties as $5.0 million for both patents ($4.6 million for the '763 patent and $400,000 for the '633), adjusting future payments to present value. *Id.*  Therefore, Cisco asserts that the jury's $6.5 million award "is best understood as a fully paid-up license" because its award is so close to Mr. Musika's $5.0 million calculation.  (Opp. at 6; D.I. 359 at 1908:12-1909:13.)

But that was not the only evidence on damages offered by Mr. Musika, and it was not what Cisco argued in its closing.  Indeed, Mr. Musika also gave testimony on an alternative theory not involving a paid-up license that is even closer to the jury's award.  Specifically, Mr. Musika gave testimony on what the appropriate damages would be using a running royalty through the last date in 2007 for which Cisco's sales data was available, using a rate and base that Mr. Musika opined was correct. (D.I. 359 at 1910:6 - 1914:8.)  He calculated Telcordia's damages using Telcordia's expert's methodology (i.e., a running royalty, not a paid-up license) but using his own royalty base and rate instead of Telcordia's. *(Id.)*  On that basis, Mr. Musika's calculation resulted in a damage figure of $5.25 million for the '763 patent alone (D.I. 359 at 1913:8-1914:4), which is closer to the jury's $6.5 million award than his $5.0 million lump sum figure for both patents.

2

For this alternative, running royalty analysis, Mr. Musika began with the $70.0 million damages assessment (rounded) for the '763 patent offered by Telcordia's expert, Mr. Nawrocki, which was based on a running royalty only through 2007 (D.I. 359 at 1910:6-16). Mr. Musika reduced that figure by $28.0 million to account for time period differences, and by $21 million to account for excluding foreign sales, and by an additional $15.7 million to account for the difference between Telcordia's expert's proposed 2% royalty rate and his own 0.5% rate for the '763 patent. The result of Mr. Musika's calculations was a damages amount of $5.25 million for the '763 patent. (*Id.* at 1913:8-1914:4.)

Mr. Musika thus reduced Mr. Nawrocki's $70 million (rounded) damage figure for the '763 patent to $5.25 million, i.e., multiplying it by 0.075 based on his reductions for his different base and rate. If Mr. Nawrocki's $4.7 million (rounded) damage figure for the '633 patent is reduced on the same basis, i.e., by multiplying it by 0.075, the resulting running royalty for the '633 patent is $352,500. If the resulting $352,000 is added to Mr. Musika's $5.25 million for the '763 patent, the total comes to $5,602,500, or more than six hundred thousand dollars closer to the actual jury award than his own calculation of $5 million in total damages on the basis that Cisco says represents a paid-up license.

Alternatively, if the jury applied Mr. Musika's approach to Mr. Nawrocki's $4.7 million (rounded) damage figure for Cisco's infringement of the '633 patent, the total of the two patents is effectively the amount the jury awarded. Mr. Nawrocki arrived at $4.7 million based on a running royalty at 2% and included foreign sales. If that amount is reduced using Mr. Musika's royalty rate of 1%, the reduction brings it to $2.35 million. If it is further reduced to exclude foreign sales as Mr. Musika suggested it should be, it is further reduced to $1,175,000. The sum

3

total of $1,175,000 for the '633 patent and $5.25 million for the '763 patent is $6.42 million, which when rounded is the amount of the jury award.

In short, Mr. Musika – Cisco's own expert – himself demonstrated at the trial that it is impossible to tell whether the jury award represents a lump-sum, paid-up license (as Cisco argues, although his calculation of that lump sum is more than a million dollars short of the amount of the jury award), or instead reflects the jury's acceptance of Mr. Nawrocki's and Telcordia's running royalty analysis applied to Mr. Musika's royalty base and rate, or some compromise or variation of the two. Mr. Musika's own alternative analysis, moreover, is more consistent with the latter running royalty approach than with a paid-up license, and in no way supports Cisco's present assertion that the jury verdict is "best seen as adopting Mr. Musika's paid-up licensing fee." (Opp. at 8.) Indeed, that was not even what Mr. Powers argued in his closing:

> Mr. Nawrocki asked two percent on the '763 patent even though the only patent, the only offer at the time was for one percent for two. So really that is four times. If you view each of those as being worth half a percent, he is asking for four times the money, that contemporaneously they were asking for.
>
> All the evidence is inconsistent with the standards that Mr. Nawrocki used.
>
> The licenses. Well they didn't get very much money for them and they were not on – they were not on the box, they were on the card.

> At the end of all of this, at the end of all of this, we have a
> Bellcore-Telcordia practice and policy of just wanting money from
> Cisco, and having no good reason for it.

(D.I. 358 at 2256:16-2257:5.)[1]

The jury was taking notes throughout the trial and was entitled to accept or compromise

on one or the other of Mr. Musika's and Mr. Nawrocki's running royalty rates and base. *See,*

*e.g., In re TMI Litigation,* 193 F.3d 613, 665 (3rd Cir. 1999) (trier of fact assesses expert's

conclusions); *Advanced Medical Optics, Inc. v. Alcon Labs, Inc.,* No. Civ. A. 03-1095, 2005 WL

3454283 at *5 (D. Del. Dec. 16, 2005) (jury entitled to credit expert's testimony and its own

judgment). The parties agreed that the base for the '763 patent was boxes and boards, and

Cisco's expert, Mr. Musika, conceded that his differences with Mr. Nawrocki with respect to

damages for the '633 patent were "not so much at the rate level. It's what should be included in

the base. Should it be at the box level or should it be at the card level?" (D.I. 359 at 1879:20.)

In accordance with Fed. R. Civ. P. 49(b), the jury rendered a general verdict, that Telcordia's

patents were not invalid, were infringed and awarded damages of $6.5 million.

In the absence of an express jury interrogatory stating that the $6.5 million represented a

paid-up license fee for Cisco's use during the life of the patents, the verdict is consistent with the

evidence of a running royalty and the general rule in patent cases that "damages are awarded as

compensation for past infringement." *See, e.g., Trans-World Mfg. Corp. v. Al Nyman & Sons,*

*Inc,* 750 F.2d 1552, 1565 (Fed. Cir. 1984) ; *see generally,* 9 Moore's Federal Practice,

§ 49.20(6)(b) at 49-58 (3rd ed. 2007) (courts must make every effort to harmonize verdict and

---

[1] In any event, if Cisco were correct that the jury awarded it a lump-sum, paid-up license
as of the date Cisco acknowledges it received notice of infringement, it cannot claim the benefit
of that license until it has paid the judgment amount which it has not. *Fuji Photo Film, Co. v.
U.S. Int'l Trade Comm'n,* 474 F.3d 1281, 1294 (Fed. Cir. 2007).

interrogatory answers); *Loughman v. Consol. Pennsylvania Coal Co.*, 6 F.3d 88, 104 (3rd Cir. 1993) (district court should render a judgment that harmonizes verdict with evidence).

It is well-established that it is improper to extrapolate from the jury's verdict or to speculate on the reasoning behind a jury's general verdict. *See e.g., United States v. Watts*, 519 U.S. 148, 155 (1997); *United States v. Hamaker*, 455 F.3d 1316, 1337 (11th Cir. 2006) (where jury returns a general damages verdict, "theorizing about the jury's views threatens to invade the sacred province of the jury"). "A judge has no way to interpret the jury's underlying intent in the absence of a special verdict". *Id., citing United States v. Allen*, 302 F.3d 1260, 1269 (11th Cir. 2002) (citing with approval *United States v. Oozco-Prada*, 732 F.2d 1076, 1083 (2d Cir. 1984)).

The cases Cisco relies on, *e.g., Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc*, 750 F.2d 1552, 1565 (Fed. Cir. 1984); and *Stickle v. Heublein*, 716 F.2d 1550, 1563 (Fed. Cir. 1983) (Cisco Opp. at 3-5), actually support Telcordia's position that an injunction is proper in this case. In *Trans-World*, the Federal Circuit affirmed entry of an injunction, remanding it to broaden the injunction, pending determination on damages. 750 F.2d at 1565. In *Stickle v. Heublein*, the court affirmed an award of a paid-up license where the evidence at trial showed the patentee "never offered anything other than a paid-up license for making and using the patented inventions." 716 F.2d at 1561. In this case, there was ample evidence at trial that Telcordia had offered running royalty licenses, there were and are licensees paying running royalties and both Cisco's expert and Telcordia's expert offered opinion testimony of the appropriate running royalty rates for the two patents. (D.I. 355 at 1254:9-12; 1376:18-24; D.I. 359 at 1879:16-22; 1908:19-1909:5; 1913:8-17.)

Cisco's reliance on *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*, 846 F.2d 78, 1988 WL 24933 (Fed. Cir. 1988) (Opp. at 4), is equally unavailing. *Lear Siegler* simply

affirms that a trial court has discretion not to enter an injunction where it is proven that the award "was full compensation for the life of the patent." *Lear Siegler*, 1988 WL 24933, at *2.[2] But here, where the jury did not expressly state that it awarded full compensation for the life of the two patents, and the award is far more consistent with an amount of a running royalty than with a paid-up license, it is entirely proper for the Court to enter an injunction.

**B.    Telcordia Has Shown That It will Suffer Irreparable Harm And That Money Damages Are Inadequate**

In an effort to divert the Court's attention from the proper inquiry for granting an injunction, i.e., whether Telcordia made a sufficient showing of irreparable harm, Cisco focuses its argument on whether since *eBay v. MercExchange*, 126 S. Ct. 1837 (2006), there remains a presumption of irreparable harm following a finding of infringement. (Opp. at 12.) While some courts have concluded there is no longer a presumption of harm, *see, e.g., z4 Technologies, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006), the important threshold issue, set out in *eBay* and every case following it, is whether the patentee has shown that it will suffer irreparable harm and that money damages are inadequate. *See, e.g., Johns Hopkins Univ. v. Datascope Corp.*, Nos. WDQ-05-0759 & WDQ-06-2711, slip op. at 13 (D. Md. August 10, 2007) (Ex. D) ("If the Plaintiffs do not obtain injunctive relief, others may be encouraged to infringe their patents and risk litigation, thus devaluing the Plaintiffs' property.") Here, Telcordia has met that standard by coming forward with specific and uncontradicted evidence of irreparable harm. Specifically,

- Telcordia has always actively sought to license its patent portfolio including the patents-in-suit. This program will be adversely harmed if the Court does not

---

[2] *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1482 (10th Cir. 1985); and *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446 (Fed. Cir. 1984), also cited by Cisco (Opp. at 5), merely provide that the Court may affirm a jury's award consistent with the evidence at trial.

protect its patents with an injunction. (D.I. 352 at 277:9-25; Giordano Dep. Testimony, July 19, 2007 ("Giordano Dep.") (Ex. B) at 712:7-714:7; 729:10-730:21.)

- Telcordia's licensing program has a strong reputation and goodwill to protect. (Giordano Dep. at 709:6-19; 710-713.)

- Telcordia has a current royalty stream to maximize. (Giordano Dep. at 729:10-732:14.)

- Telcordia has a customer base to retain. (Giordano Dep. at 712:7-714:7.)

- Telcordia has continuing research and development activities it seeks to fund through maximizing its licensing revenues. (Giordano Dep. at 704:14-706:3; 708:7-709:5.)

