IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC., )
)
Plaintiff/Counterclaim Defendant, )
)
v. )
)
CISCO SYSTEMS, INC., )
)
Defendant/Counterclaim Plaintiff. )
)

Civil Action No. 04-876-GMS

**REDACTED**
**PUBLIC VERSION**

TELCORDIA TECHNOLOGIES, INC.'S REPLY BRIEF IN SUPPORT OF
ITS MOTION TO ENHANCE DAMAGES PURSUANT TO 35 U.S.C. § 284

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20005
(202) 408-4000

Dated: August 13, 2007

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Telcordia Technologies, Inc.*

# TABLE OF CONTENTS

I.     Introduction ...................................................................................................................1

II.    Cisco's Rejected Defenses Were Not "Meritorious Challenges" ..................................2

    A.    Cisco's Mocking of Telcordia's Pre-suit Licensing Efforts Demonstrates
        Cisco's Ongoing Apathy—Not a "Meritorious" Defense ...................................2

    B.    Cisco Provides an Inaccurate and Incomplete Re-creation of Telcordia's
        Pre-suit Licensing Overtures ............................................................................3

        1.    Cisco's Post-trial Assertions Are Inconsistent with the Trial
            Record .....................................................................................................4

        2.    Cisco's Blame-Shifting Is Also Betrayed by the Evidence of
            Record .....................................................................................................5

        3.    Telcordia's Witnesses Did Not Adopt Cisco's Positions .....................6

    C.    Cisco Did Not Form a Good Faith Belief of Non-infringement or
        Invalidity ...........................................................................................................6

        1.    Cisco's Allusion to its Advice of Counsel is Improper and
            Exemplifies Cisco's Bad Faith ...............................................................6

        2.    Cisco's Inventorship Challenge Was Not a Strong Defense but
            Rather Was Grounded on Rumor and Speculation ................................10

        3.    Cisco's Bullet Point List of Defenses Does Not Demonstrate
            "Meritorious Challenges" .......................................................................11

    D.    Cisco Copied Telcordia's Patented SRTS and UPSR Technologies ...................11

        1.    Telcordia Did Not Violate Any Standards Policies ...............................12

        2.    The Evidence of Cisco's Copying Is Overwhelming ............................14

    E.    Cisco's Highly Culpable Actions Before the ATM Forum Demonstrate
        Motivation to Harm, Attempt to Conceal, and Should Not Be Excused ............16

    F.    Cisco's Bad Faith Litigation Tactics and Conduct Weigh in Favor of
        Enhancement ......................................................................................................19

    G.    Cisco's Supposed "Remedial Measures" Are Inadequate ..................................20

    H.    Cisco's Size and Financial Condition Strongly Weigh In Favor of
        Enhancement ......................................................................................................20

i

III.    Conclusion ....................................................................................................20

## TABLE OF AUTHORITIES

*Condit v. Dunne,*
   225 F.R.D. 100 (S.D.N.Y. 2004) ........................................................8

*Fort James Corp. v. Solo Cup Co.,*
   412 F.3d 1340 (Fed. Cir. 2005) .......................................................8

*Interstate Circuit, Inc. v. United States,*
   306 U.S. 208 (1939) ..............................................................13, 14

*Sanofi-Synthelabo v. Apotex, Inc.,*
   299 F.Supp.2d 303 (S.D.N.Y. 2004) ................................................7

*Stryker Corp. v. Davol, Inc.,*
   234 F.3d 1252 (Fed. Cir. 2000) ......................................................20

*Todd v. South Jersey Hosp. System,*
   152 F.R.D. 676 (D.N.J. 1993) ........................................................8

## FEDERAL STATUTES AND RULES

35 U.S.C. § 284 ...................................................................1, 20

Fed. R. Civ. P. 26(b)(5) ..........................................................7, 8

## I.    Introduction

As if completely oblivious to the jury verdict against it—a verdict for willful infringement nevertheless—Cisco introduces its answering brief on the issue of enhanced damages with a resounding self-congratulatory pat on the back.  Cisco boasts that anyone present at trial "could not forget" a host of supposedly memorable events favoring Cisco's case, including:

- "Mr. Adam [one of the three France Telecom engineers deposed in the case—none of whom ever claimed to be an inventor of SRTS] with his shock of white hair and French accent";

- "Dr. Lau's ultimate admission that one of the key concepts of the SRTS invention had in fact come from France Telecom [an entirely inaccurate interpretation of the record, *see* D.I. 389]"; and

- "Professor Grover's [Cisco's technical expert on UPSR] poise and facility in explaining the Prisco & Hoss article, which had been so confusing to Telcordia's expert Dr. Prucnal [an interpretation of events that is belied by the jury's rejection of Dr. Grover's positions, and adoption of Dr. Prucnal's positions, on all critical issues regarding UPSR]."

In reality, all of Cisco's supposed "unforgettable" trial events supporting its defenses are easily forgotten (or, more accurately, never happened in the first place).  Nevertheless, Cisco concludes its self-congratulations with the unsupported pronouncement that "if there was one thing that became clear over the eight days of evidence and argument, it was this: the validity of Telcordia's patents and their applicability to Cisco's products were severely in doubt."  D.I. 391 at 2.  Cisco's conclusion—belied by the evidence of record and the jury verdict—demonstrates just how far it is willing to stretch and twist the record in this case.

In reality, the validity of Telcordia's patents and their applicability to Cisco's products were persuasively established by substantial evidence—the jury unanimously found that Telcordia's patents were enforceable, not invalid, and *willfully* infringed by Cisco.  D.I. 348.  Cisco's slender defenses fell flat with the jury and fall even flatter now.

In contrast with Cisco's supposed "unforgettable" events at trial, the actual memorable take-aways from the evidence at trial have nothing to do with the distractions of white hair, French accents, or Cisco's expert's self-proclaimed poise and facility; they have to do with basic underlying principles of long-term, bad-faith willful infringement, including:

1

- Cisco's admitted acute awareness—in its engineering, business, and legal quarters—of Telcordia's SRTS and UPSR patents;

- Cisco's decade-long refusal to license Telcordia's patents—sometimes expressed in a crass and arrogant manner;

- Cisco's deliberate and knowing design of its products to incorporate—unlicensed—Telcordia's SRTS and UPSR technologies; and

- Cisco's ability to compete in the market and dominate sales with an unfair advantage over Telcordia's lawful licensees (*i.e.*, the fruits of Cisco's willful infringement).

