IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,          )
                                       )
          Plaintiff/Counterclaim Defendant,   )
                                       )
          v.                           )     Civil Action No. 04-876-GMS
                                       )
CISCO SYSTEMS, INC.,                   )     **REDACTED**
                                       )     **PUBLIC VERSION**
          Defendant/Counterclaim Plaintiff.   )
                                       )

**TELCORDIA TECHNOLOGIES, INC.'S REPLY BRIEF IN SUPPORT
OF ITS FED. R. CIV. P. 54(B) MOTION FOR ATTORNEY FEES
AND EXPENSES PURSUANT TO 35 U.S.C. § 285 AND/OR
THE COURT'S INHERENT EQUITABLE AUTHORITY**

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20005
(202) 408-4000

Dated: August 13, 2007

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff/Counterclaim Defendant
Telcordia Technologies, Inc.*

## TABLE OF CONTENTS

I.     Introduction .................................................................................................1

II.    Argument ....................................................................................................3

       A.    Telcordia's Discovery in the ITC Case Was Expressly Approved by the
             ALJ and Revealed Key Facts Regarding Cisco's Infringement .....................3

       B.    Cisco Withheld Fundamental, Highly Relevant Documents During
             Discovery in this Case ......................................................................5

       C.    Cisco's Demand for OSMINE Documentation Was Unnecessarily
             Burdensome ................................................................................10

       D.    Cisco's Shotgun Defense Strategy Was Inappropriate ..........................12

       E.    Cisco's "Strawman" Arguments Are Irrelevant and Have No Purpose in
             this Proceeding.............................................................................13

       F.    Telcordia's Evidence of Willful Infringement is Decisively Strong and
             Warrants a Fee Award ....................................................................14

       G.    Telcordia's Deposition Designations Do Not Amount to Misconduct on
             Telcordia's Behalf.........................................................................16

       H.    Cisco's Scattershot Aspersions Do Not Establish Misconduct on
             Telcordia's Behalf.........................................................................17

III.   Conclusion .................................................................................................20

i

## TABLE OF AUTHORITIES

*Condit v. Dunne,*
  225 F.R.D. 100 (S.D.N.Y. 2004) .................................................................16

*Conoco, Inc. v. Energy & Environmental Int'l, L.C.,*
  460 F.3d 1349 (Fed. Cir. 2006) .................................................................17

*Fort James Corp. v. Solo Cup Co.,*
  412 F.3d 1340 (Fed. Cir. 2005) .................................................................16

*Fuji Photo Film Co. v. Benun,*
  463 F.3d 1252 (Fed. Cir. 2006) .................................................................20

*Intel Corp. v. U.S.I.T.C.,*
  946 F.2d 821 (Fed. Cir. 1991) ....................................................................4

*Israel Bio-Engineering Project v. Amgen, Inc.,*
  475 F.3d 1256 (Fed. Cir. 2007) .................................................................17

*Kimberly-Clark Corp. v. James River Corp. of Virginia,*
  131 F.R.D. 607 (N.D. Ga. 1989) ...............................................................15

*Smith v. Alyeska Pipeline Service Co.,*
  538 F. Supp. 977 (D. Del. 1982) ...............................................................15

*Todd v. South Jersey Hosp. System,*
  152 F.R.D. 676 (D.N.J. 1993) ...................................................................16

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.,*
  21 F.Supp.2d 366 (S.D.N.Y. 1998) ...........................................................15

## FEDERAL STATUTES AND RULES

35 U.S.C. § 271 .........................................................................................20

35 U.S.C. § 284 .........................................................................................20

35 U.S.C. § 285 .....................................................................................2, 20

Fed. R. Civ. P. 26(b)(5) ............................................................................16

Fed. R. Civ. P. 65(d) ................................................................................20

ii

## I.    Introduction

In an effort to hide the egregiousness of its behavior in this litigation, Cisco's brief in response to Telcordia's motion for attorney fees raises irrelevant arguments, distorts the trial record, and unquestionably misrepresents the law.  In fact, Cisco's tactics in responding to Telcordia's motion for attorney fees (as well as its tactics in responding to Telcordia's other post-trial motions) exemplify exactly why Telcordia should be entitled to attorney fees in this case—from day one Telcordia has been forced to wrestle with Cisco's aggressive strategies and unduly liberal interpretations of facts and law. Cisco's misrepresentations in its answering brief are its worst yet—Cisco turns the tables, charges Telcordia with wrongdoing, and tries to support its unwarranted charges with sheer misstatements to this Court about the Administrative Law Judge's ("ALJ's") rulings in the contemporaneous parallel ITC action.

Most notably, Cisco accuses Telcordia of wrongdoing for pursuing discovery during the parallel ITC action into what Cisco calls its "discontinued products," forging a position that "discontinued products are irrelevant to ITC relief."  Cisco's opportunistic mischaracterization on this point is unparalleled—the ALJ in the ITC case expressly ordered Cisco to provide discovery on its "discontinued products," explaining in a written opinion with reference to Supreme Court and Federal Circuit precedent exactly why "discontinued products" are indeed relevant to ITC relief.  Moreover, Cisco more generally fails to inform the Court that Telcordia's discovery efforts in the ITC case were expressly approved by the ALJ—again in written orders that explain exactly why Telcordia was entitled to additional discovery in that parallel action.  For Cisco to now turn around in this Court and level serious charges of wrongdoing against Telcordia based upon judicially endorsed discovery in the ITC is entirely improper.

As to the proper subject of this motion—Cisco's (not Telcordia's) litigation misconduct as an adjudicated willful infringer—in its answering brief Cisco just as troublingly simply brushes off the fact that it withheld the most relevant and critical documents about its accused products—the technical schematics illustrating the structure and operation of its products and emails about the accused functionality from its primary design engineer for a product-in-suit—until two months before trial.

1

Indeed, the documents were finally produced in the parallel ITC action, not in this case. Absent Telcordia's vigilant pursuit of additional discovery at the ITC—a pursuit which Cisco now boldly labels as inappropriate conduct on Telcordia's part—Cisco would have gotten away with not producing the fundamental documents that established its infringement and copying in this case.

Cisco casually shrugs off this basest form of litigation misconduct, wrongly excusing itself by (1) claiming that Telcordia was in no way prejudiced by Cisco's withholding of fundamental documents regarding the structure and operation of its products and, alternatively, (2) blaming Telcordia for failing to raise the issue with this Court during discovery in this case. Cisco's excuses are mind-boggling. Telcordia was greatly prejudiced by Cisco's withholding of documents. Until Telcordia wrested the fundamental product schematics from Cisco in the ITC case, Cisco's primary non-infringement defense before this Court was that Telcordia could not establish the very facts that were contained in the withheld documents. Cisco's late and forced production of the key documents prompted a new expert report on the matter and a re-tooling of Telcordia's case just weeks before trial and long after the close of discovery.

Moreover, Telcordia could not raise these matters before this Court because, during discovery in this case, Cisco represented that it believed it had produced all relevant, responsive documents. Only when Telcordia learned that Cisco's representations were suspect—during discovery in the ITC case and, again, long after discovery had closed in this case—could Telcordia seek any discovery relief. Telcordia did seek extensive discovery relief—it filed a total of six motions to compel before the ITC. Telcordia should not be chastised for its logical choice to pursue discovery relief before the ITC, where discovery was open, instead of before this Court, where discovery had long been closed.

At bottom, Cisco's casual approach to its discovery obligations in this case, its creative post hoc excuses, and its refusal, even now, to exhibit any sign of contrition for its serious violations of the Federal Rules, all weigh in favor of granting reasonable attorney fees and expenses pursuant to 35 U.S.C. § 285 and the Court's inherent equitable authority.

2

II.    **Argument**

A.    **Telcordia's Discovery in the ITC Case Was Expressly Approved by the ALJ and Revealed Key Facts Regarding Cisco's Infringement**

In trying to turn the tables on Telcordia, Cisco suggests that Telcordia's institution of a parallel ITC action—what Cisco calls a "profligate action . . . for which Telcordia has no prospect of significant relief" (D.I. 393 at 20)—establishes some sort of misconduct on Telcordia's behalf. Notably, Cisco furiously protests about the additional discovery that it was required to produce before the ITC, again suggesting some sort of wrongdoing on Telcordia's behalf. *Id.*

Cisco fails to mention that it moved for a protective order before the ITC seeking to preclude Telcordia from issuing any further discovery—arguing that Telcordia already had all of the discovery it needed (in part by virtue of the discovery taken in this case)—and was denied. Ex. A. Cisco also fails to mention that the ALJ was further aware of Telcordia's discovery efforts because, after Telcordia suspected that Cisco had not in fact produced all relevant material during discovery in this case, Telcordia filed six motions to compel before the ITC, four of which were granted or granted-in-part, one of which was denied as moot (because Cisco produced the requested information before the ALJ had ruled on the motion), and only one of which was fully denied. Exs. A-C. In other words, the ALJ was aware of and was actively managing the nature and scope of discovery in the ITC case. In fact, much of the discovery was expressly endorsed (indeed ordered) by the ALJ. Cisco's suggestion before this Court that Telcordia's pursuit of discovery in the ITC—discovery that had been endorsed and ordered by the judge presiding over the case—somehow amounts to malfeasance on Telcordia's part is entirely inappropriate.

Even more inappropriate, however, is Cisco's express misrepresentation to this Court leveled in an effort to bolster its argument that Telcordia wrongly engaged in pursuit of discovery before the ITC. Specifically, Cisco chides Telcordia for pursuing ITC discovery into what Cisco calls "discontinued products," claiming that "discontinued products are irrelevant to ITC relief." D.I. 393 at 21. Cisco makes this bold and entirely inaccurate accusation in the face of an Order from the ALJ commanding Cisco to produce discovery as to its supposed "discontinued products" and detailing exactly why "discontinued products" are indeed relevant to ITC relief:

3

| Cisco's Representations Before this Court | ALJ Order Granting Telcordia Motion to Compel (Ex. C) |
|---|---|
| "This is an action that Telcordia maintains to this day . . . and for which Telcordia has no prospect of significant relief." D.I. 393 at 20.<br><br>"Even more troubling, much of Telcordia's ITC discovery requests were directed to a product that Cisco never even sold (i.e., the CS 12 card), products that simply do not perform the accused SRTS functionality (e.g., the BSC cards, NSC cards, MPSM-16-T1E1, and 7500 series routers), and discontinued products that are irrelevant to ITC relief (e.g., PA-A2 modules, NM-1A modules, WAI modules, and the Lightstream 1010). D.I. 393 at 21.<br><br>"The ITC can only provide an exclusion order preventing Cisco from importing infringing products or a cease and desist order prohibiting Cisco from infringing acts connected to infringing imports for which Cisco maintains a commercially significant domestic inventory. The ITC cannot award money damages. Thus, discontinued products are irrelevant to ITC relief." Id. | "The fact that the Motion Respondents allege to have discontinued the manufacture and importation of some of the accused products at issue in this investigation does not preclude a finding that there is a violation of Section 337. See Intel Corp. v. U.S.I.T.C., 946 F.2d 821, 830 fn. 14 (Fed. Cir. 1991)("[respondent] suggests that the issue of whether its 'old' design . . . infringed the '084 patent was mooted by its unilateral decision to stop manufacturing the 'old' design EPROMs. We disagree. The Supreme Court has stated that '[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'"). In addition, the discontinued products are relevant to the issue of remedy. For example, past violations can support an exclusion order preventing the importation of spare parts related to the discontinued products." Ex. C. |

While Cisco ignores this basic principle of law, quite logically Cisco's "discontinued" products can still have infringed Telcordia's patents and can still threaten to infringe Telcordia's patents in the future if re-introduced. Despite Cisco's misrepresentation of the law, "discontinued" products can be relevant to, among other things, the scope of an exclusion order and the importation of spare parts related to the discontinued products. See, e.g., Intel Corp. v. U.S.I.T.C., 946 F.2d 821, 830 fn. 14 (Fed. Cir. 1991).

Cisco truly knows no boundaries in its litigation tactics—it is willing to advance internally inconsistent arguments from one breath to the next, and it is willing to cavalierly misrepresent facts and law to support its positions. Telcordia's judicially endorsed discovery pursuits in a parallel litigation should not distract from Cisco's litigation misconduct in this case in any way—indeed, Cisco's behavior in responding to Telcordia's motion for attorney fees further demonstrates why Telcordia should be awarded attorney fees in this case.

4

**B.**    **Cisco Withheld Fundamental, Highly Relevant Documents During Discovery in this Case**

Although Cisco's answering brief is peppered with excuses and distractions, the fact is that in

discovery in this case, Cisco simply did not produce the two most critical and highly relevant types of

documents:

- Board schematics for the products-in-suit. These schematics demonstrate the structure and operation of the products-in-suit, including, *inter alia*, the components in the products, the manner in which the components are connected, the identification and cross references for electrical signals used in the products, circuit diagrams of the products, block diagrams of the products, illustrations of all interfaces in the products, and clock generation logic. *See, e.g.*, PTX-1517. As far as documentation of the structure and operation of the accused products is concerned, board schematics stand as the most relevant documents in the case. Cisco knew all along of the incredibly pertinent relevance of its board schematics in this case—indeed, Cisco has long advocated that this case is all about its "cards" (*i.e.*, "boards") as opposed to its "boxes," "networks," "chips," or other configurations of its products. Specifically, during the pretrial phase of the case Cisco advocated that "[t]he accused SRTS functionality resides on optional cards, which are invoiced, and sold separately from the boxes." D.I. 292 at Ex. 1.

- Emails from its design engineers discussing the specific SRTS technology accused of infringement in this case as it applies to the specific products accused of infringement in this case. Among these withheld emails are the incriminating exchanges between Cisco and its chip supplier, PMC-Sierra, demonstrating that Cisco directly copied Telcordia's patented SRTS technology. *See, e.g.*, PTX-1753.

To summarize, the documents that Cisco withheld are not marginal documents from marginal players—

they are the fundamental documents about the products and technologies in suit that were used and

authored by the Cisco engineers responsible for the products-in-suit.

The withheld board schematics, which were produced in the ITC case in February of 2007, a full

nine months after discovery closed in this case, proved to be central to Telcordia's infringement case.

Before Cisco begrudgingly produced its board schematics, Telcordia's expert had only circumstantial

evidence, not direct proof, of the network clock frequency that was used in Cisco's products. Indeed,

Cisco's expert seized upon Telcordia's circumstantial evidence of Cisco's network clock frequency:

**REDACTED**

5

**REDACTED**

Ex. D. As such, before it produced its board schematics, Cisco's primary non-infringement defense for the '633 patent centered on the argument that Telcordia could not prove the network clock frequency in Cisco's products. But Cisco's February 2007 production of board schematics in the ITC case demonstrated that Cisco had documentation of its clock frequencies all along. On April 13, 2007, only weeks before trial, Telcordia generated another expert report based on Cisco's belated document production, this time definitively identifying the clock frequencies and associated components and signals in Cisco's products with reference to Cisco's belatedly produced board schematics:

**REDACTED**

Ex. E. Dr. Clark's analysis of the Cisco board schematics (the same schematics introduced at trial), therefore, removed entirely Cisco's primary defense—that Telcordia's infringement theory suffered from a failure of proof.

Cisco attempts to discount the significance of its belated production of board schematics by defensively proclaiming that "at trial Telcordia merely plopped a one-inch stack of schematics in front of its expert and asked him to identify the documents," and that "Telcordia's use of schematics at trial consumes a mere 13 lines of the trial transcript." D.I. 393 at 14. But the number of lines of trial transcript consumed by testimony about a document is not an appropriate measure of the significance of

6

the evidence contained in a document. The fact that Dr. Clark could rely upon the schematics when rendering his opinion—which included the identification of the clock frequencies in Cisco's products (*see, e.g.*, Trial Tr. 846, 848)—completely removed what was going to be Cisco's primary non-infringement defense. That this was done efficiently at trial should not serve to Telcordia's detriment now.

