MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

RODGER D. SMITH II
302 351 9205
302 498 6209 FAX
rsmith@mnat.com

January 31, 2012 - Original Filing Date
February 7, 2012 - Redacted Filing Date

REDACTED - PUBLIC VERSION

The Honorable Gregory M. Sleet
United States District Court
for the District of Delaware
844 North King Street
Wilmington DE 19801-3570

*VIA ELECTRONIC MAIL*

Re: *Telcordia Technologies, Inc. v. Cisco Systems, Inc.*; C.A. No. 04-876 (GMS)

Dear Chief Judge Sleet:

Pursuant to the Court's guidance during the October 14, 2011 telephonic hearing, Cisco provides this submission relating to the calculation of post-verdict royalties.

**A. Introduction**

This issue arises at the tail end of the patent dispute between Telcordia and Cisco that has included fifteen plus years of licensing discussions and nearly eight years of litigation. Over the years, the parties have had numerous discussions to try to resolve this matter. The sticking point at every juncture has been Telcordia's unreasonable demands concerning the value of its patents. The instant dispute focuses on Telcordia's last-ditch attempt to extract a windfall profit, this time for post-verdict royalties. To do this, Telcordia ignores the effective royalty rate awarded by the jury following a full-blown presentation of evidence, and instead attempts to apply an inflated royalty rate that is divorced from real world facts.

When it first initiated this litigation, Telcordia asserted what it considered to be three of its "champion" patents against Cisco in an attempt to demonstrate the value of Telcordia's portfolio and pressure Cisco into a large settlement. But after the Court's Claim Construction Order, Telcordia was forced to agree that the patent it had considered to be its premier patent—and the source of almost all of its expected licensing revenue—was not infringed by Cisco. This Court granted summary judgment of non-infringement on multiple independent grounds, a ruling later affirmed by the Federal Circuit. Although Telcordia consequently reduced its damages demand based on the lesser value of its two remaining asserted patents, in the weeks leading up to trial, Telcordia still pursued an unreasonable damages theory. Just before trial, this Court granted Cisco's motion *in limine*, reducing Telcordia's asserted damages from nearly $200 million to $77 million. Although the jury found the two patents valid and infringed, it rejected Telcordia's damages demand and awarded only $6.5 million.

Dissatisfied with the verdict, Telcordia now attempts to recover a far bigger payout for

post-trial damages than what the jury awarded. Cisco has already paid Telcordia over million— —covering the jury's verdict, pre- and post-judgment interest, and post-verdict sales, applying an effective royalty rate calculated by Telcordia based on the jury's verdict. Yet, Telcordia continues to seek further payment, demanding that Cisco pay the effective royalty rate awarded by the jury for post-verdict sales, resulting in an ***additional amount of nearly*** on the two patents, one of which expired only months after the verdict and the other set to expire in October 2012. This request far exceeds the jury's award on the same patents for a six-year period—the jury award on over $1.1 billion in sales amounted to only $6.5 million (before interest),[1] while Telcordia now seeks over In fact, the total amount Telcordia seeks from Cisco for post-verdict sales on these two patents of all of Telcordia's patents (a total of 559 U.S. patents and 333 foreign patent equivalents at the time) and all existing license agreements for not more than *See* Ex. 1 Telcordia's demands are excessive.

### B. Factual Background And Summary Of The Dispute

Your Honor presided over the trial of this case in April and May 2007. On May 10, 2007, the jury found that Cisco infringed the asserted claims of the '633 and '763 patents and that those patents were not invalid or unenforceable. D.I. 420 at 1. The jury awarded Telcordia $6.5 million, very close to the amount identified by Cisco's expert for a fully paid-up lump sum royalty for the life of the patents. The Court awarded prejudgment interest on that damages award, and ordered an accounting of interim sales from January 31, 2007 to the date of the judgment. *Id.* at 27, 29. The Court ordered the parties to negotiate the terms of a reasonable royalty that would apply to post-judgment sales. *Id.* at 24-27. After appeal, the Federal Circuit remanded to allow the parties to complete negotiations of the ongoing royalty.

The parties have agreed that, for purposes of the ongoing royalty calculation, the jury's award represents an *effective* royalty rate of 0.64 percent.[2] The parties then applied that 0.64 percent royalty to post-verdict sales, and ***Cisco has already paid*** Telcordia a total of which included (a) the jury award; (b) the amount for the accounting period; (c) pre- and post-judgment interest; ***and*** (d) the amount for post-verdict sales at the jury's 0.64 percent effective royalty rate.

As a result, the dispute before the Court is on the narrow question of whether Telcordia should get ***an additional payment of*** which is the incremental royalty resulting from Telcordia's application of a royalty rate more than that applied by the jury to Cisco's post-verdict sales. Specifically, Telcordia seeks for sales of products

---

1 As set forth below, the damages award based on the entire market value of the products grossly overcompensates Telcordia for any infringement. Telcordia's request for an even larger royalty rate on an already oversized base only compounds that inequity.

