IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC., )
)
    Plaintiff/Counterclaim Defendant, )
)
v. )    Civil Action No.  04-876-GMS
)
CISCO SYSTEMS, INC., )
)
    Defendant/Counterclaim Plaintiff. )

## MEMORANDUM

### I.    INTRODUCTION

On May 10, 2007, a jury returned a unanimous verdict in favor of the plaintiff Telcordia Technologies, Inc. ("Telcordia"), finding that U.S. Patent Nos. RE 36,633 (the "'633 patent") and 4,835,763 (the "'763 patent") (collectively, "the patents-in-suit") were valid, and that Cisco Systems, Inc., ("Cisco") willfully infringed the asserted claims of the '633 and '763 patents. (D.I. 346.) On May 16, 2007, the court entered judgment on the verdict. (D.I. 348.) In its post-trial motions, Telcordia sought a permanent injunction or, in the alternative, an order requiring Cisco to pay an ongoing market-rate royalty. (D.I. 366.) The court declined Telcordia's requests, ordered the parties to negotiate the terms of a reasonable royalty rate going forward, and directed the parties to submit competing proposals if they failed to reach an agreement on their own. (D.I. 420 at 27.) On appeal, Cisco challenged, *inter alia*, the court's holding that the asserted claims of the '763 are valid, and the court's order requiring the parties to negotiate an ongoing royalty. *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1367 (Fed. Cir. 2010). The Federal Circuit affirmed the court's findings on those issues and remanded to allow the parties to negotiate the terms of the royalty. *Id.* at 1379. Unfortunately, the parties' negotiations

were unsuccessful. Presently before the court are Telcordia's and Cisco's cross-proposals for an ongoing royalty rate on post-verdict sales of products that infringe the patents-in-suit. (D.I.s 434; 435.)

## II.   BACKGROUND

The patents-in-suit relate to telecommunications networks. In particular, the '633 patent discloses a residual time stamp technique method and apparatus for timing recovery in a broadband network. The '763 patent is directed to a survivable or self-healing fiber optic ring network that can withstand a cut line or failed node.

Prior to trial, the court granted Cisco's motion *in limine* to limit Telcordia's '633 patent damages theory to only "boxes" that were sold with a specific card capable of infringing the '633 patent, not the total number of "boxes" Cisco sold. (D.I. 335 at 5.) That reduced Telcordia's asserted damages from nearly $200 million to $77 million. (D.I. 434 at 1.) At the conclusion of trial, the jury found the asserted claims of the two patents valid, and awarded Telcordia $6.5 million as compensation for Cisco's willful infringement. (D.I. 346.) The court granted Telcordia's post-trial motion for prejudgment interest, but denied its motions for enhanced damages and attorney fees. (D.I. 420 at 2.) After remand from the Federal Circuit, Telcordia calculated an effective royalty rate of 0.64% for past infringement based on the ratio of the jury's $6.5 million damages award over Cisco's $1.1 billion total sales of accused products through trial. (D.I. 434 at 2; D.I. 435 at 1.) In order to narrow the dispute and cut-off additional interest on the judgment, Cisco paid Telcordia $11,667,028. That sum represents the $6.5 million jury award for past infringement, pre- and post-judgment interest, and an amount for post-verdict sales of the accused products at the 0.64% effective royalty rate. (D.I. 434 at 2; D.I. 435 at 1.) Accordingly, the dispute before the court is the narrow question of whether the jury's effective

royalty rate for past infringement is the appropriate measure of damages to compensate Telcordia

for Cisco's post-verdict infringement.