- Telcordia's ability to license its products will be adversely affected if Telcordia is not awarded an injunction. (Giordano Dec., D.I. 368, at ¶ 2.)

Cisco does not contradict this evidence, but instead argues that the Court should deny Telcordia an injunction because it would only give Telcordia leverage in licensing negotiations and that is not a reason to grant an injunction, particularly where Telcordia does not practice the patents. (Opp. at 13-14.) But, the Supreme Court made it clear in *eBay* that Telcordia's practice of licensing, rather than developing, its patents in no way excludes Telcordia from the opportunity to obtain a permanent injunction. *eBay*, 126 S. Ct. 1840-1841.

> Neither the District Court nor the Court of Appeals below fairly applied these traditional equitable principles in deciding respondent's motion for a permanent injunction. Although the District Court recited the traditional four-factor test, 275 F.Supp.2d. at 711, it appeared to adopt certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases. Most notably, it concluded that a "plaintiff's willingness to license its patents" and "its lack of commercial activity in practicing the patents" would be sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue. *Id.* at 712. But traditional equitable principles do not permit such broad classifications.

> For example, some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the

8

> financing necessary to bring their works to market themselves.
> Such patent holders may be able to satisfy the traditional four-
> factor test, and we see no basis for categorically denying them the
> opportunity to do so.  To the extent that the District Court adopted
> such a categorical rule, then, its analysis cannot be squared with
> the principles of equity adopted by Congress.

*eBay*, 126 S. Ct. 1840-1841; *see, e.g., Commonwealth Scientific and Ind. Research Org v.*

*Buffalo Tech.*, No. 06-CV-324, 2007 WL 173998 at *9 (E.D. Tex. June 15, 2007) (granting

injunction to patentee who did not compete with defendant and had a licensing program relying

on the Supreme Court's rejection in *eBay* of the conclusion that a plaintiff's willingness to

license its patents and its lack of commercial activity would be sufficient to establish the patentee

would not suffer irreparable harm) (Ex. A).

And as Mr. Giordano's uncontradicted testimony shows, Telcordia is not seeking "undue

leverage" in its licensing negotiations, but rather a level playing field with its current and

prospective licensees.  It is important to Telcordia's licensing program that existing and

prospective licensees see that willful infringers will be enjoined from continuing to violate its

patent rights:


**REDACTED**


(Giordano Dep. at 712:3-713:10.)

Cisco's argument that Telcordia has an adequate remedy at law simply because Telcordia

licenses its intellectual property (Opp. at 16-18) is necessarily based on the presumption that a

licensing company could never prove irreparable harm, which runs afoul of *eBay*'s proscription

against categorical rules and its holding that in each case the court must weigh the equities.

Here, Telcordia's licensing program will suffer harm that is not quantifiable or fully

compensable at law. Telcordia's goodwill and effectiveness in attracting future licensees will be irreparably harmed if the marketplace sees that a willful infringer such as Cisco can simply pay later after profiting illegally from Telcordia's technology. (D.I. 368, Giordano Dec. ¶¶ 2-3.)

To support its contention that Telcordia cannot show irreparable harm, Cisco relies on *MercExchange, L.L.C. v. eBay, Inc.*, No. 2:01cv736, 2007 U.S. Dist. LEXIS 54642 (E.D. Va. July 27, 2007), submitted as subsequent authority (D.I. 400). Aside from the fact that this decision is not binding on this Court, Cisco's reliance on *MercExchange* is misplaced.

First, to the extent that MercExchange was denied an injunction because of "its desire to obtain money" by licensing its patents or because it did not practice the invention, as Cisco urges (D.I. 400 at 1-2), such a ruling is flatly inconsistent with the Supreme Court's pronouncement in *eBay* that the courts must apply the traditional four-factor analysis to the facts regardless of the patentee's status.

Second, to the extent that the court in *MercExchange* found that on those facts an injunction was not warranted, the facts here are very different. In particular, unlike *MercExchange*, Telcordia has a long history of research and development. Telcordia was the successor to Bell Labs, initially functioning as the research arm to the Regional Bell Operating Companies (D.I. 352 at 274:11-275:17), inheriting many of its fine scientists and continuing to work in research and development, and growing from a company in 1984 that had no patents to one today that has close to 1,000 patents worldwide. (*Id.*) Unlike *MercExchange*, Telcordia is not a "patent troll." Telcordia's licensing program is well-established (D.I. 352 at 277:2-278:6). Telcordia has consistently sought to bring its intellectual property to the marketplace on fair and reasonable terms. (*Id.*) As the successor to Bell Labs, it has a long and famous history of research and development and continues to contribute to the field. (*See e.g.,* D.I. 352 at 273:12-

10

275:17; D.I. 351 at 571:8-572:2; D.I. 354 at 1168:7-1169:14.) Unlike *MercExchange*, it has not

used the patents primarily as a sword in litigation. (D.I. 352 at 277:17-278:6.) Unlike

*MercExchange*, which admitted "that subsequent to trial, it retained an outside company" to

analyze its patent portfolio to sell it off, *MercExchange*, 2007, U.S. Dist. LEXIS 54642, at *76

(emphasis in original), Telcordia is not attempting to sell off its intellectual property rights.

(Giordano Dep., July 19, 2007 at 726:16-727:15).[3]

The court denied MercExchange an injunction in large part because it had taken "few

steps, if any, before trial, during trial, or within the first three years after trial to either develop its

patents or to establish a licensing program." *MercExchange*, 2007 U.S. Dist. LEXIS 54642, at

*64. Telcordia, by contrast, before, during and after trial, has had an active and established

licensing program. (D.I. 352 at 277:9-25.) Further, the *MercExchange* court found that one of

the factors relied on by MercExchange in seeking an injunction —development of the patent

with uBid — appeared to be a ruse, an effort to placate the court. *MercExchange*, 2007 U.S.

Dist. LEXIS 54642, at *57.

Another significant difference between *MercExchange* and this case is that all of the

claims of MercExchange's infringed patent-in-suit (a business method patent) were twice

rejected by the PTO in interim actions in re-examination proceedings. *Id.* at *72. In denying an

injunction, the court weighed the fact that these PTO rejections were issued even before issuance

of *KSR*, which the court felt expressed reservations regarding patents similar to MercExchange's

patents-in-suit. *Id.* at *71-72. No such cloud hangs over Telcordia's infringed patents-in-suit.

Further weighing against an injunction for *MercExchange* was that it had "virtually no

presence" in the industry, "little, if any," name recognition, customer base or licensing program.

3.

**REDACTED**

(*Id.*)

11

*Id.* at *78. Here, as detailed above, Telcordia has a presence and name recognition in the industry, as well as an established licensing program.

Instead, Telcordia is like CSIRO, a research institution with a licensing program, recently granted an injunction in *Commonwealth Scientific and Ind. Research Org., supra* at *3-4. Like CSIRO, Telcordia is primarily a research entity

**REDACTED**

(Giordano Dec., May 30, 2007, D.I. 368, at ¶ 1; Giordano Dep. at 692:7-693:8.) Like CSIRO, Telcordia uses revenue from licensing its intellectual property to fund further research and development. (D.I. 368 at ¶ 1; Giordano Dep. at 704:24-705:20.)

Most importantly, like CSIRO, Telcordia has shown that its harm is not merely financial, and that damage to its reputation and licensing program is irreparable. *Commonwealth Scientific and Ind. Research Org., supra* at *4.

> Having its patents challenged via the courts not only impugns CSIRO's reputation as a leading scientific research entity but forces it to divert millions of dollars away from research and into litigation costs. Delays in funding result in lost research capabilities, lost opportunities to develop additional research capabilities, lost opportunities to accelerate existing projects or begin new projects…the harm of lost opportunities is irreparable. They cannot be regained with future money because the opportunity that was lost already belong to someone else.

*Id.*[4]

---

[4] Cisco argues that Telcordia is precluded from seeking an injunction, but in proceeding before the ITC, Cisco urged the ITC to wait for this Court's ruling on Telcordia's request for an injunction arguing, among other things, that if this Court granted an injunction, the ITC proceeding might be moot. (Cisco Motion for Extension of Target Date, filed in the ITC June 27, 2007, attached at Ex. C, D.I. 277027, at 6.) Not only is Cisco's present argument that Telcordia cannot possibly qualify for an injuction inconsistent with its position before the ITC, but is also plainly inconsistent with the Supreme Court's mandate in *eBay*.

12

Telcordia will suffer such harm if an injunction does not issue in this case. Telcordia's good will and reputation stems from its inherited Bell Labs' reputation and scientists, and has continued on through the research work of its research scientists, such as those who testifed at trial, including Dr. Lau and former employers, Drs. Fleischer and Chao, who are the inventors of the infringed patents and who received honors and patents for their research work at Telcordia (D.I. 351 at 669:18-671:3; D.I. 357 at 937:8-938:7.)

Telcordia's reputation, its customer base and licensing program make an important contribution to patent development. On these facts, balancing the equities, the Court should find damages at law insufficient and an injunction proper. "Moreover, there is public interest in strong patent protection." *Johns Hopkins Univ. v. Datascope Corp.*, Nos. WDQ-05-0759 & WDQ-06-2711, slip op. at 15 (Ex. D).

### C. The Balance Of Hardships And Public Interest Weigh In Favor Of Granting An Injunction

Cisco argues that the balance of hardships and public interest weigh in Cisco's favor, erroneously asserting that Telcordia's proposed injunction would enjoin non-infringing activity. (Opp. at 18-23.) A cursory review of Telcordia's proposed Order (D.I. 367 at Ex. A) shows that with respect to the '633 patent, Cisco would be enjoined from making, using, selling only those "products having Synchronous Residual Times Stamp (SRTS) specific features." (D.I. 367, Ex. A p. 2.) In ruling on the parties' motions *in limine*, the Court specifically ruled that potentially infringing products with respect to the '633 patent were boxes with SRTS-enabled boards. (D.I. 335 at 5.)

The infringing products described in the proposed injunction are exactly what the Court ruled to be potentially infringing, and what the jury found in fact to be infringing. Cisco's

13

assertion that Telcordia is now seeking an injunction for all of Cisco's products is simply not correct.

Moreover, while one cannot identify with certainty the basis for the jury's damage award, the trial evidence is consistent with the jury's acceptance of Telcordia's damages base for the '633 patent as boxes with boards. As explained above, even under Cisco's expert's opinion as to the appropriate running royalty rate, the jury's award is fully consistent with a running royalty award for past infringement by boxes and boards for the '633 patent. For example, if the jury accepted Mr. Nawrocki's calculation that Cisco's U.S. revenue was approximately $115,000,000 for boxes and boards that were SRTS-enabled (D.I. 355 at 1264:16-1265:2) and applied Mr. Musika's alternative theory of a 1% royalty rate, a damage award for the '633 patent of $1.15 million, added to a $5.25 million award for the '763 patent, is just about what the jury awarded.

Expert testimony and common sense also support a jury award, and an injunction against infringement by Cisco's boxes and boards, with respect to the '633 patent. The boards by themselves do not run SRTS; it is only when Cisco's boxes are fitted with the SRTS-enabled boards that a Cisco customer can use the SRTS functionality. (D.I. 357 at 842:11-25.) Indeed, the "entire market rule" jury instruction, upon which the parties agreed and which the Court gave, provides that in the context of proofs such as those Telcordia proffered in this case, the jury can properly base damages on the value of the entire product even though only one part of it is the infringing part. (D.I. 343 at 40.)