Cisco's effort to draw attention away from its egregious conduct—by belatedly raising new defenses and spinning inaccurate recounts of the events at trial—should not be afforded any serious weight. Rather, Telcordia respectfully submits that the evidence in this case, viewed against the enhancement factors set forth in the Federal Circuit's *Read v. Portec* opinion, weighs strongly in favor of enhancing damages.

## II.     Cisco's Rejected Defenses Were Not "Meritorious Challenges"

Cisco's primary argument against enhancement of damages centers on Cisco's ongoing insistence that its defenses should have prevailed. Cisco's defenses, however, fell flat for a reason—they were not supported by the evidence and they ran afoul of common sense.

### A.     Cisco's Mocking of Telcordia's Pre-suit Licensing Efforts Demonstrates Cisco's Ongoing Apathy—Not a "Meritorious" Defense

At the outset, in arguing that its defenses were "meritorious," Cisco mocks Telcordia's decade-long good-faith efforts to license Cisco. Apparently still suggesting that Cisco never had any reason to take Telcordia seriously, Cisco calls Telcordia's licensing efforts a "Jackson Pollock," with reference to a misleading demonstrative slide that Cisco presented to the jury as part of its unsuccessful defenses. D.I. 391 at 7, Ex. 2. Specifically, Cisco's argument, and its attendant "Jackson Pollock" joke, dredges up the same collateral and irrelevant arguments that Cisco raised at trial—namely that Telcordia over the years raised patent claims during negotiations with Cisco that it ultimately did not pursue in this litigation. D.I. 391 at 4-8. But Cisco's complaints about different patents and unasserted claims (*e.g.*, the unasserted '080 patent, '119 patent, and '954 patent) are nothing more than a distraction technique designed to shift focus from Cisco's willful infringement of the patents and claims-in-suit. The fact that Telcordia carefully chose to pursue certain strong patent claims in this litigation (based on the information that was available to Telcordia when it filed

2

suit), rather than each and every potential patent claim that Telcordia had ever previously raised with Cisco, does not detract from Telcordia's case and does nothing to demonstrate the "meritoriousness" of Cisco's decade-long refusal to obtain a license to the patents-in-suit.[1]

More troublingly, Cisco's cavalier and mocking attitude about the events that preceded this lawsuit is indicative of Cisco's ongoing bad faith towards Telcordia. Cisco forgets that the decade-long pre-suit licensing overtures from Telcordia were designed to avoid this lawsuit and to instead reach an amicable license agreement—much like the agreements accepted by nearly 20 other members of the industry. PTX-5000 (Ex. A to D.I. 389); DTX-2569; Trial Tr. 287, 1286-87. Unfortunately, unlike the rest of the industry, Cisco systematically stonewalled Telcordia for over a decade and, ultimately, forced Telcordia to vindicate its patent rights through a costly litigation. Nevertheless, even now Cisco continues to casually mock Telcordia's "Jackson Pollock" licensing efforts, apparently oblivious to the fact that it was this same dismissive and cavalier attitude that formed the basis of the jury's finding of willfulness against Cisco in the first place.

**B.      Cisco Provides an Inaccurate and Incomplete Re-creation of Telcordia's Pre-suit Licensing Overtures**

Clinging to the argument that it never had any reason to take Telcordia seriously, Cisco presents a gross distortion of Telcordia's genuine pre-suit efforts to negotiate a license—turning the actual negotiation history on its head to reach the absurd conclusion that Cisco's extensive pre-suit willful infringement "was largely attributable to Telcordia," not Cisco. D.I. 391 at 33. Specifically, in addition to accusing Telcordia of "erratically identify[ing] numerous patents"—again, an irrelevant distraction—Cisco incorrectly claims that its

---

[1] Citing the testimony of Mr. Giordano, Cisco wrongly insists that Telcordia conceded or stipulated that Cisco does not infringe the claims of the original SRTS patent. D.I. 391 at 5. But when Cisco asked Mr. Giordano about this supposed stipulation, Mr. Giordano candidly stated "I'm not aware of that. I'm not sure I know what you are referring to . . . I'm not sure. I have to go, I have to go back and review the record. I don't remember." Trial Tr. 400-01. Moreover, as Cisco well knows, there was no such stipulation in the record in this case. In fact, the only stipulation of record is that "Telcordia does not assert any claims originally issued as part of U.S. Patent No. 5,260,978 against Cisco or Lucent." JTX-6000. The stipulation does not mean that Cisco does not infringe those claims—it only means that when Cisco ultimately forced Telcordia to enforce its patents in litigation, Telcordia chose to focus its resources on proving infringement for a limited number of claims, not every claim in its patents. Telcordia's ultimate choice to pursue certain patent claims over others does not show a "callous disregard for Cisco's legal rights" as Cisco claims. D.I. 391 at 5.

requests for information from Telcordia were "met with nearly a decade of silence," and that Cisco was

"unable to get straight answers from Telcordia." D.I. 391 at 8.

As established at trial, just the opposite is true—Telcordia advanced over 25 communications to Cisco

regarding the licensing of the patents-in-suit, whereas Cisco provided a mere four letters in response—one of

which says nothing more than "once we have had a chance to review this matter, we will be in contact" (PTX-

443), and the other three of which circularly demand information that Telcordia had already long ago provided

(e.g., claim charts, licensing terms, etc.) (PTX-443, PTX-463, PTX-1206).

### 1.    Cisco's Post-trial Assertions Are Inconsistent with the Trial Record

During trial, Mr. Giordano—Telcordia's Vice President and Acting General Counsel who was

personally involved in the negotiations with Cisco—testified about the entirety of the decade-long negotiations

with Cisco.  Trial Tr. 297-360.  Mr. Giordano presented a detailed timeline to help explain each

communication, each phone call, each letter, each meeting, and to detail all of the instances in which Telcordia

provided licensing terms, provided identifications of the patents and products that infringe those patents,

provided detailed recitations of infringement positions, provided claim charts, sought face to face meetings,

warned Cisco of its infringement, and reminded Cisco that its competitors were licensed.  Id.  Mr. Giordano

sponsored and explained all of the documentary evidence supporting his testimony.  PTX 443, 448, 450, 452-

54, 456, 458-60, 462-64, 466, 728, 1181-83, 1195-96, 1200-01, 1203-06, 1231-32, 1519.  Cisco's post hoc re-

creation of the events in an effort to suggest that Cisco was "met with a decade of silence" is simply betrayed

by the facts of record.