Cisco not only withheld its critical board schematics until February 2007, it also withheld a trove of emails sent between and among the primary engineers responsible for the products in suit. Moreover, these were not just general emails. They were emails expressly discussing Cisco's use of SRTS technology—the very technology at issue in this case—as it applied to the specific Cisco products accused of infringement in this case. As an example, an email between Vipul Jain (a Cisco engineer personally involved in designing the accused products, including implementing SRTS in those products), Ramesh Sastry (another Cisco engineer personally involved in designing the accused products and implementing SRTS in those products), and Rod Fergueson (a PMC-Sierra engineer helping Cisco to implement SRTS in its products) explains:

> **Here is how we have implemented the SRTS RCV side logic:**
>
> 1. **The implementation is as per the block diagram in PMC PM73121 AAL1gatorII data sheet, Page 33 Figure 22.** I would like to make sure if this block diagram is a complete one or is there anything else we need to take care of (such as any corner cases while generating the SRTS value).
>
> 2. What we see on the output is a sequence of **SRTS** values. Is this the correct behavior? I would hope that we should get a fixed **SRTS** value generated for a given receive clock frequency.
>
> Appreciate your help in this regard.

PTX-1753. Cisco's withholding of these emails through the entire discovery period in this case, producing them only in the parallel ITC case a mere months before trial, is inexcusable.

Cisco's proffered excuses for its conduct are unbelievable. In the same motion in which Cisco chastises Telcordia for seeking too much discovery, for serving too many document requests and interrogatories, and for pursuing wide-ranging discovery too aggressively, Cisco amazingly also claims

7

that somehow, Telcordia did not properly request and pursue the fundamental core documents at issue in

this litigation—and as such Cisco was justified in withholding the documents. Talking out of both sides

of its mouth, Cisco claims that Telcordia "utter[ly] faile[d] to pursue discovery diligently." D.I. 393 at

12. Cisco's positions are obviously internally inconsistent and desperate. Of course Telcordia sought

board schematics and emails regarding the specific technologies at issue in this case—the critical

withheld documents are directly responsive to many of Telcordia's targeted document requests seeking

technical information about the Cisco products accused of practicing SRTS and infringing the '633

patent. As just one notable example, in its very first set of document requests served in April of 2005,

Telcordia sought:

> All documents and things that refer or relate to the design, manufacture,
> configuration, structure, specifications, use, or operation of any **Product-
> In-Suit, including but not limited to the following:** service manuals,
> operator's or owner's manuals, installation manuals, reference manuals,
> customer network configurations, **schematics, block diagrams, logic
> diagrams, timing diagrams, circuit diagrams, specifications,**
> manufacturing or production drawings, engineering drawings,
> engineering change notices, test procedures, and computer program
> source code listings.

Telcordia document request no. 32. Ex. F. Moreover, Telcordia followed its many relevant discovery

requests with a string of demand letters, culminating in Cisco's representation that it believed it had

produced all relevant information in its possession. Exs. D through F to D.I. 372. Specifically, for

example, on September 27, 2005, Telcordia indicated that it:

> expects that Cisco's production will include, for example, technical
> documents showing (1) Cisco's **internal communications (including
> emails)** concerning its products, (2) Cisco's **communications with
> component suppliers,** (3) Cisco's communications with customers
> concerning its products, and (4) **documents created by Cisco's
> engineers** when designing its products (such as engineering
> specifications, **board layouts, bills of materials, and schematics**).

Ex. E to D.I. 372. The parties had agreed to substantially complete their respective document productions

by October 31, 2005. Ex. I. After producing its documents, Cisco responded to Telcordia's September

27, 2005, letter by indicating that:

> Cisco has worked in good faith to substantially complete its document
> production by October 31, and, as explained in my letter of October 6,

8

2005, we believe that our production as of October 31 [2005] resolved
the issues in your September 27 [2005] letter.

Ex. F to D.I. 372. But Cisco's representation was highly misleading. In fact it had actually withheld the

exact documents—internal emails between its engineers about the products-in-suit, email

communications with its component supplier (PMC-Sierra), and critical board schematics of the products-

in-suit—that were not only called for in Telcordia's document requests, but also that were expressly

called out in Telcordia's correspondence with Cisco. Despite the fact that additional meet and confer

conferences regarding document production ensued after these letters, Cisco did not retreat from its

misleading representation—it simply withheld the documents.[1]

Cisco tries to excuse its withholding of these documents with an array of desperate and defensive

arguments. First, Cisco tries to excuse its withholding of key, relevant documents on the grounds that

Telcordia's discovery requests were supposedly "kitchen sink" requests. D.I. 393 at 12. Then, in an

effort to sidestep Telcordia's letters calling out the exact documents that Cisco withheld, Cisco tries to

excuse its conduct on the grounds that the letters were sent in the early stages of discovery. *Id.* Cisco

also tries to dismiss Telcordia's letters by indicating that the letters "fail to even identify the specific

discovery request under which Cisco was allegedly required to provide board level schematics." *Id.*

Finally, Cisco resorts to its typical distraction strategy, launching into a string of discovery

correspondence between the parties on other issues to somehow reach the impossible conclusion that

Cisco rightly believed that Telcordia really did not want to discover the fundamental technical documents

---

[1] Cisco withheld the documents while persistently (but, as it turns out, misleadingly) insisting throughout
discovery that its production was "substantially complete" (usually in the context of aggressively chiding
Telcordia regarding Telcordia's production). For example, in March of 2006, after Telcordia provided
Cisco with an update regarding the status of a supplemental Telcordia production, Cisco chided:

> There is no justification for Telcordia's belated production of documents.
> **Unlike Cisco, which undertook significant burden and expense to
> substantially complete its production** . . . There is simply no
> justification for Telcordia's failure to abide by the August 26, 2005
> agreement requiring substantial completion of document production by
> October 31, 2005.

Ex. K (emphasis added).

9

in the case (*i.e.*, board layouts or schematics illustrating the structure, operation, and features of the exact products-in-suit and the exact accused infringing functionality). *Id.* at 12-13.

Cisco's excuses are facially meritless. Again, the withheld documents are not marginally relevant, fringe documents. They are the fundamental technical documents in this case and they should have been produced at the outset of discovery. Moreover, the record belies Cisco's excuses—Telcordia expressly identified these key withheld documents in correspondence with Cisco, and Cisco withheld the documents anyway. More importantly, under the Federal Rules, Cisco was absolutely obligated to produce the key documents about its products-in-suit and its engineers' emails about the products and the accused SRTS functionality by virtue of Telcordia's document requests—regardless of Cisco's creative interpretation of the correspondence and back-and-forth about discovery issues. Cisco simply could not have fairly reached the conclusion that Telcordia was not pursuing the key technical documents in this case. Cisco's creative interpretation of the discovery process—chalking up its withholding of key documents to the result of "typical discovery back-and-forth in which experienced litigators engage"—is aggressive to say the least and is at odds with common sense. Apparently, from Cisco's point of view, "experienced litigators engage" in discovery gamesmanship that allows for the withholding of critical technical documents—about the specific products-in-suit and the specific accused technical features (SRTS in this case)—that are directly covered by specific Rule 34 document requests.

Cisco's suggestion that it was justified in withholding this key information about the products-in-suit because Telcordia did not properly pursue discovery should be dismissed out of hand. Rather, the fact is that Cisco violated the Federal Rules in withholding the most relevant documents in the case. Those documents were then uncovered in a parallel litigation, serendipitously just in time for Telcordia to rework its case to incorporate the withheld information. This incident alone, as well as Cisco's amazing excuses and explanations, warrant an award of attorney fees in this case.

**C.    Cisco's Demand for OSMINE Documentation Was Unnecessarily Burdensome**

In its answering brief, Cisco tries to soften its incredibly burdensome discovery requests regarding Telcordia's OSMINE documents in several respects. First, Cisco claims that because Telcordia

10

did not move for a protective order during discovery, it should not raise the issue now. But as Telcordia explained in its opening brief, concerns about its business reputation that go well beyond the limits of this litigation effectively precluded Telcordia from seeking relief from the production of OSMINE materials. D.I. 372 at 10. Specifically, Cisco's demand for OSMINE documents presumed that Telcordia had violated the contractual and statutory provisions that strictly limited Telcordia's use of materials submitted under Telcordia's OSMINE program—a program in which Cisco is but one of many participants. *Id.* at 9. As such, had Telcordia resisted production instead of clearing its name by producing the documents, that resistance in itself would lend credibility to Cisco's rank speculation that Telcordia violates its contractual and statutory OSMINE obligations. As Cisco knew, Telcordia could ill-afford to jeopardize its entire OSMINE business in this manner (*i.e.*, give its OSMINE customers any reason to believe or suspect that Telcordia illegally misuses their highly confidential OSMINE technical documentation in order to identify and develop infringement allegations).

Second, Cisco now pretends that its OSMINE discovery demands were targeted and narrow, when in fact they were not. D.I. 393 at 10. Perhaps recognizing the needless and over-burdensome nature of its demands—which required Telcordia to produce back to Cisco hundreds of thousands of documents that were already in Cisco's possession—Cisco now claims that it was only "interested in determining precisely how Telcordia was using those documents." *Id.* But that most certainly was not Cisco's position during discovery. Instead, Cisco demanded that "Telcordia [] produce all documents and things relating to Telcordia's analyses of Cisco's accused products as part of Telcordia's OSMINE testing and certification process . . ." D.I. 372 at Ex. B.[2] In sum, Cisco's demand that Telcordia produce its OSMINE documents (under the unfounded rank assumption that Telcordia violated statutory and contractual obligations) was an entirely unnecessary demand designed to grossly multiply Telcordia's litigation costs.

---

[2] While Cisco tries to pass the buck and blame Lucent for the overbearing and needless OSMINE demands, this was a separate, independent demand leveled by Cisco (not Lucent). Ex. B to D.I. 372.

D.    **Cisco's Shotgun Defense Strategy Was Inappropriate**

In an attempt to excuse its shotgun approach to this litigation—raising a litany of equitable

defenses but only actually pursuing two of the defenses—Cisco argues that:

> strategic trial decisions are often made at the last minute . . . [a
> defendant] cannot possibly be expected to know with certainty how
> extensively to pursue certain defenses until the midpoint of trial.
> Likewise, lawyers may need to make such decisions 'on-the-fly' in
> response to witness examinations, jury reactions, rulings by the Court, or
> evidentiary issues.

D.I. 393 at 15. While some of this may be true, as Telcordia noted in its opening brief, Cisco dropped

several of its defenses during exchange of the pretrial order—long before trial, but long after Cisco forced

Telcordia to expend extensive resources countering the defenses in discovery and addressing the defenses

in its trial brief, its statement of contested issues, and its jury instructions. D.I. 372 at 11. In other words,

Cisco did not drop these defenses at the "midpoint of trial" or in response to "witness examinations, jury

reactions, rulings by the Court, or evidentiary issues." At the very least, Cisco should have alerted

Telcordia to its intent to abandon its defenses before Telcordia addressed them in its pretrial order.

Cisco also excuses its belated abandonment of its patent misuse claim by suggesting that the

Court's ruling on Cisco's damages motion *in limine* was, in effect, equivalent to a favorable ruling on a

patent misuse defense. But Cisco's damages *in limine* motion had nothing to do with Cisco's misuse

defense. Rather, as to patent misuse Cisco alleged:


**REDACTED**


Ex. G. Telcordia completely rebutted these supposed patent misuse defenses so strongly in its case-in-

chief (through, *inter alia*, the testimony of Dr. Walters and Mr. Giordano) that it is not surprising that

Cisco chose to drop the defense. But Cisco's patent misuse defense—as it had been disclosed to

12

Telcordia in discovery—had nothing to do with damages or the Court's ruling *in limine*, as Cisco now contends.

Finally, Cisco does not even try to excuse its eleventh hour addition of a brand new defense—that Telcordia's SRTS patent should be rendered unenforceable because Telcordia "demands terms from Lucent and Cisco that materially differ from all previous licenses it granted" (D.I. 318 at Ex. I2)—for the first time in its trial brief. D.I. 372 at 15. While some give and take as to which defenses ultimately make it to the jury was to be expected, Cisco deliberately raised and dropped defenses in a strategic, untimely manner only after forcing Telcordia to expend significant time and resources addressing the defenses.

**E.    Cisco's "Strawman" Arguments Are Irrelevant and Have No Purpose in this Proceeding**

Curiously, rather than comprehensively address the instances of Cisco's litigation misconduct upon which Telcordia bases its motion for attorney fees—likely due to the highly egregious nature of those instances—Cisco wastes its efforts on a distracting "strawman" strategy. Specifically, on its own accord Cisco raises a litany of additional instances of its own "litigation misconduct" and then argues that this conduct does not support an award of attorney fees. But the conduct that Cisco raises is not conduct that Telcordia ever raised or relied upon in support of its motion for fees. Rather, Cisco raises these strawmen just to academically knock them down—another irrelevant diversion in a string of arguments designed to shift the focus away from Cisco's true egregious litigation misconduct. For example:

- Cisco claims that its withholding of reports demonstrating foreign sales on a sale-by-sale basis forms the basis of an accusation of "litigation misconduct" but is not strong enough to warrant attorney fees against Cisco. D.I. 393 at 8-9. While Telcordia explained its position on this matter in its answer to Cisco's frivolous Rule 59(a) motion (D.I. 388 at 20-22) to short circuit the argument—Telcordia does not rely upon, and never has relied upon, Cisco's withholding of foreign sales information as a basis for its attorney fees motion. *See* D.I. 372.

- Cisco claims that its inability to present live witnesses to sponsor its case forms the basis of an accusation of "litigation misconduct" but does not warrant attorney fees. D.I. 393 at 9. The fact that Cisco did not present live witnesses to the jury to sponsor its aggressive and far reaching defense theories is not litigation misconduct; rather it is simply an indication of the weakness of Cisco's case and the lack of genuine evidentiary support. Telcordia never suggested that Cisco's failure to muster witnesses to sponsor its case was "litigation misconduct," and Telcordia does

13

not advance that position now as a basis for its attorney fees motion.[3]

- Cisco claims that its general counsel's outbursts during his deposition form the basis of an accusation of "litigation misconduct." D.I. 393 at 9; D.I. 374 at 9-11. Telcordia never contended, and does not now contend, that Mr. Barr's testimony is "litigation misconduct." Mr. Barr's crass testimony demonstrates a number of points on the merits, but it is not "litigation misconduct" (rather, it is simply sworn testimony that supports Telcordia's case).

Given that Telcordia is not relying upon—and did not rely upon in its opening brief—any of Cisco's "strawman" arguments, Telcordia submits that Cisco's positions and arguments should be disregarded in favor of addressing the egregious Cisco misconduct that Telcordia actually does rely upon to support its fee petition.

     **F.**     **Telcordia's Evidence of Willful Infringement is Decisively Strong and Warrants a Fee Award**

As Telcordia demonstrates in its answer to Cisco's frivolous Rule 59(a) motion (D.I. 388) and in its opening and reply briefs in support of enhanced damages (D.I. 370), substantial evidence establishes Cisco's extensive and unapologetic willful infringement in this case. Such evidence includes:

- Cisco's admitted acute awareness—in its engineering, business, and legal quarters—of Telcordia's SRTS and UPSR patents;

- Cisco's decade-long refusal to license Telcordia's patents—sometimes expressed in a crass and arrogant manner;

- Cisco's deliberate and knowing design of its products to incorporate—unlicensed—Telcordia's SRTS and UPSR technologies; and

- Cisco's ability to compete in the market and dominate sales year after year with an unfair advantage over Telcordia's lawful licensees (i.e., the fruits of Cisco's willful

---

[3] Just as in its other post-trial briefs, Cisco alleges that Telcordia improperly noted the absence of Cisco's former general counsel, Robert Barr, while knowing that Mr. Barr could not attend trial because of a heart condition. D.I. 393 at 21. As Telcordia noted in it answer to Cisco's Rule 59(a) motion, that is not correct. D.I. 388 at 23-25. Moreover, Cisco seems to over-dramatize Mr. Barr's condition. The only fact that Telcordia ever knew about Mr. Barr's health was that at some time prior to two months before trial, Mr. Barr had an angioplasty procedure. *Id.* at 25. Moreover, a review of recent publicly available materials reveals that Mr. Barr has made numerous appearances to speak and moderate at professional conferences around the country this winter and spring. Ex. H. Given the timing of the procedure and the timing of Mr. Barr's other professional appearances, it seems that Cisco is trying to overplay the sympathy card in this case. Regardless, the point remains that nobody, not Mr. Barr, nor Mr. Scheineman, nor Mr. Morgridge, nor Mr. Chambers, nor Mr. Showalter, nor anyone else appeared to sponsor Cisco's aggressive and incorrect defenses.

infringement).