2 Telcordia calculated an effective royalty rate of 0.64% based on the ratio of jury's $6.5 million damages award over Cisco's total sales of accused products through trial. Without agreeing that this is what the jury's award represents, Cisco has agreed to pay this rate on the remaining sales so as to cut-off further requests for post-judgment interest. Of course, the fact that Cisco has already made this payment should not be a basis for Telcordia to urge "splitting the difference" between what Cisco has paid and what Telcordia seeks. As set forth herein, Cisco has already paid more than what Telcordia is reasonably entitled to.

(whether they practice the '763 or the '633 patent) until the expiration of the '763 patent, and then [redacted] for the remainder of the life of the '633 patent.[3] *Compare* Ex. 2 ("Scenario A" calculation applying effective royalty rate of 0.64 resulting in [redacted] already paid by Cisco[4]) *with* Ex. 3 ("Scenario B" calculation applying Telcordia's proposed royalty rate and seeking an additional [redacted] over what Cisco has paid). In terms of sheer dollar value, Telcordia now seeks a total of [redacted] that Cisco has already paid on a $6.5 million verdict.

**1. Summary Of Applicable Law**

Courts regularly base their awards of ongoing royalties on the jury's award. *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 628 (Fed. Cir. 1985); *Orion IP, LLC v. Mercedes-Benz USA, LLC*, No. 6:05 CV 322, 2008 U.S. Dist. LEXIS 108683, at *13-14 (E.D. Tex. Mar. 28, 2008), vacated on other grounds, 605 F.3d 967 (Fed. Cir. 2010) (applying the royalty awarded by the jury to the ongoing royalties and rejecting plaintiff's request to double that rate because it failed to show how the situation after the verdict was any different than that presented at trial); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 442 (E.D. Tex. 2006) ("Calculating the appropriate royalty rate for any future infringement . . . can be made based on the same reasonable royalty calculation used by the jury at trial."); *see also Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 918 (E.D. Tex. 2008). In fact, courts caution against disregarding the jury's award and reevaluating the same evidence already been considered by the jury. *See, e.g., Amado v. Microsoft Corp.*, No. CV 03-242, 2008 U.S. Dist. LEXIS 110152, at *30 (C. D. Cal. Dec. 4, 2008) (*Amado III*) (noting it would be error to consider a license that predated the judgment and was already considered by the jury).

In deciding whether to adjust the royalty rates warranted by the jury's award, courts consider whether the parties' bargaining positions and economic circumstances have changed post-verdict on a case-by-case basis. *See, e.g., Amado v. Microsoft Corp. (Amado II)*, 517 F.3d 1353, 1361-62 (Fed. Cir. 2008). The prevailing view is to engage in a Georgia-Pacific analysis even in a post-judgment context, but assess only the factors that may have changed post-verdict. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335, 2010 U.S. Dist. LEXIS 79039, at *16-22 (S.D. Cal. Aug. 5, 2010) (applying a selected set of Georgia-Pacific factors to a hypothetical negotiation taking place on the date the court upheld the jury's findings and denied motion for permanent injunction); *Cummins-Allison Corp. v. SBM Co.*, 584 F. Supp. 2d 916, 918-19 (E.D. Tex. 2008) (reasoning that the Georgia-Pacific factors are still relevant in a post-judgment context and rejecting the argument that "everything has changed" after the verdict); *Ariba*, 567 F. Supp. 2d at 918 (same); *Orion IP, LLC*, 2008 U.S. Dist. LEXIS 108683, at *14 (same). Even courts that do not formally apply Georgia-Pacific balance the same considerations that the jury in this case was instructed to consider, including the nominal value of the infringing portion of the overall product, the low cost of the implementation of the design-around, and the patentee's status as a non-competing entity as detrimental to the patentee's bargaining power during the post-verdict period. *Amado III*, 2008 U.S. Dist. LEXIS 110152, at *16-34. The age of the technology and changes in the market may also justify a reduced rate. *See, e.g., Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 987 (N.D. Cal. 2009).

---

3 The '763 patent expired on Feb. 4, 2008; the '633 patent expires on Oct. 30, 2012.

4 Cisco has also paid an additional [redacted] in interest on top of this amount.

### C. Telcordia Has No Legitimate Basis To Demand A Royalty Far Exceeding That Awarded By The Jury

The jury returned its verdict applying a 0.64 percent effective royalty rate based on a full-blown presentation of evidence by both sides' expert and fact witnesses and jury instructions explaining reasonable royalty law at the time. Although Telcordia bases its request for a higher royalty rate on the supposed change in circumstances following the verdict, both the law and the post-verdict facts confirm that Telcordia has been paid what it is due, indeed more.