## III.   STANDARD OF REVIEW

If a permanent injunction is not warranted, courts have the power to assess a reasonable

ongoing royalty in light of continued infringement when the parties are unable to negotiate a

license regarding the future use of a patented invention. *See Paice LLC v. Toyota Motor Corp.*

*(Paice II)*, 504 F.3d 1293, 1315 (Fed. Cir. 2007).  "[A]n assessment of prospective damages for

ongoing infringement should 'take into account the change in the parties' bargaining positions,

and the resulting change in economic circumstances, resulting from the determination of

liability.'"  *ActiveVideo Networks, Inc. v. Verizon Communs., Inc. (ActiveVideo II)*, 694 F.3d

1312, 1343 (Fed. Cir. 2012) (quoting *Amado v. Microsoft Corp. (Amado II)*, 517 F.3d 1353,

1362 (Fed. Cir. 2008)).   In *ActiveVideo II*, the Federal Circuit clarified that a liability

determination affects the prospective damages assessment in the ongoing royalty context, as well

as when royalty damages are imposed for an injunction that was stayed during appeal.  *Id.*

Indeed, the Federal Circuit has emphasized that damages for post-verdict infringement are

fundamentally different from a reasonable royalty for pre-verdict infringement.  *Amado II*, 517

F.3d at 1361.

> Prior to judgment, liability for infringement, as well as the validity
> of the patent, is uncertain, and damages are determined in the
> context of that uncertainty.  Once a judgment of validity and
> infringement has been entered, however, the calculus is markedly
> different because different economic factors are involved.

*Id.* at 1362.  Although the Federal Circuit has not delineated specific economic factors for courts

3

to assess in an ongoing royalty context,[1] it has noted that a party's position is stronger after prevailing on appeal. *ActiveVideo II*, 649 F.3d at 1343. Accordingly, the court must exercise its discretion in considering all relevant economic factors presented by the parties and provide a clear explanation of its reasons for the imposed ongoing royalty rate. *See Paice II*, 504 F.3d at 1315.

## IV. DISCUSSION

Although the court strongly encouraged the parties to be reasonable in their negotiations, (D.I. 420 at 27 n.12), they have provided vastly dissimilar proposals for the appropriate ongoing royalty rate.[2] Cisco argues that the 0.64% effective royalty rate that it has already paid for post-verdict sales is more than what Telcordia is reasonably entitled to. (D.I. 434 at 2 n.2.) In contrast, Telcordia proposes an ongoing royalty based on its market rates of 3.5% for both patents until February 4, 2008 -- the expiration of the '763 patent -- and 2% thereafter until October 30, 2012 -- the expiration of the '633 patent. (D.I. 435 at 2.) As such, Telcordia seeks $20,592,108 for total damages and interest. The difference in the parties' positions amounts to roughly $8.9 million.[3] (D.I. 434 at 2; D.I. 435 at 2 n.2, Exs. B, C.)

---

[1] Chief Judge Rader suggests that possible ongoing royalty considerations include "potential changes in the market or other circumstances that might affect the royalty rate reaching into the future." *Paice II*, 504 F.3d at 1317 (Rader, C.J., concurring). In contrast, the *Amado II* Court provided five nonexclusive factors to establish a royalty rate when the infringing sales were subject to an injunction: (1) the infringer's likelihood of successful appeal; (2) the ability of the infringer to immediately comply with the injunction; (3) the parties' reasonable expectations that the stay was entered by consent or stipulation; the evidence and arguments found material to granting (4) the permanent injunction, and (5) the stay pending appeal. *Amado II*, 517 F.3d at 1362. But the *Amado II* factors "may not directly apply in an ongoing royalty situation." *ActiveVideo II*, 649 F.3d. at 1343.

[2] The court notes that at trial, Cisco's damages expert proposed a royalty rate of 0.5% for the '763 patent and 1% for the '633 patent, (D.I. 392 at 30), while Telcordia's damages expert proposed a 2% royalty rate for each of the respective patents, (D.I. 404 at 3).

[3] Excluding post-judgment interest, the difference between the parties' proposals is approximately $7.9 million. Using post-verdict infringing products sales revenue of $278,022,486, Telcordia's proposal seeks $9,684,119 in damages for post-verdict infringement, while Cisco's proposed rate equates to $1,779,344. (*See* D.I. 435, Exs. B, C.)