While Cisco suggests that Telcordia is seeking to revisit the Court's ruling on the '633 infringing boxes and boards, (Opp. at 19), it is actually Cisco that apparently now would like the Court to change its earlier ruling, (D.I. 335 at 5) ("direct infringement can exist only for the boxes sold with the SRTS-capable cards, or the SRTS-capable cards that the defendants sold to

customers") to a ruling that only boards could be found to infringe the '633 patent. The Court should summarily reject Cisco's argument because its earlier ruling is law of the case, and was the basis for admission of evidence on the '633 patent at trial.

Cisco's complaint that Telcordia's proposed injunction with respect to the '763 patent is overbroad is equally erroneous. Telcordia's proposed Order is limited to only those "products having unidirectional path switched rug (UPSR) or path protected mesh network (PPMN)-specific features . . ." Lacking any real grounds to challenge the proposed injunction order, Cisco has set up a straw man argument that is incorrect. Telcordia's proposed language captures only infringing products and the injunction should issue. *See, e.g., Additive Controls & Measurement Sys., Inc. v. Floridation, Inc.*, 986 F.2d 476, 479-80 (Fed. Cir. 1993) (permanent injunctions typically prohibit manufacture, use, or sale of the specific infringing devices or to infringing devices not more than colorably different from the infringing device); *Black & Decker v. Robert Bosch Tool Corp.*, No. 04C7955, 2006 WL 3446144 at *5 (N.D. Ill., Nov. 29, 2006) (court has wide latitude in framing permanent injunctions.)

## III.    TELCORDIA HAS NOT RELINQUISHED OR WAIVED ITS RIGHT TO EXCLUDE OTHERS FROM PRACTICING THE '633 AND '763 PATENTS

Cisco's argument that Telcordia has waived its right to an injunction because the '663 patent covers a standard and the '763 patent covers a Telcordia generic requirement is without factual or legal support. A patentee's rights, including the right to exclude, is not diminished by the adoption of an industry standard. *See e.g., Broadcom Corp. v. Qualcomm Inc.*, No. 05-3350, 2006 WL 2528545, at *9 (D.N.J. Aug. 31, 2006); *Lucent Technologies, Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 265 (D. Del. 2000) (denying a request for a new trial based on exclusion of evidence of standards abuse).

15

Cisco's novel legal theory that participation in a standard setting body is a waiver of the patentee's right to exclude (Cisco Opp. at 23-26) has not been adopted by any court of which Telcordia is aware, and is in fact contradicted by a recent case awarding an injunction to a patentee holding a patent as an IEEE standard for wireless local area networks. *See, e.g., Commonwealth Scientific and Ind. Research Org.*, 2007 WL 1739999 at *8.

Further, Cisco did not proffer any evidence, either at trial or in its opposition brief, that Telcordia knowingly waived its rights to exclude others from practicing the '633 and '763 patented inventions. That a willing licensee may have a cause of action in contract law to enforce an offer of a license on RAND terms, and to ask a court to supply and enforce those licensing terms, *see, e.g., Ess Tech. Inc. v. PC-Tel, Inc.*, No. 3-97-20292, 1999 U.S. LEXIS 23227 (N.D. Cal. November 2, 1999) (Opp. at 24 n. 20), does not lead to the conclusion, as Cisco argues, that an injunction is improper against an unwilling licensee. On the contrary, the logical corollary of such a right is that an unwilling licensee, here a willful infringer, can and should be enjoined from continuing to infringe.

## IV. THE NOTICE PROVISION IN THE PROPOSED INJUNCTION IS STANDARD AND CISCO FAILS TO JUSTIFY A STAY

Cisco's chief complaint about the notice provision of Telcordia's proposed injunction is that it does not explicitly provide that Cisco can notify its employees of the injunction by posting notices on its websites. (Opp. at 27-28.) Telcordia has no objection to Cisco complying with the notice provision of any injunction the Court issues in this matter by using its internal and external websites for notice.

Finally, the Court should reject Cisco's self-serving pronouncements that because its JMOL briefs present "strong" evidence of invalidity (the same evidence heard by and rejected by the jury), the Court should find that Cisco has made a "strong" showing of likelihood of success

16

on the merits." (Opp. at 28.) As explained in Telcordia's opposition briefs to Cisco's post-trial motions, more than adequate evidence supported the jury's verdict that the patents were not invalid. Cisco has failed to demonstrate a significant ground upon which overturning the verdict is highly probable.

## V. TELCORDIA SHOULD BE AWARDED A MARKET-RATE ROYALTY IF THE COURT DENIES INJUNCTIVE RELIEF

Cisco does not dispute that the Court has the authority to award Telcordia an ongoing market-rate royalty. *See, e.g., On Demand Machine Corp. v. Ingram Ind., Inc.*, 442 F.3d 1331, 1345 (Fed. Cir. 2006) (affirming court's discretion to set a royalty for continuing infringement); *Voda v. Cordis*, No. CIV-03-1512-L, 2006 WL 2570614, at *6 (W.D. Okla. Sept. 5, 2006) (D.I. 367, Ex. B) (awarding a compulsory license); *Paice v. Toyota Motor Corp.*, No. 2:04-CV-11-DF, 2006 U.S. Dist. Lexis 61600, at *20 (E.D. Tex. Aug. 16, 2006) (D.I. 367, Ex. C) (same); *Finisar Corp. v. DirecTVGroup, Inc.*, 1:05 CV-264 (E.D. Tex. July 7, 2006) (D.I. 367, Ex. D) (same).

Instead, Cisco argues that it should not be required to pay an ongoing royalty either because the jury awarded a paid-up license, which it did not, or because the parties agreed that the jury accepted Cisco's expert's view on the appropriate royalty rate, which the parties did not. (Opp. at 29-30.) First, as shown in section I above, it is clear that the jury did not award a paid-up license because the amount it did award is far closer to the amount based on a running royalty for past damages. Cisco's argument is not only baseless but does not in any event prevent issuance of a remedial order now. As the Federal Circuit has made clear:

> An accused infringer does not acquire an implied license unless it has actually paid full compensation. The entry of an infringement judgment does not in and of itself confer an implied license.

17

*Fuji Photo Film, Co. v. U.S. Int'l Trade Comm'n*, 474 F.3d 1281, 1294-95 (Fed. Cir. 2007). Second, as also shown in section I above, the parties do not agree that the jury accepted Mr. Musika's royalty rate as his testimony only shows that it cannot be determined exactly which rate or base the jury accepted. The jury's $6.5 million award is plainly more consistent with a running royalty for past damages than a paid up license for the life of both patents.

The Court can and should make a determination as to the appropriate royalty for ongoing and prospective infringement through the life of the patents as the general rule in patent cases is that an award of damages is for past infringement. *See, e.g., Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc*, 750 F.2d 1552, 1565 (Fed. Cir. 1984); *z4 Technologies, Inc. v. Microsoft Corp.*, 434 F.Supp.2d 437, 444-445 (E.D. Tex. 2006) (severing plaintiff's continuing causes of action for monetary damages due to Microsoft's continuing post-verdict infringement of plaintiff's patents).

Moreover, Cisco's attempt to limit any market-rate royalty that the Court decides upon to 0.5% for the '763 patent and 1.0% for the '633 patent, (Opp. at 30), should be rejected not only because it is not dictated by the jury verdict, but because it is inconsistent with the line of cases starting with *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* 575 F.2d 1152, 1158-1159 (6th Cir. 1978) and continuing through *Stickle v. Heublein*, 716 F.2d 1550, 1561-2 (Fed. Cir. 1983) and *Maxwell v. Baker*, 86 F.3d 1098, 1109-1110 (Fed. Cir. 1996), which provide that limiting the litigation-context royalty to the royalty that the adjudicated infringer might have obtained had it not subjected the patent owner to expensive and time-consuming litigation is inappropriate and would place the adjudicated infringer in a "heads-I-win, tails-you-lose" posture. Cisco argues that the market-rate royalty should not be accepted by this Court not because it is not the rate at which others are being offered a license but because Telcordia's lawyers advised or assisted in

18

arriving at the market-rate offer letters. (Opp. at 31.) The Court should not reject the market-rate terms because Telcordia's counsel assisted in sending out licensing letters. Telcordia respectfully asks the Court to award it a market-rate royalty for Cisco's ongoing infringement of the '633 and '763 patents if the Court denies injunctive relief.

**VI.    CONCLUSION**

For the reasons stated above, and in Telcordia's opening memorandum, the Court should enter an order enjoining Cisco's ongoing infringement of the '633 and '763 patents, or in the alternative, order Cisco to pay a market rate royalty.

ASHBY & GEDDES

/s/ *Tiffany Geyer Lydon*
_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C.  20005
(202) 408-4000

Dated:  August 13, 2007

183146.1

# EXHIBIT A

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: --- F.Supp.2d ----)

**H**

Commonwealth Scientific and Industrial Research
Organisation v. Buffalo Technology Inc.
E.D.Tex.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas,Tyler
Division.
COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION,
Plaintiff
v.
BUFFALO TECHNOLOGY INC., and Buffalo,
Inc., Defendants.
No. 6:06-CV-324.

June 15, 2007.

**Background:** Owner of patent for wireless local
area network (WLAN) invention brought patent
infringement action against manufacturer of
allegedly infringing devices. After court found
patent valid and infringed, owner moved for
permanent injunction.

**Holding:** The District Court, Davis, J., held that
owner was entitled to permanent injunction.

Motion granted.

**[1] Patents 291 ⚙═►317**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k317 k. Permanent Injunction. Most
Cited Cases
In order to obtain permanent injunctive relief,
prevailing plaintiff in patent infringement action
must demonstrate that: (1) it has suffered
irreparable injury; (2) remedies available at law,
such as monetary damages, are inadequate to
compensate for that injury; (3) considering balance
of hardships between plaintiff and defendant,
remedy in equity is warranted; and (4) public
interest would not be disserved by permanent

injunction.

**[2] Patents 291 ⚙═►317**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k317 k. Permanent Injunction. Most
Cited Cases
Owner of patent for wireless local area network
(WLAN) invention was entitled to permanent
injunction barring infringer from manufacturing
and selling infringing devices, even though patentee
did not sell patented devices, where patentee was
research institution that relied on revenue from
licensing to fund further research and development,
delays in funding resulted in lost research
capabilities and opportunities, compulsory license
would interfere with patentee's right to control its
licensing program and to choose to whom to
license, patent was core technology embodied in
industry standards for WLANs, infringing devices
made up only 11% of infringer's sales, and
infringer's WLAN products were not essential for
public health or public welfare.

**Patents 291 ⚙═►328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction,
and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most
Cited Cases
5,487,069. Cited.