Moreover, Cisco levels its sweeping re-characterizations of the evidence with the safety of knowing it

cannot now be tested, through cross-examination, against the documentary evidence of record (i.e., the decade-

long time line demonstrating Telcordia's exhaustive efforts to license Cisco).  Indeed, if Cisco truly believed

that it was "met with a decade of silence," that Telcordia provided "a smorgasbord of vague, unsupported

allegations," and that Cisco was "unable to get a straight answer from Telcordia," then where were the

witnesses to proffer these complaints at trial and to weather cross-examination on the matter?  As Telcordia

noted in its answer to Cisco's motion for a new trial, many current Cisco executives were personally aware of

4

the negotiations with Telcordia. D.I. 388 at 25. But Cisco did not present any witness to explain and stand behind Cisco's supposed "meritorious" position that it was justified in ignoring and stonewalling Telcordia for a decade.[2]

### 2.     Cisco's Blame-Shifting Is also Betrayed by the Evidence of Record

Cisco also incorrectly attempts to shift the blame to Telcordia for the parties' failure to meet earlier in a face to face negotiation, complaining that "it took from 1994 to 2003 for Telcordia to have a meeting with Cisco." D.I. 391 at 7. Cisco ignores the substantial evidence of record showing that Telcordia persistently asked Cisco for a face to face negotiation, only to be rebuffed and ignored by Cisco:

- "Bruce Sidran, Bellcore's Vice President Licensing & Business Development, and I [Vince Kovalick] believe it is very important to meet with you to discuss the term sheet, and to answer any questions you may have. We suggest either May 12 or 13, 1998 at your facilities in San Jose." PTX-450 (April 1998)

- "We would like to meet with you or your designated representative to explain why we believe you need a license under these Telcordia patents. . . If we don't hear from you shortly, I will call to arrange a meeting." PTX-456 (Sept. 2001)

- "We would like to meet with you or your designated representative to explain why we believe you need a license under the above identified Telcordia patents." PTX-458 (Nov. 2002)

- "Vernon and I would like to meet with you and appropriate Cisco R&D managers to discuss this matter at a time and place of your convenience." PTX-1201 (Dec. 2002)

The evidence demonstrates that the fault for Cisco's refusal to meet face to face with Telcordia lies with Cisco alone—Telcordia persistently sought a meeting and was ignored.

In sum, Cisco's re-creation of the negotiation history between Cisco and Telcordia stands un-sponsored by any witness and in direct conflict with the documents and testimony introduced at trial. Cisco's bold position—that it was justified in ignoring Telcordia's licensing overtures for years only to finally force litigation—simply demonstrates Cisco's ongoing audacity in its dealings with Telcordia. If anything, the fact

---

[2] Indeed, even during discovery only one witness testified as to the negotiations between Cisco and Telcordia—Cisco's 30(b)(6) witness and former general counsel Robert Barr—who, far from supporting Cisco's positions, reduced himself to hurling crude insults when challenged to reconcile Cisco's aggressive litigation positions with the contrary documentary evidence of record ("I'm not going to answer this out of context crap."). D.I. 388 at 19-20.

that Cisco continues to excuse its actions with an unsupported and untested rewrite of history weighs in favor

of enhancement of damages in this case.

### 3. Telcordia's Witnesses Did Not Adopt Cisco's Positions

In its classic (but misleading) technique, Cisco plucks sound bites out of the record to further turn the

evidence on its head, proclaiming that "not even Telcordia's own witnesses believed Cisco to be stalling or

stonewalling." D.I. 391 at 10.[3] Amazingly, Cisco claims that Mr. Giordano—the Telcordia officer responsible

for negotiating with Cisco—personally did not believe that Cisco was "stalling or stonewalling." *Id.* Again,

the trial record demonstrates that nothing could be further from the truth. In addition to the extensive

documentation and testimony identified above in support of Telcordia's position that Cisco engaged in

elaborate stalling and stonewalling during licensing negotiations, Mr. Giordano testified at length about his

personal reaction to Cisco's frustrating stonewalling tactics, summarizing the situation as follows:

> Well, I think, my view at that time was that, as the time progressed, I was
> more involved in the negotiations and getting reports from Vernon [Vernon
> Anthony - Telcordia's director of licensing] and the team working on it, that
> at each turn, we just were getting more questions. And while they would
> actively engage in licensing conversations with us, it didn't appear that they
> were moving any further along toward being serious in taking a license as
> opposed to just stringing us along to see how long we would go.

Trial Tr. 357. The record simply does not support Cisco's conclusion that Telcordia's own witnesses believed

that Cisco was acting in "complete good faith."

### C. Cisco Did Not Form a Good Faith Belief of Non-Infringement or Invalidity

#### 1. Cisco's Allusion to its Advice of Counsel is Improper and Exemplifies Cisco's Bad Faith

In trying to excuse its decade-long stonewalling, Cisco suggests that it formed a good faith belief that

it could ignore Telcordia's patents. Cisco even references its "advice of counsel" in support of this position.

---

[3] Specifically, Cisco cites two sound bites, one from Mr. Giordano and another from Mr. Sincoskie, in support
of its position. D.I. 391 at 10. The record establishes that both of these sound bites address specific isolated
negotiations with Cisco (a specific Memorandum of Understanding in Mr. Giordano's case, and a specific
meeting about general business relationships between Cisco and Telcordia—as distinct from negotiations over
Telcordia's patents—in Mr. Sincoskie's case). Trial Tr. 416; 1963-64. Cisco grossly overextends these
limited statements to propound sweeping, unfounded conclusions about Telcordia's witnesses' personal
beliefs—conclusions which are directly contradicted by all of the evidence of record.

Cisco's supposed "advice of counsel" does not demonstrate any good faith on Cisco's behalf. To the contrary, the facts of this case demonstrate that the existence of Cisco's "advice of counsel" exemplifies Cisco's bad faith.

At the outset, it bears noting that Cisco did not disclose or rely upon any opinions of counsel in this case. But Cisco went further and actually chose to hide the fact that it even had advice of counsel. Specifically, in contravention of Fed.R.Civ.P. 26(b)(6), Cisco adamantly refused to provide the dates, authors, recipients, and description of its opinions. Instead, Cisco coyly claimed that:

> Cisco is under no obligation to provide non-privileged information about opinion letters, if any exist. Simply put, the *existence of such opinions is not relevant or responsive* now that Cisco has elected not to rely on an opinion letter.