In sum, the jury's finding of willfulness is supported by substantial evidence of record, and the law is clear that a finding of willfulness, standing alone, is sufficient to support a fee award. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 21 F. Supp.2d 366, 378 (S.D.N.Y. 1998), *aff'd*, 231 F.3d 1339 (Fed. Cir. 2000).

Despite these facts, throughout its post-trial briefing Cisco consistently confuses the jury's decision to award a modest amount of damages with the jury's decisions on willfulness and liability. But liability issues, including willfulness, have nothing to do with damages—they are entirely separate issues (indeed, so much so that in some cases the issues have even been bifurcated). *See, e.g., Kimberly-Clark Corp. v. James River Corp. of Virginia*, 131 F.R.D. 607, 609 (N.D. Ga. 1989) *citing Smith v. Alyeska Pipeline Service Co.*, 538 F. Supp. 977, 986 (D. Del. 1982). In this case, the jury was properly instructed to decide each issue separately and properly carried out those instructions. Trial Tr. 2100-161; D.I. 348. As such, the jury's calculation of damages cannot, as Cisco purports, be indicative of the strength or weakness of the evidence on willfulness or any other issue.

Similarly, Cisco argues that its claim construction victory on the '306 patent somehow weakens Telcordia's evidence on the unrelated '633 and '763 patents. D.I. 393 at 6. The issue of '306 patent claim construction, however, is also disassociated with the issues of willful infringement of the unrelated '633 and '763 patents. Moreover, Telcordia's fee request excludes all fees and costs associated with Telcordia's work related to the '306 patent. D.I. 372 at 5.

Cisco also suggests that its debunked defenses, including its improper inventorship defense, its "standards misconduct" theory, and its inequitable conduct theories, all serve to weaken the evidence of Cisco's willful infringement. Telcordia addresses the questionable merits of each of these arguments in other post-trial briefs (e.g., D.I. 388, 389). Needless to say, Cisco's suspect and rejected defenses do not indicate "weakness" in the jury's verdict of willfulness against Cisco.

Finally, Cisco states that it "sought and received the advice of competent legal counsel" in support of its claim that Telcordia's evidence of willfulness is supposedly "weak." D.I. 393 at 6. As

15

Telcordia noted in its reply brief in support of enhanced damages (filed concurrently with this brief), Cisco's reliance on the existence of "advice of counsel" during the post-trial phase of the case is shocking considering its extensive efforts to hide the mere existence of that advice during discovery (in contravention of the requirements of Fed. R. Civ. P. 26(b)(5)). Cisco's attempt to now raise an "advice of counsel" defense is highly inappropriate. *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1351 (Fed. Cir. 2005) ("It would be unfair to permit Fort James to rely on favorable legal opinions, but protect the communications on which those opinions depend."); *Condit v. Dunne*, 225 F.R.D. 100, 108 (S.D.N.Y. 2004); *Todd v. South Jersey Hosp. Sys.*, 152 F.R.D. 676, 688 (D.N.J. 1993)("defendants cannot both stand upon and assert a privilege, and then rely upon any such privileged information in a defense, while expecting that the privilege can continue to shield the information from the plaintiffs").

Moreover, also as set forth in Telcordia's reply brief in support of enhanced damages, the non-privileged Cisco emails that were produced in this case

REDACTED

As such, although it was not "evidence" and was not before the jury, Cisco's "advice of counsel," if anything, strengthens the evidence in support of willfulness.

G.    **Telcordia's Deposition Designations Do Not Amount to Misconduct on Telcordia's Behalf**

In a further effort to distract attention from its own egregious misconduct during this case, Cisco dedicates an entire section of its brief to complain about the volume of Telcordia's deposition designations. D.I. 393 at 26-28. But Cisco engaged in the exact same conduct against which it so vigorously now protests. Specifically, in the final pretrial order Cisco designated voluminous deposition testimony from 44 transcripts of 26 different witnesses. D.I. 318 at Ex. F2. Nine of these transcripts were from depositions that were not even taken in this case. *Id.* Although Cisco actually introduced deposition testimony from only 9 witnesses in its case-in-chief, Telcordia was forced to evaluate all 44 of Cisco's designated transcripts and prepare the attendant counter-designations and objections.

16

Both parties understood the consequences of a failure to identify evidence in the pretrial order—"[i]tems not listed will not be admitted unless good cause is shown." Model Pretrial Order.[4] As such, both parties designated all testimony that would potentially be used under the various theories of the case. The procedure is designed to preserve rights, and does not come anywhere near misconduct.

**H.    Cisco's Scattershot Aspersions Do Not Establish Misconduct on Telcordia's Behalf**

Cisco casts a number of scattershot aspersions in its answering brief in a transparent effort to simply make Telcordia look bad. Cisco's arguments are incorrect and inappropriate. For example, Cisco aggressively faults Telcordia for addressing issues related to '306 patent infringement expert reports in its summary judgment answering brief. D.I. 393 at 22-23. Telcordia did not, as Cisco suggests, raise the issues to "reopen expert discovery" or to "prejudice Cisco" as to the '306 patent infringement expert report issue. *Id.* Rather, as Telcordia noted in its summary judgment answering brief:

> Telcordia remains mindful of the Court's unwillingness to consider further submissions on the issue of whether Telcordia should be permitted to serve '306 patent infringement expert reports. D.I.s 232, 291 at n.2. Telcordia must set forth its positions in this answering brief, however, in order to preserve its rights on appeal and avoid waiver. . . .

D.I. 252 at 10. Telcordia fears that its motive—to preserve its rights on appeal—may have gotten lost in the rhetoric in this case. The Federal Circuit can apply particularly stringent standards when considering whether a party has waived an argument by failing to diligently preserve the argument during proceedings before the district court. *See, e.g., Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1268 n. 9 (Fed. Cir. 2007)("as this argument was not raised below, it is waived."); *Conoco, Inc. v. Energy & Environmental Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006)("legal issues in patent infringement suits are not immune to the doctrine of waiver on appeal, and except for certain circumstances, those issues not raised below at the district court cannot be heard for the first time on appeal"). The fact that Telcordia's hand was forced in this regard, and that Telcordia had to raise its positions as to the '306 patent

---

[4] Indeed, during trial Cisco successfully precluded Telcordia from introducing evidence, in part for the reason that Telcordia had not identified the disputed evidence in the pretrial order. Trial Tr. 462.

17

infringement expert reports at the risk of waiving all positions on appeal, should not be leveraged against Telcordia during post-trial proceedings in this case.

In another scattershot aspersion, Cisco faults Telcordia for producing multiple copies of the same email, hinting that this somehow proves wrongdoing on Telcordia's behalf. D.I. 393 at 19-20. The fact that more than one copy of the same document was produced is most likely an indication of the presence of more than one copy of the document in the files of the respective custodians. This often happens, for example, with email communications, which may be sent to a whole group and hence exist in the mailboxes of multiple persons. Telcordia's production of all copies of its documents reflects nothing more than Telcordia's diligent efforts to search for and produce all relevant, responsive discovery. This effort stands in stark contrast to Cisco's complete failure to produce the most critical emails and documents in this case. *See* Section II.B.

In another misguided aspersion, Cisco presents a list of Finnegan, Henderson attorneys and identifies their respective status as partner or associate in support of its collateral argument that Telcordia "had no regard for either its own costs or those of its opponent." D.I. 393 at 19. But the number of attorneys working on a case is not an appropriate measure of costs. Rather, as Cisco knows, costs are measured using the lodestar method which accounts for the number of hours (not the number of attorneys) dedicated to a case. The fact that Telcordia chose to involve a large number of attorneys, each working far less than full time on the case, whereas Cisco chose to involve a smaller number of attorneys (each presumably working closer to full time on the case) is a management decision that has nothing to do with the merits of this motion.[5] Indeed, as noted in its opening brief, Telcordia's fee request was calculated using the lodestar method (again, properly focused on hours worked, and not the number of attorneys) and falls well within the objective measure of typical costs of a patent infringement litigation of this

---

[5] Moreover, while Cisco pats itself on the back for using fewer attorneys than Telcordia, Cisco fails to mention that it coordinated its defense in this case as part of a joint defense agreement with Lucent and Alcatel, both of which were represented by entirely different attorney teams. The number of attorneys on the plaintiff and defense sides of these cases, after accounting for the joint defense agreement, was more or less equally balanced.

magnitude as reported in the American Intellectual Property Law Association's annual Report of the Economic Survey. D.I. 372 at 7. Cisco's effort to malign Telcordia because of the number of attorneys who worked on the case is another distraction technique that simply ignores the appropriate analysis (i.e., the lodestar) and ignores the objectively reasonable number of hours and costs incurred.

Cisco also faults Telcordia for identifying infringing products after Telcordia obtained discovery on the products, studied that discovery, and confirmed that the products infringe. D.I. 393 at 24. But the parties agreed to a very specific process for identifying infringing products in this case. First, Telcordia identified a set of technical criteria that Telcordia felt would be likely to infringe when incorporated into a product (without yet knowing the intricacies of how Cisco's products worked), then Cisco produced a core set of "relevant functionality" documents for each product that exhibits the technical criteria—in order to allow Telcordia to make an informed infringement determination as to each product, and finally, after Telcordia evaluated the core "relevant functionality" documents and identified the specific infringing products, Cisco would produce full discovery as to the identified infringing products. Ex. I. This staged process, designed by Telcordia to narrow Cisco's initial discovery burden, was not only agreed upon by the parties, but was also presented to (and approved by) the Court during a discovery hearing in the Lucent case. Oct. 11, 2005, Telehearing Tr. at 24. Despite agreeing to the staged process, when Telcordia identified the infringing products for full discovery (mere weeks after Cisco expressly invited Telcordia to identify the products (Ex. J)), Cisco refused to provide the discovery on the grounds that Telcordia's identification of products was too late. But the timing of Telcordia's identification of products, of course, was keyed to Cisco's initial production of core "relevant functionality" documents. Had Cisco produced its core "relevant functionality" documents in a timely manner in response to Telcordia's initial discovery requests, Telcordia would have identified the infringing subset of products in a commensurately more timely manner, and the dispute regarding the appropriate scope of products in this case would have been averted entirely.

Cisco also claims that Telcordia is improperly pursuing damages theories which the Court precluded Telcordia from pursuing. D.I. 393 at 23-4. Specifically, Cisco asserts that Telcordia is seeking

to enjoin boxes without boards. *Id.* Cisco misinterprets Telcordia's position—Telcordia seeks to enjoin the products that have been adjudged to infringe (*i.e.*, for the '633 patent, boxes that include SRTS functionality) and any products not colorably different. *See* D.I. 367 at 8; Ex. A to D.I. 367 (proposed injunction covering "products having Synchronous Residual Time Stamp (SRTS)-specific features). There is nothing improper about Telcordia's request for an injunction—the proposed scope of the injunction is entirely consistent with the governing law.[6] 35 U.S.C. § 271; Fed. R. Civ. P. 65(d).

**III.    Conclusion**

For all of the reasons set forth in Telcordia's briefing in support of this motion and Telcordia's briefing in support of Telcordia's Motion to Enhance Damages Pursuant to 35 U.S.C. § 284—including Cisco's willful infringement and the egregiousness of Cisco's conduct based upon the *Read* factors—and because Cisco litigated this case in a manner that unnecessarily increased Telcordia's expenses, Telcordia respectfully requests that the Court find this case exceptional and award Telcordia its reasonable attorney fees and expenses pursuant to 35 U.S.C. § 285 and its inherent equitable authority.

---

[6] Cisco goes further to attack the scope of the exclusion order that Telcordia seeks before the ITC. D.I. 393 at 24. The appropriate scope of an exclusion order is a matter for the ITC to determine, and need not correspond with the scope of an injunction in a district court case. *See, e.g., Fuji Photo Film Co. v. Benun*, 463 F.3d 1252 (Fed. Cir. 2006). The issue of an exclusion order is currently pending before the ITC, is a matter exclusively for ITC consideration, and will be adjudicated by the ITC as part of the ITC case. Cisco's injection of the issue into these proceedings is highly inappropriate.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Steven M. Anzalone
Richard H. Smith
Vincent P. Kovalick
Laura P. Masurovsky
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20005
(202) 408-4000

Dated: August 13, 2007

183147.1

21

# EXHIBIT A

May Contain Confidential Information

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

In the Matter of
**CERTAIN EQUIPMENT FOR
TELECOMMUNICATIONS OR DATA
COMMUNICATIONS NETWORKS, INCLUDING
ROUTERS, SWITCHES, AND HUBS, AND
COMPONENTS THEREOF**

Inv. No. 337-TA-574

**Order No. 18:**    (1) DENYING Telcordia 4th Motion to Compel - Interrogatories Seeking Technical Information Regarding the Accused Products [Motion Docket No. 574-24];
(2) DENYING Telcordia's 5th Motion to Compel - Interrogatories Seeking Information Regarding Manufacturing Locations of the Accused Products and for an Order Requiring Cisco to Cooperate in Discovery [Motion Docket No. 574-26];
(3) DENYING Cisco's Motion for a Protective Order Limiting Further Discovery [574-29];
(4) GRANTING-IN-PART Telcordia's 6th Motion to Compel Cisco to Produce Discovery: Interrogatories Seeking Information re: (1) Products Containing an Accused SRTS Chip; (2) Inventories of that Accused SRTS Chip; (3) Results of Keyword Searches of Cisco's Document Database; and (4) Certain Employees' Knowledge of and Communications Regarding Clock Recovery [Motion Docket No. 574-30]
(5) DENYING Cisco's Motion for a Consolidated Oral Argument on Outstanding Motions; and
(6) GRANTING Joint Motion to Extend The Time For Filing Opening Expert Reports [Motion Docket No. 574-39].

To expedite this Order, the parties' positions are only briefly summarized for each outstanding motion. Be it known that the administrative law judge has carefully considered each party's arguments and filings in their entirety.

## I.    Telcordia 4th Motion to Compel - Interrogatories Seeking Technical Information Regarding the Accused Products [Motion Docket No. 574-24]

Telcordia's 4th motion to compel [motion docket no. 574-24] seeks answers to Interrogatories 42, 43, 44, 157, 170, which request technical details on the operation of the accused products that are directly related to the infringement issues in this investigation, as well as basic information about what

portions of the larger accused products are involved in receiving, forwarding, and transmitting the signals used in the infringing method. According to Telcordia, Cisco has thus far refused to respond to the interrogatories. In its reply memorandum, Telcordia argues that the sources Cisco has pointed to in response to the proffered interrogatories does not provide the requested information sought by the interrogatories. Telcordia asks that if Cisco does not have the requested information that Cisco so state. Telcordia's motion [motion docket no. 574-27] for leave to file a reply is hereby granted. Telcordia's motion [motion docket no. 574-32] for leave to file a response to Cisco's surreply is also granted.

Cisco opposes Telcordia's motion arguing that it has provided Telcordia with wide-ranging discovery relating to the functionality of the accused products and is unable to provide further responses to Telcordia's interrogatories. Cisco notes that Telcordia has already had an opportunity for discovery in the Delaware District Court action. According to Cisco, Telcordia has served 206 interrogatories, 375 document requests and several depositions. Cisco filed a surreply to allegedly clarify its position for the record. According to Cisco, it has taken fair and reasonable steps to fulfil its discovery obligations and understands its continuing obligation to supplement its responses. Cisco notes that because expert reports are not yet do, it has not undertaken the obligation to provide any litigation expert conclusions. Specifically, Cisco states that "[i]t has agreed to produce the factual information in its custody and control, but not to provide the opinions of its litigation expert that may in the future be derived from the factual record that has been produced." Cisco's motion for leave to file a surreply is hereby granted.