#### 1. Telcordia Received More Than Fair Compensation Based On The Royalty Base Alone

Since the trial in this matter, the Federal Circuit has clarified that a damages award cannot be based on the entire market value of a product where the patented feature is only a part of that product. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Applying that principle, Telcordia has already received damages beyond what it is due. For example, for the '633 patent, Telcordia sought damages on large multi-service switches and routers and the cards optionally used with those devices, even though the functionality was admittedly present only on a chip on certain of the cards, and even then where the customer had to elect to use the accused function rather than several noninfringing alternatives that were also programmed onto the chip and much more widely used. *See, e.g.,* Trial Tr. at 1394:19-1397:20. For Telcordia to now seek to recover an even higher royalty rate on that base confirms that Telcordia is seeking a windfall, not fair compensation for the infringement.

#### 2. The Parties' Post-Verdict Bargaining Positions Support A Royalty Rate Lower Than, But In No Event Exceeding, The Jury's Effective Rate

As with the damages base, events since trial support a ***reduced*** royalty rate for ongoing royalties, not the higher rate Telcordia demands. Indeed, even though Telcordia won on liability, Telcordia's bargaining position in a reasonable royalty analysis has weakened. First, at the time of the verdict, the '763 patent, which represents the ***vast*** majority of post-verdict sales, had less than nine months before expiration. Patents near expiration are less useful to potential licensees, especially for aging technology. Moreover, assuming the parties were negotiating the ongoing royalty at the time of the May 2007 verdict and Telcordia demanded the exorbitant royalty of [redacted] percent, Cisco would have been motivated to find an alternative, including, for example, by deferring sales of the products accused of infringing the '763 patent during the period between the verdict and patent expiration or advising customers not to deploy the systems until after the patent expired. Indeed, because Telcordia asserted only method claims requiring the products to be deployed in a very particular way in a customer's network, many of the post-verdict sales would not be used until after expiration of the patents. For example, accused products could not infringe until they were shipped, put into service and configured to use the accused functionality, which would not happen immediately because of the complexity of the accused products and the customer systems and networks into which they are incorporated. And even for those systems that might have been deployed before the patent expired, Cisco could have disabled the accused functionality for customers during the short period until expiration.

Likewise, for the '633 patent, it is likely that Cisco would have adapted its products to further design-around or otherwise avoid infringement at a minimal cost. Such design changes could have been implemented relatively quickly with relative ease, especially because the technologies underlying both the '763 and '633 patents are optional and noninfringing

alternatives were already being provided by Cisco. *See, e.g.,* Trial Tr. at 1394:19-1397:20, 1526:22-1542:6, 1104:22-1105:22, 1116:5-6, 1795:15-1796:8. Cisco has discontinued all but one of the cards accused of practicing the '633 patent and began the phase-out of the only remaining card while Telcordia's motion for injunctive relief was pending. D.I. 391 at 33-35.

Moreover, there is no evidence that sales of the accused products or any ancillary products are driven by the accused functionality. As Cisco established at trial, the accused functionality is one of three methods of providing synchronization in unstructured ATM circuit emulation, which itself is only one extremely limited use of the multiservice network cards accused of infringing the '633 patent. Trial Tr. at 1898:5-1901:2. Cisco's damages expert estimated that less than 1.0 percent of the customers for accused products had any products configured for use of the functionality. *Id.* The functionality accused of infringing the '763 patent is one of many types of available protection schemes, and the customer chooses which of the many choices is the most appropriate for its network. *Id.* The balance of these factors outweighs any impact the infringement finding may have had on Telcordia's bargaining power.

Telcordia's argument that it should get a huge premium over the jury's verdict because "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement," *Amado II,* 517 F.3d at 1361-62, misses the mark. Any "difference" is largely due to the threat of an injunction. *See id.,* 517 F.3d at 1362 ("This is not a case like *Paice*, however, where the court's task was to assess an appropriate level of damages for ongoing infringement under circumstances in which an injunction was not warranted. Here, Microsoft *was* enjoined from further infringing activity yet was permitted to continue only by virtue, and with the imprimatur, of the court-ordered stay."); *see also Presidio Components, Inc.*, 2010 U.S. Dist. LEXIS 79039, at *14 (S.D. Cal. Aug. 5, 2010); *Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 03-027-SLR, slip. op at 7 (D. Del. Sept. 30, 2009) (concurring in the *Amado* analysis, but acknowledging that the patentee's strengthened bargaining position results from the hold-up effect resulting from a risk of injunction). There is no injunction threat in this case because the Court has already denied Telcordia's request for an injunction. D.I. 420 at 24-26. Thus, "[w]here, as here, an injunction is no longer proper, the Court is hard pressed to find in what material respect the situation is different now than it was during trial." *Presidio Components, Inc.*, 2010 U.S. Dist. LEXIS 79039, at *13.