4

Telcordia focuses exclusively on Cisco's optical networking system ("ONS") products found to infringe Telcordia's '763 patent.[4] It argues that the '763 patent ongoing royalty period -- between the May 2007 Judgment and the expiration of the '763 patent -- represented a key strategic timeframe for Cisco's ONS products from a revenue and product-positioning perspective. (D.I. 435 at 3.) During that timeframe, Telcordia contends that the market for Cisco's ONS products had matured and Cisco enjoyed an upward revenue trend -- more than doubling the sales volumes it experienced three to four years earlier.[5] (*Id.* at 6.) Telcordia further asserts that Cisco would not have been willing or able to pull the ONS products from the market just when demand was rapidly increasing, because that would have disrupted Cisco's relationships with strategically important customers, such as, Time Warner, Comcast, and Amazon.com, who relied on the ONS products. (*Id.* at 7.) Finally, Telcordia argues that Cisco's decision to continue willfully infringing despite the specter of an ongoing royalty illustrates that it did not have a redesign, or any other practical strategy, to capitalize on the ONS product line without using Telcordia's '763 patent. (*Id.*) Therefore, Telcordia argues its market rates are the appropriate rate for the ongoing royalty because its bargaining position is strengthened by victory at trial, and market conditions evolved in a way that greatly enhanced the value of a license to the '763 patent. (*Id.* at 6-7.)

In contrast, Cisco argues that the post-verdict landscape provides little bargaining power for Telcordia to negotiate a rate exceeding the jury's effective royalty rate. At the time of the

---

[4] Telcordia explains that, unlike the '633 patent, there was no dispute at trial as to the technical scope of the products (*e.g.*, chip vs. "board" vs. product) included in the royalty base for the '763 patent. Additionally, due to sales volumes, the ongoing royalty for the '633 patent is far less consequential than the '763 patent. (D.I. 435 at 2 n.3; *see also* Note 6, *infra* (discussing relative royalty base for the patents-in-suit).)

[5] Telcordia provided revenue attributed to Cisco's ONS products by year, in millions of dollars: 2003 - $158; 2004 - $195; 2005 - $239; 2006 - $311; 2007 - $351; 2008 (through February 4, 2008) - $35. (D.I. 435 at 3.)

5

verdict, the '763 patent, which represents the vast majority of post-verdict sales,[6] had less than

nine months before expiration. (D.I. 434 at 4.) Rather than paying the "exorbitant 3.5%

royalty," Cisco contends it could have deferred sales of the accused product, advised its

customers not to deploy the systems until after the patent expired, or disabled the accused

functionality during the short period until the '763 patent expired. (*Id.*) Cisco argues those

options were possible because Telcordia only asserted method claims that required the products

to be deployed in a very particular way in a customer's network,[7] (*id.*), and the accused

functionality is only one of many types of available network protection schemes, (*id.* at 5).

Cisco similarly argues it could have designed around or avoided infringement of the '633 patent

at minimal cost because it already provided noninfringing alternatives and had begun to phase

out the only card that practiced '633 patent while Telcordia's motion for injunctive relief was

pending. (*Id.* at 4-5.) Cisco thus argues that the balance of those factors outweighs any impact

the infringement finding may have had on Telcordia's bargaining power. (*Id.* at 5.)

In addition, Cisco argues that Telcordia does not have an established "market rate"

remotely close to what it is seeking from Cisco, and that Telcordia's own post-verdict licenses

confirm that it should not receive more than the jury's effective royalty rate. (D.I. 434 at 5.)

Cisco highlights license agreements where two of its competitors in the optical networking

market made lump-sum payments roughly equivalent to the jury's 0.64% effective royalty rate.

---

[6] The submitted financial documentation demonstrates the disparity between the '763 and '633
royalty bases. In the two full fiscal quarters after the verdict, but before the '763 patent expired, Cisco
sold an average of $96.6 million of infringing products. In contrast, the two full quarters attributed only to
the '633 patent averaged $226,000 in sales. (D.I. 435, Ex. B.)

[7] Cisco argues many of the post-verdict sales would not infringe because the products would not
be in use until after the '763 patent expired. (D.I. 434 at 4.) Cisco explains that the products could not
infringe until they were put into service and configured to use the accused functionality, which would not
happen immediately due to the complexity of the accused products and the customer networks into which
they are incorporated.