Sidney C. Capshaw, III, Andrew W. Spangler and
Elizabeth L. DeRieux of Brown McCarroll,
Longview, TX, D. Stuart Bartow, Daniel J. Furniss,
Gary H. Ritchey, and Robert D. Tadlock of
Townsend & Townsend & Crew, Palo Alto, CA,
Deborah J. Race and Otis W. Carroll, Jr. of Ireland
Carroll & Kelly, Tyler, TX, Franklin Jones, Jr. of
Jones & Jones, Marshall, TX, for Plaintiff.
Richard J. Codding, Joanna H. Kim, and Justin A.
Radell of Akin Gump Strauss Hauer & Feld LLP,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 2
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: --- F.Supp.2d ----)

Los Angeles, CA, Allen F. Gardner and Michael E. Jones of Potter, Minton PC, Tyler, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**
DAVIS, District Judge.
*1 Before the Court is Plaintiff Commonwealth Scientific and Industrial Research Organisation's ("CSIRO") Motion for Entry of Permanent Injunction (Docket No. 234). Having considered the relevant briefing, oral arguments, and the applicable law, the Court **GRANTS** CSIRO's Motion for Entry of Permanent Injunction.

## BACKGROUND

CSIRO is the principal scientific research organization of the Australian Federal Government. Established in 1926, CSIRO conducts scientific research and applies the efforts of that research to benefit the public at large. CSIRO is similar to the United States' National Science Foundation and National Institute of Health. CSIRO has a broad charter to advance health, prosperity, and welfare by conducting strategic scientific research and applying the results of that research to benefit Australia and people everywhere. CSIRO operates its own laboratories and is active in the areas of health, agriculture, energy, information technology, minerals, manufacturing, marine and terrestrial environments, and natural resources. One of CSIRO's broad goals is to develop technology that can be used to create start-up companies and/or be licensed to firms to earn commercial royalties to fund other research.

In the very late 1980's and early 1990's groups throughout the world were trying to design an indoor wireless network. However, the indoor radio environment presented problems with signal interference because radio waves can be reflected by some materials such as walls, furniture, and other indoor items causing them to arrive at the receiver from different paths and at different times. This is known as the "multipath" problem. Studies revealed that minor changes in a room resulted in major changes in the propagation characteristics.

Companies all over the world made efforts to solve the multipath problem.

In February 1992, CSIRO engineers identified the key elements to the solution of the multipath problem. Avoiding the multipath problem requires a lengthening of signal duration, which negatively impacts data rate. To overcome the loss of data rate, the use of orthogonal frequency division multiplexing, which permits data to be sent on multiple channels simultaneously, was incorporated. The data is broken into subparts and each subpart is simultaneously transmitted on a different carrier frequency. Because there is simultaneous transmission of all the signal parts, the data transmission rate is higher than with other approaches. Techniques such as error correction and interleaving were used to deliver high reliability in the data transmission.

On November 22, 1992, CSIRO filed a patent application with the Australian Patent Office. On November 23, 1993, CSIRO filed an application for a United States patent based on the same disclosure. U.S. Patent No. 5,487,069 ("the 069 patent") issued on January 23, 1996. CSIRO has also obtained patents in Japan and Europe for its Wireless Local Area Network ("WLAN") invention.

*2 CSIRO's intent from the beginning was to derive revenue from its invention through licensing the 069 patent. In 1997, CSIRO and Macquarie University formed Radiata Communications Pty Ltd., an Australian company, to commercialize the 069 patent. CSIRO licensed the 069 patent to Radiata, and in 2001 Cisco Systems, Inc. acquired Radiata for $295 million in stock and began paying royalties to CSIRO.

In 1998, the Institute of Electrical and Electronics Engineers ("IEEE") contacted CSIRO to request assurance that CSIRO would license its 069 patent to companies wanting to implement the IEEE's 802.11a standard on reasonable and non-discriminatory ("RAND") terms once the IEEE approved the 802.11 standard, which pertains to WLANs. CSIRO agreed. In 1999, the IEEE ratified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: --- F.Supp.2d ---)

the 802.11a standard, which embodies the core technology invention by CSIRO. The IEEE also ratified the 802.11b standard, which differs from CSIRO's invention, and was initially adopted by more companies. In 2003, the IEEE ratified the 802.11g standard, which also embodies CSIRO's invention. In 2003, CSIRO contacted companies who practiced the 069 patent and began license agreement discussions. None of the potential licensees accepted CSIRO's license agreement offer.

On February 2, 2005, CSIRO brought suit against Buffalo Technology, Inc., an American corporation, and Buffalo, Inc., a Japanese corporation, (collectively "Buffalo") alleging infringement of the 069 patent. Buffalo competes in the production and sale of WLAN products that are compliant with the IEEE 802.11a and 802.11g standards. The sale of WLAN products comprise approximately eleven percent of Buffalo Technology's business. In addition to its wireless products, Buffalo sells memory products and network accessories. Buffalo's family of products is sold to distributors and retail outlet stores. Since Buffalo utilizes the IEEE 802.11a and g standards, this suit would serve as a test case to determine whether WLANs compliant with IEEE 802.11a and g standards infringe the 069 patent and to determine the validity of the 069 patent in light of the prior art.

The Court held a *Markman* hearing on February 22, 2006 and issued an opinion construing the claims of the 069 patent on May 8, 2006. At the pretrial hearing on July 20, 2006, CSIRO and Buffalo agreed to submit the case on cross motions for summary judgment on infringement, invalidity over prior art, and invalidity for lack of sufficient written description in lieu of a jury trial. After hearing oral arguments on August 15 and considering all of the summary judgment evidence that was submitted, the Court granted CSIRO's motions for summary judgment of validity and infringement and denied Buffalo's cross motions on November 13, 2006 (Docket No. 228). Although the issue of CSIRO's damages has not been determined, the parties asked the Court to rule on CSIRO's motion for permanent

injunction. Accordingly, CSIRO's motion for permanent injunction is now before the Court.

## APPLICABLE LAW

*3 [1] When considering whether to award permanent injunctive relief to a prevailing plaintiff in a patent infringement dispute, courts should apply the traditional four-factor test used by courts of equity. *eBay, Inc. v. MercExchange, LLC,* --- U.S. ----, ----, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006). The prevailing plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* The Supreme Court held "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 1841.

## ANALYSIS

### Irreparable Harm Suffered by CSIRO

CSIRO argues its licensing and research and development programs will be irreparably harmed if a permanent injunction is not granted. CSIRO further argues if it cannot obtain injunctive relief against Buffalo, others will be encouraged to infringe the 069 patent and risk litigation rather than enter into a license agreement. CSIRO argues a patent holder who does not practice its invention may establish irreparable harm "by showing that an existing infringement precludes his ability to license his patent...." *See Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1273 (Fed.Cir.1985); *Amazon.com Inc. v. Barnesandnoble.com Inc.,* 73 F.Supp.2d 1228, 1246 (W.D.Wa.1999); *see also Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1456 (Fed.Cir.1985) ("in the absence of the injunction, other potential infringers will be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: --- F.Supp.2d ----)

encouraged to infringe"). CSIRO contends a significant factor for its inability to license the 069 patent arises from potential licensees refusing to take a license if their competitors do not also take a license. A licensee's own licensing payments would put itself at a competitive disadvantage against infringers who are willing to risk detection and enforcement. Once the litigation against Buffalo commenced, there was little chance any company would take a license until Buffalo's defenses had been shown to be without merit. CSIRO further contends there remains little chance that others will take a license after this Court's summary judgment ruling since Buffalo announced its plan to appeal this Court's ruling.

Buffalo argues that since CSIRO and Buffalo are not competitors Buffalo does not irreparably harm CSIRO by depriving it of any profits from the sale of products, nor does Buffalo irreparably harm CSIRO by depriving it of any market share or brand name recognition. Buffalo contends that since *eBay* district courts have typically granted injunctive relief in favor of competitors but denied injunctive relief to non-competing licensors. *See TiVo, Inc. v. EchoStar Commc'ns Corp.*, 446 F.Supp.2d 664, 669 (E.D.Tex.2006) (Folsom, J.) (highlighting the fact that "Defendants compete directly with Plaintiff ..." in granting the permanent injunction); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 WL 2385139, *4 (E.D.Tex. Aug.16, 2006) (Folsom, J.) (noting that "because Plaintiff does not compete for market share ... concerns regarding loss of brand name recognition and market share similarly are not implicated"); *Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333-TJW, 2006 WL 3741891, *4 (E.D.Tex. Dec.19, 2006) (Ward, J.) (noting that "[the parties] are not direct competitors, and this fact weighs heavily in the court's analysis").

*4 However, in *eBay* the Supreme Court warned against creating broad classifications:
[S]ome patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their work to market themselves. Such patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so.

126 S.Ct. at 1840. The majority opinion in *eBay* rejected the conclusion that "a 'plaintiff's willingness to license its patents' and 'its lack of commercial activity in practicing the patents' would be sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue." *Id.* (internal citations omitted).

CSIRO is a research institution and relies heavily on the ability to license its intellectual property to finance its research and development. The revenue from licensing its intellectual property is used to fund further research and development for frontier projects. Every year, CSIRO identifies the portfolio of research and development projects that it will fund, and CSIRO actively maintains a list of frontier project opportunities for investment when additional funding becomes available. When extra funding becomes available, existing frontier projects are expanded to create greater benefits. Frontier projects could be initiated or developed sooner with additional licensing revenue. CSIRO provided many examples in areas of important research and development activities where increased funding would permit its research and development work to be expanded and produce beneficial results earlier including addressing the increasing rate of obesity and the consequential increase of Type 2 diabetes, developing biomaterials that can be used to aid recovery from traumatic damage to the body, and examining the impact of climate change and mitigating its causes.

CSIRO has shown that its harm is not merely financial. While CSIRO does not compete with Buffalo for marketshare, CSIRO does compete internationally with other research groups-such as universities-for resources, ideas, and the best scientific minds to transform those ideas into realities. CSIRO's reputation is an important element in recruiting the top scientists in the world.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                      Page 5
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: --- F.Supp.2d ----)

Having its patents challenged via the courts not only impugns CSIRO's reputation as a leading scientific research entity but forces it to divert millions of dollars away from research and into litigation costs. Delays in funding result in lost research capabilities, lost opportunities to develop additional research capabilities, lost opportunities to accelerate existing projects or begin new projects. Once those opportunities have passed, they are often lost for good, as another entity takes advantage of the opportunity. Delays in research are likely to result in important knowledge not being developed at all or CSIRO being pushed out of valuable fields as other research groups achieve critical intellectual property positions. Thus, the harm of lost opportunities is irreparable. They cannot be regained with future money because the opportunity that was lost already belongs to someone else.

*5 [2] Buffalo argues this harm is a past harm, for which injunctive relief is inappropriate. Buffalo also argues that denying a permanent injunction and forcing CSIRO to take a license would give CSIRO the licensing revenue it desires. While this is certainly a harm by Buffalo that CSIRO suffered in the past, it is also harm by others CSIRO will suffer in the future, as discussed in the next section. Similarly, for the reasons discussed in the next section, forcing CSIRO to extend a license to Buffalo will not cure this harm. The irreparable harm factor favors a permanent injunction.

### Adequacy of Remedies Available at Law

In addition to harming its research and development programs, CSIRO argues that if the Court does not enter a permanent injunction, the Court will force a compulsory license upon CSIRO. A compulsory license would not contain the negotiated business terms typically used by patent holders to control their inventions. CSIRO contends it has a right to control its licensing program and to choose to whom to license and on what terms. Further, the price of a compulsory license established through a trial on damages would be inadequate since CSIRO's past damages are limited compared to its ongoing damages.