Ex. H to D.I. 314. Now, in its post-trial briefs Cisco takes the exact opposite position: "the *existence* of that advice is highly probative of Cisco's good faith." D.I. 391 at 8. To summarize:

| Cisco's Position in Discovery | Cisco's Position Post-Trial |
|---|---|
| "the *existence* of such opinions is not relevant or responsive" | "the *existence* of that advice is highly probative of Cisco's good faith" |

Needless to say, Cisco should not be permitted to hide the *existence* of its opinions during discovery on relevance grounds only to turn around and rely upon the *existence* of those opinions during post-trial proceedings. The law is clear that having chosen to assert its privilege, Cisco cannot rely on its opinions of counsel as probative of its supposed good faith or for any other reason:

> [T]his District has adamantly refused to allow a litigant to invoke privilege to protect discovery of information relating to the matter the litigant put directly at issue. *Sanofi-Synthelabo v. Apotex, Inc.*, 299 F.Supp.2d 303, 308-09 (S.D.N.Y. 2004)(finding it unfair for complainant to assert contentions to the court and then to rely on privilege to block disclosure of materials that might disprove or undermine those contentions).

*Condit v. Dunne*, 225 F.R.D. 100, 108 (S.D.N.Y. 2004); *see also Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340 (Fed. Cir. 2005) ("It would be unfair to permit Fort James to rely on favorable legal opinions, but protect the communications on which those opinions depend."); *Todd v. South Jersey Hosp. Sys.*, 152 F.R.D. 676, 688 (D.N.J. 1993)("defendants cannot both stand upon and assert a privilege, and then rely upon any such

7

Ex. A(emphasis added).[5]  The Cisco position reached ,

REDACTED

from Mr. Fedorkow to Kevin Stodola, the Tellabs representative at the ATM Forum: '

REDACTED

'  Ex. C.[6]

Had Cisco ever harbored a good faith belief that it did not infringe or that Telcordia's patent was

invalid or unenforceable, then Cisco would not have concluded—and openly conveyed to other companies at

the ATM Forum—                                        Indeed, contemporaneous emails

reflecting                                        , are highly probative of

Cisco's bad faith willful infringement—namely :

REDACTED

---

[5] During his deposition, Mr. Fedorkow explained that he was referring to          REDACTED


REDACTED

[6] In its opening brief on enhanced damages, out of an abundance of caution, Telcordia confined its discussion of facts regarding Cisco's behavior before the ATM Forum to those facts which were before the jury during trial. D.I. 370 at 9. Cisco chose a different approach in its answering brief—liberally discussing the "boycott" and "antitrust" issues that were not before the jury and creating a new story out of more than 15 un-admitted documents (nearly half of which Cisco neglects to identify as "not admitted" in its brief). D.I. 391 at 14-26. In order to provide the appropriate balance and to effectively respond to Cisco's new story (one which it declined to present during trial), Telcordia's reply brief is not limited to facts that were before the jury.

9

### 2.    Cisco's Inventorship Challenge Was Not a Strong Defense but Rather Was Grounded on Rumor and Speculation

Cisco also tries to excuse its conduct by holding out its debunked theory that France Telecom contributed to the invention of SRTS as one of its "strong defenses" and as a basis for its supposed good-faith belief that Telcordia's SRTS patent was invalid. D.I. 391 at 8-12. As Telcordia noted in its opposition to Cisco's JMOL motion, however, Cisco's improper inventorship defense was deeply flawed—no witness from France Telecom ever even claimed to be an inventor of SRTS. D.I. 389 at 29. Nevertheless, Cisco (not France Telecom) persisted with its supposed "strong defense" by relying upon a series of six vague and sketchy faxes to suggest that France Telecom engineers invented SRTS. But those faxes fell far short of proving Cisco's strained theory. Indeed, without any actual claim to inventorship from France Telecom, and without any serious documentary evidence to support its theory, Cisco's improper inventorship defense borders on frivolous.

Now Cisco even notes that the foundation of its primary validity challenge derived from mere rumors and speculation. Specifically, Cisco highlights an email that explains:

> Many rumors circulated regarding the SRTS patent. . . . some claim that SRTS was developed when France Telecom and Bellcore merged two competing techniques called SFET and RTS for submission to the ITU. Bellcore then filed in the US without admitting France Telecom as a co-inventor. I don't know how to verify this rumor.

D.I. 391 at 8. Rumors are not defenses, and Cisco's suggestion that the industry recognized an inventorship problem is belied by the fact that the industry, unlike Cisco, took licenses to the patent rather than willfully infringing on the strength of a rumor. Now, Cisco has fully tested the rumor—forcing foreign depositions of three France Telecom engineers, obtaining all communications between Telcordia and France Telecom, and presenting all facts concerning its inventorship rumor to the jury.

Again, most tellingly, despite Cisco's encouragement, none of the France Telecom engineers claimed to be an inventor of Telcordia's SRTS patent during their depositions. D.I. 389 at 29-30. That Cisco nevertheless hangs on to the debunked rumor of improper inventorship—holding it out as an example of the supposed strength of its defenses—is indicative of just how aggressive but unfounded Cisco's positions have been (and remain to be) during this litigation.

10

### 3. Cisco's Bullet Point List of Defenses Does Not Demonstrate "Meritorious Challenges"

Cisco's simple regurgitation of its failed defenses in a series of bullet points—including, for instance Cisco's flawed § 112 challenge to the '763 patent and Cisco's tired "improper inventorship" challenge to the '633 patent—does not somehow elevate those defenses to "meritorious challenges."[7]  Rather, Cisco's bullet point list represents nothing more than a litany of stubborn roadblocks that Cisco clings to in an effort to extend its stonewalling well beyond a decade.  Cisco should not be rewarded for litigating the defenses—it should have taken a license long-ago at then-offered rates, obviating the need for this litigation altogether.[8]

### D. Cisco Copied Telcordia's Patented SRTS and UPSR Technologies

The evidence of overt copying in this case, one of the most important factors exemplifying Cisco's egregious culpability, is overwhelming.  Because it cannot possibly confront that evidence head-on, Cisco engages in another elaborate distraction technique—this time first alleging that Telcordia violated standards rules when its technologies were standardized, and then concluding that Cisco should not be faulted for copying the standards.  Leaving aside for the moment the fact that Cisco is trying to raise a new convoluted defense—for the first time—in the post-trial phase of the case (exemplified by Cisco's citation to almost 20 new documents, none of which was admitted or used during trial in any way), the evidence does not support Cisco's assertions.

---

[7] Telcordia addresses Cisco's rejected defenses on the merits in response to Cisco's motion for JMOL.  D.I. 389.