The Staff opposes Telcordia's 4th motion to compel. According to the Staff, there would be no useful purpose in compelling Cisco to produce discovery that it has represented it has already produced

or does not have in its possession, custody and control. The Staff notes that if Cisco's representations turn out to be false, or if Cisco at some later point in the investigation tries to introduce evidence that it has previously withheld, Telcordia could seek sanctions or other remedies.

Cisco has represented that it has answered the interrogatories in question and has no further information to provide. Cisco has also represented that it understands its continuing obligation to supplement its responses. Having considered the parties' memoranda in support and opposition to the instant motion, Telcordia's 4th motion to compel is hereby denied.

II.    **Telcordia's 5th Motion to Compel - Interrogatories Seeking Information Regarding Manufacturing Locations of the Accused Products and for an Order Requiring Cisco to Cooperate in Discovery [Motion Docket No. 574-26]**

Telcordia's 5th motion to compel [motion docket no. 574-26] seeks an answer to interrogatory 30, which requests details on the manufacture of the accused products, and in particular the locations and facilities where the accused products and components used in the accused products are produced. Telcordia notes that the information sought is relevant to both importation and remedy. According to Telcordia, it has proposed a compromise whereby Cisco need only identify: (1) the manufacturing locations for specific components of the MPSM-8-T1E1 module and if it does not know where the components are made, it can merely state how it got the components; and (2) the manufacturing location for the modules (as opposed to smaller components on those modules) that also go into any final product compatible with an MPSM-8-T1E1. Telcordia also seeks an order requiring Cisco to cooperate with discovery. Telcordia also filed a reply [motion docket no. 574-34] in which it acknowledged that Cisco has provided it with the requested information. Although Cisco has provided the requested discovery, Telcordia states that it continues to seek an order requiring Cisco to cooperate with discovery. Telcordia's motion for leave to file a reply is hereby granted.

Cisco argues that Telcordia's 5th Motion to compel is moot because it has provided the requested information. Apparently Cisco did not receive an email from Telcordia in which Telcordia informed Cisco that it would be filing the present motion to compel unless Cisco provided the requested information. Upon learning that Telcordia filed the instant motion, Cisco supplemented its responses to interrogatory number 30 to provide the information sought by Telcordia.

The Staff notes that the motion appears to be mooted by Cisco's Third Supplemental Response to Interrogatory No. 30. With regard to Telcordia's request that Cisco be warned and ordered to cooperate in discovery, the Staff argues that Telcordia's request should be denied. The Staff asserts that Telcordia has not demonstrated that Cisco is refusing to comply with its discovery obligations and according to the Staff, Cisco's conduct during discovery has not lacked proper grounding or good-faith bases.

Having considered the parties' memoranda in support and opposition to the instant motion, Telcordia's 5th motion to compel is hereby denied as moot. Telcodia's request for an order requiring Cisco to cooperate with discovery is also hereby denied.

## III.   Cisco's Motion for a Protective Order Limiting Further Discovery [574-29]

Cisco's motion for protective order [motion docket no. 574-29] requests an order limiting Telcordia from serving additional discovery requests without advance leave from the ALJ. According to Cisco, such an order is necessary to protect against Telcordia's escalating discovery requests which are causing Cisco increasing burden and expense and which stand to interfere with the upcoming April 2007 trial in the parallel district court litigation. Cisco contends that while the number of patents, claims, and products at issue in this investigation has decreased, Telcordia's discovery requests have increased more than two-fold. When Telcordia initiated this investigation it accused Cisco of

4

infringing nine claims in three different patents. As it currently stands, Telcordia is only asserting two claims in one of the patents. Additionally, Cisco asserts that Telcordia's discovery requests are increasingly divorced from the subject matter of this investigation or simply duplicative of prior discovery taken in this investigation and the parallel district court action.

Telcordia accuses Cisco of filing its motion for protective order in an "effort to stop the current trend of positive rulings on Telcordia's discovery motions." Telcordia argues that its discovery requests have been reasonable and that the quantity is not excessive for a Section 337 investigation. Telcordia acknowledges that Cisco did produce many documents in the parallel district court litigation, but asserts that the document production did not include technical details or entire categories of documents that Telcordia was seeking, and that it was limited to only certain of the products accused of infringement in this investigation. According to Telcordia its discovery requests in this investigation have been focused on trying to obtain narrow categories of documents that were not produced in the district court case. Additionally, Telcordia notes that Section 337 investigations have issues that are not present in district court, i.e. importation, etc., that require new discovery. With regard to Cisco's assertion that Telcordia's discovery requests are interfering with its trial preparation in the parallel district court case, Telcordia argues that any problems related to the overlapping schedules between this investigation and the district court action are of Cisco's own making. Telcordia notes that Cisco asked to move the target date in this investigation until after the district court trial knowing that such a move would mean that discovery in this investigation would coincide with trial preparation in the district court case. Also, Telcordia notes that Cisco could have chosen to stay the district court case, but chose otherwise.

The Staff opposes Cisco's motion for protective order. The Staff argues that it cannot support

Cisco's motion at least in part because Cisco's own failures to produce requested discovery make grranting Cisco's motion for protective order inequitable. The Staff does note, however, that as Telcordia propounds more and more discovery requests, Cisco's argument grows stronger.

Telcordia argues that its number of discovery requests is reasonable for a Section 337 case. The administrative law judge finds this argument unpersuasive. In determining whether the number of discovery requests in this investigation are unduly burdensome, the focus remains centered on this investigation. The reduction in the number of claims and patents at issue in this investigation has undoubtedly simplified this investigation. As such, Cisco's argument is well taken. On the other hand, Telcordia correctly points out that any burdens related to Cisco's responsibilities in the parallel district court action are of Cisco's own making. Having considered the parties' memoranda in support and opposition to the instant motion, the administrative law judge finds that Cisco has failed to prove the need for a protective order. Accordingly, Cisco's motion for protective order is hereby denied.

IV.    **Telcordia's 6th Motion to Compel Cisco to Produce Discovery: Interrogatories Seeking Information re: (1) Products Containing an Accused SRTS Chip; (2) Inventories of that Accused SRTS Chip; (3) Results of Keyword Searches of Cisco's Document Database; and (4) Certain Employees' Knowledge of and Communications Regarding Clock Recovery [Motion Docket No. 574-30]**

Telcordia moves for an order compelling Cisco to provide answers to Interrogatory Nos. 178, 179 and 196-201. [Motion Docket No. 574-30]  Interrogatory No. 178 asks Cisco to identify each Cisco product that contained or was designed to use any version of an AAL1 gator chip and provide related information. Interrogatory No. 179 requires Cisco to identify the number of AAL1 gator chips held in inventory by or on behalf of Cisco. Interrogatory No. 196 requires Cisco to identify the documents resulting from a proposed electronic keyword search of Cisco's EDCS document database. Interrogatory Nos. 197-201 requires Cisco to describe certain Cisco engineers' knowledgeable and

6

communications regarding any Bellcore or Telcordia patent from clock recovery. According to

Telcordia each of these requests is relevant and therefore discoverable.

Cisco opposes Telcordia's 6th motion to compel. Cisco argues at the outset that Telcordia's

motion should be denied because Telcordia allegedly filed the instant motion without the requisite

meet-and-confer. Notably, Telcordia certifies in its motion that it did meet-and-confer. Cisco also

argues that with few exceptions, the requested information is of questionable relevance. With regard to

request No. 178, Cisco argues that the request asks for all products that contain the gator chip

regardless of whether the products are capable of carrying out the accused functionality. According to

Cisco, neither Telcordia nor its expert have articulated an infringement theory in this investigation that

would reach the AAL1 gator chips that are used in products that do not enable SRTS. With regard to

interrogatory No. 179, Cisco asserts that Telcordia's justification for this discovery request is that it

would like to account for roughly 100,000 AAL1 gator chips that it believes PMC-Sierra sold to Cisco.

According to Cisco, it previously informed Telcordia that its understanding of the matter was based on

an incorrect reading of PMC-Sierra's interrogatory responses. With regard to request No. 196, Cisco

argues that there is no authority for Telcordia being able to direct how Cisco goes about conducting its

discovery obligations. According to Cisco, it has produced the requested discovery and it has searched

its database for relevant documents.

The Staff supports Telcordia's 6th motion to compel in part. With regard to Interrogatory No.

178, the Staff agrees with Cisco that the wording of Interrogatory No. 178 is broader than Telcordia

represents. Specifically, the Staff agrees with Cisco that discovery of products that are not capable of

performing the claimed SRTS and do not have the AAL1 gator chip are not likely to lead to the

discovery of admissible evidence. However, the Staff argues that discovery of Cisco's accused

products that do contain an AAL1 gator chip, and thus arguably perform or are capable or performing the SRTS functionality, is proper. With regard to Interrogatory No. 179, the Staff asserts that the information sought is relevant and to the extent that Cisco has not already provided the requested information, Telcordia's motion as its pertains to this request should be granted. With regard to Interrogatory No. 196, the Staff agrees with Cisco that Telcordia has provided no authority for its request to direct and coordinate the manner in which Cisco searches for potential responsive documents. The Staff asserts that Telcordia's argument that it is "not confident" that it has received all relevant documents is insufficient to support its discovery request. With regard to Interrogatory Nos. 197-201, the Staff supports Cisco's argument that these interrogatories appear to request the same information that should have been produced in response to Interrogatory No. 4. Nevertheless, the Staff argues that it is conceivable that there is additional relevance in the more specifically directed Interrogatories 197-201.

With regard to Interrogatory No. 178, the administrative law judge agrees with the Staff. Cisco is hereby ordered to provide responsive answers to Interrogatory No. 178, but only with regard to accused products that do contain an AAL1 gator chip. With regard to Interrogatory No. 179, the administrative law judge is convinced that the information sought is relevant and accordingly hereby orders Cisco to provide responsive answers to Interrogatory No. 179 to the extent it has not already done so. Regarding Interrogatory No. 196, the administrative law judge agrees with the Staff. Accordingly, Telcordia's motion to compel with regard to Interrogatory No. 196 is hereby denied. With regard to Interrogatories Nos. 197-201, Cisco is hereby ordered to provide responsive answers to Interrogatories 197-201 to the extent it has additional information to provide. If Cisco has no more information it should so state. Having considered the parties' memoranda in support and opposition to

the instant motion, the administrative law judge hereby grants-in-part Telcordia's 6th motion to compel as discussed above. Cisco shall produce the requested discovery within 12 days from the date of this Order.

V.     **Cisco's Motion for a Consolidated Oral Argument on Outstanding Motions**

Cisco moves for a consolidated oral argument on the outstanding discovery motions. The Staff does not object to Cisco's request. Telcordia takes no position on the request. Cisco's motion for consolidated oral argument is hereby denied.

VI.    **Joint Motion to Extend The Time For Filing Opening Expert Reports [Motion Docket No. 574-39]**

The parties jointly move for an order extending the time for filing opening expert reports from February 8, 2007 to February 12, 2007. The joint motion [motion docket no. 574-039] to extend the time of filing opening expert reports is hereby granted.

By March 12, 2006, each party shall file a statement as to whether or not it seeks to have any portion of this document deleted from the public version thereof. By the aforementioned date, any party seeking to have any portion of this document deleted from the public version must file (and submit to this office) a copy of this document with red brackets indicating any portion asserted to contain confidential business information.

So ORDERED.

Sidney Harris
Administrative Law Judge

Issued: February 28, 2007

9

CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS                 INV. NO. 337-TA-574
OR DATA COMMUNICATIONS NETWORKS, INCLUDING
ROUTERS SWITCHES, AND HUBS, AND COMPONENTS THEREOF

## CERTIFICATE OF SERVICE

I, Marilyn R. Abbott, hereby certify that the attached **Confidential Order** has been served on upon Benjamin Levi, Esq. and upon the following parties via first class mail, and air mail where necessary on <u>March 1, 2007</u>.

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436

## COUNSEL FOR COMPLAINANT TELCORDIA TECHNOLOGIES, INC.:

Smith R. Brittingham IV, Esq.
Donald R. Dunner, Esq.
Steven M. Anzalone, Esq.
James T. Wilson, Esq.
John Williamson, Esq.
**FINNEGAN, HENDERSON, FARABOW,
GARRETT, & DUNNER, LLP**
901 New York Ave., NW
Washington, DC 20001

## COUNSEL FOR RESPONDENT CISCO SYSTEMS, INC.:

David A. Hickerson, Esq.
Joanne M. Guerrera, Esq.
David N. Southard, Esq.
**WEIL, GOTSHAL & MANGES LLP**
1300 Eye Street, NW
Washington, DC 20005

Matthew D. Powers, Esq.
Edward R. Reines, Esq.
Jessica L. Davis, Esq.
Sonal N. Metha, Esq.
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, CA 94605

CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS
OR DATA COMMUNICATIONS NETWORKS, INCLUDING ROUTERS
SWITCHES, AND HUBS, AND COMPONENTS THEREOF

INV. NO. 337-TA-574

COUNSEL FOR RESPONDENT ALCATEL USA, INC.:

Stuart J. Sinder, Esq.
Michelle Carniaux, Esq.
Mark A. Hannermann, Esq.
Clement J. Naples, Esq.
Michael G. Gabriel, Esq.
Elizabeth S. Tse, Esq.
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004

Marcia H. Sundeen, Esq.
**KENYON & KENYON LLP**
1500 K Street, NW
Suite 700
Washington, DC 20005

COUNSEL FOR RESPONDENT LUCENT TECHNOLOGIES, INC.:

Maximillian A. Grant, Esq.
**LATHAM & WATKINS LLP**
555 Eleventh St., NW, Suite 1000
Washington, DC 20004-1304

Steven C. Cherny, Esq.
**LATHAM & WATKINS LLP**
New York, NY 10022-4834

David A. Nelson, Esq.
**LATHAM & WATKINS LLP**
233 South Wacker Drive
Suite 5800
Chicago, IL 60606-6306

COUNSEL FOR RESPONDENT PMC-SIERRA, INC.:

Michael A. Ladra, Esq.
James C. Otteson, Esq.
Matthew R. Reed, Esq.
Nathan L. Walker, Esq.
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 940306

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Smith R. Brittingham, IV
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7003 2260 0004 5445 1984

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

David A. Hickerson, Esq.
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW
Washington, DC 20005

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7003 2260 0004 5445 1991

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Matthew D. Powers, Esq.
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7003 2260 0004 5445 2004

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                     ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:           ☐ No

1. Article Addressed to:

Stuart J. Sinder, Esq.
KENYON & KENYON LLP
One Broadway
New York, NY 10004

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
(Transfer from service label)     7003 2260 0004 5445 2011

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                     ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:           ☐ No

1. Article Addressed to:

Marcia H. Sundeen, Esq.
KENYON & KENYON LLP
1500 K Street, NW
Suite 700
Washington, DC 20005

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
(Transfer from service label)     7003 2260 0004 5445 2028

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                     ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:           ☐ No

1. Article Addressed to:

Steven C. Cherny, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Ste. 1000
Washington, DC 20004

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
(Transfer from service label)     7003 2260 0004 5445 2035

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-1540

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Michael A. Ladra, Esq.
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94306

Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7003 2260 0004 5445 2042

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Maximillian A. Grant, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street, N.W. Suite 1000
Washington, DC 20004-1304

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7003 2260 0004 5445 2059

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

David A. Nelson, Esq.
LATHAM & WATKINS LLP
233 South Waker Drive  Suite 5800
Chicago, IL 60606-6306

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7003 2260 0004 5445 2066

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-1540

# EXHIBIT B

May Contain Confidential Information

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br>**CERTAIN EQUIPMENT FOR**<br>**TELECOMMUNICATIONS OR DATA**<br>**COMMUNICATIONS NETWORKS, INCLUDING**<br>**ROUTERS, SWITCHES, AND HUBS, AND**<br>**COMPONENTS THEREOF** | **Inv. No. 337-TA-574** |

**Order No. 15:  (1) Granting Complainant's Motion to Compel Respondent Cisco to Produce Corporate Representative Witness For Deposition; and (2) Granting In Part Complainant's Third Motion to Compel Cisco to Produce Requested Discovery: Answers to Interrogatories Seeking Names of Persons Knowledgeable About Relevant Facts**

## I.    INTRODUCTION

By publication of the notice of investigation in the *Federal Register* on June 16, 2006, the

Commission instituted this investigation pursuant subsection (b) of section 337 of the Tariff Act of 1930,

as amended, to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain equipment for telecommunications or data communications networks, including routers, switches, and hubs, or components thereof, by reason of infringement of one or more of claims 1, 3, and 4 of U.S. Patent No. 4,893,306, claims 1, 3, 5, 8, 11, and 33 of U.S. Patent No. Re. 36,633, and claims 1, 2, 7, and 8 of U.S. Patent No. 4,835,763, and whether an industry in the United States exists as required by subsection (a)(2) of section 337.