Likewise, Telcordia's argument that an increase in the ongoing royalty rate is warranted because Cisco continued to infringe after the finding of willful infringement is wrong. Indeed, given the Court's rulings that an injunction is not appropriate, that Cisco's conduct did not warrant any enhancement of damages, and that an ongoing royalty was sufficient to fully compensate Telcordia for Cisco's ongoing sales and permitted Cisco to continue those sales—there is nothing wrongful about such conduct. *See, e.g., Amado II*, 517 F.3d at 1362 (rejecting the use of the willfulness finding as a multiplier for an ongoing royalty).

**3. Telcordia's [REDACTED] Confirm Its Demands Are Inflated**

Even beyond the above factors, Telcordia's own [REDACTED] confirm that jury's rate should be reduced or, at a minimum, maintained. Telcordia's [REDACTED] show that Telcordia still does not have [REDACTED] for the '763 or the '633 patent, let alone one even remotely close to the rates is seeks to extract from Cisco. If anything, a close review of the [REDACTED] Telcordia has produced supports Cisco's request for a royalty of no more than 0.64 percent. Telcordia has produced [REDACTED] that were not considered by

the jury in reaching its verdict: (1) a [redacted] and (2) [redacted][5]

The [redacted], based on dollar value alone, reflects a royalty rate even lower than the 0.64 percent effective royalty rate that Cisco has already paid to Telcordia for post-verdict sales. Just days before trial, Telcordia's damages expert served a supplemental expert report setting forth his damages calculations for Cisco and Lucent heading into trial. For Lucent, he proposed [redacted] in damages on a base of [redacted], at a royalty rate of 2.0 percent. Exh. 4 (April 20, 2007 Nawrocki Supp. Report). Just before the start of trial, [redacted] Exh. 5 ([redacted] Applying that amount to the [redacted] damages base used by Telcordia's expert for Lucent results in an effective royalty rate of [redacted] less than the rate Telcordia now asserts as [redacted]." But even this overstates [redacted] The [redacted] damages base sought by Telcordia on the eve of trial was for sales by Lucent only, not for sales by Alcatel which are [redacted]. In fact, Telcordia had separate claims pending against Alcatel, which resulted in an even larger damages base. Thus, the effective royalty rate was ***even lower*** than [redacted]

With respect to [redacted] This amounts to an effective royalty rate of [redacted][7] For the [redacted] Nonetheless, [redacted] suggest that Telcordia could not be more wrong [redacted]

- [redacted] ([redacted]) [redacted]
- [redacted]
- [redacted]

---

[5] Telcordia has refused to identify [redacted]. The identity of [redacted] would obviously be relevant to the Court's determination of the effective royalty rate and whether [redacted] of Cisco's standing would consider.

[6] The agreement also includes nonmonetary terms, [redacted]

[7] The [redacted]

Significantly, each of the . Cisco's payment of a 0.64 percent royalty rate is thus more than reasonable.

Despite all of this evidence, Telcordia nonetheless seeks excessive so-called of percent on the '763 and the '633 patents for the life of the '763 patent, and percent on the '633 patent after the '763 patent expires. *See* Exh. 11 (Dec. 3, 2010 Email from J. Williamson). Telcordia asserts that these *Id.* But, for a host of reasons, that provides little support for Telcordia's inflated demands:

- The jury already considered the term sheet in reaching its 0.64% verdict. PTX-59 at 3.
- The "
- The claimed percent royalty rate for the '763 patent is more than five times the effective rate the jury awarded, and also significantly higher than the 2 percent rate Telcordia's own expert advocated for that patent at trial. Trial Tr. at 1254:4-18.
- Since the verdict, t for the '763 patent. Similarly, for the '633 patent, there is no t on a tiny royalty base.
- Telcordia demanded in post-trial motions that Cisco pay this alleged but the Court denied that request, instead ordering the parties to negotiate a reasonable royalty rate going forward. D.I. 420 at 27.

**D. Conclusion**

For the reasons set forth above, the post-verdict landscape provides little bargaining power for Telcordia to negotiate a rate exceeding the jury's effective royalty rate, a fact confirmed by Telcordia's own Applying that rate, Telcordia has already received million on a $6.5 million jury verdict, representing more than fair compensation for any use of the '763 and the '633 patents for their life. It is time for this litigation to end.

---

8

9 Although the effective royalty rate for *past* sales y

                              Respectfully,

Jack B. Blumenfeld (#1014)

JBB/dlb
Enclosures
cc: Clerk of Court (Via Hand Delivery; w/ encl.)
Steven J. Balick, Esquire (Via Electronic Mail; w/ encl.)
Donald Dunner, Esquire (Via Electronic Mail; w/ encl.)
5152980.1