(*Id.* at 6.) Telcordia, on the other hand, argues that even though it did not achieve its market rates in recent license agreements, there is widespread industry interest in lawfully licensing its patents, and it was willing to negotiate a lower rate because the voluntary licensees did not force Telcordia to endure protracted, disruptive, and expensive litigation. (*Id.* at 6 n.7.) "Cisco, by contrast, is an adjudicated willful infringer that . . . forced Telcordia into eight-year long litigation, continuing to willfully infringe even after judgment." (*Id.*) Therefore, Telcordia argues the court would not serve the interests of justice by affording Cisco an ongoing royalty under the same favorable licensing terms as Telcordia's voluntary licensees. (*Id.*)

As a starting point, Telcordia -- the victor at trial and on appeal -- is now in a stronger bargaining position. *See ActiveVideo II*, 649 F.3d at 1343. Quite simply, "[f]ail[ure] to consider the parties' changed legal status would create an incentive for every defendant to fight each patent infringement case to the bitter end because without consideration of the changed legal status, there is essentially no downside to losing." *Paice LLC v. Toyota Motor Corp. (Paice III)*, 609 F. Supp. 2d 620, 628 (E.D. Tex. 2009). For that reason, courts frequently impose a post-verdict ongoing royalty rate that is higher than the reasonable royalty found at trial for past infringement.[8] However, the court must assess an ongoing royalty in light of relevant post-

---

[8] *See, e.g., Boston Scientific Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 276 (D. Del. 2012) (2.95% jury royalty rate; 32% ongoing royalty rate (plaintiff requested 32%) imposed to account for reasonable royalty and lost profits where the defendant was an adjudicated willful infringer and direct competitor in the medical field; permanent injunction appropriate but not issued for public policy reasons; enhanced damages had been awarded; and plaintiff prevailed at trial, on appeal, and during reexamination); *Paice III*, 609 F. Supp. 2d at 630-31 ($25 per vehicle effective jury award; $98 ongoing award (plaintiff requested $130 -- 2% of hybrid powertrain) in consideration of: the defendant's continued, voluntary, and willful infringement; defendant's profit margin; and the impact of ongoing royalty on plaintiff's ability to further license the patented technology); *Creative Internet Adver. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009) (20% jury rate; 23% ongoing royalty (plaintiff requested 23%) based on defendant's decision not to design around, or otherwise stop infringing); *I/P Engine, Inc. v. AOL Inc.*, C.A. No. 11-512, 2014 U.S. Dist. LEXIS, at *13-15 (E.D. Va., Jan. 28, 2014) (3.5% jury rate; 4.6% ongoing royalty (plaintiff requested 5%) because the defendants were adjudicated infringers who made substantial investments in the interim to improve the infringing product); *Morpho*

verdict economic circumstances. *See Paice*, 504 F.3d at 1315.

Given the vast disparity between the royalty bases for the respective patents, the court finds that a market license would contain separate royalty rates for the '633 and '763 patents. *See* Note 6, *supra*; *see also Bard*, 2010 U.S. Dist. LEXIS 144259 at *24-25 (finding free-market license between the parties would separate royalty rates due to different market considerations for the accused products). Indeed, Telcordia's Term Sheet identifies different running royalties on sales of specifically defined products where the '633 and '763 patents are licensed individually (2% and 3%, respectively), but simply caps the running royalty to 3.5% "[w]here any two but not three" of the Telcordia patents are licensed. (D.I. 435, Ex. A.) The court finds further support for its view in the parties' own damages experts' proposals for separate royalty rates for the respective patents. *See* Note 2, *supra*.

With that prologue, the court finds that Telcordia is in a stronger bargaining position with respect to the '763 patent, but not strong enough to achieve a full 3% "market rate" ongoing royalty. The relatively short nine-month patent life and post-verdict licenses to Cisco's competitors at effective rates well below 1% undermines Telcordia's bargaining position.