Buffalo argues that a compulsory license would force Buffalo to pay CSIRO licensing royalties-the lack of which is CSIRO's alleged irreparable harm. Since CSIRO says its harm is in not having past royalty payments to fund its projects, Buffalo contends royalty payments today would be an entirely adequate remedy.

In *eBay,* the Supreme Court indicated that the right to exclude alone is not sufficient to support a finding of injunctive relief and that such relief " 'may' issue only 'in accordance with the principles of equity' " under § 283 of the patent act. *See eBay,* 126 S.Ct. at 1840. Accordingly, a violation of the right to exclude does not inevitably lead to the conclusion that a patent holder cannot be adequately compensated by remedies at law such as monetary damages without first applying the principles of equity.

The violation of a patent owner's right to exclude can present a situation where monetary damages cannot adequately compensate the patent holder for that injury. For example, when an infringer saturates the market for a patented invention with an infringing product or damages the patent holder's good will or brand name recognition by selling infringing products, that infringer violates the patent holder's exclusionary right in a manner that cannot be compensated through monetary damages. This is because it is impossible to determine the portions of the market the patent owner would have secured but for the infringer's actions or how much damage was done to the patent owner's brand recognition or good will due to the infringement. Although CSIRO has not suffered these particular types of harms, CSIRO's harm is no less important than other recognized forms of harm a competitor might suffer to its brand name or sales position in the market. Its reputation as a research institution has been impugned just as another company's brand recognition or good will may be damaged.

*6 In his concurrence, Justice Kennedy instructed

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: — F.Supp.2d ——)

Page 6

courts to be cognizant of the nature of the patent being enforced and the economic function of the patent holder when applying the equitable factors. *eBay*, 126 S.Ct. at 1842 (Kennedy, J., concurring) ("When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest."); *see also z4 Techs., Inc. v. Microsoft Corp.*, 434 F.Supp.2d 437, 440-41 (E.D.Tex.2006) (Davis, J.) (finding the infringing technology was "a small component of [Microsoft's] software" and the infringement did not hinder or exclude z4's sales or licensing of its product). The right to exclude becomes more urgent when the product is the invention.

This case is not the situation that concerned Justice Kennedy; Buffalo's infringing use of CSIRO's technology is not limited to a minor component of the technology. The 069 patent is the core technology embodied in the IEEE's 802.11a and 802.11g standards. Buffalo's products are designed to provide the wireless functionality of the IEEE's 802.11a and 802.11g standards. Since Buffalo's infringement relates to the essence of the technology and is not a "small component" of Buffalo's infringing products, monetary damages are less adequate in compensating CSIRO for Buffalo's future infringement.

A compulsory license will not adequately compensate CSIRO for Buffalo's continued intentional infringement. The royalty payment would be extrapolated from a determination of Buffalo's past sales, which may not adequately reflect the worth of the patent today to Buffalo. Further, such a royalty payment does not necessarily include other non-monetary license terms that are as important as monetary terms to a licensor such as CSIRO. Monetary damages are not adequate to compensate CSIRO for its damages, which are not merely financial.

*The Balance of Hardships*

If the Court does not issue the injunction, CSIRO will be forced to accept Buffalo as a compulsory licensee. The Court has already discussed how a compulsory license would harm CSIRO. Buffalo argues the issuance of an injunction will force Buffalo out of the WLAN business in the United States.

The hardship to Buffalo of permanently enjoining its infringing conduct is limited to the injury ordinarily expected when an injunction is imposed. Mere hardship incurred in the process of ceasing operations is not sufficient. *See Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Buffalo's own damages expert claims "this product, to date, has not proven itself a commercial success in the United States for Buffalo." Plaintiff's Motion for Permanent Injunction Ritchey Decl. Exh. E at 11. Since wireless products make up only eleven percent of Buffalo Technology's business, Buffalo's hardship if it is precluded from making future wireless sales in the United States is far from catastrophic.[FN1] Further, no considerable hardship will be imposed on distributors and resellers by an injunction against Buffalo because those distributors and resellers may continue to sell non-infringing Buffalo products and other competing WLAN products.

*7 The harm Buffalo faces by an injunction is purely monetary, whereas the harm CSIRO faces if no injunction issues has far reaching effects. CSIRO will not only be injured financially, but that financial injury will directly and negatively impact CSIRO's research and development efforts and its ability to bring new technologies into fruition. The balance of hardships favors CSIRO's motion for permanent injunction because the harm that continued infringement would likely cause CSIRO's research and development projects outweighs the harm that an injunction would cause Buffalo in being excluded from competing in the WLAN market.

### The Public Interest

CSIRO argues that the public has an interest in upholding patent rights and this is not one of the limited situations where an injunction would be contrary to the public's interest. Buffalo contends CSIRO has not shown how the public interest would not be served by the imposition of a compulsory license.

The public has an interest in a strong patent system. In general, public policy favors the enforcement of patent rights. See *Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed.Cir.2006); *PPG Indus., Inc. v. Guardian Indus., Corp.,* 75 F.3d 1558, 1567 (Fed.Cir.1996). The public maintains an interest in protecting the rights of patent holders as well as enforcing adequate remedies for patent infringement. Permanent injunctions serve that interest. In order to enforce a patentee's fundamental property right, courts have consistently allowed injunctive relief to patent owners whose patents have been infringed. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1246-47 (Fed.Cir.1989) ("Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property."); *In re Berwyn E. Etter,* 756 F.2d 852, 859 (Fed.Cir.1985) ("The essence of all property is the right to exclude and the patent property right is certainly not inconsequential.").

However, there are rare and limited circumstances in which an injunction would be contrary to a significant public interest such as health and safety concerns. See, e.g., *Hybritech, Inc. v. Abbott Lab.,* 4 U.S.P.Q.2d 1001, 1987 WL 123997 (C.D.Cal.1987) (public interest required that injunction not stop supply of medical test kits that the patentee itself was not marketing), *aff'd,* 849 F.2d 1446 (Fed.Cir.1988); *City of Milwaukee v. Activated Sludge,* 69 F.2d 577, 21 U.S.P.Q. 69 (7th Cir.1934) (injunction refused against city operation of sewage disposal plant because of public health danger); *see also z4,* 434 F.Supp.2d at 444 (finding the possible harm to the public slightly weighed against an injunction of Microsoft's products). No such interests are implicated here since Buffalo's WLAN products are not essential for the public health or public welfare. Buffalo has not shown how the public will be deprived of any benefit if Buffalo's products are enjoined. The public interest would not be disserved by a permanent injunction because WLAN products are obtainable from multiple sources other than Buffalo.

**\*8** Research institutions, such as CSIRO, make substantial scientific advances. The work of research institutions is often at the forefront of scientific awareness. Although their work may not always have immediate applications, the work of research institutions has produced enormous benefits to society in the form of new products and processes. Because the work of research institutions such as CSIRO is often fundamental to scientific advancement, it merits strong patent protection. Furthermore, the public interest is advanced by encouraging investment by research organizations into future technologies and serves to promote the progress of science and the useful arts. Thus, the public interest factor favors CSIRO's motion for permanent injunction.

### CONCLUSION

The balance of equities viewed through the facts of this case warrants injunctive relief. CSIRO has demonstrated it will suffer irreparable harm in the absence of a permanent injunction, harm that cannot be remedied adequately through the recovery of monetary damages. The balance of the hardships weighs in favor of CSIRO. The public has an interest in maintaining a strong patent system, and the public would be harmed more by denying an injunction than granting one. Thus, the public interest weighs in favor of CSIRO. Accordingly, a permanent injunction should issue under the traditional four-factor test recited in *eBay,* and CSIRO's motion is **GRANTED.** Therefore, the Court does not reach whether the United States-Australia Free Trade Agreement Implementation Act requires an injunction.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)
(Cite as: — F.Supp.2d —)

The Court **ORDERS** the parties to meet and confer on the wording and practical implementation of the injunction and to submit a proposed permanent injunction to the Court within five days of this order.

**So ORDERED.**

> FN1. Buffalo does argue that enjoining Buffalo from its wireless sales in the Unites States will have a greater effect on its business than merely prohibiting eleven percent of its business because it has shelf-space agreements with distributors and distributors' may be less willing to carry other Buffalo products absent its wireless products. Buffalo does not elaborate on this concern. Given that Buffalo's wireless products make up only ten to fifteen percent of its U.S. business, it is difficult to believe that without such products distributors would be unwilling to sell other Buffalo products.

E.D.Tex.,2007.
Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology Inc.
--- F.Supp.2d ----, 2007 WL 1739999 (E.D.Tex.)

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

REDACTED

# EXHIBIT C

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before the Honorable Carl C. Charneski
Administrative Law Judge

In the Matter of

CERTAIN EQUIPMENT FOR
TELECOMMUNICATIONS OR DATA
COMMUNICATIONS NETWORKS,
INCLUDING ROUTERS, SWITCHES, AND
HUBS, AND COMPONENTS THEREOF

Investigation No. 337-TA-574

RESPONDENT CISCO SYSTEMS, INC.'S MOTION FOR EXTENSION OF THE
TARGET DATE, EVIDENTIARY HEARING, AND PROCEDURAL SCHEDULE TO
ALLOW FOR ADJUDICATION OF THE PENDING POST-TRIAL MOTIONS IN THE
PARALLEL DISTRICT COURT ACTION

Respondent Cisco Systems, Inc. ("Cisco") respectfully requests that the target

date, and corresponding evidentiary hearing and procedural schedule, be extended to allow for

completion of post-trial briefing in the parallel district court action. The jury verdict, which

remains unscrutinized by the district court judge, does not reflect the "final word" of the district

court, and the overall outcome of the district court litigation remains in serious doubt. Given that

Telcordia will not be prejudiced by the modest delay associated with an extension that allows for

conclusion of post-trial briefing, the extension of the target date represents an ideal way to

conserve resources that would be squandered should the Administrative Law Judge proceed with

an evidentiary hearing that could later be called into question by the true "final word" of the

district court.

Counsel for Respondent PMC-Sierra, Inc. has confirmed that PMC-Sierra does

not oppose this motion. Counsel for Telcordia has stated that Telcordia will oppose this motion,

while the Staff will take a position once it reviews this motion and the supporting papers.