[8] Indeed, beyond the almost 20 licensees in the industry, the other two major industry players—Lucent and Alcatel—elected to settle their cases rather than to challenge the validity of Telcordia's patents before a jury with weak and misguided defenses.  These two well-financed and well-represented defendants had raised the exact same invalidity defenses as Cisco, but chose to settle rather than test the defenses before the jury.  While Telcordia recognizes that parties can settle cases for many reasons, the objective fact that Lucent and Alcatel chose not to gamble with weak defenses is complemented by the fact that a large group of additional sophisticated companies in the industry, after presumably considering the strength of Telcordia's patents against any possible validity challenges, also chose to license Telcordia's patents rather than to test the types of questionable defenses that Cisco stubbornly advances in this case.

1.    Telcordia Did Not Violate Any Standards Policies

In its answering brief, Cisco spins a detailed one-sided story about the standardization of SRTS technology, partly in an effort to try to excuse its culpable boycott of Telcordia's technology but also in an effort to suggest that Telcordia violated established standards body policies when SRTS was standardized before the International Telecommunications Union ("ITU"), the American National Standards Institute ("ANSI") and the ATM Forum. D.I. 391 at 14-25. Cisco's story is not based upon any evidence presented at trial, but upon a hand-picked selection of almost 20 new, un-admitted documents. There is a reason that Cisco chose not to admit these documents during trial—and there is a reason that Cisco failed to bring any witness to trial who was familiar with the standardization of SRTS. The true factual account of SRTS standardization (an account that was presented to the jury through a live Telcordia witness who had personal knowledge of the rules governing the relevant standards bodies and who personally participated in SRTS standardization) stands as a complete rebuttal to Cisco's imaginative re-creation of the facts.

Specifically, during trial Dr. Steven Walters, a life-time Bellcore employee who was the program manager interfacing with the ITU and who was President and Chairman of the ATM Forum, testified about the standardization of SRTS. Trial Tr. 1167-92. Dr. Walters was not only personally familiar with the rules and practices of the ITU, ANSI, and the ATM Forum, but was also personally involved during the standardization of SRTS. *Id.* Dr. Walters clearly explained the intellectual property policies of each standards body, and explained exactly how Bellcore's actions during the standardization of SRTS complied with those policies. *Id.* PTX-234, 725, 1195-96, 1216, 1220-22, 1231-32, 1415, 1487; DTX-2397. Cisco's positions now—that Bellcore did not comply with standards body policies—stands in direct conflict with the evidence of record:

> Q:    During your tenure as program director for the ATM program, from 1990 to 1997, did Bellcore comply with the patent policies of ANSI, ITU and the ATM Forum with respect tot eh ATM program that you were responsible for?
> A:    I believe we did.
> Q:    And that program included the disclosure of SRTS?
> A:    Yes.

Trial Tr. 1179 (Dr. Walters); *see also* Trial Tr. 1180-1192 (Dr. Walters explaining in detail exactly how and why Bellcore's actions were in compliance with the relevant policies). For its part, Cisco brought no witness

12

to trial to sponsor its so-called "standards misconduct" theory—and it did not introduce the slew of documents it now presents to the Court. In a nonsensical attempt to excuse this absence of evidence, Cisco purports that:

> Mr. Fedorkow was prepared to testify at trial and tell the full story surrounding Telcordia's standards misconduct. However, as Telcordia presented its case-in-chief, it became clear that it was abandoning it standards story . . . perhaps sensing how flat this theme was falling and recognizing how little evidentiary support it had.

D.I. 391 at 18. To the contrary, in its case-in-chief Telcordia vigorously and successfully defended the propriety of its actions before standards bodies, presenting the jury with the president and chairman of the ATM Forum and Bellcore's primary representative at the ITU to explain the relevant patent policies in detail and to demonstrate how Bellcore's actions were in compliance with those policies. It is Cisco, not Telcordia, that is left with no evidentiary support.[9]

The absence of any evidence or sponsoring witnesses, however, does not dissuade Cisco from its post-trial effort to rewrite the facts by dredging up and patching together a series of isolated, un-admitted documents—out of the literally thousands of documents that provide the complete picture of SRTS standardization—to haphazardly allege that Telcordia "deceived" and "(mis)led the industry into adopting SRTS." D.I. 391 at 14, 25. Cisco alleges serious wrongdoing, what amounts to fraud, without any evidentiary support in the record and without ever even having plead its newfound fraud allegations. Cisco's belated charade should be taken for what it is: an effort to distract from Cisco's copying of Telcordia's standardized technologies, not a genuine challenge to the propriety of Telcordia's actions before the ITU, ANSI, and the ATM Forum.

---

[9] Cisco engineer Mr. Fedorkow was the co-chair of the ATM Forum working group that actually voted to approve SRTS. Surprisingly, Cisco did not call Mr. Fedorkow to sponsor its defenses at trial, despite promising to call him during pre-trial proceedings. Trial Tr. 100. The only inference that should flow from the failure to call Mr. Fedorkow is that Mr. Fedorkow's trial testimony—like his deposition testimony—would have been adverse to Cisco. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.").

## 2.    The Evidence of Cisco's Copying Is Overwhelming

When Cisco's "standards misconduct" smokescreen is lifted, overwhelming evidence of Cisco's copying remains. The evidence at trial demonstrated that Cisco deliberately developed its products to comply with industry standards and specifications knowing that Bellcore's SRTS and UPSR patents covered Cisco's implementations of those standards and specifications. D.I. 370 at 3-8. Moreover, the evidence also demonstrated that Cisco deliberately and knowingly developed its products to comply with those standards and specifications by using technical implementations that infringe the SRTS and UPSR patents. *Id.* Despite Cisco's desperate efforts to obscure these straightforward facts—that is copying, plain and simple.

To the extent that there is any remaining question about Cisco's deliberate copying of Telcordia's technologies, the evidence at trial also clearly established that Cisco used PMC-Sierra chips in its products, and that Cisco engineers directly corresponded with PMC-Sierra engineers about the function and operation of the PMC-Sierra chips—knowing full well that the PMC-Sierra chip practiced Telcordia's patented SRTS technology. Indeed, the second page of the PMC-Sierra data sheet expressly warns users of the SRTS patent and the data sheet also contains a block diagram with a legend that also expressly identifies the Bellcore SRTS patent. Ex. E (excerpts from PTX-1366).