71 Fed. Reg. 34967 (2006).

The notice of investigation names Telcordia Technologies, Inc. ("Telcordia") as the Complainant,

and Cisco Systems, Inc., Lucent Technologies, Inc., Acatel S.A., Alcatel USA, and PMC-Sierra, Inc., as

the Respondents.  The Commission Investigative Staff ("Staff") of the Office of Unfair Import

Investigations is also a party in this investigation.  Id.

## II.    DISCUSSION

### A.    Complainant's Motion to Compel Respondent Cisco to Produce Corporate Representative Witness For Deposition

On November 16, 2006, Telcordia filed a motion [Motion Docket No. 574-019] to compel Cisco to produce a corporate representative witness for depositions regarding Cisco's defenses. On November 27, 2006, Cisco filed its opposition to the motion to compel. On November 27, 2006, the Staff filed its response in support of the motion to compel. On December 4, 2006, Telcordia filed a motion [Motion Docket No. 574-021] for leave to file a reply. Telcordia's motion for leave is hereby granted.

Pursuant to Commission Rule 210.33(a), Telcordia filed the instant motion, asking for an order compelling Cisco to produce one or more corporate representatives to testify in response to Telcordia's First Notice of Deposition. The deposition notice Telcordia served on Cisco requested testimony on two topics: (1) Cisco's equitable estoppel defense; and (2) Cisco's intervening rights defense. Following Cisco's objections, Telcordia narrowed and revised the deposition topics. At issue in the present motion are Cisco's revised deposition topics 1(a), 1(b), 2(a), 2(e), and 2(f). Cisco declines to produce a witness on revised topics 1(a), 1(b) and 2(a), arguing that the topics are burdensome and overbroad. Cisco declines to produce a witness on revised topics 2(e) and 2(f), arguing that a deposition "is [not] the appropriate vehicle for such discovery." Although Cisco declined to produce a witness on revised topics 2(e) and 2(f), Cisco did agree to produce documents "sufficient to show [the requested] information."

The deposition topics in contention are:

1. . . .

(a) All facts and circumstances supporting Cisco's claim that Cisco or its predecessor LightStream relied on Telcordia's and/or Bellcore's asserted conduct in designing, developing, or marketing any of the accused products, including but not restricted to Cisco's or LightStream's decisions to include or not include certain features in the accused products and how these decisions were related to Telcordia's and/or Bellcore's conduct.

(b) All facts and circumstances supporting Cisco's claim that Cisco has suffered evidentiary and/or economic prejudice attributable to Telcordia's alleged conduct or delay in asserting its claims, including but not restricted to Cisco's or LightStream's expenditures on products or features developed as a result of Telcordia's and/or Bellcore's conduct.

. . .

2.    The facts and circumstances relating to Cisco's Seventh Affirmative Defense of intervening rights, including but not limited to the following:

(a) The developmental history of the allegedly infringing products by Cisco or LightStream between November 9, 1993, through March 28, 2000, relating to when particular features were incorporated into these products, the motivation for including those features in those products, and whether the design of those features was influenced by the '768 [*sic* '978] or '633 patents or any standard;

. . .

(e) Cisco's orders or contracts, if any, for any of the allegedly infringing products entered into before March 28, 2000, for such products to be manufactured or sold thereafter; and

(f) Cisco's inventory of allegedly infringing products as of March 28, 2000, if any; whether that inventory could be remanufactured or converted into non-infringing products; and if so, the costs of any such conversion.

As previously discussed, in the present investigation Cisco is asserting an equitable estoppel defense and an intervening rights defense. The Commission Rules clearly state that parties may obtain discovery, regarding any matter, not privileged, that is relevant to the claims or defense of any party. 19 C.F.R. § 210.27(b). Discoverable matter includes information that is reasonably calculated to lead to the discovery of admissible evidence. Id. There is no question that the information sought by Telcordia is relevant to Cisco's equitable estoppel and intervening rights defenses. Cisco does not argue that the information is irrelevant, nor assert any other convincing argument as to why Telcordia is not entitled to the requested information. Contrary to Cisco's argument, based on the evidence presented in connection with the instant motion, the Administrative Law Judge finds the deposition topics neither overbroad nor overly

3

burdensome. Accordingly, Telcordia's motion to compel is hereby granted.

**B.    Motion to Compel Cisco to Produce Requested Discovery: Answers to Interrogatories Seeking Names of Persons Knowledgeable About Relevant Facts**

On December 11, 2006, Telcordia filed a motion [Motion Docket No. 574-023] to compel Cisco to produce requested discovery: answers to interrogatories seeking names of persons knowledgeable about relevant facts. On December 21, 2006, Cisco filed an opposition to Telcordia's motion to compel. Also on December 21, 2006, the Staff filed its response in support of Telcordia's motion to compel.

Telcordia seeks an order compelling Cisco to respond to questions in its Fourth Set of Interrogatories. Specifically, Telcordia seeks an order compelling Cisco to identify individuals with knowledge of certain facts. Cisco objects to Telcordia's discovery request arguing that the requests are overbroad and unduly burdensome.

Commission Rule No. 210.27(b)(2) provides that "a party may obtain discovery regarding any matter, not privileged, that is relevant to . . . [t]he identity and location of persons having knowledge of any discoverable matter." 19 C.F.R. § 210.27(b)(2). The Administrative Law Judge has carefully reviewed Telcordia's Fourth Set of Interrogatories. With the exception of Interrogatory Nos. 155 and 173, the Administrative Law Judge is not persuaded that Telcordia's interrogatory requests are overbroad or unduly burdensome. With regard to Interrogatory Nos. 155 and 173, specific exception is taken to Telcordia's requests that Cisco "[i]dentify any persons involved in the hardware design for each of the following Cisco service modules" and "[i]dentify any persons involved in hardware design (including requirements analysis, logic design, or logic synthesis) for each of the following Cisco bridging ASIC's." These requests do not seek persons "having knowledge," but rather persons involved in the hardware design. Additionally, the requests are overbroad and unduly burdensome because the requests ask Cisco to identify every person involved in the hardware design.

4

## IV.    CONCLUSION

Having read the parties' memoranda in support and opposition, having carefully considered the arguments on both sides of the issues, and for the reasons cited hereinabove, the Administrative Law Judge hereby: (1) Grants Telcordia's motion [Motion Docket No. 574-019] to compel Cisco to produce corporate representative witness for depositions regarding Cisco's defenses; and (2) Grants-In-Part Telcordia's motion [Motion Docket No. 574-023] to compel Cisco to produce requested discovery. Cisco shall forthwith designate a corporate representative(s) to testify in accordance with Telcordia's revised deposition request. Also, to the extent not already done, Cisco is hereby ordered to supplement its responses to Telcordia's Fourth Set of Interrogatories to more fully address the requested information, including Telcordia's requests for identification persons knowledgeable of certain facts.

By January 15, 2007, each party shall file a statement as to whether or not it seeks to have any portion of this document deleted from the public version thereof. By the aforementioned date, any party seeking to have any portion of this document deleted from the public version must file (and submit to this office) a copy of this document with red brackets indicating any portion asserted to contain confidential business information.

So ORDERED.

Sidney Harris
Administrative Law Judge

Issued: January 8, 2007

5

CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS                    INV. NO. 337-TA-574
OR DATA COMMUNICATIONS NETWORKS, INCLUDING
ROUTERS SWITCHES, AND HUBS, AND COMPONENTS THEREOF

## CERTIFICATE OF SERVICE

I, Marilyn R. Abbott, hereby certify that the attached **Confidential Order** has been served on upon Benjamin Levi, Esq. and upon the following parties via first class mail, and air mail where necessary on

January 9, 2007

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436

## COUNSEL FOR COMPLAINANT TELCORDIA TECHNOLOGIES, INC.:

Smith R. Brittingham IV, Esq.
Donald R. Dunner, Esq.
Steven M. Anzalone, Esq.
James T. Wilson, Esq.
John Williamson, Esq.
**FINNEGAN, HENDERSON, FARABOW,
GARRETT, & DUNNER, LLP**
901 New York Ave., NW
Washington, DC 20001

## COUNSEL FOR RESPONDENT CISCO SYSTEMS, INC.:

David A. Hickerson, Esq.
Joanne M. Guerrera, Esq.
David N. Southard, Esq.
**WEIL, GOTSHAL & MANGES LLP**
1300 Eye Street, NW
Washington, DC 20005

Matthew D. Powers, Esq.
Edward R. Reines, Esq.
Jessica L. Davis, Esq.
Sonal N. Metha, Esq.
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, CA 94605

CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS                    INV. NO. 337-TA-574
OR DATA COMMUNICATIONS NETWORKS, INCLUDING ROUTERS
SWITCHES, AND HUBS, AND COMPONENTS THEREOF

<u>COUNSEL FOR RESPONDENT ALCATEL USA, INC.:</u>

Stuart J. Sinder, Esq.
Michelle Carniaux, Esq.
Mark A. Hannermann, Esq.
Clement J. Naples, Esq.
Michael G. Gabriel, Esq.
Elizabeth S. Tse, Esq.
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004

Marcia H. Sundeen, Esq.
**KENYON & KENYON LLP**
1500 K  Street, NW
Suite 700
Washington, DC 20005

<u>COUNSEL FOR RESPONDENT LUCENT TECHNOLOGIES, INC.:</u>

Maximillian A. Grant, Esq.
**LATHAM & WATKINS LLP**
555 Eleventh St., NW, Suite 1000
Washington, DC 20004-1304

Steven C. Cherny, Esq.
**LATHAM & WATKINS LLP**
New York, NY 10022-4834

David A. Nelson, Esq.
**LATHAM & WATKINS LLP**
233 South Wacker Drive
Suite 5800
Chicago, IL 60606-6306

<u>COUNSEL FOR RESPONDENT PMC-SIERRA, INC.:</u>

Michael A. Ladra, Esq.
James C. Otteson, Esq.
Matthew R. Reed, Esq.
Nathan L. Walker, Esq.
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 940306

# EXHIBIT C

May Contain Confidential Information

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| |
|---|
| **In the Matter of**<br>**CERTAIN EQUIPMENT FOR**<br>**TELECOMMUNICATIONS OR DATA**<br>**COMMUNICATIONS NETWORKS, INCLUDING**<br>**ROUTERS, SWITCHES, AND HUBS, AND**<br>**COMPONENTS THEREOF** |

Inv. No. 337-TA-574

**Order No. 13: Granting Complainant Telcordia's Motion to Compel**

## I.    INTRODUCTION

By publication of the notice of investigation in the *Federal Register* on June 16, 2006, the

Commission instituted this investigation pursuant subsection (b) of section 337 of the Tariff Act

of 1930, as amended, to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337
> in the importation into the United States, the sale for importation, or
> the sale within the United States after importation of certain
> equipment for telecommunications or data communications networks,
> including routers, switches, and hubs, or components thereof, by
> reason of infringement of one or more of claims 1, 3, and 4 of U.S.
> Patent No. 4,893,306, claims 1, 3, 5, 8, 11, and 33 of U.S. Patent No.
> Re. 36,633, and claims 1, 2, 7, and 8 of U.S. Patent No. 4,835,763,
> and whether an industry in the United States exists as required by
> subsection (a)(2) of section 337.

71 Fed. Reg. 34967 (2006).

The notice of investigation names Telcordia Technologies, Inc. ("Telcordia") as the

Complainant, and Cisco Systems, Inc., Lucent Technologies, Inc., Acatel S.A., Alcatel USA, and

PMC-Sierra, Inc., as the Respondents. The Commission Investigative Staff ("Staff") of the

Office of Unfair Import Investigations is also a party in this investigation. Id.

On September 14, 2006, Complainant Telcordia filed a motion [Motion Docket No. 574-016] to compel Respondents Cisco Systems, Inc., Lucent Technologies, Inc., and Alcatel USA, Inc. (collectively "Motion Respondents") to provide information regarding all accused products. On September 25, 2006, the Staff filed its response supporting Telcordia's motion to compel. On September 26, 2006, the Motion Respondents filed an opposition to the present motion. Because the opposition was filed a day late, the Motion Respondents contemporaneously filed an unopposed motion [Motion Docket No. 574-017] seeking leave to file their opposition out of time. That motion is hereby granted. On October 10, 2006, Telcordia moved for leave to file a reply in support of its motion to compel [Motion Docket No. 574-018]. That motion is also hereby granted.

## II.    STANDARDS OF LAW

The Commission Rules clearly state that parties may obtain discovery, regarding any matter, not privileged, that is relevant to the claims or defense of any party.  19 C.F.R. § 210.27(b).  Discoverable matter includes information that is reasonably calculated to lead to the discovery of admissible evidence.  Id.

## III.    DISCUSSION

Telcordia argues that the Motion Respondents should be compelled to respond to discovery requests regarding all accused products in the present investigation, because such information is relevant to show a violation of Section 337. Telcordia Memo. at 6-7. Telcordia also argues that such information is relevant, or likely to lead to relevant evidence, to the

2

intervening rights defense asserted by two of the Motion Respondents. Id. at 9. The Motion

Respondents argue that Telcordia's motion should be denied, because "Telcordia has not

explained - and indeed cannot explain - the relevancy of discovery on products that Respondents

discontinued" and because "discovery is not properly directed at discontinued products for which

there is no threat of a violation." Motion Respondents Memo. at 2.

 The fact that the Motion Respondents allege to have discontinued the manufacture and

importation of some of the accused products at issue in this investigation does not preclude a

finding that there is a violation of Section 337. See Intel Corp. v. U.S.I.T.C., 946 F.2d 821, 830

fn. 14 (Fed. Cir.1991) ("[respondent] suggests that the issue of whether its 'old' design ...

infringed the '084 patent was mooted by its unilateral decision to stop manufacturing the 'old'

design EPROMs. We disagree. The Supreme Court has stated that the '[m]ere voluntary

cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be

compelled to leave '[t]he defendant ... free to return to his old ways.'"). In addition, the

discontinued products are relevant to the issue of remedy. For example, past violations can

support an exclusion order preventing the importation of spare parts related to the discontinued

products.


**IV.    CONCLUSION**

 Having read the parties' memorandum in support and opposition, having carefully

considered the arguments on both sides of the issue, and for the reasons cited hereinabove, the

Administrative Law Judge hereby Grants Telcordia's motion [Motion Docket No. 574-016] to

compel.

By December 4, 2006, each party shall file a statement as to whether or not it seeks to have any portion of this document deleted from the public version thereof.  By the aforementioned date, any party seeking to have any portion of this document deleted from the public version must file (and submit to this office) a copy of this document with red brackets indicating any portion asserted to contain confidential business information.

So ORDERED.

Sidney Harris
Administrative Law Judge

Issued: November 27, 2006

4

CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS          INV. NO. 337-TA-574
OR DATA COMMUNICATIONS NETWORKS,
INCLUDING ROUTERS SWITCHES, AND HUBS,
AND COMPONENTS THEREOF

## CERTIFICATE OF SERVICE

I, Marilyn R. Abbott, hereby certify that the attached **Confidential Order** has been served on upon
Steven R. Pederson, Esq..and upon the following parties via first class mail, and air mail where necessary
on  November 28, 2006          .