---

*Detection, Inc. v. Smiths Detection, Inc.*, C.A. No. 2:11-498, U.S. Dist. LEXIS 150376, at *26-30 (E.D. Va. Oct. 17, 2013) ($7,500 reasonable royalty for each pre-verdict sale; court imposed a 25% increase -- $9,375 per sale ongoing royalty (plaintiff requested between $7,500 and $11,000) because the plaintiff was in a far superior bargaining position; the defendant did not commence design around until after jury returned a verdict of validity and infringement; and post-verdict sales amounted to willful infringement of a valid patent); *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. C10-5870, 2013 U.S. Dist. LEXIS 85781, at *6-8 (W.D. Wash., June 18, 2013) (6% jury rate for past infringement; court imposed 8% royalty rate for willful ongoing infringement (plaintiff requested 9%) based on plaintiff's stronger bargaining position due to decisive jury verdict in its favor; and defendant lacked alternatives to infringing product); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, C.A. No. 03-597, 2010 U.S. Dist. LEXIS 144259, at *25-28 (D. Ariz., Sept. 9, 2010) (10% jury rate for all products; court imposed 20% ongoing royalty for directly competing products in older established market (plaintiff requested 35%) and 15% ongoing royalty for noncompeting products in recently developed market (plaintiff requested 20%) because the defendant chose to continue post-verdict infringement unabated; permanent injunction not issued due to potential health consequences; and court had awarded enhanced damages and attorney fees), *aff'd*, 670 F.3d 1171 (Fed. Cir. 2012).

8

However, the court is not completely convinced by Cisco's arguments that it could have avoided infringement during the nine-month timeframe by deferring sales or disabling the accused functionality because it did not provide any evidence that it actually implemented those measures. As such, Cisco willfully infringed for the duration of the '763 patent life. Further, the court agrees with Telcordia that the interests of justice would not be served if Cisco was afforded an ongoing royalty under the same favorable terms as a voluntary licensee. Therefore, the court finds that an ongoing royalty of 1.25% for the '763 patent reflects the value of the patent relative to the maturing market, the strategic value of Cisco's ONS products, and the appropriate premium for Cisco's continued willful infringement over Telcordia's voluntary licensees.

Similarly, the court finds that Telcordia's bargaining power for the '633 patent would have improved. But Cisco's proactive measures to reduce and/or eliminate infringement, the contested royalty base, and Telcordia's post-verdict licenses counsel away from a full 2% "market rate" ongoing royalty. Therefore, the court finds that an ongoing royalty of 1% for the '633 patent is appropriate under the given circumstances.

## V.    CONCLUSION

For the reasons stated above, the court finds that the appropriate ongoing royalty rate is 1.25% for Cisco products that infringe the '763 patent and 1% for Cisco products that infringe the '663 patent.

Dated: April 14, 2014

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-876-GMS |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

At Wilmington, this 14th day of April, 2014,

IT IS HEREBY ORDERED THAT:

1. A 1.25% ongoing royalty rate applies to sales of Cisco Systems, Inc. ("Cisco") products that infringe U.S. Patent No. 4,835,763 (the "'763 patent").

2. A 1% ongoing royalty rate applies to sales of Cisco products that infringe U.S. Patent No. RE 36,633 (the "'633 patent").

3. Within ten (10) days of this order the parties shall provide the court a damages calculation for post-verdict sales of infringing products based on the respective '763 and '633 patent ongoing royalty rates. The damages calculation shall conform with the parties' previous proposals, (D.I. 434, Exs. 2, 3; D.I. 435, Exs. B, C), however, the sales of infringing products for the timeframe after May 16, 2007 through February 4, 2008 -- the expiration of the '763 patent -- must differentiate between sales of products attributable to the '763 and '633 patents. The damages for post-verdict infringement of the '633 patent shall be based on actual, not estimated, sales of infringing products through October 30, 2012. Cisco shall receive credit for its past payment based on an

effective 0.64% royalty rate.   In the absence of an agreement, the parties shall simultaneously file competing proposals of no more than five (5) pages.

CHIEF, UNITED STATES DISTRICT JUDGE