Dated:  June 27, 2007

Respectfully submitted,

*Sonal Mehta /MM*

David A. Hickerson, Esq.
Joanne M. Guerrera, Esq.
David N. Southard, Esq.
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Washington, DC  20005

Matthew D. Powers, Esq.
Edward R. Reines, Esq.
Jessica L. Davis, Esq.
Sonal N. Mehta, Esq.
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California  94605

*Counsel for Respondent Cisco Systems, Inc.*

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before The Honorable Carl C. Charneski
Administrative Law Judge

In the Matter of

CERTAIN EQUIPMENT FOR
TELECOMMUNICATIONS OR DATA
COMMUNICATIONS NETWORKS,
INCLUDING ROUTERS, SWITCHES, AND
HUBS, AND COMPONENTS THEREOF

Investigation No. 337-TA-574

MEMORANDUM IN SUPPORT OF RESPONDENT CISCO SYSTEMS, INC.'S
MOTION FOR EXTENSION OF THE TARGET DATE, EVIDENTIARY HEARING,
AND PROCEDURAL SCHEDULE TO ALLOW FOR ADJUDICATION OF THE
PENDING POST-TRIAL MOTIONS IN THE PARALLEL DISTRICT COURT ACTION

As discussed in Cisco's Response to Telcordia's motion for summary
determination, post-trial briefing in the district court has not yet concluded, and the ultimate
outcome of the district court litigation remains in doubt. Moving forward with the evidentiary
hearing prior to the true conclusion of the district court litigation presents a significant risk that
judicial and private resources will be squandered in the event Judge Sleet modifies the jury's
preliminary finding. Indeed, even if the district court judge does not reverse the jury's finding as
to the invalidity of the '633 patent, it is highly likely that in resolving Telcordia's request for an
injunction and other post-trial motions, the district court judge will make several key
determinations as to the scope of the jury's verdict and the impact of that verdict on Telcordia's
right to relief going forward. Cisco respectfully submits that the most practical course is for the
Administrative Law Judge to wait for the Judge Sleet to rule on these issues before they are
addressed here.

The wisdom of extending the timeline for this Investigation is also supported by a
balancing of the potential prejudice to each party. While the Administrative Law Judge, Staff

and parties risk the unnecessary expenditure of resources and potential inconsistent rulings, Telcordia will suffer no prejudice from a modest delay. Indeed, it is expected that the district court post-trial briefing will conclude shortly, and if Telcordia prevails in the district court, as it apparently expects, it will obtain an immediate remedy that would far exceed anything the ITC could provide.

Accordingly, Cisco respectfully submits that the wisest course of action is to extend the schedule in this Investigation until Judge Sleet has formally reviewed the jury's findings. At that point, the district court outcome will present a level of certainty and finality far greater than the current state of the matter, and the district court's rulings may present additional guidance as to the jury's verdict as it relates to this Investigation.

## I.    THE ADMINISTRATIVE LAW JUDGE IS AUTHORIZED TO EXTEND THE TARGET DATE

Pursuant to Commission Rule 210.51(a), an Administrative Law Judge can modify a target date for "good cause shown":

> After the target date has been set, it can be modified by the administrative law judge for *good cause shown* before the Investigation is certified to the Commission.

19 C.F.R. § 210.51(a).[1]  While there is a preference for section 337 investigations to be completed as expeditiously as possible, the Commission has explained that it is appropriate to extend the target date for an investigation where good cause to do so is demonstrated:

> We recognize that the statute, as amended, calls for *flexible deadlines,* and in cases where the ALJ or a party to the investigation demonstrates that good cause exists, the Commission has, and will continue to, *accede to extensions of the target date.*

*Certain Organizer Racks and Products Containing Same,* ITC Inv. No. 337-TA-466, Commission Opinion at 4 n. 5 (Feb. 8, 2002); *see also Certain Panel Fasteners, Products Containing Same, and Components Thereof,* Inv. No. 337-TA-480, Commission Opinion at 3

---

[1]    Emphases supplied throughout, unless otherwise noted.

(Dec. 10, 2002) (same). Along these lines, at least one Administrative Law Judge has noted that "[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with *economy of time and effort for itself, for counsel, and for litigants.*" *In the Matter of Certain Spiral Grilled Products*, ITC Inv. No. 337-TA-426, Order 4 (March 14, 2000) (citations omitted) (emphasis added). Thus, the Administrative Law Judge is well authorized to extend the target date for good cause, which may encompass concerns regarding economy of resources.[2]

## II.  GOOD CAUSE EXISTS TO EXTEND THE TARGET DATE UNTIL AFTER POST-TRIAL BRIEFING IN THE DISTRICT COURT IS COMPLETE

The Administrative Law Judge in this Investigation has already recognized that the pendency of post-trial motions in the district court case may present good cause for an additional extension of the target date and evidentiary hearing:

> If the parties believe that there are post-trial motions pending before Judge Sleet that will have an impact on this case and that they believe that it would be a proper basis for, again, another postponement of the hearing, I would certainly be willing to hear your arguments. I don't want to force this hearing down anybody's throat.

Exh. A [May 15, 2007 Telehearing Tr.] at 34. The Administrative Law Judge further noted that "in terms of the District Court proceedings, this is more of a fluid situation than ordinarily might be the case." *Id.* at 39. As contemplated by the Administrative Law Judge, good cause for a postponement exists.

---

[2]  Multiple extensions of the target date are not unprecedented. *See, e.g., Certain Baseband Processor Chips and Chipsets, Transmitter and Reciever (Radio) Chips, Power Control Chips, And Products Containing Same*, Inv. No. 337-TA-543, Initial Determination (Public Version), 2006 ITC LEXIS 803, 6-9 (Oct. 10, 2006) (extending the target date three times); *Certain Network Interface Cards and Access Points*, Inv. No. 337-TA-455, Commission Opinion, (Dec. 10, 2002) (extending the target date four times so that it was roughly 32 months from the date the investigation was instituted).

**A.    The "Final Word" Of The District Court Would Provide The Administrative Law Judge With Indispensable Guidance, Ensuring The Conservation Of Significant Public And Private Resources**

As discussed in detail in Cisco's Response to Telcordia's motion for summary determination, the outcome of the parallel district court action remains uncertain. Indeed, crucial post-trial motions are pending that could alter the jury's findings in a way that would have far-reaching consequences for this Investigation. Most significantly, the overwhelming evidence in the district court trial points to the conclusion that '633 patent is invalid, a result that would obviate the need for this investigation entirely. However, even to the extent the jury verdict of no invalidity is not overturned, it is likely that the district court will determine that Cisco has a fully paid-up license to the '633 patent which would preclude Telcordia from obtaining any remedy in the ITC, again rendering this Investigation moot. Rather than repeat them here, the Administrative Law Judge is referred to Cisco's Response to Telcordia's motion for summary determination for a thorough discussion of these points.

Notwithstanding the above, Telcordia apparently urges the Administrative Law Judge to rush forward and conduct an evidentiary hearing, with no regard for the consequences should the district court judge reverse the jury's findings. These consequences would be highly prejudicial to everyone involved in this Investigation. Specifically, the parties, the Administrative Law Judge, and the Staff will all have been forced to prepare for and conduct a complex evidentiary hearing, the scope of which remains uncertain, but will undoubtedly require the Administrative Law Judge to delve deeply into the evidence to define the precise scope of any alleged infringement so that a proper remedy can be crafted. Ultimately, the outcome of this process could be inconsistent with the district court outcome, leaving Cisco exposed to conflicting obligations under competing injunctive orders. Alternatively, the Administrative Law Judge could be placed in the awkward position of having to revise and/or rescind a remedial order that was issued for naught. Should the Administrative Law Judge simply decide to wait for the modest period of time necessary for the district court to conclude post-trial briefing, none of these evils will arise. On the contrary, the Administrative Law Judge would be able to proceed

with the guidance of a firm, judge-reviewed outcome—likely supported by a well-reasoned opinion—that will remain stable at least throughout the lengthy appeals process. Good cause thus exists to extend the target date.

### B.    Telcordia Will Not Be Prejudiced By Postponement Of The Target Data

It is clear that Telcordia will not be prejudiced by a slight extension of the target date to accommodate post-trial motions. Indeed, Telcordia and Cisco had over ten years of communications before Telcordia even thought to file the District of Delaware action in 2004, and waited another two years before instituting this Investigation. Having waited over a decade to seek any remedy at all—and even then choosing not to seek the remedy offered by this forum—it simply cannot be said that there is any urgency to the relief Telcordia now seeks.

Moreover, even if Telcordia ultimately achieves everything it hopes to achieve in the district court—receiving vindication on every single one of its arguments—it will still suffer no prejudice if it is asked to wait for Judge Sleet to review the jury's findings before being allowed to proceed in the ITC. Indeed, the time associated with the district court post-trial briefing is a matter of months, and Telcordia is by no means in need of a remedy that cannot wait this very short period of time.[3] This is particularly so because the only product at issue in this investigation is a single Cisco module accused of performing the accused functionality: the MPSM-8-T1E1, which itself is manufactured in the United States.[4] Cisco long ago discontinued

---

[3]    Interestingly, Telcordia itself encouraged extensions for the post-trial briefing in the district court action, including extensions relating to its request for an injunction. That Telcordia stipulated to the extension of the briefing schedule for its motion for an injunction through mid-August (the current deadline) undermines any argument from Telcordia that it needs or wants immediate injunctive relief.

[4]    Cisco notes that Telcordia will aggressively ask the Administrative Law Judge for a remedy that pertains to products other than the MPSM-8-T1E1 module. Indeed, Telcordia's motion for Summary Determination incorrectly asserts that the jury found Cisco's entire "MGX family" of products to be infringing. As discussed in Cisco's response to Telcordia's summary determination motion, and will be explained in detail at any evidentiary hearing in this Investigation, Telcordia's misguided view is based on the irrational theory that various multipurpose Cisco boxes that are merely capable of housing a wide range of printed circuit assemblies, including the MPSM-8-T1E1, can infringe even when not outfitted with an MPSM-8-T1E1.

any other products capable of carrying out the accused functionality. Moreover, any exclusion order that Telcordia could obtain from the ITC would provide it with far less protection than the injunctive order that the district court would issue *immediately* after ruling on post-trial motions, should the district court decide an injunction is warranted. Simply put, there is no pressing need for the ITC to duplicate the efforts of the district court just so that Telcordia can have a duplicate remedy a few months sooner.

## III.  CONCLUSION

For the foregoing reasons, Cisco respectfully requests that the Administrative Law Judge extend the target date, evidentiary hearing and procedural schedule until after the completion of post-trial briefing in the parallel district court litigation.