Cisco not only used the PMC-Sierra chip in its products (knowing that it practiced SRTS), but Cisco also designed its own proprietary SRTS implementation patterned on Telcordia's SRTS technology. Trial Tr. 1415-17. Specifically, when designing its own SRTS implementation, Cisco directly contacted PMC-Sierra's engineers to make sure that the Cisco SRTS implementation would be the same as the PMC-Sierra SRTS implementation (*i.e.*, the implementation that expressly uses Bellcore's patented technology):

> Hi Rod [PMC-Sierra engineer],
>
> **Here is how we have implemented the SRTS RCV side logic:**
>
> 1. **The implementation is as per the block diagram in PMC PM73121 AAL1gatorII data sheet, Page 33 Figure 22.** I would like to make sure if this block diagram is a complete one or is there anything else we need to take care of (such as any corner cases while generating the SRTS value).
>
> 2. What we see on the output is a sequence of **SRTS** values. Is this the correct behavior? I would hope that we should get a fixed **SRTS** value generated for a given receive clock frequency.

14

Appreciate you help in this regard.

-Vipul [Cisco engineer]

PTX-1753. In other words, Cisco emails sent contemporaneously with the design of Cisco's products demonstrate that Cisco intended to copy Telcordia's patented SRTS technology that was identified in PMC-Sierra's product literature.

In its answering brief, Cisco tries to draw attention away from its engineer's copying of Telcordia's patented SRTS implementation by noting that its engineers corresponded with PMC-Sierra in order to promote interoperability of products. D.I. 391 at 14. But Cisco's desire to achieve interoperability with other products is not an excuse for Cisco's express, unsanctioned copying and use of SRTS. To the contrary, the fact that Cisco needed to achieve interoperability, needed Telcordia's patented SRTS technology to do so, but nevertheless refused to take a license to SRTS, further exemplifies Cisco's bad faith copying. Indeed, only by knowingly misappropriating Telcordia's SRTS technology was Cisco able to achieve the desired compatibility and interoperability between its products and the lawful products of Telcordia's legitimate licensees. The evidence of Cisco's knowing copying of SRTS should not be excused or ignored merely because Cisco desired "interoperability."

Nor should Cisco's copying of Telcordia's UPSR invention be ignored. The evidence at trial—most notably testimony from Cisco engineer Brian Rushka—established Cisco's deliberate and knowing copying of Telcordia's generic requirement for unidirectional path switched rings (UPSR), GR-1400:

> Question: Does Cisco believe that the architecture for path protection switching is its idea?
>
> Answer: A specific -- a specific instance or aspect of that I cannot -- Cisco did not define -- excuse me, Cisco did not define a workable, usable or desirable or saleable set of switching criteria for path protection switching. The definition of the criteria was obtained from GR-1400 because that was a preexisting description of what people expect, want, need, and are willing to purchase. So I can say with certainty that that was not an invention or discovery by myself or my coworkers.

Trial Tr. 1027. Just as in the case of SRTS, Cisco's copying of Telcordia's patented UPSR technology weighs heavily in favor of enhancing damages in this case.

15

**E.    Cisco's Highly Culpable Actions Before the ATM Forum Demonstrate Motivation to Harm, Attempt to Conceal, and Should Not Be Excused**

Although Cisco goes to great lengths to try to excuse and obscure its conduct before the ATM Forum, the facts demonstrate Cisco's ill-will and high culpability:

> (1) Bellcore disclosed its SRTS patent and provided a RAND assurance in complete accordance with ATM Forum rules;
> (2) Cisco responded publicly by denouncing Bellcore at the ATM Forum;
> (3) Cisco responded privately by initiating a behind-the-scenes exchange of information about Bellcore's specific licensing terms in violation of ATM Forum policies;
> (4) Cisco actively encouraged members of the ATM Forum to vote against the SRTS specification —despite the fact that Bellcore provided its RAND assurance in complete compliance with ATM Forum policies—until specific license terms met with Cisco's approval; and most importantly
> (5) Cisco knew that its treatment of Bellcore was wrong and inappropriate.

Telcordia notes these facts simply to demonstrate that Cisco acted against Telcordia and its SRTS patent in a knowing, willful, and highly culpable manner.

First, before the ATM Forum voted to incorporate SRTS into its specification, Bellcore announced to the ATM Forum:

> Bellcore has been granted US Patent No. 5,260,978 for Synchronous Residual Time Stamp for Timing Recovery in a Broadband Network. This Invention may apply to the ATM Adaptation Layer Type I (AAL1) ANSI standard which is used in the ATM Forum Circuit Emulation Service specification. In accordance with ATM Forum and ANSI procedures Bellcore is currently preparing the appropriate ANSI patent holder statement.
>
> It is Bellcore's policy that Bellcore patents are available for licensing on a non-exclusive and nondiscriminatory basis and at reasonable royalties. . . .

PTX-234. According to trial testimony of Dr. Walters, the President and Chairman of the ATM Forum with intimate familiarity with the ATM Forum's rules, this disclosure satisfied the requirements of the ATM Forum policy. Trial Tr. 1178-87, PTX-725, 1220, 1487. Specifically, the ATM Forum policy required a patentee to disclose its patent and provide a RAND assurance, but forbade the discussion of actual licensing terms. Trial Tr. 1214-16, PTX 1487. Cisco's Mr. Fedorkow, the co-chair of the ATM Forum working group working on SRTS, also confirmed that Bellcore's disclosure of SRTS was "within the rules." Trial Tr. 1164. Finally, to emphasize the point that Bellcore's SRTS disclosure was in full compliance, it bears noting that Bellcore's SRTS disclosure is virtually identical, in all material respects, to Cisco's patent disclosures before the ATM Forum:

16

> Cisco is the owner of US Patent No. 5,088,032, entitled "Method and
> Apparatus for Routine Communications among Computer Networks", issued
> February 11, 1992. This patent may apply to the proposed P-NNI protocol
> specification. In accordance with ATM Forum and ANSI procedures, Cisco
> will make a nonexclusive license available under reasonable,
> nondiscriminatory terms and conditions for use in implementing this standard,
> to the extent necessary to implement this standard.

PTX-1531 at 7. As such, in disclosing its SRTS patent, Bellcore not only behaved "within the rules," but also

behaved consistently with Cisco and all other members of the ATM Forum vis-à-vis their patent disclosures.

Despite Bellcore's compliance with the rules, the evidence demonstrates that Cisco denounced

Bellcore publicly and engaged in underhanded manipulation against Bellcore privately. Under the auspices of

an unfounded violation of ATM Forum policy, Cisco gained leverage to artificially depress the RAND license

rates that Telcordia could charge for the SRTS patent.

For example, Cisco publicly proclaimed that Telcordia's actual license terms were not RAND—an

incorrect assertion that is not an appropriate matter for discussion at the ATM Forum in any event. PTX 1242.