Marilyn R. Abbott, Secretary
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436

## COUNSEL FOR COMPLAINANT TELCORDIA TECHNOLOGIES, INC.:

Smith R. Brittingham IV, Esq.
Donald R. Dunner, Esq.
Steven M. Anzalone, Esq.
Houtan K. Esfahani, Esq.
James T. Wilson, Esq.
John Williamson, Esq.
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT, & DUNNER, LLP**
901 New York Ave., NW
Washington, DC 20001

## COUNSEL FOR RESPONDENT CISCO SYSTEMS, INC.:

David A. Hickerson, Esq.
Joanne M. Guerrera, Esq.
David N. Southard, Esq.
**WEIL, GOTSHAL & MANGES LLP**
1300 Eye Street, NW
Washington, DC 20005

Matthew D. Powers, Esq.
Edward R. Reines, Esq.
Jessica L. Davis, Esq.
Sonal N. Metha, Esq.
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, CA 94065

CERTAIN EQUIPMENT FOR TELECOMMUNICATIONS    INV. NO. 337-TA-574
OR DATA COMMUNICATIONS NETWORKS,
INCLUDING ROUTERS SWITCHES, AND HUBS,
AND COMPONENTS THEREOF

FOR RESPONDENT ALCATEL USA, INC.:

Stuart J. Sinder, Esq.
Michelle Carniaux, Esq.
Mark A. Hannermann, Esq.
Clement J. Naples, Esq.
Michael G. Gabriel, Esq.
Elizabeth S. Tse, Esq.
**KENYON & KENYON LLP**
One Broadway
New York, NY 10004

Marcia H. Sundeen, Esq.
**KENYON & KENYON LLP**
1500 K Street, NW
Suite 700
Washington, DC 20005

FOR RESPONDENT LUCENT TECHNOLOGY/PCM SIERRA:

Steven C. Cherny, Esq.
David A. Nelson, Esq.
Maximillian A. Grant, Esq.
**LATHAM & WATKINS LLP**
555 Eleventh St., NW, Suite 1000
Washington, DC 20004-1304

Michael A. Ladra, Esq.
James C. Otteson, Esq.
Matthew R. Reed, Esq.
Nathan L. Walker, Esq.
**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 940306

# EXHIBIT D

# REDACTED

# EXHIBIT E

**REDACTED**

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )   C.A. No. 04-876-GMS
    )
CISCO SYSTEMS, INC.,    )
    )
    Defendant.    )

## TELCORDIA'S FIRST SET OF REQUESTS FOR PRODUCTION TO CISCO SYSTEMS, INC. (NOS. 1-98)

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Telcordia Technologies, Inc. ("Telcordia") hereby serves this First Set of Requests for Production of Documents and Things to Defendant Cisco Systems, Inc. ("Cisco") and requests that Cisco produce the requested documents and things within thirty (30) days of service at the offices of Telcordia's counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., 901 New York Avenue, NW, Washington, DC 20001-4413.

## INSTRUCTIONS AND DEFINITIONS

The following instructions and definitions apply to all of Telcordia's requests for production in this case as well as to Cisco's discovery responses:

1.    The term "Cisco" shall mean Cisco Systems, Inc., together with all partners, directors, owners, officers, members, employees, agents, representatives, attorneys, and any other persons under the control of Cisco Systems, Inc., including all parents, divisions, subsidiaries, affiliates, and predecessors of Cisco Systems, Inc.

specifications, manufacturing or production drawings, engineering drawings, engineering change

notices, test procedures, and computer program source code listings.

REQUEST NO. 31.

All documents and things that refer or relate to the design, manufacture, configuration,

structure, specifications, use, or operation of any product for framing, multiplexing, or

demultiplexing SONET, ATM-framed, and/or packet-based bit streams, including but, not

limited to the following: service manuals, operator's or owner's manuals, installation manuals,

reference manuals, customer network configurations, schematics, block diagrams, logic

diagrams, state diagrams, timing diagrams, circuit diagrams, specifications, manufacturing or

production drawings, engineering drawings, engineering change notices, test procedures, and

computer program source code listings.

REQUEST NO. 32.

All documents and things that refer or relate to the design, manufacture, configuration,

structure, specifications, use, or operation of any Product-In-Suit, including but, not limited to

the following: service manuals, operator's or owner's manuals, installation manuals, reference

manuals, customer network configurations, schematics, block diagrams, logic diagrams, state

diagrams, timing diagrams, circuit diagrams, specifications, manufacturing or production

drawings, engineering drawings, engineering change notices, test procedures, and computer

program source code listings.

REQUEST NO. 33.

All documents and things that refer or relate to the evaluation, testing, diagnosis, or

troubleshooting of the capability of any Cisco product to multiplex packet traffic into

synchronous frames.

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of April, 2005, the attached **TELCORDIA'S FIRST**

**SET OF REQUESTS FOR PRODUCTION TO CISCO SYSTEMS, INC. (NOS. 1-98)** was

served upon the below-named counsel of record at the address and in the manner indicated:

Jack B. Blumenfeld, Esquire                  <u>HAND DELIVERY</u>
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19899-1347


Matthew D. Powers, Esquire               <u>VIA ELECTRONIC MAIL</u>
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065


John G. Day

# EXHIBIT G

**REDACTED**

# EXHIBIT H

# The 4th Hawaii Conference
## "Telecommunication and Intellectual Property: U.S. and Asian Perspectives"

| | |
|---|---|
| Co-Hosted by | SNU Center for Law & Technology |
| | SNU Center for Law & Public Utilities |
| | Berkeley Center for Law & Technology |
| Sponsored by | KT (Korea Telecommunications Corp.) |
| | SKT (SK Telecommunications Corp.) |
| | NHN (NHN Corp.) |
| | Netpia (Netpia Inc.) |
| | Woo Yun Kang Jeong & Han |
| | KIPO(Korean Intellectual Property Office) |
| | PDMC (Program Deliberation & Mediation Committee) |
| | Korea Patent Attorneys Association |
| | Electronic Times |
| | IAKL (International Association of Korean Lawyers) |
| Date | January 12-13, 2007. |
| Venue | Hyatt Regency Waikiki, Hawaii, U.S.A. |

*Program Schedule*          ** This program may change

## 12 January 2007, Friday

| Time | Program |
|---|---|
| 1.30pm | Registration |
| 2.00pm | Keynote speech: Dean Moon-Hyuck HO (SNU College of Law) |
| | **INTELLECTUAL PROPERTY PANEL** <br> Moderator: Prof. Peter S. Menell (Boalt Hall, BCLT) |
| 2.15pm | Prof. Robert Barr ( BCLT) |
| | Director Jongkyun Woo (The Korean Intellectual Property Office), *" Recent Developments in Korean Patent Law"* |
| | Prof. Peter S. Menell (Boalt Hall, BCLT) , *"Patent Law Reform"* |
| | Research Judge Seong-Soo Park (Supreme Court of Korea), *"Regulation of Patent Right Abuse"* |
| | Commentators: Prof. Sang-Jo JONG (Director of SNU Center for Law & Technology) <br> Prof. Dae-Hwan Koo (SNU College of Law) |
| 4.00pm | **Coffee break** |
| | **INDUSTRY ISSUES PANEL** <br> Moderator: Prof. Robert Barr (Executive Director of BCLT) |
| | VP & General Counsel Sirgoo Lee *( NHN Corp.)* |
| | Young I. Ma (Netpia Inc.) |

| | |
|---|---|
| | Mr. David Simon (Intel Corp.) |
| | Mr. Richard Lutton (Apple Corp.) |
| | Mr. Andy Culbert (Microsoft Corp.) |
| | *Questions and Responses for Audience* |
| 6.00pm | **DINNER** |
| | Dinner speech |

## 13 January 2007, Saturday

| Time | Program |
|---|---|
| | **TELECOMMUNICATIONS PANEL** Moderator: Prof. Howard Shelanski (*Boalt Hall, BCLT*) |
| 9.00am | Prof. Junseok Hwang (SNU College of Engineering), *"Development of Telecommunication Technology and Development Direction of Telecommunication Market Regulation System"* |
| | Prof. Howard Shelansk (*Boalt Hall, BCLT*), *"Telecom Regulations"* |
| | Prof. Phil Weiser (University of Colorado School of Law), *"Law and Policy regarding Internet Communications"* |
| | FCC Member [TBD] |
| | Prof. Jae-Won Kang (Dongguk University College of Social Science Department of Mass Communication), *"Convergence and Regulatory Issues: Focusing on IPTV as an emerging convergence service in Korea "* |
| | Prof. Molly Shaffer Van Houweling (Boalt Hall, BCLT) |
| | Prof. James B. Speta (Northwestern University School of Law) |
| | Commentators: Prof. Nak-In SUNG (SNU College of Law) Prof. Won-Woo Lee ( Vice Dean of SNU College of Law) Prof. Seong-Wook Heo (SNU College of Law) |
| 11.00am | **Coffee break** |
| | **INDUSTRY ISSUES PANEL** Moderator: Prof. Howard Shelanski (*Boalt Hall, BCLT*) |
| | KT |
| | Legal Counsel Sarah Hyun (SKT Strategic Legal Team) |
| | *Questions and Responses for Audience* |

---

**Conference Adminsitartive Staffs**

*SNU Center for Law & Technology: Phone (82-2) 880-7569 / Fax (82-2) 873-6269 / www.clt.re.kr*
*Myeong-Hee Lee (skdike@snu.ac.kr), Hyeseung Song (shihra@snu.ac.kr)*
*Ji Won shin (ssoo@snu.ac.kr), Joshua Junho Park (ssoo@snu.ac.kr)*

*Berkeley Center for Law & Technology: Phone 510.642.3702 / Fax 510.643.1328 / www.law.berkeley.edu/institutes/bclt*
*David M. Grady (dgrady@law.berkeley.edu)*



goldman school of public policy



**POLICYMATTERS**

# {FEBRUARY 2007 ARCHIVE}

## The fight for Net Neutrality continues

SASHA HORWITZ || FEBRUARY 24, 2007 || SCIENCE & TECHNOLOGY

Savetheinternet.com recently release this video to support their 2007 push to defend Net Neutrality. GSPP Alumni Derek Turner works for Free Press, the media reform organization that operates Save the Internet. Take a look:...

Continue reading "The fight for Net Neutrality continues" »

[PERMALINK] [COMMENTS (1)] [TRACKBACKS (0)]

## San Francisco's Bloody Problem

MATT JORDAN || FEBRUARY 20, 2007 ||

The last three years have seen a notable spike in homicide and gun violence in the Bay Area. In 2005, San Francisco's homicide rate was the highest it had been in more than 10 years, and Oakland's first-half 2006 murder rates were 78% higher than first-half 2005 (the most recent reliable statistics). The past week has seen 5 different shootings in San Francisco's highly integrated Western Addition, and several more in the primarily lower-class neighborhoods of Bayview and Hunters Point. While the San Francisco Police Department vociferously defends its arrest rate for violent crimes (one of the worst in the...

Continue reading "San Francisco's Bloody Problem" »

[PERMALINK] [COMMENTS (0)] [TRACKBACKS (0)]

## Nano debate

JAVIERA BARANDIARAN || FEBRUARY 14, 2007 || SCIENCE & TECHNOLOGY

On January 24th I had the opportunity to attend the Fred Friendly Seminar series Nano: the Power of Small. This was a panel debate on the what sorts of questions government needs to ask when evaluating the responsibilities a new company working with nanotechnology needs to assume. Each panelist played a role in the political process: Christine Daniel, Deputy City Manager of Fremont, was mayor, with two advisors, Andrew Maynard of the Woodrow Wilson Center and Clayton Teague, Director of the National Nanotechnology Coordination Office. Richard Denison, of Environmental Defense, was a city council member representing green groups and Kristen...

Continue reading "Nano debate" »

[PERMALINK] [COMMENTS (0)] [TRACKBACKS (0)]

## Do Liberals Have Wings?

DOUG SPENCER || FEBRUARY 09, 2007 || POLITICS

Not long ago our esteemed classmate Claire Michaels asked a provocative question: is liberal ideology a fairytale? The text of her e-mail follows: I'm reading this book called On Beauty by

### Sidebar

Sonya Blesser

Does Your Legislator's Sex Matter?
**Marianne A. Ferber and Michael Brun**

Private Educational Services: Whom Does the Market Leave Behind?
**Matthew Steinberg**

California's Photovoltaic Gamble
**Adam Langton, Hai Guan, and Anne Su**

Policy in Practice

Courting an Efficient Bureaucracy: Lessons in Judicial Reform
**Kate Harrison**

Special Section: Electoral Policy

Combating Voter Fraud (All of It)
**Paul Leistra**

Restoring Local Voting Rights to Non Citizens
**Chris Finn**

In Defense of Electronic Voting Machines
**Ernie Tedeschi**

Where Do We Draw the Lines? Redistricting Revisited
**Brian Leubitz**

### Navigation sidebar

search this blog:



**L** Technorati

HOME
ABOUT
AUTHORS
SUBJECTS
ARCHIVES
BLOGROLL
SYNDICATION
PAST ISSUES
SUBMISSIONS
CALENDAR



This weblog is licensed under a Creative Commons License.

net e man ionows. I m reading this book called *On Beauty* by Zadie Smith, and there's a part where two black characters are talking about affirmative action, and the conservative one says: "Kiki, if there's one thing I understand about you liberals, it's how much you like to be told a fairytale. You complain about creation myths-but you have a dozen of your own. Liberals never believe that conservatives are motivated by moral convictions as profoundly held as those you liberals...

Continue reading "Do Liberals Have Wings?" »

[PERMALINK] [COMMENTS (7)] [TRACKBACKS (0)]

## A Tale of Two Patent Systems: Pharma and IT Square Off in D.C.

JAMEEL ALSALAM || FEBRUARY 09, 2007 || SCIENCE & TECHNOLOGY

Last Wednesday, Feb 7, Robert Barr, who heads the Berkeley Center for Law and Technology spoke about the current political debate around patent reform, which has mostly stemmed from the differential impacts of the current system on the Biotech/Pharma industries versus the IT industry. Almost none of what is below are my ideas, but rather my regurgitations of Robert's talk. For the pharmaceutical and biotech companies like Genentech and Merck, patents are lifeblood. These companies spend an estimated $700 million researching, developing and FDA testing to bring a new drug to market. Once all this work has been done, it...

Continue reading "A Tale of Two Patent Systems: Pharma and IT Square Off in D.C." »

[PERMALINK] [COMMENTS (3)] [TRACKBACKS (0)]

## Your IQ: all you need to know?

JAVIERA BARANDIARAN || FEBRUARY 01, 2007 ||

In a recent three part article, Charles Murray defends the idea that university and mandatory schooling are not for everyone, and that a gifted few should be selected on the basis of their IQ to attend school and university (read **part 1, part 2**, and **part 3**). Beyond the many caveats with which IQ should be treated - for good responses see **here** and **here**- as David Kirp points out in his article, this is as much about quality education as it is about the kind of society we want to live in.