Dated: June 27, 2007

Respectfully submitted,

*Sonal Mehta /MLM*

David A. Hickerson, Esq.
Joanne M. Guerrera, Esq.
David N. Southard, Esq.
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Washington, DC 20005
(202) 682-7000
(202) 857-0940 (fax)

Matthew D. Powers, Esq.
Edward R. Reines, Esq.
Jessica L. Davis, Esq.
Sonal N. Mehta, Esq.
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94605
(650) 802-3000
(650) 802-3100 (fax)

*Counsel for Respondent Cisco Systems, Inc.*

6

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on June 27, 2007 as indicated, on the following:

| | |
|---|---|
| **_Via EDIS_** | **_Via E-Mail_** |
| The Honorable Marilyn R. Abbott | Smith R. Brittingham IV |
| Secretary | Donald R. Dunner |
| U.S. International Trade Commission | Steven M. Anzalone |
| 500 E Street, S.W., Room 112-A | Houtan K. Esfahani |
| Washington, D.C. 20436 | James T. Wilson |
| | John Williamson |
| | Finnegan, Henderson, Farabow, Garrett & Dunner, LLP |
| | 901 New York Avenue, N.W. |
| | Washington, D.C. 20001 |
| **_Via Hand Delivery_** | **_Via E-Mail_** |
| The Honorable Carl C. Charneski | Michael A. Ladra |
| Office of the Administrative Law Judge | James C. Otteson |
| U.S. International Trade Commission | Matthew R. Reed |
| 500 E Street, S.W., Room 317 | Wilson Sonsini Goodrich & Rosati |
| Washington, D.C. 20436 | 650 Page Mill Road |
| | Palo Alto, CA 94306 |
| **Two Copies** | |
| | _Counsel for Respondent PMC-Sierra, Inc._ |
| **_Via E-Mail and Hand Delivery_** | |
| Benjamin Levi | |
| Office of Unfair Import Investigations | |
| U.S. International Trade Commission | |
| 500 E Street, S.W., Room 401 | |
| Washington, D.C. 20436 | |

Michael L. Martin
Paralegal

# EXHIBIT A

1

```
 1         THE    UNITED    STATES    INTERNATIONAL TRADE COMMISSION
 2    CERTAIN EQUIPMENT FOR                )
 3    TELECOMMUNICATIONS OR DATA           )
 4    COMMUNICATIONS NETWORKS,             )
 5    INCLUDING ROUTERS SWITCHES, AND      )
 6    HUBS, AND COMPONENTS THEREOF         )    Inv. No. 337-TA-574
 7
 8                             Conference Room
 9                             1220 L Street, N.W.
10                             Washington, D.C.
11                             Tuesday,
12                             May 15, 2007
13              The telephone conference commenced, pursuant to
14    notice, at 2:00 p.m., at the United States International
15    Trade Commission, Honorable Carl G. Charneski,
16    Administrative Law Judge, Presiding.
17              APPEARANCES:
18              For Complainant Telcordia Technologies, Inc.:
19              SMITH R. BRITTINGHAM IV, Esquire
20              DONALD R. DUNNER, Esquire
21              JAMES T. WILSON, Esquire
22              JOHN WILLIAMSON, Esquire
23              ELIZABETH NEIMIER, Esquire
24              Finnegan, Henderson, Farabow, Garrett & Dunner,
25              LLP
26              901 New York Avenue, N.W.
27              Washington, D.C.  20001
28              For Respondent Cisco Systems, Inc.:
29              JOANNE M. GUERRERA, Esquire
30              Weil, Gotshal & Manges LLP
31              1300 Eye Street, N.W.
32              Washington, D.C.  20005
33              EDWARD R. REINES, Esquire
34              Weil, Gotshal & Manges LLP
35              201 Redwood Shores Parkway
36              Redwood Shores, California  94605
```

5/15/2007 Telephone conference

34

1    sense I get from the parties.  And, you know, I guess we are

2    going to have that cross that bridge when we come to it.  If

3    the parties believe that there are post-trial motions

4    pending before Judge Sleet that will have an impact on this

5    case and that they believe that it would be a proper basis

6    for, again, another postponement of the hearing, I would

7    certainly be willing to hear your arguments.  I don't want

8    to force this hearing down anybody's throat.  In fact, I

9    really want the parties to earnestly discuss settlement.

10   So, on the one hand, that's my feeling.  On the other hand,

11   I realize we have to keep to a schedule.  But, I'm not going

12   to push this case to hearing just to adhere to the schedule.

13   If there is good reason to postpone the hearing again,

14   again, ever so slightly, I'm certainly willing to hear the

15   parties arguments.  But, we'll cross that bridge when we

16   come to it.

17            I think there was a reference earlier to the

18   unusual procedural posture of this case and I can agree with

19   that.  And besides the unusual posture of this case, we have

20   this sort of tightening window of hearing availability

21   before the ITC and we have to meet a target date.  So, I

22   think we can accomplish both.  But, I guess it's going to

23   take a lot of cooperation from the parties.

24            So, it seems that right now, just to summarize,

25   the hearing in this matter will be postponed from June 13th.

1    is a major problem, we're being pretty reasonable right now,

2    bring it to my attention as soon as possible.  If you have a

3    problem with the hearing date, contact my office

4    immediately.  If you have a problem with any item in the

5    scheduling order that you believe needs rectified, contact

6    my office immediately.  And, again, I am trying -- I will do

7    my best to work with the parties to get this ready for

8    hearing, if we need to.  And I realize that, in terms of the

9    District Court proceedings, this is more of a fluid

10   situation than ordinarily might be the case.

11          Ms. Guerrera, I am sorry to interrupt you.

12          MS. GUERRERA:  Oh, no, that's okay, Your Honor.

13   Just two issues.  One, I guess we can all basically assume

14   then that as of today, the May 18th deadline is off for

15   exhibit lists?

16          JUDGE CHARNESKI:  That's correct, all deadlines

17   are off.

18          MS. GUERRERA:  And then, also, just for clarity of

19   the record sake, you had asked me about the reg I was

20   referencing and that is Section 210.18.  That's the 30-day

21   clause for summary determination motions in advance of the

22   fixed hearing date.

23          JUDGE CHARNESKI:  Right.

24          MS. GUERRERA:  Thank you.

25          JUDGE CHARNESKI:  Okay.  Well, counsel, before we

5/15/2007 Telephone conference

4343

1                     REPORTER'S CERTIFICATE

2

3     DOCKET NO.:     337-TA-574

4     CASE TITLE:     Certain Equipment and Telecommunications or

5                     Data Communications Networks

6     HEARING DATE:   May 15, 2007

7     LOCATION:       Washington, D.C.

8

9          I hereby certify that the proceedings and evidence are

10    contained fully and accurately on the tapes and notes

11    reported by me at the hearing in the above case before

12    Finnegan, Henderson, Farabow, Garrett & Dunner, LLP.

13

14

15

16

17                              Date: 5/15/07

18

19                               Mona McClellan

20                              Official Reporter

21                              Heritage Reporting Corporation

22                              Suite 600

23                              1220 L Street, N. W.

24                              Washington, D. C.  20005-4018

25

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                                  *
THE JOHNS HOPKINS UNIVERSITY
AND ARROW INTERNATIONAL, INC.,*

      Plaintiffs,              *     CIVIL NOS.: WDQ-05-0759
                                                 WDQ-06-2711
v.                             *

DATASCOPE CORPORATION,         *

      Defendant.               *

*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

The Johns Hopkins University ("JHU") and Arrow

International, Inc., ("Arrow") sued Datascope Corporation

("Datascope") for patent infringement.  Pending are the

Plaintiffs' motions for Judgment on Partial Findings and to

Alter/Amend Judgment and the Defendant's motions for Judgment as

a Matter of Law and to Alter/Amend Judgment.  For the reasons

discussed below, the Court will grant the Plaintiffs' motion for

judgment on partial findings, the Plaintiffs' and Datascope's

motions to amend, and will deny Datascope's motions for judgment.

I.    Background

JHU owns Patents 5,766,191, "Percutaneous Mechanical

Fragmentation Catheter System" (the "'191 patent"); 6,824,551,

"Percutaneous Mechanical Fragmentation Catheter System" (the

"'551 patent"); and 7,108,704, "Percutaneous Mechanical

1

Fragmentation Catheter System" (the "'704 patent"). The '191 patent was issued on June 16, 1998, the '551 patent was issued on November 30, 2004, and the '704 patent was issued on September 19, 2006. The patents claim methods for fragmenting clots within hemodialysis grafts. Arrow licenses the patents and sells a device based on them. Jan. 18, 2006 Mem. Op.

On June 11, 2007, the Court bifurcated the trial so that the jury hearing the Plaintiffs' infringement claims would not hear Datascope's evidence that the patents are unenforceable because of the Plaintiffs' inequitable conduct and unclean hands. From June 11-15, the parties tried the infringement claims and Datascope's obviousness defense. On June 15, 2007, the jury found for the Plaintiffs, and the Court entered judgment for $690,875.

On July 25, 2007, the parties tried Datascope's inequitable conduct and unclean hands defenses. Datascope offered evidence of the Plaintiffs' allegedly improper conduct in prosecuting the '704 patent. At the conclusion of Datascope's evidence, the Plaintiffs moved for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c).

II.  Analysis

A.  Motion for Judgment on Partial Findings

The Plaintiffs argued that Datascope did not offer clear and convincing evidence of inequitable conduct. Specifically, the

Plaintiffs argued that Datascope did not establish that: (1) the attorney prosecuting the patent knew of information withheld from the Patent and Trademark Office (the "PTO"); (2) the allegedly withheld information was material; (3) the withheld information was not cumulative; and (4) there was an intent to deceive the PTO.

1.    Standard of Review

Rule 52(c) permits the entry of judgment as a matter of law on a claim or defense when: (1) a "party has been fully heard on an issue[;]" (2) "the court finds against th[at] party on that issue[;]" and (3) the claim or defense cannot succeed "without a favorable finding on that issue." Fed. R. Civ. P. 52(c). "In considering a motion for judgment for partial findings under Fed. R. Civ. P. 52(c) the judge, as trier of the facts, must weigh and consider all of the evidence presented." *Cherrey v. Thompson Steel Co., Inc.*, 805 F.Supp. 1257, 1261 (D. Md. 1992). Judgment under Rule 52(c) must be supported by findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

2.    Applicable Law

a.    Inequitable Conduct

"Patent applicants owe a 'duty of candor and good faith' to the PTO." *Bruno Indep. Living Aids, Inc. V. Acorn Mobility Services, Ltd.*, 394 F.3d 1348, 1352 (Fed. Cir. 2005) (*citing* 37

3

C.F.R. § 1.56(a) (2004)). Inequitable conduct may include

"affirmative misrepresentations of a material fact, failure to

disclose material information, or submission of false material

information, coupled with an intent to deceive." *Baxter Intern.,*

*Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327 (Fed. Cir. 1998). To

prove inequitable conduct resulting from a failure to disclose,

Datascope

> must offer clear and convincing proof of: (1) prior art or
> information that is material; (2) knowledge chargeable to
> applicant [or the attorney who prosecuted the application]
> of that prior art or information and of its materiality; and
> (3) failure of the applicant to disclose the art or
> information resulting from an intent to mislead the PTO.

*Cordis Corp. v. Boston Scientific Corp.,* 188 Fed. Appx. 984 (Fed.

Cir. 2006) (*citing FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411,

1415 (Fed. Cir. 1987)).

The "[a]pplicant must be chargeable with knowledge of the

existence of the prior art or information, for it is impossible

to disclose the unknown." *Manitowoc,* 835 F.2d at 1415. Indeed,

the applicant must have *actual knowledge* of the prior art

reference. *Digital Control, Inc. v. Charles Mach. Works,* 437

F.3d 1309, 1318 (Fed. Cir. 2006). The Federal Circuit has said,

however, that "one should not be able to cultivate ignorance, or

disregard numerous warnings that material information or prior

art may exist, merely to avoid actual knowledge of that

information or prior art." *Brasseler, U.S.A. I, L.P. v. Stryker*

*Sales Corp.,* 267 F.3d 1370, 1384 (Fed. Cir. 2001) (quotations

4

omitted).

b.   Unclean Hands

The doctrine of "[u]nclean hands bars a party from receiving equitable relief because of that party's own inequitable conduct. *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228.   Datascope bears the burden of proving by clear and convincing evidence that the Plaintiffs acted with unclean hands."  *In re Omeprazole Patent Litigation*, 483 F.3d 1364, 1374 (Fed Cir. 2007).