More troublingly, behind the scenes Cisco solicited information from ATM Forum members about Bellcore's

licensing offers to other ATM Forum members, exchanged emails with other ATM Forum members

suggesting that the license rates were too high, and organized a group boycott of Telcordia's SRTS technology

until Telcordia provided license terms that Cisco privately deemed acceptable. Ex. 8 to D.I. 391; PTX 1242.

Deposition testimony and contemporaneous emails demonstrate that both of Cisco's key representatives at the

ATM Forum, Guy Fedorkow and Anthony Alles,

<strong>REDACTED</strong>

Of course, there is Mr. Fedorkow's

contemporaneous email memorializing Cisco's interpretation of events at the ATM Forum:

- <strong>REDACTED</strong>

- "no one could say 'I'm voting against CES until Bellcore reduces their licensing fee to $10K.' What
  we could all say was that we were voting against it because of our respective 'business concerns'
  regarding the spec, and that we "needed more time to resolve these concerns";

- "the vote went against the document by about 19 to 1, with everyone in the room knowing that we
  were voting against the Bellcore terms.

<strong>REDACTED</strong>

· 17

Ex. 8 to D.I. 391.  But beyond this email, there are countless other emails and corresponding deposition testimony demonstrating that Cisco knew that it was treating Telcordia unfairly.

Specifically, both Mr. Fedorkow, as an ATM Forum committee co-chair, and Mr. Alles, as a regular Cisco attendee at the ATM Forum, knew that the ATM Forum's policies and rules precluded collusive discussion of private financial matters between members of the ATM Forum.  During his deposition, Mr. Fedorkow testified:

**REDACTED**

Ex. B.  Similarly, during his deposition Mr. Alles testified:

**REDACTED**

Ex. D.  But, as Mr. Fedorkow's boycott email demonstrates, Cisco did in fact violate the rules—it helped to organize a group vote against SRTS that was designed to force Bellcore to lower its price for a license to the SRTS patent.  Moreover, additional emails between Cisco and other ATM Forum members in the late 1994 and early 1995 time frame demonstrate that:

**REDACTED**

- **REDACTED** x. F (email from Randy Mitchell of Mitre Corp., co-chair of the ATM Forum CES committee, to Cisco's Guy Fedorkow, the other co-chair of the ATM Forum CES committee)
- **REDACTED** Ex. C (email from Cisco's Guy Fedorkow to Tellabs' Kevin Stodola)
- **REDACTED** Ex. G (return email from Tellabs' Kevin Stodola to Cisco's Guy

Fedorkow disclosing Bellcore's confidential licensing position with Tellabs)

REDACTED

Ex. H (email from Tellabs' Kevin Stodola to Cisco's Guy
Fedorkow regarding Bellcore's confidential licensing negotiations)

REDACTED

Ex. A (email from Cisco's

Guy Fedorkow to MCI's Tim Dwight)

REDACTED

Ex. I (email from Cisco's Fedorkow to IBM).

These emails were not public broadcasts to the ATM Forum group. Rather, they were one-on-one behind the

scenes communications demonstrating that Cisco was actively engaged in the exact conduct that Mr. Alles and

Mr. Fedorkow knew to be inappropriate—

REDACTED

Antitrust laws and ATM Forum policies aside, it is clear that Cisco's actions were wrongfully and

knowingly designed to undermine Bellcore's SRTS licensing rates. The actions were unwarranted because

Bellcore was always in full compliance with ATM Forum policies—it promised to license SRTS on RAND

terms and it kept that promise. Cisco's treatment of Telcordia at the ATM Forum,

REDACTED

demonstrate Cisco's ill-will and highly culpable state of mind.

**F.    Cisco's Bad Faith Litigation Tactics and Conduct Weigh in Favor of Enhancement**

*Read* factor 3 indicates that the Court should consider bad faith litigation tactics and conduct when

weighing enhancement under 35 U.S.C. § 284. Cisco's litigation misconduct is discussed in detail in

Telcordia's opening (D.I. 372) and reply briefs in support of its motion for attorney fees. Telcordia

incorporates those arguments by reference. This misconduct thus is another factor militating in favor of

enhanced damages.

19

G.    Cisco's Supposed "Remedial Measures" Are Inadequate

Cisco pays lip service to *Read* factor 6.[10]  As to its products that incorporate Telcordia's UPSR technology, rather than remove the infringing functionality, Cisco is apparently in the process of removing reference to "UPSR" from its website—the products still infringe.  That is hardly a remedial measure.

As to its infringing SRTS products, Cisco claims that it will phase out the infringing feature by the end of the year, but that it has every intention of continuing to service its customer's infringing products.  That continued service is nothing more than continued post-verdict willful infringement.  *See, e.g., Stryker Corp. v. Davol, Inc.*, 234 F.3d 1252 (Fed. Cir. 2000).  Despite its creative effort to grant itself a license by virtue of the judgment, Cisco is not in fact licensed to service the products by virtue of the judgment—Cisco has not satisfied the judgment or paid anything to Telcordia whatsoever for the right to use SRTS technology.

H.    Cisco's Size and Financial Condition Strongly Weigh in Favor of Enhancement

Cisco generated billions of dollars in revenues through selling products that incorporate Telcordia's patented SRTS and UPSR technologies.  Amazingly, Cisco alleges that Telcordia's references to the billions of dollars in sales of products which illegally incorporated Telcordia's patented technology is a "cynical attempt to leverage Cisco's success as a leader in innovation for Telcordia's own financial gain." D.I. 391 at 31.  As to the products in suit, Cisco is not a "leader in innovation"—it is an adjudicated willful infringer.  Cisco knowingly stole SRTS and UPSR—while its competitors rightfully paid the modest license fee.  The fact that Cisco, in a post-trial brief, would brag about its "success as a leader in innovation" as to the very products for which a jury found it to be willfully infringing is a perfect example how Cisco leverages its size and strength in the industry, and how Cisco treats Telcordia's patent rights—with brash, willful, and unapologetic disregard.

III.   Conclusion

Against the jury's finding that Cisco willfully infringed Telcordia's patents, and in considering all of the facts and circumstances, Telcordia respectfully requests that the Court exercise its discretion to treble the jury's damages award pursuant to 35 U.S.C. § 284.

---

[10] Although Cisco accuses Telcordia of a "gross misapprehension" about Cisco's supposed "remedial measures," Cisco first conveyed its "remedial measures" through its answering brief.  D.I. 391 at 33.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff/Counterclaim Defendant
Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20005
(202) 408-4000

Dated: August 13, 2007

183148.1

21

# EXHIBIT A

**REDACTED**

# EXHIBIT B

# REDACTED

# EXHIBIT C

**REDACTED**

# EXHIBIT D

# REDACTED

# EXHIBIT E



*Data Sheet*

PMC-Sierra, Inc.