Continue reading "Your IQ: all you need to know?" »

[PERMALINK] [COMMENTS (2)] [TRACKBACKS (0)]





BERKELEY CENTER FOR
**LAW & TECHNOLOGY**

## Conference Schedule
(Updated March 23, 2007)

**Friday, March 9**

 general photo gallery

**8:00-8:25**
registration & continental breakfast

**8:25-8:30**
**Introduction to the Conference**
Robert Barr, BCLT



IV R

**8:30-10:30**
**Business Models Enabled by DRM Technologies**
🔊 audio    photo gallery
*Moderator* - Anthony Malutta, Townsend and Townsend and Crew
Dean Marks, Warner Brothers 📄 slides
Victoria Bassetti, EMI Music
Tom Rubin, Microsoft Corp.
Todd Alberstone, RealNetworks, Inc. 📄 slides
Gerard Lewis, Comcast
Andrew Bridges, Winston & Strawn 📄 slides
Hal Varian, iSchool, UC Berkeley 📄 slides

**10:30-11:00**
break

**11:00-12:30**
**Private Sector Initiatives to Design Technology to Enable (Some) Privileged Uses**
🔊 audio    photo gallery
*Moderator* - Marc Kauffman, Nixon Peabody
Susan Landau, Sun Microsystems 📄 slides
Rene van Buuren, Telematica Institute, Netherlands 📄 slides
David Sohn, Center for Democracy and Technology 📄 slides
Edward Felten, Princeton University
Julie Cohen, Georgetown Univ. Law Center 📄 slides

**12:30-2:00**
**David Nelson Memorial Keynote Lecture**
photo gallery
*Introduction* - Jim Bennett, Morrison & Foerster 🔊 audio
Commissioner J. Thomas Rosch, FTC 🔊 audio 📄 text

**2:00-3:30**
**What Role Should the Government Play in Enabling or Regulating DRM Technologies?**
🔊 audio    photo gallery
*Moderator* - Neel Chatterjee, Orrick, Herrington & Sutcliffe
Justin Hughes, Cardozo Law School
Gigi Sohn, Public Knowledge
David Carson, Copyright Office 📄 slides

Molly Van Houweling, BCLT & Boalt Hall School of Law
Richard Owens, World Intellectual Property Organization

**3:30-4:00**
break

**4:00-5:30**
**Can Anti-circumvention Rules Be Made Consistent with Privileged Uses?**
🔊 **audio**    **photo gallery**
*Moderator* - Bob Steinberg, Latham & Watkins
Jerome H. Reichman, Duke Law School
Graeme Dinwoodie, Chicago-Kent Law School
Nic Garnett, Interight.com
Ian Kerr, Univ. of Ottawa Law School 📄 **slides**

**5:45-7:00**
Conference Reception at the Berkeley Art Museum
*Sponsored By Townsend and Townsend and Crew LLP*

---

**Saturday, March 10**

**8:00-8:30**
check in & continental breakfast

**8:30-9:00**
**Keynote Lecture**
🔊 **audio**    **photo gallery**
*Introduction* - Pamela Samuelson, BCLT
Lynne Brindley, Chief Executive of the British Library 📄 **slides**

**9:00-10:30**
**Consumer Protection Issues Posed by Sony BMG Copy-Protected CDs**
🔊 **audio**    **photo gallery**
*Moderator* - Laurence Pulgram, Fenwick & West
Deirdre Mulligan, BCLT, Samuelson Clinic, & Boalt Hall School of Law 📄 **slides**
Cindy Cohn, Electronic Frontier Foundation
Natali Helberger, University of Amsterdam 📄 **slides**
Jane Winn, University of Washington School of Law

**10:30-11:00**
break

**11:00-12:30**
**Interoperability Concerns about DRM Technologies**
🔊 **audio**    **photo gallery**
*Moderator* - Roger Ross, McDermott, Will & Emery
Julien Dourgnon, Que Choisir 📄 **slides**
Stefan Bechtold, Max Planck Institute 📄 **slides**
Mitch Singer, Sony Pictures 📄 **slides**
Pamela Samuelson, BCLT, iSchool, & Boalt Hall School of Law 📄 **slides**

**12:30-1:30**
lunch

**1:30-3:00**
**Consumer Protection: Inside of Copyright Law or Outside?**
🔊 **audio**    **photo gallery**
*Moderator* - Peter S. Menell, BCLT & Boalt Hall School of Law
Bernt Hugenholtz, Univ. of Amsterdam Law School 📄 **slides**
Niva Elkin-Koren, Univ. of Haifa Law School 📄 **slides**
Joseph P. Liu, Boston College Law School 📄 **slides**
Peter Swire, Ohio State Univ. Law School 📄 **slides**
Luis Villarroel Villalon, Chile Ministry of Education



June 14-15, 2007
The Ritz-Carlton
San Francisco, CA

ABA SECTIONS OF ANTITRUST
AND INTELLECTUAL PROPERTY LAW

Intellectual Property/Antitrust:
Strategic Choices,
Evolving Standards, and
Practical Solutions

MARK S. POPOFSKY, CONFERENCE CHAIR





# WELCOME

Dear Colleague:

Intellectual property remains a key force in the world economy.  Navigating the evolving intellectual property legal thicket increasingly requires understanding how intellectual property law and antitrust law intersect.  Indeed, in no area of antitrust law are the stakes higher, and the issues more dynamic, than in establishing the rules of the road in areas as diverse as strategic product redesign, standard setting, patent settlements, and the acquisition of intellectual property.

The Section of Antitrust Law and the Section of Intellectual Property Law of the American Bar Association are pleased to invite you to explore these and other issues at the conference titled Intellectual Property/Antitrust: Strategic Choices, Evolving Standards, and Practical Solutions, to be held at The Ritz-Carlton in San Francisco on June 14-15, 2007.

The Conference's focus, as its title reflects, is how companies, and those who counsel them, can better understand how the evolving intellectual property and antitrust laws impact the strategic choices firms in IP-laden industries confront.  A richer understanding of how those legal regimes intersect, and learning from the experiences of seasoned intellectual property/antitrust practitioners, academics, and enforcers, can prove invaluable in developing practical solutions for recurring and novel business problems.

The Conference will bring together an exceptionally talented faculty to tackle these and related issues, including leading academics, notable practitioners, and government officials, among them:  Federal Trade Commissioner Pamela Jones Harbour, Patent and Trademark Office General Counsel James Toupin, U.S. Department of Justice Senior Counsel for Intellectual Property Frances Marshall, Professors Robert Barr, Richard Gilbert, Mark Lemley, and Carl Shapiro, as well as numerous experienced counselors and litigators from the private bar.

The topics the faculty will address reflect the diversity of the field.  Panels will tackle patent reform, the antitrust implications of "strategic" use of intellectual property (most notably product design, pricing, and patent settlements), the licensing and acquisition of intellectual property, standard setting, and patent pools, as well as the numerous strategic and practical issues that arise in litigating intellectual property/antitrust cases. These topics should be of interest and importance to all who practice and guide clients in this area.

We hope to see you in San Francisco in June.

Joseph Angland
Chair, Section of Antitrust Law

Mark Popofsky
Conference Chair

2

# CONFERENCE AGENDA

## Wednesday, June 13

4:30 - 6:00 p.m.
**Registration**

## Thursday, June 14

8:00 - 8:30 a.m.
**Registration**

8:30 - 8:45 a.m.
**Welcome and Introduction**
**Joseph Angland,** Chair, ABA Section of Antitrust Law, Heller Ehrman LLP, New York, NY

8:45 - 9:00 a.m.
**Conference Chair's Opening Remarks**
**Mark S. Popofsky,** Kaye Scholer LLP, Washington, DC

9:00 - 10:00 a.m.
**Keynote Address**
**Mark A. Lemley,** Stanford Law School, Stanford, CA

10:00 - 10:15 a.m.
**Break**

10:15 a.m. - noon
**Patent Reform: Judicial, Legislative, and Administrative Responses
to Fundamental Questions**

The Federal Trade Commission's 2003 report, "To Promote Innovation: The Proper
Balance of Competition and Patent Law," made several significant recommendations,
stimulated extensive debate, and prompted the introduction of major patent-reform
legislation in Congress. Meanwhile, the Supreme Court has issued several important
patent decisions and the US PTO has proposed dramatic modifications to the processing
of patent applications. This panel will explore the impact of actual and proposed changes
to patent law and practice and their impact on competition in various industries.
**Moderator:**

**Robert Barr,** University of California, Berkeley, CA
**Panelists:**

**Susan A. Creighton,** Wilson Sonsini Goodrich & Rosati PC, Washington, DC
**Matthew D. Powers,** Weil Gotshal & Manges LLP, Redwood Shores, CA
**Michael Schallop,** Latham & Watkins LLP, Menlo Park, CA
**James Toupin,** General Counsel, United States Patent and Trademark Office,
Washington, DC

**3**

# CONFERENCE AGENDA

## Thursday, June 14

**12:15 - 1:45 p.m.**
**Luncheon and Remarks**
**Pamela Jones Harbour**, Commissioner, Federal Trade Commission, Washington, DC

**2:00 - 3:30 p.m.**
**"Strategic" Use and Protection of Intellectual Property**
The exploitation and assertion of valuable intellectual property can have strategic benefits for firms. However, this conduct also can pose significant risks. This panel will explore cutting-edge antitrust issues presented by the "strategic" assertion of intellectual property, including strategic product redesign, bundling, strategic pricing, challenges to industry standards, and patent infringement litigation and settlements. Although the pharmaceutical and biotech industries are the scene of many developments in this area, this panel will also discuss how these important antitrust issues apply more generally in intellectual property-driven businesses.
**Moderator:**
**Christopher J. Kelly**, Mayer Brown Rowe & Maw LLP, Washington, DC
**Panelists:**
**David A. Balto**, Washington, DC
**Sean A. Johnston**, Vice President, Intellectual Property, Genentech, Cupertino, CA
**Mark A. Lemley**, Stanford Law School, Stanford, CA
**Jerome A. Swindell**, Senior Counsel, Johnson & Johnson, New Brunswick, NJ

**3:30 - 3:45 p.m.**
**Break**

**3:45 - 5:15 p.m.**
**Current Topics in Intellectual Property Licensing and Acquisition**
This panel will focus on critical issues relating to the antitrust analysis of IP-laden transactions, both in the United States and overseas, including (i) the analytical framework for evaluating intellectual property transactions, particularly market definition and competitive effects; (ii) selected vertical (*i.e.*, tying and exclusive dealing) and horizontal (*i.e.*, pooling and grant backs) intellectual property-licensing issues; and (iii) mergers and acquisitions, including the analysis of pending intellectual property litigation between merging parties and licensing as a remedy for challenged transactions.
**Moderator:**
**Arthur J. Burke**, Davis Polk & Wardwell, Menlo Park, CA
**Panelists:**
**Richard J. Gilbert**, University of California, Berkeley, CA
**Gail Levine**, Assistant General Counsel, Verizon Communications Inc., Arlington, VA
**Gil Ohana**, Director, Antitrust and Competition, Cisco Systems, Inc., San Jose, CA
**Craig Waldman**, Cooley Godward Kronish LLP, Palo Alto, CA

4

# CONFERENCE AGENDA

## Friday, June 15

**8:45 - 9:00 a.m.**
**Opening Remarks**

**9:00 - 10:30 a.m.**
**Standard-Setting: Patent Hold-up, Disclosure, *Ex Ante* Licensing, and the Limits of Self-Regulation**
This past year has witnessed several high-profile standard-setting matters in the agencies and the courts, including *Rambus*, *Golden Bridge*, and the Department of Justice's Business Review Letter in *VITA*. This panel will address these developments and discuss the antitrust risks of *ex ante* disclosure and negotiation of licensing terms (including RAND commitments), intellectual property disclosure obligations of standard setting participants, and the benefits and pitfalls of consortia and joint ventures compared to formal standards development organizations.

**Moderator:**

**M. Howard Morse**, Drinker Biddle & Reath LLP, Washington, DC

**Panelists:**

**Frances Marshall**, Special Counsel for Intellectual Property, Antitrust Division, U.S. Department of Justice, Washington, DC

**Ron Moore**, Legal Standards Team, Microsoft Corporation, Redmond, WA

**Carl Shapiro**, University of California, Berkeley, CA

**Willard K. Tom**, Morgan Lewis & Bockius LLP, Washington, DC



**10:30 - 10:45 a.m.**
**Break**

**10:45 - 12:15 p.m.**
**Litigation Strategy in Intellectual Property/Antitrust Cases**
This panel will review the latest procedural developments relating to the litigation of antitrust claims in the context of patent, copyright, and other intellectual property disputes, and the litigation strategy issues that flow from them. Topics include (i) filing antitrust claims as preemptive strikes in light of *Holmes Group*; (ii) crafting well-pleaded *Walker Process* and sham litigation claims; (iii) working with experts to develop and shape sound antitrust theories that survive summary judgment and *Daubert* motions and find adequate factual support at trial; and (iv) preparing antitrust-based arguments for and against the award of injunctive relief under the four-part *eBay* test.

**Moderator:**

**Henry C. Su**, Howrey LLP, East Palo Alto, CA

**Panelists:**

**Brian P. Brosnahan**, Heller Ehrman LLP, San Francisco, CA

**Karma M. Giulianelli**, Bartlit Beck Herman Palenchar & Scott LLP, Denver, CO

**Donn P. Pickett**, Bingham McCutchen LLP, San Francisco, CA

**Daniel M. Wall**, Latham & Watkins LLP, San Francisco, CA

**12:15 p.m.**
**Adjourn**

5

**CONFERENCE INFORMATION**

## CONFERENCE ABC's

### A. Register

A variety of methods of registration are available for your convenience. We encourage you to register by May 24, 2007. Those registered by this date will qualify for a lower registration, will be included in the Roster of Attendees posted on the conference web site, and will have access to the course materials prior to the conference.

### Methods of Registration



A variety of rates and discounts are available to each attendee. Government and academic rates are available for those with a primary position at an academic or government institution (*i.e.*, law firm lawyers who also are adjunct professors would pay the firm rate). Currently enrolled law students can register for free on-line. The ABA automatically adjusts registrations submitted at the incorrect rate. Full payment at the correct rate must be received in order to process your registration and CLE credits. The ABA does not accept wire transfers or purchase orders.

### Discounts



### Your registration fee includes:

Admission to CLE sessions; CLE credit; Course Materials; Continental breakfast and Thursday lunch.

6

# CONFERENCE INFORMATION

## B. Confirmations

Confirmations will be sent within one day of on-line registration. Those registering via mail or fax should allow 10 days after their registration is received and processed (provided complete information and appropriate payment was submitted). Providing your ABA number does help expedite the process. Please be advised that incomplete or incorrect information will delay the processing of registration forms.

If you have not received your confirmation within the time frame estimated here, please e-mail harrisp@staff.abanet.org. Please allow the estimated time given for confirmations prior to calling the Section to check on the status of your registration.

## C. Cancellations

In the event of cancellation, by the registrant, a refund of the registration fee, less a $50.00 administrative fee, will be granted only for written requests received by Patricia Harris (harrisp@staff.abanet.org) by 5:00 pm CST, May 24, 2007. There will be no refunds after this date. Please allow 4 to 6 weeks after the conference for the processing of any refunds. The ABA reserves the right to cancel any conference or portion thereof and assumes no responsibility for personal expenses.

## D. Substitutions

Written requests for substitutions will be permitted prior to the conference for requests received by May 24th. After May 24th, substitutions will need to be made on-site. There is no additional cost for substitutions. Substitutions are not permitted once a registrant has registered on-site or after the conference has occurred. Please submit a request on firm letterhead to transfer the registration. Once the registration is substituted, it will not revert back to the original registrant. Only the substitute will be eligible for CLE credit. The substitute and original registrant must work out the payment between themselves.

## E. Special Needs

Confirmed registrants should notify pickeriw@staff.abanet.org by May 24 if special assistance for access and/or dietary needs are required.

## F. Sign-in for MCLE Credit

Sign-in for CLE and pick-up your Certificate of Attendance at registration. The majority of attendees only need do this once for the entire conference. NY and DE attendees are required by their states to sign in and out of each session. The forms for NY and DE will be located in the back of each session room. At the conclusion of the conference, NY attorneys should pick-up their customized Certificate of Attendance at the CLE Information Desk. Required sponsor documentation has been forwarded to and credit requested from MCLE states with general requirements for all lawyers. Lawyers seeking credit in PA must pay a fee of $1.50 per credit hour directly to the PA CLE Board. The ABA pays applicable fees in other states where the sponsor is required to do so. In states where a late fee may become applicable, the ABA pays this fee as well.

Please be aware that each state has its own rules and regulations, including its definition of "CLE" as well as "Ethics." Therefore, certain conferences may not receive CLE credit in some states. Please check with your state provider for confirmation of general as well as ethics approval for any conference. A Certificate of Attendance will be available for all attendees at the CLE Information Desk.

Please check the conference website one week prior to the conference for information on the number of CLE credit hours available.

## HOTEL & CONFERENCE VENUE



### Hotel & Conference Venue

A limited number of sleeping rooms have been reserved for conference faculty and participants at The Ritz-Carlton, San Francisco, so please reserve your room promptly. Individuals should contact the hotel directly to make hotel reservations (reference the ABA Section of Antitrust Law 2007 Intellectual Property Conference room block) and for specific information regarding additional charges. After Monday, May 6, 2007 or when the room block is sold out, guest rooms at the ABA rate are not guaranteed and may not be available.

Single/Double - $303.00 + tax

All hotel rates are subject to applicable tax of 14.5%.

The Ritz-Carlton

600 Stockton Street

San Francisco, CA 94108-2331

Ph: 415.296.7465

Fax: 415.291.0288

http://www.ritzcarlton.com/hotels/san_francisco/

Conference sessions will occur at The Ritz-Carlton.