3.   Findings of Fact

Datascope alleges that Alan Miller, Ph.D., breached the duty of candor.  On October 7, 2004, Dr. Miller, a patent prosecuting attorney at Amster Rothstein & Ebenstein LLP ("Amster"), filed the '704 patent application with the PTO.  During the prosecution of that patent, the Plaintiffs began the instant litigation against Datascope for the infringement of the '191 patent and the '551 patent.  Subsequently, the '704 patent claims were included. The Plaintiffs' litigation counsel are different Amster attorneys.

Datascope answered the Plaintiffs' interrogatories in June 2005 (the "Initial Response").  (Def. Ex. 742).  Dr. Miller read the Initial Response.  July 25, 2007 Trial Tr. 9.  That response included reference to the Fischell '425 patent--prior art that

Datascope contends affects the patentability of what would become

the '704 patent.  Although the response noted that Datascope "*may*

supplement [its] answer" after further review of the references

contained in the Initial Response, Tr. 11 (emphasis added), Dr.

Miller was not told that it *would* or even that it *would likely*

file supplemental answers.  Importantly, Datascope did not

challenge Dr. Miller's handling of the Initial Response; indeed,

Dr. Miller submitted the information included in the Initial

Response to the PTO--including reference to the Fischell '425

patent.

In October 2005, Datascope supplemented its responses to the

Plaintiffs' interrogatories (the "First Supplement").  (Def. Ex.

748).  In January 2006, Datascope again supplemented its

responses (the "Second Supplement").  (Def. Ex. 752).  Dr. Miller

was not informed of either set of supplemental answers.  Tr. 13-

24.  Datascope also provided the Plaintiffs with the expert

report of Thomas Aretz, M.D. (the "Aretz Report").  (Def. Ex.

753).  Dr. Miller did not learn of the Aretz Report.  Tr. 14-15.

Dr. Miller did not ask the litigation team for additional

information, and the litigation team did not offer it to him.

*Id.* 15-20.  Thus, Dr. Miller did not have knowledge of

Datascope's (1) further explanations regarding prior art and, in

particular, the Fischell '425 patent; (2) evidence of prior

publications and prior uses; and (3) evidence of the ordinary

6

skill in the art.

4.    Conclusions of Law

Dr. Miller's submission of information from the Initial Response was not inequitable conduct. Although it is clear that Dr. Miller did not learn of the information contained in the Supplements or the Aretz Report, Datascope contends that Dr. Miller deliberately avoided that knowledge and that such avoidance requires that he be charged with that knowledge. This contention rests solely on the reference in the Initial Response that Datascope *may* supplement that response. As Dr. Miller and the litigation team did not discuss their work, there is insufficient evidence that he cultivated his ignorance.

Datascope argued that because Dr. Miller and the litigation team worked for Amster, the Court may infer deliberate avoidance. If Dr. Miller and the litigating attorneys were in separate law firms, it would be improper to draw such an inference from their lack of communication. The Court will not draw that inference merely because the attorneys practice at the same firm. Such an inference would merely penalize multi-practice law firms for their depth and sophistication.

Datascope argued that the Plaintiffs had a duty of inquiry. Indeed, the Federal Circuit has said that applicants should inquire

when they were on notice of certain factual issues which may

7

> have been material to the prosecution of the patent
> application. . .. Attorneys must conduct meaningful
> inquiries when the surrounding factual circumstances would
> cause a reasonable attorney to understand that relevant and
> questionable material information should be assessed.

*Brasseler*, 267 F.3d at 1385. The 'duty' to inquire does not

exist in a vacuum; it requires notice of specific circumstances

that warrant investigation. *Id.* at 1383. Although the

Supplements or the Aretz Report may have created this duty had

Dr. Miller known of their existence, he had no knowledge of them

and, accordingly, he had no duty to inquire. *Cordis*, 188 Fed.

Appx. at 987 (*citing Brasseler*, 267 F.3d at 1383).

The Court finds that Datascope has not proven, by clear and

convincing evidence, that Dr. Miller knew of the additional

information. As that knowledge is a required element of

inequitable conduct and such conduct is required for Datascope's

unclean hands argument, Datascope's two arguments fail and the

motion for judgment on partial pleadings will be granted.

B.   Motions for Judgment as a Matter of Law

Datascope has filed two motions seeking judgment as a matter

of law under Federal Rule of Civil Procedure 50(b) or, in the

alternative, for a new trial under Rule 59(a). The first motion

seeks judgment or a new trial on the issue of invalidity for

obviousness, and the second motion seeks judgment or a new trial

on the issue of infringement.

1.    Standard of Review

"[A] court should not 'disturb a jury verdict unless without weighing the evidence or assessing witness credibility, it concludes that reasonable people could have returned a verdict only for the moving party.'" *Willis v. Youngblood*, 384 F.Supp.2d 883, 886 (D. Md. 2005) (*quoting Randall v. Prince George's County, Md.*, 302 F.3d 188, 201 (4th Cir. 2002)). "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the nonmoving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered." *Id.* (*citing Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir.2005)). In reviewing such a motion, a court "must view the evidence in the light most favorable to the Plaintiff, and the Plaintiff receives the benefit of all inferences." *Id.*

Under Rule 59(a), a district court may grant a new trial if it determines that "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Id.* (*quoting Atlas Food Sys. and Sers., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). A decision under Rule 59(a) is within the discretion of the court. *Id.*

9

2.    Invalidity for obviousness

Datascope bears the burden of proof on invalidity and must
prove that the patents are invalid by clear and convincing
evidence. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60
(Fed. Cir. 2007). As Datascope bears the burden of proof, the
standard for granting its motion for judgment is different than
that for traditional Rule 50(b) motions. Indeed, a motion for
judgment as a matter of law "in favor of a party bearing the
burden of proof may be granted only where (1) the movant has
established its case by evidence that the jury would not be at
liberty to disbelieve and (2) the only reasonable conclusion is
in [the movant's] favor." *Nobelpharma AB v. Implant Innovations,
Inc.*, 141 F.3d 1059, 1065 (Fed. Cir. 1998) (internal quotations
omitted).

Here, Datascope's evidence of invalidity for obviousness is
largely based on the testimony of Dr. Aretz. Dr. Aretz "walk[ed]
the jury through" the prior art and other references that
Datascope contended rendered the patents at issue obvious. Reply
Mem. Supp. Invalidity Mot. 11. The jury determined the
credibility of Dr. Aretz, a testifying witness who was cross-
examined, and the other admitted evidence of obviousness.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As
The jury was free to disbelieve the evidence supporting the
obviousness defense, the motion for judgment as a matter of law

10

as to invalidity for obviousness must be denied.

In support of its motion for a new trial on the issue of invalidity for obviousness, Datascope contends that the Plaintiffs reneged on a commitment that was the basis for the Court's decision to bifurcate.  As Datascope's argument does not address the grounds for a new trial under Rule 59(a) and the Plaintiffs did not argue that submission of the Fischell '425 patent *created an enhanced presumption of validity* for the Plaintiffs' patents, the Court will not grant a new trial on the issue of invalidity for obviousness.

3.   Infringement

Viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that a reasonable jury could have concluded--like the jury here--that Datascope infringed the Plaintiffs' valid patents.  The jury's finding was certainly not against the clear weight of the evidence.  Accordingly, the motion for judgment as a matter of law or, in the alternative, for a new trial on infringement will be denied.

C.   Motions to Alter/Amend Judgment

The Plaintiffs and Datascope have moved, under Federal Rule of Civil Procedure 59(e), to alter/amend the judgment.  The Plaintiffs seek a permanent injunction and Datascope seeks to recharacterize the judgment based on the jury's verdict as an

11

interim judgment rather than a final judgment.

1.    Standard of Review

Under Federal Rule of Civil Procedure 59(e), a court may grant a motion for reconsideration to: 1) accommodate an intervening change in controlling law; 2) account for new evidence previously unavailable; or 3) correct a clear error of law or prevent manifest injustice.  *Bogart v. Chapell,* 396 F.3d 548 (4th Cir. 2005).

2.    Recharacterization of the judgment resulting from the jury trial

The Plaintiffs have not opposed Datascope's motion to amend the June 15, 2007 judgment.  In addition, the trial ending on June 15 was the first in the bifurcated proceedings.  As a result, the Court concludes that the June 15, 2007 judgment, which resulted from the jury's verdict as to infringement and invalidity for obviousness, was not a final judgment.  Paragraph 2 of that judgment should have said:

> 2.  That any and all prior rulings made by the Court
> disposing of any claims against any parties are incorporated
> by reference therein, and this order shall be deemed to be a
> final Judgment within the meaning of Fed. R. Civ. P. 58 as
> to infringement and invalidity for obviousness, but shall
> remain open pending the Court's adjudication of the
> defendant's defenses and counterclaims regarding inequitable
> conduct and unclean hands.

3.    Permanent Injunction

12

Whether a permanent injunction should issue has been argued by the parties. "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *eBay Inc. v. Mercexchange, LLC*, 126 S.Ct. 1837, 1841 (2006). "As a result, the familiar four-factor test applies in disputes arising under the Patent Act." *Id.* at 1839. Accordingly, the Plaintiffs must demonstrate:

> (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

Datascope's product competes directly with the Plaintiffs' product. In fact, it is the only competition and thus, its sale reduces the Plaintiffs' market share. Continued sales by Datascope will irreparably harm the Plaintiffs. *See Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F.Supp.2d 978, 982-83 (W.D. Tenn. 2006) (loss of market share and loss of name recognition from competition is irreparable harm). If the Plaintiffs do not obtain injunctive relief, others may be encouraged to infringe their patents and risk litigation, thus devaluing the Plaintiffs'

property.

The jury concluded that Datascope infringed the Plaintiffs'
patents.  As "the principal value of a patent is its statutory
right to exclude, the nature of the patent grant weighs against
holding that monetary damages will always suffice to make the
patentee whole." *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d
1446, 1456-57 (Fed. Cir. 1988); *Smith & Nephew*, 466 F.Supp.2d at
984 ("Monetary damages generally are not an adequate remedy
against future infringement").  The importance of the Plaintiffs'
continuing right to exclude favors a permanent injunction.

The balance of hardships favors a permanent injunction.
Datascope's evidence of potential harm from a permanent
injunction issue is speculative and slight.  Datascope contends,
without evidence, that an injunction would harm its relationship
with its customers, which may result in lost sales of unrelated
products.  This conjectural harm is slight.  Moreover,
Datascope's loss of sales of the infringing product is not
accorded much weight.  *See Smith & Nephew*, 466 F.Supp.2d at 984
(hardship for loss of sales and for ceasing operations is not
sufficient because they are direct consequences of the illegal
patent infringment).  The Court concludes that the balance of
harms favors injunctive relief.

The final question is whether the public interest would be
disserved by the issuance of a permanent injunction.  There is

evidence that the Plaintiffs have sufficient manufacturing capacity to meet the demand currently met by Datascope. Moreover, there is public interest in strong patent protection. Accordingly, the public interest favors a permanent injunction in this case.

Upon consideration of the traditional equitable factors, the Court concludes that a permanent injunction is appropriate.

III. Conclusion

For the reasons discussed above, the Court will grant the Plaintiffs' motion for judgment on partial findings, the Plaintiffs' and Datascope's motions to amend, and will deny Datascope's motions for judgment.

August 9, 2007                    _____/s/_____
Date                             William D. Quarles, Jr.
                                 United States District Judge

15