*PM73121 AAL1gator II*

*PMC-980620*    Issue 3    *AAL1 SAR Processor*

# PM73121

# AAL1gator II

# AAL1 Segmentation And Reassembly Processor

# DATA SHEET

**Issue 3: January 1999**



EXHIBIT
Holden
10



PTX 1366

PROPRIETARY AND CONFIDENTIAL TO PMC-SIERRA, INC. AND FOR ITS CUSTOMERS' INTERNAL USE

01366-0001

**Data Sheet**

 PMC-Sierra, Inc.

**PM73121 AAL1gator II**

**PMC-980620**          **Issue 3**          *AAL1 SAR Processor*

AAL1gator II is a trademark of PMC-Sierra, Inc.

AT&T is a registered trademark of AT&T

ECLIPTEK is a registered trademark of ECLIPTEK Corporation

Level One is a registered trademark of Level One Communications, Inc.

SyncFIFO is a trademark of Integrated Device Technology, Inc.

MITEL is a registered trademark of MITEL Corporation

All other brand or product names are trademarks or registered trademarks
of their respective companies or organizations.

NOTE:    The AAL1gator II device contains SRTS logic that Bellcore holds the patent on.
Please refer to the NOTE on page 172 for more information regarding Bellcore's SRTS patent.

01366-0002

 *PMC-Sierra, Inc.*

*Preliminary*

**PM73121**
**AAL1gator II**

## Eight Link Circuit Emulation Service on a Chip

## FEATURES

- Performs AAL1 Segmentation And Reassembly (SAR) function on either eight T1/E1 links or a single DS3/E3 link.
- Supports 256 Virtual Channels (VCs).
- Adheres to the ATM Forum's Circuit Emulation Service (CES) 2.0 (af-vtoa-0078.000) specification and ITU-T Recommendation I363.1 for AAL1.
- Supports both structured and unstructured data formats selectable on a per-link basis.
- Supports both T1 and E1 lines selectable on a per-link basis.
- Supports n x 64 structured data format with Common Channel Signaling (CCS) and Channel Associated Signaling (CAS) configuration options.
- Supports arbitrary timeslot-to-VC mappings, including alternating timeslots.
- Provides per-VC data and signalling conditioning in both the transmit and the receive directions.
- Arbitrates a 16-bit microprocessor interface to two 128K x 8 (12 ns) SRAMs.
- Supports multicast connections, ATM Monitoring (AMON), Remote Monitoring (RMON), and ATM Circuit Steering (ACS).

- Supports a glueless interface to the PM4344 TQUAD, PM6344 EQUAD, and PM4351 COMET T1/E1 interface devices.
- Supports counters as required by ATM Forum CES 2.0 MIB.
- Pin-compatible with the WAC-021-X.
- Built-in T1/E1 transmit line clock generation based on received Synchronous Residual Time-Stamp (SRTS) values, the received line clock, or a nominal frequency.

### TRANSMIT CELL INTERFACE FEATURES

- Provides an ATM-layer or PHY-layer 33 MHz UTOPIA Level 2 interface. Both Single PHY (SPHY) and Multi-PHY (MPHY) modes are supported.
- Provides per-VC transmit queueing with individual partially filled cell length settings.
- Supports a calendar queue service algorithm that produces minimal Cell Delay Variation (CDV).
- Generates and transmits SRTS values for unstructured modes.
- Provides a supervisory transmit buffer for Operations, Administration, and Maintenance (OAM) cells, and for ATM signalling.

### RECEIVE CELL INTERFACE

- Provides an ATM-layer or PHY-layer 33 MHz UTOPIA Level 2 interface. Both SPHY and MPHY modes are supported.
- Provides per-VC queues with individual CDV tolerance settings and partially filled cell length settings.
- Provides per-VC partially filled cell length settings.
- Provides a multiplexed interface to external receive Phase-Locked Loops (PLLs) for SRTS clock recovery for unstructured modes or adaptive clock recovery.
- Provides a supervisory receive queue and processor interrupts for OAM cell receptions.
- Provides sequence number processing in accordance with the "Fast SN Algorithm" as specified in the ITU-T Recommendation I.363.1.

### APPLICATIONS

- ATM Multiservice Switches
- ATM Access Concentrators or Multiplexers
- Digital Access Cross-Connects
- Multiservice Access Devices

## BLOCK DIAGRAM

RL_CLK[7:0]
RL_SIG[7:0]
RL_SER[7:0]
RL_MSYNC[7:0]
RL_FSYNC[7:0]

N_CLK
TL_CLK[7:0]
TL_SIG[7:0]
TL_SER[7:0]
TL_MSYNC[7:0]
TL_FSYNC[7:0]
TLCLK_OUTPUT_EN

SYB_CLK
/RESET
/I_TEST
/OE

/SCAN_TRST
/SCAN_TMS
/SCAN_TDI
/SCAN_TDO
/SCAN_TCLK

**Transmit Frame Transfer Controller (TFTC)**

**Cell Service Decision (CSD)**

**JTAG**

**Transmit Adaptation Layer Processor (TALP)**

**Transmit UTOPIA Interface Block (TUTOPIA)**

TATM_CLK
TATM_SOC
TATM_DATA[7:0]
/TATM_EN
/TATM_FULL

PHY_ENABLE

**Memory Interface and Arbitration Controller (MIAC)**

**Receive Frame Transfer Controller (RFTC)**

**Receive Adaptation Layer Processor (RALP)**

**Receive UTOPIA Interface Block (RUTOPIA)**

RATM_CLK
RATM_SOC
RATM_DATA[7:0]
/RATM_EN
/RATM_EMPTY

SRTS_DOUT[3:0]
SRTS_LINE[3:0]
SRTS_STRB
ADAP_STRB
ADDR17
HOLDOFF
/PROC_ADS
/PROC_WR
/PROC_CS
/PROC_ACK
PROC_INT
SP_DATA_CLK
SP_DATA_DIR
/SP_ADD_EN
/SP_DATA_EN
MEM_ADDR[16:0]
MEM_DATA[15:0]
/MEM_WE[1:0]
/MEM_OE
/MEM_CS

Configured in ATM Mode

Note: The AAL1gator II device contains SRTS logic for which Bellcore holds the patent.

© 1998 PMC-Sierra, Inc. September, 1998

01366-0008

# EXHIBIT F

# REDACTED

# EXHIBIT G

# REDACTED

# EXHIBIT H

# REDACTED

# EXHIBIT I

# REDACTED