### Messages

Messages for conference attendees may be left with the ABA Intellectual Property Conference registration desk at 415.364.3501. Messages will be posted on a bulletin board as they are received. Messages will not be delivered into the meeting rooms. It is the individual's responsibility to check the board for messages.

### Roster of Participants

A roster of conference participants will be available on the conference website and updated on a weekly basis.   Participants must be registered prior to May 24, 2007 to be listed.

### Tape Recording

No audio recording or videotaping of any part of the conference will be permitted.

## TRAVEL INFORMATION



**Travel Information**

Individuals are responsible for making their own travel arrangements. International travelers should check their visa requirements with their local Embassy or Consulate. We are unable to send out letters supporting visa applications prior to processing the registration.

*Air*—The Ritz–Carlton is located near two major area airports. All airlines offer a full range of domestic and international flights.
- San Francisco International Airport (SFO) is 40 minutes away. Taxi $50-$55
- Oakland International Airport (OAK) is 45-50 minutes away. Taxi $70

We encourage you to use the ABA travel company, Travelocity Business, to receive ABA airfare discount fares. Visit http://www.abanet.org/travel/onlinetravel.html or call **1.866.321.8403**. Please use the ABA American Airlines (preferred airline) discount code #17715 under which your air travel needs to be purchased to receive either the ABA percentage discount or zone fare.

*BART* (www.bart.gov) Bay Area Rapid Transit — provides a clean and efficient public transportation system when getting around San Francisco and the metropolitan suburbs. By BART allow approximately 30 minutes to and from San Francisco International Airport.

*Rental Cars* — ABA members are entitled to special discounts by calling our premier provider, Hertz Rent-A-Car at 1.800.654.3131. Identify yourself as an ABA member to receive the discounted rate.

*Taxi Cabs* — Are available at the exits of each terminal. Dispatchers are available at the exits to assist passengers.

**9**

## Mark Your Calendar
### For Upcoming ABA Sections of Antitrust Law and Intellectual Property Law conferences.

Visit http://www.abanet.org/antitrust/at-calendar/upcoming.html or
http://www.abanet.org/intelprop/calendar.html

**April 12-14, 2007**
22nd Annual Intellectual Property Law Conference
Crystal Gateway, Marriott Hotel, Arlington, VA

**April 18-20, 2007**
55th Annual Antitrust Law Spring Meeting
JW Marriott Hotel, Washington, DC

**August 9-15, 2007**
ABA Annual Meeting
San Francisco, CA

**October 4-5, 2007**
Antitrust Litigation Conference
The Ritz–Carlton Hotel, Philadelphia, PA

**November 15-16, 2007**
Antitrust Law Fall Forum
The National Press Club, Washington, DC

**January 31-February 1, 2008**
International Cartel Conference
The Ritz–Carlton Hotel, San Francisco, CA

**March 26-28, 2008**
56th Annual Antitrust Law Spring Meeting
JW Marriott Hotel, Washington, DC

**April 10-12, 2008**
23rd Annual Intellectual Property Law Conference
Crystal Gateway, Marriott Hotel, Arlington, VA



10

## REGISTRATION

### ABA SECTIONS OF ANTITRUST LAW/INTELLECTUAL PROPERTY LAW
### INTELLECTUAL PROPERTY/ANTITRUST CONFERENCE REGISTRATION
#### June 14-15, 2007, The Ritz-Carlton, San Francisco, CA

| | By May 24 | After May 24 | Qty: | Amt: |
|---|---|---|---|---|
| Antitrust & Intellectual Property Law Section Members | $750.00 | $850.00 | _____ | $_____ |
| Non-Antitrust & Intellectual Property Law Section Members | $850.00 | $950.00 | _____ | $_____ |
| Govt/Academic Antitrust & Intellectual Property Law Section Members | $250.00 | $350.00 | _____ | $_____ |
| Govt/Academic Non-Section Members | $350.00 | $450.00 | _____ | $_____ |
| Antitrust Law Member Benefit Coupon | -$100.00 | -$100.00 | _____ | $_____ |
| Join the Section of Antitrust Law | $50.00 | $50.00 | _____ | $_____ |
| Join the Section of Intellectual Property Law | $75.00 | $75.00 | _____ | $_____ |

Law Students (Limited space available for currently enrolled law students. Please register on-line for complimentary registration; lunches are at an additional fee for students).

**Events**

☐ I will attend the **Thursday Luncheon**                                              $ N/A ____
   Please email pickeriw@staff.abanet.org with any special dietary needs.

                                               **REGISTRATION TOTAL**    $ _____

Please mail/fax the completed registration form with your payment to:
ABA Section of Antitrust Law Meetings Coordinator
321 N. Clark Street
Chicago, IL 60610
Fax: 312.988.5637

**Payments will not be taken over the telephone.**

| 0 | | | | | | | |

(Your 8-digit ABA# begins with a zero and is required to receive the Section Member rate.)

Name:

Title:

Firm/Agency/School:

Address:

City:                                                                          State:

Zip:                                          Email:

Telephone:                                Fax:

☐ Enclosed check (make payable to the American Bar Association).

☐ Credit Card Number & Expiration Date

Number:_____ Expiration:_____

Signature:_____

Please call with any questions at 312.988.5609

**11**

Non-Profit Organization
U.S.Postage
PAID
American Bar Association



# EXHIBIT I

**From:**    Richard Rainey
**To:**      Telcordia-Atty-Group
**Date:**    8/26/05 4:43PM
**Subject:** Fwd: Re: Telcordia v. Cisco

Richard L. Rainey
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
901 New York Ave., NW
Washington, DC  20001
Phone: (202) 408-4019
Fax: (202) 408-4400
Internet: richard.rainey@finnegan.com

NOTICE: This e-mail is sent by a law firm and may contain information that is confidential, protected, or
privileged.  If you are not the intended recipient, please delete the e-mail and any attachments and notify
us immediately.

>>> <edward.reines@weil.com> 08/26/05 04:41PM >>>
Agreed.  Have a good weekend.


            "Richard Rainey"
            <Richard.Rainey@fi      To:    <edward.reines@weil.com>
            nnegan.com>             cc:    "Don Dunner" <don.dunner@finnegan.com>
                            Subject: Telcordia v. Cisco
            08/26/2005 01:34
            PM




Dear Ed:
   Following up on our phone conference of today, attached is a revised
version of the agreement between Telcordia and Cisco.  The only change is
in paragraph 3 where we added the language "on a rolling basis to be
completed" immediately following "No. 1" and changed the date from October
1 to October 31.  Please advise by return email whether we are in
agreement.

Regards,
Richard.

Richard L. Rainey
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
901 New York Ave., NW
Washington, DC  20001
Phone: (202) 408-4019
Fax: (202) 408-4400
Internet: richard.rainey@finnegan.com

NOTICE: This e-mail is sent by a law firm and may contain information that
is confidential, protected, or privileged. If you are not the intended
recipient, please delete the e-mail and any attachments and notify us
immediately.

(See attached file: Telcordia Cisco Agreement.doc)

< END >

----------------------------------------------
The information contained in this email message is intended only for
use of the individual or entity named above. If the reader of this
message is not the intended recipient, or the employee or agent
responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this
communication in error, please immediately notify us by email
(postmaster@weil.com), and destroy the original message. Thank you

**Agreement regarding:**

    **(1) Mutual substantial completion of document production;**
    **(2) Cisco's supplementation of its answer to Telcordia Interrogatory No. 1;**
    **(3) Cisco's document production associated with its supplementation of its answer to Telcordia Interrogatory No. 1; and**
    **(4) Telcordia's noticed Rule 30(b)(6) deposition of Cisco.**

**Cisco and Telcordia agree as follows:**

    (1) The parties agree to the mutual substantial completion of document production by October 31, 2005. As part of its production, Cisco will provide a complete document production as to all products identified by Telcordia in its July 14, 2005, supplemental answers to Cisco Interrogatory Nos. 1-3. This agreement applies to document production in response to the parties' first respective sets of requests for production, subject to objections.

    (2) Cisco agrees to supplement its answer to Telcordia Interrogatory No. 1 by October 1, 2005, as follows:

        (a) Cisco will identify all of its products (i) that enable customers to transmit data over SONET, and (ii) that Cisco has used to transmit data over SONET;

        (b) Cisco will identify all of its products that it has promoted as compliant with the ATM Forum Standard, the I.363.1 standard, or the ANSI T1.630 standard, as those standards are specified by the paragraph numbered "3" in our July 13, 2005, letter; and

        (c) Cisco will identify all of its products that it has promoted as compliant with GR-1400, as those standards are specified by the paragraph numbered "5" in our July 13, 2005, letter.

    (3) Cisco agrees to produce "relevant functionality" documents for all products identified in Cisco's supplemental answer to Telcordia Interrogatory No. 1 on a rolling basis to be completed by October 31, 2005. In producing these "relevant functionality" documents, Cisco will make a good faith effort to insure that its document production:

        (a) thoroughly addresses the specific functionalities and standards / GR sections set forth in our July 13, 2005, letter (the ATM Forum Standard (*see, e.g.*, af-vtoa-0078.000 Section 3.4.1), the ITU-T Standard I.363.1 (*see, e.g.*, Section 2.5.2.2.2), the ANSI T1.630 standard (*see, e.g.*, Section 5 referencing I.363.1), and/or GR-1400 Issue 1, Revision 1, Section 3);

     (b) provides Telcordia with adequate information in order to make its "threshold" infringement determination for each product identified by Cisco in its supplemental response to Telcordia Interrogatory No. 1;

     (c) discloses all relevant components for each product identified by Cisco in its supplemental response to Telcordia Interrogatory No. 1; and

     (d) provides enough information for Telcordia to identify any integrated circuits involved in the functionalities set forth in our July 13, 2005, letter.

(4) Telcordia will refrain from taking its noticed Rule 30(b)(6) deposition until after October 31, 2005.

(5) By agreeing to this plan, neither party is conceding that the discovery to which it is entitled in this case should be so restricted. Both parties reserve the right to seek broader and additional discovery.

# EXHIBIT J

## WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

. FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(650) 802-3118
sonal.mehta@weil.com

October 6, 2005

**VIA E-MAIL**

John Williamson, Esq.
Finnegan Henderson Farabow
   Garrett & Dunner LLP
901 New York Avenue NW
Washington, DC 20001-4413

Re:    *Telcordia v. Cisco*, C.A. No. 04-876-GMS

Dear John:

I write in response to your letter of September 27, 2005 concerning Cisco's document production. Cisco is working in good faith to substantially complete its document production by October 31, 2005, pursuant to the parties' August 26, 2005 agreement.[1]

With regard to the specific issues raised in your letter, Cisco will be producing, subject to its objections, responsive technical documentation and bills of materials showing the relevant components of products identified in Cisco's September 30 supplemental response to Interrogatory No. 1. Cisco also intends to produce responsive email from the custodians we have identified in our investigation.

Your letter also requests financial and sales information. Pursuant to our written responses and objections to Telcordia's first set of document requests, Cisco

---

[1]    Your letter references a letter of August 5, 2005. We are not aware of any correspondence from your firm on August 5, 2005. To the extent you meant to reference your letter of June 15, 2005 concerning Cisco's responses to Telcordia's document requests, I refer you to my letter of August 16, 2005 setting forth our response.

WEIL, GOTSHAL & MANGES LLP

John Williamson, Esq.
October 6, 2005
Page 2

intends to produce financial information for the products accused of infringement. Please let us know the products you are accusing once you identify them.

Finally, though it should go without saying, we expect Telcordia's production to be substantially complete as to all the categories of documents in Cisco's first set of document requests by October 31, 2005. Based on Telcordia's responses to Cisco's document requests, we understand that Telcordia will be producing, subject to its objections, documents responsive to each of Cisco's requests. However, Telcordia has not, to date, produced documents responsive to certain of Cisco's requests, including in particular all license agreements for the patents-in-suit. We have asked for these agreements repeatedly, and request that you produce them immediately.

Very truly yours,

Sonal N. Mehta

# EXHIBIT K

WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE
201 REDWOOD SHORES PARKWAY
REDWOOD SHORES, CALIFORNIA 94065
(650) 802-3000
FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

(650) 802-3118
sonal.mehta@weil.com

March 16, 2006

**VIA EMAIL**

Geoffrey C. Mason, Esq.
Finnegan Henderson Farabow
  Garrett & Dunner LLP
901 New York Avenue NW
Washington, DC 20001-4413

Re:     _Telcordia v. Cisco_, C.A. No. 04-876-GMS

Dear Geoff:

I write in response to your February 27, 2006 letter concerning deficiencies in Telcordia's document production, the subject of Cisco's December 29, January 24, February 2, February 15 and February 25 communications to Telcordia.

In your letter, you suggest that Cisco's "allegations" about Telcordia's document production have "proven to be inaccurate" and essentially refuse to engage in a meet and confer on the deficiencies we have identified in your production. This response is not well-taken.

At the outset, Telcordia appears to be fundamentally misunderstanding Cisco's meet and confer communications. We have repeatedly asked Telcordia to either complete its production to address the deficiencies we have identified or to "confirm that no additional documents exist." If it is true that Telcordia has "gathered and produced, subject to [y]our objections, responsive documents based on a diligent search of Telcordia's files," Telcordia should be able to confirm that in a letter to Cisco as

WEIL, GOTSHAL & MANGES LLP

Geoff Mason, Esq.
March 16, 2006
Page 2

requested. Telcordia's indignant refusal to do so raises serious concerns about the adequacy of its search.

These concerns are amplified by the eleventh-hour production by Telcordia of important documents. Telcordia attempts to make much of the fact that our February 15, 2006 letter specifically calls out only one example of Telcordia's inadequate production. Setting aside the fact that this one example is just that – an example – and that the other inadequacies in Telcordia's production are detailed in our December 29 letter, it is ironic that the very example called out in our letter has itself has proven to be correct, contrary to your suggestion. Specifically, late in the evening on February 17, 2006, Cisco learned for the first time that Telcordia had possession of a draft standards document requested in our December 29, 2005 letter. Cisco only learned that Telcordia had possession of this document when we saw Telcordia's portion of the Joint Claim Construction Statement hours before its filing. We were obviously shocked to see Telcordia's citation to the document because you had represented, just days before, that it was not in Telcordia's possession, custody, or control. *See* February 8, 2006 Letter from G. Mason ("The document in question is a draft document nearly 20 years old. Based upon a reasonably diligent search of Telcordia's files, it is not in Telcordia's possession, custody, or control."). The eleventh-hour disclosure (literally) of a document that you represented was not in Telcordia's possession, custody or control proves that one of two things happened: either Telcordia purposefully withheld this document to cause prejudice to Cisco or Telcordia did not perform an adequate search for the document in response to our document requests served nearly a year ago. Both possibilities seriously call into question your assurances that Telcordia has "gathered and produced, subject to [y]our objections, responsive documents based on a diligent search of Telcordia's files."

Further confirming that Telcordia has not in fact completed its production of documents responsive to our discovery requests, you state in your letter that Telcordia will "substantially complete" its document production by March 31, 2006. We are startled to learn that Telcordia's production was not substantially completed by October 31, 2005, at least as to document requests 1-100, as agreed to by the parties on August 26, 2005. There is no justification for Telcordia's belated production of documents. Unlike Cisco, which undertook significant burden and expense to substantially complete its production for the January 23, 2006 list of newly-accused products by March 10, 2006, the scope of discovery requested from Telcordia has not significantly changed since Cisco's first set of requests were served over 11 months ago. There is simply no justification for Telcordia's failure to abide by the August 26, 2005 agreement requiring substantial completion of its document production by October 31, 2005.

**WEIL, GOTSHAL & MANGES LLP**

Geoff Mason, Esq.
March 16, 2006
Page 3

We would like to meet and confer on Monday, March 20 at 1 pm ET to discuss the deficiencies identified in our December 29, 2005 letter and the issues raised herein. Please be prepared to address specifically each of the points raised in our communications. If Telcordia refuses to meet and confer in good faith, we will have no choice but to seek the Court's assistance.

Very truly yours,

Sonal N. Mehta